ORAL ARGUMENT SCHEDULED FOR FEBRUARY 5, 2026

No. 25-5209

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

MENNONITE CHURCH USA, et al.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,
*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Columbia,
No. 25-cv-00403 (Dabney Friedrich, District Judge)

**PLAINTIFFS-APPELLANTS' REPLY BRIEF**

Kelsi Brown Corkran
Shelby B. Calambokidis
Julia Gegenheimer
Alexandra Lichtenstein
Kate Talmor
INSTITUTE FOR
CONSTITUTIONAL
ADVOCACY & PROTECTION,
GEORGETOWN LAW
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ...................................................................................... vi

ARGUMENT ...................................................................................... 1

I.    The Court Should Reject Defendants' Efforts to Understate Their Change in Policy Regarding Immigration Enforcement Activity at Places of Worship. .......................................................................... 1

II.   Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on Attendance Declines at Their Places of Worship. .......................................... 4

      A.    The Magnitude of Plaintiffs' Attendance Declines is Irrelevant to Standing. ...................................................................................5

      B.    Plaintiffs' Attendance Declines are Fairly Traceable to the Rescission. ...................................................................................10

      C.    Plaintiffs' Attendance Declines are Redressable by Injunctive Relief. ...................................................................................199

III.  Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on the Imminent Risk of Immigration Enforcement Action at or Near Their Places of Worship. .............................................................. 20

      A.    The District Court Applied the Wrong Legal Standard in Assessing Imminence. ...........................................................................20

      B.    Plaintiffs Have Demonstrated an Imminent Threat of Immigration Enforcement Activity at or Near Their Places of Worship. ...................................................................................23

IV.   Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on Their Conscience Injuries and Their Security Costs Necessitated by the Rescission. .............................................................................. 25

i

CONCLUSION ................................................................................................. 26

CERTIFICATE OF COMPLIANCE ....................................................................... A1

CERTIFICATE OF SERVICE ............................................................................. A2

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Act Now to Stop War and End Racism Coal. v. District of Columbia*, 589 F.3d 433 (D.C. Cir. 2009) ...............................................................21

*Am. Library Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005) ................................ 4, 23

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .....................................9

*Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284 (D.D.C. 2020) ..........9

*Center for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) ................22

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...............................................23

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019)............................. 15, 16, 17

*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) .......... 9, 10, 14, 17, 18, 19

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)................................................8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012)...............................................................................................26

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ...................................24

*N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126 (D.C. Cir. 2015) ................21

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997).............................22

*Orangeburg v. FERC*, 862 F.3d 10 (D.C. Cir. 2017) .............................................18

*Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009) ........................ 20, 22

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007).............................22

iii

*Pub. Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989) ............................................10

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................7

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ................... 7, 10

*Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) ..................................... 21, 22

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022)..........................................................10

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)................................. 21, 23

*TransUnion LLC v. Ramirez*, 519 U.S. 413 (2021) ................................................5, 7

*U.S. Telecom. Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).................................21

*United States v. Students Challenging Regul. Agency Procs.*,
412 U.S. 669 (1973)...............................................................................................10

*Walden v. Kosinski*, 153 F.4th 118 (2d Cir. 2025) ...................................................17

*Warth v. Seldin*, 422 U.S. 490 (1975).......................................................................23

*Widmar v. Vincent*, 454 U.S. 263 (1981)....................................................................8

## Other Authorities

Nick Miroff & Maria Sacchetti, *Trump Officials Haven't Decided on Post-
Inauguration Chicago Raids, Homan Says*, Wash. Post (Jan. 18, 2025),
https://perma.cc/D7AZ-P5WK................................................................................11

Camilo Montoya-Galvez, *Trump Officials Revoke Biden Policy that Barred ICE
Arrests Near "Sensitive Locations" Like Schools and Churches*, CBS News (Jan.
21, 2025), https://perma.cc/U7WB-6BE4 ..............................................................11

Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already
Securing Our Border and Deporting Criminal Aliens (Jan. 26, 2025),
https://perma.cc/EG9L-UPKR ........................................................................ 2, 11

Press Release, DHS, Statement from a DHS Spokesperson on Directives
    Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole
    (Jan. 21, 2025), https://perma.cc/5TFV-ZSKP ........................................ 1, 2, 11

Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting
    ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025),
    https://perma.cc/QLZ9-AGCJ ................................................................11

Br. of the United States as Amicus Curiae, *First Choice Women's Resource Center
    v. Platkin*, No. 24-781 (U.S. Aug. 28, 2025) ......................................10

Ximena Bustillo & Sergio Martínez-Beltrán, *Trump Administration Strips Schools,
    Churches of Immigration Enforcement Protections*, NPR (Jan. 21, 2025),
    https://perma.cc/E46W-F8LR ................................................................11

**GLOSSARY**

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| DHS | U.S. Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| RFRA | Religious Freedom Restoration Act |
| USCCB | U.S. Conference of Catholic Bishops |

## ARGUMENT

As Plaintiffs' opening brief demonstrates, Plaintiffs are suffering numerous concrete harms—attendance declines, an imminent threat of enforcement action, conscience injuries, and security costs—that are fairly traceable to Defendants' rescission of the sensitive locations policy and that are at least partially redressable by a preliminary injunction reinstating that policy. Defendants' contrary arguments should be rejected as unsupported by the record and foreclosed by controlling precedent.

