# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 5, 2026 Decided October 20, 2026

No. 25-5209

MENNONITE CHURCH USA, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00403)

*Kelsi Brown Corkran* argued the cause for appellants. With her on the briefs were *Shelby B. Calambokidis*, *Julia Gegenheimer*, *Alexandra Lichtenstein*, and *Kate Talmor*.

*Tobin Raju* and *David A. Schulz* were on the brief for *amici curiae* Quaker Practices and Beliefs in support of appellants.

*Hyland Hunt* and *Dana Kaersvang* were on the brief for *amici curiae* Fair and Just Prosecution and the Law Enforcement Action Partnership in support of appellants.

*Stephen W. Miller* was on the brief for *amicus curiae* the United States Conference of Catholic Bishops in support of appellants.

*Golnaz Fakhimi*, *Lynn Damiano Pearson*, and *Hilda Bonilla* were on the brief for *amici curiae* 20 Faith-Based, Immigrant Justice, and/or Civil Rights Organizations in support of appellants.

*Michael E. Talent*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brett A. Shumate*, Assistant Attorney General, and *August E. Flentje*, Attorney. *Michael S. Raab*, *Sarah N. Smith*, and *Lowell V. Sturgill, Jr.*, Attorneys, entered appearances.

*Christopher J. Hajec* and *Matt A. Crapo* were on the brief for *amicus curiae* Federation for American Immigration Reform in support of appellees.

Before: WILKINS, RAO, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

Dissenting opinion filed by *Circuit Judge* RAO.

PAN, *Circuit Judge*: For more than thirty years, the U.S. government largely refrained from conducting immigration-enforcement operations at "sensitive locations," including houses of worship. But on January 20, 2025, the Department of Homeland Security (DHS) changed course: DHS announced that immigration officers may use "discretion" and "common sense" to apprehend undocumented immigrants at locations that the government had previously shielded, such as churches, mosques, and synagogues. Immigration and Customs Enforcement (ICE) subsequently implemented that directive with a policy of its own: Supervisory agents may now

approve enforcement operations "at or near" protected places, on a "case by case" basis, with no "bright line rules" to cabin their discretion.

A group of twenty-seven Judeo-Christian organizations sued the government, seeking to protect houses of worship from invasive immigration-enforcement activities. They brought claims under the First Amendment, the Religious Freedom Restoration Act, and the Administrative Procedure Act. The organizations moved for a preliminary injunction that would require the government to revert to its prior, more protective policy, and that would bar immigration agents from conducting enforcement operations at houses of worship in the absence of exigent circumstances or a judicial warrant. The district court denied the motion. It held that plaintiffs likely lacked Article III standing to pursue their claims because some of their asserted injuries were likely not sufficiently imminent, while others were likely not traceable to the government's change in policy or redressable by a reversion to the prior policy. We reverse.

**I.**

**A.**

Congress has tasked DHS with the administration and enforcement of the nation's immigration laws. 8 U.S.C. § 1103(a)(1). The agency enjoys broad enforcement powers, including the authority to investigate suspected violations of immigration laws, to arrest suspected offenders, and to deport certain undocumented immigrants. *Id.* §§ 1225, 1226, 1357. DHS acts through numerous subcomponents, including ICE and Customs and Border Patrol (CBP), which are both empowered to "enforce and administer all immigration laws." 6 U.S.C. § 211(c)(8).

In 1993, the government adopted a "Sensitive Locations Policy," under which it directed immigration authorities to "attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." J.A. 146. That policy remained in place, with relatively minor alterations, for over thirty years.

The most recent version of the Sensitive Locations Policy was adopted in 2021, when then-Secretary of Homeland Security Alejandro Mayorkas sent a memorandum to the acting heads of ICE and CBP entitled "Guidelines for Enforcement Actions in or Near Protected Areas." J.A. 130. The Mayorkas Memo instructed that, "[t]o the fullest extent possible, we should not take an enforcement action in or near a [sensitive] location," such as a "place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place." J.A. 131. It provided that "before taking an enforcement action in or near a protected area," officers "must seek prior approval from their Agency's headquarters, or as [headquarters] otherwise delegate[s]." J.A. 133. Enforcement actions covered by the Memo "include[d], but [were] not limited to, . . . arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.*

The Mayorkas Memo included an "exigent circumstances" exception, which allowed emergency enforcement actions in protected areas in situations involving "national security threat[s]"; "imminent risk of death, violence, or physical harm"; the destruction of criminal evidence; or "hot pursuit of an individual who poses a public safety threat"; as well as when "[a] safe alternative location [did] not exist." J.A. 133. The

Memo instructed agents to "exercise [their] judgment" when deciding whether specific circumstances qualified as exigent. *Id.* Where exigent circumstances precluded prior approval, the Mayorkas Memo instructed that agents promptly report the action to headquarters. In all circumstances, "[t]o the fullest extent possible," any enforcement action at or near a sensitive location had to "be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing" the sensitive location. *Id.*

On January 20, 2025, Acting DHS Secretary Benjamine Huffman issued a memorandum superseding and rescinding the Mayorkas Memo. The Rescission Memo removes the former limits on enforcement activities at sensitive locations. It instead instructs immigration officers to "use [their] discretion along with a healthy dose of common sense" when conducting operations at houses of worship. J.A. 128. The Rescission Memo notes that "[t]he Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

Eleven days later, then-Acting ICE Director Caleb Vitello issued a more detailed policy memo to implement the rescission of the Sensitive Locations Policy. The Vitello Memo disavows "bright line rules" and instructs certain office-level supervisory personnel to make "case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." J.A. 512–13. Under the Vitello Memo, ICE supervisors can "provide authorization for [sensitive-locations] actions either verbally or in writing." J.A. 513.

The rescission of the Mayorkas Memo was part of the Administration's "broader initiative to accelerate immigration enforcement." *Mennonite Church USA v. DHS*, 778 F. Supp. 3d 1, 6 (D.D.C. 2025). In a press release issued on the day after the Rescission Memo was circulated, DHS announced that "criminal aliens" would no longer be able "to hide in America's schools and churches to avoid arrest." J.A. 31 (quoting Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://perma.cc/ZM97-MY89). In a subsequent press release about the rescission of the Sensitive Locations Policy, DHS noted that ICE agents "believe that rescinding the Mayorkas [Memo] is going to free them up to go after more illegal immigrants." J.A. 110–11 (quoting Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens (Jan. 26, 2025), https://perma.cc/9YZA-G9PZ).

**B.**

In response to the government's change in enforcement policy, a coalition of twenty-seven Judeo-Christian organizations sued DHS, CBP, ICE, and the leaders of those three agencies (collectively, the government) in February 2025. Plaintiffs fall into two categories: Sixteen plaintiffs are national or regional denominational bodies, and the remaining eleven plaintiffs are denominational or interdenominational associations. The first category comprises entities like the General Assembly of the Presbyterian Church, U.S.A., and the Union for Reform Judaism — large organizations that serve as centralized hubs for hundreds of congregations with shared faiths, such as Presbyterianism and Reform Judaism. The second category comprises a range of associations, like the Latino Christian National Network and the Rabbinical

Assembly, which provide support for and represent the interests of their member congregations, clergy, and congregants.

Plaintiffs collectively represent the interests of millions of worshippers, including Baptists, Brethren, Catholics, Conservative Jews, Episcopalians, Evangelicals, Mennonites, Quakers, Pentecostals, Presbyterians, Reconstructionist Jews, Reform Jews, Unitarian Universalists, United Methodists, and Zion Methodists. They and their members sponsor a wide variety of religious and social activities and resources, such as worship services, food and clothing pantries, and legal, language, and job-training assistance. In their complaint, every plaintiff alleges that at least one of its member congregations provides support to undocumented immigrants — some of whom are members of the congregations, and others of whom benefit from their charitable work.

Plaintiffs brought three claims before the district court. First, they alleged that the Rescission Memo violates the Religious Freedom Restoration Act, which bars the federal government from "substantially burden[ing] a person's exercise of religion" unless the burden "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b); J.A. 92–95. Second, they asserted that the Memo violates the First Amendment by impinging on their freedom of expressive association. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). And third, they claimed that in promulgating the Rescission Memo, DHS violated the Administrative Procedure Act because it did not "reasonably consider[] the relevant issues and reasonably explain[] the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); J.A. 97–99.

Plaintiffs moved for a preliminary injunction to shield their member congregations from enforcement actions during the pendency of the litigation. They asked the district court: (1) to resurrect the Mayorkas Memo's Sensitive Locations Policy (by staying the Rescission Memo and enjoining the government from effectuating the Rescission Memo), and (2) to bar the government "from carrying out immigration enforcement activities at [p]laintiffs' places of worship or during religious ceremonies, absent exigent circumstances or the existence and planned execution of a judicial warrant." J.A. 106.

