ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5209

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MENNONITE CHURCH USA, et al.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,
*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Columbia,
No. 25-cv-00403 (Dabney Friedrich, District Judge)

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

Kelsi Brown Corkran
Shelby B. Calambokidis
Julia Gegenheimer
Alexandra Lichtenstein
Kate Talmor
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION,
GEORGETOWN LAW
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.     Parties and Amici

1.     The Plaintiffs-Appellants in this case are Mennonite Church USA; The African Methodist Episcopal Zion Church; Central Atlantic Conference United Church of Christ; The Central Conference of American Rabbis; Christian Church (Disciples of Christ); Church of the Brethren, Inc.; Convención Bautista Hispana de Texas; The Episcopal Church; Fellowship Southwest; Friends General Conference; General Assembly of the Presbyterian Church (U.S.A.), through the Stated Clerk of the General Assembly, Rev. Jihyun Oh; General Commission on Religion and Race of The United Methodist Church; Latino Christian National Network; Massachusetts Council of Churches; The New York Annual Conference of The United Methodist Church; New York State Council of Churches; North Carolina Council of Churches; The North Georgia Conference of The United Methodist Church, by and through The Board of Trustees, North Georgia Conference, United Methodist Church, Inc.; The Rabbinical Assembly; Reconstructing Judaism; Rhode Island State Council of Churches; Union for Reform Judaism; Universalist Unitarian Association; The United Synagogue of Conservative Judaism; The Western North Carolina Conference of The United

Methodist Church, through The Board of Trustees, Western North Carolina Conference, United Methodist Church, Inc.; Wisconsin Council of Churches; and WISDOM, Inc.

2.      Pursuant to Rule 26.1, Plaintiffs-Appellants have no parent companies or publicly traded companies with a 10% or greater ownership interest in their entities.

3.      The Defendants-Appellants in this case are the U.S. Department of Homeland Security; Kristi Noem, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. Customs and Border Protection; Rodney S. Scott, Commissioner, U.S. Customs and Border Protection, in his official capacity; U.S. Immigration and Customs Enforcement; and Todd M. Lyons, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity.

4.      There were no intervenors in the district court, and there have been no intervenors in this Court to date.

5.      The Immigration Reform Law Institute appeared as amicus curiae in the district court.  To date, there have been no amici in this court.

**B.    Rulings Under Review**

The ruling under review is the Order entered April 11, 2025 (Dkt. No. 29) by Judge Friedrich, denying Plaintiffs' motion for a preliminary injunction.  The accompanying Memorandum Opinion (Dkt. No. 30) is published in the Federal

Supplement. *Mennonite Church USA v. U.S. Department of Homeland Security*, 778 F. Supp. 3d 1 (D.D.C. 2025).

## C.    Related Cases

This case has not previously been before this Court or any court other than the district court.  The only case of which counsel are aware that raises similar issues and falls within the meaning of D.C. Circuit Rule 28(a)(1)(C) is *Philadelphia Yearly Meeting of the Religious Society of Friends v. U.S. Department of Homeland Security*, No. 25-1512 (4th Cir.).

*/s/ Kelsi Brown Corkran*
Kelsi Brown Corkran

## TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES ................... i

TABLE OF AUTHORITIES ................................................. vi

GLOSSARY ............................................................ xi

INTRODUCTION ........................................................ 1

STATEMENT OF JURISDICTION .......................................... 4

STATEMENT OF THE ISSUE ............................................. 4

STATEMENT OF THE CASE ............................................. 4

    I.    Plaintiffs' Religious Duty to Welcome and Serve Immigrants ........... 4

    II.   DHS's Thirty-Year Sensitive Locations Policy ................................. 7

    III.  DHS's Sensitive Locations Policy Rescission ................................. 10

    IV.  Plaintiffs' Suit and Preliminary Injunction Motion ........................... 12

SUMMARY OF ARGUMENT .......................................... 22

STANDARD OF REVIEW ............................................. 23

ARGUMENT.......................................................... 24

    I.    Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on Attendance Declines at Their Places of Worship. .............. 25

        A.    Plaintiffs are Concretely Injured by Attendance Declines at Their Religious Services and Social Service Ministries ....... 25

        B.    Plaintiffs' Attendance Declines are Traceable to DHS's Sensitive Locations Policy Rescission and Redressable by Preliminary Injunctive Relief ............................. 29

iv

II.     Plaintiffs Have Standing to Obtain a Preliminary Injunction
        Based on the Imminent Risk of Immigration Enforcement
        Action at or Near Their Places of Worship........................................46

        A.      The District Court Applied the Wrong Standard in
                Assessing Imminence.................................................................47

        B.      Plaintiffs Have Demonstrated an Imminent Threat of
                Immigration Enforcement Activity at or Near Their
                Places of Worship. ...................................................................50

        C.      The Threat of Immigration Enforcement at Plaintiffs'
                Places of Worship Is Fairly Traceable to the Rescission
                Memo and Redressed by a Preliminary Injunction. ................55

III.    Plaintiffs Have Standing to Obtain a Preliminary Injunction
        Based on Their Conscience Injuries and the Costs of Protective
        and Security Measures Necessitated by the Sensitive Locations
        Policy Rescission. ..............................................................................57

CONCLUSION .................................................................................. 61

CERTIFICATE OF COMPLIANCE.....................................................A1

CERTIFICATE OF SERVICE..............................................................A2

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.A.R.P. v. Trump*, 605 U.S. 91 (2025) ................................................................40

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ............................................33, 34

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017).......................................29

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)...............50, 51

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................29

*Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 293 (D.D.C. 2020) .........35

*Carpenters Ind. Co. v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017)...................................28

*Chamber of Com. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995).......................................50

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .................................47, 52, 56

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)..................................................30

*Diamond Alt. Energy LLC v. EPA*,
   145 S. Ct. 2121 (2025).............................. 3, 22, 30, 32, 33, 35, 36, 37, 38, 39, 40

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................47

*FCC v. U.S. Telecom Ass'n*, 111 F.4th 81 (D.C. Cir. 2024)...................................49

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)...........................29, 30, 59

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905 (D.C. Cir. 2015)...................24

*Green v. U.S. Dep't of Just.*, 392 F. Supp. 3d 68 (D.D.C. 2019) ..........................49

*Gutierrez v. Saenz*, 145 S. Ct. 2258 (2025) ....................................................36, 44

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ...............................24

*Lackey v. Stinnie*, 604 U.S. 192 (2025) ................................................................40

*Larson v. Valente*, 456 U.S. 228 (1982) ...............................................................38

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)........................................24, 29, 30

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ........................................................37

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
  70 F.4th 582 (D.C. Cir. 2023)............................................................................29

*Murthy v. Missouri*, 603 U.S. 43 (2024)................................................................41

*N.Y. Republican State Comm. v. S.E.C.*, 799 F.3d 1126 (D.C. Cir. 2015).............49

*Nat'l Wrestling Coaches Ass'n v. Dep't of Ed.*, 366 F.3d 930 (D.C. Cir. 2004).....34

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997)............................48

*New Jersey v. EPA*, 989 F.3d 1038 (D.C. Cir. 2021) ............................................39

*Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017).......................................36

*Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009) ........................47, 38

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)......................47, 48

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017)............................34

*Phila. Yearly Meeting of Religious Society of Friends v. U.S. Dep't of Homeland
  Security*, 767 F. Supp. 3d 293 (D. Md. 2025)...................... 17, 18, 25, 42, 44, 45

*Presbyterian Church (U.S.A.) v. United States*,
  870 F.2d 518 (9th Cir. 1989) ...............................................................25, 27, 28

*Renal Phys. Ass'n v. U.S. Dep't of Health & Human Servs.*,
  489 F.3d 1267 (D.C. Cir. 2007) ..............................................................34

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ........................35

*Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) ............................................48

*Steffel v. Thompson*, 415 U.S. 452 (1974) ..............................................................54

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .............. 22, 47, 51, 53, 54

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) .....................49, 50, 51

*United Presbyterian Church in the U.S.A. v. Reagan*,
  738 F.2d 1375 (D.C. Cir. 1984) .......................................................54, 55

*Uzuegbunam v. Preczewski*, 592 U.S. 279 (2021) .....................................30, 36, 38

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ..............................47

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................23

*Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010) ............................................30

## Statutes

5 U.S.C. §§ 701 *et seq.* ..........................................................................................12

8 U.S.C. § 1103 ........................................................................................................ 7

42 U.S.C. §§ 2000bb *et seq.* ...................................................................................12

## Other Authorities

Jack Jenkins, *'This Is Domestic Terror': Shaken by ICE Raids, Pastors Rethink
  Ministries*, Religion News Serv. (Aug. 4, 2025),
  https://religionnews.com/2025/08/04/when-ice-detains-people-on-church-
  grounds-pastors-say-congregations-suffer/ .......................................................21

Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html ................................................................................................................20

Vincent Medina, *Tensions High as Immigration Sweeps Reach Downey Churches*, Downey Patriot (June 16, 2025), https://www.thedowneypatriot.com/articles/tensions-high-as-immigration-sweeps-reach-downey-churches..............................................................20

Ryan Oehrli, *Methodists to ICE in Charlotte: Our Churches Are Not Your Staging Ground*, Charlotte Observer (May 23, 2025), https://www.charlotteobserver.com/living/religion/article307054346.html........20

Andy Olsen, *When ICE Comes to Church*, Christianity Today (Jan. 31, 2025), https://www.christianitytoday.com/2025/01/should-churches-fear-ice-raids-atlanta...........................................................................................................12

Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens (Jan. 26, 2025), https://www.dhs.gov/news/2025/01/26/president-trump-already-securing-our-border-and-deporting-criminal-aliens ...........................................1, 11

Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-lawenforcement-and-ending-abuse ............11

Press Release, United Methodist Church Western North Carolina Conference, Protecting Sacred Spaces: WNCC Responds to ICE Presence at Charlotte-Area Church During Preschool Hours (May 22, 2025), https://www.wnccumc.org/newsdetail/protecting-sacred-spaces-wncc-responds-to-ice-presence-at-charlotte-area-church-during-preschool-hours-19103214 .....20

Karla Rendon, *Immigration Raids Reported Near Downey Churches*, NBCLA (June 11, 2025), https://www.nbclosangeles.com/news/local/downey-churches-home-depot-immigration-raids/3721686/ .......................................................21

ix

Gustavo Sagrero Álvarez, *Washington Family Torn Apart After Father Arrested Outside of Church and Deported*, KUOW (Mar. 6, 2025), https://www.kuow.org/stories/washington-family-torn-apart-after-father-arrested-outside-church-and-deported ................................................................12

Anita Snow & Debadrita Sur, *ICE Agents Detain Migrants on Church Grounds at 2 California Parishes, Diocese Says*, Nat'l Cath. Reporter (June 26, 2025), https://www.ncronline.org/news/ice-agents-detain-migrants-church-grounds-2-california-parishes-diocese-says .........................................................21

Ittai Sopher, *'Keep Off Our Property,' | DC Area Christian Leaders Ask ICE to Stop Parking in Church Lots* (Aug. 23, 2025), https://www.wusa9.com/article/news/local/home-rule/church-federal-authorities-immigration-ice-white-house-home-rule-donald-trump/65-03c6626e-e1a6-4ab6-b000-8d0f0e4d8559 ...........................................................................21

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CBP | U.S. Customs and Border Protection |
| DHS | U.S. Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| RFRA | Religious Freedom Restoration Act |

## INTRODUCTION

Plaintiffs represent millions of people of faith across dozens of religious traditions: Baptists, Brethren, Conservative Jews, Episcopalians, Evangelicals, Mennonites, Quakers, Pentecostals, Presbyterians, Reconstructionist Jews, Reform Jews, Unitarian Universalists, United Methodists, Zion Methodists, and more. They join together in this suit to challenge an unprecedented assault on their religious exercise by the Department of Homeland Security ("DHS").

