ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5209

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

MENNONITE CHURCH USA, et al.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,
*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Columbia,
No. 25-cv-00403 (Dabney Friedrich, District Judge)

**JOINT APPENDIX**
**VOLUME I**

Kelsi Brown Corkran
Shelby B. Calambokidis
Julia Gegenheimer
Alexandra Lichtenstein
Kate Talmor
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION, GEORGETOWN LAW
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Counsel for Plaintiffs-Appellants*

## APPENDIX
## TABLE OF CONTENTS

**VOLUME ONE**

**Document (ECF No.)**                                                                    **Page**

District Court Docket Report ........................................................................App. 001

Complaint (ECF No. 1)................................................................................App. 022

Plaintiffs' Motion for Preliminary Injunction (ECF No. 11)........................App. 102

Plaintiffs' Notice of Corrected Proposed Preliminary Injunction Order
    (ECF No. 19)......................................................................................App. 104

Proposed Order (ECF No. 19-1) .................................................................App. 106

Order Denying Plaintiffs' Motion for Preliminary Injunction
    (ECF No. 29).....................................................................................App. 107

Memorandum Opinion Denying Plaintiffs' Motion for Preliminary
    Injunction (ECF No. 30) ...................................................................App. 108

Notice of Appeal (ECF No. 37) ..................................................................App. 125

**VOLUME TWO (EXHIBITS)**

**Document (ECF No.)**                                                                    **Page**

Complaint Exhibits

Exhibit 1 to Complaint, Memorandum from Benjamine C. Huffman,
    Acting Sec'y, DHS, "Enforcement Actions in or Near Protected Areas"
    (Jan. 20, 2025) (ECF No. 1-1) .................................................................App. 127

Exhibit 2 to Complaint, Memorandum from Alejandro N. Mayorkas, Sec'y,
    Dep't of Homeland Sec., "Guidelines for Enforcement Actions in or
    Near Protected Areas" (Oct. 27, 2021) (ECF No. 1-2)............................App. 129

Exhibit 3 to Complaint, Memorandum from David V. Aguilar, Deputy
Comm'r, CBP, "U.S. Customs and Border Protection Enforcement
Actions at or Near Certain Community Locations" (Jan. 18, 2013)
(ECF No. 1-3) .........................................................................App. 135

Exhibit 4 to Complaint, Memorandum from John Morton, Dir., ICE,
"Enforcement Actions at or Focused on Sensitive Locations," 10029.2
(Oct. 24, 2011) (ECF No. 1-4)...............................................App. 138

Exhibit 5 to Complaint, Memorandum from Julie L. Myers, Assistant Sec'y,
ICE, "Field Guidance on Enforcement Actions or Investigative Activities
at or Near Sensitive Community Locations," 10029.1 (July 3, 2008)
(ECF No. 1-5) .........................................................................App. 142

Exhibit 6 to Complaint, Memorandum from James A. Puleo, Acting Assoc.
Comm'r, Immigration & Naturalization Serv., "Enforcement Activities at
Schools, Places of Worship, or at Funerals or Other Religious Ceremonies,"
HQ 807-P (May 17, 1993) (ECF No. 1-6)...............................App. 145

Exhibits to Plaintiffs' Preliminary Injunction Motion

Exhibit 1 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Dr. J. Elvin Sadler, General Secretary-Auditor of Plaintiff The African
Methodist Episcopal Zion Church ("A.M.E. Zion") (ECF No. 11-4).....App. 149

Exhibit 2 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Jane Doe # 1 Supporting Plaintiff A.M.E. Zion
(ECF No. 11-5) .........................................................................App. 156

Exhibit 3 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Freeman L. Palmer, Conference Minister of Plaintiff Central
Atlantic Conference United Church of Christ ("CAC")
(ECF No. 11-6) .........................................................................App. 160

Exhibit 4 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Seth Kaper-Dale on Behalf of the Reformed Church of
Highland Park in Support of Plaintiff CAC (ECF No. 11-7) .................App. 166

Exhibit 5 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Rabbi Hara Person, Chief Executive of Plaintiff the Central Conference
of American Rabbis ("CCAR") (ECF No. 11-8)....................................App. 171

Exhibit 6 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Rabbi Serge A. Lippe in Support of Plaintiff CCAR (ECF No. 11-9)....App. 176

Exhibit 7 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Teresa Hord Owens, General Minister and President of
Plaintiff the Christian Church (Disciples of Christ) ("DOC") in the United
States and Canada (ECF No. 11-10).......................................................App. 181

Exhibit 8 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Mary Abigail Conley Supporting Plaintiff DOC
(ECF No. 11-11) .....................................................................................App. 186

Exhibit 9 to Plaintiffs' Preliminary Injunction Motion, Declaration of
David Steele, General Secretary of Plaintiff Church of the Brethren
("COB") (ECF No. 11-12)........................................................................App. 191

Exhibit 10 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 2 on Behalf of Anonymous Member Church
Supporting Plaintiff COB (ECF No. 11-13) .............................................App. 201

Exhibit 11 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 3 on Behalf of Anonymous Member Church
Supporting Plaintiff COB (ECF No. 11-14) .............................................App. 205

Exhibit 12 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Jesse Rincones, Executive Director of Plaintiff Convención Bautista
Hispana de Texas ("CBHT") (ECF No. 11-15).......................................App. 209

Exhibit 13 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Fernando Rojas on Behalf of Azle Avenue Baptist Church in
Support of Plaintiff CBHT (ECF No. 11-16) ..........................................App. 215

Exhibit 14 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 4 on Behalf of Anonymous Member Church
Supporting Plaintiff CBHT (ECF No. 11-17) .........................................App. 220

Exhibit 15 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 5 on Behalf of Anonymous Member Church
Supporting Plaintiff CBHT (ECF No. 11-18) .........................................App. 224

Exhibit 16 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Most Reverend Sean W. Rowe for Plaintiff The Episcopal Church
("TEC") (ECF No. 11-19) .......................................................................App. 228

Exhibit 17 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Julia Ayala Harris, President of The House of Deputies of TEC
Supporting Plaintiff TEC (ECF No. 11-20)..............................................App. 236

Exhibit 18 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Right Reverend Jennifer Reddall on Behalf of the Episcopal
Diocese of Arizona Supporting Plaintiff TEC (ECF No. 11-21) ............App. 242

Exhibit 19 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Right Reverend David C. Rice on Behalf of the Episcopal Diocese
of San Joaquin and St. James Episcopal Cathedral Supporting Plaintiff
TEC (ECF No. 11-22)...............................................................................App. 246

Exhibit 20 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Right Reverend Lucinda Ashby on Behalf of the Episcopal Diocese
of El Camino Real Supporting Plaintiff TEC (ECF No. 11-23)..............App. 251

Exhibit 21 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Stephen Reeves, Executive Director of Plaintiff Fellowship Southwest
(ECF No. 11-24) ......................................................................................App. 255

Exhibit 22 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend John Doe # 6 on Behalf of Anonymous Member Church
Supporting Plaintiff Fellowship Southwest (ECF No. 11-25).................App. 261

iv

Exhibit 23 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend John Doe # 7 on Behalf of Anonymous Member Church
    Supporting Plaintiff Fellowship Southwest (ECF No. 11-26)................App. 266

Exhibit 24 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Barry Crossno, General Secretary of Plaintiff Friends General
    Conference ("FGC") (ECF No. 11-27)......................................................App. 273

Exhibit 25 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Interim Clerk Jane Doe # 8 on Behalf of Anonymous Monthly
    Meeting Supporting Plaintiff FGC (ECF No. 11-28)..............................App. 279

Exhibit 26 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend Jihyun Oh on Behalf of Plaintiff General Assembly of the
    Presbyterian Church (U.S.A.) ("PCUSA") (ECF No. 11-29) ................App. 284

Exhibit 27 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Pastor John Doe # 9 on Behalf of Anonymous Member Congregation
    Supporting Plaintiff PCUSA (ECF No. 11-30) ......................................App. 290

Exhibit 28 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Jane Doe # 10 on Behalf of Anonymous Congregation Supporting
    Plaintiff PCUSA (ECF No. 11-31) ..........................................................App. 295

Exhibit 29 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Pastor John Doe # 11 on Behalf of Anonymous Worshiping
    Community Supporting Plaintiff PCUSA (ECF No. 11-32)..................App. 299

Exhibit 30 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Giovanni Arroyo on Behalf of Plaintiff General Commission on Religion
    and Race of The United Methodist Church ("GCORR")
    (ECF No. 11-33) ......................................................................................App. 303

Exhibit 31 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Pastor Alisa Lasater Wailoo on Behalf of First United Methodist
    Church of Germantown Supporting Plaintiff GCORR
    (ECF No. 11-34) ......................................................................................App. 309

v

Exhibit 32 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Pastor John Doe # 12 on Behalf of Anonymous Congregation
   Supporting Plaintiff GCORR (ECF No. 11-35) ......................................App. 314

Exhibit 33 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Carlos L. Malavé, President of Plaintiff Latino Christian
   National Network ("LCNN") (ECF No. 11-36) ......................................App. 319

Exhibit 34 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Pastor John Doe # 13 in Support of Plaintiff LCNN (ECF No. 11-37) ..App. 326

Exhibit 35 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Laura Everett, Executive Director of Plaintiff Massachusetts
   Council of Churches ("MCC") (ECF No. 11-38)....................................App. 333

Exhibit 36 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Judith K. Hanlon on Behalf of Hadwen Park Congregational
   Church Supporting Plaintiff MCC (ECF No. 11-39) .............................App. 340

Exhibit 37 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Jonathan Carlson, Moderator of Plaintiff Mennonite Church USA
   ("MC USA") (ECF No. 11-40).................................................................App. 345

Exhibit 38 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Pastor John Doe # 14 on Behalf of Anonymous Congregation
   Supporting Plaintiff MC USA (ECF No. 11-41)....................................App. 352

Exhibit 39 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Pastor Jane Doe # 15 on Behalf of Anonymous Congregation
   Supporting Plaintiff MC USA (ECF No. 11-42)....................................App. 356

Exhibit 40 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Bishop Thomas J. Bickerton on Behalf of Plaintiff New York Annual
   Conference of The United Methodist Church ("NYAC")
   (ECF No. 11-43) ......................................................................................App. 361

Exhibit 41 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend Dr. James F. Karpen on Behalf of St. Paul & St. Andrew
    United Methodist Church for Plaintiff NYAC (ECF No. 11-44)...........App. 367

Exhibit 42 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Peter Cook, Executive Director of Plaintiff New York State
    Council of Churches ("NYSCOC") (ECF No. 11-45) ...........................App. 372

Exhibit 43 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend John Doe # 16 on Behalf of Anonymous Member Church
    Supporting Plaintiff NYSCOC (ECF No. 11-46)...................................App. 378

Exhibit 44 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend Jennifer Copeland, Executive Director of Plaintiff North
    Carolina Council of Churches ("NCCC") (ECF No. 11-47)...................App. 382

Exhibit 45 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend John Doe # 17 Supporting Plaintiff NCCC
    (ECF No. 11-48) ......................................................................................App. 387

Exhibit 46 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Bishop Robin Dease on Behalf of Plaintiff The North Georgia
    Conference of The United Methodist Church ("NGA")
    (ECF No. 11-49) ......................................................................................App. 391

Exhibit 47 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Angela Gilreath-Rivers on Behalf of Anonymous Member Church for
    Plaintiff NGA (ECF No. 11-50) .............................................................App. 397

Exhibit 48 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Pastor Jane Doe # 18 on Behalf of Anonymous Member Church
    Supporting Plaintiff NGA (ECF No. 11-51) ...........................................App. 402

Exhibit 49 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Rabbi Jacob Blumenthal, Chief Executive Officer of Plaintiffs The
    Rabbinical Assembly ("RA") and The United Synagogue of
    Conservative Judaism ("USCJ") (ECF No. 11-52) .................................App. 406

Exhibit 50 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Rabbi Jill Borodin on Behalf of Herself and Congregation Beth
Shalom Supporting Plaintiffs RA and USCJ (ECF No. 11-53)..............App. 412

Exhibit 51 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Rabbi Deborah Waxman, President and CEO of Plaintiff
Reconstructing Judaism (ECF No. 11-54)................................................App. 416

Exhibit 52 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Rabbi Dev Noily on Behalf of Kehilla Community Synagogue
Supporting Plaintiff Reconstructing Judaism (ECF No. 11-55)..............App. 423

Exhibit 53 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Rabbi John Doe # 19 on Behalf of an Anonymous Synagogue
Supporting Plaintiff Reconstructing Judaism (ECF No. 11-56)..............App. 428

Exhibit 54 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Jeremy Langill for Plaintiff Rhode Island State Council of Churches
("RISCC") (ECF No. 11-57) ....................................................................App. 432

Exhibit 55 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend John Doe # 20 on Behalf of Anonymous Congregation
Supporting Plaintiff RISCC (ECF No. 11-58)........................................App. 437

Exhibit 56 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Melissa S. Johnson, General Counsel and Vice President, People &
Culture for Plaintiff Union for Reform Judaism ("URJ")
(ECF No. 11-59) ......................................................................................App. 441

Exhibit 57 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Rabbi John Doe # 21 on Behalf of Anonymous Congregation in Support
of Plaintiff URJ (ECF No. 11-60)............................................................App. 447

Exhibit 58 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Carey McDonald, Executive Vice President of Plaintiff Unitarian
Universalist Association ("UUA") (ECF No. 11-61)..............................App. 452

viii

Exhibit 59 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Jane Doe # 22 on Behalf of Anonymous Congregation Supporting
   Plaintiff UUA (ECF No. 11-62) ..............................................................App. 458

Exhibit 60 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Bishop Kenneth H. Carter, Jr. on Behalf of Plaintiff The Western
   North Carolina Conference of The United Methodist Church ("WNCC")
   (ECF No. 11-63) ....................................................................................App. 463

Exhibit 61 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend John Doe # 23 on Behalf of Anonymous Member Church
   Supporting Plaintiff WNCC (ECF No. 11-64) ........................................App. 469

Exhibit 62 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend John Doe # 24 on Behalf of Anonymous Member Church
   Supporting Plaintiff WNCC (ECF No. 11-65) ........................................App. 474

Exhibit 63 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Kerri Parker, Executive Director of Plaintiff Wisconsin
   Council of Churches ("WCC") (ECF No. 11-66)....................................App. 479

Exhibit 64 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Jane Doe # 25 on Behalf of Anonymous Member Church Supporting
   Plaintiff WCC (ECF No. 11-67) ..............................................................App. 485

Exhibit 65 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   David Liners, Executive Director of Plaintiff WISDOM
   (ECF No. 11-68) ....................................................................................App. 489

Exhibit 66 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   John Doe # 26 in Support of Plaintiff WISDOM (ECF No. 11-69)........App. 494

Notice of Corrected Declarations (ECF No. 24)...........................................App. 499

Amended Declaration of Pastor John Doe #12 on Behalf of Anonymous
   Congregation Supporting Plaintiff GCORR (ECF No. 24-1) .................App. 502

Amended Declaration of Bishop Robin Dease on Behalf of Plaintiff
  NGA (ECF No. 24-2).................................................................................App. 506

Exhibits to Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion

Exhibit A to Defendants' Opposition, Memorandum from Caleb Vitello,
  Acting Director, ICE, "Common Sense Enforcement Actions in
  or Near Protected Areas" (Jan. 31, 2025) (ECF No. 16-1) .....................App. 511

x

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00403-DLF

MENNONITE CHURCH USA et al v. U.S. DEPARTMENT OF
HOMELAND SECURITY et al
Assigned to: Judge Dabney L. Friedrich
Case in other court: USCA, 25-05209
Cause: 42:2000 Religion

Date Filed: 02/11/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**MENNONITE CHURCH USA**                represented by   **Alexandra Lichtenstein**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
600 New Jersey Avenue NW
Washington, DC 20001
757-581-1046
Email: alex.lichtenstein@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
600 New Jersey Ave. NW
Washington, DC 20001
202-661-6539
Email: jg1370@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
600 New Jersey Avenue NW
Washington, DC 20001
202-661-6627
Email: kt894@georgetown.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
600 New Jersey Avenue NW
Washington, DC 20001
410-533-1545
Email: sc2053@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
INSTITUTE FOR CONSTITUTIONAL

ADVOCACY AND PROTECTION
600 New Jersey Avenue NW
Washington, DC 20001
202-661-6728
Fax: 202-661-6730
Email: kbc74@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AFRICAN METHODIST EPISCOPAL ZION CHURCH**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CENTRAL CONFERENCE OF AMERICAN RABBIS**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHRISTIAN CHURCH (DISCIPLES OF CHRIST)**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHURCH OF THE BRETHREN, INC.**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CONVENCION BAUTISTA HISPANA DE TEXAS**                represented by    **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EPISCOPAL CHURCH**                represented by    **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FELLOWSHIP SOUTHWEST**              represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FRIENDS GENERAL CONFERENCE**       represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GENERAL ASSEMBLY OF THE**          represented by **Alexandra Lichtenstein**
**PRESBYTERIAN CHURCH (U.S.A.)**      (See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

Kate Talmor
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH**     represented by    **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LATINO CHRISTIAN NATIONAL NETWORK**     represented by    **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MASSACHUSETTS COUNCIL OF CHURCHES**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NEW YORK STATE COUNCIL OF CHURCHES**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORTH CAROLINA COUNCIL OF CHURCHES**          represented by   **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH**          represented by   **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

Kelsi B. Corkran
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RABBINICAL ASSEMBLY**                    represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RECONSTRUCTING JUDAISM**              represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RHODE ISLAND STATE COUNCIL OF**        represented by **Alexandra Lichtenstein**
**CHURCHES**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

UNION FOR REFORM JUDAISM          represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

UNITARIAN UNIVERSALIST
ASSOCIATION                        represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH**
*through The Board of Trustees, Western North Carolina Conference, United Methodist Church, Inc.*

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WISCONSIN COUNCIL OF CHURCHES**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WISDOM, INC.**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ALL PLAINTIFFS**

represented by **Alexandra Lichtenstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia Gegenheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Talmor**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shelby Bradford Calambokidis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kelsi B. Corkran**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**U.S. DEPARTMENT OF HOMELAND
SECURITY**

represented by **Kristina Ann Wolfe**
U.S. DEPARTMENT OF JUSTICE
P.O. Box 883
Ben Franklin Station
Washington, DC 20044
(202) 353-4519
Email: kristina.wolfe@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**KRISTI NOEM**
*Secretary of the U.S. Department of
Homeland Security, in her official capacity*

represented by **Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**U.S. CUSTOMS AND BORDER
PROTECTION**

represented by **Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**PETE R. FLORES**
*Secretary of the U.S. Department of
Homeland Security, in her official capacity*

represented by **Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT**

represented by **Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**CALEB VITELLO**
*Acting Director, U.S. Immigration and
Customs Enforcement, in his official
capacity*

represented by **Kristina Ann Wolfe**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| IMMIGRATION REFORM LAW INSTITUTE | represented by | **Christopher Joseph Hajec** IMMIGRATION REFORM LAW INSTITUTE 25 Massachusetts Avenue, NW Suite 335 Washington, DC 20001 (202) 232-5590 Fax: (202) 464-3590 Email: chajec@irli.org *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11470854) filed by RHODE ISLAND STATE COUNCIL OF CHURCHES, CONVENCION BAUTISTA HISPANA DE TEXAS, WISCONSIN COUNCIL OF CHURCHES, AFRICAN METHODIST EPISCOPAL ZION CHURCH, NORTH CAROLINA COUNCIL OF CHURCHES, MENNONITE CHURCH USA, NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH, NEW YORK STATE COUNCIL OF CHURCHES, WISDOM, INC., WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH, MASSACHUSETTS COUNCIL OF CHURCHES, RECONSTRUCTING JUDAISM, UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM, FRIENDS GENERAL CONFERENCE, GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.), UNION FOR REFORM JUDAISM, LATINO CHRISTIAN NATIONAL NETWORK, UNITARIAN UNIVERSALIST ASSOCIATION, CHURCH OF THE BRETHREN, CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST, FELLOWSHIP SOUTHWEST, GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH, NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, EPISCOPAL CHURCH, CENTRAL CONFERENCE OF AMERICAN RABBIS, RABBINICAL ASSEMBLY, CHRISTIAN CHURCH (DISCIPLES OF CHRIST). (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Civil Cover Sheet, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons)(Corkran, Kelsi) (Entered: 02/11/2025) |
| 02/11/2025 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by FRIENDS GENERAL CONFERENCE, GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.), GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH, LATINO CHRISTIAN NATIONAL NETWORK, MASSACHUSETTS COUNCIL OF CHURCHES, NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, NEW YORK STATE COUNCIL OF CHURCHES, NORTH CAROLINA COUNCIL OF CHURCHES, NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH, RABBINICAL ASSEMBLY, MENNONITE CHURCH USA, RECONSTRUCTING JUDAISM, RHODE ISLAND STATE COUNCIL OF CHURCHES, UNION FOR REFORM JUDAISM, UNITARIAN UNIVERSALIST ASSOCIATION, UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM, WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH, WISCONSIN COUNCIL OF CHURCHES, WISDOM, INC., AFRICAN METHODIST EPISCOPAL ZION CHURCH, CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST, CENTRAL |

| | | |
|---|---|---|
| | | CONFERENCE OF AMERICAN RABBIS, CHRISTIAN CHURCH (DISCIPLES OF CHRIST), CHURCH OF THE BRETHREN, CONVENCION BAUTISTA HISPANA DE TEXAS, EPISCOPAL CHURCH, FELLOWSHIP SOUTHWEST (Corkran, Kelsi) (Entered: 02/11/2025) |
| 02/11/2025 | 3 | NOTICE of Appearance by Kelsi B. Corkran on behalf of All Plaintiffs (Corkran, Kelsi) (Main Document 3 replaced on 2/11/2025) (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | 4 | NOTICE of Appearance by Alexandra Lichtenstein on behalf of All Plaintiffs (Lichtenstein, Alexandra) (Entered: 02/11/2025) |
| 02/11/2025 | 5 | NOTICE of Appearance by Shelby Bradford Calambokidis on behalf of All Plaintiffs (Calambokidis, Shelby) (Entered: 02/11/2025) |
| 02/11/2025 | | RESOLVED.....NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error(s) need correction: Attorney Kelsi Corkran is not an Active bar member. Please refer to the court website for Bar Status Lookup, Attorney Admissions, and Renewal Information at www.dcd.uscourts.gov/attorneys. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (znmw) Modified on 2/11/2025 (znmw). Modified on 2/11/2025 (zhcn). (Entered: 02/11/2025) |
| 02/11/2025 | | Case Assigned to Judge Dabney L. Friedrich. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 6 | SUMMONS (6) Issued Electronically as to All Defendants. (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/11/2025) |
| 02/11/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error(s) need correction: Missing summonses- U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 7 | REQUEST FOR SUMMONS TO ISSUE filed by ALL PLAINTIFFS.(Lichtenstein, Alexandra) (Entered: 02/11/2025) |
| 02/12/2025 | 8 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (mg) (Entered: 02/12/2025) |
| 02/12/2025 | 9 | STANDARD ORDER for Civil Cases. See text for details. Signed by Judge Dabney L. Friedrich on February 12, 2025. (lcdlf1) (Entered: 02/12/2025) |
| 02/21/2025 | 10 | Joint MOTION for Scheduling Order by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Corkran, Kelsi) (Entered: 02/21/2025) |
| 02/21/2025 | 11 | MOTION for Preliminary Injunction by ALL PLAINTIFFS. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Declaration Index, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Exhibit 22, # 26 Exhibit 23, # 27 Exhibit 24, # 28 Exhibit 25, # 29 Exhibit 26, # 30 Exhibit 27, # 31 Exhibit 28, # 32 Exhibit 29, # 33 Exhibit 30, # 34 Exhibit 31, # 35 Exhibit 32, # 36 Exhibit 33, # 37 Exhibit 34, # 38 Exhibit 35, # 39 Exhibit 36, # 40 Exhibit 37, # 41 Exhibit 38, # 42 Exhibit 39, # 43 Exhibit 40, # 44 Exhibit 41, # 45 Exhibit 42, # 46 Exhibit 43, # 47 Exhibit 44, # 48 Exhibit 45, # 49 Exhibit 46, # 50 Exhibit 47, # 51 Exhibit 48, # 52 Exhibit 49, # 53 Exhibit 50, # 54 Exhibit 51, # 55 Exhibit 52, # 56 Exhibit 53, # 57 Exhibit 54, # 58 Exhibit 55, # 59 Exhibit 56, # 60 Exhibit 57, # 61 Exhibit 58, # 62 Exhibit 59, # 63 Exhibit 69, # 64 Exhibit |