I.    **The Court Should Reject Defendants' Efforts to Understate Their Change in Policy Regarding Immigration Enforcement Activity at Places of Worship.**

Many of Defendants' arguments turn on their characterization of the Rescission Memo as effecting only "limited changes" in "the internal guidelines" for immigration enforcement activity at places of worship. Defs.' Br. 36. Defendants' own press releases confirm, however, that the rescission represented a significant change in policy. The rescission, DHS Acting Secretary Benjamine Huffman announced, "empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens" who "will no longer be able to hide in America's schools and churches to avoid arrest."[1] Huffman further

---

[1] *See* Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan.

*Continued on next page.*

1

explained that the Trump Administration rescinded the sensitive locations policy because it "tie[d] the hands of our brave law enforcement," while the Administration's new policy "instead trusts them to use common sense."[2]  In other words, Defendants viewed the sensitive locations policy as interfering with CBP and ICE enforcement actions, permitting undocumented noncitizens to "hide" in churches, and tying the hands of ICE and CBP officers in conducting enforcement activity at places of worship—none of which would be true under the new enforcement policy announced in the Rescission Memo.  DHS's website features a news article confirming that ICE agents also understood the rescission "to free them up to go after more illegal immigrants."[3]

Whatever the merits of Defendants' opinion of the sensitive locations policy, Defendants' contemporaneous statements confirm that they understood the rescission to be a sea change in immigration enforcement, as it was.  As detailed in Plaintiffs' opening brief, Pls.' Br. 42-45, the 2021 Memo required immigration agents to scrupulously avoid "at all times" enforcement or surveillance "in or near a protected area" except where a set of highly circumscribed exceptions applied,

21, 2025), https://perma.cc/5TFV-ZSKP [hereinafter DHS Press Release on Directives Expanding Law Enforcement].
[2] *Id.*
[3] Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens (Jan. 26, 2025), https://perma.cc/EG9L-UPKR [hereinafter DHS Press Release on Promises Made, Promises Kept].

2

and to seek *Headquarters*-level approval where such exceptions might apply, absent exigent circumstances. App. 131-33. In stark contrast, the Rescission Memo rejects any "bright line rules" and delegates to agents the "discretion" to use their own "common sense" in deciding whether to undertake activity in or near places of worship. App. 128. This is not merely a shift of responsibility to "a different supervisor," Defs.' Br. 37—under the new "common sense" policy, agents have repeatedly staged enforcement operations in church parking lots; entered a church preschool to find a staff member; arrested individuals in the parking lots or immediate vicinities of churches and synagogues; refused to leave when requested by a pastor to vacate the premises and, in one instance, "dr[ew] a firearm" on a pastor; and arrested an elderly man who had just dropped his granddaughter at a church school. *See* Pls.' Br. 19-21.[4]

Defendants emphasize that the Rescission Memo does not explicitly designate places of worship as "high priority locations" or direct ICE and CBP officers to target them, Defs.' Br. 36, 44, but it is easy to put two and two together: The Administration has pledged to deport *all* removable noncitizens by the end of

---

[4] Defendants dismiss one of these examples as "suggest[ing] enforcement occurred incidentally at a place of worship—not that the place of worship was targeted for enforcement," Defs.' Br. 42, because the person arrested on church grounds was not a member. Even if true, that is irrelevant; restrictions on enforcement activity on church property under the sensitive locations policy did not turn on whether the church or its members were themselves under target. *See* App. 132.

President Trump's term, App. 028, and Defendants have communicated to their agents and to the public that they rescinded the sensitive locations policy to "empower" ICE and CBP officers to effectuate that goal by conducting enforcement activity at "schools and churches," *infra* pp. 14-15.

Finally, Defendants assert that Plaintiffs' declarations demonstrate that, even under the sensitive locations policy, "immigration enforcement actions and surveillance occurred at Plaintiffs' churches and synagogues." Defs.' Br. 45. But only two of Defendants' examples, App. 169, 375, actually involved enforcement activity at a place of worship. A few incidents *over three decades* of sensitive locations restrictions fall far short of demonstrating that "the tempo of enforcement in or near worship places has, at most, barely increased." Defs.' Br. 45.