Plaintiffs supported their motion with sixty-six exhibits, including at least two declarations per plaintiff. The declarants — leaders and congregants of plaintiffs and their member congregations — established that each plaintiff had "strong reason to believe" that at least one of its member congregations was "at imminent risk of immigration enforcement actions." *E.g.*, J.A. 151. And they attested that members of all but one plaintiff had "experienced declines in attendance at worship services and social service events due to" congregants' fear of increased ICE and CBP enforcement in the wake of the Rescission Memo. Gov't Br. 15. Many of the declarants also cited financial and conscience concerns flowing from the imminent risk of immigration enforcement at their houses of worship.

Plaintiffs and their declarants asserted — and the district court acknowledged — that after the Rescission Memo issued, several specific enforcement actions occurred at or near houses of worship, including (1) a raid at a plaintiff-affiliated church,[1]

[1] *Mennonite Church*, 778 F. Supp. 3d at 6 & n.1; J.A. 507 (North Georgia Conference of the United Methodist Church) ("ICE agents came into the [church] daycare office looking for a staff member who they believed to be undocumented.").

(2) a raid next door to a plaintiff-affiliated church,[2] (3) a raid at a nonplaintiff church,[3] and (4) surveillance at or near three plaintiff-affiliated churches.[4] Plaintiffs' briefs on appeal cite at least six more examples of immigration-enforcement actions at or near houses of worship, but those allegations were not presented to the district court.

Before the district court, plaintiffs articulated four theories of constitutional standing, with each theory relying on a different injury to plaintiffs and their member congregations. First, plaintiffs alleged that they and their affiliated congregations were injured by an imminent threat of immigration enforcement at or near their houses of worship.

---

[2] *Mennonite Church*, 778 F. Supp. 3d at 6 & n.2; J.A. 507 (North Georgia Conference of the United Methodist Church) ("[ICE] conducted another raid next door to another of our churches.").

[3] *Mennonite Church*, 778 F. Supp. 3d at 6 & n.2; J.A. 28 ("[A]n usher standing in the church entrance saw a group of ICE agents outside and locked the door. The agents said that they were there to arrest Wilson Velásquez . . . ."). The media reported on the incident. *See, e.g.*, J.A. 28 n.11 (citing Andy Olsen, *When ICE Comes to Church*, *Christianity Today* (Jan. 31, 2025), https://perma.cc/FPG3-5YNZ).

[4] J.A. 231 (Episcopal Church) ("ICE recently showed up at a food pantry hosted by a congregation in California to take photographs of people lined up to receive food."); J.A. 253 (Episcopal Church) ("We have seen an ICE presence outside some of our churches, and in early February, ICE agents showed up outside the Food Pantry at one of our congregations and took pictures of people who were in line to receive food."); J.A. 336 (Massachusetts Council of Churches) ("Congregants have reported . . . [ICE] surveillance targeting direct service programs such as legal counsel, education, youth ministry, after school care, and food provision."); J.A. 496 (WISDOM) ("[W]e have recently noticed an unknown vehicle repeatedly idling on the edges of our property for 15 to 30 minutes at a time over the course of several days. We suspect ICE is surveilling us again.").

Second, they asserted an injury based on attendance declines at member congregations — *i.e.*, direct harm from having fewer worshippers and social-services recipients. Third, they claimed a conscience injury, asserting that the imminent threat of enforcement created a moral quandary in which they must either encourage congregants to attend services and thus risk deportation, or encourage congregants to skip services and thus contravene their religious beliefs. And fourth, they asserted that they and their affiliated congregations suffered a financial injury from the costs of better security and other measures necessary to respond to the imminent threat of enforcement at their houses of worship.

The district court held that plaintiffs were unlikely to establish standing under any of the four theories and therefore denied their request for a preliminary injunction. *Mennonite Church*, 778 F. Supp. 3d at 13. First, the district court held that alleged harm from the threat of enforcement at plaintiff-affiliated houses of worship likely was not sufficiently imminent. *Id.* at 8–9. Second, it held that even if plaintiffs alleged cognizable attendance declines, those declines likely were neither traceable to the Rescission Memo nor redressable by a return to the Mayorkas Memo's Sensitive Locations Policy. *Id.* at 10–12. And third, it held that because plaintiffs likely did not demonstrate the imminence of harm from enforcement, their conscience and financial claims likely failed. *Id.* at 13.

Plaintiffs challenge all three holdings on appeal. We have jurisdiction under 28 U.S.C. § 1292(a)(1).[5]

---

[5] While this case was under consideration, parallel litigation was ongoing in the Fourth Circuit. *Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-1512, 2026 WL 2409055 (4th Cir. Aug. 18, 2026). The Fourth Circuit decided that case in August,

**II.**

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We "review the district court's decision to [deny] the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022). Because the district court denied the preliminary injunction based solely on its analysis of plaintiffs' standing, we accept, for present purposes, the complaint's well-pleaded factual allegations and plausible legal theories. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

To establish a likelihood of success on the merits, a plaintiff must show a "substantial likelihood" of constitutional standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). The constitutional-standing requirement stems from Article III, which limits federal courts' jurisdiction to actual "Cases" and "Controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate Article III standing, a plaintiff must show that it has suffered an "injury in fact," that is "fairly traceable to the challenged action of the defendant," and that is "likely" to "be redressed by a favorable decision." *Id.* at 560–61 (cleaned up).

Although the district court analyzed and rejected four theories of standing, we only need to determine that one

---

affirming a preliminary injunction requiring DHS to revert to the Mayorkas Memo for enforcement actions at those plaintiffs' houses of worship.

plaintiff likely has standing based on one of those theories for the case to proceed. *See Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). That is "because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Id.*; *see also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 402 n.22 (1982) (explaining that if one plaintiff has standing, the court "possess[es] Art. III jurisdiction to entertain those common issues presented by all plaintiffs"). That said, "standing is not dispensed in gross" — rather, at least one "plaintiff must demonstrate standing for each . . . form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (citations omitted); *cf. Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("The Government's applications to partially stay the preliminary injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue.").

## III.

We focus on plaintiffs' allegations of harm to their members from the imminence of increased enforcement actions, and we hold that all plaintiffs likely have associational standing under that theory to pursue both forms of relief that they seek — *i.e.*, a reversion to the Mayorkas Memo's Sensitive Locations Policy and an order prohibiting the government from conducting enforcement operations at houses of worship in the absence of a judicial warrant or exigent circumstances. We therefore decline to reach plaintiffs' other theories of standing. *See U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 n.4 (D.C. Cir. 2002). In so doing, we do not suggest that plaintiffs do not face harm from their asserted increased financial burdens, decreased attendance, and crises of conscience, or that those other theories of injury are

insufficient. *Cf. Phila. Yearly Meeting of Religious Soc'y of Friends*, 2026 WL 2409055, at *5–6 (holding that plaintiffs had standing based on a theory of injury derived from the decline in attendance at their houses of worship). Nor do we suggest that plaintiffs lack organizational standing to sue in their own right, or associational standing to sue on behalf of their undocumented-immigrant members. Rather, we limit our analysis to one theory of standing out of respect for "the cardinal principle of judicial restraint," which counsels that "if it is not necessary to decide more, it is necessary not to decide more." *Alon Refin. Krotz Springs, Inc. v. EPA*, 172 F.4th 12, 19 n.3 (D.C. Cir. 2026) (cleaned up).

**A.**

The doctrine of associational standing empowers organizations to sue on behalf of their members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). To secure associational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* Here, plaintiffs assert associational standing on behalf of their member congregations that minister to undocumented immigrants. Plaintiffs seek to protect their members' religious exercise and expressive association under the Religious Freedom Restoration Act and the First Amendment, as well as their procedural rights under the Administrative Procedure Act.

Plaintiffs clearly satisfy the second requirement of associational standing: The interests they seek to protect are germane to their shared purpose of "welcom[ing], protect[ing], and car[ing] for . . . exiles and refugees," and "provid[ing]

support and shelter to . . . immigrants regardless of legal status." Opening Br. 5. The government does not argue to the contrary.

Plaintiffs also satisfy the third requirement of associational standing: "[T]he nature of [plaintiffs'] claim[s]" and the nature "of the relief sought" do not "make the individual participation of each injured party indispensable to proper resolution of the cause." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). This requirement stems from prudential concerns about "administrative convenience and efficiency," not from "elements of a case or controversy within the meaning of the Constitution." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). Here, "the nature of [plaintiffs'] claim[s]" — arising under the Religious Freedom Restoration Act, the First Amendment, and the Administrative Procedure Act — does not make "indispensable" the type of individual evidentiary showings that would require the participation of plaintiffs' members. *Warth*, 422 U.S. at 511. Rather, all plaintiffs are similarly situated religious organizations with identical claims of preenforcement injury, and they raise purely "legal questions" on behalf of their member congregations, which a court can resolve without delving into "the individual circumstances of any aggrieved member[s]." *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 508 (D.C. Cir. 2020) (citation omitted). Similarly, "the nature of . . . the relief sought" — enjoining a government policy — does not require the members' individual participation. *Warth*, 422 U.S. at 511. Where, as here, "an association seeks prospective or injunctive relief for its members," "individual participation is not normally necessary." *United Food*, 517 U.S. at 546 (cleaned up).