For three decades, DHS's "sensitive locations" policy substantially restricted immigration enforcement activity in or near places of worship.  On January 20, 2025, DHS abruptly rescinded that policy, instead directing Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") officers to "use [their] discretion along with a healthy dose of common sense" in deciding whether to conduct immigration enforcement actions at places of worship. App. 128.  Consistent with the understanding of ICE officers "that rescinding the [sensitive locations policy] … free[d] them up to go after more illegal immigrants,"[1] numerous enforcement actions have since taken place at Plaintiffs' places of worship and others around the country.  Meanwhile, Plaintiffs have

---

[1] Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens (Jan. 26, 2025), https://www.dhs.gov/news/2025/01/26/president-trump-already-securing-our-border-and-deporting-criminal-aliens [https://perma.cc/EG9L-UPKR].

experienced significant attendance declines at their worship activities and social service ministries, and they face unconscionable choices about how to fulfill their religious mandate to welcome immigrants—a central precept of their faith practices—when doing so makes their congregants and social service participants easy targets for immigration enforcement, thereby violating Plaintiffs' equally important mandate to protect their vulnerable neighbors. Many of Plaintiffs' congregations have responded by undertaking protective measures—such as heightening security, locking doors, moving services online, and being less public about their immigrant-focused ministries—which are both costly and in tension with their religious duties of openness and hospitality. Plaintiffs submitted 66 declarations from denominational and congregational leaders documenting these harms and tracing them to the sensitive locations policy rescission.

The district court nonetheless denied Plaintiffs' motion for preliminary injunctive relief on the ground that Plaintiffs failed to establish a substantial likelihood of Article III standing. The court held that it could not "conclude with little doubt that the policy rescission has caused the widespread declines in attendance," rather than "the administration's broader immigration crackdown," nor could it conclude, "with little doubt, that religious attendance would rebound under a return to [the prior] policy." App. 119-21 (internal quotation marks

2

omitted).  The court further held that immigration enforcement at or near Plaintiffs' places of worship was not sufficiently imminent to establish injury-in-fact.  App. 117, 123-24.  Accordingly, the court concluded that Plaintiffs' conscience injury was "too speculative," and their security costs amounted only to non-cognizable self-inflicted harms.  App. 123-24 (citations and quotations omitted).

In so holding, the district court made several errors of law and abused its discretion.  The court required Plaintiffs to establish traceability and redressability for their attendance declines with a level of certainty that not only goes far beyond this Court's standing, but also conflicts with Supreme Court precedent—most notably that Court's recent decision in *Diamond Alternative Energy LLC v. EPA*, 145 S. Ct. 2121 (2025).  And the district court's requirements for showing injury based on future enforcement action—evidence of "specific directives to immigration officers to target [P]laintiffs' places of worship, or a pattern of enforcement actions" against those places of worship, App. 117—exceed the legal standard for preenforcement challenges alleging harms to religious and expressive associational rights.

Because the record evidence demonstrates that Plaintiffs have a substantial likelihood of standing under the correct legal tests, the Court should reverse the

3

district court's decision and remand for further consideration of Plaintiffs' request for preliminary injunctive relief.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over the underlying case pursuant to the U.S. Constitution and 28 U.S.C. § 1331.

The district court denied Plaintiffs' preliminary injunction motion on April 11, 2025. App. 107. Plaintiffs timely noticed an appeal on May 30, 2025. App. 125. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether Plaintiffs have standing to obtain preliminary injunctive relief in their challenge to DHS's rescission of its longstanding "sensitive locations" policy substantially restricting immigration enforcement action at or near places of worship.

## STATEMENT OF THE CASE

## I.    Plaintiffs' Religious Duty to Welcome and Serve Immigrants

Plaintiffs are 12 national denominational bodies and representatives, 4 regional denominational bodies, and 11 denominational and interdenominational associations, all rooted in the Jewish and Christian faiths. Although Plaintiffs represent a wide range of religious traditions, they are united in their belief that every human being is created in God's image (Genesis 1:27). Welcoming and

4

serving the stranger, or immigrant, is thus a central tenet of Plaintiffs' religious practices.

The Torah, the most sacred and central document of Judaism, lays out this command 36 times, more than any other teaching: "The stranger who resides with you shall be to you as one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt" (Leviticus 19:34). The history of the Jewish people, from escaping slavery in Egypt to the horrors of the Holocaust, reflects the many struggles faced by immigrants throughout the world. The Jewish religious mandate is not simply to protect the Jews in various lands, but to serve and defend all who are vulnerable and oppressed. As a community of immigrants, Jews are charged by God to pursue justice, to build a society that is welcoming to all of God's creatures, and to provide support and shelter to other immigrants regardless of legal status.

The Christian and Christian-rooted Plaintiffs receive from Judaism the Hebrew Bible's exhortation to welcome, protect, and care for the exiles and refugees who become their neighbors through displacement. They further embrace the Gospel of Jesus Christ, who echoed this command and self-identified with the stranger: "For I was hungry, and you gave me food, I was thirsty, and you gave me drink, I was a stranger, and you welcomed me" (Matthew 25:35). Indeed, Jesus

5

became a refugee in Egypt after Herod's persecution forced Mary and Joseph to flee their home (Matthew 2:1-15). Their Biblical call to love their neighbors (Luke 10:25-28; John 13:34; 1 John 4:7), to care for strangers and foreigners (Exodus 22:21; Leviticus 24:22; Deuteronomy 10:18-19, 24:17-18; Jeremiah 22:3), and to show hospitality (Genesis 18:1-8; Luke 10:29-37; Romans 12:13; Hebrews 13:1-2), makes no distinction based on immigration status.[2]

In short, Judeo-Christian scripture, theology, and tradition demonstrate clear and irrefutable unanimity on Plaintiffs' religious duty to welcome, serve, and protect the undocumented immigrants in their midst. Plaintiffs take this duty seriously. They emphatically reject any citizenship or documentation requirement for membership or participation in their religious communities: *All* are welcome to participate in their worship services, social service ministries, and other religious activities, regardless of immigration status. *See, e.g.*, App. 177-78, 218, 282, 288. Many of Plaintiffs' congregations affirmatively communicate to their congregants and communities, through physical signs and social media, that immigrants are welcome, safe, and loved in their churches and synagogues. *See, e.g.*, App. 163,

---

[2] The Unitarian Universalists recognize Jesus's teachings and Biblical guidance as prophetic and primary sources of wisdom, without requiring any credal tests related to their divinity; these teachings belong to the core sources of faithful inspiration in the Unitarian Universalist Living Tradition.

179, 276, 312, 478.  Many have undocumented congregants.  *See, e.g.*, App. 211, 244, 258, 322, 336, 348, 358, 508.  Many have social service ministries—English language classes, food distribution centers, clothing pantries, health care clinics, legal services—that bring undocumented people into their places of worship on a regular basis.  *See, e.g.*, App. 163-64, 212, 258-59, 375, 409, 444-45.  All understand this integration of immigrant neighbors into the life and service of their congregations as "core" to their mission and a "key element of [their] religious practice."  App. 153.

## II.    DHS's Thirty-Year Sensitive Locations Policy

DHS is the Executive Branch agency with principal responsibility for enforcing the nation's immigration laws.  *See* 8 U.S.C. § 1103(a)(1).  Recognizing the importance of communal religious practices "to the well-being of people and the communities of which they are a part," App. 131, DHS for over 30 years substantially restricted immigration enforcement activities at places of worship.

In 1993, the Acting Associate Commissioner for Operations of the Immigration and Naturalization Service (ICE's predecessor) issued a memorandum confirming that it was the agency's policy "to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies."  App. 146.

7

The memo required officers to receive prior written supervisory approval before conducting enforcement actions at these locations unless exigent circumstances existed, and it provided guidance for prior approval to ensure that any enforcement activity minimized disruption.  App. 146-47.  In 2008, an ICE Assistant Secretary issued field guidance reiterating the 1993 Memo and outlining the high bar for ICE personnel "to act at or near sensitive community locations."  Even in exceptional circumstances, such as "terrorism-related investigations" or "matters of public safety," Headquarter-level pre-approval was required.  App. 144.

In 2011, the ICE Director issued a memo that superseded the prior policy but maintained tight restrictions on enforcement activity at sensitive locations.  App. 139-41.  The memo explained that ICE's policy was "to ensure these enforcement actions do not occur at nor are focused on sensitive locations such as schools and churches" absent exigent circumstances.  *Id.*  The memo defined "enforcement actions" to include "(1) arrests; (2) interviews; (3) searches; and (4) for purposes of immigration enforcement only, surveillance."  App. 139.  Authority to grant exceptions rested with just four Headquarters-level officials.  App. 140.  CBP maintained a similar policy.  App. 136-37.