App. 015

6), # 65 Exhibit 62, # 66 Exhibit 63, # 67 Exhibit 64, # 68 Exhibit 65, # 69 Exhibit 66) (Corkran, Kelsi) (Entered: 02/21/2025)

| | | |
|---|---|---|
| 02/24/2025 | | MINUTE ORDER granting the 10 Motion for Scheduling Order. The defendants shall file their response to the plaintiffs' 10 Motion for Preliminary Injunction on or before March 14, 2025; and the plaintiff shall file their reply on or before March 24, 2025. The Courtroom Deputy will contact the parties to schedule a motions hearing on April 2, 3, or 4. So Ordered by Judge Dabney L. Friedrich on February 24, 2025. (lcdlf1) (Entered: 02/24/2025) |
| 02/25/2025 | 12 | NOTICE of Appearance by Kristina Ann Wolfe on behalf of All Defendants (Wolfe, Kristina) (Entered: 02/25/2025) |
| 02/25/2025 | | NOTICE of Hearing: Preliminary Injunction Hearing set for 4/4/2025 at 10:00 AM in Courtroom 24A (In Person) before Judge Dabney L. Friedrich. (smc) (Entered: 02/25/2025) |
| 02/26/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Julia Gegenheimer, Filing fee $ 100, receipt number ADCDC-11504948. Fee Status: Fee Paid. by ALL PLAINTIFFS. (Attachments: # 1 Exhibit Declaration of Julia Gegenheimer and Certificate of Good Standing, # 2 Text of Proposed Order)(Calambokidis, Shelby) (Entered: 02/26/2025) |
| 02/26/2025 | | MINUTE ORDER granting the 13 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So Ordered by Judge Dabney L. Friedrich on February 26, 2025. (lcdlf1) (Entered: 02/26/2025) |
| 02/26/2025 | 14 | NOTICE of Appearance by Julia Gegenheimer on behalf of All Plaintiffs (Gegenheimer, Julia) (Entered: 02/26/2025) |
| 03/04/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Kate Talmor, Filing fee $ 100, receipt number ADCDC-11509597. Fee Status: Fee Paid. by ALL PLAINTIFFS. (Attachments: # 1 Exhibit Declaration of Kate Talmor and Certificate of Good Standing, # 2 Text of Proposed Order)(Lichtenstein, Alexandra) Modified docket text on 3/4/2025 (mg). (Entered: 03/04/2025) |
| 03/04/2025 | | MINUTE ORDER granting the 15 Motion for Leave to Appear Pro Hac Vice. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So Ordered by Judge Dabney L. Friedrich on March 4, 2025. (lcdlf1) (Entered: 03/04/2025) |
| 03/14/2025 | 16 | Memorandum in opposition to re 11 Motion for Preliminary Injunction,,,,, filed by U.S. DEPARTMENT OF HOMELAND SECURITY, KRISTI NOEM, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Wolfe, Kristina) (Entered: 03/14/2025) |
| 03/19/2025 | 17 | Unopposed MOTION for Leave to File Amicus Brief *in support of Defendants* by IMMIGRATION REFORM LAW INSTITUTE. (Attachments: # 1 Exhibit amicus brief, # 2 Exhibit proposed order)(Hajec, Christopher) (Entered: 03/19/2025) |
| 03/19/2025 | | MINUTE ORDER granting the 17 Unopposed Motion for Leave to File Amici Curiae Brief. The Clerk of Court is directed to file the [17-1] Brief of Immigration Reform Law Institute on the docket. So Ordered by Judge Dabney L. Friedrich on March 19, 2025. (lcdlf1) Modified to correct chambers error on 3/20/2025 (smc). (Entered: 03/19/2025) |
| 03/19/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 17 Unopposed MOTION for Leave to File Amicus Brief *in support of Defendants* by IMMIGRATION |

REFORM LAW INSTITUTE. (Attachments: # 1 Exhibit amicus brief, # 2 Exhibit proposed order)(Hajec, Christopher).

Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal.

Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 3/26/2025. (zhcn) 3/21/2025 (zapb). (Entered: 03/20/2025)

| 03/19/2025 | 18 | AMICUS BRIEF by IMMIGRATION REFORM LAW INSTITUTE. (mg) (Entered: 03/20/2025) |
| 03/20/2025 | 19 | NOTICE of Proposed Order *for Preliminary Injunction* by ALL PLAINTIFFS re 11 MOTION for Preliminary Injunction (Attachments: # 1 Text of Proposed Order) (Gegenheimer, Julia) (Entered: 03/20/2025) |
| 03/24/2025 | 20 | REPLY to opposition to motion re 11 Motion for Preliminary Injunction,,,,, filed by ALL PLAINTIFFS. (Corkran, Kelsi) (Entered: 03/24/2025) |
| 03/25/2025 | 21 | NOTICE of Appearance by Kate Talmor on behalf of All Plaintiffs (Talmor, Kate) (Entered: 03/25/2025) |
| 03/25/2025 | 22 | Unopposed MOTION for Order *Providing Remote Public Access to Courtroom Audio for the April 4, 2025 Hearing* by ALL PLAINTIFFS. (Attachments: # 1 Text of Proposed Order)(Gegenheimer, Julia) (Entered: 03/25/2025) |
| 03/26/2025 | | MINUTE ORDER granting the 22 Motion for Order Providing Remote Public Access. The docket will be updated to provide the public dial-in line for the hearing of April 4, 2025. So Ordered by Judge Dabney L. Friedrich on March 26, 2025. (lcdlf1) (Entered: 03/26/2025) |
| 03/26/2025 | | MINUTE ORDER: The court will provide access for the public to telephonically attend the hearing scheduled for April 4, 2025, at 10:00 AM. The hearing can be accessed by dialing the Toll-Free Number: 833-990-9400 (Meeting ID: 117076001). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Dabney L. Friedrich on 3/26/2025. (smc) (Entered: 03/26/2025) |
| 03/31/2025 | 23 | LEAVE TO FILE DENIED- Jonah the Tishbite Motion to Intervene. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file DENIED. The putative intervenor has not established that he is entitled to intervene as of right, or that he qualifies for permissive intervention, under Federal Rule of Civil Procedure 24(a), (b)." Signed by Judge Dabney L. Friedrich on 3/31/2025. (mg) (Entered: 04/01/2025) |
| 04/02/2025 | 24 | NOTICE *of Corrected Declarations* by ALL PLAINTIFFS (Attachments: # 1 Declaration, # 2 Declaration)(Gegenheimer, Julia) (Entered: 04/02/2025) |
| 04/03/2025 | 25 | NOTICE *of Filing of Proof of Service/Summons Executed* by ALL PLAINTIFFS (Attachments: # 1 Declaration, # 2 Exhibit USPS Tracking Delivery Confirmations) |

App. 017

| | | |
|---|---|---|
| 04/03/2025 | 26 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 2/202/2025., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/20/2025. ( Answer due for ALL FEDERAL DEFENDANTS by 4/21/2025.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PETE R. FLORES served on 2/21/2025; KRISTI NOEM served on 2/19/2025; U.S. CUSTOMS AND BORDER PROTECTION served on 2/21/2025; U.S. DEPARTMENT OF HOMELAND SECURITY served on 2/19/2025; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT served on 2/19/2025; CALEB VITELLO served on 2/19/2025. (See docket entry 25 to view document) (mg) (Entered: 04/08/2025) |
| 04/04/2025 | | Minute Entry for Motion Hearing held on 4/4/2025 before Judge Dabney L. Friedrich: re 11 MOTION for Preliminary Injunction. Oral arguments heard and TAKEN UNDER ADVISEMENT. Court Reporter: Sara Wick. (smc) (Entered: 04/04/2025) |
| 04/07/2025 | 28 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: Motion to Intervene; Jonah the Tishbite. Reason(s): Filer is not a party to the case. (zdp) (Entered: 04/11/2025) |
| 04/09/2025 | 27 | Unopposed MOTION to Clarify re Order on Motion for Scheduling Order,, Set/Reset Deadlines, by PETE R. FLORES, KRISTI NOEM, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Attachments: # 1 Text of Proposed Order)(Wolfe, Kristina) (Entered: 04/09/2025) |
| 04/09/2025 | | MINUTE ORDER granting the 27 Unopposed Motion to Clarify. It is ordered that all filing deadlines, case management obligations, and discovery are STAYED pending resolution of plaintiffs' 11 Motion for a Preliminary Injunction. This stay applies, without limitation, to defendants' response to plaintiffs' complaint, the attorney conference required pursuant to Federal Rule of Civil Procedure 26(f); the issuance of a scheduling order pursuant to Federal Rule of Civil Procedure 16(b); initial disclosure obligations pursuant to Rule 26(a)(1); and all other written, documentary, and oral discovery. The stay is entered without prejudice to either party moving to lift the stay. So Ordered by Judge Dabney L. Friedrich on April 9, 2025. (lcdlf1) (Entered: 04/09/2025) |
| 04/11/2025 | 29 | ORDER denying the 11 Motion for Preliminary Injunction. See text for details. Signed by Judge Dabney L. Friedrich on April 11, 2025. (lcdlf1) (Entered: 04/11/2025) |
| 04/11/2025 | 30 | MEMORANDUM OPINION regarding the 11 Motion for Preliminary Injunction. See text for details. Signed by Judge Dabney L. Friedrich on April 11, 2025. (lcdlf1) (Entered: 04/11/2025) |
| 04/11/2025 | 31 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: Motion to Intervene; Jonah the Tishbite.. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit Part 1 of 2, # 2 Exhibit Part 2 of 2) (zdp) (Entered: 04/18/2025) |
| 04/21/2025 | 32 | Joint STATUS REPORT by LATINO CHRISTIAN NATIONAL NETWORK, MASSACHUSETTS COUNCIL OF CHURCHES, MENNONITE CHURCH USA, NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, NEW YORK STATE COUNCIL OF CHURCHES, NORTH CAROLINA COUNCIL OF CHURCHES, NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH, RABBINICAL ASSEMBLY, RECONSTRUCTING JUDAISM, RHODE ISLAND STATE COUNCIL OF CHURCHES, UNION FOR REFORM JUDAISM, UNITARIAN UNIVERSALIST ASSOCIATION, UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM, WESTERN NORTH CAROLINA CONFERENCE OF |

| | | |
|---|---|---|
| | | THE UNITED METHODIST CHURCH, WISCONSIN COUNCIL OF CHURCHES, WISDOM, INC.. (Talmor, Kate) (Entered: 04/21/2025) |
| 04/22/2025 | | MINUTE ORDER. Upon consideration of the parties' 32 Joint Status Report, it is ordered that this case remains STAYED. See Minute Order of April 9, 2025. The parties are directed to file a joint status report on or before May 12, 2025, proposing a schedule for further proceedings. So Ordered by Judge Dabney L. Friedrich on April 22, 2025. (lcdlf2) (Entered: 04/22/2025) |
| 04/22/2025 | | Case Stayed. (smc) (Entered: 04/22/2025) |
| 05/12/2025 | 33 | Joint STATUS REPORT by PETE R. FLORES, KRISTI NOEM, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, CALEB VITELLO. (Attachments: # 1 Text of Proposed Order)(Wolfe, Kristina) (Entered: 05/12/2025) |
| 05/14/2025 | | MINUTE ORDER. Upon consideration the 33 Joint Status Report, the following schedule shall govern further proceedings: the plaintiffs shall file their renewed motion for a preliminary injunction on or before June 2, 2025; the defendants shall file their response on or before June 25, 2025; and the plaintiffs shall file their reply on or before July 9, 2025. All additional deadlines, case management obligations, and discovery remain STAYED pending the Court's resolution of the plaintiffs' forthcoming renewed motion for a preliminary injunction. So Ordered by Judge Dabney L. Friedrich on May 14, 2025. (lcdlf1) (Entered: 05/14/2025) |
| 05/19/2025 | 34 | TRANSCRIPT OF MOTION HEARING before Judge Dabney L. Friedrich held on 04/04/2025. Page Numbers: 1-86. Date of Issuance: 05/19/2025. Court Reporter: Sara Wick, telephone number 202-354-3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/9/2025. Redacted Transcript Deadline set for 6/19/2025. Release of Transcript Restriction set for 8/17/2025.(Wick, Sara) (Entered: 05/19/2025) |
| 05/27/2025 | 35 | Consent MOTION for Briefing Schedule *Modification* by AFRICAN METHODIST EPISCOPAL ZION CHURCH, ALL PLAINTIFFS, CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST, CENTRAL CONFERENCE OF AMERICAN RABBIS, CHRISTIAN CHURCH (DISCIPLES OF CHRIST), CHURCH OF THE BRETHREN, INC., CONVENCION BAUTISTA HISPANA DE TEXAS, EPISCOPAL CHURCH, FELLOWSHIP SOUTHWEST, FRIENDS GENERAL CONFERENCE, GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.), GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH, LATINO CHRISTIAN NATIONAL NETWORK, MASSACHUSETTS COUNCIL OF CHURCHES, MENNONITE CHURCH USA, NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, NEW YORK STATE COUNCIL OF CHURCHES, NORTH CAROLINA COUNCIL OF CHURCHES, NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST |

| | | |
|---|---|---|
| | | CHURCH, RABBINICAL ASSEMBLY, RECONSTRUCTING JUDAISM, RHODE ISLAND STATE COUNCIL OF CHURCHES, UNION FOR REFORM JUDAISM, UNITARIAN UNIVERSALIST ASSOCIATION, UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM, WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH, WISCONSIN COUNCIL OF CHURCHES, WISDOM, INC.. (Talmor, Kate) (Entered: 05/27/2025) |
| 05/28/2025 | | MINUTE ORDER granting the 35 Consent Motion for Briefing Schedule Modification. The plaintiffs shall file their renewed motion for a preliminary injunction on or before June 4, 2025.<br><br>The Court is not inclined to grant any motion requesting an indicative ruling under Federal Rule of Civil Procedure 62.1(a). Such a ruling is proper where it would "promote judicial efficiency and fairness" by, for example, obviating the need for the appeal. *Amarin Pharms. Ireland Ltd. v. FDA*, 139 F.Supp.3d 437, 447 (D.D.C. 2015). That is not the case here. Among other reasons, the Court would be required "to consider the exact issue that is pending on appeal." *Litovich v. Bank of Am. Corp.*, No. 20-cv-3154 (VEC), 2022 WL 16856436, at *2 (S.D.N.Y. Nov. 10, 2022). In any renewed motion for a preliminary injunction, the plaintiffs would be required to establish standing to sue for their requested relief. Thus, any indicative ruling would necessarily need to address the issue of standing, which the plaintiffs would also raise in their appeal of the Court's April 11, 2025 Order denying the plaintiffs' initial motion on standing grounds. Where standing is the "the very issue on appeal..., an indicative ruling from this Court on the topic 'would not promote judicial efficiency or fairness.'" *Amarin Pharms.*, 139 F.Supp.3d at 447. So Ordered by Judge Dabney L. Friedrich on May 28, 2025. (lcdlf1) (Entered: 05/28/2025) |
| 05/30/2025 | 36 | NOTICE by AFRICAN METHODIST EPISCOPAL ZION CHURCH, ALL PLAINTIFFS, CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST, CENTRAL CONFERENCE OF AMERICAN RABBIS, CHRISTIAN CHURCH (DISCIPLES OF CHRIST), CHURCH OF THE BRETHREN, INC., CONVENCION BAUTISTA HISPANA DE TEXAS, EPISCOPAL CHURCH, FELLOWSHIP SOUTHWEST, FRIENDS GENERAL CONFERENCE, GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.), GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH, LATINO CHRISTIAN NATIONAL NETWORK, MASSACHUSETTS COUNCIL OF CHURCHES, MENNONITE CHURCH USA, NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, NEW YORK STATE COUNCIL OF CHURCHES, NORTH CAROLINA COUNCIL OF CHURCHES, NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH, RABBINICAL ASSEMBLY, RECONSTRUCTING JUDAISM, RHODE ISLAND STATE COUNCIL OF CHURCHES, UNION FOR REFORM JUDAISM, UNITARIAN UNIVERSALIST ASSOCIATION, UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM, WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH, WISCONSIN COUNCIL OF CHURCHES, WISDOM, INC. (Talmor, Kate) (Entered: 05/30/2025) |
| 05/30/2025 | 37 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 29 Order on Motion for Preliminary Injunction, Set/Reset Deadlines, 30 Memorandum & Opinion by AFRICAN METHODIST EPISCOPAL ZION CHURCH, ALL PLAINTIFFS, CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST, CENTRAL CONFERENCE OF AMERICAN RABBIS, CHRISTIAN CHURCH (DISCIPLES OF CHRIST), CHURCH OF THE BRETHREN, INC., CONVENCION BAUTISTA HISPANA DE TEXAS, EPISCOPAL CHURCH, FELLOWSHIP SOUTHWEST, FRIENDS GENERAL CONFERENCE, GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.), GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH, LATINO CHRISTIAN NATIONAL NETWORK, |

| | | MASSACHUSETTS COUNCIL OF CHURCHES, MENNONITE CHURCH USA, NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, NEW YORK STATE COUNCIL OF CHURCHES, NORTH CAROLINA COUNCIL OF CHURCHES, NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH, RABBINICAL ASSEMBLY, RECONSTRUCTING JUDAISM, RHODE ISLAND STATE COUNCIL OF CHURCHES, UNION FOR REFORM JUDAISM, UNITARIAN UNIVERSALIST ASSOCIATION, UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM, WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH, WISCONSIN COUNCIL OF CHURCHES, WISDOM, INC.. Filing fee $ 605, receipt number ADCDC-11725538. Fee Status: Fee Paid. Parties have been notified. (Talmor, Kate) (Entered: 05/30/2025) |
|---|---|---|
| 06/02/2025 | 38 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 37 Notice of Appeal to DC Circuit Court, (zdp) (Entered: 06/02/2025) |
| 06/05/2025 | | USCA Case Number 25-5209 for 37 Notice of Appeal to DC Circuit Court,,,,, filed by RECONSTRUCTING JUDAISM, NEW YORK STATE COUNCIL OF CHURCHES, LATINO CHRISTIAN NATIONAL NETWORK, NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH, NORTH CAROLINA COUNCIL OF CHURCHES, FELLOWSHIP SOUTHWEST, GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH, ALL PLAINTIFFS, MASSACHUSETTS COUNCIL OF CHURCHES, CHRISTIAN CHURCH (DISCIPLES OF CHRIST), RHODE ISLAND STATE COUNCIL OF CHURCHES, NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, EPISCOPAL CHURCH, CHURCH OF THE BRETHREN, INC., WISDOM, INC., FRIENDS GENERAL CONFERENCE, AFRICAN METHODIST EPISCOPAL ZION CHURCH, CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST, UNITARIAN UNIVERSALIST ASSOCIATION, CENTRAL CONFERENCE OF AMERICAN RABBIS, UNITED SYNAGOGUE OF CONSERVATIVE JUDAISM, RABBINICAL ASSEMBLY, UNION FOR REFORM JUDAISM, WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH, GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.), MENNONITE CHURCH USA, WISCONSIN COUNCIL OF CHURCHES, CONVENCION BAUTISTA HISPANA DE TEXAS. (zdp) (Entered: 06/05/2025) |
| 07/15/2025 | 39 | Mail Returned as Undeliverable re 23 Leave to File Denied, Sent to Jonah Tishbite; Resent to New Address: Unknown - Unable to Forward. (smc) (Entered: 07/15/2025) |

App. 021

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA,
3145 Benham Avenue Suite 1
Elkhart, IN 46517;

THE AFRICAN METHODIST
EPISCOPAL ZION CHURCH,
3225 West Sugar Creek Road
Charlotte, NC 28269;

CENTRAL ATLANTIC CONFERENCE
UNITED CHURCH OF CHRIST,
918 South Rolling Road
Catonsville, MD 21228;

THE CENTRAL CONFERENCE OF
AMERICAN RABBIS,
355 Lexington Avenue
New York, NY 10017;

CHRISTIAN CHURCH (DISCIPLES OF
CHRIST),
1099 N. Meridian Street
Indianapolis, IN 46204;

CHURCH OF THE BRETHREN, INC.
1451 Dundee Avenue
Elgin, IL, 60120;

CONVENCIÓN BAUTISTA HISPANA
DE TEXAS,
PO Box 761264
San Antonio, TX 78245;

THE EPISCOPAL CHURCH,
815 Second Avenue
New York, NY 10017;

FELLOWSHIP SOUTHWEST,
PO Box 822993
Dallas, TX 75382;

Case No.: _____

**COMPLAINT**

FRIENDS GENERAL CONFERENCE,
PO Box 40844
Philadelphia, PA 19107;

GENERAL ASSEMBLY OF THE
PRESBYTERIAN CHURCH (U.S.A.),
through the Stated Clerk of the General
Assembly, Rev. Jihyun Oh,
100 Witherspoon Street
Louisville, KY 40202;

GENERAL COMMISSION ON
RELIGION AND RACE OF THE UNITED
METHODIST CHURCH,
100 Maryland Avenue, NE
Washington, DC 20002;

LATINO CHRISTIAN NATIONAL
NETWORK,
PO Box 32382
Amarillo, TX 79120;

MASSACHUSETTS COUNCIL OF
CHURCHES,
138 Tremont Street
Boston, MA 02111;

THE NEW YORK ANNUAL
CONFERENCE OF THE UNITED
METHODIST CHURCH,
20 Soundview Avenue
White Plains, NY 10606;

NEW YORK STATE COUNCIL OF
CHURCHES,
85 Chestnut Street
Albany, NY 12210;

NORTH CAROLINA COUNCIL OF
CHURCHES,
27 Horne Street
Raleigh, NC 27607;

THE NORTH GEORGIA CONFERENCE
OF THE UNITED METHODIST
CHURCH, through The Board of Trustees,

North Georgia Conference, United
Methodist Church, Inc.,
1795 Old Peachtree Road
Duluth, GA 30097;

THE RABBINICAL ASSEMBLY,
3080 Broadway #604
New York, NY 10027;

RECONSTRUCTING JUDAISM,
1299 Church Road
Wyncote, PA 19095;

RHODE ISLAND STATE COUNCIL OF
CHURCHES,
1520 Broad Street
Providence, RI 02905;

UNION FOR REFORM JUDAISM,
633 Third Avenue, 7th Floor
New York, NY 10017;

UNITARIAN UNIVERSALIST
ASSOCIATION,
24 Farnsworth Street
Boston, MA 02210;

THE UNITED SYNAGOGUE OF
CONSERVATIVE JUDAISM,
3080 Broadway, Suite B208
New York, NY 10027;

THE WESTERN NORTH CAROLINA
CONFERENCE OF THE UNITED
METHODIST CHURCH, through The
Board of Trustees, Western North Carolina
Conference, United Methodist Church, Inc.,
13924 Professional Center Drive #200
Huntersville, NC 28078;

WISCONSIN COUNCIL OF CHURCHES,
203 Wisconsin Avenue
Madison, WI 53703; and

WISDOM, INC.,
2821 North Vel R. Phillips Avenue #115,

Milwaukee, WI 53212,

        *Plaintiffs*,


       *v.*

U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Avenue, SE
Washington, DC 20528;

KRISTI NOEM, Secretary of the U.S.
Department of Homeland Security, in her
official capacity,
2707 Martin Luther King Jr. Avenue, SE
Washington, DC 20528;

U.S. CUSTOMS AND BORDER
PROTECTION,
1300 Pennsylvania Avenue, NW
Washington, DC 20004;

PETE R. FLORES, Acting Commissioner,
U.S. Customs and Border Protection, in his
official capacity,
1300 Pennsylvania Avenue, NW
Washington, DC 20004;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street, SW
Washington, DC 20536; and

CALEB VITELLO, Acting Director, U.S.
Immigration and Customs Enforcement, in
his official capacity,
500 12th Street, SW
Washington, DC 20536,

        *Defendants*.