## II. Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on Attendance Declines at Their Places of Worship.

As a preliminary matter, Defendants note that attendance declines are not mentioned by all 66 declarants. Defs.' Br. 15. It is well established, however, that associational standing requires only that "at least one [association] member … has standing to sue in its own right." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005).[5] And while Defendants are certainly correct that "standing is not

---

[5] Plaintiffs do not know why the district court characterized Plaintiffs' attendance declines as an organizational injury and the imminent risk of enforcement action as an associational injury. *See* App. 114. Plaintiffs have never made this distinction,

*Continued on next page.*

dispensed in gross," Defs.' Br. 32 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)), it is equally true that standing is not denied in gross: Any Plaintiff that establishes its own standing may obtain preliminary injunctive relief without regard to the standing of other Plaintiffs, as Defendants acknowledge. *See* Defs.' Br. 65 n.7.

Twenty-six Plaintiffs[6] have standing to obtain preliminary injunctive relief based on declarations establishing it is likely that at least one of their congregations has been concretely injured by attendance declines that are fairly traceable to the recission of the sensitive locations policy and that are at least partially redressable by an injunction reinstating that policy. Defendants' contrary arguments are meritless.

### A. The Magnitude of Plaintiffs' Attendance Declines is Irrelevant to Standing.

Defendants do not contest the district court's determination that Plaintiffs' congregations experienced "significant" attendance declines in the wake of the sensitive locations policy rescission. App. 117; *see* Pls.' Br. 26 (describing evidence). Nor do Defendants contest that such declines constitute an Article III injury-in-fact. The parties' disagreement is instead over whether a smaller decline

---

but rather assert both associational injuries and organizational injuries for all of their claims.

[6] *See* Defs.' Br. 64-65 (noting that one Plaintiff did not allege attendance declines).

5

would also constitute an injury-in-fact.  *See* Pls.' Br. 27-29; Defs.' Br. 62-63.  This
dispute matters despite Plaintiffs' significant attendance declines because, if a
smaller decline suffices to establish an injury-in-fact, then Article III's traceability
and redressability requirements are satisfied even if only a subset of the absent
congregants stopped attending because of the rescission and would return to their
places of worship if Plaintiffs obtained a preliminary injunction restoring the
sensitive locations policy's enforcement restrictions.  *See* Pls.' Br. 37.

As Plaintiffs' declarations explain, within their religious traditions, the
absence of even a single congregant or ministry participant profoundly injures both
the local congregation and the wider denomination: "[W]hen the *whole* community
cannot gather, the communion of the member is impaired."  App. 234 (emphasis
added).  *See* Pls.' Br. 28-29 (providing other examples); *see also, e.g.*, App. 204
("[W]hen some families are missing the whole congregation suffers."); App. 278
("[T]he fullness of God can only be known through our collective experience."); 
App. 410 ("[O]ur religious mandate [is] to worship in person together … with *all*
members of our community." (emphasis added)).  Accordingly, if at least one of
each Plaintiff's congregants or ministry participants stopped attending in response
to the rescission of the sensitive locations policy and would return if the policy was
restored, traceability and redressability are satisfied.

6

Citing *TransUnion LLC v. Ramirez*, Defendants assert that Plaintiffs' "claim that the loss of a single congregant or participant is inconsistent with their 'religious traditions'" is "nothing more than … an abstract concern" unrelated "to a harm traditionally recognized as providing a basis for a lawsuit in American courts." Defs.' Br. 61-62 (internal quotation marks omitted). *TransUnion* itself, however, forecloses Defendants' argument. There, the Court described "harms specified by the Constitution" as "[c]hief among" traditional Article III injuries, citing both freedom of speech and infringement of religious exercise as examples. *TransUnion*, 519 U.S. at 425; *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020) ("[A]ttending religious services" is "at the very heart" of the "guarantee of religious liberty.").

The injuries underlying Plaintiffs' RFRA claim—i.e., the substantial burdening of their religious exercise through (among other things) chilled participation in their worship and ministry activities—plainly bear a "close relationship," *TransUnion*, 519 U.S. at 424, to the harms recognized by the Free Exercise Clause. *See* App. 092-95. Those injuries also underlie Plaintiffs' expressive association claim, which falls squarely under the First Amendment. *See* App. 095-97; *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (recognizing a "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of

7

grievances, and the exercise of religion"); *Widmar v. Vincent*, 454 U.S. 263, 269 (1981) ("religious worship and discussion" are "forms of speech and association protected by the First Amendment.").

To the extent Defendants contest the sincerity of Plaintiffs' attestations that their communal worship and ministry activities are impaired by the absence of any member of their religious communities, Defendants misstep.  If "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection," *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) (internal quotation marks omitted), then undoubtedly beliefs derived directly from Plaintiffs' religious scripture suffice: "Suppose one of you has a hundred sheep and loses one of them.  Doesn't he leave the ninety-nine in the open country and go after the lost sheep until he finds it?  And when he finds it, he joyfully puts it on his shoulders and goes home.  Then he calls his friends and neighbors together and says, 'Rejoice with me; I have found my lost sheep.'" Luke 15:4-6; *see also* Romans 12:4-5 ("For just as each of us has one body with many members, and these members do not all have the same function, so in Christ we, though many, form one body, and each member belongs to all the others."); Ezekiel 34:12-16 ("As a shepherd examines his flock while he himself is among his scattered sheep, so will I examine my sheep.  I will deliver them from every place where they were scattered on the day of dark clouds. ... The lost I will search

out, the strays I will bring back, the injured I will bind up, and the sick I will

heal….").