Thus, our analysis of associational standing turns on whether plaintiffs' congregational members likely "would

otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. Specifically, "[t]he association[s] must allege that [their] members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth*, 422 U.S. at 511.

**B.**

Plaintiffs make a preenforcement claim of injury — *i.e.*, they assert that the imminent threat of immigration enforcement at houses of worship injures their member congregations. Plaintiffs contend that increased enforcement activity "shatter[s] consecrated sanctuary space, thwart[s] communal worship, and undermine[s] the social service ministry work that is central to [their members'] religious expression and practices." Opening Br. 46. They further assert that the expected surge in enforcement operations at houses of worship is traceable to the government's change in policy, and that the resulting injury will be redressed by an injunction that (1) revives the Mayorkas Memo's Sensitive Locations Policy during the pendency of litigation, and (2) bars enforcement at member congregations absent a judicial warrant or exigent circumstances.

*1. Injury in Fact*

The district court rejected plaintiffs' claim of preenforcement injury because, it believed, the alleged threat of enforcement was not sufficiently imminent. Relying on a series of decisions involving restrictions on the manufacture and possession of firearms, the district court explained that "[t]o demonstrate imminence, a plaintiff must show that enforcement 'results from a special law enforcement priority,' namely that the plaintiff has been 'singled out or uniquely targeted by the government for enforcement.'" *Mennonite*

*Church*, 778 F. Supp. 3d at 8 (cleaned up) (quoting *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009)); *see also id.* at 8–9 (citing *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007)); *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997). Applying that standard, the district court rejected plaintiffs' theory of injury because plaintiffs had failed to demonstrate that they or their members were being "targeted" or "singled out" for immigration enforcement. *Mennonite Church*, 778 F. Supp. 3d at 9.

The legal standard applied by the district court is inapposite. It is associated with firearms cases and addresses only "preenforcement challenges to a criminal statute not burdening expressive rights and not in the form of appeal from an agency decision." *Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005); *see also Russell v. District of Columbia*, 804 F. Supp. 3d 192, 200–01 (D.D.C. 2025) (assessing this court's "idiosyncratic" approach to evaluating imminent harm in firearms cases). This case fits none of the criteria for using that "idiosyncratic" test — it does not involve firearms, and it raises a challenge to an agency decision that allegedly burdens religious expression.

We look instead to the Supreme Court's discussion of imminent injury in *Babbitt v. United Farm Workers National Union*: "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest," but restricted by a government policy, a "credible threat" of enforcement under that policy suffices to demonstrate imminent harm. 442 U.S. 289, 298 (1979). The Supreme Court has elaborated on *Babbitt*'s "credible threat" standard on several occasions. In *Clapper v. Amnesty International USA*, it suggested that an injury is "imminent" only when it is "certainly impending." 568 U.S. 398, 412, 414 (2013). But the following year, in *Susan B. Anthony List v.*

*Driehaus* (*SBA List*), the Court reaffirmed *Babbitt*'s "credible threat" articulation and clarified that under *Clapper*, imminence exists when "the threatened injury is certainly impending, *or* there is a substantial risk that the harm will occur." 573 U.S. 149, 158–59 (2014) (cleaned up) (emphasis added). It further explained "that the pre-enforcement nature" of review is "not troubling" when plaintiffs "allege[] an actual and well-founded fear that the law will be enforced against them." *Id.* at 160 (cleaned up).

After *Clapper* and *SBA List*, we held that "[s]tanding to challenge laws burdening expressive rights requires only a credible statement by the plaintiff of intent to" exercise such expressive rights, "and a conventional background expectation that the government will enforce the law." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (cleaned up); *accord Act Now to Stop War & End Racism Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009). That more permissive standard reflects our "special solicitude" for preenforcement First Amendment claims. *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135 (D.C. Cir. 2015). And the "principle applies with particular force" where, as here, a plaintiff challenges an agency action, rather than a statute. *U.S. Telecom*, 825 F.3d at 739. Finally, we note that it is easier for a plaintiff to establish the imminence of enforcement where the government "has not disavowed any intention of" conducting enforcement actions under the challenged provision. *Babbitt*, 442 U.S. at 302.

Under *Babbitt* and its progeny, plaintiffs likely have demonstrated imminent injury to their member congregations.

Plaintiffs' affiliated congregations intend to engage in conduct — ministering to undocumented immigrants — that is "affected with" a First Amendment "interest." *Babbitt*, 442

U.S. at 298. And they have demonstrated that under the Rescission Memo, their members face a "credible threat" of enforcement that will likely cause imminent, if not immediate, injury. *Id.* Indeed, plaintiffs rely on far more than the "conventional background expectation that the government will enforce the law," which is all that is required. *U.S. Telecom*, 825 F.3d at 739 (citation omitted). Above and beyond that, plaintiffs have direct evidence that the government intends to increase immigration enforcement at sensitive locations — that is the whole point of the Rescission Memo. *See* DHS, Promises Made, *supra* ("[ICE agents] believe that rescinding the Mayorkas [Memo] is going to free them up to go after more illegal immigrants." (citation omitted)). The government has done the opposite of "disavow[ing] any intention of" taking enforcement action at or near plaintiffs' members' houses of worship. *Babbitt*, 442 U.S. at 302. Instead, it announced a plan to ramp up enforcement, and that initiative has already begun: Plaintiffs point to several specific examples of the government engaging in enforcement activity at or near their members' houses of worship. *See supra* nn.1–4 & accompanying text; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("Past wrongs [are] evidence bearing on whether there is a real and immediate threat of repeated injury." (cleaned up)). Plaintiffs plainly present "good evidence that the threat of enforcement is not chimerical." *SBA List*, 573 U.S. at 164 (cleaned up).

This case does not resemble *Clapper* because the challenged policy here directly targets houses of worship for increased enforcement, including those operated by plaintiffs' members. *Clapper* involved a five-step chain of events, where a general law targeting third parties only incidentally impacted the plaintiffs. *See* 568 U.S. at 410. Here, by contrast, enforcement operations have already begun at or near the premises of plaintiff-affiliated congregations, as a direct result

of a new policy that facilitates the apprehension of undocumented immigrants at houses of worship. Although plaintiffs and their member congregations have not violated any immigration laws themselves, the congregations are nevertheless targeted by the enforcement *policy* at issue, which addresses *where* the government will enforce such laws. The policy expressly targets houses of worship for enforcement activity, by removing constraints that previously protected those places. The effect on plaintiffs' members therefore is direct and completely different from the situation in *Clapper*.

Given the "credible threat" of impending enforcement activity at or near plaintiffs' members' premises, plaintiffs "should not be required to await and undergo [further enforcement] as the sole means of seeking relief." *Babbitt*, 442 U.S. at 298 (cleaned up). Because plaintiffs assert injury from agency action that "burden[s] expressive rights," *U.S. Telecom*, 825 F.3d at 739 (citations omitted), and they are directly injured by the government's already-implemented policy of enforcing immigration laws at houses of worship, they likely have met the standard for showing "imminent" harm, as articulated by the Supreme Court and our court.

*2. Traceability*

To establish standing, plaintiffs must show that their members' injury is "fairly traceable to the defendant's challenged behavior." *Davis v. FEC*, 554 U.S. 724, 733 (2008). The traceability requirement bars standing primarily where an alleged injury "depends on the independent action of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). That is not the case here. Plaintiffs' theory of traceability is straightforward: They argue that the Rescission Memo directly causes immigration authorities to increase enforcement at plaintiff-affiliated houses of worship, and that

enforcement will harm plaintiffs' members. *See Mennonite Church*, 778 F. Supp. 3d at 6. The government does not contest the traceability of plaintiffs' members' preenforcement injury. Thus, "because Article III requires no more than *de facto* causality, traceability is satisfied here." *Dep't of Com.*, 588 U.S. at 768 (cleaned up).

*3. Redressability*

"To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (cleaned up). Here, plaintiffs seek two forms of equitable relief: (1) a return to the Mayorkas Memo's Sensitive Locations Policy during the pendency of litigation, and (2) an order requiring the government to obtain a "judicial warrant" before undertaking enforcement at a house of worship, absent exigent circumstances. J.A. 106. We separately assess whether "each form of relief" would redress plaintiffs' asserted injury. *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted). We hold that they both likely would.