In 2021, DHS Secretary Alejandro Mayorkas issued a superseding memo that reaffirmed the agency's longstanding policy of refraining from enforcement at

8

sensitive locations.  App. 130-34.  Recognizing the profound impact that immigration enforcement has on people's lives and broader societal interests, the 2021 Memo directed that, "[t]o the fullest extent possible," ICE and CBP "should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities."  App. 131.  It described this principle as "fundamental."  *Id.*

The 2021 Memo explained that enforcement actions taken "near," but not "in," a sensitive location may have the same restraining effect on an individual's access to the location, and it instructed agents to avoid enforcement action near such spaces to the fullest extent possible.  App. 132.  Activities covered by the policy "include[d], but [were] not limited to, … arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance."  App. 133.

The 2021 Memo acknowledged "limited circumstances under which an enforcement action" might need to take place "in or near a protected area."  App. 132.  The provided examples each involved urgent and imperative fact patterns: "a national security threat"; "an imminent risk of death, violence, or physical harm to a person"; "hot pursuit of an individual who poses a public safety threat" or "of a personally observed border-crosser"; "an imminent risk that evidence material to a

criminal case will be destroyed"; or where "[a] safe alternative location does not exist."  App. 133.  Even in cases where such imperatives did exist, prior Headquarters approval was required absent exigent circumstances.  *Id.*

Where exigent circumstances precluded prior approval, the 2021 Memo instructed that the action be promptly reported to Headquarters.  *Id.*  In all circumstances, "[t]o the fullest extent possible," any enforcement action in or near a sensitive location had to be "taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing" the sensitive location.  *Id.*

## III.  **DHS's Sensitive Locations Policy Rescission**

On January 20, 2025, DHS Acting Secretary Benjamine Huffman issued a new memorandum (the "Rescission Memo") that rescinded the 2021 Memo and jettisoned the government's decades-old sensitive locations policy.  App. 128.

Disavowing the need for any "bright line rules regarding where our immigration laws are permitted to be enforced," the Rescission Memo directs ICE and CBP to "use [their] discretion along with a healthy dose of common sense" in deciding whether to conduct enforcement activity at sensitive locations.  *Id.*  It does not acknowledge any of the rationales motivating the 30-year policy tightly restricting enforcement at places of worship, nor does it identify any evidence that

10

the sensitive locations policy thwarted legitimate immigration enforcement interests.

Because the Rescission Memo places no boundaries on where immigration agents may engage in enforcement activities, it provides them with unconstrained authority to undertake enforcement actions at or near places of worship.  DHS has confirmed that the purpose of the Rescission Memo is to ensure that "the Trump Administration [does] not tie the hands of our brave law enforcement,"[3] and that ICE agents understand that the rescission "free[s] them up to go after more illegal immigrants."[4]

On January 31, 2025, ICE Acting Director Caleb Vitello issued a memorandum charging ICE's several Assistant Field Office Directors and Assistant Special Agents in Charge with authorizing ICE enforcement actions at or near sensitive locations pursuant to the Rescission Memo.  *See* App. 512-13. Vitello permitted verbal or written authorization and required additional consultation only for enforcement during public demonstrations.  *Id.* at 513.

---

[3] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-lawenforcement-and-ending-abuse [https://perma.cc/5TFV-ZSKP].

[4] Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens, *supra* note 1.

11

Within days of the rescission, enforcement actions occurred at a church in Georgia during worship services[5] and at a church in Washington State.[6]  ICE soon began conducting enforcement in the vicinity of Plaintiffs' churches and synagogues.  *See* App. 244, 348, 358.  ICE agents entered one Plaintiff church's daycare office on suspicion of an undocumented staff member, *see* App. 507-08; at two other Plaintiff churches, ICE agents took photos of food pantry participants, *see* App. 231, 253; congregants at another Plaintiff church "reported contact from or surveillance by ICE" targeting ministry services providing legal counsel, education, and food, *see* App. 336; and still another Plaintiff church reported suspected ICE surveillance at the edges of its property over the course of several days, *see* App. 496.

## IV.    Plaintiffs' Suit and Preliminary Injunction Motion

On February 11, 2025, Plaintiffs filed suit in the U.S. District Court for the District of Columbia against DHS, ICE, and CBP, challenging the rescission of the sensitive locations policy and the new enforcement policy set forth in the

---

[5] Andy Olsen, *When ICE Comes to Church*, Christianity Today (Jan. 31, 2025), https://www.christianitytoday.com/2025/01/should-churches-fear-ice-raids-atlanta [https://perma.cc/FPG3-5YNZ].

[6] Gustavo Sagrero Álvarez, *Washington Family Torn Apart After Father Arrested Outside of Church and Deported*, KUOW (Mar. 6, 2025), https://www.kuow.org/stories/washington-family-torn-apart-after-father-arrested-outside-church-and-deported [https://perma.cc/65U9-WYTB].

Rescission Memo.  Plaintiffs assert claims under the First Amendment, the

Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, and

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*  App. 022-101.

On February 20, 2025, Plaintiffs moved for a preliminary injunction that

would (1) bar DHS from effectuating the Rescission Memo and require DHS to

follow the procedures and policies in the 2021 Memo during the pendency of the

litigation; (2) bar immigration enforcement activities at or near Plaintiffs' places of

worship absent exigent circumstances or the existence and planned execution of a

judicial warrant; and (3) stay the effective date of the Rescission Memo.  App. 102.

Plaintiffs explained that while the first prong of the injunction would address the

harm caused by the Rescission Memo, the 2021 Memo's exception for certain

actions taken with Headquarters-level approval does not survive scrutiny under

RFRA and the First Amendment, which require DHS to use the least restrictive

means to further any interest it has in conducting immigration enforcement at

Plaintiffs' places of worship.  Because exceptions for exigent circumstances and

judicial warrants suffice to further any governmental interest, a more expansive

supervisory-authority exception is unlawful.  Pls.' Reply Supp. Mot. Prelim. Inj. 7,

Dkt. No. 20.

13

Plaintiffs submitted substantial evidence to establish their Article III standing, asserting both associational standing to sue on behalf of their injured members and organizational standing based on injuries to their ability to carry out their missions and activities.  *See* Pls.' Mem. Support Mot. Prelim. Inj. 12, Dkt. No. 11-1.  Plaintiffs submitted 66 declarations from denominational and congregational leaders detailing the harm they were already experiencing due to the new enforcement policy set forth in the Rescission Memo.  *See* App. 149-498. The declarations noted substantial decreases in worship attendance and participation in social service ministries due to fear of immigration enforcement activity at Plaintiffs' places of worship under the new policy.  *See* App. 154, 196-97, 350, 410, 421.  The declarations further explained that the policy change forces Plaintiffs to make an unconscionable "Hobson's choice": If they continue to welcome immigrants to participate in congregational activities and social service ministries at their churches and synagogues, they make their congregants and social service participants easy targets for enforcement action, in abrogation of their religious obligation to love and protect their vulnerable neighbors.  But if they withdraw that welcome by cutting back on their in-person activities, they "violate God's commands in favor of human ones."  App. 331; *see also* App. 214, 323-24. The declarants also explained that they were undertaking measures to protect their

14

congregants and visitors—such as heightening security, locking doors, moving services online, and being less public about their immigrant-focused ministries— that are both financially burdensome and in tension with their religious duties of openness and hospitality. *See* App. 260, 308, 381, 427, 446, 456.

Finally, Plaintiffs substantiated their belief that they are at imminent risk of future enforcement actions at or near their places of worship, which would profoundly interfere with their religious exercise and expressive association rights. They cited public record documents demonstrating that the express purpose of the Rescission Memo is to empower ICE and CBP to undertake enforcement action at or near the "sensitive locations" that undocumented immigrants cannot easily avoid without significant personal and societal cost—including Plaintiffs' churches and synagogues. *See* App. 55. Plaintiffs' declarations provided examples of DHS conducting enforcement actions in the vicinity of their places of worship. *See* App. 244, 348, 358. And Plaintiffs described ICE enforcement activity at their places of worship since the policy rescission. *See* App. 231, 253, 336, 496, 507-08.

Plaintiffs also offered evidence that their injuries are traceable to the Rescission Memo and would be redressed by an injunction reinstating limitations on immigration enforcement actions at or near places of worship. Numerous declarations described attendance declines beginning immediately after the

15

rescission, and several explicitly cited the change in policy as the cause. *See, e.g.*, App. 196-99, 289, 370. The declarants also attested that fear of immigration enforcement actions in light of the policy change was already causing them to scale back on their ministries and take other protective measures. *See, e.g.*, App. 164-65, 185, 223, 307-08, 509. Plaintiffs explained that the requested injunction would redress these injuries by restoring the confidence of their congregants and social service participants in the safety of their worship spaces. Pls.' Mem. Support Mot. Prelim. Inj. 33.

Plaintiffs also established that they were likely to succeed on the merits of their claims. As they explained, the Rescission Memo substantially burdens their religious exercise and violates their freedom of expressive association by interfering with their ability to gather for communal worship, social-service ministries, and other faith-based practices. *Id.* at 23-25. And because the policy does not advance any compelling government interest, let alone through the least restrictive means, it cannot survive strict scrutiny. *Id.* at 26. Further, the Rescission Memo violates the APA because it arbitrarily and capriciously abandoned DHS's longstanding policy without a reasoned explanation. *Id.* at 26-30.

Finally, Plaintiffs explained that they are irreparably harmed by the
Rescission Memo's burden on their religious exercise rights, and that the balance
of the equities weighs in their favor because an injunction would maintain the
status quo and prevent enforcement of an unconstitutional policy. *Id.* at 30-33.

While Plaintiffs' motion was pending, the U.S. District Court for the District
of Maryland granted a preliminary injunction in a parallel suit brought on behalf of
six Quaker Meetings, one Baptist denomination, and a Sikh Temple. *See Phila.*
*Yearly Meeting of Religious Society of Friends v. U.S. Dep't of Homeland Security*,
767 F. Supp. 3d 293, 336 (D. Md. 2025). The injunction required DHS to return to
the 2021 Memo policies and procedures with respect to the plaintiffs in that suit.
*Id.* The court found that the Rescission Memo had "abruptly removed all …
limitations and safeguards" on immigration enforcement actions at or near places
of worship, *id*. at 304, which had caused reductions in attendance at the plaintiffs'
services and programs that interfered with their religious practice, *id*. at 312-16.
Concluding that these attendance reductions harmed the plaintiffs and that a return
to the 2021 Memo would address, at least in part, the fear causing the attendance
declines, the court held that the plaintiffs had standing to challenge the rescission.
*Id*. at 319. The court further concluded that the plaintiffs were likely to succeed on
the merits of their First Amendment and RFRA claims, that they would suffer

17

irreparable harm in the absence of an injunction, and that the balance of the equities tipped in their favor.  *Id.* at 328, 333-34.