## INTRODUCTION

1.      Plaintiffs in this challenge are 12 national denominational bodies and

representatives, 4 regional denominational bodies, and 11 denominational and

interdenominational associations, all rooted in the Jewish and Christian faiths.  Plaintiffs and

their members are Baptist, Brethren, Conservative Jewish, Episcopalian, Evangelical,

Mennonite, Quaker, Pentecostal, Presbyterian, Reconstructionist Jewish, Reform Jewish,

Unitarian Universalist, United Methodist, Zion Methodist, and more.  They bring this suit unified

on a fundamental belief: Every human being, regardless of birthplace, is a child of God worthy

of dignity, care, and love.[1]  Welcoming the stranger, or immigrant, is thus a central precept of

their faith practices.

2.      The Torah lays out this tenet 36 times, more than any other teaching: "The stranger

who resides with you shall be to you as one of your citizens; you shall love them as yourself, for

you were strangers in the land of Egypt" (Leviticus 19:34).  In the Gospels, Jesus Christ not only

echoes this command, but self-identifies with the stranger: "For I was hungry, and you gave me

food, I was thirsty, and you gave me drink, I was a stranger, and you welcomed me" (Matthew

25:35).  Plaintiffs' religious scripture, teaching, and traditions offer clear, repeated, and

irrefutable unanimity on their obligation to embrace, serve, and defend the refugees, asylum

seekers, and immigrants in their midst without regard to documentation or legal status.

3.      Recognizing the importance of communal religious practices "to the well-being of

people and the communities of which they are a part,"[2] the Department of Homeland Security

---

[1] The Unitarian Universalist belief system is explained in footnote 43.
[2] Ex. 2, Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec.,
"Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021),
https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-
actions-in-near-protected-areas.pdf [https://perma.cc/49LU-BNAK] ("2021 Memo").

("DHS") for over 30 years substantially restricted immigration enforcement action in or near places of worship.  Although DHS has statutory authority to conduct a variety of enforcement actions—such as conducting stops and interrogations, serving process and other orders, and executing immigration arrests and raids without judicial warrant—DHS's longstanding "sensitive locations" (or "protected areas") policy provided that Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") would do so at or near places of worship only under exigent circumstances or with prior written, high-level supervisory approval.

4.      On January 20, 2025, DHS abruptly reversed course and rescinded the sensitive locations policy.[3]  Disavowing the need for any "bright line rules regarding where our immigration laws are permitted to be enforced," the Rescission Memo instead directs ICE and CBP officers to "use [their] discretion along with a healthy dose of common sense" in deciding whether to conduct immigration enforcement actions at places of worship, during religious ceremonies, and at other sensitive locations.[4]  DHS's website features a news article stating that ICE agents understand the rescission "to free them up to go after more illegal immigrants."[5]

---

[3] *See* Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse [https://perma.cc/5TFV-ZSKP].
[4] Ex. 1, Memorandum from Benjamine C. Huffman, Acting Sec'y, DHS, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Rescission Memo").
[5] Press Release, DHS, Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens (Jan. 26, 2025), https://www.dhs.gov/news/2025/01/26/president-trump-already-securing-our-border-and-deporting-criminal-aliens [https://perma.cc/EG9L-UPKR].

5.       The rescission reflects President Donald Trump's goal of deporting all immigrants in the United States without lawful status during his current four-year term.[6]  To accomplish this, President Trump's "border czar" Tom Homan explained, DHS will conduct immigration enforcement actions "across the country, uninhibited by any prior administration guidelines."[7]  Federal officials have confirmed that the target of these enforcement actions will include undocumented immigrants with no criminal record.[8]  Over the first week of the current Trump Administration, ICE arrested over 4,500 people,[9] including nearly 1,000 people in a Sunday "immigration enforcement blitz."[10]

6.       At least one of these enforcement actions occurred at a church in Georgia during worship service.  According to news coverage,[11] an usher standing in the church entrance saw a group of ICE agents outside and locked the door.  The agents said that they were there to arrest Wilson Velásquez, who had traveled to the United States from Honduras with his wife and three children in 2022.  Immediately after crossing the border, they turned themselves in to U.S. authorities and requested asylum.  They were given a court date and then released after federal

---

[6] Ted Hesson, *Trump Aims to Deport All Immigrants in the US Illegally*, Reuters (Dec. 8, 2024), https://www.reuters.com/world/us/trump-says-he-aims-deport-all-immigrants-us-illegally-2024-12-08/ [https://perma.cc/XZD9-UXLQ].

[7] Nick Miroff & Maria Sacchetti, *Trump Officials Haven't Decided on Post-Inauguration Chicago Raids, Homan Says*, Wash. Post (Jan. 18, 2025), https://www.washingtonpost.com/immigration/2025/01/18/chicago-immigration-raids/ [https://perma.cc/D7AZ-P5WK].

[8] *Id.*

[9] Adam Fullerton, *Texas ICE Raid Tracker: Cities Where Arrests Have Happened*, Fox 4 News (Jan. 28, 2025), https://www.fox4news.com/news/texas-ice-raid-tracker-cities-dallas-austin-houston-jan-28 [https://perma.cc/D2F3-MDXV].

[10] Priscilla Alvarez & Rosa Flores, *Trump Administration Launches Nationwide Immigration Enforcement Blitz*, CNN (Jan. 27, 2025), https://www.cnn.com/2025/01/26/politics/chicago-immigration-trump-ice/index.html [https://perma.cc/22MM-9M68].

[11] *See* Andy Olsen, *When ICE Comes to Church*, Christianity Today (Jan. 31, 2025), https://www.christianitytoday.com/2025/01/should-churches-fear-ice-raids-atlanta/ [https://perma.cc/FPG3-5YNZ].

agents cinched a GPS-tracking monitor on Velásquez's ankle.  After settling in suburban Atlanta, the family joined a Pentecostal church where they worshipped several times a week and helped with music.  They were listening to the pastor's sermon when ICE agents arrived to arrest Velásquez.  Although Velásquez had attended all his required check-ins at an Atlanta ICE office and had a court date scheduled to present his asylum case to a judge, ICE agents arrested him anyway, explaining that they were simply "looking for people with ankle bracelets."  The pastor, Luis Ortiz, tried to reassure his congregation, but he "could see the fear and tears on their faces."

7.    Plaintiffs' congregations and members face an imminent risk of similar immigration enforcement actions at their places of worship.  Consistent with their call to welcome and serve all people, many have undocumented congregants and many offer social service ministries— such as food and clothing pantries, English as a Second Language ("ESL") classes, legal assistance, and job training services—at their churches and synagogues that serve undocumented people.  An immigration enforcement action during worship services, ministry work, or other congregational activities would be devastating to their religious practice.  It would shatter the consecrated space of sanctuary, thwart communal worship, and undermine the social service outreach that is central to religious expression and spiritual practice for Plaintiffs' congregations and members.

8.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of Plaintiffs' congregations and members.  Congregations are experiencing decreases in worship attendance and social services participation due to fear of immigration enforcement action.  For the vulnerable congregants who continue to attend worship services, congregations must choose between either exposing them to arrest or undertaking security measures that are in direct tension with their religious duties of welcome and hospitality.

Likewise, the choice that congregations currently face between discontinuing social service ministries or putting undocumented participants at risk of arrest is no choice at all: Either way, congregations are forced to violate their religious duty to serve and protect their immigrant neighbors.

9.      DHS's authorization of immigration enforcement action at Plaintiffs' places of worship in the absence of exigent circumstances or a judicial warrant violates Plaintiffs' rights under the Religious Freedom Restoration Act ("RFRA") and the First Amendment.  Under RFRA, the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that the burden is "the least restrictive means of furthering [a] compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 & n.2 (2014) (quoting 42 U.S.C. § 2000bb-1(a), (b)).  The First Amendment similarly prohibits government interference in the freedom of expressive association—including association for the purpose of engaging with others in protected religious exercise, speech, or peaceable assembly—unless the government can show its conduct serves "compelling state interests . . . that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

10.      As described above, the burden imposed on Plaintiffs' religious exercise by the looming threat of immigration enforcement action at their places of worship and during their religious ceremonies is profound, as is the interference such action causes to Plaintiffs' expressive association.  Whatever interest DHS has in enforcing immigration law, it cannot meet its burden of demonstrating that its interference with Plaintiffs' religious practices is the least restrictive means of serving that interest.

9

11.     Aside from substantially burdening religious exercise, DHS's abrupt rescission of its sensitive locations policy flouts legal constraints on agency action. Before reversing longstanding policy, an agency must recognize that it is changing course, reasonably explain its rationale for adopting the new policy, consider reliance interests that the previous policy may have engendered, and grapple with alternatives. DHS made no attempt to engage in such a considered approach. Instead, the agency simply declared—on the first full day of the new presidential administration—that "no longer" will "criminal aliens," such as "murders [sic] and rapists . . . . hide in America's schools and churches."[12]  DHS provided no evidence suggesting that the previous policy had allowed criminals to hide in churches, or otherwise had thwarted immigration enforcement. Nor did it consider the reasons animating the unbroken policy that had, over multiple administrations of both major political parties, recognized the sanctity of houses of worship and the need to abstain from violating those sacred spaces, absent compelling and unusual circumstances. DHS likewise ignored the serious harms that will befall communities of faith and those they serve if the government now is free to conduct immigration enforcement actions at places of worship and during religious ceremonies. The rescission is final agency action that violates the requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under the United States Constitution and 28 U.S.C. § 1331.

---

[12] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole, *supra* note 3.

13.    Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants are officers and employees of the United States, acting in their official capacities, or an agency thereof, and reside in this District; a substantial part of the events or omissions giving rise to this action are occurring in this District; and at least one Plaintiff resides in this District.

### PARTIES

14.    **Plaintiff The African Methodist Episcopal Zion Church** ("A.M.E. Zion") is a historically African-American Christian denomination, founded by Bishop James Varick in 1796 in New York City, chartered in 1801, and authorized as a denomination in 1820. A.M.E. Zion currently has 1,600 congregations and approximately 1,500,000 active members across the continental United States. Affectionately known as "The Freedom Church" and the Church of Harriet Tubman, Frederick Douglass, and Sojourner Truth, A.M.E. Zion proudly upholds Methodist doctrine and consistently promotes civil rights and liberation theology as its central focus for all people. Because its mission is "Loving God with all our heart, with all our soul, and with all our minds, and to love our neighbor as ourselves," A.M.E. Zion is committed to serving people regardless of race, creed, color, faith, or national origin, including immigrants lacking legal status. A.M.E. Zion is headquartered in Charlotte, North Carolina.

15.    **Plaintiff Central Atlantic Conference United Church of Christ** ("CAC") includes 153 congregations of the United Church of Christ in the mid-Atlantic region of the United States. Inspired by Jesus's "inclusive journey of love, justice, and hope," CAC "strives to foster the strength and well-being of the church in all its settings." Consistent with the United Church of Christ's core value of Extravagant Welcome, CAC believes that immigrants are human beings, made in God's image, and do not deserve the terror of harassment, threats, raids, violence,

imprisonment, separation from their families, and deportation; they deserve welcome and sanctuary.  CAC is headquartered in Catonsville, Maryland.

16.  **Plaintiff The Central Conference of American Rabbis** ("CCAR") is the Reform Rabbinic leadership organization.  Founded in 1889 with the mission of gathering Reform rabbis to provide mutual support, CCAR currently has 2,300 member rabbis who serve over 2 million Reform Jews.  CCAR enriches and strengthens the Jewish community by fostering excellence in the Reform rabbis who lead it.  Because the Jewish people's scripture and history compels them to work with and help immigrants and refugees, CCAR's member rabbis directly serve immigrant communities without regard to legal status.  CCAR recognizes that all human beings are created b'tzelem Elohim (in the image of God), and therefore are deserving of our respect and care.  CCAR is headquartered in New York, New York.

17.  **Plaintiff Christian Church (Disciples of Christ)** ("DOC") originated in Cane Ridge, Kentucky, in the early 1800s as a movement that rejected any test of fellowship to be welcomed into the Body of Christ.  The current denominational name and structure were adopted in 1969, and DOC now has over 3,000 congregations, all but 20 of which are in the United States.  Because the Bible calls Christians to welcome the stranger, DOC congregations have long been "immigrant welcoming" and involved in settling refugees and supporting immigrants in local communities.  DOC congregations welcome and serve immigrants regardless of status, believing that all are created in the image of God and that all persons have a right to respect, dignity, a means to support themselves, and opportunity to determine their own futures.  DOC is headquartered in Indianapolis, Indiana.

18.  **Plaintiff Church of the Brethren** ("COB") currently has approximately 75,185 members in 782 congregations within 23 districts.  It traces its roots back more than 300 years to

Germany when, in 1708, a group of individuals influenced by Pietism and Anabaptism broke away from the state churches to form their own religious group seeking to follow a different kind of life based on peaceful and compassionate action. Due to persecution and economic hardship, its members migrated to North America and organized the first congregation in 1723 in Germantown, Pennsylvania. COB is considered a historic peace church, and has continually prioritized loving enemies, welcoming the stranger, and acting in ways that promote the well-being of all and help those in need or who have been marginalized. Consistent with those beliefs, COB expresses its deep concern for the plight of refugees and immigrants, both undocumented and documented, and advocates for just and humane immigration policies. COB is headquartered in Elgin, Illinois.

19.    **Plaintiff Convención Bautista Hispana de Texas** ("CBHT") was founded in 1910 (f.k.a. Convención Bautista Mexicana de Texas) and incorporated in 2011 with the mission of serving its churches and members to fulfill their unique God-inspired vision. CBHT's membership includes approximately 1,100 Hispanic Baptist churches across Texas. Most of CBHT's congregations are affiliated at the national level with the Southern Baptist Convention, which has affirmed the responsibility of churches to minister to all individuals, regardless of immigration status, and has declared that any form of nativism, mistreatment, or exploitation is inconsistent with the Gospel of Jesus Christ. CBHT's member churches thus welcome immigrants into their congregations and serve them through social service ministries without regard to documentation. CBHT's registered office is in San Antonio, Texas.

20.    **Plaintiff The Episcopal Church** ("TEC") was established in 1785 and is a constituent member of the Anglican Communion, a global family of churches that have historic roots in the Church of England. TEC has 106 dioceses, with 96 in the United States and its

territories, that include more than 6,700 congregations with approximately 1.5 million active members.  Recognizing the Bible's repeated calls for God's people to embrace the foreigner as a way of extending the work that is at the heart of God in every time and place, TEC champions and advocates for humane policies towards migrants, and many dioceses, parishes, and Episcopal networks provide resources, support, and care for asylum seekers, undocumented immigrants, refugees, and other migrant communities.  TEC is headquartered in New York, New York.

21.    **Plaintiff Fellowship Southwest** is an independent, ecumenical, Christian nonprofit entity with numerous denominations represented on its board and among its member churches, which are located primarily in Texas, Oklahoma, New Mexico, Arizona, and Southern California.  Fellowship Southwest's basic mission is to help Christians and churches practice compassion, pursue justice, and build new connections across racial and denominational boundaries.  It focuses on four areas of compassionate mission work and advocacy: immigration, racial justice, Native American justice, and hunger.  Immigration is its most active area of work, which includes establishing and supporting a network of churches, ministries, and pastors serving migrants on the U.S. southern border.  Fellowship Southwest is headquartered in Dallas, Texas.

22.    **Plaintiff Friends General Conference** ("FGC"), founded in 1900, is an association of 16 regional Quaker organizations (called yearly meetings) and 12 directly affiliated monthly meetings primarily in the United States and Canada.  The 16 Yearly Meetings are composed of hundreds of local Quaker meetings and churches with approximately 30,000 total members and attenders.  Because Jesus's teachings related to compassion, peace, and justice ground Quaker spiritual practices, FGC is committed to working for a world where dignity and rights are upheld regardless of migration status.  The principles of inclusion and welcoming are common practices

at Quaker meetings with no distinction made for legal status, and concern for immigrants, refugees, and asylum seekers is widespread among Quakers.  FGC is headquartered in Philadelphia, Pennsylvania.

23.     **Plaintiff General Assembly of the Presbyterian Church, U.S.A. ("PCUSA")**, through the Stated Clerk of the General Assembly, Reverend Jihyun Oh,[13] is a national Christian denomination with nearly 1.1 million members in over 8,500 congregations, organized into 166 presbyteries under the jurisdiction of 16 synods.  Shaped by its Reformed theology, history, and representational form of leadership, PCUSA faithfully works to serve Christ in the world through new and existing communities of faith, hope, love, and witness.  Guided by their call to welcome the stranger and belief in the inherent dignity of all people, PCUSA actively advocates for and works toward more just immigration laws and processes.  PCUSA is headquartered in Louisville, Kentucky.

24.     **Plaintiff General Commission on Religion and Race of The United Methodist Church** ("GCORR") is one of 13 churchwide agencies established by the General Conference of The United Method Church to provide essential services and ministries beyond the scope of individual local congregations and annual conferences.  GCORR's mandate is to challenge, lead, and equip the people of The United Methodist Church ("UMC") to become interculturally competent, ensure institutional equity, and facilitate vital conversations about religion, race, and culture.  GCORR administratively houses and provides oversight for the Plan for

---

[13] The Stated Clerk appears here on behalf of the policies of the General Assembly and is the highest ecclesiastical officer of the General Assembly.  The General Assembly does not claim to speak for all Presbyterians, nor are its policies binding on the membership of the Presbyterian Church.  However, the General Assembly is the highest legislative and interpretive body for the denomination, and it is the final point of decision in all disputes.  As such, its statements are considered worthy of the respect and prayerful consideration of all the denomination's members.

Hispanic/Latino Ministries of the UMC, which impacts over 600 Latino immigrant congregations and ministries. As provided by the United Methodist Social Principles, GCORR affirms the sacred status of migrants, immigrants, and refugees, and opposes all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and families based on their status as migrants, immigrants, or refugees. GCORR is specifically acting together with the New York, North Georgia and Western North Carolina Annual Conferences of the UMC and within the scope of its own ministry areas in acting as plaintiff in this case. GCORR is headquartered in Washington, DC.

25.    **Plaintiff Latino Christian National Network** ("LCNN") is a vibrant community of Latino Christian leaders representing Evangelical, Pentecostal, Historic Protestant, and Catholic traditions across the United States. LCNN began in 1998 under the umbrella of another Christian organization, and then was independently founded in 2021 with the mission of working towards unity among Latino Christian leaders for the holistic transformation of communities in the United States. LCNN's members include 80 Christian pastors and leaders. Because innumerable Bible passages instruct the people of God to welcome immigrants and refugees, advocacy for comprehensive immigration reform has been at the core of LCNN's mission for over 12 years. LCNN is registered in Orlando, Florida.

26.    **Plaintiff Massachusetts Council of Churches** ("MCC") is an association of congregations and 18 denominations convinced that what binds us together in Christ is stronger than what divides us. As the nation's oldest state council of churches, MCC is the embodied expression of Christian unity in faith and witness across the Commonwealth of Massachusetts. Throughout its history, MCC has devoted itself to working for and witnessing the dignity and support of immigrants. Indeed, MCC's commitment to serving and ministering to immigrants

precedes its founding, through its predecessor bodies that provided direct services of pastoral

care, feeding, counseling, literacy education, and housing to immigrant laborers.  MCC is

headquartered in Boston, Massachusetts.

27.    **Plaintiff Mennonite Church USA** ("MC USA") was founded in 2001 as a merger

of two preceding national bodies (General Conference Mennonite Church and Mennonite

Church).  MC USA currently has approximately 50,000 members in 477 congregations within 15

area conferences.  MC USA is considered a historic peace church, part of the Anabaptist

tradition that has continually prioritized loving enemies and doing good to all.  MC USA

renounces the indifference to and mistreatment of undocumented and documented immigrants

and commits itself to joining God's reconciling mission and to living and acting as sisters and

brothers in Christ regardless of legal status.  As such, MC USA advocates for just and humane

immigration policies for immigrants and refugees, and it empowers congregations, area

conferences, and denominational staff to serve as advocates for these vulnerable groups of

people.  MC USA is headquartered in Elkhart, Indiana.

28.    **Plaintiff The New York Annual Conference of The United Methodist Church**

("NYAC") is an Annual Conference of approximately 410 United Methodist churches across

New York and western Connecticut.  NYAC's mission is to share God's love by creating safe

places where all are accepted and welcomed, connecting the needs of people to the presence of

God, and transforming the world through Christ.  As a United Methodist Church Annual

Conference, NYAC affirms the sacred status of migrants, immigrants, and refugees, and opposes

all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and

families based on their status as migrants, immigrants, or refugees.  This position is consistent

with the denominational standards and foundational principles expressed in Paragraph 163.g

(Page 49 of Total)

"Migrants, Immigrants, and Refugees" of the 2020/2024 United Methodist Book of Discipline of The United Methodist Church.  NYAC is headquartered in White Plains, NY.

29.      **Plaintiff New York State Council of Churches** ("NYSCOC") is a statewide organization through which Christians accomplish mission goals that can be achieved more effectively by working together.  Founded in 1893, NYSCOC consists of nine denominational members representing 29 distinct judicatories in New York.  NYSCOC's members covenant to care for one another, safeguard the presence of vital Christian communities, provide hospitality to all, proclaim the Gospel boldly in each place, and declare God's just will among the powers and principalities.  NYSCOC's members believe that congregations should be a place of peace and safety for the oppressed in our midst, and they resist laws, directives, and structures that compromise that welcome.  NYSCOC is headquartered in Albany, New York.

30.      **Plaintiff North Carolina Council of Churches** ("NCCC") is an ecumenical organization promoting Christian unity and working towards a more just society in the State of North Carolina.  NCCC's members include 27 judicatories of 19 denominations and seven individual congregations.  Across the state, its members have over 6,200 congregations.  Founded in 1935 to address racial inequality, NCCC enables denominations, congregations, and people of faith to impact the State on issues such as economic justice and development, human well-being, equality, and compassion and peace, following the example and mission of Jesus Christ.  Ensuring labor and housing protection for migrant farmworkers is one of NCCC's top priority areas, and its work includes mobilizing people of faith to participate in grassroots movements and legislative efforts to empower immigrants in North Carolina.  NCCC is headquartered in Raleigh, North Carolina.

31.     **Plaintiff The North Georgia Conference of The United Methodist Church**

("NGA"), through The Board of Trustees, North Georgia Conference, United Methodist Church,

Inc., is an Annual Conference of over 400 United Methodist churches in North Georgia.  NGA's

mission is to actively engage and transform communities through the love and grace of Jesus

Christ.  As a United Methodist Church Annual Conference, NGA affirms the sacred status of

migrants, immigrants, and refugees, and opposes all laws and policies that attempt to criminalize,

dehumanize, or punish displaced individuals and families based on their status as migrants,

immigrants, or refugees.  NGA is headquartered in Duluth, Georgia.

32.     **Plaintiff The Rabbinical Assembly** ("the RA") is the international association of

Conservative rabbis.  Since its founding in 1901, the RA has been the creative force shaping the

ideology, programs, and practices of the Conservative movement.  The RA currently has 1,640

member rabbis worldwide of whom 1,301 are located within the United States.  Around 60

percent of its members work in congregational settings.  In adherence to the tenets of

Conservative Judaism, the RA advocates for just and humane immigration policies for

immigrants and refugees and encourages rabbis, congregations, and staff to serve as advocates

for these vulnerable groups of people.  The RA is headquartered in New York, New York.