Indeed, courts have rejected similar government efforts to minimize "the

theological importance of gathering in person as a full congregation." *Capitol Hill*

*Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 294 (D.D.C. 2020).  "[I]t is not for

[the government] to say that [the Church's] religious beliefs about the need to meet

together as one corporal body 'are mistaken or insubstantial.'"  *Id.* at 295 (third

alteration in original) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682,

725 (2014)).  "It is for the Church, not the [government] or this Court, to define for

itself the meaning of 'not forsaking the assembling of ourselves together.'"  *Id.*

(quoting Hebrews 10:25); *see also id.* (recognizing that the plaintiff church's "faith

requires" "meeting as a *complete* congregation") (emphasis added).

To the extent Defendants mean instead to argue that even sincere spiritual

injury must reach a high magnitude before it becomes cognizable under Article III,

Defendants do not and cannot identify any authority for that proposition.  To the

contrary, the Supreme Court recently reiterated in *Diamond Alternative Energy,*

*LLC v. EPA*, 606 U.S. 100, 114 (2025) (internal quotation marks omitted), that the

loss or recovery of "[e]ven one dollar" suffices to establish Article III standing.

Surely, then, the same is true of the loss or recovery of a person in a body of

religious believers.  Indeed, the Government recently cited *Diamond* for the

9

proposition that "[s]tanding does not depend on the extent of the injury" in a First Amendment challenge.  Br. of the United States as Amicus Curiae at 33, *First Choice Women's Resource Ctr. v. Platkin*, No. 24-781 (U.S. Aug. 28, 2025).  This Court agrees: "[I]t is well established that an injury need not be to economic or other comparably tangible interests, nor need it be 'significant'—an 'identifiable trifle' will do."  *Pub. Citizen v. FTC*, 869 F.2d 1541, 1548 (D.C. Cir. 1989) (citation, internal quotation marks, and brackets omitted) (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)); *see also Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) ("[T]he loss of First Amendment freedoms … unquestionably constitutes irreparable injury" even when "minimal." (quoting *Roman Cath. Diocese*, 592 U.S. at 19)).

## B.    Plaintiffs' Attendance Declines are Fairly Traceable to the Rescission.

Plaintiffs' declarations demonstrate that their attendance declines are likely due at least in part to the policy recission and that the requested injunction would likely lead at least some of their community members to return to worship and ministry activities.  *See* Pls.' Br. 29-33.  That is all Article III requires: Plaintiffs need only show that third-party attendance declines were likely—not certain—to occur as a result of the rescission, *see Diamond Alt. Energy*, 606 U.S. at 117-18, and that "a predictable chain of events … would likely result from judicial relief" that would at least partially redress the declines, *id*. at 121 (internal quotation

10

marks omitted).  In making this showing, Plaintiffs are permitted to rely on

commonsense logic to demonstrate that the declines were a predictable reaction by

congregants and social service participants to the rescission of the sensitive

locations policy.  *See id.* at 115-16, 120-21.

     Defendants' suggestion that Plaintiffs' congregants may not have known

about the rescission, Defs.' Br. 54-55, is both implausible and belied by the record.

DHS extensively publicized the rescission,[7] resulting in widespread media

coverage,[8] and dozens of Plaintiffs' declarations describe congregants' knowledge

of the change in policy and the fear and anxiety it caused.  Many of those

declarations are highly specific.  *See, e.g.*, App. 196-97 (A "Spanish-speaking

congregation … has seen attendance at its worship services fall by half as word

spread … that churches are no longer considered off limits to immigration

authorities."); App. 227 ("[O]ur immigrant neighbors are deterred by DHS's new

---

[7] *See, e.g.*, DHS Press Release on Directives Expanding Law Enforcement, *supra* note 1; DHS Press Release on Promises Made, Promises Kept, *supra* note 3.

[8] *See, e.g.*, Nick Miroff & Maria Sacchetti, *Trump Officials Haven't Decided on Post-Inauguration Chicago Raids, Homan Says*, Wash. Post (Jan. 18, 2025), https://perma.cc/D7AZ-P5WK; Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://perma.cc/QLZ9-AGCJ; Ximena Bustillo & Sergio Martínez-Beltrán, *Trump Administration Strips Schools, Churches of Immigration Enforcement Protections*, NPR (Jan. 21, 2025), https://perma.cc/E46W-F8LR; Camilo Montoya-Galvez, *Trump Officials Revoke Biden Policy that Barred ICE Arrests Near "Sensitive Locations" Like Schools and Churches*, CBS News (Jan. 21, 2025), https://perma.cc/U7WB-6BE4.