*a. Stay of Rescission Memo*

Plaintiffs challenge the legality of the government's new enforcement policy, and they seek a stay of that policy during the pendency of this litigation. Naturally, "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (cleaned up). And where, as here, plaintiffs' members have been subject to "the [enforcement] action[s] . . . at issue, then there is ordinarily little question . . . that a judgment preventing . . . the action[s] will redress" the harm. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (cleaned up). Plaintiffs need not show that a stay of the Rescission Memo will restore the *status quo ante*; they need

only show that such equitable relief will cure “at least some of” their asserted injury. *Id.* at 114. Plaintiffs have likely made that showing.

The Rescission Memo announces a new policy that removed previous limitations on enforcement actions at houses of worship. The Memo thus “free[s] [ICE] up to go after more illegal immigrants” at or near plaintiff-affiliated houses of worship. DHS, Promises Made, *supra*. Staying the implementation of the Rescission Memo would reinstate, for now, the prior policy delineated in the Mayorkas Memo. That prior policy prohibited immigration authorities from undertaking enforcement actions “in or near a protected area,” absent exigent circumstances or “prior approval” from agency headquarters. J.A. 133. The Mayorkas Memo also declared that, “[t]o the fullest extent possible,” immigration authorities “should not take an enforcement action in or near a [sensitive] location.” J.A. 131. Thus, reinstating the Mayorkas Memo would mean that ICE no longer would be “free[d] . . . up” to “go after more illegal immigrants” at houses of worship. That would likely redress “at least some of” plaintiffs’ asserted injury from increased enforcement. *Diamond Alt.*, 606 U.S. at 114.

To be sure, the Mayorkas Memo gave the government leeway to increase enforcement activity at houses of worship, above and beyond the historical norm. For example, under the Mayorkas Memo, ICE and CBP leadership were free to “delegate” their approval authority to subordinates and thus could have created a dispersed approval authority akin to that imposed by the Vitello Memo. J.A. 133. And as the district court pointed out, the Mayorkas Memo left immigration officers with significant discretion, failed to define certain key terms, and did not confer “legally enforceable rights.” *Mennonite Church*, 778 F. Supp. 3d at 12. But even so, the

Mayorkas Memo required agents to avoid sensitive-locations enforcement "to the fullest extent possible." J.A. 132. It also narrowly defined the exception for "exigent circumstances," and it included additional guidelines to mitigate the adverse consequences of covered actions. J.A. 133. Thus, even if a reversion to the Mayorkas Memo would not restore the *status quo ante*, it likely would alleviate "at least some of" plaintiffs' asserted injury, *Diamond Alt.*, 606 U.S. at 114, by discouraging at least some immigration-enforcement activities at or near their members' houses of worship.

*b. Judicial-Warrant Requirement*

Plaintiffs also ask the district court to bar enforcement operations at their members' houses of worship "absent exigent circumstances or the existence and planned execution of a judicial warrant." J.A. 99–100. They acknowledge that no judicial-warrant requirement has previously bound the government in this context, but they argue that such a requirement is necessary to vindicate their rights under the Religious Freedom Restoration Act and the First Amendment, and to redress their members' injury. This requested relief would impose even more stringent protections than the Mayorkas Memo, and thus also would redress plaintiffs' claimed injury from imminent enforcement activity.

Requiring immigration authorities to seek a judicial warrant before searching for suspects or arresting them at houses of worship — absent exigent circumstances — would redress enforcement-related injuries by adding a procedural and substantive hurdle that would deter or slow down enforcement. Under a judicial-warrant regime, immigration agents would need to obtain a judge's authorization to make an arrest or to conduct a search at a protected location. That would entail making a showing of probable cause that (1) the person

to be arrested at a house of worship committed a crime, and (2) the object of the agents' search — such as a criminal suspect — will be found at the house of worship. *See Steagald v. United States*, 451 U.S. 204, 213 (1981). Gathering such evidence and presenting it to a judicial officer would slow down the pace of enforcement, and the administrative burden likely would deter at least some agents from seeking to conduct enforcement operations at houses of worship. Thus, plaintiffs likely meet their burden to show redressability.

**IV.**

We respectfully disagree with our dissenting colleague, who asserts that (1) plaintiffs lack standing to challenge the rescission of the Mayorkas Memo because their members' injuries would not be redressed by an injunction reinstating the Memo, and (2) we should remand for the district court to decide whether those injuries would be redressed by the imposition of a judicial-warrant requirement, but such a requirement is impermissible on the merits.

The dissenting opinion primarily argues that plaintiffs have not shown redressability because "reinstatement" of the Mayorkas Memo "will not . . . require DHS to change how it conducts immigration enforcement near places of worship." Dissent at 6. But the Memo plainly does require DHS to "change how it conducts immigration enforcement": It provides that immigration agents, "[t]o the fullest extent possible," must "not take an enforcement action in or near a [sensitive] location." J.A. 131. According to the dissent, a policy that presumptively prohibits enforcement activity at houses of worship is not likely to affect enforcement activity at houses of worship. That contention is unsupportable.

As already noted, redressability is not a high bar. It requires only that plaintiffs show their injury is "*likely*" to be

redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61 (emphasis added). "If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 381. And a plaintiff need only establish that a "favorable decision will relieve *a* discrete injury;" he "need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (first emphasis added, second emphasis in original). Thus, the plaintiffs in this case meet their burden if they show that reinstatement of the Mayorkas Memo is likely to result in "even one" fewer enforcement operation at "even one" plaintiff-affiliated place of worship. *Cf. Diamond Alt.*, 606 U.S. at 114 ("Even one dollar of additional revenue for the plaintiffs would satisfy the redressability component of Article III standing." (cleaned up)); *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (redressability satisfied by nominal damages); *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (redressability satisfied if a favorable decision would "*slow* or *reduce*" the alleged harm (emphasis in original)).

The dissenting opinion overlooks that permissive standard and downplays the record evidence. The Mayorkas Memo imposes a default policy: ICE agents and CBP officers generally may not enforce immigration laws at houses of worship, absent exigent circumstances or individualized permission. And DHS itself proclaimed that "rescinding the Mayorkas [Memo] is going to free [ICE agents] up to go after more illegal immigrants." J.A. 110–11. If rescinding the memo "free[s] up" immigration authorities to "go after" immigrants at houses of worship, reinstating the memo is likely to have the opposite effect. *Id.* That conclusion is supported by common sense and case law, not "speculation." Dissent at 12; *see Diamond Alt.*, 606 U.S. at 112; *All. for Hippocratic Med.*, 602 U.S. at 380 ("If a defendant's action causes an

injury, enjoining the action . . . will typically redress that injury.").

The dissenting opinion is premised on the mistaken belief that the Mayorkas Memo announces a Sensitive Locations Policy that is non-binding and therefore has only a speculative effect on enforcement operations. Dissent at 10 (asserting that the Memo's effect on law enforcement activity depends on "whatever persuasive force the Memo might have on enforcement officials"). That assumption is contradicted by a long line of cases which firmly establish that even non-binding or "advisory" administrative materials exert "a powerful coercive effect" on executive action. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (citation omitted); *see also OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 813 (D.C. Cir. 1998) ("An agency's statement of a *general enforcement policy* [is] . . . reviewable." (citation omitted) (emphasis in original)); *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973) (en banc) (upholding challenge to HUD enforcement practices over the government's objection that such decisions are committed to executive branch discretion). That is often why the head of an agency issues a policy memo in the first place: to direct agency officials on whether, how, and when to exercise their authority. And because policy directives do command government action, challenges to policy memos like the one at issue here are commonplace. *See, e.g.*, *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) (holding plaintiffs had standing to challenge EPA's policy statement that "provid[ed] firm guidance to enforcement officials . . . ."). Contrary to the dissent's view, courts generally assume that agencies comply with their announced administrative policies. *Cf. United States v. Chem. Found.*, 272 U.S. 1, 15 (1926) ("[C]ourts presume that [officers] have properly discharged their official duties.").

Even the government does not suggest that ICE agents and Border Patrol officers are at liberty to ignore policy memos that set standards for how their agencies will wield their authority to enforce the immigration laws. Indeed, various incarnations of the Sensitive Locations Policy have guided the government's exercise of its enforcement discretion at houses of worship for over thirty years. If the Mayorkas Memo had as little effect as the dissent posits, the Administration would have had no need to rescind it in order to effectuate its new and more aggressive approach to immigration enforcement. *Cf. Diamond Alt.*, 606 U.S. at 118 ("[I]f invalidating the regulation[] would change nothing . . . why . . . [is the government] defending the regulation[]?"). Moreover, the dissenting opinion does not contest that plaintiffs have met both the injury and causation requirements of standing. But if the Memo had no effect, plaintiffs' members could not have been injured by its rescission in the first place.[6] *See Khalid v. Blanche*, 172 F.4th 876, 885 (D.C. Cir. 2026) ("Causation and redressability are often flip sides of the same coin." (cleaned up)).