On April 11, 2025, the district court in this case reached the opposite conclusion, denying preliminary injunctive relief on the ground that Plaintiffs failed to establish a substantial likelihood of standing.  App. 124.  The court noted that Plaintiffs had demonstrated "significant" declines in attendance at their congregations, "amounting to double-digit percentages or dozens of congregants being absent."  App. 117.  "Even assuming without deciding" that these attendance decreases "comprise an injury," however, the court held that Plaintiffs did not have standing because they had not offered "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  App. 118 (internal quotation marks omitted).  Although Plaintiffs submitted declarations attesting that congregants had stopped attending services after DHS's new policy was implemented, *see* App. 112 & n.4, 117, 120 & n.8—and citing the sensitive locations policy rescission as the reason for the attendance declines, *see* App. 112 & n.5, 120—the court held that such "limited and conclusory assertions" were insufficient to leave "little doubt" that the rescission caused the declines given Plaintiffs' "acknowledge[ment] that broader immigration enforcement actions, and the extensive media coverage of

18

those actions, have caused many undocumented immigrants to refuse to go out in public in general," App. 119-20.  The court also faulted Plaintiffs for failing to proffer "objective statistical evidence showing that religious attendance declines were a predictable effect of the rescission policy."  App. 120.

For "similar reasons," the court held that Plaintiffs had not established that their attendance declines would be redressed by preliminary injunctive relief.  App. 121.  The court found that Plaintiffs had not presented enough evidence that "religious attendance would rebound" under a preliminary injunction, as congregants would still face the risks of "leaving their homes generally, or of traveling to or from religious services" given DHS's broader deportation efforts. *Id.*

As for the injuries that Plaintiffs would suffer from future enforcement action at or near their places of worship, the court held that such action was not sufficiently imminent to support standing.  App. 117.  That lack of imminence, the court concluded, also doomed Plaintiffs' claims based on their asserted conscience and security-cost injuries.  App. 123-24.

Plaintiffs timely appealed.  App. 125.  Meanwhile, enforcement actions at places of worship continue.  On May 20, 2025, armed ICE agents staged an enforcement operation at a Plaintiff church in Charlotte, North Carolina.  The

incident occurred during pickup for the preschool ministry housed in and operated by the church, frightening the children and their families, as well as church staff and congregants.[7]  Less than a month later, on June 11, 2025, a group of masked and armed men wearing vests labeled "Police"—believed to be federal immigration agents—detained and arrested a Latino man in the parking lot of a Plaintiff church in Downey, California.  The agents ignored church leaders' requests that the agents leave church property, instead telling one pastor that "[t]he whole country is our property" and drawing a firearm on another pastor.[8]  That same day, immigration agents detained an elderly man on the sidewalk in front of a Catholic church in Downey after he had dropped off his granddaughter at the

---

[7] Ryan Oehrli, *Methodists to ICE in Charlotte: Our Churches Are Not Your Staging Ground*, Charlotte Observer (May 23, 2025), https://www.charlotteobserver.com/living/religion/article307054346.html [https://perma.cc/D6PW-6ZMU]; Press Release, United Methodist Church Western North Carolina Conference, Protecting Sacred Spaces: WNCC Responds to ICE Presence at Charlotte-Area Church During Preschool Hours (May 22, 2025), https://www.wnccumc.org/newsdetail/protecting-sacred-spaces-wncc-responds-to-ice-presence-at-charlotte-area-church-during-preschool-hours-19103214 [https://perma.cc/B63B-BHDD].

[8] Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/la-protests-ice-raids-church-arrest.html [https://perma.cc/C5XC-GUMX]; Vincent Medina, *Tensions High as Immigration Sweeps Reach Downey Churches*, Downey Patriot (June 16, 2025), https://www.thedowneypatriot.com/articles/tensions-high-as-immigration-sweeps-reach-downey-churches [https://perma.cc/6JN4-3XQF].

church's school.[9]  In another pair of June incidents, immigration agents conducted enforcement operations at two separate Catholic Church parishes, detaining several men in the parking lot of one church and arresting a longtime congregant on the property of the other.[10]  Additional enforcement has occurred at places of worship across the country.  Multiple church leaders in Washington, D.C., have described ICE staging operations in their church parking lots.[11]  One news source noted "at least 10 instances of apparent immigration enforcement activity conducted by ICE or other federal agents on or immediately near church grounds since Trump's inauguration," across five states and Puerto Rico.[12]

---

[9] Karla Rendon, *Immigration Raids Reported Near Downey Churches*, NBCLA (June 11, 2025), https://www.nbclosangeles.com/news/local/downey-churches-home-depot-immigration-raids/3721686 [https://perma.cc/4UMS-2K3V].

[10] Anita Snow & Debadrita Sur, *ICE Agents Detain Migrants on Church Grounds at 2 California Parishes, Diocese Says*, Nat'l Cath. Reporter (June 26, 2025), https://www.ncronline.org/news/ice-agents-detain-migrants-church-grounds-2-california-parishes-diocese-says [https://perma.cc/YBV3-JAPL].

[11] Ittai Sopher, *'Keep Off Our Property,' | DC Area Christian Leaders Ask ICE to Stop Parking in Church Lots* (Aug. 23, 2025), https://www.wusa9.com/article/news/local/home-rule/church-federal-authorities-immigration-ice-white-house-home-rule-donald-trump/65-03c6626e-e1a6-4ab6-b000-8d0f0e4d8559 [https://perma.cc/WL6C-RC8L].

[12] Jack Jenkins, *'This Is Domestic Terror': Shaken by ICE Raids, Pastors Rethink Ministries*, Religion News Serv. (Aug. 4, 2025), https://religionnews.com/2025/08/04/when-ice-detains-people-on-church-grounds-pastors-say-congregations-suffer [https://perma.cc/7YGB-Q9PY].

## SUMMARY OF ARGUMENT

I.  Plaintiffs have established a likelihood of standing to obtain preliminary injunctive relief in their challenge to DHS's rescission of the sensitive locations policy, based on the attendance declines at Plaintiffs' religious services and social service ministries.  Such declines constitute an injury-in-fact to Plaintiffs, for whom each congregant and social service participant is an integral component of their religious body.  Plaintiffs' declarations, along with the "commonsense inferences" drawn from that evidence, *Diamond Alt. Energy LLC v. EPA*, 145 S. Ct. 2121, 2136 (2025), establish that the attendance declines are traceable to the policy rescission, which predictably led many of their congregants and social service participants to avoid their places of worship for fear of immigration enforcement activities occurring there.  It is similarly predictable that a preliminary injunction would make at least some of those people comfortable with returning to Plaintiffs' places of worship, satisfying the redressability requirement.

II.  Plaintiffs also have standing based on the imminent risk of enforcement action at or near their places of worship, which interferes with their ability to engage in communal religious activity.  Plaintiffs offered evidence demonstrating a "substantial risk" that such harm would occur.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  Plaintiffs have substantial numbers of undocumented

immigrants in their congregations and social service ministries, and DHS has publicly touted the Rescission Memo as enabling its agents to target places of worship in its mass deportation efforts; DHS has also conducted enforcement operations at or near Plaintiffs' and others' places of worship since the policy rescission. Because the authority to conduct this enforcement activity flows directly from the Rescission Memo, injunctive relief reinstating limitations on that authority would redress Plaintiffs' injuries.

III. For these same reasons, Plaintiffs have standing based on their conscience injuries and on the costs of the protective and security measures necessitated by the policy rescission. The imminent threat of enforcement action at Plaintiffs' locations makes those harms cognizable, and Plaintiffs' declarations identify the rescission as the source of their conscience injury and the impetus for their protective and security measures. Preliminary injunctive relief requested would thus redress those injuries.

## STANDARD OF REVIEW

A plaintiff seeking preliminary injunctive relief must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555

23

U.S. 7, 20 (2008).  To succeed on the merits, a plaintiff must establish a "substantial likelihood" of Article III standing, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015), which requires an "injury in fact" that is "fairly traceable to the challenged action of the defendant" and that "will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks, alterations, and citations omitted).

This Court reviews the district court's decision whether "to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

## ARGUMENT

Plaintiffs established a substantial likelihood of Article III standing based on four concrete injuries that are fairly traceable to DHS's rescission of the sensitive locations policy and that are redressable by a preliminary injunction: (1) attendance declines at their worship activities and social service ministries; (2) the imminent risk of immigration enforcement action at or near their places of worship; (3) conscience injuries arising from the policy rescission; and (4) the costs of increased security measures to protect congregants and social service participants

24

against enforcement actions and to forestall further attendance declines.  In holding otherwise, the district court made numerous errors of law and abused its discretion.

## I.    Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on Attendance Declines at Their Places of Worship.

The district court acknowledged significant attendance declines at Plaintiffs' places of worship but held that those injuries were neither traceable to the Recission Memo nor redressable by a preliminary injunction.  In reaching those conclusions, the district court erroneously subjected Plaintiffs to a heightened evidentiary requirement at odds with the traceability and redressability standards set forth by this Court and the Supreme Court.

### A. Plaintiffs are Concretely Injured by Attendance Declines at Their Religious Services and Social Service Ministries.

Plaintiffs submitted substantial evidence documenting attendance declines at their worship services and social service ministries following the sensitive locations policy rescission.[13]  As the Ninth Circuit recognized in *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989), government conduct that has a chilling effect on participation in church activities inflicts an Article III injury-in-fact on the church as an organization.  *See also Phila. Yearly*

---

[13] *See, e.g.*, App. 154, 175, 185, 196-99, 203-04, 207-08, 226-27, 233-35, 259, 277, 288-89, 307-08, 344, 350, 370, 376-77, 385-86, 395, 410, 421, 435-36, 446, 456, 467-68, 472-73, 483, 497.

25

*Meeting*, 767 F. Supp. 3d at 313 ("[R]eduction in attendance at religious services and activities constitutes a concrete injury in fact.").