33.     **Plaintiff Reconstructing Judaism** has been the central organization of the

Reconstructionist movement since 2012 and currently has 94 congregations, mostly in the United

States.  Reconstructing Judaism's vision is a diverse, connected, and engaged Judaism that

meaningfully contributes to a just and compassionate world.  Inspired by the Torah's repeated

teaching that Jews have a special obligation to welcome and care for "strangers," the

Reconstructionist movement holds an abiding commitment to supporting and sheltering

immigrants, regardless of whether they are Jews and regardless of their legal status.  This

religious mandate is bolstered by centuries of Jewish lived experience, including the Holocaust, when Jews were immigrants and refugees seeking shelter in the face of danger and discrimination. Reconstructing Judaism is headquartered in Wyncote, Pennsylvania.

34. **Plaintiff Rhode Island State Council of Churches** ("RISCC") was convened in 1937 by a Christian minister, a Unitarian minister, and a Rabbi who recognized during the poverty of the Great Depression that people of faith have a responsibility to advocate for, and call leaders into the work of, justice. RISCC maintains relationships with ten judicatory bodies of eight denominations. Its membership consists of 20 individual congregations across Rhode Island. RISCC's advocacy work is rooted in the spiritual principle that we are called to act in defense of vulnerable populations and communities. Owing to the clear Biblical record to "welcome the stranger," RISCC's programming includes mobilizing and equipping its members to resist oppressive enforcement actions against undocumented immigrants. RISCC is headquartered in Providence, Rhode Island.

35. **Plaintiff the Union for Reform Judaism** ("URJ") was founded in 1873 by Rabbi Isaac Mayer Wise as the Union of American Hebrew Congregations. Today, URJ includes 815 congregations across North America encompassing 1.5 million Reform Jews. URJ envisions a world in which Judaism enables all people to experience peace and wholeness (shalom), justice and equity (tzedek), and belonging and joy (shayachut and simcha). URJ has long supported a fair and generous immigration policy, informed by the history of the Jewish people as a group forced time and again to flee the lands in which it resided. URJ affirms its commitment to create the same opportunities for today's immigrants that America offered the Jewish community not so many years ago. URJ is headquartered in New York, New York.

36.     **Plaintiff Unitarian Universalist Association** ("UUA") was founded in 1961 as a

merger of the American Unitarian Association (founded in 1825) and the Universalist Church of

America (founded in 1793).  The UUA currently has over 1,000 congregations and related faith

communities, located across all 50 states and the District of Columbia.  Its adult membership is

over 130,000.  Unitarian Universalism is a non-credal faith, bound together by a covenant which

is expressed through the inseparable and deeply interwoven shared religious values of

interdependence, pluralism, justice, transformation, generosity, and equity—all centered around

love.  The imperative to care for those most at risk, especially due to systems of injustice, is one

of Unitarian Universalism's historic and defining religious commitments.  The UUA's

longstanding, robust commitment to immigration justice, explicit in its support of both

documented and undocumented immigrants as well as its commitment to human rights, has been

democratically established through its General Assembly, which is the UUA's highest

ecclesiastical authority.  The UUA is headquartered in Boston, Massachusetts.

37.     **Plaintiff The United Synagogue of Conservative Judaism** ("USCJ") was founded

as an unincorporated federation of Conservative Jewish synagogue congregations in 1913 and

incorporated as the United Synagogue of America by special act of the New York Legislature in

1916.  Its name was changed to The United Synagogue of Conservative Judaism by act of the

New York Legislature in 1992.  USCJ currently has 560 member congregations located in seven

Districts throughout North America, including over 500 located within the United States. Its

member congregations have over 1,000,000 individual members.  In adherence to the tenets of

Conservative Judaism, USCJ advocates for just and humane immigration policies for immigrants

and refugees, and encourages congregations and staff to serve as advocates for these vulnerable

groups of people.  USCJ is headquartered in New York, New York.

38.     **Plaintiff The Western North Carolina Conference of The United Methodist Church** ("WNCC"), through The Board of Trustees, Western North Carolina Conference, United Methodist Church, Inc., is an Annual Conference of 628 United Methodist churches in Western North Carolina.  WNCC's mission is to make disciples of Jesus Christ for the transformation of the world, which it accomplishes through creating vital and sustainable local congregations, embracing racial justice and inclusion as discipleship and sanctification, and centering the well-being and health of leadership, both clergy and laity.  As a United Methodist Church Annual Conference, WNCC affirms the sacred status of migrants, immigrants, and refugees, and it opposes all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and families based on their status as migrants, immigrants, or refugees. WNCC is headquartered in Huntersville, North Carolina.

39.     **Plaintiff Wisconsin Council of Churches** ("WCC") was incorporated in 1947 to address human needs in the State of Wisconsin that were too great for any one church to address alone.  WCC's members include 32 judicatory bodies (representing 23 Christian traditions), three observer bodies, and 13 ecumenical partners.  These member bodies span approximately 2,000 congregations and approximately one million Christians.  For over 70 years, WCC has engaged in direct ministry related to immigrants, immigrant-serving organizations, and churches that seek to be welcoming of immigrants and refugees.  WCC seeks economic justice through immigration policies that prioritize family reunification, protect workers' rights, and enforce immigration laws with justice and compassion, as well as through increased efforts to address the root causes of international migration in poverty, war, persecution, and environmental degradation.  WCC is headquartered in Madison, Wisconsin.

40.      **Plaintiff WISDOM** is a network of interfaith organizations who work for racial and economic justice throughout Wisconsin.  WISDOM began with Milwaukee Inner-City Congregations Allied for Hope's founding in 1988 and then became its own membership organization in 2000.  WISDOM's members include 180 congregations from 19 different faith traditions across Wisconsin.  For over 25 years, WISDOM has consistently advocated for fair and safe immigration processes for all families.  WISDOM is headquartered in Milwaukee, Wisconsin.

41.      **Defendant U.S. Department of Homeland Security** ("DHS") is the federal agency responsible for, among other things, enforcing immigration laws.  DHS is an executive department of the United States Government, headquartered in Washington, DC.

42.      **Defendant Kristi Noem** is the Secretary of DHS and is sued in her official capacity as the official exercising the power as head of the agency.

43.      **Defendant U.S. Customs and Border Protection** ("CBP") is a subcomponent of DHS, headquartered in Washington, DC, and is responsible for, among other things, enforcing immigration laws at and between ports of entry.

44.      **Defendant Pete R. Flores** is the Acting Commissioner of CBP and is sued in his official capacity as the individual exercising the power as head of the subcomponent.

45.      **Defendant U.S. Immigration and Customs Enforcement** ("ICE") is a subcomponent of DHS, headquartered in Washington, DC, and is responsible for, among other things, interior immigration enforcement and detention and removal operations.

46.      **Defendant Caleb Vitello** is the Acting Director of ICE and is sued in his official capacity as the individual exercising the power as head of the subcomponent.

## LEGAL BACKGROUND

### Religious Freedom Restoration Act

47.     "In order to ensure broad protection for religious liberty," the Religious Freedom

Restoration Act ("RFRA") provides that the federal "'[g]overnment shall not substantially

burden a person's exercise of religion even if the burden results from a rule of general

applicability.'"  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 & n.2 (2014) (quoting

42 U.S.C. § 2000bb-1(a)).  In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme

Court ruled that the First Amendment's guarantee of free exercise of religion is not offended by

operation of neutral laws of general applicability.  In enacting RFRA, however, Congress

expressly concluded that "laws 'neutral' toward religion may burden religious exercise as surely

as laws intended to interfere with religious exercise."  42 U.S.C. § 2000bb(a).  RFRA thus

requires the government to provide a "compelling justification" and demonstrate that it is acting

through the least restrictive means even when defending neutral laws, whenever those laws

substantially burden religious exercise.  *Id.*; *see id.* § 2000bb-1.

48.     Under RFRA, exercise of religion includes "'not only belief and profession but the

performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'"

*Hobby Lobby*, 573 U.S. at 710 (quoting *Smith*, 494 U.S. at 877).  Moreover, RFRA protects "*any*

exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42

U.S.C. § 2000cc-5(7)(A) (emphasis added) (incorporated through *id.* § 2000bb-2(4)).

49.     "If the Government substantially burdens a person's exercise of religion," then

RFRA entitles "that person . . .  to an exemption from the rule unless the Government

'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling

governmental interest; and (2) is the least restrictive means of furthering that compelling

24

governmental interest.'" *Hobby Lobby*, 573 U.S. at 694–95 (quoting 42 U.S.C. § 2000bb-1(b)).

In other words, the government must satisfy strict scrutiny. *Singh v. Berger*, 56 F.4th 88, 93

(D.C. Cir. 2022).

50.     To do so, the government may not rely on "broadly formulated interests," and

instead must focus on the "harm of granting specific exemptions to particular religious

claimants." *Hobby Lobby*, 573 U.S. at 726–27 (quoting *Gonzales v. O Centro Espírita*

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)).  And if the government can achieve its

"marginal interest" in enforcing a rule against the plaintiffs, *id.* at 727, without burdening

religion, then "it must do so," *Singh*, 56 F.4th at 93 (quoting *Fulton v. City of Philadelphia*, 593

U.S. 522, 541 (2021)).

**The First Amendment**

51.     The First Amendment to the U.S. Constitution protects the interconnected rights to

free religious exercise, freedom of speech, and peaceable assembly.  U.S. Const. amend. I.  The

Supreme Court has also recognized, among these constitutional protections, a right to expressive

association.  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  This "corresponding"

associational right, *id.* at 622, safeguards the freedom "to associate for the purpose of engaging

in those activities protected by the First Amendment—speech, assembly, petition for the redress

of grievances, and the exercise of religion," *id.* at 618.

52.     These rights are fundamental.  The right of expressive association, in particular, is

"indispensable" to "preserving other individual liberties."  *Id.*  It is constitutionally protected not

only against "actual restrictions on an individual's ability to join with others to further shared

goals" but also against more indirect government action, including that which "risk[s]" a

"chilling effect on association . . . ."  *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595,

618 (2021); *Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192, 195 (D.D.C. 1990)

(quoting *Lyng v. Int'l Union*, 485 U.S. 360, 367 & n.5 (1988)).  Such indirect interference

includes conduct that "directly and substantially" interferes with the protected activity by

"preventing" people from associating or "burdening their ability to do so in any significant

manner."  *Pathfinder Fund*, 746 F. Supp. at 195 (internal quotation marks and alterations

omitted); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69 (2006) (freedom of

expressive association protects against government action that "ma[kes] group membership less

attractive"); *see also Bonta*, 594 U.S. at 615–17 (discussing chilling effect of requiring group

membership disclosure).

53.    A significant burden on expressive association runs afoul of the First Amendment

unless the government can show its conduct serves "compelling state interests . . . that cannot be

achieved through means significantly less restrictive of associational freedoms."  *Roberts*, 468

U.S. at 623; *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357

U.S. 449, 460–61 (1958) (finding it "immaterial whether the beliefs sought to be advanced by

association pertain to political, economic, religious or cultural matters, and state action which

may have the effect of curtailing the freedom to associate is subject to the closest scrutiny").

**DHS's Statutory Immigration Enforcement Authority**

54.    Immigration officers have broad statutory authority to engage in a variety of

immigration enforcement actions.  This authority includes the investigatory power to conduct

warrantless interrogations and temporary detentions, patrol private land near the border, enter

and inspect locations open to the general public, and serve process and other orders; it also

includes the power to make arrests, with and without a warrant.  *See* 8 U.S.C. §§ 1226(a),

1357(a).

55.     Under 8 U.S.C. § 1357(a), immigration officers are empowered to take several enforcement actions even in the absence of a warrant.  Section 1357(a) grants officers the power to execute and serve orders, subpoenas, and other process.  8 U.S.C. § 1357(a).  It allows them to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  *Id.* § 1357(a)(1).  It permits them to "patrol[]" private land near the border.  *Id.* § 1357(a)(3).  And it authorizes warrantless arrests under multiple circumstances "if there is a likelihood of the [subject] escaping" before a warrant can issue—including where an officer "has reason to believe" an immigrant has violated a law or regulation, observes a person committing a federal crime, or "has reasonable grounds to believe" a person has committed or is committing a federal felony offense.  *Id.* § 1357(a)(2), (a)(4)–(5); 8 C.F.R. § 287.8(c).

56.     Section 1226(a) separately governs immigration officers' arrest and detention authority pursuant to a warrant.  *See* 8 U.S.C. § 1226(a).  It provides that certain supervisory federal immigration enforcement officials[14] may issue non-judicial warrants (commonly referred to as "ICE warrants") authorizing the arrest and detention of an immigrant pending a decision on whether he is removable from the United States.  An ICE warrant may be executed by trained immigration officers identified by regulation.  8 C.F.R. § 287.5(e)(3); *cf.* 8 U.S.C. § 1357(g) (permitting state and local officers to perform investigative, apprehension, or detention functions of a federal immigration officer upon written agreement).

---

[14] The Immigration and Nationality Act originally vested a variety of immigration enforcement powers, including the power to issue administrative warrants, in the Attorney General.  After DHS was created as part of the Homeland Security Act of 2002, those functions shifted to the Secretary of DHS.  *See* 8 U.S.C. § 1103(a).  By regulation, various immigration officials in DHS and its constituent subcomponents are now authorized to exercise the power to issue arrest warrants for immigration violations.  8 C.F.R. §§ 287.5(e)(2), 241.2(a)(1).

57.     Unlike judicially authorized warrants, ICE warrants are issued by an immigration official rather than a neutral magistrate. Such warrants are based only on that official's finding of probable cause of removability (a civil violation) rather than probable cause of a criminal offense. The documents used to issue ICE warrants provide authorizing officials with a series of checkboxes through which to indicate the basis for arrest: the probable cause of removability or, in the case of a warrant of removal/deportation, the entity that issued a final removal order. ICE warrants do not authorize immigration officers to enter non-public areas or to conduct broader searches of an arrest location.

58.     Regulations promulgated under §§ 1226 and 1357 help illustrate the full scope of these statutory authorities. For instance, as 8 C.F.R. § 287.8 elaborates, although immigration officers may not enter non-public areas (except as provided by § 1357(a)(3)) to conduct questioning without a warrant or consent, "nothing . . . prohibits" them entry into places of general public access "without a warrant, consent, or any particularized suspicion in order to question any person whom the officer believes to be an alien . . . ." 8 C.F.R. § 287.8(f) (discussing "site inspections"). The regulations further provide that immigration officers may interrogate anyone and, in some circumstances, may "briefly detain" them. *Id.* § 287.8(b); 8 C.F.R. § 287.5(a)(1).

## FACUAL BACKGROUND

### History of the Sensitive Locations Policy

59.     For decades, the federal government has maintained a general policy of not conducting immigration enforcement operations in designated "sensitive locations" (also referred

to as "protected areas"), including, but not limited to, places of worship and religious

ceremonies.

60.    Over 30 years ago, the Acting Associate Commissioner for Operations of the

Immigration and Naturalization Service, the predecessor of ICE, issued a memorandum

confirming that it was the agency's "policy . . . to attempt to avoid apprehension of persons and

to tightly control investigative operations on the premises of . . . places of worship, funerals and

other religious ceremonies."[15]  Specifically, the memo required officers to receive prior written

approval by a district director or chief patrol agent before conducting any enforcement

"operations which are likely to involve apprehensions on the premises" of a place of worship or

the site of a funeral or other religious ceremony, unless exigent circumstances existed.  In

determining whether to grant prior approval for a proposed enforcement action at a sensitive

location, the memo instructed applicable high-level decisionmakers to consider factors such as

the availability of alternative measures, the importance of the enforcement objective, and

whether, and how, agents could minimize the impact on the operation of the place of worship.

The memo further directed that, in the unusual situation where exigent circumstances required an

agent to enter a place of worship without prior written approval, the action must be immediately

reported to headquarters.

61.    In 2008, the Assistant Secretary of ICE issued field guidance reiterating the

importance of the existing policy prohibiting apprehensions in sensitive locations, and affirming

its direction that officers should "[a]ttempt to avoid apprehension of persons and to tightly

control investigative operations on the premises of . . . places of worship, funerals and other

---

[15] Ex. 6, Memorandum from James A. Puleo, Acting Assoc. Comm'r, Immigration &
Naturalization Serv., "Enforcement Activities at Schools, Places of Worship, or at Funerals or
Other Religious Ceremonies," HQ 807-P (May 17, 1993).

(Page 61 of Total)

religious ceremonies."[16]  The guidance stated that the 1993 memo remained in effect, and it

provided additional detail outlining the high bar for ICE personnel "to act at or near sensitive

locations," including "terrorism-related investigations, matters of public safety, or actions where

no enforcement activity is involved."  The field guidance specified that, even in these

exceptional circumstances, pre-approval from "the appropriate Headquarters program office"

was required.

62.    In 2011, the Director of ICE issued a memo that superseded the prior guidance but

maintained tight restrictions on enforcement activity at sensitive locations. [17]  As that memo

explained, ICE's policy was "to ensure these enforcement actions do not occur at nor are focused

on sensitive locations such as schools and churches" without prior written approval, absent

exigent circumstances such as terrorism, imminent risk of death or physical harm, pursuit of a

dangerous felon, or an imminent risk of destruction of evidence material to a criminal case.  The

memo explicitly defined "enforcement actions covered by this policy" to include "(1) arrests;

(2) interviews; (3) searches; and (4) for purposes of immigration enforcement only,

surveillance."  The prior written permission necessary to conduct arrests at a sensitive location,

absent exigent circumstances, required high-level approval from one of four designated

Headquarters-level officials

63.    The Deputy Commissioner of CBP issued similar guidance in 2013.[18]

---

[16] Ex. 5, Memorandum from Julie L. Myers, Assistant Sec'y, ICE, "Field Guidance on
Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations,"
10029.1 (July 3, 2008).

[17] Ex. 4, Memorandum from John Morton, Dir., ICE, "Enforcement Actions at or Focused on
Sensitive Locations," 10029.2 (Oct. 24, 2011), https://www.ice.gov/doclib/ero-
outreach/pdf/10029.2-policy.pdf [https://perma.cc/7UME-P62Z].

[18] Ex. 3, Memorandum from David V. Aguilar, Deputy Comm'r, CBP, "U.S. Customs and
Border Protection Enforcement Actions at or Near Certain Community Locations" (Jan. 18,
2013).

30
App. 051

64.     In 2021, the Secretary of DHS issued a memo that superseded the prior guidance for both ICE and CBP, reaffirmed the government's longstanding policy to refrain from enforcement in sensitive locations, and expanded its scope.[19]  Recognizing the profound impact that immigration enforcement can have on people's lives and broader societal interests, the 2021 Memo directed that, "[t]o the fullest extent possible," ICE and CBP "should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities."  It described this principle as "fundamental."  It further emphasized that DHS "can accomplish [its] enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more."[20]

65.     The 2021 Memo offered a non-exhaustive list of sensitive locations (or "protected areas") where such essential services or activities take place, including churches, schools, hospitals, and social service establishments.  As relevant here, that list specifically included "[a] place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place" as well as "[a] place where a funeral, . . . rosary, wedding, or other religious . . . ceremonies or observances occur."  The policy also recognized that enforcement action that is not taken "in" a sensitive location may still have the same restraining effect on an individual's access to the location itself if conducted "near" the location, and instructed agents not to take enforcement action near such spaces to the fullest extent possible.[21]

---

[19] Ex. 2, 2021 Memo, *supra* note 2.
[20] *Id.* at 2.
[21] *Id.* at 2–3.

66.    The 2021 Memo reiterated the agency's policy to abstain from not only apprehensions, but also certain investigative activities, in sensitive locations. Activities covered by the policy "include[d], but [were] not limited to, . . . arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance."[22]

67.    As had been the case for decades, the 2021 Memo acknowledged that exigent circumstances might require officers to undertake immigration enforcement at sensitive locations without prior written approval.  It provided examples of the narrow types of circumstances in which an exception would apply, such as a where "[a] safe alternative location does not exist"; where the enforcement action involves "a national security threat," "an imminent risk of death, violence, or physical harm to a person," "[t]he hot pursuit of an individual who poses a public safety threat," or "a personally observed border-crosser"; or "an imminent risk that evidence material to a criminal case will be destroyed."  And, like the prior policies, the 2021 Memo imposed certain reporting requirements for enforcement undertaken at a sensitive location without prior authorization.[23]

68.    Finally, even where exigent circumstances preclude prior approval, the 2021 Memo instructed that "[t]o the fullest extent possible," any enforcement action in or near a sensitive location "should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing" the sensitive location.[24]

---

[22] *Id.* at 4.
[23] *Id.* at 3–4.
[24] *Id.* at 4.

**The Rescission of the Sensitive Locations Policy**

69.    On January 20, 2025, shortly after President Trump was sworn into office, DHS

Acting Secretary Benjamine Huffman issued a new memo that rescinded the 2021 Memo and

jettisoned the government's decades-old sensitive locations policy.[25]  DHS did not publish the

memo on its website; instead, the rescission was first reported by a news outlet that explained

that it had received a draft of the memo.[26]  DHS later issued a press release confirming it had

rescinded the sensitive locations policy,[27] but it still has not published the Rescission Memo.

70.    The Rescission Memo ends DHS's policy of refraining from conducting arrests or

other enforcement activities in sensitive locations.  Disavowing the need for any "bright line

rules regarding where our immigration laws are permitted to be enforced," the Rescission Memo

instead directs ICE and CBP to "use [their] discretion along with a healthy dose of common

sense" in deciding whether to conduct a law enforcement action at a sensitive location.

71.    The Rescission Memo fails to even acknowledge the compelling rationales that

motivated the unbroken 30-year policy prohibiting arrests in houses of worship or during

religious ceremonies.  It provides no evidence whatsoever that the government's previous policy

of abstention had thwarted legitimate immigration enforcement interests, nor any support for the

contention that "criminals" are hiding in churches or synagogues, *see supra* note 3.   The

Rescission Memo provides no cogent reason for its abrupt about-face on the very day President

Trump was sworn into office.  It fails to consider the reliance interests of communities and

---

[25] Ex. 1, Rescission Memo, *supra* note 4.

[26] *See* Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use [https://perma.cc/QLZ9-AGCJ].

[27] Press Release, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole, *supra* note 3.

persons of faith that have felt free to engage in religious worship and religiously mandated acts of service without fear of placing their immigrant neighbors at risk of arrest or deportation. Nowhere does the memo acknowledge, much less grapple with, the substantial religious burden imposed by enforcement activity at or near places of worship. And finally, it neglects to consider alternative, less-burdensome means through which the government could pursue its legitimate interests.

72.    Because the Rescission Memo places no boundaries on where immigration agents may engage in enforcement activities, ICE and CBP agents are now authorized under 8 U.S.C. §§ 1226(a) and 1357(a) to engage in broad enforcement actions at places of worship. In its press release announcing the policy change, a DHS spokesperson explained that "the Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense."[28] DHS's website features a news article stating that ICE agents understand the rescission "to free them up to go after more illegal immigrants."[29]

73.    The rescission reflects President Trump's goal of deporting all immigrants in the United States without lawful status during his current four-year term.[30] To accomplish this, President Trump's "border czar" Tom Homan explained, DHS would conduct enforcement actions "across the country, uninhibited by any prior administration guidelines."[31] Federal officials have confirmed that the target of these enforcement actions will include undocumented immigrants with no criminal record.[32] In emphasizing the president's "countless" statements

---

[28] *Id.*

[29] Press Release, DHS, *Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens*, *supra* note 5.

[30] Hesson, *supra* note 6.