policy from visiting our church."); App. 233 ("Since the new policy was adopted, I
have heard from bishops, priests, and laypeople from all over the Church
expressing fear and dismay at the impact that the rescission will have, and in many
instances has already had, on their ministry."); App. 264 ("[T]he people we serve
through our ministries are fearful of enforcement action under DHS's new
policy."); App. 282 ("Many members of our community are experiencing
heightened fear and anxiety as a result of the policy rescission…."); App. 289 ("A
worshiping community in the Midsouth reports a decline in attendance of over half
its families as a result of the new policy."); App. 293 ("Based on feedback from the
leaders of the Spanish-speaking community, the health seminars [that the church
planned to host] were postponed indefinitely due to the new DHS policy."); App.
302 ("Parents are worried about the change in policy and afraid to participate in …
church activities…"); App. 308 ("Because of the fear caused by the change in the
sensitive locations policy, churches are not able to carry out their biblically-
mandated mission …."); App. 359 ("Most congregants have said they are afraid to
come to worship services or to connect with their community ever since the policy
was rescinded."); App. 375 ("As a result of the rescission of the sensitive locations
policy, our congregations are deeply anxious and feel inadequately prepared for
escalating enforcement."); App. 376 ("Several churches in New York City have
already reported a decline in attendance for worship and at social service

12

ministries, directly connected to fear of ICE enforcement under the new policy."); App. 400 ("Our church has already had congregants stop coming to church out of fear of ICE under DHS's new policy."); App. 410 ("One of our Chicago congregations reports that congregants have said that they will stop attending services if the policy remains in place."); App. 461 ("At least one member of our congregation has already stopped attending services because of the sensitive locations policy rescission."); App. 483 ("One member church … has already been told by one member family that they do not feel safe coming to church services under DHS's new policy."); App. 497 ("We are already experiencing a decrease in participation in worship services and other church activities due to fear of enforcement action under DHS's new policy.").  The declarations referencing DHS's "new policy" make clear that they are describing "the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy."  *See, e.g.*, App. 244, 275, 281, 311.

Even declarations referring more generally to declines in attendance that occurred after the policy rescission or to fears of an enforcement action at a house of worship contextualize those impacts in a way that makes clear that their congregants' decision not to attend worship and ministry activities are fairly traceable to the policy rescission.  Concerns about "going to church due to the imminent risk of an ICE raid or enforcement action," App. 395, for example, are

clearly traceable to the policy recission, since such enforcement actions were substantially restricted under the prior policy.  *See, e.g.*, App. 293 (families are absent from church activities "due to fear of an ICE raid on our church property"); App. 289 (congregants "are now afraid to attend gatherings at a church building that may be entered by immigration enforcement"); App. 370 ("Attendance at services has declined, and my congregants tell me that the reason is that they fear that [ICE or CBP] will target our church."); *see also, e.g.*, App. 196, 203, 207, 226-27, 254, 259, 270, 350, 385-86, 487-88.

The district court accordingly did not question whether congregants were *aware* of the rescission, but rather acknowledged that Plaintiffs' declarations attest that "congregations 'have already had congregants stop coming to church out of fear of ICE under DHS's new policy.'"  App. 120 (alteration omitted) (quoting App. 400).

Defendants suggest that "fear that ICE or CBP will target a church could just as plausibly arise from the Administration's decision to engage in enforcement actions across the country."  Defs.' Br. 54 (internal quotation marks omitted).  But as explained above, the sensitive locations policy ensured that ICE and CBP would *not* target places of worship except in the rarest of circumstances.  *See supra* pp. 1-4.  Defendants rescinded the policy because they understood it to "tie the hands" of ICE and CBP officers, whereas Defendants wanted to "empower" ICE and CBP to

14

undertake enforcement activity at places of worship unfettered by sensitive locations restrictions. *Id.* It was surely "commonsense" and "predictable," *Diamond Alt. Energy*, 606 U.S. at 120-21, that Plaintiffs' congregants and ministry participants would take Defendants' word on this. *See id.* at 116 ("When third party behavior is predictable, commonsense inferences may be drawn."); *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) ("Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties.").

Although a few declarants observe that some congregants have expressed fear about leaving their homes generally since the Administration began its broader immigration crackdown, most refer to congregants "staying home" specifically from worship and social service ministries since the rescission, *see* App. 185, 234, 307, 360, 421, 468, which is a far cry from "refusing to go out in public" altogether, Defs.' Br. 61. And none of Plaintiffs' declarations can fairly be read as suggesting that *all* of Plaintiffs' absent congregants and ministry participants would stay away from their places of worship regardless of the sensitive locations policy rescission. Indeed, it would defy "basic logic," Defs.' Br. 61, to jump to that conclusion given the substantial attestations to the contrary, *supra* pp. 11-13; Pls.' Br. 31-33, and the profound hardships of being separated from one's faith

15

community and social service lifelines, *see* App. 204 ("Church is considered like a second home to our families"; App. 301-02 ("As a predominantly immigrant worshiping community, many of our members are far from home and have created a second family with those with whom they worship."); App. 330 (Missing "the historical orthodox Christian practice of sharing in the body and blood of Jesus … will cause tremendous disorientation."); App. 234-35 (Without access to social service ministries, "people will go hungry, will forgo meetings that help them maintain sobriety, will do without free health checks, will miss ESL or citizenship classes, will not use childcare services that would enable them to work, and will suffer social isolation."); App. 298 ("Community members will lose access to helpful, life-sustaining food.  They will lose access to clothing.  They will lose access to ESL classes and other educational opportunities.").