The dissenting opinion repeatedly references the government's broad statutory authority and enforcement discretion, Dissent at 7–11, but those considerations are beside the point. No one doubts that the government is empowered by the Immigration and Nationality Act to enforce the

---

[6] The dissenting opinion suggests that the recission of the Mayorkas Memo has not had a substantial effect on the volume of enforcement operations because plaintiffs have pointed to only a "handful" of post-rescission operations at houses of worship. Dissent at 9 n.3. But this case was filed less than three weeks after the rescission and the district court issued its opinion less than two months later. J.A. 14, 18. Accordingly, even a "handful" of additional immigration operations at houses of worship during that short period is evidence that the level of enforcement increased.

immigration laws. And it is undisputed that the current Administration has adopted a more aggressive stance on immigration issues than the previous Administration. Although those governmental prerogatives provide important context, they do not change the legal force of policy guidance that is embodied in memos issued by agency leaders to officers in the field. Such memos mandate how statutory power and enforcement discretion will be exercised: Where agencies have "legal authorit[y] and enforcement discretion," they nonetheless depend on "guidance document[s]" to translate their specific priorities into action. *Id.* at 10. Thus, "a guidance document that leaves in place both legal authorities and enforcement discretion" is still a binding directive to ICE agents and CBP officers when it constrains agency discretion. *Id.* The dissent cites no authority to the contrary.

The dissenting opinion's argument that plaintiffs cannot show redressability because the "status quo is held in place by other forces," Dissent at 13 (cleaned up), is precluded by the Supreme Court's opinion in *Diamond Alternative Energy*, 606 U.S. at 116–20. In that case, the government argued that a coalition of fuel producers failed to establish redressability because even if the challenged regulations were invalidated, vehicle manufacturers would independently choose to comply with the regulations and produce electric cars because "the automobile market ha[d] changed" in a manner that made the choice inevitable. *Id.* at 113. The Court rejected that argument, explaining that "commonsense inferences" about how the regulation would impact the market, plus statements made by the parties, were enough to show redressability. *Id.* at 116. The Court concluded by saying that the "redressability requirement should not be misused" to "prevent the targets of government [action] from challenging [those actions] that threaten their [livelihoods]." *Id.* at 120.

That holding applies here. Regardless of the government's general zeal to conduct immigration operations, the Mayorkas Memo explicitly constrains such operations in houses of worship and therefore is "likely" to prevent at least one such enforcement action from taking place at a plaintiff-affiliated sensitive location. Places of worship are "targets" of enforcement operations under the Rescission Memo, and the "redressability requirement should not be misused" to bar plaintiffs' claims. *Diamond Alt.*, 606 U.S. at 120. Even the dissenting opinion recognizes that the Mayorkas Memo "discouraged immigration enforcement in protected areas," Dissent at 18 — and that concession supports the "commonsense inference[]" that reinstating the Memo will cause a non-zero reduction in those types of operations at those types of locations. *Diamond Alt.*, 606 U.S. at 116.

The two cases cited by the dissenting opinion do not support a different conclusion. In *United States v. Texas*, 599 U.S. 670 (2023), two states sought an order directing DHS to alter its policy so that the agency would "arrest[] *more* noncitizens," and the Court held that they had "no judicially cognizable interest in procuring enforcement" actions against individual third-party respondents. *Id.* at 677 (cleaned up) (emphasis in original). That is a far cry from this case, where plaintiffs seek to set aside a policy that targets their members' places of worship for immigration enforcement operations.[7] The dissenting opinion nevertheless posits that

---

[7] The dissenting opinion erroneously asserts that the new policy does not target houses of worship. Dissent at 9 n.4. The government rescinded the Mayorkas Memo so that it could increase immigration enforcement at houses of worship, which qualifies as "targeting." *See supra* 18–19; J.A. 31 (DHS press releases proclaiming that "criminal aliens" would no longer be able "to hide in America's schools and churches to avoid arrest"); J.A. 110–11 (DHS press release noting that ICE agents "believe that rescinding the Mayorkas

this case, like *Texas*, involves a "lawsuit[] seeking to change the enforcement priorities of the Executive Branch," which is "not . . . redressable by a federal court." Dissent at 9 (cleaned up). We disagree with that characterization of this case. Plaintiffs here do not seek to change the Administration's overarching enforcement priorities but instead argue that certain actions taken by the government to pursue those priorities — *i.e.*, actions to increase enforcement operations at sensitive locations — violate the Religious Freedom Restoration Act, the First Amendment, and the Administrative Procedure Act. That is certainly the kind of suit that is redressable by the federal courts.

*Coalition for Humane Immigrant Rights v. Mullin*, 185 F.4th 1275 (D.C. Cir. 2026) (per curiam), is also distinguishable. In that case, the plaintiffs challenged a memorandum and an email that announced a particular expedited-removal policy, but they failed to challenge a regulation that authorized the same policy. *Id.* at 1282–83. We held that those plaintiffs lacked standing because setting aside the memorandum and the email would not have redressed their injuries where the government was free to implement the same policy by relying on the unchallenged regulation. *Id.* Here, by contrast, plaintiffs challenge the rescission of the Sensitive Locations Policy, claiming that the Administration's new policy that fails to shield places of worship from enforcement activity violates the Religious Freedom Restoration Act (RFRA) and the First Amendment, and that the rescission of the prior policy was arbitrary and capricious under the Administrative Procedure Act (APA). Plaintiffs have not failed to challenge any alternative source of legal authority or policy guidance that permits unfettered immigration-

---

[Memo] is going to free them up to go after more illegal immigrants").

enforcement activity at sensitive locations — in other words, if plaintiffs succeed in their RFRA, First Amendment, and APA challenges to the new immigration policy, no other legal authority allows the government to retain that policy. Thus, setting aside the new policy announced in the Rescission Memo and reinstating the old policy explicated in the Mayorkas Memo would redress the harm to plaintiffs' members from increased enforcement activity at their houses of worship.

Finally, the dissenting opinion declines to address whether plaintiffs have standing to ask for alternative relief in the form of a judicial-warrant requirement, but nevertheless opines on the merits of whether such relief would be permissible. Dissent at 15–17.

The dissent suggests that the district court has not yet considered whether plaintiffs have standing to request that relief, and it would remand for the district court to address the issue "in the first instance." *Id*. at 15. We disagree. The district court denied plaintiffs' motion for a preliminary injunction in its entirety, after concluding that plaintiffs likely lacked Article III standing — that ruling encompassed all of the claims and requested forms of relief that were before it, including the judicial-warrant requirement. *See* J.A. 124 (denying motion for preliminary injunction without qualification).

In any event, the dissenting opinion skips over analyzing the standing issue and offers observations about whether the district court has authority to grant the requested relief. Dissent at 15–17. That approach is inappropriate for three reasons. First, we are required to establish our jurisdiction before reaching the merits of a claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998) ("For a court to pronounce

upon the [merits of a case] when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires."). Second, the district court never analyzed whether it had authority to impose a judicial-warrant requirement, and "we are a court of review, not first view." *Bauer v. FDIC*, 38 F.4th 1114, 1126 (D.C. Cir. 2022); *see also Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 584 n.1 (D.C. Cir. 2020) ("[W]e generally decline to consider questions not passed upon below."). And third, the parties to this appeal have not briefed or argued any merits issues related to plaintiffs' request for a judicial-warrant requirement. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief."); *Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014) (same). We therefore decline to respond to the dissenting opinion's discussion of an issue that is not properly before us.

* * *

For the foregoing reasons, we hold that plaintiffs likely have standing to bring their claims challenging the government's rescission of the Mayorkas Memo's Sensitive Locations Policy, under the First Amendment, the Religious Freedom Restoration Act, and the Administrative Procedure Act. Plaintiffs' members likely face imminent harm from increased enforcement at their houses of worship; that harm is traceable to the new enforcement policy; and the relief requested will likely redress their injury, at least in part. We therefore reverse the district court's denial of plaintiffs' motion for a preliminary injunction and remand for further consideration of that motion.

*So ordered.*

RAO, *Circuit Judge*, dissenting: In January 2025, the Department of Homeland Security modified its internal guidance on immigration enforcement in protected areas such as places of worship. In general, the previous administration's guidance discouraged enforcement in or near protected areas, while the new guidance requires officials to use common sense when conducting such enforcement. Several Christian and Jewish groups sued, alleging that the new guidance violates their constitutional and statutory rights. Concluding that the plaintiffs likely lacked standing, the district court denied their request for a preliminary injunction.