Here, as the district court recognized, "the attendance declines in plaintiffs' congregations have been significant, amounting to double-digit percentages or dozens of congregants being absent." App. 117. "[O]ne largely Hispanic congregation 'has reported a decrease in attendance at its weekly worship services from approximately 140 to 90 individuals.'" *Id.* (quoting App. 196). "[A]t another Spanish-speaking congregation, 'attendance at worship services has dropped by 25 to 40 percent since mid-January.'" *Id.* (quoting App. 196). "[A]t a West Coast church, 'attendance at Sunday worship services has declined approximately 33 percent, from an average attendance of approximately 140 to approximately 90 individuals.'" *Id.* (alteration omitted) (quoting App. 203). "[A]nd a 'worshiping community in the Midsouth reports a decline in attendance of over half its families as a result of the new policy.'" *Id.* (quoting App. 289); *see also* App. 112 (citing App. 207, 289, and App. 472 as further examples of "significant" attendance declines); App. 207 (attendance decline from approximately 370 to 270 individuals); App. 289 (roughly 50 percent attendance decrease at social service ministries); App. 472 (100 percent decrease in immigrant attendance at one service).

26

The district court "assum[ed] without deciding that [these] attendance decreases comprise an injury," but noted "significant[] factual differences" between this case and *Presbyterian Church*, where the government had conducted an extensive surveillance operation at one of the plaintiff church's places of worship. App. 118. Any factual differences between the alleged government action in *Presbyterian Church* and the policy challenged here, however, are immaterial to whether attendance declines concretely injure places of worship. To be sure, the nature of the challenged government conduct may impact its lawfulness, but it has no bearing on what constitutes a cognizable injury-in-fact to a religious body. *Presbyterian Church* explains that because communal gatherings were important to the church's religious practices, attendance declines constituted not only an individual injury to worshippers but also an injury to the church itself, whose "ability to carry out its ministries ha[d] been impaired." 870 F.2d at 521-22. The nature of the challenged government action did not factor into the Ninth Circuit's injury analysis.

To the extent the district court suggested that attendance declines *must* be as substantial as they are here to plead an injury-in-fact, *see* App. 117, that is wrong as a matter of law. Certainly nothing in *Presbyterian Church* indicates that the Ninth Circuit's holding was so limited. "Churches, as organizations, suffer a

27

cognizable injury when assertedly illegal government conduct deters their adherents from freely participating in religious activities protected by the First Amendment." *Presbyterian Church*, 870 F.2d at 523. This "concrete, demonstrable decrease in attendance," *id.* at 522, is not subject to any minimum threshold: The loss of any congregant or social service participant injures a religious body. *Cf. Carpenters Ind. Co. v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("Economic harm … clearly constitutes an injury-in-fact. And the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes.").

Indeed, Plaintiffs' declarations establish that within their religious traditions, the absence of a single congregant or social service participant profoundly injures both the local congregation and the wider denomination. *See, e.g.*, App. 234 (noting that a "core Episcopalian belief[]" is "that the Church is one body—when the whole community cannot gather, the communion of the members is impaired, injuring the whole denomination"); App. 230 ("[A]n injury to any one baptized believer … is an injury to the whole diocese and the whole denomination."); App. 199 ("Our belief is that interpreting scripture and following the teachings of Jesus … require the participation of all persons. In a church grounded in the centrality of community, the inability of any person to participate within the community due to

fear denies the rich variety of that community to all of its members."); App. 347

("Our identity as Mennonites is communal, such that harm to any of our members

affects every member and the strength of our denomination as a whole.  As Paul

writes in 1 Corinthians 12:26, 'if one part of the body suffers, all the parts suffer

with it.'").

### B. Plaintiffs' Attendance Declines are Traceable to DHS's Sensitive Locations Policy Rescission and Redressable by Preliminary Injunctive Relief.

To establish traceability, Plaintiffs must show that their attendance declines

are "fairly traceable to the challenged action of the defendant."  *Lujan*, 504 U.S. at

560 (internal quotation mark and alterations omitted).  "Article III standing does

not follow the causation principles of tort law."  *Me. Lobstermen's Ass'n v. Nat'l*

*Marine Fisheries Serv.*, 70 F.4th 582, 593 (D.C. Cir. 2023).  "[A]n injury may be

'fairly traceable' to an agency action that is not 'the very last step in the chain of

causation,'" *id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)), or "the

most immediate cause, or even a proximate cause, of the plaintiffs' injuries," *Attias*

*v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017).

Causation and redressability often are "flip sides of the same coin": If a

plaintiff shows that the defendant's action caused an injury, "enjoining the action

… will typically redress that injury."  *FDA v. All. for Hippocratic Med.*, 602 U.S.

29

367, 380-81 (2024).  To establish redressability, Plaintiffs must show that their

attendance declines are "likely" to "be redressed by a favorable decision."  *Lujan*,

504 U.S. at 561 (internal quotation marks omitted); *Wolfson v. Brammer*, 616 F.3d

1045, 1056 (9th Cir. 2010) (redressability need only be likely, not certain).  "[T]he

ability to effectuate [even] a partial remedy satisfies the redressability

requirement."  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) (internal

quotation marks omitted).

Where, as here, the plaintiff's injury arises from third-party conduct,

causation and redressability turn on whether "third parties will likely react to the

government regulation (or judicial relief) in predictable ways that will likely cause

(or redress) the plaintiff's injury."  *Diamond Alt. Energy*, 145 S. Ct. at 2134

(internal quotation marks omitted); *accord Dep't of Com. v. New York*, 588 U.S.

752, 768 (2019).  This showing does not require "affidavits or other evidence"

from experts or the third parties themselves, *Diamond Alt. Energy*, 145 S. Ct. at

2132, 2139, nor does it require *conclusively* establishing how the relevant parties

would react to the relief sought, *id.* at 2137.  Instead, plaintiffs need only "show a

predictable chain of events," *id.* at 2139 (quoting *All. for Hippocratic Med.*, 602

U.S. at 385), which can rely on "commonsense inferences" about how third parties

will act, *id.* at 2136.

Applying these standards, Plaintiffs have established that their attendance declines are fairly traceable to the sensitive locations policy rescission and likely redressable by preliminary injunctive relief. As noted above, *supra* pp. 25-29, Plaintiffs submitted numerous declarations demonstrating that their congregations experienced attendance declines as a result of the policy rescission. Declarants explained that "[c]ongregations with significant numbers of immigrants" were "already report[ing] a decrease in worship attendance" in the weeks following the rescission and that the two were linked: Congregants "convey[ed] that they are now afraid of going to church due to the imminent risk of an enforcement action." *See, e.g.*, App. 196-97; *see also* App. 198 (similar observation regarding participation in a food distribution ministry).

Some declarants spoke specifically to the risk of enforcement action *at* their places of worship due to the rescission. One church leader was "told by [a] member family that they do not feel safe coming to church services under DHS's new policy," and that another "reported decreases in attendance because families no longer feel safe from ICE/CBP inside the church." App. 483. Another declarant testified that "[a]ttendance at services has declined, and my congregants tell me that the reason is that they fear that [ICE] or [CBP] will target our church." App. 370; *accord* App. 203, 226-27. Similar examples abound. *E.g.*, App. 461

31

("At least one member of our congregation has already stopped attending services because of the sensitive locations policy rescission."); App. 487 ("Attendance at our worship services and other congregation activities has decreased because families no longer feel safe in their house of prayer. The families that do attend are feeling anxious and afraid. During our last worship service, they asked me to keep the outside doors locked out of fear that there could be an ICE/CBP raid at any moment."); App. 254 ("In several congregations, our clergy report that people have stopped coming to church for fear of the raids. They do not believe the church is a safe place anymore for them, their families, or their friends."); App. 288-89 ("Attendance has declined at many of our congregations because of fear of ICE raids. For example, a worshiping community in the Midsouth reports a decline in attendance of over half its families as a result of the new policy…. Other congregations have seen a drop in attendance at their outreach ministries, with … [one] report[ing] the indefinite end of their ministries of hospitality, as their Spanish-speaking siblings are now afraid to attend gatherings at a church building that may be entered by immigration enforcement."); App. 414 ("Immigrants have reported that they are afraid of coming to synagogue, so they are staying away and not attending our services and other programs. Members are afraid that uninvited

security personnel will intrude on our worship and life cycle celebrations, which are very intimate and private affairs.").

Based on this evidence and the "commonsense inferences" that can be drawn from it, traceability and redressability are easily met. *Diamond Alt. Energy*, 145 S. Ct. at 2135-36, 2139. It was "predictable," *id.* at 2138, that the rescission of the sensitive locations policy would leave individuals more afraid of immigration enforcement actions at their places of worship and prompt many to stay home from religious services and social service ministries. It is similarly predictable that a preliminary injunction would make at least some of those people comfortable with returning to Plaintiffs' places of worship.

The district court held otherwise because it determined that it could not "conclude 'with little doubt' that the policy rescission has caused the widespread declines in attendance" without more "'substantial evidence' that the policy rescission—as opposed to the administration's broader immigration crackdown— has caused the … absences." App. 119-20 (quoting *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015)); *see also* App. 120 (holding that the record was "insufficient" to clear "the high bar … [for] show[ing] a causal relationship between the government policy and third-party conduct"). For "similar reasons," the court determined that the evidence "d[id] not establish, with 'little doubt,' that

33

religious attendance would rebound under a return to [the prior] policy."  App. 121 (quoting *Arpaio*, 797 F.3d at 20).  These holdings reflect several errors of law and an abuse of discretion.

1.    The district court's first legal error was requiring Plaintiffs to establish traceability and redressability with a level of certainty that neither this Court nor the Supreme Court demands.  The "little doubt" standard requires only that plaintiffs produce something "more than a bald allegation" or "unadorned speculation" about how third parties will act—they must offer evidence commensurate with the stage of the proceeding "to demonstrate a substantial likelihood that the third party" will respond in a way that will redress their injuries. *Renal Phys. Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).  This Court has found "little doubt" as to standing where, for example, a plaintiff "introduced affidavits and other record evidence" indicating that the challenged action "was a substantial factor motivating the decisions of the third parties."  *Nat'l Wrestling Coaches Ass'n v. Dep't of Ed.*, 366 F.3d 930, 941 (D.C. Cir. 2004) (citation omitted), *abrogated on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).  The test applied by the district court not only goes far beyond that standard, but also conflicts with Supreme Court precedent: As *Diamond Alternative Energy* reiterates, plaintiffs

34

need only show that their injuries *likely*—"not certainly, but likely"—resulted from the challenged government conduct and would be redressed by an injunction.  145 S. Ct. at 2137.