[31] Miroff & Sacchetti, *Trump Officials Haven't Decided on Post-Inauguration Chicago Raids, Homan Says*, *supra* note 7.

[32] *Id.*

that "he is focused on launching the largest mass deportation operation in American history of illegal criminals," the White House Press Secretary explained that "if you are an individual, a foreign national, who illegally enters the United States of America, you are, by definition, a criminal."[33]

74.    Over the first week of the Trump Administration, ICE arrested over 4,500 people,[34] including nearly 1,000 people in a Sunday "immigration enforcement blitz."[35]  At least one of these arrests occurred at a church in Georgia during worship service.[36]  Those numbers are only expected to grow: "ICE field offices have been told to meet a quota of 75 arrests per day," a much higher rate of arrests than previous administrations.[37]

75.    The wave of enforcement actions has not been limited to those with criminal records or pending charges.  Those arrested in the first week of the new Trump Administration included an individual who had been in the United States for a year and a half, had no criminal record outside of a traffic violation, and had an asylum application pending.[38]  As Homan warned, all undocumented immigrants are "on the table" and "got a problem."[39]

---

[33] Karoline Leavitt, White House Press Secretary, Press Briefing (Jan. 29, 2025), https://www.whitehouse.gov/briefings-statements/2025/01/press-briefing-by-press-secretary-karoline-leavitt/ [https://perma.cc/F2SK-CESS].

[34] Fullerton, *supra* note 9.

[35] Alvarez & Flores, *supra* note 10.

[36] *See supra* ¶ 6.

[37] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, Wash. Post (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota [https://perma.cc/2FKT-EUW8].

[38] Ashley Ahn & Miguel Martinez, *ICE Makes Arrests in Metro Atlanta, Announces 'Targeted Operations' Here and Elsewhere*, Atlanta Journal-Constitution (Jan. 27, 2025), https://www.ajc.com/news/atlanta-news/ice-makes-arrests-in-metro-atlanta-announces-targeted-operations-elsewhere/MXCCJQIQR5CIRPDIMCRPESFGNA [https://perma.cc/NJ5X-KUW7].

[39] Mike Levine & Meghan Mistry, *Trump's Border Czar: 'If You're in the Country Illegally, You Got a Problem'*, ABC News (Jan. 26, 2025), https://abcnews.go.com/Politics/trumps-border-czar-youre-country-illegally-problem/story?id=118085728 [https://perma.cc/2MER-NLHL].

76.    Nor are arrests and detentions limited to those who are actually subject to removal. During the first week of the administration, for example, ICE arrested a grandmother, mother, and toddler in Milwaukee after the family was overheard speaking Spanish while shopping—despite the fact that all three were U.S. citizens from Puerto Rico.  Not until after the family had been taken into custody and transported to a detention center did officials verify their status and release them.[40]

77.    Experts believe that the reported quotas imposed on ICE officers will "significantly increase the chance that officers will engage in more indiscriminate enforcement tactics," including targeting easy-to-access locations and immigrants who have not committed crimes.[41] A former ICE chief counsel explained that "[q]uotas will incentivize ICE officers to arrest the easiest people to arrest, rather than the people that are dangerous noncitizens."[42]

**Plaintiffs' Sincerely Held Religious Beliefs**

78.    As adherents of Judaism, Plaintiffs The Central Conference of American Rabbis, Reconstructing Judaism, The Rabbinical Assembly, The United Synagogue of Conservative Judaism, and the Union for Reform Judaism believe that every human being—without exception—is created in God's image (Genesis 1:27).  Welcoming the stranger, or immigrant, is a central tenet of the Jewish religion, mentioned 36 times in the Torah—more than any other teaching: As Leviticus 19:34 commands, "The stranger who resides with you shall be to you as

---

[40] Allison Walker, *ICE Says 'Sorry' After Detaining US Citizens for Speaking Spanish: Report*, Latin Times (Jan. 29, 2025), https://www.latintimes.com/ice-says-sorry-after-detaining-us-citizens-speaking-spanish-report-573967 [https://perma.cc/632H-4KTH].
[41] Miroff & Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, *supra* note 37.
[42] *Id.*

one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt."

79.     The history of the Jewish people, from escaping slavery in Egypt to the horrors of the Holocaust, reinforces the many struggles faced by immigrants throughout the world.  The Jewish religious mandate that comes out of these traumatic times is not simply to protect the Jews in various lands, but to serve and defend all who are vulnerable and oppressed.  It is to turn Jewish suffering into the sacred work of ensuring liberty and dignity for all human beings.  As a community of immigrants, Jews are charged by God to pursue justice, to build a society that is welcoming to all of God's creatures, and to provide support and shelter to other immigrants regardless of their legal status.

80.     The remaining Plaintiffs represent dozens of Christians and Christian-rooted faiths— Baptists, Brethren, Disciples, Episcopalians, Evangelicals, Mennonites, Quakers, Pentecostals, Presbyterians, Unitarian Universalists, United Methodists, Zion Methodists, and more.  These Plaintiffs receive from Judaism the Hebrew Bible's exhortation to welcome, protect, and care for the exiles and refugees who become our neighbors through displacement.  They further embrace the Gospel of Jesus Christ, who not only echoed this command, but self-identified with the stranger: "For I was hungry, and you gave me food, I was thirsty, and you gave me drink, I was a stranger, and you welcomed me" (Matthew 25:35).  Indeed, Jesus became a refugee in Egypt after Herod's persecution forced Mary and Joseph to flee their home (Matthew 2:1-15).  To love the outsider, then, is to love Jesus himself.

81.     The Christian Plaintiffs claim their identity as citizens of God's kingdom and reject all hierarchies of race, language, nationality, and legal status as anathema to the original unity given to people by God.  Their Biblical call to love their neighbors (Luke 10:25-28; John 13:34;

1 John 4:7), to care for strangers and foreigners (Exodus 22:21; Leviticus 24:22; Deuteronomy 10:18-19; Deuteronomy 24:17-18; Jeremiah 22:3-5), and to show hospitality (Genesis 18:1-8; Luke 10:29-37; Romans 12:13; Hebrews 13:1-2), makes no distinction based on immigration status.[43] The Bible, Christian theology, and the traditions of the Church thus offer clear, repeated, and irrefutable unanimity on the obligation of Christian and Christian-rooted followers to welcome, serve, and protect the undocumented immigrants in their midst.

### The Substantial Burden on Plaintiffs' Religious Exercise

82.     **Plaintiff The African Methodist Episcopal Zion Church** ("A.M.E. Zion") faces an imminent risk of an immigration enforcement action at its churches. A.M.E. Zion has congregations in cities and neighborhoods with large immigrant communities and in areas where ICE or CBP have conducted enforcement actions, including in the past few weeks. Some of their congregations have immigrant members, including those who are undocumented. Some of their congregations also provide social service ministries on their church campus that serve immigrants, such as food distribution, and others provide facility space to Hispanic churches or immigrant rights advocacy groups.

83.     An enforcement action during a worship service, religious ceremony, or other church activity will harm A.M.E. Zion by interfering with the church's religious mandate to worship in person together as a congregation and to welcome all people regardless of status to join them in

---

[43] Unitarian Universalists ("UU") recognize Jesus's teachings and Biblical guidance as prophetic and primary sources of wisdom, without requiring any credal tests related to their divinity; these teachings belong to the core sources of faithful inspiration in the UU Living Tradition. As a tradition with historical roots in Christianity, Christian imperatives for hospitality and to care for one's neighbor are reflected in the UUA's shared religious values, which covenant to "declare that every person is inherently worthy and has the right to flourish with dignity, love, and compassion," to "build and sustain fully accessible and inclusive communities," and to "protect Earth and all beings from exploitation."

their worship.  It will violate the sanctity of their worship space and disrupt congregants' ability to worship without fear.  Likewise, an immigration enforcement action directed at their social service ministries will prevent them from carrying out their mission to serve all immigrants, whom they feel called to welcome without regard to status, and to protect their vulnerable neighbors.

84.    The rescission of the sensitive locations policy is already substantially burdening A.M.E. Zion's religious exercise.  Since the rescission of the sensitive locations policy, congregations have reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an immigration enforcement action.  Moreover, the imminent threat of an enforcement action on church property places A.M.E. Zion congregations in the impossible position of choosing whether to freely carry out their religious mission, putting congregants and those they serve at risk of arrest or deportation, or to change the way they serve and minister to those congregants, in an effort to protect them. Either of these choices would violate their religious beliefs.

85.    **Plaintiff Central Atlantic Conference United Church of Christ ("CAC")'s** member churches face an imminent risk of an immigration enforcement action.  CAC has member churches in five states and the District of Columbia, and there have been numerous immigration raids in cities where congregations are located.  Some congregations have immigrant members, including those who are undocumented.  A substantial number of congregations have outreach services to immigrant communities, including but not limited to ESL courses, soup kitchens, and legal services, and they offer those services to participants irrespective of immigration status.  Several member churches also provide physical sanctuary to

immigrants in need, which has gained attention from immigration authorities: While one church was serving as a sanctuary, ICE agents were spotted around the outside of the building.

86.     An enforcement action taken during a worship service, religious ceremony, or other church activity will harm CAC congregations by interfering with their religious mandate to worship in person together, with all members of their community, including those who are immigrants and without lawful status. One of the United Church of Christ's core values is "extravagant welcome," and churches' outreach to immigrant populations is a ministry of welcome, hospitality, and, in a fundamental sense, justice. An enforcement action in a CAC church will be sacrilegious and cause emotional, spiritual, and potentially physical harm to congregants and those served by church programs.

87.     The rescission of the sensitive locations policy is already substantially burdening CAC's religious exercise. CAC congregants report stories of immigrant parents in their communities keeping children at home because going out in the community—even to school or church—is unsafe. Fearful of exposing the immigrants they serve to arrest, CAC congregations feel significant pressure to reconsider the social service ministries they consider important to their religious mission.

88.     **Plaintiff The Central Conference of American Rabbis** ("CCAR")'s members work in congregations across the country that face an imminent risk of an immigration enforcement action. Rabbis within CCAR serve in congregations in major cities with large immigrant populations where ICE raids have taken place, including in California, Florida, and Arizona, among others, as well as in congregations along the southern border in locations such as San Diego, Tucson, El Paso, and McAllen. Many of these synagogues provide social services to immigrants. For example, one synagogue runs an on-site preschool in which 40 percent of

participating families are from Central America; another runs a longstanding, on-site homeless shelter in a major city.

89.    Enforcement action at CCAR members' synagogues will shatter the sense of safety that congregants need in their places of worship by harkening back to the persecution of Jews by government agents before and during the Holocaust. Judaism is a communal religion in which individuals are instructed to gather and celebrate as a community; an immigration enforcement action will spark fear of gathering in person, impacting congregants' ability to freely practice their faith, and some members have indicated that it might cause them to dissociate from Jewish life entirely. A enforcement action while young children are present and being educated in their religious tradition will be particularly shocking and injurious to member communities: the guarantee that Jews, as a minority religion, can conduct their religious life without fear of government intrusion is the backbone of the American compact with religious groups.

90.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of CCAR rabbis and their broader congregations. One rabbi reported that, although providing educational services to all community members (including immigrant families) is a supreme religious value, families are nervous about sending their children to school in the synagogue due to fears about immigration enforcement.

91.    **Plaintiff Christian Church (Disciples of Christ)** ("DOC") faces an imminent risk of an immigration enforcement action at its churches. DOC has congregations in border areas, in cities with large immigrant communities, and in at least one city that is a large refugee resettlement site. ICE arrests and detentions have occurred in recent weeks in cities and states that are home to member congregations. Many of DOC's congregations include immigrants, and at least one has congregants who were previously arrested or detained by ICE or CBP. Several

41

DOC congregations provide social service ministries, such as food pantries, on their campus that are open to and serve immigrants regardless of documentation status. One church advertises on its building that it shares worship space with a Spanish-speaking congregation.

92. An enforcement action during a worship service, religious ceremony, or other activity will harm DOC by interfering with its congregations' abilities to worship together in person with congregants who are immigrants without legal status. Such action will further interfere with DOC congregations' religious mandate to be a safe and welcoming place for all. An enforcement action that interferes with DOC congregations' on-site community food distribution will preclude them from carrying out their core religious mandate to feed their neighbors, which they view as fundamental to being the church that God calls on them to be.

93. The rescission of the sensitive locations policy is already substantially burdening the religious exercise of DOC congregations. Since the rescission, some DOC congregants are staying home from services due to the threat of an enforcement action. Clergy have experienced stress corresponding to the palpable fears of their congregants, and they have been forced to take time, attention, and energy away from ministry to focus instead on securing resources and developing plans to keep their houses of worship and congregants safe. The looming threat of an enforcement action puts pressure on DOC congregations to consider cutting back on worship services and other congregation activities; reducing their actions and statements, including during services and on social media, regarding inclusivity; or changing social ministries like food provision to more resource-intensive, and less inclusive, direct delivery. Each of these alternatives interferes with DOC's religious mission to openly welcome and minister to all.

94. **Plaintiff Church of the Brethren** ("COB") faces an imminent risk of an immigration enforcement action at its churches. COB has congregations in various states with

significant numbers of immigrant congregants who risk deportation because they are undocumented or have parole status or Temporary Protected Status ("TPS") which may soon expire. These congregations are located in communities where ICE has conducted raids and enforcement actions over the past few weeks. Some congregations also provide social service ministries on their church campuses that serve both documented and undocumented immigrants, such as food distribution or soup kitchens.

95.     An enforcement action during a worship service, religious ceremony, or other church activity will harm COB congregations by interfering with their ability to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. It will substantially disrupt COB's spiritual practices and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants. Likewise, an enforcement action directed at COB congregations' social service ministries will prevent them from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to as part of their evangelical faith and whom they are called to protect as some of the most vulnerable in our society.

96.     The rescission of the sensitive locations policy is already substantially burdening COB's religious exercise. Since the rescission, COB churches providing services such as food distribution or soup kitchens have reported a decline in attendance and participation. Congregations have also reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an enforcement action. Not only has this burdened the religious exercise of those congregants who are missing worship services due to fear, but it also impacts the religious exercise of those attending by diminishing the shared community and fellowship experience. Since its founding, COB has emphasized the

centrality of community to Christian faith and the belief that interpreting Scripture and following the teachings of Jesus cannot be done in isolation or separation, but require the participation of all persons.  In a church grounded in the centrality of community, the inability of any person to participate within the community due to fear denies the rich variety of that community to all of its members.  The imminent threat of an enforcement action on church property also puts congregations in the impossible position of choosing whether to freely carry out their religious mission (putting congregants and those they serve at risk of arrest or deportation), to tell their immigrant neighbors to stay home, or to change or cut back on the way they worship and minister in an effort to protect them.  Any of these choices would violate the churches' religious beliefs.

97.     **Plaintiff Convención Bautista Hispana de Texas** ("CBHT")'s member churches face an imminent risk of an immigration enforcement action.  CBHT has churches all along the border of Texas and in cities with large immigrant communities, including in cities where ICE has conducted raids and enforcement actions over the past few weeks.  The overwhelming majority of CBHT churches have immigrant congregants.  There are undocumented congregants and pastors in CBHT churches, some of whom have received letters to appear or have been arrested by ICE in the past.  Other undocumented congregants have been deported.  Some CBHT churches also provide social service ministries on their campuses that serve both documented and undocumented immigrants, such as food distribution, health care, and legal services.

98.     An enforcement action during a worship service, religious ceremony, or other church activity will harm CBHT churches by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status.  It will substantially disrupt the whole church's spiritual

practices and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants.  Likewise, an enforcement action directed at their social service ministries will prevent them from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to as part of their evangelical faith.

99.     The rescission of the sensitive locations policy is already substantially burdening the religious exercise of CBHT churches.  Since the rescission, some CBHT churches have reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an enforcement action.  Moreover, the imminent threat of an enforcement action on church property places CBHT churches in the impossible position of choosing whether to continue pursuing their religious activities, thereby putting their undocumented congregants and social service recipients at risk of arrest, or to protect them by changing or cutting back on church activities and ministries.  Either option violates their religious beliefs.

100.    **Plaintiff The Episcopal Church** ("TEC")'s congregations face an imminent risk of an immigration enforcement action.  TEC has congregations across the country, including in communities that are mere miles from the border, have large undocumented populations, have experienced ICE actions, or have been specifically named by the Trump Administration as targets for enforcement actions.  Many congregations include worshippers who have come to this country from across the world, with some composed almost exclusively of immigrants (both documented and undocumented), and with congregants who have been arrested and placed in removal proceedings.  Indeed, one church was targeted by local officials who parked outside and attempted to arrest undocumented congregants leaving church in past enforcement efforts.  Some congregations also provide social services to documented and undocumented immigrants as part

of their ministry, including food banks and shared meals, ESL classes, health services, and more. These services are open to anyone who needs them, regardless of their legal status, and ICE agents have already appeared outside the food pantry at one congregation, photographing those in line and causing some to leave without being fed.

101.     An enforcement action at an Episcopal congregation during a worship service or other church activity will undermine fundamental tenets of the faith.  Episcopal worship takes an incarnate form: congregants must be with one another in a community.  Having the sacred trust of worship and the consecrated space of sanctuary shattered by an immigration enforcement action will be directly opposed to that practice and will harm the Church and its members.  And even the loss of some congregants to the fear that immigration enforcement officers could enter during services undermines core Episcopalian beliefs that the Church is one body—when the whole community cannot gather, the communion of the members is impaired, and an injury to one is an injury to the whole denomination.  Likewise, enforcement actions targeted at social service ministries impede the church's spiritual mission by violating the fundamental principles of sanctuary, mercy, and care for the vulnerable.

102.     Episcopal congregations are already experiencing a substantial burden on their religious exercise as a result of the rescission of the sensitive locations policy.  Congregations across the country have experienced a decrease in attendance at worship services and social service ministries because of members' fears of ICE or CBP as well as the same fears felt by nonmembers who participate in congregations' social service ministries.  Some congregants with legal status are choosing to stay home out of fear that they may be mistakenly arrested simply because of their appearance.  In one diocese, congregants were too afraid to even attend an informational Zoom call with an immigration attorney.  Certain ministries, like those that serve

largely undocumented farm worker populations, have had to be ended or restructured to keep congregants safe.  Some congregations have stationed members at the church door to keep an eye out for immigration officials.  The threat of an immigration enforcement action on church property could force Episcopal congregations to change their worship because of the fear of putting those they serve at risk or suffering the loss of leaders, congregants, and fellowship who are afraid to attend.

103.    **Plaintiff Fellowship Southwest**'s member churches face an imminent risk of an immigration enforcement action.  Fellowship Southwest has churches located along the border and near ports of entry, in cities with significant immigrant populations, and in areas where ICE has recently conducted raids and enforcement actions.  Several of its churches have congregations comprised of nearly all immigrants—some are undocumented, and some have been the subject of immigration enforcement action in the past, including arrest and deportation.  One church has congregants who work for DHS, CBP, and ICE.  In addition to worship services and activities, some of Fellowship Southwest's member churches provide social service ministries that serve both documented and undocumented immigrants, including ESL classes, citizenship classes, low-cost immigration legal services, health fairs, and food and clothes distribution.  These ministries are considered part of the churches' mission, occur on the church campus, and many are publicly advertised.  One member church's outreach ministry work brings it into contact with ICE and CBP.

104.    An enforcement action taken during a worship service, religious ceremony, or other church activity will harm Fellowship Southwest churches by preventing them from worshiping together freely and peacefully as a congregation in a place they consider sanctuary, and from welcoming the stranger as they feel so called.  Such action will be particularly traumatizing for

the churches who consider themselves congregations of immigrants.  Similarly, any immigration enforcement action taken at or near the churches' outreach ministries will impede their mission of serving their most vulnerable neighbors, including undocumented immigrants, whom they seek to embrace and assist as a demonstration of God's love.

105.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of Fellowship Southwest churches.  Since the rescission, some member churches have reported a decrease in worship attendance, and congregants have expressed fear to go to church due to the imminent risk of an enforcement action.  Moreover, the looming threat of an enforcement action on church property puts member churches in the impossible position of choosing whether to freely carry out their religious mission, placing congregants and those they serve at risk of arrest or deportation, or to change the way they worship and conduct their outreach ministries in an effort to protect their immigrant neighbors.  Either of these options violates the churches' religious beliefs.  Some Fellowship Southwest churches have already implemented, or are considering implementing, additional security measures such as locking doors or holding more private streaming services.

106.    The Quaker meetings of **Plaintiff Friends General Conference** ("FGC") face an imminent risk of an immigration enforcement action.  Several FGC meetings are located in border-state cities, cities with high immigrant populations, and cities that have seen recent immigration enforcement actions.  FGC meetings welcome all comers, including immigrants. Several meetings have openly served as sanctuary locations for asylum-seekers and other immigrants; ICE has previously targeted some of those individuals in sanctuary for deportation. In addition, many FGC meetings are publicly involved in social justice issues: one hosts Spanish-language worship groups; another provides on-site services to unhoused people

regardless of legal status; and still others publicize their commitment and connection to immigrant relief efforts online or through the media. One meeting in particular hosts a ministry that provides food and legal advice to immigrants who are in removal proceedings. That ministry is known both to the general public and to the local ICE field office.

107.    An enforcement action during a meeting activity will harm FGC meetings by interfering with a core Quaker practice of seeking and experiencing communion with the Divine through community and silent worship (called expectant waiting). An enforcement action in a meetinghouse will violate the meetings' religious traditions of welcoming the stranger, recognizing God in everyone, and creating a safe space for worship and the spiritual, internal experience of communion. As many meetings also provide children's programming in their meetinghouses, an enforcement action will also present a traumatizing disruption to their important religious education efforts.

108.    The rescission of the sensitive locations policy is already substantially burdening the FGC meetings' religious exercise. Multiple meetings have been grappling with their congregants' increased feelings of anxiety, unease, and lack of safety in their community. Some are considering controlling entrance to their meetinghouses, including by locking their doors during worship, despite the negative impact on open and welcome community worship that has long been Quaker tradition.

109.    **Plaintiff General Assembly of the Presbyterian Church, U.S.A.** ("PCUSA") faces an imminent risk of an immigration enforcement action at its worshiping communities and congregations. PCUSA has worshiping communities and congregations across the United States, including in border states and in cities with large immigrant populations, such as Chicago and Philadelphia. These congregations are reporting ICE activity in their communities and near their

church buildings.  Proof of immigration status has never been a requirement for membership in PCUSA churches.  Immigrants with a variety of legal statuses lead PCUSA congregations and comprise a significant portion of numerous PCUSA congregations.  Some congregants are undocumented and some are facing removal orders.  All are beloved members of the worshiping communities and congregations they attend.  Numerous congregations are providing housing and other assistance to immigrant families as they navigate various immigration processes.  PCUSA congregations also provide social service ministries on their campuses that are open to and serve immigrants regardless of documentation status.  Those ministries include food and clothing distribution, schools, ESL classes, legal assistance, and job training services.

110.    A core Presbyterian tenet is group discernment.  Members discern the will of God together as a body of believers.  An immigration enforcement action during a worship service, religious ceremony, or other church activity will harm PCUSA by violating the religious sanctuary, peace, and security they strive to provide to all congregants.  It will prevent congregations from expressing and practicing their communal faith, which prioritizes group discernment, in-person worship with singing, prayer, and small-group support.  And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services and act as Christ's hands and feet in the world, action which is central to their faith and practice.

111.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of PCUSA congregations.  At least one congregation has already experienced a significant decrease in church attendance since the rescission of the sensitive locations policy, while others fear that congregants will be reluctant to worship together in person; still others have stopped live streaming their services despite their desire to witness to the larger community

with this technology. Some PCUSA congregations have recently implemented, or are considering implementing, additional security measures such as closing or locking church doors. Such measures, however, stand in direct tension with the hospitality of Christ that PCUSA endeavors to provide all worshippers, and with PCUSA's essential mission to provide fellowship, spiritual growth, and community support to its congregants.