Finally, Defendants assert that Plaintiffs' attendance declines are not attributable to the rescission because they arise from "congregants' subjective perception of the risk of immigration enforcement" at their places of worship, which Defendants claim is unjustified.  Defs.' Br. 55 (internal quotation marks omitted).  This argument mistakenly conflates the imminence requirement for standing based on *future* injuries resulting from immigration enforcement at Plaintiffs' places of worship, *see* Pls.' Br. 47, with the predictability requirement for standing based on present injuries arising from third-party responses to the

16

rescission, *see id.* at 30.  In *Department of Commerce v. New York*, the Supreme Court squarely rejected the government's assertion that the third-party conduct at issue—noncitizens declining to respond to the decennial census—was not fairly traceable to the reinstatement of a citizenship question because the noncitizens' fears about the consequences of answering that question were "unfounded."  588 U.S. at 767.  The Court explained that the standing inquiry was not whether the noncitizens' fears were speculative, but whether their refusal to participate in the census was a "predictable effect" of the reinstatement.  *Id.* at 768.

Here, too:  When Defendants announced that they were rescinding the sensitive locations policy so that ICE and CBP officers could freely engage in enforcement activity at places of worship, a predictable effect was that some of Plaintiffs' immigrant congregants and ministry participants would fear that such enforcement activity would occur at their places of worship and stop attending. That is all traceability requires.

Defendants argue otherwise by portraying the Supreme Court's recent decision in *Diamond Alternative Energy* as narrowly limited to consideration of "commonsense economic realities" and "basic economic logic."  Defs.' Br. 59-60. Defendants offer no cogent reason, however, for why the Court's holding that "commonsense inferences [may] be drawn" from "predictable" "third party behavior" must be restricted to economic injuries.  *Diamond Alt. Energy*, 606 U.S.

17

at 116.  To the contrary, in the few months since *Diamond* issued, the Second

Circuit already has applied it to consider "commonsense inferences" in a free

speech challenge to an election regulation.  *See Walden v. Kosinski*, 153 F.4th 118,

131 (2d Cir. 2025).

More importantly, Plaintiffs do not—as Defendants insist—rely on

commonsense inferences "to fill evidentiary gaps."  Defs.' Br. 59.  As detailed in

Plaintiffs' opening brief and above, the record contains copious sworn statements

tying Plaintiffs' attendance declines to the rescission of the sensitive locations

policy.  *See* Pls.' Br. 31-33; *supra* pp. 11-13.  Commonsense inferences about the

predictable reaction of immigrant congregants and ministry participants to the

rescission—i.e., avoiding places of worship—simply bolsters that evidence.

Acceptance of straightforward logical inferences does not require the Court

to "assume[]" that the rescission was "the only change relating to immigration

enforcement this Administration has made," *contra* Defs.' Br. 60, or to ignore the

potential impact of the general climate of fear the Administration has cultivated,

because Article III does not require that the rescission be the *only* cause of their

injuries.  *See Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017); Pls.'

Br. 36.

**C.    Plaintiffs' Attendance Declines are Redressable by Injunctive Relief.**

Redressability requires only a showing that judicial relief "would likely redress at least some of [Plaintiffs'] injuries." *Diamond Alt. Energy*, 606 U.S. at 114; *see* Pls.' Br. 37-38.  Plaintiffs' declarations, which are reinforced by common sense, establish it is likely that at least some of Plaintiffs' absent congregants and ministry participants will return to their places of worship if Plaintiffs obtain a preliminary injunction reinstating the sensitive locations policy.  *See generally* Pls.' Br. 25-45.

Defendants note that Plaintiffs have preserved an argument that they are further entitled to an injunction of the 2021 policy's exception for certain actions with headquarters-level approval because that exception does not survive scrutiny under RFRA and the First Amendment, Defs.' Br. 58, which require Defendants to utilize the least (or significantly less) restrictive means to further any interest they have in conducting immigration enforcement at Plaintiffs' places of worship.  *See* Pls.' Br. 13.  That argument plainly is not, as Defendants suggest, Defs.' Br. 59, an admission that an injunction reinstating the sensitive locations policy would not likely redress their attendance declines at least partially, which is all that redressability requires.  *See* Pls.' Br. 37-38.  As Plaintiffs have maintained throughout this litigation, the 2021 sensitive locations policy certainly provided some meaningful limitations on the unchecked enforcement authorized by the

19

Rescission Memo, and Plaintiffs' attendance declines are both fairly traceable to

the rescission and redressable by a reinstatement of the prior policy. *See* Pls.' Br.