Plaintiffs have failed to make a clear showing of standing. In particular, the guidance they seek to restore has no effect on the Executive Branch's legal authority or enforcement discretion. Plaintiffs ultimately offer only speculation that restoring policy guidance from a previous administration will change the enforcement practices of this one. Because redressability requires more than conjecture, the district court correctly denied a preliminary injunction. I respectfully dissent.

I.

On his first day in office, President Trump announced a broad immigration enforcement effort focused on deporting unlawfully present aliens. This included an overarching policy to "execute the immigration laws against all inadmissible and removable aliens" and achieve "total and efficient enforcement of those laws." Protecting the American People Against Invasion, Exec. Order 14,159, § 2, 90 Fed. Reg. 8443 (Jan. 20, 2025); *see also* Securing Our Borders, Exec. Order 14,165, § 2(d), 90 Fed. Reg. 8467 (Jan. 20, 2025) (directing "all appropriate action" to "[r]emov[e] promptly all aliens who enter or remain in violation of Federal law"). As part of this policy shift, the Acting Secretary of the Department of Homeland Security ("DHS") rescinded the previous

administration's guidance regarding immigration enforcement near protected areas such as places of worship and schools. *See* DHS, Enforcement Actions in or Near Protected Areas (Jan. 20, 2025) ("Huffman Memo") (rescinding DHS, Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021) ("Mayorkas Memo")).

The Mayorkas Memo provided that immigration officers should, "[t]o the fullest extent possible," avoid engaging in "enforcement action in or near" schools, houses of worship, and other protected areas. J.A. 131–32. For operations near such locations, the Memo generally required pre-approval from the headquarters of Immigration and Customs Enforcement ("ICE") or Customs and Border Protection, but those agencies could also delegate approval authority to lower level officials. The Memo, however, preserved enforcement discretion. It explained that whether an enforcement action qualified as near a protected area would be determined by individual officers on a case-by-case basis. And officers would need to "exercise [their] judgment" to determine when "limited circumstances," such as a "national security threat" or an imminent risk of harm, warranted enforcement "in or near a protected area" without advance approval. *Id.* at 132–33. Finally, the Memo included the usual proviso that the guidance "does not limit an agency's or employee's statutory authority" and "may not be relied upon to create any right or benefit." *Id.* at 133–34.

On January 20, 2025, the Acting Secretary rescinded the Mayorkas Memo, concluding it was "not necessary … to create bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* at 128. Instead, the Huffman Memo recognized that officers "apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location" and

that officers "should continue to use that discretion along with a healthy dose of common sense." *Id.*

The Acting ICE Director followed up with additional guidance regarding immigration enforcement in protected areas. *See* ICE, Common Sense Enforcement Actions in or Near Protected Areas (Jan. 31, 2025) ("Vitello Memo"). Like the Mayorkas Memo, the Vitello Memo recognizes the special enforcement concerns in or near protected areas but contains no language discouraging (or for that matter encouraging) enforcement in protected areas. It charges field office supervisors "with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action" in such areas. J.A. 513. Neither the Huffman Memo nor the Vitello Memo suggests that sensitive locations will be targeted for immigration enforcement.

Twenty-seven Christian and Jewish organizations challenged the rescission of the Mayorkas Memo and the replacement policy set forth in the Huffman Memo, asserting claims under the First Amendment, the Religious Freedom Restoration Act, and the Administrative Procedure Act ("APA"). They sought a preliminary injunction requiring the reinstatement of the Mayorkas Memo and barring implementation of the Huffman Memo, as well as a broader injunction prohibiting immigration enforcement at their places of worship absent exigent circumstances or a judicial warrant.[1]

---

[1] Plaintiffs are denominational bodies and associations of churches, synagogues, pastors, and rabbis. Their member congregations worship and provide social services to immigrants at their churches and synagogues, and plaintiffs' claims concern immigration enforcement at these locations, which plaintiffs generally describe as their "places of worship" and "social service ministries." *See*

In support of their standing, plaintiffs submitted declarations asserting four theories of injury. First, plaintiffs asserted there was an imminent threat of enforcement at their places of worship against aliens who participate in religious and social services and are unlawfully present in the country. Plaintiffs pointed to the rescission of the Mayorkas Memo and the administration's announced enforcement priorities, a handful of enforcement actions at or near places of worship, and instances of surveillance of plaintiffs' facilities. Second, plaintiffs attested they were experiencing a decline in attendance at their religious services and social programs, and some alleged the decline was caused by rescission of the Memo. Third, some plaintiffs alleged the rescission forced them to choose between welcoming immigrants, as their faith requires, and protecting those immigrants from law enforcement. Fourth, still others alleged costs from additional security, training, and other protective measures.

The district court denied plaintiffs' request for a preliminary injunction because they failed to make a clear showing of standing. *Mennonite Church USA v. DHS*, 778 F. Supp. 3d 1, 13 (D.D.C. 2025). The court first held that plaintiffs had failed to show the threat of enforcement was sufficiently imminent because neither the Huffman Memo nor the Vitello Memo targeted places of worship, and the limited incidents and surveillance in the record did not establish a pattern of enforcement against plaintiffs. *Id.* at 8–9, 13. The court then concluded plaintiffs had not demonstrated that attendance declines were traceable to the rescission of the Mayorkas Memo or redressable by an injunction reinstating it. Because the conscience and mitigation cost injuries depended on the same alleged enforcement threat, the court held that they

---

Appellants' Br. 1–2. Following plaintiffs' briefing, I refer to the relevant locations as "places of worship."

did not independently establish standing. *Id.* at 13. In addition, the district court did not separately analyze standing to seek an injunction requiring a judicial warrant for enforcement at places of worship, observing only in passing that it could not "restrain[] executive discretion more broadly." *Id.* at 12. Plaintiffs appeal the denial of the preliminary injunction.

## II.

To demonstrate a justiciable Article III case or controversy, at least one plaintiff must show it has suffered, or will suffer, an injury in fact fairly traceable to the challenged action and redressable by the court. *Murthy v. Missouri*, 144 S. Ct. 1972, 1985–86 (2024). "At the preliminary injunction stage … the plaintiff must make a clear showing that she is likely to establish each element of standing." *Id.* at 1986 (cleaned up).

None of the plaintiffs have demonstrated standing for the injunctive relief they seek. Most obviously, they have failed to establish redressability. Redressability requires a substantial "likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Causation and redressability are often "flip sides of the same coin," but redressability "can still pose an independent bar in some cases"—as when the case is not "of the kind traditionally redressable in federal court." *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 & n.1 (2024) (cleaned up). The "logical nexus" between the judicial remedy requested and the concrete injury alleged is "essential to assure that [the plaintiff] is a proper and appropriate party to invoke federal judicial power." *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) (cleaned up).

A.

Plaintiffs primarily claim their alleged injuries will be redressed by an injunction ordering reinstatement of the Mayorkas Memo. But even assuming that plaintiffs' alleged injuries are sufficiently imminent and were caused by rescission of the Memo, reinstatement of the Memo will neither alter DHS's underlying enforcement authority nor require DHS to change how it conducts immigration enforcement near places of worship.

It is purely speculative that returning to the policies set forth in the Mayorkas Memo will either reduce enforcement activity near plaintiffs' places of worship or reverse attendance declines at those places. Because plaintiffs have failed to demonstrate any predictable consequences from reinstatement of the Memo, the injunction they seek will not redress their alleged injuries. *See Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025) (explaining "[c]ourts must distinguish the predictable from the speculative effects of government action or judicial relief") (cleaned up).

1.

First, plaintiffs allege they will be directly harmed by the threat of increased immigration enforcement at their places of worship, where they minister to aliens without regard to immigration status. Plaintiffs argue that enforcement actions at their places of worship would "shatter consecrated sanctuary space, thwart communal worship, and undermine the social service ministry work that is central to Plaintiffs' religious expression and practices." Appellants' Br. 46. They maintain that the imminent risk of such actions "substantially interferes with their religious exercise" and expressive association. *Id.* Plaintiffs contend that an injunction reinstating the Mayorkas

Memo will redress the threat of increased immigration enforcement.

Plaintiffs have failed to clearly demonstrate redressability from barring implementation of the Huffman Memo and reinstating the Mayorkas Memo. To begin with, nothing in the new policy guidance targets places of worship for enforcement. Moreover, reinstatement of the Mayorkas Memo will not alter the legal authority of immigration officers to engage in enforcement actions at or near these places of worship. Federal law authorizes immigration officers to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1); *see* 8 C.F.R. § 287.5(a)(1). Such officers may also arrest and detain an alien based on an administrative warrant. 8 U.S.C. § 1226(a). The Mayorkas Memo expressly states that it "does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area." J.A. 133.