Plaintiffs clearly satisfy the traceability and redressability standards as properly understood.  They do not rely on speculation; instead, they have offered extensive evidence linking attendance declines to the rescission of the sensitive locations policy.  *See supra* pp. 31-33.  As explained above, that evidence is bolstered by "commonsense inferences," *Diamond Alt. Energy*, 145 S. Ct. at 2136: When the government rescinds an immigration enforcement policy offering certain protections for places of worship, it is wholly predictable that at least some immigrants will decrease their attendance at those places of worship.  It is also predictable that reinstating the prior policy would likely alleviate some of that fear and prompt some of them to return, particularly given the importance of communal worship in Judeo-Christian traditions.  *Cf. Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020) ("[A]ttending religious services" is "at the very heart" of the "guarantee of religious liberty."); *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 293, 294-95 (D.D.C. 2020) (recognizing that the plaintiff church's "faith requires" "gathering in person as a full congregation"); *see supra* pp. 28-29.  The district court erred in making it improperly "difficult or impossible

35

to establish standing" in a situation "where the standing analysis should be straightforward." *Diamond Alt. Energy*, 145 S. Ct. at 2139.

2. The district court compounded this error when it concluded that the existence of "an undisputed alternative cause for the declines in religious attendance," namely DHS's broader immigration enforcement efforts, undermined Plaintiffs' evidence of causation and redressability. App. 119-21. Article III does not require the challenged action to be the only cause of a plaintiff's injury; even an "equally important player in the story does not erase [the challenged action's] role." *Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017). Nor is there any requirement that the relief sought address every cause of Plaintiffs' injury or redress the injury in full. *See Uzuegbunam,* 592 U.S. at 291; *see also Gutierrez v. Saenz*, 145 S. Ct. 2258, 2268 (2025) (noting that the redressability inquiry is not one that asks courts to "guess as to whether a favorable court decision will in fact ultimately" lead to the relief requested by the plaintiffs). Accordingly, even if Plaintiffs' congregants and social service participants are reluctant to leave their homes in part because of DHS's broader immigration enforcement efforts, the existence of another source of fear neither undercuts nor negates Plaintiffs' declarations attesting that the attendance declines are attributable to the absent

36

individuals' awareness of the sensitive locations policy rescission. *See supra* pp. 31-33 (describing declarations).

To be sure, the challenged policy must be a "but-for" cause of Plaintiffs' injuries. App. 118. As explained, *supra* pp. 28-29, however, each missing person's absence is itself an injury-in-fact, which means that traceability is satisfied so long as even one of each Plaintiffs' congregants or social service participants stopped attending because of the policy rescission specifically. Plaintiffs' declarations easily establish that at least some of Plaintiffs' absent congregants and social service participants likely would have continued to attend if the sensitive locations policy had remained in place, which suffices to trace the rescission to Plaintiffs' injury. The district court erred as a matter of law in requiring more.

The district court made a related legal error when it required that Plaintiffs demonstrate that "religious attendance would *rebound* under a return to [the sensitive locations] policy." App. 121 (emphasis added). Like causation, redressability does not set such a high bar: It requires only a showing that judicial relief "would likely redress *at least some* of [Plaintiffs'] injuries." *Diamond Alt. Energy*, 145 S. Ct. at 2135 (emphasis added); *see also Massachusetts v. EPA*, 549 U.S. 497, 525 (2007) (explaining that a plaintiff "'need not show that a favorable decision will relieve his *every* injury,'" and that a favorable decision requiring the

37

defendant to "take steps to *slow* or *reduce*" the plaintiff's injury is sufficient for standing purposes (quoting *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982))).  A plaintiff asserting an economic injury, for example, satisfies the redressability requirement if judicial relief would "likely" result in "[e]ven 'one dollar' of additional revenue." *Diamond Alt. Energy*, 145 S. Ct. at 2135 (quoting *Uzuegbunam*, 592 U.S. at 292).  So, too, here: Because it is likely that at least one of each Plaintiff's congregants or social service participants will return if a preliminary injunction issues, Plaintiffs have established redressability.

Applying the proper traceability and redressability standards is particularly important where, as here, the additional causes of the Plaintiffs' injuries are also actions by Defendants.  Under the district court's reasoning, DHS could shield itself from any challenge to the Rescission Memo by targeting Plaintiffs' immigrant congregants in so many different ways that no single action is the predominant cause of Plaintiffs' injury, making the injury non-redressable by a judicial decision enjoining any single action.  Such a rule would run headlong into the Supreme Court's admonition that standing principles ought not to "incentiv[ize] … gamesmanship" or "make it difficult or impossible to establish standing in cases where the standing analysis should be straightforward." *Id.* at 2139.

3.    The district court's next error was dismissing Plaintiffs' declarations linking the policy rescission to the attendance declines as "conclusory, second-hand, and limited in nature," and faulting Plaintiffs for failing to present "any objective statistical evidence showing that religious attendance declines were a predictable effect of the rescission policy."  App. 120.  *Diamond Alternative Energy* specifically rejects the standard of proof demanded by the district court, rendering it an error as a matter of law.

To show that third parties are likely to react to government action or judicial relief in predictable ways that cause or redress the injury in question, a plaintiff need not introduce evidence from the third parties themselves.  *Diamond Alt. Energy*, 145 S. Ct. at 2139.  This is because requiring affidavits from those third parties would make standing dependent on whether they are "willing to publicly oppose (and possibly antagonize) the government," which could improperly make it "difficult or impossible" for plaintiffs to establish standing.  *Id.*  That concern is particularly acute here, where the third parties could risk disclosure of their vulnerable immigration status by participating in Plaintiffs' suit.

A plaintiff also need not offer "expert" evidence to establish standing based on third-party conduct, *id.*, or "produce empirical study piled on empirical study predicting with specificity" how third parties would react, *New Jersey v. EPA*, 989

39

F.3d 1038, 1048 (D.C. Cir. 2021). "[O]bjective statistical evidence" *can*
demonstrate the predictability of third-party actions, as in *Department of
Commerce*. App. 120. But that evidence is not *required* to establish standing, and
certainly not at this early stage of the litigation. Unlike the plaintiffs in
*Department of Commerce*, who had been afforded the opportunity for full
discovery and a trial on the merits and thus could rely on "*trial evidence* that
'noncitizen households have historically responded to the census at lower rates,'"
App. 120 (emphasis added), Plaintiffs here seek a preliminary injunction, which is
"customarily granted on the basis of procedures that are less formal and evidence
that is less complete than in a trial on the merits," *A.A.R.P. v. Trump*, 605 U.S. 91,
96 (2025) (quoting *Lackey v. Stinnie*, 604 U.S. 192, 200-01 (2025)).

The evidence offered by Plaintiffs and the "commonsense inferences" that
can be drawn about how third parties will react to a change in policy suffice to
establish traceability and redressability. *Diamond Alt. Energy*, 145 S. Ct. at 2136.
As explained above, *supra* pp. 31-33, Plaintiffs submitted declarations attesting
that congregants stopped attending services after the sensitive locations policy was
rescinded and that congregants identified the rescission as the reason they no
longer felt safe coming to Plaintiffs' places of worship. That evidence is supported
by commonsense inferences about how individuals were likely to—and, in fact,

40

did—respond to the policy change. The record establishes that the rescission was meant to assist the "administration's broader initiative to accelerate immigration enforcement," and to communicate to ICE and CBP agents that enforcement actions at places of worship were acceptable and even encouraged. *See* App. 110-11 (noting that DHS's website "highlights that 'ICE agents who spoke to Fox News said they believe that rescinding the [2021 Memo] is going to free them up to go after more illegal immigrants'"). The record further establishes that Plaintiffs and their congregants were aware of the rescission's purpose and of the accompanying enforcement actions at or near formerly protected locations, including places of worship. *See, e.g.*, App. 253, 336. When DHS rescinds an immigration policy offering certain protections for places of worship and then begins surveillance and enforcement actions at local churches, it is predictable that immigrants will stay away from such locations. Indeed, as Plaintiffs have demonstrated, those attendance decreases are already happening. *See supra* pp. 25-26; *cf. Murthy v. Missouri*, 603 U.S. 43, 59 (2024) (where plaintiffs seek forward-looking relief, past injuries are relevant "for their predictive value").

Similar commonsense inferences can be drawn about redressability. Congregants and ministry participants felt safe attending Plaintiffs' worship services and social service programs when the sensitive locations policy was in

41

place, and they feel unsafe attending those events after the policy rescission. It is no leap to assume that those same people—or at least some of them, *see supra* pp. 31-33—would once again feel safe to resume attendance if Plaintiffs obtained a preliminary injunction.

4. Finally, the district court erred in assuming that the sensitive locations policy was not "substantive[ly] distinct[]" from the new policy set forth in the Rescission Memo. App. 122. That interpretation is demonstrably wrong: As *Philadelphia Yearly Meeting* explains, the prior policy imposed "specific restrictions not present in the 2025 Policy" on immigration enforcement in or near places of worship and ordered officers to avoid such actions "[t]o the fullest extent possible." 767 F. Supp. 3d at 318. And because it was "fundamental" that immigration enforcement activity not deny "people of faith access to their places of worship," the 2021 Memo required ICE and CBP to avoid enforcement activity not only *in* places of worship, but also "near" them. App. 131-32.

The 2021 Memo acknowledged "limited circumstances under which an enforcement action" might need to take place "in or near a protected area." *Id.* But the narrowness of the provided examples—each of which involve urgent and imperative fact patterns—clarified for agents the exceptionally high bar set to justify such incursions on sacred space: where there exists "a national security

42

threat"; "an imminent risk of death, violence, or physical harm to a person"; "hot

pursuit of an individual who poses a public safety threat" or "of a personally

observed border-crosser"; "an imminent risk that evidence material to a criminal

case will be destroyed"; or where "[a] safe alternative location does not exist."

App. 133.  And even in cases where such imperatives *did* exist, prior,

Headquarters-level approval was required absent exigent circumstances.  *Id.*

The highly circumscribed nature of those exceptions is a far cry from the

Rescission Memo, which eschews *any* need for "bright line rules" and directs

agents to rely on their own "common sense" in deciding whether to exercise their

enforcement authority at or near places of worship.  App. 128.  DHS

acknowledged that its new policy is substantively distinct from the prior regime

when it explained that the purpose of the rescission was to "not tie the hands of our

brave law enforcement" conducting enforcement activity.  *Supra* pp. 10-12.

Indeed, the differences between the policies are starkly reflected in recent

enforcement actions, in which church parking lots have been the sites of both

surveillance and arrests.  *See supra* pp. 12, 19-22.