112.    **Plaintiff General Commission on Religion and Race of The United Methodist Church** ("GCORR") faces an imminent risk of an immigration enforcement action at UMC congregations. Some congregations are located in cities with large immigrant communities where ICE has conducted raids and enforcement actions over the past few weeks. Some of these congregations are predominantly Hispanic, and some worship with, and provide sanctuary to, undocumented individuals as an exercise of their faith. Some congregations also provide social service ministries on their church campus that serve both documented and undocumented immigrants, such as food distribution, clothing closets, wellness services, and immigration advice and support. Several congregations have been targeted by ICE in the past.

113.    An enforcement action during a worship service, religious ceremony, or other church activity will harm GCORR by interfering with the religious mandate given by the UMC to GCORR and UMC congregations to engage in communal worship and participate in sacraments such as holy communion, and to welcome and embrace all members of the community in doing so, without regard to legal status. These services are sacred, and any enforcement action will not only disrupt them in a literal sense, but will compromise churches' ability to provide a safe space for congregants to freely worship in peace. Similarly, an enforcement action during any ministries will prevent GCORR and UMC congregations from carrying out the UMC's mission

51

to serve their immigrant neighbors without regard to status, which is central to their expression of their Christian faith.

114.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of GCORR and UMC congregations.  Since the rescission, some congregants have been too afraid to attend church in person, making the communal worship central to the United Methodist faith an impossibility, and forcing churches to explore alternatives such as bringing communion to members directly.  Likewise, those served by outreach ministries have expressed fear of immigration enforcement, and some have been too afraid to come to church to receive these services.  A decrease in participation in these ministries prevents GCORR and UMC congregations from living out the Gospel of providing hospitality to their most vulnerable neighbors.  And those congregations that continue to welcome their immigrant neighbors to worship with them and participate in their ministries are forced to assume the risk of exposing their neighbors to arrest or deportation, which is directly at odds with their faith-based commitment to protect them.

115.    **Plaintiff Latino Christian National Network** ("LCNN")'s members face an imminent risk of an immigration enforcement action at their churches.  LCNN represents Latino Christian leaders across the country.  Many of its members' churches are located at or close to the border, and many serve largely Latino congregations.  A significant proportion of these congregations consist of immigrants vulnerable to deportation or individuals who are part of mixed-status families.  Indeed, there are congregants who have already received Notices to Appear or final orders of removal.  Some LCNN members provide social services as part of their church's ministry, such as ESL classes, clothing distribution, ministry for special needs individuals, and classes on healthcare access and financial literacy.  These services are provided

52

without regard to an individual's immigration status.  Members' churches have also hosted and supported asylum seekers and unaccompanied minors who have crossed the border.

116.    An enforcement action taken during a worship service, religious ceremony, or other church activity will harm LCNN members by interfering with their religious mandate to worship in person together with their congregations, welcoming all members of their community, including those who are undocumented.  An enforcement action will disrupt their duty to worship God in community and peace, and it will destroy the sanctuary of their churches, which should be a place of safety and refuge.  Social service ministries, moreover, are a key part of their religious practices, allowing them to live out their sacred responsibility to love and serve the vulnerable.  A decline in participation in worship or social services will undermine their fundamental commitment to build a community of faith and offer communion to those in need. For LCNN members, worship and faith-based gatherings are not just optional events—they are an essential formational practice where faith is nurtured, hope is restored, and the community is strengthened.

117.    The rescission of the sensitive locations policy is already substantially burdening LCNN members' religious exercise.  LCNN has received reports of members cancelling regular weekly events and moving their worship services online.  LCNN's members have already seen attendance drop, and congregants are expressing fear and anxiety about coming to church due to concerns about potential enforcement actions.  One of LCNN's members has seen his church's small business support program lose 75 percent of its participants since the policy was rescinded. As the viability of these social service ministries is uncertain, LCNN members have been forced to let go of staff.

118.    The congregations and denominations that comprise **Plaintiff Massachusetts Council of Churches** ("MCC")'s congregations face an imminent risk of an immigration enforcement action.  ICE has conducted several widely reported enforcement actions across the state of Massachusetts where MCC churches are located.  Moreover, many member churches are based in areas with large immigrant populations and are made up of many immigrant congregants and clergy, including undocumented immigrants.  Congregants have reported contact from or surveillance by ICE agents; some churches have received reports of congregants being placed in removal proceedings.  Many MCC member churches also offer social service ministries—such as food pantries, clothing provision, or legal aid programs—that cater to immigrant populations.

119.    An enforcement action during worship services or other church activities will harm member churches by interfering with their ability to gather, worship, and serve together.  It will inject fear, intimidation, and trauma into worship spaces crafted to provide safety, sanctuary, and community.  And it will contradict the member churches' core belief in welcoming the stranger (including immigrants and foreigners) as one of their own.  In addition, an enforcement action during social service ministries, such as food distribution, will shatter the community safety net that many MCC churches view as a religious expression and extension of worship.

120.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of MCC churches.  Member churches are reporting decreased attendance, both at church services and at food pantries, in the wake of the rescission.  The fears animating these drops in attendance are also weakening congregations' sense of community, prompting many church leaders to consider trade-offs between fundamental aspects of their faith and the security of their congregants.  Some churches have removed essential information about religious

54

services from public websites or have canceled events altogether.  Others have expended already-limited resources on additional security measures or to secure more volunteers for church services.

121.    **Plaintiff Mennonite Church USA** ("MC USA")'s congregations faces an imminent risk of an immigration enforcement action.  MC USA has congregations in border states and in cities with large immigrant populations, such as Chicago and Philadelphia, where ICE has recently taken enforcement actions.  Immigrants comprise a significant portion of numerous MC USA congregations, including some in which all or nearly all of the congregants are immigrants. Many of those immigrant congregants are undocumented; some are facing removal orders. Numerous congregations are providing sanctuary and other assistance to immigrant families as they navigate the asylum process.  MC USA congregations also provide social service ministries on their campuses that are open to and serve immigrants regardless of documentation status. Those ministries include food and clothing distribution, ESL classes, legal assistance, and job training services.

122.    An enforcement action taken during a worship service, religious ceremony, or other church activity will harm MC USA by violating the religious sanctuary, peace, and security they strive to provide to all congregants.  It will prevent congregations from expressing and practicing their communal faith, which prioritizes in-person worship with singing, prayer, and small-group support.  And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services that are central to their faith and practice.

123.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of MC USA congregations.  At least one congregation has experienced a

significant decrease in church attendance since the rescission, while others fear that congregants will be reluctant to worship together in person. Some MC USA congregations have recently implemented, or are considering implementing, additional security measures such as closing or locking church doors, or moving services online. Such measures, however, stand in direct tension with the hospitality of Christ that MC USA endeavors to provide all worshippers, and with MC USA's essential mission to provide fellowship, spiritual growth, and community support to its congregants.

124.    **Plaintiff The New York Annual Conference of The United Methodist Church** ("NYAC") faces an imminent risk of an immigration enforcement action at its churches. NYAC congregations are diverse, with significant ethnic constituencies from South America, Africa, Central America, the Caribbean, East Asia, and Southeast Asia, and some congregants are undocumented. They are located in communities with significant immigrant populations and where ICE has conducted enforcement actions in recent weeks. At least one congregant and a ministry volunteer were recently detained by ICE. Many NYAC congregations also provide social service ministries on their church campus that serve both documented and undocumented immigrants, such as ESL classes, soup kitchens, food pantries, clothing closets, warming centers, legal service clinics, and tutoring programs. And some NYAC congregations have declared themselves "sanctuary churches" and provide a safe living space for immigrants facing deportation. As part of this work, one NYAC church has visited ICE offices to advocate for a stay of deportation and has received a threatening letter from ICE.

125.    An enforcement action taken on church property will harm NYAC congregations by interfering with worship services and ministries that are central to their religious practices. The Discipline governing United Methodists commands congregations to open their doors to all

persons in the community regardless of status and to gather—as one—in fellowship to hear the Word of God and receive sacraments such as holy communion.  It also commands that they welcome and serve their immigrant neighbors, such as by helping them to secure food, education, housing, and employment.  The entry of armed immigration enforcement officers will be particularly disruptive to this exercise of faith and violate the sanctity of the property: United Methodists consider all local church buildings to be sacred Christian spaces dedicated to God, and prohibit firearms based, among other things, on Jesus's call to his followers to be peacemakers.

126.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NYAC churches.  At least one congregation has seen a decline in participation in its outreach ministries since the rescission, with those they serve expressing their fear of immigration enforcement.  If immigrants do not feel safe participating in NYAC church ministries, that impedes its congregants' spiritual mission of welcoming and serving immigrants and thus impact their witness to the world.  And just as changing the way they worship with and serve their immigrant neighbors would violate the churches' religious beliefs, so, too, would continuing to offer social service ministries if it means putting congregants and neighbors at risk of arrest or deportation.

127.    **Plaintiff New York State Council of Churches** ("NYSCOC")'s members face an imminent risk of an immigration enforcement action.  NYSCOC's members have churches throughout New York State, including in areas with large immigrant populations or that have been targeted enforcement actions.  Many of these churches have large immigrant congregations, and others host social service outreach ministries (e.g., legal services, health clinics, clothing closets, and food pantries) that serve undocumented people, some of whom have been detained

and deported.  Numerous NYSCOC members have declared themselves to be sanctuary churches, and at least one has been subjected to ICE surveillance and unauthorized entry by ICE agents.  In one instance while the sensitive locations policy was still in place, a sanctuary guest was arrested by ICE shortly after leaving church property.

128.    An enforcement action during a worship service, religious ceremony, or other church activity will harm NYSCOC's members by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status.  Although NYSCOC's members follow a variety of faith traditions, they are united in the belief that all people should be treated equally as children of God.  All members feel that caring for and protecting the most vulnerable members of society, with no status distinctions, is a Biblical imperative.  When their churches are inhibited or prohibited from offering the services and conducting the worship and programming germane to their faith expression, they are denied access to the faith itself.

129.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NYSCOC members, who are reporting decreased attendance at worship services and other church activities due to fear of an enforcement action.  At least one member church has incurred costs for increased security measures to prevent immigration enforcement officers from entering the building without a judicial warrant.

130.    **Plaintiff North Carolina Council of Churches** ("NCCC") member churches face an imminent risk of an immigration enforcement action.  NCCC has members across the state of North Carolina, which has a large immigrant population, and most of its denominational members have congregations with immigrant members and immigrant congregations.  Some NCCC churches also provide social service ministries on their church campus, such as ESL

classes, soup kitchens, and food pantries that serve their communities regardless of immigration status. One church, for example, runs a "Circle of Welcome" ministry that specifically targets refugees, providing them with wraparound services, and partners with another local outreach ministry to serve the Spanish-speaking community, such as by offering space for ESL classes.

131.    An enforcement action during a worship service, religious ceremony, or other church activity will harm NCCC churches by interfering with their religious mandate to welcome all persons into their congregations, including undocumented immigrants, and by violating the sanctity and peace of their worship. Similarly, an enforcement action directed at their social service ministries will prevent them from carrying out their mission of welcoming and serving all immigrants, whom scripture directs them to protect, regardless of status, as some of society's most vulnerable.

132.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NCCC churches. Since the rescission, multiple congregations have reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an enforcement action. At least one member church has removed any mention of their Latino congregation from its website and social media. Moreover, the looming threat of an enforcement action on church property puts NCCC churches in the impossible position of choosing whether to freely carry out their religious mission, thereby putting congregants and those they serve at risk of arrest or deportation, or to change the way they serve and minister to them, in an effort to protect them. Either option violates the churches' religious beliefs.

133.    **Plaintiff The North Georgia Conference of The United Methodist Church** ("NGA") faces an imminent risk of an immigration enforcement action at its local churches.

NGA has numerous predominantly immigrant congregations and many of its churches offer a variety of outreach ministries specifically for immigrant populations, such as ESL classes, soup kitchens, food pantries, clothing pantries, and tutoring programs.

134.    An enforcement action taken on church property will harm NGA's congregations by interfering with worship services and ministries that are central to their religious practices.  The Discipline governing United Methodists commands congregations to open their doors to all persons in the community regardless of status and to gather—as one—in fellowship to hear the Word of God and receive sacraments such as holy communion.  It also commands that they welcome and serve their immigrant neighbors, such as by helping them to secure food, education, housing, and employment.  The entry of armed immigration enforcement officers will be particularly disruptive to this exercise of faith and violate the sanctity of the property: United Methodists consider all local church buildings to be sacred Christian spaces dedicated to God, and firearms are prohibited based, among other things, on Jesus's call to his followers to be peacemakers.

135.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of NGA's congregations.  Since the rescission, congregants have expressed fear over attending worship services.  The looming threat of an enforcement action on church property also puts congregations in the impossible position of choosing whether to freely carry out their religious mission but risk subjecting their members and those they serve to arrest or deportation, or to change or cut back on the way they worship and minister in an effort to protect their immigrant neighbors.  Either option violates United Methodist religious beliefs.

136.    **Plaintiff The Rabbinical Assembly** ("the RA")'s member rabbis face an imminent risk of an immigration enforcement action at their synagogues.  The RA has rabbis serving in

congregations in border states and in cities with large immigrant populations, such as Chicago and Philadelphia, where ICE has recently taken enforcement actions. Immigrants belong to many congregations where RA rabbis serve, and their synagogue spaces are sometimes used by people who are undocumented and in at least one instance may also be facing removal orders. A number of RA rabbis serve in congregations that provide sanctuary and other assistance to immigrant families including social service ministries on their campuses and partnering with other religious institutions that are open to and serve immigrants regardless of documentation status. Those ministries include food and clothing distribution as well as emergency and long-term housing support.

137.    An enforcement action during a worship service, religious ceremony, or other synagogue activity will harm the RA's members by violating the religious sanctuary, peace, and security they strive to provide to all who use these spaces. It will prevent congregations from expressing and practicing their communal faith, which prioritizes in-person worship with singing, prayer, and learning as a community. And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services that are central to their faith and practice.

138.    **Plaintiff Reconstructing Judaism**'s member congregations face an imminent risk of an immigration enforcement action at their synagogues. Reconstructing Judaism has congregations across the United States, including in areas that have been targeted for immigration enforcement because they have large immigrant populations. Many Reconstructionist congregations serve immigrants or those with immigrant family members as part of their congregations and offer social services that are used by immigrants regardless of their immigration status. Many members have also taken actions specifically to welcome

61

immigrants, including becoming a Welcoming Congregation involved in supporting refugees and offering sanctuary to immigrant families.

139.    An enforcement action during a worship service, religious ceremony, or other church activity will harm Reconstructionist congregations by interfering with their religious mandate to worship in person together with all members of their community, including those who are immigrants and without lawful status. It is a spiritual obligation and an abiding commitment among Reconstructionist Jews to provide support and shelter to immigrants, regardless of whether they are Jews and regardless of their legal status. The knowledge of suffering and fear by immigrants, particularly fear that affects their participation in worship and activities, is considered a loss and a wound to Reconstructionist congregations. Moreover, the holiness of Jewish worship sites, extending to the breadth of synagogue property, is sacrosanct, and an immigration enforcement action on synagogue property will violate the safety and sanctity of that space.

140.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of Reconstructionist congregations. Congregants have reported that they are afraid that they may be swept up in raids regardless of their immigration status, and some are suffering and staying home from services as a result. Reconstructionist congregations feel pressure to choose between their moral and religious obligations as Jews and as human beings and the risk of putting immigrants in harm's way. Already, in response to the rescission of the policy, many congregations have invested time and resources in training staff and congregants about how to respond to the possibility of an enforcement action and how to keep each other safe.

141.    **Plaintiff Rhode Island State Council of Churches** ("RISCC")'s member churches face an imminent risk of an immigration enforcement action. Many of its congregations serve immigrant populations, including individuals of various immigration statuses. Numerous member congregations provide on-site social services, such as food and clothing, to a diverse range of people, including undocumented immigrants. Member churches also have provided sanctuary shelter for immigrant families on church premises.

142.    Enforcement action at an RISCC church will represent an unprecedented and untenable incursion into a sacred space in which congregants are invited to be co-creators with the divine and freely participate in the life of the church. RISCC member churches believe in the importance of the separation of church and state as a foundational principle that protects both our democracy and religious exercise, and immigration enforcement—the business of the secular state—is for another place.

143.    The rescission of the sensitive locations policy is already substantially burdening RISCC members' religious exercise because it pressures them to cut back on worship, ceremonies, and other activities. These offerings are the very heart of Christian living: the gathering of community, where congregants gather as members of the body of Christ (including those who are undocumented) to celebrate communion, baptism, and marriage; to serve one another; and to celebrate the other rites of the Church. Some RISCC churches already are reporting a decrease in attendance since the policy rescission. This decrease represents a clear attack on the rights of member churches freely to live out their religious values, especially the value of providing for the most vulnerable among society. At least one member church is working on a safety plan for the congregation, including educating members on their legal rights in the event of an immigration raid.

144.    **Plaintiff the Union for Reform Judaism ("URJ")**'s members face an imminent risk of an immigration enforcement action.  Many of its congregations are located in cities where high-profile immigration raids have been, and likely will be, conducted; others are located in border communities, including the Rio Grande Valley.  Reform synagogues within its organization have declared themselves "sanctuary congregations" offering shelter to immigrants. Many of its member synagogues host on-site foodbanks, meal programs, homeless shelters, clothing donation, ESL classes, or other support services for undocumented individuals. Undocumented immigrants enter URJ synagogues daily to worship, seek pastoral counsel, learn, socialize, and obtain needed services and support.

145.    An enforcement action at a URJ synagogue will have a profoundly disruptive effect on their ability to fulfill their religious and prophetic mandate.  It would be expected to fray the social bonds within the congregation and inhibit the core value of creating experiences that strengthen a vibrant Jewish life.  It also will catalyze a decline in worship attendance, which could impact a synagogue's ability to hold prayer services with the common quorum for public prayer.  Synagogue members already are on high alert due to recurring, violent, and high-profile antisemitic events; the infiltration into a sacred space of armed immigration enforcement officers would be highly triggering of emotional distress, which is antithetical to its religious mission. An enforcement action during worship or a religious ceremony will stand in direct contrast to URJ synagogues' mission to serve as "a house of prayer for all peoples" (Isaiah 56:7), without regard to demographics or status.

146.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of URJ synagogues.  Many of these congregations have, since the 1980s, declared themselves to be sanctuaries for those risking deportation—yet several congregations

App. 085

already have contacted URJ out of concern for the legal ramifications of continuing to offer these faith-driven services.  The threat of enforcement action interferes with synagogues' ability to fulfill the central prophetic value of caring for the migrant.  One synagogue already has changed its food pantry policies to ensure that patrons do not wait outside in the parking lot where they may be excessively vulnerable.

147.    **Plaintiff Unitarian Universalist Association** ("UUA")'s congregations face an imminent risk of an enforcement action, as UUA congregations are known for providing sanctuary and resources to immigrants; several have declared themselves sanctuary congregations and have housed immigrants on short- and long-term bases.  Many are located near the U.S.-Mexico or U.S.-Canada borders, or in cities where immigration enforcement actions have recently occurred.  UUA congregations include both documented and undocumented immigrants.  Consistent with the UUA's call to care for and minister to immigrants regardless of legal status, many congregations provide social ministries that serve immigrant communities in church spaces, such as through food and diaper distribution, ESL classes, a migrant-focused early learning program, and other tutoring and skill-building.  A congregation that hosts an immigration-related legal clinic has been reported by neighbors to DHS for having undocumented people on church property.

148.    An enforcement action at a UUA place of worship during religious services or other religious activity will significantly interfere with its congregations' ability to welcome the stranger and to provide a sacred space for sanctuary, safety, and trust to congregants, including immigrants and other vulnerable people.  An enforcement action will leave UUA congregations unable to fulfill their spiritual mission—one grounded in relationship, community, and spiritual growth by living out their values—through outreach or congregant participation in services.

149.    The rescission of the sensitive locations policy is already substantially burdening the religious exercise of UUA congregations.  Since the rescission, leaders of UU congregations have expressed concerns over publicly sharing information about worship services or immigrant support efforts, though they recognize that limiting dissemination of that information precludes full participation in congregational life.  Members of some congregations have already stopped attending services due to the sensitive locations policy rescission.  Multiple congregations are considering additional security measures, including adding security or registration to protect those who come to worship—measures that carry significant financial costs and would burden any ability to provide open and welcoming worship spaces.  Some congregations are now forced to choose between options that both violate their religious principles: continuing to provide social service ministries despite risk to their immigrant participants, or denying basic resources to entire communities by reducing or discontinuing the services.

150.    **Plaintiff The United Synagogue of Conservative Judaism** (USCJ)'s congregations face an imminent risk of an immigration enforcement action.  USCJ has congregations in border states and in cities with large immigrant populations, such as Chicago and Philadelphia, where ICE has recently taken enforcement actions.  Immigrants comprise a portion of nearly every USCJ congregation, and their synagogue spaces are sometimes used by people who are undocumented and may in at least one instance also be facing removal orders.  A number of USCJ congregations are providing sanctuary and other assistance to immigrant families including social service ministries on their campuses and partnering with other religious institutions that are open to and serve immigrants regardless of documentation status.  Those ministries include food and clothing distribution as well as emergency and long-term housing support.

151.    An enforcement action during a worship service, religious ceremony, or other synagogue activity will harm USCJ's members by violating the religious sanctuary, peace, and security they strive to provide to all who use these spaces.  It will prevent congregations from expressing and practicing their communal faith, which prioritizes in-person worship with singing, prayer, and learning as a community.  And, to the extent any such action is directed at the congregations' social service ministries, it will interfere with their ability to engage in community-based services that are central to their faith and practice.

152.    **Plaintiff The Western North Carolina Conference of The United Methodist Church** ("WNCC") faces an imminent risk of an immigration enforcement action at its churches.  Several of WNCC's congregations have a heavy percentage of immigrant members and immigrants who benefit from social service ministries—such as ESL classes, soup kitchens, food pantries, clothing pantries, mobile showers, and tutoring programs—that they provide on their church campuses.  These congregations do not ask about immigration status; legal status is irrelevant for membership in a local church, attendance at worship services, or receipt of outreach ministry services.  The location of these churches also puts them at heightened risk of enforcement.  One church, for example, is located in a community where ICE's physical presence has visibly increased; another is located next door to an ICE office; and another is located in an area that has seen large scale raids and detentions by ICE in the past.

153.    An enforcement action on church property will harm WNCC's churches by interfering with worship services and ministries that are central to their religious practices.  The Discipline governing United Methodists commands congregations to open their doors to all persons in the community regardless of status and to gather—as one—in fellowship to hear the Word of God and receive sacraments such as holy communion.  It also commands that they

welcome and serve their immigrant neighbors, such as by helping them to secure food, education, housing, and employment. The entry of armed immigration enforcement officers will be particularly disruptive to this exercise of faith and violate the sanctity of the property: United Methodists believe that all local church buildings are sacred Christian spaces dedicated to God, and firearms are prohibited based, among other things, on Jesus's call to his followers to be peacemakers.

154.    The rescission of the sensitive locations policy is already substantially burdening the WNCC's religious exercise. Since the rescission, several WNCC congregations have seen a marked and sudden decline in worship attendance and ministry participation among immigrants, and church members and service recipients have expressed concern about immigration enforcement. WNCC congregations have also experienced a consequent drop in tithes as well as volunteers to support to outreach ministries. One congregation has taken down its website and social media pages, ended its live-stream option for worship services, cancelled small groups in order to keep a low profile, and installed security cameras; it also now locks its doors during worship services. These changes are at odds with the United Methodist mission to provide maximum opportunity for spiritual growth and fellowship, but the rescission of sensitive locations policy forces all WNCC churches to violate their religious beliefs one way or another—either by changing the way they worship and minister to protect their immigrant neighbors, or by continuing to freely carry out their religious mission while putting their immigrant neighbors at risk of arrest or deportation.