31-33.

### III. Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on the Imminent Risk of Immigration Enforcement Action at or Near Their Places of Worship.

In arguing that Plaintiffs lack standing based on the imminent risk of

immigration enforcement activity at or near their places of worship, Defendants

urge the Court to apply an incorrect legal standard for preenforcement standing and

to disregard evidence that ICE and CBP have conducted, and will continue to

conduct, enforcement activity at and near Plaintiffs' places of worship. The Court

should decline to compound the errors of the district court below.

### A. The District Court Applied the Wrong Legal Standard in Assessing Imminence.

Plaintiffs' opening brief explains that, in assessing their standing to

challenge future immigration enforcement at their places of worship, the district

court improperly relied on a "singled out for prosecution" test that this Court

applies to preenforcement challenges to firearms statutes. *See Ord v. District of*

*Columbia*, 587 F.3d 1136, 1141 (D.C. Cir. 2009) (internal quotation marks

omitted); Pls.' Br. 47-50. Defendants barely engage with Plaintiffs' argument on

this point; they simply assert that the test is "consistent with" standing law and is

"thus wholly appropriate" in this case. Defs' Br. 48. Remarkably, Defendants

offer no response at all to this Court's precedent expressly cabining application of that heightened standard to "non-First Amendment preenforcement challenge[s]." *Seegars v. Gonzales*, 396 F.3d 1248, 1253-54 (D.C. Cir. 2005); Pls.' Br. 48.

Where, as here, expressive rights are concerned, standing requires only "'a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law.'" *Act Now to Stop War and End Racism Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) (quoting *Seegars*, 396 F.3d at 1253). This standard reflects the "special solicitude" given to First Amendment claims in preenforcement challenges. *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135 (D.C. Cir. 2015); *U.S. Telecom. Ass'n v. FCC*, 825 F.3d 674, 740 (D.C. Cir. 2016). Plaintiffs in such cases show, by meeting this standard, that injury is "certainly impending" *or* that there is "a 'substantial risk' that the harm will occur," thereby establishing a cognizable injury-in-fact. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal citation omitted); *see also id.* at 160 (these injury-in-fact requirements can be satisfied through allegations of "actual and well-founded fear[s]" of enforcement) (internal citation omitted).

Defendants argue that this test is an "ill fit" because its previous applications include challenges to "statutes and regulations proscribing or mandating certain action by the challengers." Defs.' Br. 47. But this is also true for Defendants'

preferred "singled out for prosecution" test, just largely in the Second Amendment context instead. *Ord*, for example, involved a plaintiff's Second Amendment challenge to a criminal firearms statute to enjoin its enforcement against him. *See* 587 F.3d at 1142; Defs.' Br. 48 (relying on *Ord*); App. 115 (same). Other seminal cases applying this standard—*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997); *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005); and *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)—similarly involve Second Amendment challenges to criminal firearms laws that applied directly to the plaintiffs' conduct. Defendants offer no explanation for how that test could be a better fit than one that actually applies to First Amendment challenges.

The additional caselaw Defendants cite merely reiterates a basic precept of standing that Plaintiffs do not contest: Harm must be non-speculative to constitute an injury-in-fact. *See* Defs.' Br. 34-35, 48. None support the district court's application of the "singled out for prosecution" test to Plaintiffs' First Amendment and RFRA claims.

Finally, Defendants simply misunderstand associational standing when they assert that it is foreclosed here because "'the participation of individual members in the lawsuit' would be necessary to determine whether a threat of enforcement as to them is imminent." Defs.' Br. 49 (quoting *Center for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015)). The language Defendants quote

22

refers to the *merits* of individual members' claims, not to their individual standing: An "association may be an appropriate representative of its members" "so long as *the nature of the claim and of the relief sought* does not make the individual participation of each injured party indispensable to the proper resolution of the cause." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added). As noted earlier, *supra* pp. 4-5, it is well established that associational standing requires only that "at least one [association] member … has standing to sue in its own right." *Am. Library Ass'n*, 406 F.3d at 696.

### B. Plaintiffs Have Demonstrated an Imminent Threat of Immigration Enforcement Activity at or Near Their Places of Worship.