The Mayorkas Memo leaves in place existing enforcement authority and does not meaningfully constrain enforcement discretion. Of course, the Memo repeatedly exhorts that "to the fullest extent possible" enforcement actions should not be undertaken in or near a protected area. *Id.* at 132. But the Memo recognizes there are "limited circumstances" in which an enforcement action may "need[] to be taken" in such areas, including everything from a national security threat to the mere absence of a "safe alternative location." *Id.* at 132–33. The Memo also repeatedly and sensibly states that enforcement decisions entail discretion and judgment. At bottom, nothing in the Memo prevents or restricts enforcement actions at places of worship.[2]

---

[2] Plaintiffs stress the contrast between the Mayorkas Memo and the Huffman Memo. The Mayorkas Memo may have a different

Moreover, the rescission of the Mayorkas Memo is just one relatively minor part of the current administration's broader policy of increasing enforcement of immigration laws. As President Trump announced, his administration will pursue "total and efficient enforcement" against "all inadmissible and removable aliens." 90 Fed. Reg. at 8443. Given the non-binding nature of the Memo and the current administration's immigration priorities, it is purely speculative that reinstating the Memo would change the scope of immigration enforcement in protected areas.[3]

---

emphasis and greater detail, but the Mayorkas, Huffman, and Vitello Memos all recognize that "protected areas" present special enforcement concerns that must be handled with good judgment. *See* J.A. 128, 131, 512 & n.1. The new policy guidance does not target places of worship, and nothing in the Mayorkas Memo would require the current administration to embrace the prior administration's enforcement priorities.

[3] Furthermore, the record shows that enforcement in protected areas has remained relatively constant under the Mayorkas Memo and the Huffman and Vitello Memos. The record includes several examples of enforcement near places of worship when the Mayorkas Memo was operative. After the rescission, the district court found that "only one enforcement action has taken place at the hundreds of plaintiffs' member congregations," and that plaintiffs could "point to only three instances" of enforcement "in or near any place of worship anywhere in the country" in the first ten weeks. *Mennonite Church*, 778 F. Supp. 3d at 9 (describing the limited post-rescission incidents). These facts weaken plaintiffs' claims that rescinding the Mayorkas Memo caused more enforcement and further undermine redressability. *See Allen v. Wright*, 468 U.S. 737, 759 (1984) ("The links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain respondents' standing.").

Where the relief sought would not change the administration's legal authority or require a change of enforcement priorities, we have held that plaintiffs cannot establish redressability. *See Coalition for Humane Immigrant Rights v. Mullin* ("*CHIR*"), 185 F.4th 1275, 1281–82 (D.C. Cir. 2026) (per curiam). In *CHIR*, the plaintiffs claimed that because a DHS memorandum and an ICE email had caused the increased use of expedited removal procedures, staying those directives would decrease the use of such procedures. We identified "a fatal redressability problem" with that logic: staying the memo and email "would not affect the Government's authority to continue subjecting the plaintiffs to expedited removal," nor would it change the administration's enforcement priorities. *Id.* Although it was possible that the district court's stay of the memo and email would limit the use of expedited removal, plaintiffs had failed to show that redressability was likely. *Id.* This case is materially indistinguishable from *CHIR*. It is possible that reinstating the Mayorkas Memo will impact enforcement efforts, but plaintiffs have not shown it is likely.[4] We cannot premise jurisdiction on

---

The majority does not question the district court's factfinding and relies on the same handful of incidents as evidence that the threat of greater enforcement is imminent. If a few incidents after the Mayorkas Memo's rescission are enough to show an imminent injury, then the fact that a few incidents also occurred before rescission suggests the Memo had no meaningful impact on enforcement in protected areas, undercutting both causation and redressability.

[4] The majority attempts to manufacture redressability by asserting that places of worship are now the "targets" of enforcement. Majority Op. 28. But nothing in the new policy guidance suggests such sensitive locations will be targeted for enforcement. J.A. 128, 513.

conjecture about how the Executive will exercise its enforcement discretion.

Furthermore, plaintiffs' redressability argument runs into a more fundamental problem: lawsuits seeking to change the enforcement priorities of the Executive Branch are generally beyond the jurisdiction of the federal courts. For instance, in *United States v. Texas*, two States sought an order requiring the federal government to make more immigration arrests, but the Court held that "precedents and longstanding historical practice establish that the States' suit here is not the kind redressable by a federal court." 143 S. Ct. 1964, 1971 (2023).

Article II vests all of the executive power in the President, U.S. Const. art. II, § 1, cl. 1, and therefore the Executive has the "authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *Texas*, 143 S. Ct. at 1971 (cleaned up). These principles have particular salience in the immigration context, where "the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Id.* at 1971–72 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–91 (1999)). Plaintiffs ask the courts to direct less enforcement of immigration laws by reinstating the Mayorkas Memo. But their suit is similarly not the kind redressable by the federal courts.

In finding that plaintiffs have established redressability, the majority predicts that reinstating the Mayorkas Memo would "discourag[e] at least some immigration-enforcement activities at or near [plaintiffs'] houses of worship." Majority Op. 22. That prediction, however, rests only on whatever persuasive force the Memo might have on enforcement officials. That effect would not follow from the requested injunction, which would simply reinstate a guidance document

that leaves in place both legal authorities and enforcement discretion.[5] *See Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury."). Mere exhortation cannot justify exercise of the Article III judicial power.

Under both the old and new guidance, whether officers take enforcement action remains committed to the Executive's discretion—choices a court can neither dictate nor confidently anticipate.[6] While it is theoretically possible that less enforcement would occur with the Mayorkas Memo in place, it is "plaintiffs' burden to show that redressability is 'likely'—not just possible." *CHIR*, 185 F.4th at 1282; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (rebuffing "standing theories that rest on speculation about the decisions of independent actors"). Rescission of the Memo is a small part

---

[5] I agree with the majority that guidance can have a coercive effect on regulated parties, but the Huffman Memo is merely an internal policy statement. It simply reinforces that officials must use "common sense" when enforcing immigration laws in sensitive locations. The Huffman Memo is therefore not like agency guidance that sets forth how to comply with statutes and regulations on pain of civil and criminal liability. *Cf. Bennett v. Spear*, 520 U.S. 154, 169–71 (1997) (finding redressability where advisory guidance had a "powerful coercive effect" because disregarding the guidance risked substantial civil and criminal penalties). Nor do the majority's cases on reviewability under the APA and selective enforcement have anything to do with standing in this case. *See* Majority Op. 25.

[6] For the sake of clarification, nothing in my redressability analysis turns on an assumption that the government will not comply with the Mayorkas Memo if reinstated by the court. *Contra* Majority Op. 25–26. The problem for standing is that there is nothing specific to comply with because neither the Mayorkas Memo nor the new policy guidance requires any particular enforcement decision near a sensitive location.

of the current administration's policies to increase enforcement of immigration laws, and plaintiffs offer nothing more than speculation that reinstating the Memo would reduce enforcement in protected areas.[7]

2.

Second, plaintiffs allege they have experienced declines in attendance at their religious and social services. They maintain that reinstating the Mayorkas Memo would "restor[e] the confidence of their congregants and social service participants in the safety of their worship spaces." Appellants' Br. 16. They rely on declarations linking some absences to rescission and ask us to infer that at least some congregants would return if the Memo were restored. Redressability here is lacking because it is speculative that reinstatement of the Memo will lead to reductions in enforcement, and even more speculative that simply bringing back the Memo will prompt aliens to return to plaintiffs' places of worship.

Plaintiffs' redressability argument with respect to their attendance injury turns on the expected response of third parties. But it is a "bedrock principle" that federal courts ordinarily cannot redress injuries caused by "the independent action of some third party not before the court," so a plaintiff whose theory of redress runs through third parties must show that those parties "will likely react in predictable ways." *Murthy*, 144 S. Ct. at 1986 (cleaned up). When redressability

[7] Plaintiffs' alleged conscience injuries and mitigation costs are likewise not redressable by reinstatement of the Mayorkas Memo. As plaintiffs describe them, these injuries are consequences of the threatened enforcement at their places of worship. Because reinstatement is unlikely to redress the threat of enforcement, it is also unlikely to redress plaintiffs' conscience injuries or reduce their costs for protective measures.

turns on the actions of third parties, it is the "burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). At the preliminary injunction stage, plaintiffs must support each predictive link with factual evidence, not merely an inference from past events. *Murthy*, 144 S. Ct. at 1986–87.

Plaintiffs provide no evidence specifically showing that reinstating the Mayorkas Memo is likely to induce congregants to return to their places of worship. Some declarations state that aliens have stayed away from such places because of the Memo's rescission, but there are no statements averring that a person who previously stopped coming to a place of worship would return if the Memo were reinstated. The closest forward-looking statement suggests that some congregants "will stop attending services if the [new] policy remains in place," but it says nothing about how reinstatement would affect individuals who previously stopped attending. J.A. 410. We cannot assert jurisdiction based on such "unadorned speculation" about how third parties will react to the proposed injunction. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).