In any event, even if the differences between the policies were less obvious,

that would not undermine Plaintiffs' redressability arguments.  The redressability

inquiry does not ask courts to "guess as to whether a favorable court decision will

43

in fact ultimately" lead to the relief requested by the plaintiffs. *Saenz*, 145 S. Ct. at 2268. Instead, redressability is satisfied as long as the requested relief would remove even one "barrier" contributing to the plaintiff's injury. *Id.* A change in the legal circumstances between the parties is enough to establish standing, even if it may ultimately result in the same outcome. *Id.* That test is clearly satisfied here: Even if ICE or CBP could ultimately take the same action under the new DHS policy as they could under the prior one, Plaintiffs' injuries are still redressable by reinstating limitations on enforcement actions, which impose barriers that do not exist under the Rescission Memo. Plaintiffs' proposed injunction, moreover, imposes a judicial warrant requirement for non-exigent enforcement actions, which would further limit enforcement actions at Plaintiffs' places of worship.

The extent of the facial differences between the two policies aside, ICE agents, congregants, and social participants alike understand the Rescission Memo to more broadly permit enforcement activity at places of worship. *See supra* pp. 10-12; 31-33. For this reason—and because "Plaintiffs operated their places of worship under the [prior policy] without experiencing the kind of concern and reduced attendance that they are currently experiencing," *Phila. Yearly Meeting*, 767 F. Supp. 3d at 319—it is reasonable to infer that preliminary injunctive relief would be understood by at least some congregants and social service participants

44

as permitting fewer enforcement actions in their sacred spaces and thus creating a

greater sense of security, leading them to return to Plaintiffs' places of worship.

*See supra* pp. 31-33.

*    *    *

As the district court in *Philadelphia Yearly Meeting* concluded, "[w]here the

religious institutions themselves, after hearing from their members, have concluded

that the reduced attendance is caused by the 2025 Policy, and where it appears to

have occurred only since the issuance of [that policy], DHS's attempts to contest

the validity of this causal connection are not persuasive." 767 F. Supp. 3d at 316;

*see also id.* at 318 (noting that "the predictability of this reaction is stronger than in

*Department of Commerce* because there is evidence, in the form of declarations

from Plaintiffs, that some such individuals have already stopped attending worship

services and ministry programs as a direct result of the 2025 Policy"). And these

attendance injuries are redressable even if "some members of Plaintiffs would

remain concerned about venturing to public places like houses of worship in light

of the general increase in immigration enforcement separate from the 2025

Policy," because "it is reasonable to infer that a return to the 2021 Policy would

reduce both the number of enforcement actions that would occur at a place of

45

worship and the level of fear and concern over such actions that has caused the reduction in attendance at Plaintiffs' places of worship." *Id.* at 319.

## II. Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on the Imminent Risk of Immigration Enforcement Action at or Near Their Places of Worship.

Plaintiffs also have standing to obtain a preliminary injunction because the Rescission Memo puts them at imminent risk of immigration enforcement action at or near their places of worship, which substantially interferes with their religious exercise. These enforcement actions shatter consecrated sanctuary space, thwart communal worship, and undermine the social service ministry work that is central to Plaintiffs' religious expression and practices.

The district court held that immigration enforcement at or near Plaintiffs' places of worship is not sufficiently imminent to establish injury-in-fact. App. 117, 123. But the court's requirements for showing injury—evidence of "specific directives to immigration officers to target [P]laintiffs' places of worship, or a pattern of enforcement actions" against those places of worship, App. 117—exceed the legal standard for preenforcement challenges alleging harms to religious and expressive associational rights. Because the district court imposed too high a bar for demonstrating injury, it erred in finding that Plaintiffs lacked standing to bring their preenforcement challenge.

46

### A. The District Court Applied the Wrong Standard in Assessing Imminence.

When a plaintiff seeks injunctive relief against future injury, judicial review may be conducted preenforcement if the threatened injury is non-speculative and "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or* if there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up); *Clapper*, 568 U.S. at 414 n.5 (plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about," but can instead show "a 'substantial risk' that the harm will occur"). A plaintiff can therefore satisfy the injury-in-fact requirement in a preenforcement suit by alleging "an actual and well-founded fear" that he will be the subject of enforcement. *Driehaus*, 573 U.S. at 160 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).

In assessing the risk of future enforcement here, the district court incorrectly applied a stricter test largely borrowed from the context of preenforcement challenges to firearms statutes. *See* App. 115 (citing *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) and *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008)). Under that test, plaintiffs must show that the harm from a threat of

47

enforcement "results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the … government for prosecution.'"  *Ord*, 587 F.3d at 1141 (quoting *Parker*, 478 F.3d at 375)).  In *Parker*, the Court found that several plaintiffs lacked standing for their preenforcement Second Amendment challenge to various District of Columbia gun laws because they failed to allege that they had been specifically and individually targeted for prosecution.  478 F.3d at 374-75.  Drawing on *Parker*, *Ord* found that a prior arrest warrant for violating a firearms law, along with the plaintiff's allegations that he was being targeted by law enforcement, was evidence of the District's special priority on enforcing the law against him and was thus sufficient to establish imminent prosecution.  587 F.3d at 1142.  *See also Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) (Second Amendment challenge to certain firearms provisions of the D.C. criminal code); *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997) (constitutional challenge by firearms manufacturers to federal criminal firearms law).

Although this Court has warned that the 'singled out for prosecution' test is not merely the "law of firearms," it *is* limited to "non-First Amendment preenforcement challenge[s]," *Seegars*, 396 F.3d at 1254, which means that it does not apply here.  *See also id.* at 1253 (noting that this Court "appears to demand

48

more" for "preenforcement challenges to a criminal statute not burdening

expressive rights").  To the contrary, this Court affords "special solicitude" to

preenforcement challenges, like this one, alleging a burden on expressive rights.

*N.Y. Republican State Comm. v. S.E.C.*, 799 F.3d 1126, 1135 (D.C. Cir. 2015).

Recognizing that the availability of preenforcement review reaches its peak

in the First Amendment context, *id.*, this Court has required only a "credible

statement" of a plaintiff's intent to engage in the violative conduct at issue, against

the "conventional background expectation that the government will enforce the

law," to show standing, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir.

2016) (internal quotation mark omitted); *see also Green v. U.S. Dep't of Just.*, 392

F. Supp. 3d 68, 84 (D.D.C. 2019) ("In this First Amendment context, there is a

'credible threat of prosecution' so long as there is 'a conventional background

expectation that the government will enforce the law.'" (quoting *U.S. Telecom*, 825

F.3d at 739)), *aff'd*, 111 F.4th 81 (D.C. Cir. 2024).  This test does not require that

the challenged policy "*direct* law enforcement to target churches or synagogues or

to treat places of worship as high priority locations for immigration enforcement,"

App. 115 (emphasis added), or that it "*mandate* conducting enforcement activities

during worship services or while social service ministries are being provided,"

App. 116 (emphasis added).  Rather, a conventional background expectation of

49

enforcement is met when the government "has not disavowed any intention" of enforcement against the plaintiffs. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979). Because Plaintiffs challenge an agency policy, which, "'unlike a statute, is typically reviewable without waiting for enforcement,' that principle applies with particular force here." *U.S. Telecom*, 825 F.3d at 739 (quoting *Chamber of Com. v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995)).

**B. Plaintiffs Have Demonstrated an Imminent Threat of Immigration Enforcement Activity at or Near Their Places of Worship.**

Plaintiffs' evidence satisfies the correct test for establishing imminence. First, the record makes clear that Plaintiffs' places of worship fall squarely within the ambit of DHS's immigration enforcement focus. Plaintiffs' churches and synagogues are in communities with large immigrant populations. App. 111. Their religious services and social service ministries regularly host—and often cater specifically to—immigrants of varying legal statuses. *See id.*; *see also, e.g.*, App. 212, 258-59, 358, 380. The record contains numerous declarations from congregations that count undocumented immigrants among their regular worshippers or social services participants—a fact known to their communities and, in some instances, to immigration authorities as well. *See, e.g.*, App. 179, 312, 496. Other congregations that do not inquire into the legal status of their congregants are nonetheless aware that their worshippers likely include

50

undocumented immigrants.  *See, e.g.*, App. 217, 258, 496.  Plaintiffs are open in their advocacy on immigration issues and have affirmed their continuing, fundamental religious mandate to welcome immigrants into their sanctuaries for services and ministries.  *See, e.g.*, App. 151, 159, 365; *see also Driehaus*, 573 U.S. at 159 (injury-in-fact requirement satisfied where a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest" that brings with it a "credible threat of prosecution" (quoting *Babbitt*, 442 U.S. at 298)); *U.S. Telecom*, 825 F.3d at 739-40.  They would do so openly and without fear—as they always have—but for the threat of enforcement activity under the Rescission Memo.  *See, e.g.*, App. 324-25, 487-88, 351.

Second, DHS has made clear that ICE and CBP can and will conduct immigration enforcement operations at places of worship.  Evidence in the record of DHS's sweeping enforcement goals shows that the prospect of immigration enforcement at Plaintiffs' places of worship is not purely hypothetical.  The Rescission Memo itself removed the longstanding presumption against enforcement, shifting to a pro-enforcement framework that leaves decisions about enforcement at sensitive locations largely to individual agents.  *See* App. 128.  And DHS's public statements demonstrate that it intends to fully exploit the Rescission Memo's enforcement permissions in order to find, detain, and deport every

51

removable person in this country.  DHS officials have "publicly announced the

goal of deporting all immigrants unlawfully present in the U.S." and imposed

"increased quotas for daily arrests."  App. 110.  A DHS press release about the

policy rescission highlighted that ICE agents believe the Rescission Memo "free[s]

them up to go after more illegal immigrants"—that is, to detain undocumented

immigrants at sensitive locations.  App. 110-11.  Another DHS press release,

issued the day after the Rescission Memo, announced that, in light of the new

policy, "criminal aliens" would no longer be able "to hide in America's schools

and churches to avoid arrest."  App. 31; *see also* Pls.' Mem. Support Mot. Prelim.

Inj. 22.  Together, this evidence leaves little question that DHS plans to conduct

enforcement activities as broadly as possible, including at places of worship.  *Cf.*

*Clapper*, 568 U.S. at 412 (finding plaintiffs' injury conjectural where they could

"only speculate as to how the [government] will exercise [its] discretion" to

enforce the challenged statute).