155.    **Plaintiff Wisconsin Council of Churches** ("WCC")'s member churches face imminent risk of an immigration enforcement action. WCC has churches throughout the state, including in cities where previous immigration raids have created massive fear, and many

churches serve agricultural areas that host large numbers of seasonal migrants.  Many WCC

member churches have immigrant pastors and mixed-status family members, including Deferred

Action for Childhood Arrivals recipients and those with no documentation, and some member

congregations are comprised of immigrants from around the world.  One church lost its own

pastor to deportation. WCC member churches recently have provided sanctuary for homeless

immigrants on their campuses, and many member churches provide other on-site social services

to immigrants, including food pantries, meal delivery, community gardens, clothing, medical

clinics, and immigration clinics.

156.     WCC's churches will be substantially burdened by an enforcement action during

worship services or other church activities.  Such action will be physically, emotionally, and

spiritually disruptive.  It will violate a space that has been dedicated to the holy work of God and

the care of neighbors.  And it will cause congregants to associate their sacred space with harmful

and violent memories.  WCC churches and their parishioners would struggle to recover from an

enforcement action at their place of worship because they would perceive a loss of safety and

damage to their public image in the community.

157.     WCC member churches' religious exercise already is substantially burdened by the

rescission of the sensitive locations policy.  Since DHS announced the rescission, WCC churches

have experienced declines in attendance.  One WCC church with an 85-percent immigrant

congregation is currently developing an emergency plan of action due to fears that an

enforcement action at its premises would mean the end of the congregation and its ability to live

out its mission as a Christian community.  One Latino pastor was advised by members to

consider closing the church.  Some WCC churches are preparing to shift to virtual worship and

Bible study, which compromises their ability to practice together as "one body" according to the

teaching of scripture.  Their religious practice is further burdened by the need to scale back their

social service offerings to avoid hosting large events at which immigrants may be targeted.

158.    **Plaintiff WISDOM**'s member congregations face imminent risk of an immigration

enforcement action.  WISDOM's faith communities are located throughout Wisconsin, including

where previous immigration raids have occurred.  For example, one congregation's membership

is roughly 50 percent Mexican; many of its congregants are undocumented; several congregants

have received communications from ICE, including a recent demand to self-deport; and the

church previously experienced the detention and deportation of one of its ministry students and

her family.

159.    An enforcement action during worship services or other religious activities will harm

WISDOM members by destroying their feelings of safety and sanctuary in their place of worship

and spurring reluctance to come together and worship as a community.  One member church

reports that an enforcement action at its location will likely lead to the church's closure, due to

the high numbers of immigrants among its members.  Enforcement action targeted at WISDOM

members will also pressure them to cut off social service support systems they currently offer,

out of fear of placing undocumented members at greater risk of detection and arrest.

160.    The rescission of the sensitive locations policy is already substantially burdening

WISDOM members' religious practices.  One church reports incredible anxiety among its

members because it is well-known locally as a community that welcomes and ministers to large

numbers of immigrants, including those without documentation.  Some congregations are now

locking their doors at all times—including during Sunday worship; they also are making changes

to worship offerings and procedures for drop-off and pick-up for children's activities, and

discontinuing social media outreach in their communities, which burdens their ability to reach

current and prospective members and practice their faith.

## CAUSES OF ACTION

### Count I

### Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*)

161.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

162.    Under RFRA, the federal "'[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability'" unless the government demonstrates that the burden is "'the least restrictive means of furthering [a] compelling governmental interest.'"  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 & n.2 (2014) (quoting 42 U.S.C. § 2000bb-1(a), (b)).

163.    Any "person whose religious exercise has been burdened in violation of" RFRA "may assert that violation as a claim . . . in a judicial proceeding" and "obtain appropriate relief" against the government.  42 U.S.C. § 2000bb-1(c).  As denominational bodies and nonprofit associations of churches, synagogues, pastors, and rabbis, Plaintiffs are "persons" within the meaning of RFRA.  *See Hobby Lobby*, 573 U.S. at 707–08 (recognizing that churches and nonprofits, as well as closely held corporations, constitute "persons" under RFRA).

164.    As a fundamental tenet of their faiths, Plaintiffs sincerely believe that they are called to join in fellowship with *all* worshippers, regardless of their immigration status, through in-person religious services and activities.  Indeed, Plaintiffs believe that welcoming immigrants, who are some of the most vulnerable members of the community and whose shared humanity is emphasized throughout Judeo-Christian scripture, is a religious imperative.  So, too, is ministering to and serving immigrants, which stems from Plaintiffs' religious commitment not

only to welcome and love their immigrant neighbors as themselves but also to provide support for those in need. Worshipping together in person as a congregation, welcoming immigrants into their congregation, and serving immigrants regardless of status in the broader community through social service ministries are therefore all essential components of Plaintiffs' religious exercise.

165.    Plaintiffs are at imminent risk of immigration enforcement actions violating the sanctity of their places of worship. Enforcement actions at or near Plaintiffs' churches and synagogues will substantially burden Plaintiffs' religious exercise. It will disrupt their worship and potentially prevent them from completing their religious responsibilities; it will desecrate and destroy all sense of safety in what is supposed to be a peaceful and holy space for congregants; and, if such action results in the removal of any person from the property, or in the further decline in attendance among congregants, it will prevent Plaintiffs' congregations and members from engaging in communal worship with all members of their community—including, but not limited to, those who are immigrants and those without lawful status. Likewise, an enforcement action directed at social service ministries on church or synagogue property will prevent Plaintiffs' congregations and members from carrying out their religious mission of welcoming and serving all immigrants without regard to status—either through direct interruption of worship or through a further decline in ministry participation by service recipients.

166.    The rescission of the sensitive locations policy is already substantially burdening Plaintiffs' religious exercise. Many of their congregations have experienced a decrease in attendance at worship services and/or outreach ministries since the rescission, with congregants and those served by the ministries conveying that they are too afraid to visit churches and

synagogues due to the looming threat of immigration enforcement action. By reducing the number and diversity of worshippers and people served through ministries, and by interfering with the ability of Plaintiffs' congregations and members to practice communally in accordance with their religious beliefs, the rescission substantially burdens Plaintiffs' religious exercise.

167.    The rescission of the sensitive locations policy also substantially burdens the religious exercise of Plaintiffs' congregations and members by forcing them to make an impossible choice: either refrain from welcoming immigrants to worship and participate in their outreach ministries, or put their congregants and others they serve at risk of arrest and deportation, despite their religious obligation to love and protect them as some of their most vulnerable neighbors. Both options violate Plaintiffs' religious beliefs.

168.    Finally, in response to the policy rescission, many of Plaintiffs' congregations and members have implemented, or are considering implementing, changes to the way they conduct their worship services, church activities, and outreach ministries—such as locking church and synagogue doors, moving services online, or being less public about their immigrant-focused ministries. Such measures also run afoul of their faith-based mission to provide fellowship, spiritual growth, and community support to their neighbors, and therefore also constitute a substantial burden on religious exercise.

169.    Defendants cannot meet their burden of showing that the rescission of the decades-old sensitive locations policy is necessary to "further[] a compelling government interest" or that it is "the least restrictive means of furthering" any such interest. 42 U.S.C. § 2000bb-1. Among other things, as past enforcement regimes have shown, the government may achieve robust immigration enforcement through measures far less burdensome on Plaintiffs' religious exercise rights.

170.     Defendants' violation of RFRA is causing ongoing, irreparable harm to Plaintiffs, their congregations, and their members.

## Count II

### First Amendment—Freedom of Expressive Association

171.     Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

172.     The First Amendment protects against government interference in the freedom of expressive association—including association for the purpose of engaging with others in protected religious exercise, speech, or peaceable assembly.  Conduct that prevents or significantly burdens expressive association unconstitutionally interferes with these rights.  *See Pathfinder Fund v. Agency for Int'l Dev.*, 746 F. Supp. 192, 195 (D.D.C. 1990) (quoting *Lyng v. Int'l Union*, 485 U.S. 360, 366, 367 n.5 (1988)).

173.     Plaintiffs engage in expressive association when their religious leaders, congregants, and other participants assemble for religious worship and instruction, for the exchange of religious ideas and experiences, and for social service ministries that put their faith into action.  Animating these associations are Plaintiffs' central and sincerely held religious beliefs in providing sanctuary, welcoming the stranger, caring for one's neighbor, and worshipping God in community, among others.  These beliefs extend to the inclusion of immigrants in church services and activities, regardless of legal status.

174.     With the rescission of the sensitive locations policy, and against the backdrop of statutory and regulatory enforcement authorities, DHS has licensed its agents to enter places of worship and to detain, question, and arrest religious leaders, congregants, and others inside.  Particularly in light of the reported arrest quotas placed on ICE offices and the recent wave of

immigration arrests and detentions, Plaintiffs face an imminent risk of an enforcement action, including during religious services, gatherings, and ministries.

175.    The threat of enforcement action has and will continue to exact a "chilling effect" that substantially burdens Plaintiffs' association.  Plaintiffs' congregations and members have already experienced a reduction in attendance at many religious services and other religious activities, arising from attendants' fears over immigration enforcement actions at houses of worship.  Plaintiffs' congregations and members have experienced direct and substantial impacts to the sanctuary, security, and atmosphere of openness that is central to their religious worship.  They have begun or have considered reducing outward expressions of their faith, including being less public about the times and locations of religious services and about immigrant-focused ministries.  They have also implemented, or have considered implementing, security measures such as locking church and synagogue doors or monitoring arrivals to services.  These effects, among others, impede Plaintiffs' abilities to gather for communal worship, share religious ideas and experiences, and otherwise express their religious beliefs.

176.    The execution of an immigration enforcement action at or near Plaintiffs' churches and synagogues will inflict devastating, direct, and substantial harms to the ability of Plaintiffs' congregations and members to join with others to worship, gather, and profess their faith.  Such enforcement action will constitute an immediate disruption to Plaintiffs' association for the purpose of religious exercise, assembly, and expression of religious belief.  It will also exacerbate the chilling effect already occurring.

177.    Defendants cannot show that immigration enforcement action at Plaintiffs' places of worship serves a compelling state interest "that cannot be achieved through means significantly less restrictive of associational freedoms."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

As past enforcement regimes have shown, the government may achieve robust immigration enforcement through measures far less burdensome on Plaintiffs' First Amendment rights.

178.    Defendants' violation of the First Amendment is causing ongoing, irreparable harm to Plaintiffs, their congregations, and their members.

## Count III

### Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)

179.    Plaintiffs restate and re-allege all preceding paragraphs as if fully set forth herein.

180.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious.  5 U.S.C. § 706(2).  DHS's rescission of the sensitive locations policy is arbitrary and capricious in numerous ways.

181.    For more than three decades, DHS has maintained a consistent set of policies, *see supra* ¶¶ 59–68, recognizing the critical importance of religious exercise, the serious burden that immigration enforcement in places of worship could impose on communities and persons of faith, and tightly restricting the circumstances in which ICE or CBP (or their predecessor) could undertake such enforcement activities, including arrests.  DHS's hasty determination to rescind its longstanding policy is final agency action because it represents "the consummation of the agency's decisionmaking process," and it both determines rights and obligations and creates "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).  This Court may review final agency action.  5 U.S.C. § 551(4), (13); 5 U.S.C. § 706.

182.    At a minimum, the APA demands that, prior to upending longstanding policies that have engendered reliance interests, an agency must acknowledge that it is changing course and explain its reasons for doing so.  *Fed. Commc'ns. Comm'n v. Fox Television*, 556 U.S. 502, 515 (2009); *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30–31

(2020). And although review under the arbitrary-and-capricious standard is deferential, a reviewing court must ensure that the agency "has reasonably considered the relevant issues and reasonably explained its decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Consideration of the relevant issues must include an "examin[ation of] the relevant data" alongside a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983), as well as consideration of the reliance interests of those likely to be impacted by an abrupt policy change, *Regents*, 591 U.S. at 30–31.

183.   The Rescission Memo makes no attempt to comply with these minimum standards. It fails to articulate any rationale whatsoever for upending its longstanding policy to abstain from certain enforcement actions in sensitive locations like houses of worship and religious ceremonies. It likewise fails to cite any relevant data supporting the need to conduct arrests, raids, and other enforcement actions in these locations, or to justify DHS's assertion that "criminals" are hiding in churches and synagogues. Nor does the agency endeavor to connect the facts to its choice to rescind longstanding policy.

184.   The Rescission Memo likewise fails to acknowledge, much less consider, the reliance interests of the communities and individuals already being harmed by its decision to overturn its prior practice. It makes no mention of the substantial religious burden imposed by immigration enforcement actions in these sensitive locations.

185.   DHS also failed to consider any alternative, less-burdensome means by which it could accomplish its legitimate governmental interests.

186.   For all these reasons, among others, DHS's abrupt rescission of the sensitive locations policy is arbitrary and capricious.

187. Defendants' violation of the APA is causing ongoing, irreparable harm to Plaintiffs, their congregations, and their members.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a. A declaration that 8 U.S.C. §§ 1226(a) and 1357(a), along with relevant implementing regulations and as interpreted by DHS to permit immigration enforcement activities in or near places of worship or during religious ceremonies, impose a substantial burden on Plaintiffs' and their members' exercise of religion, and do not reflect the least restrictive means to accomplish a compelling government interest, and thus violate the Religious Freedom Restoration Act as applied to Plaintiffs, their congregations, and their members;

b. A declaration that 8 U.S.C. §§ 1226(a) and 1357(a), along with relevant implementing regulations and as interpreted by DHS to permit immigration enforcement activities in or near places of worship or during religious ceremonies, violate the First Amendment rights of Plaintiffs, their congregations, and their members;

c. A preliminary and permanent injunction prohibiting DHS and its subcomponents, their officials, agents, employees, assigns, and all persons acting in concert with them, from carrying out immigration enforcement activities, including but not limited to activities authorized by 8 U.S.C. §§ 1226(a) and 1357(a) and relevant regulations, at Plaintiffs' places of worship or during religious ceremonies, absent

exigent circumstances or the existence and planned execution of a judicial

warrant;

d.      A preliminary and permanent injunction prohibiting DHS and its subcomponents,

their officials, agents, employees, assigns, and all persons acting in concert with

them, from effectuating the 2025 Rescission Memo purporting to rescind DHS's

longstanding sensitive locations policy, and further requiring that the procedures

and policies set forth in the 2021 sensitive locations policy be maintained unless

and until DHS revises that policy in a manner consistent with applicable laws and

regulations;

e.      An order setting aside, vacating, and remanding the 2025 Rescission Memo as

arbitrary and capricious and as issued without observance of procedures required

by law, *see* 5 U.S.C. §706(2)(A), (D);

f.      An award to Plaintiffs of reasonable costs and attorneys' fees, to the greatest

extent authorized by law; and

g.      Such other and further relief that this Court may deem fit and proper.


February 11, 2025                                    Respectfully submitted,

                                                    /s/ *Kelsi Brown Corkran*
                                                    Kelsi Brown Corkran (Bar No. 501157)
                                                    Shelby B. Calambokidis (Bar No. 1684804)
                                                    Julia Gegenheimer* (NY Bar No. 4949475)
                                                    Alexandra Lichtenstein (Bar No. 1724947)
                                                    Kate Talmor* (Maryland Bar)
                                                    INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                                        AND PROTECTION
                                                    600 New Jersey Avenue, NW
                                                    Washington, DC 20001
                                                    (202) 661-6728

                                                    *Attorneys for Plaintiffs*

*Pro hac vice application forthcoming. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA, *et al.*,

     Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

     Defendants.

Civil Action No. 25-CV-00403-DLF

---

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

     Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiffs hereby move this Court to issue a preliminary injunction enjoining Defendants from carrying out immigration enforcement activities at their places of worship, absent exigent circumstances or the execution of a judicial warrant, and to stay the effective date of DHS's 2025 Rescission Memo, for the reasons explained in the accompanying memorandum of law.

Dated:  February 21, 2025                 Respectfully submitted,

                                          /s/ *Kelsi Brown Corkran*
                                          Kelsi Brown Corkran (Bar No. 501157)
                                          Shelby B. Calambokidis (Bar No. 1684804)
                                          Julia Gegenheimer* (NY Bar No. 4949475)
                                          Alexandra Lichtenstein (Bar No. 1724947)
                                          Kate Talmor* (Maryland Bar)
                                          INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                              AND PROTECTION
                                          600 New Jersey Avenue, NW
                                          Washington, DC 20001
                                          (202) 661-6728

                                          *Attorneys for Plaintiffs*


*\*Pro hac vice application forthcoming. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member*

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

*v.*

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

---

## PLAINTIFFS' NOTICE OF CORRECTED PROPOSED PRELIMINARY INJUNCTION ORDER

On February 21, 2025, Plaintiffs moved this Court for a preliminary injunction enjoining Defendants from carrying out immigration enforcement activities at their places of worship, absent exigent circumstances or the execution of a judicial warrant, and to stay the effective date of DHS's 2025 Rescission Memo.  ECF No. 11.  Plaintiffs attached to their motion a memorandum in support, ECF No. 11-1, a series of sworn declarations from Plaintiffs and their members, ECF Nos. 11-3–11-69, and a proposed order, ECF No. 11-2.  On March 14, 2025, Defendants filed an opposition to the preliminary injunction motion.  ECF No. 16.  Plaintiffs' reply is due on March 24, in advance of an April 4 preliminary injunction hearing in this case.

In finalizing their memorandum in reply, Plaintiffs discovered that they had inadvertently attached a proposed *scheduling* order to their preliminary injunction motion, rather than the intended proposed preliminary injunction order.  The parties had previously moved to enter that scheduling order, ECF No. 10-1, and the Court granted that motion.  Plaintiffs attach here the correct proposed preliminary injunction order for the Court's consideration.  A courtesy copy of this proposed order has been provided to counsel for Defendants.

1

March 20, 2025

Respectfully submitted,

/s/ *Kelsi Corkran*
Kelsi Brown Corkran (Bar No. 501157)
Shelby B. Calambokidis (Bar No. 1684804)
/s/ *Julia Gegenheimer*
Julia Gegenheimer* (NY Bar No. 4949475)
Alexandra Lichtenstein (Bar No. 1724947)
Kate Talmor* (Maryland Bar)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
    AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Attorneys for Plaintiffs*

*Admitted pro hac vice. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

2

App. 105

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA, *et al.*,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

      Defendants.

Civil Action No. 25-CV-00403-DLF

### [PROPOSED] ORDER

Upon consideration of the Plaintiffs' motion for preliminary injunction, the motion is

**GRANTED** and it is hereby **ORDERED:**

- Defendants DHS, ICE, and CBP, along with all other DHS subcomponents, their officials, agents, employees, assigns, and all persons acting in concert with them, are hereby preliminarily **ENJOINED** from carrying out immigration enforcement activities at Plaintiffs' places of worship or during religious ceremonies, absent exigent circumstances or the existence and planned execution of a judicial warrant;

- Defendants DHS, ICE, and CBP, along with all other DHS subcomponents, their officials, agents, employees, assigns, and all persons acting in concert with them, are hereby preliminarily **ENJOINED** from effectuating the 2025 Rescission Memo purporting to rescind DHS's longstanding sensible locations policy, and shall ensure that the procedures and policies set forth in the 2021 sensitive locations policy be maintained during the pendency of this litigation;

- The effective date of Defendants' 2025 Rescission Memo is hereby **STAYED** pending final resolution of Plaintiffs' claims.

Dated: _____ ___, 2025

                                  _____
                                  DABNEY L. FRIEDRICH
                                  United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MENNONITE CHURCH USA, *et al.*,

        *Plaintiffs*,

    v.                                                                No. 25-cv-00403 (DLF)

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        *Defendants*.

**ORDER**

For the reasons stated in the accompanying Memorandum Opinion, it is

**ORDERED** that the plaintiffs' Motion for a Preliminary Injunction, Dkt. 11, is **DENIED**.

It is further

**ORDERED** that the parties shall file a joint status report proposing a schedule for further

proceedings on or before April 21, 2025.

**SO ORDERED**.

_Dabney L. Friedrich_
DABNEY L. FRIEDRICH
United States District Judge

April 11, 2025

App. 107

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MENNONITE CHURCH USA, *et al*., <br><br>          *Plaintiffs*, <br><br>     v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br>          *Defendants*. | No. 25-cv-00403 (DLF) |

## <u>MEMORANDUM OPINION</u>

Twenty-seven faith communities bring this action against federal immigration agencies seeking injunctive relief. On January 20, 2025, the U.S. Department of Homeland Security (DHS) rescinded its "sensitive locations" policy, which previously directed immigration officers to avoid enforcement actions in or near places of worship. Plaintiffs allege that the rescission violates the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq.*; the First Amendment; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*. Before the Court is the plaintiffs' motion for a preliminary injunction. Pls.' Mot., Dkt. 11. For the reasons that follow, the Court will deny the motion.

## I.    BACKGROUND

### A.    Statutory Background

DHS is the executive agency with principal responsibility for enforcing the nation's immigration laws. 8 U.S.C. § 1103(a)(1). Congress has authorized immigration officers to interrogate, arrest, detain, and remove aliens who are unlawfully present in the United States or otherwise subject to removal. *Id.* §§ 1226, 1357. For over three decades, DHS and its predecessors have limited enforcement actions in or near "sensitive locations," including places of worship and

other religious ceremonies.  Compl. ¶ 60, Dkt. 1; *see* Memorandum from James A. Puleo, Acting Assoc. Comm'r, INS, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies," HQ 807-P (May 17, 1993), Dkt. 1-6.  Under the long-standing policy, enforcement actions in or near sensitive locations were permitted only with prior written supervisory approval or under exigent circumstances.  *Id.*; *see* Memorandum from Julie L. Myers, Assistant Sec'y, ICE, "Field Guidance on Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations," 10029.1 (July 3, 2008), Dkt. 1-5; Memorandum from John Morton, Dir., ICE, "Enforcement Actions at or Focused on Sensitive Locations," 10029.2 (Oct. 24, 2011), Dkt. 1-4.

In 2021, then-Secretary of DHS Mayorkas issued updated guidance on the sensitive locations policy.  Memorandum from Alejandro N. Mayorkas, Sec'y, DHS, "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) ("Mayorkas Mem."), Dkt. 1-2.  The Mayorkas Memorandum superseded prior guidance but reaffirmed that "to the fullest extent possible, [immigration officers] should not take an enforcement action in or near a protected area," including at a "place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place."  *Id.* at 2–3.  It defined enforcement actions to include "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance."  *Id.* at 4.  The Memorandum continued to recognize exceptions for actions taken with prior written approval or under exigent circumstances.  *Id.* (defining exceptions as where "[a] safe alternative location does not exist"; an action involves "a national security threat," "imminent risk of death, violence, or physical harm to a person," "hot pursuit of an individual who poses a public safety threat," or "a personally observed border-

2

App. 109

crosser"; or where there is an "imminent risk that evidence material to a criminal case will be destroyed"). It further explained that "the exercise of judgment" was required to determine what was "near" a sensitive location and whether exigent circumstances existed. *Id.* at 3–4.

Shortly after the current administration took office on January 20, 2025, then-Acting DHS Secretary Huffman issued a new memorandum rescinding the Mayorkas Memorandum. Memorandum from Benjamine C. Huffman, Acting Sec'y, DHS, "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Rescission Mem."), Dkt. 1-1. The Rescission Memorandum "supersedes and rescinds" prior guidance and provides that DHS will no longer impose "bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* It directs officers to use "discretion along with a healthy dose of common sense" to make enforcement determinations, including in or near sensitive locations. *Id.* Then-acting Director of U.S. Immigration and Customs Enforcement (ICE) Vitello issued follow-on guidance, charging "Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." Memorandum from Caleb Vitello, Acting Dir., ICE, "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) ("Vitello Mem."), Dkt. 16-1.