For the reasons set forth in Plaintiffs' opening brief, *see* Pls.' Br. 50-55, Plaintiffs' evidence satisfies the correct test for standing in cases involving expressive rights and, in doing so, also meets the fundamental underlying requirement for preenforcement standing: a showing of "substantial risk" that the future injury will occur. *Driehaus*, 573 U.S. at 158; *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

In attempting to discount the incidents of enforcement activity that have already occurred on Plaintiffs' property and at other places of worship, Defendants repeat the district court's error of narrowly focusing on immigration raids inside Plaintiffs' buildings. Defs.' Br. 38-39, 42-43. As Plaintiffs explained in their

23

opening brief, the numerous incidents of ICE and CBP engaging in surveillance and staging enforcement actions in Plaintiffs' parking lots and around the perimeter of their property would be prohibited under the sensitive locations policy. Pls.' Br. 53-54. Evidence of at least six enforcement actions at or near places of worship within the very first month of the rescission thus is not "negligible," Defs.' Br. 41, but rather suggests that ICE and CBP immediately capitalized on their expanded enforcement authority. They continue to do so. *See* Pls.' Br. 19-21. By the very nature of *pre*enforcement standing, Plaintiffs need not await additional injuries in order to seek relief. *Cf. MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) (recognizing that, "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced" (emphasis in original)).

Defendants argue that the likelihood of enforcement activity at any particular church or synagogue nonetheless remains low given the ratio of incidents to the number of congregations Plaintiffs represent. *See* Defs.' Br. 40. But most of those "tens of thousands" of congregations, *id.*, belong to a Plaintiff denomination that is one unified religious body. As the Presiding Bishop of The Episcopal Church explained in his declaration, "[w]e are one church with many congregations: every local expression can exist only within and as part of the

24

unitary church"; accordingly, "an injury to any one … congregation is an injury to the whole diocese and the whole denomination."  App. 229-30.  Whatever the chances of enforcement activity are at any one of the 6,700 Episcopal congregations across the United States, *see* App. 229, the chances that the denomination as a whole will imminently suffer that injury are substantial— indeed, it has already happened.  *See* App. 231 ("ICE recently showed up at a food pantry hosted by a congregation in California to take photographs of people lined up to receive food").  *See also, e.g*., App. 183 (the Christian Church (Disciples of Christ), which "understands itself to be one church with many congregations," consists of over 3,000 congregations); App. 151 (the A.M.E. Zion Church consists of 1,600 congregations); App. 285 (the Presbyterian Church (U.S.A.) consists of nearly 8,500 congregations).

The rest of Defendants' imminence arguments turn on their characterization of the Rescission Memo as effecting only "limited changes" in "the internal guidelines" for immigration enforcement at places of worship.  Defs.' Br. 36. These arguments fail for the reasons identified in Part I.  *See supra* pp. 1-4.

## IV. Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on Their Conscience Injuries and Their Security Costs Necessitated by the Rescission.

Defendants do not dispute that if Plaintiffs face an imminent risk of enforcement at or near their places of worship, their asserted conscience injuries

and security costs establish their standing to obtain preliminary injunctive relief. *See* Defs.' Br. 50-51.  For the reasons Plaintiffs set forth in Parts II and III of their opening brief and in Part III above, Plaintiffs have standing based on these harms. *See* Pls.' Br.  46-61; *supra* pp. 20-25.

As the amicus brief of the U.S. Conference of Catholic Bishops ("USCCB") emphasizes, the district court's disregard of Plaintiffs' conscience injuries is additionally problematic because it effectively amounted to a judicial second-guessing of Plaintiffs' exercise of their pastoral duties "in contexts that are at the heart of Plaintiffs' religious purpose."  USCCB Br. 10.  Plaintiffs' declarations document the conscience injuries they have experienced and related measures they have undertaken "in an attempt to respond to their congregants' real, current fear that being on church property will expose them to immigration enforcement."  *Id.* at 8-9.  As USCCB observes, the district court's assessment of these injuries as too speculative is in significant tension with Plaintiffs' right to be free from "interference with the internal governance of the church."  *Id.* at 9 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012)) (brackets omitted).

## CONCLUSION

For all of the reasons set forth in Plaintiffs' Opening Brief as well as in this Reply Brief, the Court should reverse the district court's standing decision and

remand for further consideration of Plaintiffs' request for preliminary injunctive relief.


Dated: December 22, 2025                Respectfully submitted,

                                        */s/ Kelsi Brown Corkran*
                                        Kelsi Brown Corkran
                                        Shelby B. Calambokidis
                                        Julia Gegenheimer
                                        Alexandra Lichtenstein
                                        Kate Talmor
                                        *Institute for Constitutional*
                                        *Advocacy & Protection,*
                                        *Georgetown Law*
                                        600 New Jersey Avenue, NW
                                        Washington, DC 20001
                                        (202) 661-6728
                                        kbc74@georgetown.edu

                                        *Counsel for Plaintiffs-Appellants*

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a). This brief contains 6,093 words, excluding exempted parts, and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Kelsi Brown Corkran*
Kelsi Brown Corkran

A1

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of Appeals

for the District of Columbia Circuit by using the appellate CM/ECF system.

Participants in the case are registered CM/ECF users, and service will be

accomplished by the appellate CM/ECF system.

*/s/ Kelsi Brown Corkran*
Kelsi Brown Corkran