Moreover, it is difficult to imagine how reinstating the Mayorkas Memo would predictably change the behavior of unlawfully present aliens who fear law enforcement. The Memo is simply broad guidance discouraging enforcement, but it leaves in place the government's statutory enforcement authority and discretion. Nothing in the Memo would prevent the current administration from continuing with its clearly stated policies of greater immigration law enforcement. In this context, undoing the Memo's rescission "will not undo the harm, because the new status quo is held in place by other forces." *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1278

(D.C. Cir. 2007); *see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937–40 (D.C. Cir. 2004) (affirming dismissal for lack of redressability because plaintiffs offered "nothing but speculation" that vacating the challenged guidance would alter third parties' independent choices). Even assuming some causal link between the Memo's rescission and attendance declines, causation is insufficient to establish redressability because the government remains free to exercise the full range of enforcement discretion whether or not the Memo is in effect. *See CHIR*, 185 F.4th at 1282.

Without evidence that reinstating the Mayorkas Memo will bring back any absent congregants, plaintiffs' claims remain too speculative and theoretical to establish redressability. We need not conclude that the requested relief will be "totally ineffectual" to find that it is "too speculative to confer standing." *Nat'l Wrestling*, 366 F.3d at 943 (cleaned up). "When significant uncertainty persists about whether judicial resolution will redress an alleged harm, we cannot string together assumptions to justify our jurisdiction." *Food & Water Watch v. U.S. Dep't of Agric.*, 1 F.4th 1112, 1118 (D.C. Cir. 2021).

Finally, plaintiffs emphasize that they need show only that reinstatement of the Mayorkas Memo will have some effect on attendance, and they contend that common sense suggests some congregants will return if the Memo is reinstated. It is true that a plaintiff can show redressability if the remedy sought will provide at least partial relief for the plaintiff's injuries. *Diamond Alt. Energy*, 145 S. Ct. at 2135; *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (holding a request for nominal damages "satisfies the redressability element of standing"). The lack of redressability here, however, is not because plaintiffs have shown that only a few aliens are likely to return to their places of worship. Rather, what is fatal for

redressability is that plaintiffs have offered only speculation that reinstating the Memo will restore any attendance at all. "When conjecture is necessary, redressability is lacking." *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) (rejecting redressability when guidance was not shown to be likely to alter third parties' independent choices); *see also Diamond Alt. Energy*, 145 S. Ct. at 2139 (explaining there is no redressability when "invalidating a challenged regulation would have no effect on the market in question").

Redressability cannot rest on judicial "guesswork" about how relief will impact third parties. *Murthy*, 144 S. Ct. at 1986. Plaintiffs have not shown that reinstatement of the Mayorkas Memo is likely to cause even one absent congregant to return. Because we can only guess at how reinstatement of discretionary enforcement guidance will affect the behavior of alien congregants, plaintiffs have failed to demonstrate that the injunction they seek will likely remedy their alleged injury.

* * *

Because plaintiffs fail to clearly show an injunction reinstating the Mayorkas Memo is likely to redress any of their asserted injuries, I would affirm the district court's denial of such relief for lack of standing.

B.

Plaintiffs also seek a broader injunction that would impose a judicial warrant requirement for immigration enforcement at their places of worship. Plaintiffs' brief does not separately set forth standing for this broader form of relief, and the Government's brief does not address it. The district court rejected the request in passing, without addressing standing, stating only that it "cannot" issue an injunction "restraining executive discretion more broadly." *Mennonite Church*, 778

F. Supp. 3d at 12. Plaintiffs nonetheless maintained at oral argument that they continue to seek such relief, and the majority holds that they have standing to seek it.

Rather than decide in the first instance whether plaintiffs have standing to seek the broader injunction, I would remand for the district court to conduct the necessary relief-specific standing analysis.[8] *See Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (explaining standing must be assessed separately for each form of relief sought).

As the majority has determined that plaintiffs have standing for the broader injunction, the district court must decide on remand whether such relief is appropriate. On that score, I would simply observe that the district court correctly concluded that it has no authority to issue such an extraordinary injunction.

The broader injunction plaintiffs seek would exceed the equitable powers of the federal courts. The Supreme Court has recognized that the proper "scope of federal equity power" does not include supervising law enforcement procedures. *Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976) (cleaned up). Plaintiffs seek an injunction requiring judicial warrants for a broad category of immigration enforcement actions, a form of relief that is beyond the equitable power of the Article III courts. *See Texas*, 143 S. Ct. at 1971–73 (explaining federal courts generally lack authority and meaningful standards to oversee Executive Branch arrest and prosecution policies). Plaintiffs cite no case in which a court has issued an injunction

---

[8] The district court addressed whether there was standing to seek reinstatement of the Mayorkas Memo, but it did not assess standing for the judicial warrant requirement. *Mennonite Church*, 778 F. Supp. 3d at 12.

imposing a judicial warrant requirement for a significant category of enforcement actions.

Moreover, the broader injunction plaintiffs seek is independently barred by 8 U.S.C. § 1252(f)(1), which strips lower courts of jurisdiction and authority to "enjoin or restrain the operation" of 8 U.S.C. §§ 1221–1232 except with respect to the application of those provisions to an individual alien against whom proceedings have begun.[9] *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (holding that section 1252(f)(1) prohibits "injunctive relief on behalf of an entire class of aliens"); *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 481 (explaining that section 1252(f)(1) "prohibits federal courts from granting classwide injunctive relief"); *Make the Road New York v. Mullin*, 179 F.4th 16, 38, 41–43 (D.C. Cir. 2026) (Rao, J., concurring in the judgment) (explaining section 1252(f)(1) strips lower courts of authority

---

[9] The Supreme Court recently granted certiorari on the related question "[w]hether the district court had authority to enter classwide declaratory relief and APA vacatur under 8 U.S.C. § 1252(f)(1)." *DHS v. D.V.D.*, No. 26-426, at 1 (U.S. Sept. 29, 2026) (order).

Furthermore, several Justices have maintained that when section 1252(f)(1) bars a plaintiff's requested injunctive relief, there is no redressability. *See Texas*, 143 S. Ct. at 1978–80 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (concluding there was no standing because section 1252(f)(1) barred the injunction that might otherwise redress the States' injuries). Circuit precedent, however, forecloses consideration of remedial limits at the standing stage. *See Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 & n.1 (D.C. Cir. 1996) (en banc) (explaining that redressability "examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff"); *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989) (holding redressability is "not an inquiry into the scope of the court's power to grant relief").

to grant universal relief that enjoins or restrains the operation of the covered provisions).

Section 1226(a), one of the provisions covered by the restriction in section 1252(f)(1), authorizes arrest and detention of aliens on an administrative warrant. Plaintiffs seek a universal injunction imposing a judicial warrant requirement on enforcement at their places of worship or during religious ceremonies, but such an injunction would enjoin and restrain the section 1226(a) authority and is therefore barred by section 1252(f)(1).[10]

Even if an extraordinary injunction imposing a judicial warrant requirement would redress plaintiffs' alleged harms, it is unavailable in this context.

* * *

The premise of this lawsuit is that restoring policy guidance from the previous administration will result in less immigration enforcement by the current one. As a practical matter, the record shows only minimal immigration

---

[10] In other lawsuits challenging rescission of the Mayorkas Memo, courts have held that plaintiffs are likely to succeed on the merits but have refused to issue an injunction requiring a judicial warrant because such a requirement "would effectively impose an injunction on DHS's authority under 8 U.S.C. § 1226(a) to make arrests pursuant to an administrative warrant, which would be barred by 8 U.S.C. § 1252(f)(1)." *Phila. Yearly Meeting of the Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 334–35 (D. Md. 2025), *aff'd*, 187 F.4th 187 (4th Cir. 2026); *see also New England Synod v. DHS*, 824 F. Supp. 3d 118, 135, 166, 168 (D. Mass. 2026) (finding a likelihood of success on plaintiffs' Religious Freedom Restoration Act claim but concluding that section 1252(f)(1) bars enjoining arrests made pursuant to an administrative warrant).

enforcement in or near places of worship—both when the Mayorkas Memo was in place and in the months after its rescission.

In any event, even on the tenuous assumption that plaintiffs' alleged harms are imminent and caused by rescission of the Mayorkas Memo, restoring this guidance will not redress their injuries. The Memo simply discouraged immigration enforcement in protected areas but imposed no actual restriction on enforcement authority or discretion. Enforcement priorities and policies are the exclusive purview of the Executive Branch, and supervising these choices is beyond the judicial province. It is at best speculative that resurrecting policy statements from the previous administration will change current enforcement priorities. Because plaintiffs have failed to establish standing, the injunction they seek is outside the jurisdiction of the federal courts. I respectfully dissent.