Additional record evidence shows DHS is doing just that: conducting

immigration enforcement operations at and near Plaintiffs' places of worship and

others.  Plaintiffs have offered evidence of enforcement actions both at a plaintiff

church and at two other church campuses, as well as four separate instances of ICE

surveillance at or near Plaintiffs' places of worship. App. 111.  As described

above, *supra* pp. 19-22, enforcement actions at places of worship have only continued in the time since the district court ruled on Plaintiffs' preliminary injunction motion.

The district court incorrectly brushed aside Plaintiffs' evidence, finding only a "limited pattern" of prior enforcement that the court said was insufficient to demonstrate imminence.  App. 116.  As an initial matter, an extensive history of constant enforcement at Plaintiffs' places of worship is not necessary to show that future enforcement actions are impending.  While "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical,'" *Driehaus*, 573 U.S. at 164 (cleaned up), "an actual ... enforcement action is not a prerequisite to challenging the law," *id.* at 158.

In any case, Plaintiffs have offered sufficient evidence of past enforcement, and the record of ICE surveillance activity at Plaintiffs' places of worship adds particular weight to Plaintiffs' "well-founded" fears of future enforcement.  *Id*. at 159.  By discarding this surveillance evidence for its failure to "direct[ly] link" to "an actual or pending immigration raid at a church or synagogue," App. 116, the district court relied on an improperly narrow definition of immigration enforcement activity.  As the 2021 Memo recognized, ICE agents do not need to 'raid' a place of worship in order to substantially disrupt its religious activity.

53

App. 132.  "[I]mmigration enforcement surveillance" was also substantially

restricted under the sensitive locations policy, as was ICE activity "near" places of

worship.  App. 132-33.  Thus, even on its own, repeated ICE surveillance in

Plaintiffs' parking lots constitutes "past enforcement against the same conduct"

that is sufficient to show a concrete threat of future enforcement.  *Driehaus*, 573

U.S. at 164.

The district court incorrectly suggested that language from *United*

*Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984),

permitted it to disregard this surveillance evidence.  App. 116.  Considering a

challenge to an executive order on foreign intelligence, the Court in *United*

*Presbyterian Church* found no "genuine threat" of enforcement because the

plaintiffs had alleged a general chill on their conduct but not that action was

"threatened or *even contemplated* against them."  738 F.2d at 1380 (emphasis

added) (quoting *Steffel v. Thompson*, 415 U.S. 452, 475 (1974)).  Unlike "[t]he

harm of 'chilling effect'" that the court found insufficient to support standing there,

Plaintiffs here allege a genuine and "immediate threat of concrete, harmful action."

*Id.*  They assert that a well-founded fear grounded in evidence that, under the

Rescission Memo, DHS can more readily conduct enforcement at places of

worship, has repeatedly done so already, and has publicly stated its intent to

include places of worship in its exhaustive immigration enforcement efforts. Plaintiffs have more recently been targeted, *see supra* pp. 19-22, further confirming that action was certainly "contemplated against them." *United Presbyterian Church*, 738 F.2d at 1380.

In short, the record shows that Plaintiffs have engaged in religious and expressive association practices that put them squarely at risk of immigration enforcement at their places of worship. Plaintiffs have shown a desire to continue these practices, but they have been impacted by a well-founded fear that they will be subject to future enforcement actions. Far from disavowing such actions, DHS has already carried out immigration enforcement operations at Plaintiffs' places of worship and others. Plaintiffs need not speculate about future enforcement at their churches and synagogues: In vowing to deport every removable immigrant, including "criminal aliens" "hid[ing] in America's … churches," App. 31 ¶ 11; Pls.' Mem. Support Mot. Prelim. Inj. 22, DHS promises to exceed the 'conventional background expectation' of enforcement.

## C. The Threat of Immigration Enforcement at Plaintiffs' Places of Worship is Fairly Traceable to the Rescission Memo and Redressed by a Preliminary Injunction.

The threat of immigration enforcement at or near Plaintiffs' places of worship is fairly traceable to the Rescission Memo and redressed by a preliminary

injunction.  Because the Rescission Memo governs whether immigration agents may conduct "enforcement actions in or near areas that [DHS] previously determined require special protection," App. 128, any immigration enforcement at a place of worship is necessarily carried out pursuant to its terms.

This stands in stark contrast to injuries that have only an attenuated link to challenged authority, which courts have found too speculative to support standing. In *Clapper*, for instance, the Supreme Court found the plaintiffs' fears that their communications would be intercepted pursuant to a foreign electronic surveillance program "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'"  568 U.S. at 401.  To reach that conclusion, the Court detailed the numerous statutory conditions, decisions by various government officials and agents, judicial approvals, and operational successes involved in conducting the surveillance that it said made the threatened enforcement simply too remote.  *Id.* at 410.  In this case, the line from the Rescission Memo to enforcement action is much more straightforward, by its own terms requiring only that an agent's decision be made with "discretion" and "a healthy dose of common sense."  App. 128; *see also* App. 513 (charging Assistant Field Office Directors and Assistant Special Agents in Charge with this decisionmaking for ICE).

56

The Rescission Memo removed a longstanding presumption against enforcement at or near sensitive locations, a move that DHS has publicly touted as enabling its agents to conduct immigration enforcement at places of worship and as facilitating its goal of deporting every removable immigrant. *See supra* pp. 10-12. The resulting imminent threat of enforcement at Plaintiffs' locations works significant harm to their religious expression and practice. *See supra* pp. 13-16. It follows that preliminary injunctive relief would redress this threat by reinstating limitations on enforcement at or near places of worship, allowing Plaintiffs to once again provide the sanctuary, security, and communal religious services that are integral to their faiths.

**III.    Plaintiffs Have Standing to Obtain a Preliminary Injunction Based on Their Conscience Injuries and the Costs of Protective and Security Measures Necessitated by the Sensitive Locations Policy Rescission.**

Plaintiffs established two additional harms wrought by the sensitive locations policy rescission. First, the new policy announced in the Rescission Memo is presently forcing Plaintiffs to make an unconscionable "Hobson's choice": If they continue to welcome immigrants to participate in congregational activities and social service ministries at their churches and synagogues, they make their congregants and social service participants an easy target for enforcement action, in abrogation of their religious obligation to love and protect their

57

vulnerable neighbors.  But if they withdraw that welcome by cutting back on their in-person religious services and ministries, they "violate God's commands in favor of human ones." App. 331; *see also* App. 214, 323-24.  This conscience injury implicates some of the most fundamental tenets of Plaintiffs' faiths, including their religious mandates to welcome the stranger and to care for their congregants and neighbors no matter their status.

Second, the rescission has forced many of Plaintiffs' congregations to undertake measures to protect their congregants and visitors—such as heightening security, locking doors, moving services online, and being less public about their immigrant-focused ministries—which are both costly and in tension with their religious duties of openness and hospitality.  *See* App. 260, 307-08, 381, 427, 446, 456.  Such measures are reasonably necessary precautions against the devastating impacts that a congregant or visitor's immigration arrest, detention, or deportation would have on that individual, the local congregation, and the denomination as a whole.

The district court held that, absent an impending threat of immigration raids on their premises, Plaintiffs' conscience injury was "driven by a subjective chill" and thus "simply too speculative," App. 123 (citations and quotations omitted), and

their security costs amounted only to non-cognizable self-inflicted harms, App. 124.

For the reasons set forth above, *supra* pp. 50-56, Plaintiffs have shown an imminent threat of enforcement at or near their places of worship, and the district court's finding otherwise—by applying a stricter test for establishing injury than required in this context, *supra* pp. 47-50—was in error. Record evidence "establish[es] a sufficient likelihood" of enforcement at Plaintiffs' places of worship, making Plaintiffs' present (and continuing) conscience and increased-cost injuries legally cognizable. *All. for Hippocratic Med.*, 602 U.S. at 381 (considering standing requirements for alleged conscience and economic injuries).

Moreover, Plaintiffs' conscience and increased-cost injuries stem directly from the threat of enforcement at their locations and are thus fairly traceable to the Rescission Memo. Plaintiffs' declarations attest to the pressure, arising from the threat of enforcement under the Rescission Memo, to restrict access to their spaces despite an abiding religious mandate to open their doors to all comers and particularly to immigrants. *See, e.g.*, App. 177-78, 214, 218, 259-60, 282, 288, 323-24, 331, 422; *cf. All. for Hippocratic Med.*, 602 U.S. at 388 (no conscience injury where plaintiffs' declarations had not described being forced to a choice that violated their conscience). The declarations further detail the impact of measures

59

to guard against the enforcement actions at their locations: adding security, shifting resources toward restricting or locking their entrances, moving services online, or providing social services individually rather than as large group ministries.  *See, e.g.*, App. 260, 288-89, 307-08, 331-32, 381, 427, 446, 456, 509.

Importantly, the declarations tie these harms directly to the rescission.  One declarant observes, for instance, that "DHS's new enforcement policy forces us to choose between freely carrying out our religious mission, which we feel we must do as a church, and violating our commitment to welcome and protect immigrants by putting those we call to worship with us and minister to at risk of ICE action." App. 208.  Another attests that the new enforcement policy has "forced us to devote both time and some of our limited financial resources in order to secure the safety of our people … potentially jeopardizing our institutional life."  App. 440. Such measures are driven by a fear of enforcement operations that is far from speculative or subjective: At one Plaintiff church, ICE agents entered the premises to seek out a daycare staff member they suspected was undocumented.  App. 507-08.

For the same reasons that Plaintiffs have shown that preliminary injunctive relief would redress these harms.  Without the threat of immigration enforcement at or near their places of worship in the absence of exigent circumstances or a

judicial warrant, Plaintiffs would have little need to take the protective and security measures they imposed after the policy rescission. Similarly, they would no longer face a choice between taking those restrictive measures and conducting their religious worship and service with the open welcome required by their faith.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's decision and remand for further consideration of Plaintiffs' request for preliminary injunctive relief.

Dated: September 22, 2025                 Respectfully submitted,

*/s/ Kelsi Brown Corkran*
Kelsi Brown Corkran
Shelby B. Calambokidis
Julia Gegenheimer
Alexandra Lichtenstein
Kate Talmor
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION,
Georgetown Law
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Counsel for Plaintiffs-Appellants*

61

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a).  This brief contains 12,983 words, excluding exempted parts, and has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Kelsi Brown Corkran*
Kelsi Brown Corkran

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Kelsi Brown Corkran*
Kelsi Brown Corkran