The rescission of the sensitive locations policy reflects the administration's broader initiative to accelerate immigration enforcement. Compl. ¶ 5. Officials have publicly announced the goal of deporting all immigrants unlawfully present in the U.S., and ICE officers have been directed to meet increased quotas for daily arrests. *See id.* ¶¶ 5, 74, 77 & n.41. DHS's press release about the policy rescission, as posted on the government website, highlights that "ICE agents who spoke to Fox News said they believe that rescinding the Mayorkas order is going to free them up

to go after more illegal immigrants."  Press Release, DHS, "Promises Made, Promises Kept: President Trump Is Already Securing Our Border and Deporting Criminal Aliens" (Jan. 26, 2025); *see* Compl. ¶ 4 & n.5

### B.     Factual and Procedural Background

Plaintiffs are a coalition of sixteen denominational bodies and eleven denominational and interdenominational associations rooted in the Jewish and Christian faiths.  Compl. ¶ 1. "Welcoming and serving the stranger, or immigrant, is . . . a central precept of their faith practices." *Id.*  Plaintiffs' member congregations offer worship services and provide social service ministries—including food and clothing pantries, language classes, legal assistance, and job training services—to all persons "without regard to [their] documentation or legal status." *Id.* ¶¶ 2, 7.  Many of plaintiffs' member churches and synagogues have undocumented congregants or are in areas with significant immigrant populations.  *E.g.*, *id.* ¶¶ 7, 88, 100, 103, 124.

Since the policy recission, one enforcement action has taken place at a plaintiff church.[1] Two enforcement actions have taken place at non-plaintiff churches campuses.[2]  And four plaintiffs report that ICE has conducted surveillance at or near their members' premises.[3]

---

[1] *See* Pls.' Mot. Ex. 46 ¶ 7, Dkt. 11-49 ("In the local church that was raided, which is located in Atlanta, ICE agents came into the daycare office looking for a staff member who they believed to be undocumented.").

[2] *See* Compl. ¶ 6; Am. Decl. of Bishop Robin Dease ¶ 7, Dkt. 24-2.

[3] *See* Pls.' Mot. Ex. 16 ¶ 6, Dkt. 11-19 ("ICE recently showed up at a food pantry hosted by a congregation in California to take photographs of people lined up to receive food."); *id.* Ex. 20 ¶ 4, Dkt. 11-23 ("We have seen an ICE presence outside some of our churches, and in early February, ICE agents showed up outside the Food Pantry at one of our congregations and took pictures of people who were in line to receive food."); *id.* Ex. 35 ¶ 8, Dkt. 11-38 ("Congregants have reported . . . [ICE] surveillance targeting direct service programs such as legal counsel, education, youth ministry, after school care, and food provision."); *id.* Ex. 66 ¶ 7, Dkt. 11-69 ("[W]e have recently noticed an unknown vehicle repeatedly idling on the edges of our property for 15 to 30 minutes at a time over the course of several days. We suspect ICE is surveilling us again.").

4

According to the plaintiffs, such enforcement actions and surveillance are "devastating to their religious practice," "shatter[] the consecrated space of sanctuary," and "thwart[] communal worship." *Id.* ¶ 7. Many plaintiffs also allege that their congregations have seen a significant decline in attendance at worship services or in social service ministries.[4] Plaintiffs' pastors and reverends attest that congregants have stopped attending because of the policy rescission.[5] Finally, the plaintiffs allege that congregations have incurred costs for increased security measures to protect immigrant congregants, for example monitoring attendance, requiring registration, or moving worship services online. *E.g.*, *id.* ¶¶ 120, 123, 129, 149.

On February 11, 2025, the plaintiffs filed suit against DHS, the Secretary of DHS, U.S. Customs and Border Protection (CBP), the Commissioner of CBP, ICE, and the Director of ICE, challenging the rescission of the sensitive locations policy. The plaintiffs claim that immigration enforcement actions in or near their places of worship burden members' freedom of religious exercise and right to expressive association, in violation of RFRA and the First Amendment. *Id.* ¶¶ 161–78. They further claim that the rescission of the Mayorkas Memorandum was an arbitrary

---

[4] *E.g.*, Pls.' Mot. Ex. 9 ¶ 12, Dkt. 11-12 ("One largely Hispanic congregation in our Pacific Southwest District has reported a decrease in attendance at its weekly worship services from approximately 140 to 90 individuals."); *id.* Ex. 11 ¶ 8, Dkt. 11-14 ("Attendance at Sunday worship services has declined from an average attendance of approximately 370 to 270 individuals."); *id.* Ex. 26 ¶ 12, Dkt. 11-29 ("[A] congregation in North Carolina has seen a roughly 50 percent decrease in attendance at their church food pantry, GED and ESL classes, and clothing ministry."); *id.* Ex. 61 ¶ 9, Dkt. 11-64 ("On Sunday, February 16, 2025, no immigrant members or congregants attended worship services, meaning a 100 percent decrease in immigrant attendance.").

[5] *E.g.*, Pls.' Mot. Ex. 9 ¶ 12 (attesting that attendance has "fall[en] by half as word spread that ICE and CBP has become active in the area and that churches are no longer considered off limits to immigration authorities"); *id.* Ex. 10 ¶ 8, Dkt. 11-13 ("My congregants tell me that the reason they are no longer attending services is that they fear ICE or CBP will target our congregation."); *id.* Ex. 59 ¶ 9, Dkt. 11-62 (attesting that at least one congregant "stopped attending services because of the sensitive locations policy rescission"); *id.* Ex. 62 ¶ 10, Dkt. 11-65 ("One member church, St. Luke's, has already been told by one member family that they do not feel safe coming to church services under DHS's new policy.").

and capricious agency action, in violation of the APA. *Id.* ¶¶ 179–86. On February 21, the plaintiffs filed a motion for a preliminary injunction, requesting that the Court (1) enjoin the federal defendants from conducting immigration enforcement actions in or near plaintiffs' places of worship, absent exigent circumstances or a judicial warrant; and (2) stay the Rescission Memorandum. *See* Pls.' Mot. at 1. On April 4, the Court held a hearing on the motion.

## II.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citations and internal quotation marks omitted). Where a federal agency is the defendant, the last two factors merge. *Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

To succeed on the merits, "[a] plaintiff must show a likelihood of success encompass[ing] not only substantive theories but also establishment of jurisdiction," including standing to sue. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. D.C.*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). "In the context of a preliminary [relief] motion, [courts] require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,* 878 F.3d 371, 377 (D.C. Cir. 2017). The plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C.

2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  A plaintiff's "inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction."  *Food & Water Watch*, 808 F.3d at 913.

## III.    ANALYSIS

### A.    Standing

To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).  When an organization seeks to bring suit on behalf of its members—that is, to assert associational standing—it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  When an organization seeks to sue on its own behalf—that is, to assert organizational standing—it must show that the actions of the defendant concretely injure the organization's own ability to carry out its mission or activities.  *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

The plaintiffs assert four injuries in support of Article III standing.  First, they assert an associational injury based on the imminent risk that immigration enforcement actions will be taken at member congregations.  Pls.' Mot., at 12.  Second, they assert an organizational injury based on concrete declines in attendance at worship services and social service ministries.  *Id.* at 13.  Third, they assert a conscience injury—the recission allegedly forces congregations to make a "Hobson's choice," between openly welcoming all immigrants consistent with their religious obligations or restricting in-person services to protect immigrants from law enforcement.  *Id.*  Fourth, they assert

7

an organizational injury based on the costs of increased security measures that congregations have taken to protect their members. *Id.*

### 1. Imminent Immigration Enforcement Actions

The plaintiffs' first asserted injury amounts to a pre-enforcement challenge against threatened immigration enforcement actions at their places of worship. A pre-enforcement challenge requires a showing that the threatened enforcement is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014); *see Am. Libr. Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C. Cir. 1992) (requiring a "credible threat" of enforcement). To demonstrate imminence, a plaintiff must show that enforcement "results from a special law enforcement priority," namely that the plaintiff has been "singled out or uniquely targeted by the . . . government for [enforcement]." *Ord v. D.C.*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (finding that a plaintiff had been singled out when law enforcement had issued a warrant for his arrest); *Parker v. D.C.*, 478 F.3d 370, 375 (D.C. Cir. 2007). Whether the threat of enforcement is adequate "in any particular preenforcement challenge is a factual and case-specific" determination. *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997).

At least at this juncture and on this record, the plaintiffs have not made the requisite showing of a "credible threat" of enforcement. *Am. Libr. Ass'n*, 956 F.2d at 1196. Neither the Rescission Memorandum nor the Vitello Memorandum direct law enforcement to target churches or synagogues or to treat places of worship as high priority locations for immigration enforcement. Rescission Mem. (directing officers to use "common sense"); Vitello Mem., at 2 (charging law enforcement to use "judgment" and supervisors to make "case-by-case determinations"); *see Laird v. Tatum*, 408 U.S. 1, 11 (1972) (finding no injury where a challenged policy was not "regulatory, proscriptive, or compulsory in nature"); *Saline Parents v. Garland*, 630 F. Supp. 3d 201, 206

App. 115

(D.D.C. 2022). As the government represented at the preliminary injunction hearing, the policy recission reflects only "a modest change in the internal guidance that DHS is providing its immigration officers" and does not mandate conducting enforcement activities during worship services or while social service ministries are being provided. April 4 Hr'g Rough Tr., at 44, 49.

Nor does the present record show that places of worship are being singled out as special targets. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (requiring plaintiffs to "set forth [] specific facts demonstrating that" they are being targeted). Since the policy rescission took effect over 10 weeks ago, only one enforcement action has taken place at the hundreds of plaintiffs' member congregations. *See* Pls.' Mot. Ex. 46 ¶ 7. The plaintiffs can point to only three instances, since January 20, 2025, where any immigration enforcement action has taken place in or near any place of worship anywhere in the country, even under the current administration's more vigorous immigration priorities and increased ICE quotas. *See id.*; Compl. ¶ 6; Am. Dease Decl. ¶ 7. This limited pattern further undermines the inference that actions against plaintiffs' congregations are imminent. *See Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("'Past exposure to illegal conduct' can serve as evidence of threatened future injury but 'does not in itself show a present case or controversy regarding injunctive relief.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). And although four plaintiffs do allege that ICE has engaged in surveillance near their premises, they have not presented any direct link between that surveillance and an actual or pending immigration raid at a church or synagogue. *See United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1380 (D.C. Cir. 1984) (finding past surveillance insufficient to plead an injury where plaintiffs had "not adequately averred that any specific action is threatened or even contemplated against them").

Absent evidence of specific directives to immigration officers to target plaintiffs' places of worship, or a pattern of enforcement actions, the Court finds no credible threat of imminent enforcement.  Accordingly, the plaintiffs lack standing to assert a pre-enforcement challenge.

### 2.      Attendance Declines

Next, the plaintiffs allege that many congregations are experiencing concrete and measurable decreases in worship attendance and social services participation.  *See Presbyterian Church v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) (finding that a "concrete, demonstrable decrease in attendance at . . . worship activities" can constitute injury for a religious organization); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. DHS*, -- F. Supp. 3d --, 2025 WL 585768, at *8 (D. Md. Feb. 24, 2025).  As alleged—and as likely necessary to plead an injury under *Presbyterian Church*—the attendance declines in plaintiffs' congregations have been significant, amounting to double-digit percentages or dozens of congregants being absent.  For example, since January 20, 2025: one largely Hispanic congregation "has reported a decrease in attendance at its weekly worship services from approximately 140 to 90 individuals," Pls.' Mot. Ex. 9 ¶ 12; at another Spanish-speaking congregation, "attendance at worship services has dropped by 25 to 40 percent since mid-January," *id.*; at a West Coast church, "[a]ttendance at Sunday worship services has declined approximately 33 percent, from an average attendance of approximately 140 to approximately 90 individuals," *id.* Ex. 10 ¶ 8; and a "worshiping community in the Midsouth reports a decline in attendance of over half its families as a result of the new policy," *id.* Ex. 26 ¶ 12.

10

Even assuming without deciding that attendance decreases comprise an injury,[6] to establish standing, the plaintiffs must also show that injury is traceable to the government's policy, *see Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019), and redressable with the requested injunction, *see Lujan*, 504 U.S. at 562. The Court will address each in turn.

### a.    Traceability

To establish traceability, the plaintiffs must show that their alleged injury—a decline in attendance—is "fairly traceable" to the sensitive locations policy rescission. *Dep't of Com.*, 588 U.S. at 767. Where, as here, the "causal relation between injury and challenged action depends upon the decision of an independent third party"—the church congregants—it is "substantially more difficult to establish" traceability. *California v. Texas*, 593 U.S. 659, 675 (2021) (citation and internal quotation marks omitted). To do so, the plaintiffs must put forth evidence showing their injury arises from the "predictable effect of Government action on the decisions of third parties." *Dep't of Com*, 588 U.S. at 768. In other words, the plaintiffs must present "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (cleaned up). Although the challenged policy need not be the sole cause of their injury, it must be a "but-for" cause. *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1247–48 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984); *Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (finding traceability where there was another "equally important"

---

[6] The Court notes that the factual circumstances of *Presbyterian Church* differ significantly from the present record. In that case, officers conducted an extensive undercover surveillance operation and repeatedly attended and tape-recorded worship services. 870 F.2d at 520. In contrast here, only four out of the twenty-seven plaintiffs allege any actual surveillance activity, *see* Pls.' Mot. Exs. 16, 20, 35, 66; that activity has been significantly less intrusive; and no plaintiff alleges any immigration officer has entered church premises during worship services.

cause of an injury); *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 31 (D.D.C. 2023), *aff'd*, 108 F.4th 836 (D.C. Cir. 2024) (requiring the challenged government action to be "directly and inextricably" tied to the injury).

At least on the existing record, the plaintiffs have not presented "substantial evidence" that the policy rescission—as opposed to the administration's broader immigration crackdown—has caused the widespread congregant absences from religious services. *Arpaio*, 797 F.3d at 20. The plaintiffs acknowledge that broader immigration enforcement actions, and the extensive media coverage of those actions, have caused many undocumented immigrants to refuse to go out in public in general. Reply, at 5–6, Dkt. 20; *see also* Opp'n, at 17, Dkt. 16. As multiple affiants have attested, congregants "are afraid to leave their homes" as a result of the increased ICE activity in "members' neighborhoods, apartment complexes, homes, and at work sites." Pls.' Mot. Ex. 16 ¶ 6; *see e.g.*, *id.* Ex. 12 ¶ 13, Dkt. 11-15 ("The pastor at Azle Avenue Baptist has reported that several of his congregants are no longer leaving their homes out of fear of ICE."); *id.* Ex. 35 ¶ 12 ("[R]umors of escalating ICE enforcement . . . [are] driving congregants to avoid leaving their homes."); *id.* Ex. 61 ¶ 9 ("[Congregants] do not want to leave their homes out of fear of ICE arrest."). That evidence suggests that congregants are staying home to avoid encountering ICE in their own neighborhoods, not because churches or synagogues are locations of elevated risk.

The Court cannot infer the requisite "but-for" causation from affidavits that do not delineate between the effects of broader immigration enforcement priorities and the policy rescission specifically.[7] *See Cmty. Nutrition*, 698 F.2d at 1247–48. To date, the plaintiffs have

---

[7] *E.g.,* Pls.' Mot. Ex. 1 ¶ 12, Dkt. 11-4 ("[C]ongregants [are] conveying that they are now afraid of going to church due to the imminent risk of an ICE raid or enforcement action."); *id.* Ex. 7 ¶ 12, Dkt. 11-10 ("Our pastors report that some of their congregants are staying home from church for fear of being detained."); *id.* Ex. 19 ¶ 8, Dkt. 11-22 ("Our congregants are afraid of coming to

offered insufficient evidence that the Rescission Memorandum is a but-for cause of the reduced religious attendance. Affiants summarily attest that congregations "ha[ve] already had congregants stop coming to church out of fear of ICE under DHS's new policy." Pls.' Mot. Ex. 47 ¶ 10, Dkt. 11-50; *see e.g.*, *id.* Ex. 59 ¶ 9 ("[O]ne member of our congregation has already stopped attending services because of the sensitive locations policy rescission."). But such limited and conclusory assertions are not enough for the Court to conclude with "little doubt" that the policy rescission has caused the widespread declines in attendance. *Arpaio*, 797 F.3d at 20. Nor have the plaintiffs offered any objective statistical evidence showing that religious attendance declines were a predictable effect of the rescission policy. *See Dep't of Com.*, 588 U.S. at 768 (relying on trial evidence that "noncitizen households have historically responded to the census at lower rates" to find a response decrease predictable). Some affiants date the declines to mid-January,[8] when the rescission policy took effect, but that is also the date when the current administration took office and began implementing broader immigration policy changes.

Taken as a whole, the affidavits do not meet the high bar that is required to show a causal relationship between the government policy and third-party conduct. Affiants' representations are conclusory, second-hand, and limited in nature, in contrast to the evidence of an undisputed alternative cause for the declines in religious attendance. *See* Hr'g Tr., at 44–54, *Denver Public Schools v. Noem*, No. 25-cv-00474 (DDD) (D. Colo. Mar. 7, 2025) (finding no traceability where attendance declines were "based largely on broader immigration enforcement policy changes that

---

church or our programs because they are afraid of being detained, harmed, separated from their families, and deported by ICE.").

[8] *E.g.*, Pls.' Mot. Ex. 24 ¶ 10, Dkt. 11-27 ("A congregant family at a Texas meeting has not attended services since the sensitive locations policy rescission, expressing their fear of being arrested and deported by ICE or CBP."); *id.* Ex. 60 ¶ 11, Dkt. 11-63 ("Since DHS adopted the new enforcement policy, worship attendance has decreased by more than sixty percent [at one church].").

wouldn't be affected by" an injunction on the policy rescission). On the existing record, the Court cannot conclude that the plaintiffs have proffered "substantial evidence" tying the rescission to the alleged declines in religious attendance. *Arpaio*, 797 F.3d at 20.

### b.    Redressability

For similar reasons, the plaintiffs have not shown that a preliminary injunction would redress their alleged attendance injury. *Lujan*, 504 U.S. at 562. Were the Court to grant the requested injunction, the parties would be returned to the previous status quo under the Mayorkas Memorandum. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). But the evidence does not establish, with "little doubt," that religious attendance would rebound under a return to that policy. *See Arpaio*, 797 F.3d at 20. As the plaintiffs acknowledged in the preliminary injunction hearing, a return to the Mayorkas Memorandum without reverting to the "enforcement priorities of the prior administration" would not remedy their alleged burdens on religious exercise. April 4 Hr'g Rough Tr., at 10 (arguing that the headquarters authority exception in the Mayorkas Memorandum violates RFRA and the First Amendment). In other words, the plaintiffs recognize that their requested injunction would not rectify the alleged attendance declines. *See Denver Public Schools* Hr'g Tr., at 54.

Reverting to the Mayorkas Memorandum would not mitigate the risks cited by congregants of leaving their homes generally, or of traveling to or from religious services. On its face, the Mayorkas Memorandum creates no legally enforceable rights and confers only limited protections against immigration officers' exercise of discretion. *See* Mayorakas Mem., at 3–4. For example, it provides "no bright-line definition of what constitutes 'near'" a place of worship and directs officers to use the "exercise of judgment," thus allowing officers to take enforcement actions within blocks of churches or synagogues. *Id.* It further provides that immigration officers *may*

enter places of worship with "prior approval from their Agency's headquarters" or from a supervisor the agency may "otherwise delegate." *Id.* at 5. That prior written approval requirement has changed only minimally under the Vitello guidance, which directs officers to seek prior verbal or written approval from Assistant Field Office Directors and Assistant Special Agents in Charge. *See* Vitello Mem., at 2. Further, it is questionable that any substantive distinctions between the memoranda deter the kinds of immigration enforcement actions that the plaintiffs seek to prevent. *See* April 4 Hr'g Rough Tr., at 39, 46 (government counsel representing that the Rescission Memorandum represents only a "modest change" in procedure and does not authorize any substantive enforcement action "that wasn't authorized before").

*   *   *

As a whole, the plaintiffs have not shown that reinstating the Mayorkas Memorandum—without restraining executive discretion more broadly, which the Court cannot do—would provide the reassurance necessary to redress the alleged declines in religious attendance. Because the attendance injury is not fairly traceable to the rescission, nor redressable by the requested preliminary injunction, the Court finds that the plaintiffs have not shown a substantial likelihood of standing.

### 3.    Conscience Injury

Next, the plaintiffs allege that the policy rescission works a conscience injury, by forcing congregations to make a "Hobson's choice" between withdrawing welcome to all immigrants or else making those immigrants "an easy target for enforcement action" in their places of worship. Pls.' Mot., at 14. Either option would violate the plaintiffs' sincerely held religious beliefs. *Id.* The Supreme Court has recognized, in limited circumstances, that such a conscience injury can constitute a concrete injury-in-fact for purposes of Article III standing. *See FDA v. All. for*

15

*Hippocratic Med.*, 602 U.S. 367, 387 (2024) (recognizing a conscience injury if a doctor were required provide abortion services in violation of her religious beliefs). But even a conscience injury must be actual and imminent. *Id.* at 387–88 (finding no concrete injury where no plaintiff doctor was actually forced to provide abortion services over conscience objections).

Here, the plaintiffs speculate that if their congregations were to continue to hold doors open to undocumented immigrants, those individuals *would* be subject to immigration raids during worship gatherings or social service ministries. To be clear, the plaintiffs do not—and could not— allege that the policy recission imposes any direct prohibition on plaintiffs' invitation to all. Rather, the alleged conscience injury—the pressure to restrict immigrants' in-person access to services—arises from the plaintiffs' own assumption that congregants will in fact be targeted while attending church or synagogue. But as the Court has explained, the current record does not establish that such enforcement actions are sufficiently likely or imminent. Instead, the plaintiffs' alleged Hobson's choice is driven by "subjective chill" and "fear" of enforcement. *Am. Libr. Ass'n*, 956 F.2d at 1196. This type of chilling effect, or even a plaintiff's "reasonable reaction to a risk of harm . . . [that is] not certainly impending," does not suffice to establish standing. *Clapper*, 568 U.S. at 415–16. In other words, absent a credible threat of enforcement, the causal link between religious welcome and an immigration raid at a place of worship is "simply too speculative or too attenuated to support Article III standing." *Hippocratic Med.*, 602 U.S. at 393. Accordingly, the Court finds that the plaintiffs' alleged conscious injury does not confer standing.

### 4. Costs of Increased Security Measures

Finally, the plaintiffs allege that congregations have been forced to incur costs to secure their premises to protect members from immigration officers. But a plaintiff "cannot manufacture standing by incurring costs in anticipation of non-imminent harm." *Clapper*, 568 U.S. at 422. As

previously explained, the plaintiffs have not shown that enforcement actions are imminent at their places of worship.  Thus, they cannot establish standing because "they incurred certain costs . . . based on their fears of [that] hypothetical future harm." *Id.* at 416 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)).

## CONCLUSION

For these reasons, at least on the present record, the plaintiffs have not established a substantial likelihood of Article III standing.  Accordingly, the motion for a preliminary injunction is DENIED.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

April 11, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA, *et al.*,

      Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

      Defendants.

Civil Action No. 25-CV-00403-DLF

---

## NOTICE OF APPEAL

Please take notice that Plaintiffs Mennonite Church USA, *et al.*, hereby appeal to the U.S. Court of Appeals for the D.C. Circuit from this Court's April 11, 2025 opinion and order denying Plaintiffs' motion for preliminary injunction. *See* ECF Nos. 29, 30.

Dated:  May 30, 2025

Respectfully submitted,

/s/ *Kate Talmor*
Kelsi Brown Corkran (Bar No. 501157)
Shelby B. Calambokidis (Bar No. 1684804)
Julia Gegenheimer* (NY Bar No. 4949475)
Alexandra Lichtenstein (Bar No. 1724947)
Kate Talmor* (Maryland Bar)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
    AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728

App. 125

*Attorneys for Plaintiffs*

*\*DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member*

2