ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5209

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

MENNONITE CHURCH USA, et al.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,
*Defendants-Appellees*.

On Appeal from the U.S. District Court for the District of Columbia,
No. 25-cv-00403 (Dabney Friedrich, District Judge)

**JOINT APPENDIX
VOLUME II (EXHIBITS)**

Kelsi Brown Corkran
Shelby B. Calambokidis
Julia Gegenheimer
Alexandra Lichtenstein
Kate Talmor
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION, GEORGETOWN LAW
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Counsel for Plaintiffs-Appellants*

# APPENDIX
# TABLE OF CONTENTS

## VOLUME ONE

**Document (ECF No.)**                                                          **Page**

District Court Docket Report ........................................................App. 001

Complaint (ECF No. 1)................................................................App. 022

Plaintiffs' Motion for Preliminary Injunction (ECF No. 11).......................App. 102

Plaintiffs' Notice of Corrected Proposed Preliminary Injunction Order
    (ECF No. 19)......................................................................App. 104

Proposed Order (ECF No. 19-1) ..................................................App. 106

Order Denying Plaintiffs' Motion for Preliminary Injunction
    (ECF No. 29)......................................................................App. 107

Memorandum Opinion Denying Plaintiffs' Motion for Preliminary
    Injunction (ECF No. 30) ...........................................................App. 108

Notice of Appeal (ECF No. 37) ...................................................App. 125

## VOLUME TWO (EXHIBITS)

**Document (ECF No.)**                                                          **Page**

Complaint Exhibits

Exhibit 1 to Complaint, Memorandum from Benjamine C. Huffman,
    Acting Sec'y, DHS, "Enforcement Actions in or Near Protected Areas"
    (Jan. 20, 2025) (ECF No. 1-1) .................................................App. 127

Exhibit 2 to Complaint, Memorandum from Alejandro N. Mayorkas, Sec'y,
    Dep't of Homeland Sec., "Guidelines for Enforcement Actions in or
    Near Protected Areas" (Oct. 27, 2021) (ECF No. 1-2)..........................App. 129

i

Exhibit 3 to Complaint, Memorandum from David V. Aguilar, Deputy
    Comm'r, CBP, "U.S. Customs and Border Protection Enforcement
    Actions at or Near Certain Community Locations" (Jan. 18, 2013)
    (ECF No. 1-3) ......................................................................App. 135

Exhibit 4 to Complaint, Memorandum from John Morton, Dir., ICE,
    "Enforcement Actions at or Focused on Sensitive Locations," 10029.2
    (Oct. 24, 2011) (ECF No. 1-4).................................................App. 138

Exhibit 5 to Complaint, Memorandum from Julie L. Myers, Assistant Sec'y,
    ICE, "Field Guidance on Enforcement Actions or Investigative Activities
    at or Near Sensitive Community Locations," 10029.1 (July 3, 2008)
    (ECF No. 1-5) ......................................................................App. 142

Exhibit 6 to Complaint, Memorandum from James A. Puleo, Acting Assoc.
    Comm'r, Immigration & Naturalization Serv., "Enforcement Activities at
    Schools, Places of Worship, or at Funerals or Other Religious Ceremonies,"
    HQ 807-P (May 17, 1993) (ECF No. 1-6)................................App. 145

Exhibits to Plaintiffs' Preliminary Injunction Motion

Exhibit 1 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Dr. J. Elvin Sadler, General Secretary-Auditor of Plaintiff The African
    Methodist Episcopal Zion Church ("A.M.E. Zion") (ECF No. 11-4).....App. 149

Exhibit 2 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend Jane Doe # 1 Supporting Plaintiff A.M.E. Zion
    (ECF No. 11-5) ......................................................................App. 156

Exhibit 3 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend Freeman L. Palmer, Conference Minister of Plaintiff Central
    Atlantic Conference United Church of Christ ("CAC")
    (ECF No. 11-6) ......................................................................App. 160

Exhibit 4 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend Seth Kaper-Dale on Behalf of the Reformed Church of
    Highland Park in Support of Plaintiff CAC (ECF No. 11-7) ..................App. 166

Exhibit 5 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Rabbi Hara Person, Chief Executive of Plaintiff the Central Conference
   of American Rabbis ("CCAR") (ECF No. 11-8).....................................App. 171

Exhibit 6 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Rabbi Serge A. Lippe in Support of Plaintiff CCAR (ECF No. 11-9)....App. 176

Exhibit 7 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Teresa Hord Owens, General Minister and President of
   Plaintiff the Christian Church (Disciples of Christ) ("DOC") in the United
   States and Canada (ECF No. 11-10)........................................................App. 181

Exhibit 8 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Mary Abigail Conley Supporting Plaintiff DOC
   (ECF No. 11-11) ......................................................................................App. 186

Exhibit 9 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   David Steele, General Secretary of Plaintiff Church of the Brethren
   ("COB") (ECF No. 11-12).......................................................................App. 191

Exhibit 10 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Pastor John Doe # 2 on Behalf of Anonymous Member Church
   Supporting Plaintiff COB (ECF No. 11-13).............................................App. 201

Exhibit 11 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Pastor John Doe # 3 on Behalf of Anonymous Member Church
   Supporting Plaintiff COB (ECF No. 11-14).............................................App. 205

Exhibit 12 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Jesse Rincones, Executive Director of Plaintiff Convención Bautista
   Hispana de Texas ("CBHT") (ECF No. 11-15).......................................App. 209

Exhibit 13 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Fernando Rojas on Behalf of Azle Avenue Baptist Church in
   Support of Plaintiff CBHT (ECF No. 11-16) ..........................................App. 215

Exhibit 14 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 4 on Behalf of Anonymous Member Church
Supporting Plaintiff CBHT (ECF No. 11-17) ........................................App. 220

Exhibit 15 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 5 on Behalf of Anonymous Member Church
Supporting Plaintiff CBHT (ECF No. 11-18) ........................................App. 224

Exhibit 16 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Most Reverend Sean W. Rowe for Plaintiff The Episcopal Church
("TEC") (ECF No. 11-19) ......................................................................App. 228

Exhibit 17 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Julia Ayala Harris, President of The House of Deputies of TEC
Supporting Plaintiff TEC (ECF No. 11-20)............................................App. 236

Exhibit 18 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Right Reverend Jennifer Reddall on Behalf of the Episcopal
Diocese of Arizona Supporting Plaintiff TEC (ECF No. 11-21) ............App. 242

Exhibit 19 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Right Reverend David C. Rice on Behalf of the Episcopal Diocese
of San Joaquin and St. James Episcopal Cathedral Supporting Plaintiff
TEC (ECF No. 11-22)..............................................................................App. 246

Exhibit 20 to Plaintiffs' Preliminary Injunction Motion, Declaration of
the Right Reverend Lucinda Ashby on Behalf of the Episcopal Diocese
of El Camino Real Supporting Plaintiff TEC (ECF No. 11-23)..............App. 251

Exhibit 21 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Stephen Reeves, Executive Director of Plaintiff Fellowship Southwest
(ECF No. 11-24) .....................................................................................App. 255

Exhibit 22 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend John Doe # 6 on Behalf of Anonymous Member Church
Supporting Plaintiff Fellowship Southwest (ECF No. 11-25)................App. 261

iv

Exhibit 23 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Reverend John Doe # 7 on Behalf of Anonymous Member Church
     Supporting Plaintiff Fellowship Southwest (ECF No. 11-26)................App. 266

Exhibit 24 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Barry Crossno, General Secretary of Plaintiff Friends General
     Conference ("FGC") (ECF No. 11-27).....................................App. 273

Exhibit 25 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Interim Clerk Jane Doe # 8 on Behalf of Anonymous Monthly
     Meeting Supporting Plaintiff FGC (ECF No. 11-28).............................App. 279

Exhibit 26 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Reverend Jihyun Oh on Behalf of Plaintiff General Assembly of the
     Presbyterian Church (U.S.A.) ("PCUSA") (ECF No. 11-29) ................App. 284

Exhibit 27 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Pastor John Doe # 9 on Behalf of Anonymous Member Congregation
     Supporting Plaintiff PCUSA (ECF No. 11-30) ......................................App. 290

Exhibit 28 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Jane Doe # 10 on Behalf of Anonymous Congregation Supporting
     Plaintiff PCUSA (ECF No. 11-31) ..........................................................App. 295

Exhibit 29 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Pastor John Doe # 11 on Behalf of Anonymous Worshiping
     Community Supporting Plaintiff PCUSA (ECF No. 11-32)..................App. 299

Exhibit 30 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Giovanni Arroyo on Behalf of Plaintiff General Commission on Religion
     and Race of The United Methodist Church ("GCORR")
     (ECF No. 11-33) ...................................................................................App. 303

Exhibit 31 to Plaintiffs' Preliminary Injunction Motion, Declaration of
     Pastor Alisa Lasater Wailoo on Behalf of First United Methodist
     Church of Germantown Supporting Plaintiff GCORR
     (ECF No. 11-34) ...................................................................................App. 309

v

Exhibit 32 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 12 on Behalf of Anonymous Congregation
Supporting Plaintiff GCORR (ECF No. 11-35) ......................................App. 314

Exhibit 33 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Carlos L. Malavé, President of Plaintiff Latino Christian
National Network ("LCNN") (ECF No. 11-36) ......................................App. 319

Exhibit 34 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 13 in Support of Plaintiff LCNN (ECF No. 11-37) ..App. 326

Exhibit 35 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Laura Everett, Executive Director of Plaintiff Massachusetts
Council of Churches ("MCC") (ECF No. 11-38)....................................App. 333

Exhibit 36 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Reverend Judith K. Hanlon on Behalf of Hadwen Park Congregational
Church Supporting Plaintiff MCC (ECF No. 11-39) ..............................App. 340

Exhibit 37 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Jonathan Carlson, Moderator of Plaintiff Mennonite Church USA
("MC USA") (ECF No. 11-40).................................................................App. 345

Exhibit 38 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor John Doe # 14 on Behalf of Anonymous Congregation
Supporting Plaintiff MC USA (ECF No. 11-41)....................................App. 352

Exhibit 39 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Pastor Jane Doe # 15 on Behalf of Anonymous Congregation
Supporting Plaintiff MC USA (ECF No. 11-42)....................................App. 356

Exhibit 40 to Plaintiffs' Preliminary Injunction Motion, Declaration of
Bishop Thomas J. Bickerton on Behalf of Plaintiff New York Annual
Conference of The United Methodist Church ("NYAC")
(ECF No. 11-43) ......................................................................................App. 361

Exhibit 41 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Dr. James F. Karpen on Behalf of St. Paul & St. Andrew
   United Methodist Church for Plaintiff NYAC (ECF No. 11-44)...........App. 367

Exhibit 42 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Peter Cook, Executive Director of Plaintiff New York State
   Council of Churches ("NYSCOC") (ECF No. 11-45) ...........................App. 372

Exhibit 43 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend John Doe # 16 on Behalf of Anonymous Member Church
   Supporting Plaintiff NYSCOC (ECF No. 11-46)...................................App. 378

Exhibit 44 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend Jennifer Copeland, Executive Director of Plaintiff North
   Carolina Council of Churches ("NCCC") (ECF No. 11-47)...................App. 382

Exhibit 45 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Reverend John Doe # 17 Supporting Plaintiff NCCC
   (ECF No. 11-48) ......................................................................................App. 387

Exhibit 46 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Bishop Robin Dease on Behalf of Plaintiff The North Georgia
   Conference of The United Methodist Church ("NGA")
   (ECF No. 11-49) ......................................................................................App. 391

Exhibit 47 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Angela Gilreath-Rivers on Behalf of Anonymous Member Church for
   Plaintiff NGA (ECF No. 11-50) ..............................................................App. 397

Exhibit 48 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Pastor Jane Doe # 18 on Behalf of Anonymous Member Church
   Supporting Plaintiff NGA (ECF No. 11-51) ............................................App. 402

Exhibit 49 to Plaintiffs' Preliminary Injunction Motion, Declaration of
   Rabbi Jacob Blumenthal, Chief Executive Officer of Plaintiffs The
   Rabbinical Assembly ("RA") and The United Synagogue of
   Conservative Judaism ("USCJ") (ECF No. 11-52) .................................App. 406

Exhibit 50 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Rabbi Jill Borodin on Behalf of Herself and Congregation Beth
    Shalom Supporting Plaintiffs RA and USCJ (ECF No. 11-53)...............App. 412

Exhibit 51 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Rabbi Deborah Waxman, President and CEO of Plaintiff
    Reconstructing Judaism (ECF No. 11-54)................................App. 416

Exhibit 52 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Rabbi Dev Noily on Behalf of Kehilla Community Synagogue
    Supporting Plaintiff Reconstructing Judaism (ECF No. 11-55).............App. 423

Exhibit 53 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Rabbi John Doe # 19 on Behalf of an Anonymous Synagogue
    Supporting Plaintiff Reconstructing Judaism (ECF No. 11-56).............App. 428

Exhibit 54 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Jeremy Langill for Plaintiff Rhode Island State Council of Churches
    ("RISCC") (ECF No. 11-57) ....................................................App. 432

Exhibit 55 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Reverend John Doe # 20 on Behalf of Anonymous Congregation
    Supporting Plaintiff RISCC (ECF No. 11-58)........................................App. 437

Exhibit 56 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Melissa S. Johnson, General Counsel and Vice President, People &
    Culture for Plaintiff Union for Reform Judaism ("URJ")
    (ECF No. 11-59) .................................................................App. 441

Exhibit 57 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Rabbi John Doe # 21 on Behalf of Anonymous Congregation in Support
    of Plaintiff URJ (ECF No. 11-60)...........................................App. 447

Exhibit 58 to Plaintiffs' Preliminary Injunction Motion, Declaration of
    Carey McDonald, Executive Vice President of Plaintiff Unitarian
    Universalist Association ("UUA") (ECF No. 11-61)..............................App. 452

Exhibit 59 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      Jane Doe # 22 on Behalf of Anonymous Congregation Supporting
      Plaintiff UUA (ECF No. 11-62) ..............................................................App. 458

Exhibit 60 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      Bishop Kenneth H. Carter, Jr. on Behalf of Plaintiff The Western
      North Carolina Conference of The United Methodist Church ("WNCC")
      (ECF No. 11-63) .....................................................................................App. 463

Exhibit 61 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      Reverend John Doe # 23 on Behalf of Anonymous Member Church
      Supporting Plaintiff WNCC (ECF No. 11-64) .......................................App. 469

Exhibit 62 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      Reverend John Doe # 24 on Behalf of Anonymous Member Church
      Supporting Plaintiff WNCC (ECF No. 11-65) .......................................App. 474

Exhibit 63 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      Reverend Kerri Parker, Executive Director of Plaintiff Wisconsin
      Council of Churches ("WCC") (ECF No. 11-66)....................................App. 479

Exhibit 64 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      Jane Doe # 25 on Behalf of Anonymous Member Church Supporting
      Plaintiff WCC (ECF No. 11-67) ..............................................................App. 485

Exhibit 65 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      David Liners, Executive Director of Plaintiff WISDOM
      (ECF No. 11-68) .....................................................................................App. 489

Exhibit 66 to Plaintiffs' Preliminary Injunction Motion, Declaration of
      John Doe # 26 in Support of Plaintiff WISDOM (ECF No. 11-69)........App. 494

Notice of Corrected Declarations (ECF No. 24)...........................................App. 499

Amended Declaration of Pastor John Doe #12 on Behalf of Anonymous
      Congregation Supporting Plaintiff GCORR (ECF No. 24-1) .................App. 502

Amended Declaration of Bishop Robin Dease on Behalf of Plaintiff
    NGA (ECF No. 24-2)...............................................................App. 506

Exhibits to Defendants' Opposition to Plaintiffs' Preliminary Injunction Motion

Exhibit A to Defendants' Opposition, Memorandum from Caleb Vitello,
    Acting Director, ICE, "Common Sense Enforcement Actions in
    or Near Protected Areas" (Jan. 31, 2025) (ECF No. 16-1) ....................App. 511

x

# EXHIBIT 1



U.S. Department of Homeland Security
Washington, DC 20528

January 20, 2025

MEMORANDUM FOR:    Caleb Vitello
Acting Director
U.S. Immigration and Customs Enforcement

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

FROM:    Benjamine C. Huffman
Acting Secretary

SUBJECT:    Enforcement Actions in or Near Protected Areas

This memorandum addresses Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) enforcement actions in or near areas that the Department of Homeland Security (DHS) previously determined require special protection. It is effective immediately. This memorandum supersedes and rescinds Alejandro Mayorkas's October 27, 2021 memorandum entitled, Guidelines for Enforcement Actions in or Near Protected Areas.

Our brave men and women in uniform put their lives on the line every day to advance the rule of law and keep our people safe. As part of that work, officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location.

Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced. The Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion.

This memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

# EXHIBIT 2



**U.S. Department of Homeland Security**
Washington, DC 20528

October 27, 2021

MEMORANDUM TO:    Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection

Ur M. Jaddou
Director
U.S. Citizenship and Immigration Services

Robert Silvers
Under Secretary
Office of Strategy, Policy, and Plans

Katherine Culliton-González
Officer for Civil Rights and Civil Liberties
Office of Civil Rights and Civil Liberties

Lynn Parker Dupree
Chief Privacy Officer
Privacy Office

FROM:    Alejandro N. Mayorkas
Secretary

SUBJECT:    **Guidelines for Enforcement Actions in or Near Protected Areas**

---

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection.  It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

1

## I.    Foundational Principle

In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. It is because of the profound impact of our work that we must consider so many different factors before we decide to act. This can make our work very difficult. It is also one of the reasons why our work is noble.

When we conduct an enforcement action – whether it is an arrest, search, service of a subpoena, or other action – we need to consider many factors, including the location in which we are conducting the action and its impact on other people and broader societal interests. For example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care.

To the fullest extent possible, we should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities. Such a location is referred to as a "protected area."

This principle is fundamental. We can accomplish our enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more. Adherence to this principle is one bedrock of our stature as public servants.

## II.    Protected Areas

Whether an area is a "protected area" requires us to understand the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

The following are some examples of a protected area. The list is not complete. It includes only examples:

- A school, such as a pre-school, primary or secondary school, vocational or trade school, or college or university.

- A medical or mental healthcare facility, such as a hospital, doctor's office, health clinic, vaccination or testing site, urgent care center, site that serves pregnant individuals, or community health center.

- A place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place.

2

- A place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop.

- A social services establishment, such as a crisis center, domestic violence shelter, victims services center, child advocacy center, supervised visitation center, family justice center, community-based organization, facility that serves disabled persons, homeless shelter, drug or alcohol counseling and treatment facility, or food bank or pantry or other establishment distributing food or other essentials of life to people in need.

- A place where disaster or emergency response and relief is being provided, such as along evacuation routes, where shelter or emergency supplies, food, or water are being distributed, or registration for disaster-related assistance or family reunification is underway.

- A place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur.

- A place where there is an ongoing parade, demonstration, or rally.

We need to consider the fact that an enforcement action taken near – and not necessarily in – the protected area can have the same restraining impact on an individual's access to the protected area itself. If indeed that would be the case, then, to the fullest extent possible, we should not take the enforcement action near the protected area. There is no bright-line definition of what constitutes "near." A variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area. The determination requires an analysis of the facts and the exercise of judgment.

The fundamental question is whether our enforcement action would restrain people from accessing the protected area to receive essential services or engage in essential activities. Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation.

Whether an enforcement action can be taken in or near a courthouse is addressed separately in the April 27, 2021 Memorandum from Tae Johnson, ICE Acting Director, and Troy Miller, CBP Acting Commissioner, entitled "Civil Immigration Enforcement Actions in or Near Courthouses," which remains in effect.

## III.     Exceptions and Limitation on Scope

The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area. The phrase "to the fullest extent possible" recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

3

App. 132

- The enforcement action involves a national security threat.

- There is an imminent risk of death, violence, or physical harm to a person.

- The enforcement action involves the hot pursuit of an individual who poses a public safety threat.

- The enforcement action involves the hot pursuit of a personally observed border-crosser.

- There is an imminent risk that evidence material to a criminal case will be destroyed.

- A safe alternative location does not exist.

This list is not complete. It includes only examples. Here again, the exercise of judgment is required.

Absent exigent circumstances, an Agent or Officer must seek prior approval from their Agency's headquarters, or as you otherwise delegate, before taking an enforcement action in or near a protected area. If the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters (or your delegate) should be consulted post-action. To the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area.

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance. This guidance does not apply to matters in which enforcement activity is not contemplated. As just one example, it does not apply to an Agent's or Officer's participation in an official function or community meeting.

This guidance does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area.

### IV.    Training and Reporting

Please ensure that all employees for whom this guidance is relevant receive the needed training. Each of your respective agencies and offices should participate in the preparation of the training materials.

Any enforcement action taken in or near a protected area must be fully documented in your Agency's Privacy Act-compliant electronic system of record in a manner that can be searched and validated. The documentation should include, for example, identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what

4

occurred during and immediately after the enforcement action; and, any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

**V.    Statement of No Private Right Conferred**

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

5

# EXHIBIT 3



U.S. Customs and
Border Protection

JAN 18 2013

Deputy Commissioner

MEMORANDUM FOR:    See Distribution

FROM:    David V. Aguilar
Deputy Commissioner

SUBJECT:    U.S. Customs and Border Protection Enforcement Actions at or
Near Certain Community Locations

The presence of U.S. Customs and Border Protection (CBP) Officers and Agents conducting enforcement activities at or near schools, places of worship, and certain other community locations has been a sensitive issue. Accordingly, careful consideration and planning must be undertaken, as outlined herein, in relation to enforcement actions conducted at or near these establishments.

The following establishments should be considered to be within the context of this policy:

- schools, including pre-schools, primary schools, secondary schools, post-secondary schools, vocational or trade schools, and colleges and universities;
- places of worship, including places where funerals, weddings, or other public religious ceremonies are taking place;
- community centers; and
- hospitals.

CBP personnel should consult their supervisors for guidance when an enforcement action is being contemplated or planned at or near a location not specifically listed above but that may be similar in nature, description, or function. In assessing the appropriateness of a proposed action, supervisors should consider alternative measures that could achieve the enforcement objective without causing significant disruption to the normal activities or operations at the identified location, including the importance of the enforcement objective in furthering CBP's mission.

When CBP enforcement actions or investigative activities are likely to lead to an apprehension at or near such locations, written approval by the Chief Patrol Agent, Director of Field Operations, Director of Air and Marine Operations or the Internal Affairs Special Agent in Charge is required. The Deputy to these offices may approve the inspection of records, preliminary investigative activities, and similar activities at these locations where apprehensions are not likely to be made.

This policy does not summarily preclude enforcement actions at the listed locations. When situations arise that call for enforcement actions at or near the above-mentioned establishments without prior written approval, Agents and Officers are expected to exercise sound judgment and

App. 136

U.S. Customs and Border Protection Enforcement Action at or
Near Certain Community Locations
Page 2

common sense while taking appropriate action. Exigent circumstances, including matters related
to national security, terrorism, or public safety, requiring an Agent or Officer to enter these
establishments, must be reported immediately through the respective chain of command, as
applicable.

This policy does not limit or otherwise apply to CBP operations that are conducted at or near the
international border (including the functional equivalent of the border), or CBP operations that
bear nexus to the border including, for example, but not limited to smuggling interdiction efforts
that result in transportation to a hospital, custodial monitoring of injured aliens in CBP custody
that require hospitalization, or a controlled delivery from the border that concludes in close
proximity of one of the aforementioned locations.

This CBP policy guidance memorandum, which may be modified, superseded, or rescinded by
CBP at any time without notice, is not intended to, does not, and may not be relied upon to
create, any right or benefit, substantive or procedural, for any party.


Distribution:    Assistant Commissioner, Office of Air and Marine
                 Assistant Commissioner, Office of Field Operations
                 Assistant Commissioner, Office of Internal Affairs
                 Chief, Office of Border Patrol
                 Chief Counsel

# EXHIBIT 4

USCIS Case #02-9209
FEA Number: 306-112-002b

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



OCT 2 4 2011

**U.S. Immigration
and Customs
Enforcement**

MEMORANDUM FOR:    Field Office Directors
                   Special Agents in Charge
                   Chief Counsel

FROM:              John Morton
                   Director

SUBJECT:           Enforcement Actions at or Focused on Sensitive Locations

Purpose

This memorandum sets forth Immigration and Customs Enforcement (ICE) policy regarding certain enforcement actions by ICE officers and agents at or focused on sensitive locations. This policy is designed to ensure that these enforcement actions do not occur at nor are focused on sensitive locations such as schools and churches unless (a) exigent circumstances exist, (b) other law enforcement actions have led officers to a sensitive location as described in the *"Exceptions to the General Rule"* section of this policy memorandum, or (c) prior approval is obtained. This policy supersedes all prior agency policy on this subject.[1]

Definitions

The enforcement actions covered by this policy are (1) arrests; (2) interviews; (3) searches; and (4) for purposes of immigration enforcement only, surveillance. Actions not covered by this policy include actions such as obtaining records, documents and similar materials from officials or employees, providing notice to officials or employees, serving subpoenas, engaging in Student and Exchange Visitor Program (SEVP) compliance and certification visits, or participating in official functions or community meetings.

The sensitive locations covered by this policy include, but are not limited to, the following:

---

[1] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1 (July 3, 2008); Memorandum from Marcy M. Forman, Director, Office of Investigations, "Enforcement Actions at Schools" (December 26, 2007); Memorandum from James A. Puleo, Immigration and Naturalization Service (INS) Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993). This policy does not supersede the requirements regarding arrests at sensitive locations put forth in the Violence Against Women Act, see Memorandum from John P. Torres, Director Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, "Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (January 22, 2007).

Enforcement Actions at or Focused on Sensitive Locations
Page 2

- schools (including pre-schools, primary schools, secondary schools, post-secondary schools up to and including colleges and universities, and other institutions of learning such as vocational or trade schools);
- hospitals;
- churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;
- the site of a funeral, wedding, or other public religious ceremony; and
- a site during the occurrence of a public demonstration, such as a march, rally or parade.

This is not an exclusive list, and ICE officers and agents shall consult with their supervisors if the location of a planned enforcement operation could reasonably be viewed as being at or near a sensitive location. Supervisors should take extra care when assessing whether a planned enforcement action could reasonably be viewed as causing significant disruption to the normal operations of the sensitive location. ICE employees should also exercise caution. For example, particular care should be exercised with any organization assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities.

Agency Policy

*General Rule*

Any planned enforcement action at or focused on a sensitive location covered by this policy must have prior approval of one of the following officials: the Assistant Director of Operations, Homeland Security Investigations (HSI); the Executive Associate Director (EAD) of HSI; the Assistant Director for Field Operations, Enforcement and Removal Operations (ERO); or the EAD of ERO. This includes planned enforcement actions at or focused on a sensitive location which is part of a joint case led by another law enforcement agency. ICE will give special consideration to requests for enforcement actions at or near sensitive locations if the only known address of a target is at or near a sensitive location (e.g., a target's only known address is next to a church or across the street from a school).

*Exceptions to the General Rule*

This policy is meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations and make substantial efforts to avoid unnecessarily alarming local communities. The policy is not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action as outlined below. ICE officers and agents may carry out an enforcement action covered by this policy without prior approval from headquarters when one of the following exigent circumstances exists:

- the enforcement action involves a national security or terrorism matter;
- there is an imminent risk of death, violence, or physical harm to any person or property;

Enforcement Actions at or Focused on Sensitive Locations
Page 3

- the enforcement action involves the immediate arrest or pursuit of a dangerous felon, terrorist suspect, or any other individual(s) that present an imminent danger to public safety; or
- there is an imminent risk of destruction of evidence material to an ongoing criminal case.

When proceeding with an enforcement action under these extraordinary circumstances, officers and agents must conduct themselves as discretely as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location.

If, in the course of a planned or unplanned enforcement action that is not initiated at or focused on a sensitive location, ICE officers or agents are subsequently led to or near a sensitive location, barring an exigent need for an enforcement action, as provided above, such officers or agents must conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists and immediately consult their supervisor prior to taking other enforcement action(s).

<u>Dissemination</u>

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision receive a copy of this policy and adhere to its provisions.

<u>Training</u>

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision are trained (both online and in-person/classroom) annually on enforcement actions at or focused on sensitive locations.

<u>No Private Right of Action</u>

Nothing in this memorandum is intended to and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

This memorandum provides management guidance to ICE officers exercising discretionary law enforcement functions, and does not affect the statutory authority of ICE officers and agents, nor is it intended to condone violations of federal law at sensitive locations.

# EXHIBIT 5

Case 1:25-cv-00403 Document 1-5 Filed 02/11/25 Page 2 of 3
SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)
USCA Case #25-5209 Document #2136370 Filed: 09/22/2025 Page 28 of 398

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

*Office of the Assistant Secretary*

July 3, 2008

MEMORANDUM FOR:     All Field Office Directors
                    All Special Agents in Charge

FROM:               *Julie L. Myers*
                    Julie L. Myers
                    Assistant Secretary

SUBJECT:            <u>Field Guidance on Enforcement Actions or Investigative Activities
                    At or Near Sensitive Community Locations</u>

ICE personnel should refrain from conducting enforcement actions or investigative activities at
or near sensitive community locations such as schools, places of worship, and funerals or other
religious ceremonies, except in limited circumstances as set forth within this memorandum.
Such restraint strikes a balance between our law enforcement responsibilities and the public's
confidence in the way ICE executes its mission.

Precedent for this approach is clear. Under Immigration and Naturalization Service (INS) Policy
HQ 807-P, <u>Enforcement Activities at Schools, Places of Worship, or at funerals or other
religious ceremonies</u> (May 17, 1993), law enforcement personnel were directed to:

> *"[A]ttempt to avoid apprehension of persons and to tightly control investigative
> operations on the premises of schools, places of worship, funerals and other
> religious ceremonies."*

ICE policies are in place to ensure that our personnel conduct enforcement operations in a
manner that is safe and respectful of all persons. This policy was recently reinforced in a
December 26, 2007 Memorandum from Marcy M. Forman, Director, Office of Investigations,
entitled <u>Enforcement Actions at Schools</u>. This field guidance clearly states that ICE views these
actions with particular sensitivity:

> *"[I]t is important to emphasize that great care and forethought be applied before
> undertaking any investigative or enforcement type action at or near schools, other
> institutions of education, and venues generally where children and their families
> may be present."*

Policies governing ICE Office of Detention and Removal (DRO) Fugitive Operations Teams
have similarly discouraged enforcement actions in these sensitive locations. Furthermore, all of
our enforcement actions have been, and should continue to be, thoroughly planned, reviewed,
and approved by senior field office personnel so that both the public's safety and our national
security are guaranteed.

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)
www.ice.gov
(Page 28 of Total)     App. 143

REL0000024902

SUBJECT:  Field Guidance on Enforcement Actions or Investigative Activities At or Near
Sensitive Community Locations
Page 2

While ICE policies and procedures do not specifically preclude enforcement actions or
investigative activities at the aforementioned locations, the direction of INS HQ807-P remains in
effect.

Consistent with these policies, including INS HQ807-P, there may be specific situations
requiring ICE personnel to act at or near sensitive locations.  Such situations would include those
involving terrorism-related investigations, matters of public safety, or actions where no
enforcement activity is involved, such as requesting information from school officials, retrieving
records, or otherwise routine, non-enforcement activity.  Any such case must be raised to the
appropriate Headquarters program office prior to any action or, in exigent circumstances, as soon
as practicable.  Moreover, personnel are reminded to be cognizant of the impact of their activity,
exercise good judgment and act with an appropriate level of compassion in light of the location
while exercising their authority in such circumstances.

This policy should not be construed as an indication of tolerance for any violations of the law by
anyone at or in charge of any of these sensitive locations.  A formal ICE Policy Directive
providing policy and procedures for these enforcement actions and/or investigative activities will
be issued in the near future.

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

App. 144

REL0000024902

# EXHIBIT 6

# Memorandum

| Subject | Date | HQ 807-P |
|---|---|---|
| Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies. | MAY 17 1993 | |

| To | From |
|---|---|
| District Directors Chief Patrol Agents | Office of Operations |

POLICY:

It is a policy of the Service to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies.

PROCEDURES:

Enforcement operations which are likely to involve apprehensions on the premises of schools, places of worship, or at funerals or other religious ceremonies require advance written approval by the District Director or Chief Patrol Agent. Such actions are reportable under Operations Instructions (OI) 103.1(g) pertaining to reporting of incidents and unusual matters. Approval of an operation by a field office manager does not substitute for required headquarters authorizations for actions requiring such approval, e.g., 511 cases.

The Assistant District Directors, OIC, or Deputy Chief Patrol Agent, may approve inspections of records; preliminary investigative activities related to a specific individual or individuals which will not entail contact with the person under investigation; and similar activities at such locations when apprehensions will not be made.

For purposes of this policy, the term "schools" includes pre-schools; primary, secondary, and post-secondary schools (including colleges and universities); and other institutions of learning such as vocational or trade schools. "Places of worship" includes such institutions as churches, temples, and synagogues. "Other religious ceremonies" include grave site ceremonies and rosaries. The requirement for advance approval of operations in such locations should not be construed as tolerance for violations of the law by or on the premises of such institutions.

In determining the appropriateness of a proposed action, District Directors and Chief Patrol Agents shall consider the following:

EXHIBIT "E"

Page 2
District Directors
Chief Patrol Agents

The availability of alternative measures which would achieve the enforcement objective (e.g., making the arrest off the premises);

The importance of the enforcement objective in the context of Service priorities;

Measures which can be taken to minimize the impact on operation of the school or place of worship;

Whether the action has been requested or approved by managers of the institution involved.

Exceptions to this policy, e.g., local agreements to cover a specific situation or institution, must be approved in writing by the Associate Commissioner for Enforcement. Headquarters may also direct exceptions in such unusual situations as a declared national emergency by Presidential Executive Order or National Security Council directive, e.g., a mass alien influx or alien registration action.

When situations arise that do not permit written authorization prior to entry onto the premises of schools or places of worship, officers are expected to exercise good judgement concerning the appropriate action to take. Some situations will require the officer to proceed; in other instances entry onto the premises will not be appropriate. If exigent circumstances require a deviation from this policy, the matter must be reported immediately by the District Director or Chief Patrol Agent to the appropriate Assistant Commissioner. All field office managers must ensure that enforcement officers are well versed in and able to apply the criteria for exigent circumstances stated in the Service manual on *The Law of Arrest, Search, and Seizure for Immigration Officers* (M-69). Reports should explain the exigency requiring the officer's action, any steps which were taken to secure supervisory authorization in the absence of written approval (e.g., oral approval from supervisor), the seriousness of the suspected violation, whether the facility was in operation (e.g., were classes in session), and other pertinent facts.

Where operations covered by this policy are planned in advance, the general practice for Border Patrol officers requires that the operation will be conducted in plain clothes. However, under exigent circumstances, one of the factors that officers should consider is the likelihood that they will be identified as law enforcement officers; in such instances, the absence of a uniform may mitigate against continuing a pursuit.

6

Page 3
District Directors
Chief Patrol Agents

This directive does not affect the scope of authority of Service officers under the Immigration and Nationality Act, but is directed to the operational implementation of such authority.    The requirement for approval in advance of such operations and actions on such premises should not be construed as an indication of tolerance for any violations of the law by anyone at or in charge of a school or a place of worship.    This directive is an internal statement of procedure which does not confer any benefits upon nor impose any requirements upon anyone other than Service officers as a part of a uniform exercise of delegated authority.

James A. Puleo
Acting Associate Commissioner

Enclosure

7

# EXHIBIT 1

Docusign Envelope ID: 8F4E8E1E-055B-43DB-86D3-50B1C7480606

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## DECLARATION OF DR. J. ELVIN SADLER, GENERAL SECRETARY-AUDITOR OF PLAINTIFF THE AFRICAN METHODIST EPISCOPAL ZION CHURCH

I, Dr. J. Elvin Sadler hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the General Secretary-Auditor of the African Methodist Episcopal Zion Church ("A.M.E. Zion"), and I have served in that role since 2016. I help lead the day-to-day operation of the denomination and serve as a denominational representative to ecumenical bodies.

2. I make this statement based upon personal knowledge, files and documents of A.M.E. Zion that I have reviewed, as well as information supplied to me by A.M.E. Zion members whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting A.M.E. Zion's business.

3. A.M.E. Zion is a historically African-American Christian denomination, founded by Bishop James Varick in 1796 in New York City. It was chartered in 1801 and was authorized as a denomination in 1820, and it is headquartered in Charlotte, North Carolina. The denomination

Docusign Envelope ID: 8F1F8E1E-055B-43DB-86D3-50D1CF480606

is governed by a General Conference and is overseen by Bishops.  As a Connection of Churches, we are One: even though each congregation is a local ministry outpost, damage to one of our churches impacts the strength of the whole.

4.  The A.M.E. Zion Church has 1600 congregations in the continental United States with more than 1.2 million members globally.  Affectionately known as "The Freedom Church" and the Church of Harriet Tubman, Frederick Douglass, and Sojourner Truth, A.M.E. Zion proudly upholds Methodist doctrine and consistently promotes civil rights and liberation theology as its central focus for all people.  Because our mission is "Loving God with all our heart, with all our soul, and with all our minds, and to love our neighbor as ourselves," A.M.E. Zion is committed to serving people regardless of race, creed, color, faith or national origin, including immigrants lacking legal status.

5.  We wholeheartedly believe in the scriptural admonition to entertain and love strangers and those from foreign lands.  The legal status of the person is of no consequence, as the scripture makes no such distinction.  Historically, our world is made up of immigrants. People have migrated from one land to another throughout humanity's history.  It is the story of the Jewish community and it is also the story of Christianity.  As spiritual nomads, it is our responsibility to take in the stranger and those on the fringes.   This theology is deeply woven into our denominational narrative.

6.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement actions.

App. 151

7.    We have congregations located across the country, including in cities and neighborhoods with large immigrant communities and in areas where Immigration and Customs Enforcement ("ICE") and Customs and Boarder Protection ("CBP") have conducted enforcement actions in the past few weeks, such as Southern California, Southern Florida, Louisiana, Arizona, and Texas.  One congregation in Southern California is about 10 minutes from the border and located in a community that is 80 percent Hispanic.  Some of our pastors have heard from community members that they have seen ICE enforcement actions occurring near our congregations.  One of our congregations in Northern California is located in a majority immigrant neighborhood and has observed ICE stopping and questioning people in the community over the last few weeks.  And a Bay Area congregation has had members report seeing ICE enforcement activities near the church recently.

8.    Although we are a historically African-American denomination, our membership is multicultural.  For example, one member congregation in Arizona welcomes worshippers who hail from places as diverse as Alaska, Mexico, and West Africa.  Another congregation, located in the Bay Area, has a notably diverse congregation, nearly 40 percent of whom are immigrants from across Africa, Latin America, and Asia.  The majority of our congregations serve people of color, and many of our congregations serve immigrants, including those who are undocumented.  Several of our congregations host bilingual services in Spanish and English.  A member congregation in Arizona, for example, has Bibles in Spanish and provides an interpreter during Sunday services.

9.    Many of our congregations have social service outreach programs on their campuses, such as soup kitchens, clothing closets, ESL classes, and other social programs.  A congregation in North Carolina, for example, holds food outreaches on church property in partnership with a

3

Docusign Envelope ID: 8F1F8F1E-055B-43DB-86D3-50B1C7480606

Case 1:25-cv-00403-DLF    Document 11-4    Filed 02/21/25    Page 5 of 7
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 38 of 398

local food bank.  These programs serve all members of the community, regardless of their immigration status.  For our congregations in largely immigrant communities, like one of our churches located in Southern California, nearly all of the individuals they serve are immigrants, both documented and undocumented.  One of our congregations in Arizona has immigrant-focused social service activities, assisting immigrants with things like finding a job, getting clothes, and navigating the immigration process.  Some congregations also provide facility space to Hispanic churches or immigrant rights advocacy groups.  One congregation in Northern California shares their fellowship hall with an immigrant rights organization for their monthly meetings.

10. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of their community, including those who are immigrants and without lawful status.  We believe that a church is a place of refuge and hope for all people.  An enforcement action will violate the sanctity of our worship spaces and disrupt our congregants' ability to worship without fear.

11. Likewise, an enforcement action directed at our congregations' social service ministries will prevent them from carrying out our mission to welcome and serve all, including immigrants.  A.M.E. Zion is called to advocate for the oppressed and marginalized, inspired by Jesus Christ's teachings of love and compassion.  It is a core part of our mission to welcome immigrants as some of society's most vulnerable and to provide them with the resources they need.  ICE or CBP action at our churches will undermine our congregants' ability to provide that care and interfere with a key element of our religious practice.

4

Docusign Envelope ID: 8F1F8F1E-055B-43DB-86D3-50B1C7480606

12. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the rescission, congregations have reported a decrease in worship attendance, with congregants conveying that they are now afraid of going to church due to the imminent risk of an ICE raid or enforcement action.  A congregation in the Bay Area reported that there is an environment of fear in their community, particularly among immigrants, that has affected church members.  Even documented immigrants have expressed fear about the risk of getting swept up in an enforcement action.  A congregation in Georgia reports that several members of the congregation are no longer participating in in-person gatherings for fear of ICE.

13. The rescission of the sensitive locations policy also puts our congregations in the impossible position of choosing whether to freely carry out their religious mission while putting congregants and those they serve at risk of arrest or deportation, or to instead change the way they serve and minister in an effort to protect those congregants.  Either of these choices is inconsistent with our religious beliefs.  Our congregations are trying their best to fulfill our religious mission and mandate under duress, but the threat of enforcement action severely hampers our mission to help others who are in need of the services we provide.

14. Faced with this choice, some congregations are already making changes to the way worship and other services are conducted.  A congregation in Arizona is considering postponing church services or moving them online.  A congregation in Northern California has advised immigrant groups that use its space to stop advertising the location of their meetings so publicly. And a congregation in North Carolina has had to invest time and resources in contemplating how to convince immigrant neighbors to continue to patronize its food pantry and how to make that experience safer.  These changes undermine our congregations' ability to follow Jesus's

5

Docusign Envelope ID: 8F1F8E1E-055B-43DB-86D3-50B1C7480606

teachings and open themselves up as a welcoming and safe place for all members of the community.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

Signed by:
*Dr. J. Elvin Sadler*
4B842993796649C...

Dr. J. Elvin Sadler

# EXHIBIT 2

Docusign Envelope ID: 3D42E0BE-E9B0-4E36-A5B0-0A39D281C155

Case 1:25-cv-00403-DLF    Document 11-5    Filed 02/21/25    Page 2 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 42 of 398

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF REVEREND JANE DOE # 1 SUPPORTING PLAINTIFF AFRICAN METHODIST EPISCOPAL ZION CHURCH

    I, Reverend Jane Doe # 1, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as pastor of a congregation located in Northern California. We have been part of The African Methodist Episcopal Zion Church since our founding.

2. I wish to submit this declaration anonymously out of fear that my church will be targeted for immigration enforcement action. In addition, during the first Trump administration, our church was targeted by right wing extremists and we had to have local police presence to prevent them from acting on their threats. I would like to avoid that again if possible.

3. We serve all people, without regard to immigration status, as we believe that the Bible teaches us to love and serve everyone and to treat no one as a stranger or foreigner. Our Book of Discipline affirms this belief.

4. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.   The neighborhood in which our church is located is majority immigrant, with most being Latinx and many being undocumented.  It is the only majority immigrant neighborhood in our city.  In the previous Trump administration, Immigrations and Customs Enforcement ("ICE") was very active in our community and targeted this area in particular.  As of just a few weeks ago, we've seen enforcement here ramp up again—ICE has started stopping people in our community and questioning them frequently.

6.   For over a decade, our church has publicly and explicitly served the material and spiritual needs of our immigrant neighbors.  This work is personal to us: our entire congregation immigrated to this country, voluntarily or involuntarily.  These social service ministries include academic tutoring, immunizations, civic education, and more.  Most of the individuals we serve are recent immigrants, many of whom are undocumented.  We offer our church as a safe place for our immigrant community, and in the previous Trump administration we did all we could to shelter local immigrants and let them know that they could always come to our church as sanctuary.   We also share our space with local immigrant groups so that they can hold meetings.

7.   An immigration enforcement action will substantially burden our religious exercise by preventing us from carrying out our mission to welcome and serve all immigrants, and will hinder our duty to minister as Jesus would do.  Indeed, the risk of immigration enforcement action is already having a negative effect on our religious exercise, as we have not had any Latinx visitors worship with us.  Our undocumented neighbors are reeling. Even the documented immigrant population is extremely cautious, and taking measures to be able to prove they belong

App. 158

Docusign Envelope ID: 3D42E0BE-ED80-4E36-A5B0-0A39D281C155

here.  We are considering whether we can continue to allow immigrant groups to meet at the church, as we are concerned that they may be a "sitting duck" for ICE.

8.   We have had reports of ICE raids and of relatives and loved ones being detained, which is already deterring attendance at our ministries.  They are terrified, and rightly so!  We are supposed to help, to love, and to show the compassion of Jesus.  That is why we exist—to spread God's love through good works so that all may know that Jesus loves them.  The imminent threat of enforcement action undermines our ability to have a positive impact on the community and to serve our immigrant neighbors as Jesus commands us to do.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

Signed by:

*Jane Doe # 1*

4E351885C849489...

_____

Reverend Jane Doe # 1

3

# EXHIBIT 3

Docusign Envelope ID: 9CD46C13-97AB-4C5A-84D8-847274787B79

Case 1:25-cv-00403-DLF    Document 11-6    Filed 02/21/25    Page 2 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 46 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## <u>DECLARATION OF REVEREND FREEMAN L. PALMER, CONFERENCE MINISTER OF PLAINTIFF CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST</u>

I, Reverend Freeman L. Palmer, hereby submit this declaration pursuant to 28 U.S.C.

§ 1746 and declare as follows:

1.  I am the Conference Minister of the Central Atlantic Conference United Church of Christ

("CAC").

2.  I make this statement based upon personal knowledge, files and documents of CAC that I

have reviewed, as well as information supplied to me by members of CAC whom I believe to be

reliable.  These files, documents, and information are of a type that is generated in the ordinary

course of our business and that I would customarily rely upon in conducting CAC business.

3.  The United Church of Christ ("UCC") was created in 1957 by a merger of five

denominational streams.  The UCC is composed of 36 regional conferences, including CAC,

organized in 1964.  CAC is a regional setting of 153 congregations in New Jersey, Maryland,

Docusign Envelope ID: 9CD46C13-97AB-4C5A-84D8-84727A787B79

Delaware, Virginia, West Virginia, and Washington, DC.  CAC is headquartered in Catonsville, Maryland.

4.   The following is CAC's mission: "Empowered by Jesus' inclusive journey of love, justice, and hope, the Central Atlantic Conference of the United Church of Christ strives to foster the strength and well-being of the church in all its settings.  Our overarching goal is to embody and carry out our ministries in ways that manifest our unity in Christ and the richness of our diversity."

5.   CAC's role is as a "united and uniting" church, wherein each congregation governs itself as led by the Holy Spirit and lives in covenantal relationship with one another.  As such, an injury to any congregation is an injury to the whole of the Conference, and we actively engage in addressing matters that may impair the ministry and witness of any of our local congregations.

6.   CAC believes in the sacredness and holiness of all God's creation.  Every human being, with no exception, bears the image of God and has the right to live in *shalom* – a concept deeper than conventionally defined "peace," incorporating wellness and safety.  We subscribe to the Biblical imperative to treat "the stranger who sojourns with you as the native among you, and [to] love him as yourself."  In accordance with the UCC's core value of Extravagant Welcome, CAC believes that immigrant communities do not deserve the terror of harassment, threats, raids, violence, imprisonment, separation from their families, and deportation, but rather deserve welcome and sanctuary.  While our polity allows our congregations to hold different positions, I know that these beliefs are shared by a substantial number of our congregations, and I am not aware of any congregations that believe differently.

7.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that CAC congregations are at imminent risk of immigration enforcement activity.

8. CAC has congregations along the Mid-Atlantic Seaboard, including in several areas at high risk for immigration enforcement activity in New Jersey, Delaware, Maryland, and Virginia. Specifically, several member congregations are situated in areas with significant immigrant communities near poultry plants and farms in the Delaware-Maryland-Virginia peninsula. Immigration and Customs Enforcement ("ICE") has conducted heightened enforcement in several areas in which our churches are located, including in Newark, New Jersey, since the rescission of the sensitive locations policy.

9. CAC congregations include immigrants from around the world, including Central America, Indonesia, Burma, China, Haiti, India, and Pakistan. At the Reformed Church of Highland Park ("RCHP"), approximately 40 percent of congregants are immigrants, many of whom are undocumented and have been subject to immigration enforcement action, including one congregant who is currently in ICE detention. Our congregations welcome immigrants to worship and into membership regardless of their documentation. For example, People's Church of Dover advertises "[a]ll immigrants welcome," and the First Congregational United Church of Christ in D.C. has stated in worship that undocumented individuals are "fully welcomed into our sanctuary."

10. A substantial number of CAC congregations have social services ministries that serve both documented and undocumented immigrants, such as English courses, soup kitchens, and legal services. The People's Church of Dover houses 65 people and feeds approximately 90 people each night, in addition to providing individualized case management and drug treatment support. These services are provided on church property and are essential to the congregation's

3

Docusign Envelope ID: 9CD46C13-97AB-4C5A-84D8-847271787B79

Case 1:25-cv-00403-DLF    Document 11-6    Filed 02/21/25    Page 5 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 49 of 398

sense of mission and identity. They serve citizens and immigrants, both documented and undocumented. Those served, although not formally members of the congregation, are all considered part of the church. Similarly, St. Paul's United Church of Christ, in Westminster, Maryland, provides a weekly community meal for 60-100 people. That weekly meal is open to all and serves both documented and undocumented immigrants. And RCHP provides social services in its church building to over 3,000 refugees, parolees, asylees, asylum seekers, and trafficking victims each week. Many of these programs serve immigrants, both documented and undocumented, two of whom are currently in ICE detention.

11. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm CAC and our congregations by interfering with our religious mandate to worship in person together, with all members of their community, including those who are immigrants and without lawful status. It will substantially disrupt our ability to provide spiritual sustenance and nurture our congregants' faith, subjecting them to trauma in a place that is supposed to be peaceful and holy.

12. Likewise, an immigration enforcement action directed at our congregations' social service ministries will thwart our mission to welcome and serve all immigrants, which is an essential element of living out and practicing their faith in accordance with the Gospel. One CAC pastor told me that an immigration enforcement action would likely require him to add security and lock the church doors, preventing them from welcoming those seeking worship or services.

13. DHS's new enforcement policy is already substantially burdening CAC and its congregations' religious exercise by forcing a choice between refraining from welcoming undocumented congregants to participate in communal worship services and social service

Docusign Envelope ID: 9CD46C13-97AB-4C5A-B4D8-84727A787B79

Case 1:25-cv-00403-DLF   Document 11-6   Filed 02/21/25   Page 6 of 6
USCA Case #25-5209   Document #2136370   Filed: 09/22/2025   Page 50 of 398

ministries or putting them at risk of enforcement action—either of which violates our sincerely

held religious beliefs.  As interim measures, congregations are designating worship and other

spaces for "private gatherings," to protect services or ceremonies there such as weddings,

funerals, and baptisms.  At one church, a partner organization has encouraged the congregation

to stop advertising its support for immigrants, including by removing pro-immigrant signs from

the windows, to protect the church from enforcement operations.  Another congregation has

become very cautious about what it shares with the public.  All of these measures are

inconsistent with our Core Value of Extravagant Welcome, yet necessary to avoid making our

congregants and visitors targets for enforcement action.

     I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/19/2025

                                         Respectfully submitted,

DocuSigned by:

*Freeman L Palmer*
9231BF8E92CB43B...

Reverend Freeman L. Palmer

5

# EXHIBIT 4

Docusign Envelope ID: 2228754F-635B-4287-A59D-1214D5C699D1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

### DECLARATION OF REVEREND SETH KAPER-DALE ON BEHALF OF THE REFORMED CHURCH OF HIGHLAND PARK IN SUPPORT OF PLAINTIFF CENTRAL ATLANTIC CONFERENCE UNITED CHURCH OF CHRIST

I, Reverend Seth Kaper-Dale, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as co-pastor for the Reformed Church of Highland Park ("RCHP"), in Highland Park, New Jersey. RHCP became a member of the Central Atlantic Conference United Church of Christ in 2018.

2. At RCHP, we believe that worship of God is interwoven with love and care for the Other. Our church is called to worship God together, to learn and teach the gospel; to serve one another, our community, and the world with Christ's love; and to provide and maintain a consecrated place for our worship, mission, and fellowship. We are committed to learning how to practice our faith in ways that follow Jesus into the heart of God's kingdom, predicated on compassion and true justice. We see our social service ministries, particularly those which serve undocumented immigrants, as a Response to God.

Docusign Envelope ID: 2228754F-635D-4287-A59D-1214D5C699D4

3.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

4.    Approximately 40 percent of RCHP's congregants are immigrants from over 25 countries, including Venezuela, Guatemala, Peru, Jamaica, Trinidad, Grenada, Dominica, St. Lucia, the Democratic Republic of Congo, Eritrea, Nigeria, Kenya, Eswatini, Lebanon, Egypt, Korea, Japan, Russia, and Belarus.  Many of these community members are undocumented and have been subject to immigration enforcement action, including one congregant who is currently in ICE detention.

5.    RCHP also provides social services in our church building to approximately 500 refugees, humanitarian parolees, asylees, asylum seekers, unaccompanied minors, and trafficking victims per day.  Many of these programs serve immigrants, both documented and undocumented.  At least two of the undocumented people we serve are currently in Immigration and Customs Enforcement ("ICE") detention.  We employ over 100 people to work with refugees and immigrants, coordinating an "Interfaith-RISE (Refugee & Immigrant Support & Empowerment)" program to resettle refugees in central New Jersey.  We also coordinate the Deportation and Immigration Response Equipo, which provides support services (including housing, food, and counseling) to people facing immigration detention and deportation.

6.    In the early 2000s, our commitment to loving the stranger led RCHP to support the Indonesian Christian community in Highland Park, who fled religious persecution in Indonesia to seek asylum in the United States and were facing collective deportation.  We offered housing in our church to nine men in 2012 and to three men in late 2017.

2

Docusign Envelope ID: 2228754F-635B-4287-A59D-1214D5C699D1

Case 1:25-cv-00403-DLF   Document 11-7   Filed 02/21/25   Page 4 of 5
USCA Case #25-5209   Document #2136370   Filed: 09/22/2025   Page 54 of 398

7.   Due to our outspoken support of our undocumented neighbors and previous confrontations with ICE, we are a likely target for immigration enforcement action during our worship services and outreach ministries on church property.  Indeed, we have had numerous confrontations with ICE at our church over the years.

8.   An enforcement action during a worship service, religious ceremony, or other church activity will substantially burden our congregation's religious exercise by interfering with our religious mandate to worship together in person as a congregation, with all members of our community, including those who are immigrants and without lawful status.  Such an enforcement action will inflict spiritual trauma on our congregants.  An enforcement action during our social service ministries will interfere with the social and evangelical work we feel called to do as Christians.

9.   DHS's new enforcement policy is already substantially burdening our religious exercise. If we continue to operate social service ministries at our church while we are under imminent threat of immigration enforcement action, we put the people we want to serve at risk by inviting them to our building.  But if we cease providing those ministries, recipients will lose employment services, English lessons, school support, mental health services, cash assistance, and possibly housing, which we feel called by God to provide.  Either option violates our religious beliefs.  We are also mitigating our exposure to enforcement action by limiting the information we share publicly, at the cost of potentially preventing service recipients from accessing our social service ministries and undermining our religious mission to be an open and welcoming space for all.  We have also had to put "STAFF ONLY" signs all over our church in an effort to protect our spaces from ICE intrusion, undermining our congregation's spirit of

Docusign Envelope ID: 2228754F-635D-4287-A59D-1214D5C699D4

Case 1:23-cv-00403-DLF     Document 11-7     Filed 02/21/25     Page 5 of 5
USCA Case #25-5209     Document #2136370     Filed: 09/22/2025     Page 55 of 398

openness and hospitality as well as our children's sense of welcome in their Sunday school classrooms.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/19/2025

Respectfully submitted,

*Seth Kaper-Dale*
C473C2C7DF6441F...     _____

Reverend Seth Kaper-Dale

4

# EXHIBIT 5

Docusign Envelope ID: 390E0518-A678-4585-ADCC-9800009A82A3

Case 1:25-cv-00403-DLF    Document 11-8    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 57 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

  *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

  *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF RABBI HARA PERSON, CHIEF EXECUTIVE OF PLAINTIFF THE CENTRAL CONFERENCE OF AMERICAN RABBIS

  I, Rabbi Hara Person, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

  1. I am the Chief Executive of the Central Conference of American Rabbis ("CCAR"), and have served in that role since 2019.

  2. I make this statement based upon personal knowledge, files and documents of CCAR that I have reviewed, as well as information supplied to me by members of CCAR whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CCAR business.

  3. CCAR was founded in 1889 as a way to gather Reform rabbis so they could provide support to one another. We are a nonprofit membership organization headquartered in New York with more than 2,300 members. CCAR's mission is to support and strengthen Reform rabbis so that our members, their communities, and Reform Jewish values thrive.

Docusign Envelope ID: 390E0518-AG78-4585-ADCC-9800099A82A3

Case 1:25-cv-00403-DLF    Document 11-8    Filed 02/21/25    Page 3 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 58 of 398

4.    Welcoming the stranger, or immigrant, is a central tenet of the Jewish religion, mentioned 36 times in the Torah—more than any other teaching.  As Leviticus 19:34 commands, "The stranger who resides with you shall be to you as one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt."  We are commanded to recognize that all human beings are created *b'tzelem Elohim* (in the image of God), and therefore are deserving of our respect and care (Genesis 1:27).  As Jewish leaders, we are also mindful of our history as an immigrant people.  For most of our history, we have moved from one land to another—because we were exiled or persecuted in the country we were in, or for economic reasons.  Sometimes we chose to move, and sometimes we were forced to do so.  Most Jews in this country came as immigrants and, as we established ourselves, we have supported and welcomed immigrants.

5.    Rooted in this religious text and history, CCAR has adopted several resolutions about immigration including one entitled *Protecting Individuals at Risk for Deportation*.  That resolution recommends, among other action items, that congregational rabbis provide sanctuary in the form of temporary shelter within their facilities and provide legal assistance to fight deportation cases.  Consistent with our resolutions, CCAR rabbis work directly with the immigrant community—with newly resettled families and with those who have been here for a longer period of time.  To us, there is no difference in our service regarding the legal status of these people.

6.    I have good reason to believe that DHS's rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people in the country puts CCAR members at imminent risk of immigration enforcement activity at their synagogues.

7.    Rabbis within the CCAR serve in congregations in major cities with large immigrant populations where ICE raids have taken place, including in California, Florida, and Arizona,

2

Docusign Envelope ID: 390E0518-A678-4585-ADCC-9800099A82A3

among others, as well as in congregations along the southern border in locations such as San Diego, Tucson, El Paso, and McAllen.

8.    Many of our member's synagogues provide social services to immigrants.  Rabbi Serge Lippe's congregation, for example, has operated an on-site homeless shelter for almost 40 years. It is one of the longest operating synagogue-based homeless shelters in New York City, and while the congregation does not ask its shelter guests about their legal status, it is demographically likely that some are undocumented.  Another member rabbi's congregation in the Mid-Atlantic runs an on-site preschool in which 40 percent of families are from Central America, and it is well known in the congregation's largely immigrant community that the preschool is open to both documented and undocumented families.  And a CCAR member's synagogue in the Northeast hosts programs twice a month to teach English to immigrants from Syria, Central America, Afghanistan, African nations, and Ukraine and to help them writing resumes and conducting job searches, without regard to their legal status.

9.    An immigration enforcement action at CCAR members' synagogues will substantially burden their religious exercise by shattering the sense of safety that congregants need in their places of worship, harkening back to the persecution of Jews by government agents before and during the Holocaust.  Moreover, Judaism is a communal religion in which individuals are instructed to gather and celebrate as a community, and Jews cannot say certain prayers or read from the Torah without a *minyan* (a group of ten Jewish adults).  An enforcement action would spark fear of gathering in person, impacting congregants' ability to freely practice their faith, and likely would cause some synagogue members to dissociate from Jewish life entirely.

Docusign Envelope ID: 390E0518-A678-4585-ADCC-9800009A82A3

Case 1:25-cv-00403-DLF    Document 11-8    Filed 02/21/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 60 of 398

10. Likewise, an immigration enforcement action directed at congregations' social services will prevent members' synagogues from carrying out their mission to welcome and serve all immigrants as part of the Biblical command to care for the strangers in their midst.

11. The imminent risk of immigration enforcement action is already substantially burdening the religious exercise of our members' congregations. As mentioned, helping the stranger is a central tenet of the Jewish faith. But the prospect of immigration raids at synagogues is interfering with congregations' efforts to carry out this sacred work. For example, families have expressed nervousness about sending their children to the previously mentioned preschool operated at a CCAR member's synagogue. And one family has stopped attending the program for immigrant families run by the congregation in the Northeast due to fears about immigration enforcement. If participation in these social service ministries continues to decrease, or if CCAR members' congregations are forced to change the way they deliver their services, there will also be a devastating impact on both the recipients of those services and CCAR members' ability to lead their congregations in fulfilling their religious mandate of service.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/19/2025

Respectfully submitted,

Signed by:

_Hara Person_
4FC0F5F5BBAF46D...

Rabbi Hara Person

# EXHIBIT 6

Docusign Envelope ID: 2260AF4A-DA3F-4C95-BE03-B788F8287E53

Case 1:25-cv-00403-DLF    Document 11-9    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 62 of 398

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

### DECLARATION OF RABBI SERGE A. LIPPE IN SUPPORT OF PLAINTIFF THE CENTRAL CONFERENCE OF AMERICAN RABBIS

I, Rabbi Serge A. Lippe, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Senior Rabbi of the Brooklyn Heights Synagogue in New York City, a role in which I have served for more than 28 years. I have also been a member of the Central Conference of American Rabbis ("CCAR") for my entire career—more than 33 years.

2. I submit this declaration on my own behalf and share my congregation's name for identification purposes only.

3. As a Union for Reform Judaism synagogue, my congregation subscribes to our Movement's and Judaism's commitment to welcoming the stranger and the Biblical prohibition against oppressing the sojourner (migrant). The Torah commands, "The strangers who reside with you shall be to you as your citizens . . . for you were strangers in the land of Egypt" (Leviticus 19:34). Beyond those specific obligations, we affirm Isaiah's mandate that our House shall be a House of Prayer for all people (Isaiah 56:7). We have no litmus test for those who

wish to worship in our community.  All must feel safe upon entering our House.  Our history also informs our commitment to the immigrant community.  As Jewish-Americans, we are all the descendants, removed by one or two generations, of immigrants.  Motivated by our religious texts and our history, serving the needs of the stranger, or *ger* (the Hebrew Bible's term which describes those residing among us who are not native or citizen), is a central focus of my congregation.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that my synagogue is at imminent risk of an immigration enforcement action.

5.   According to the Mayor's office, roughly 500,000 undocumented immigrants live in New York City.  New York City is a city of immigrants, and 29 percent of the City's population is Hispanic.  Public reporting indicates that Immigration and Customs Enforcement ("ICE") raids have been conducted in various parts of the New York metropolitan area in recent weeks, including a raid that swept up Puerto Rican Americans in nearby Newark, New Jersey.  These raids seem particularly aimed at ideologically liberal cities and states, especially those like New York City that identify as "sanctuary cities."

6.   Our synagogue's risk of enforcement action is particularly heightened because we have operated a homeless shelter for almost 40 years, one of the longest operating synagogue-based homeless shelters in New York City, and given the demographics described above, I have good reason to believe that our shelter serves undocumented immigrants.  We have also sponsored and hosted a number of refugees/asylees from Syria, African nations, and elsewhere over the years.  Other than as required by law for employment at the synagogue, we do not inquire of anyone

what their legal status in the country is to receive attention or support of any of our programs. A number of our congregational families are also independently supporting immigrants in their neighborhoods.

7.    The wave of immigration enforcement actions is particularly threatening to my congregation because of our proximity to ICE. My synagogue is located in the heart of Downtown Brooklyn and is the closest synagogue to the borough's federal office buildings and courts. The synagogue is close to the Brooklyn side of the Brooklyn Bridge, and ICE's New York City headquarters is located just on the other side of that bridge. Federal law enforcement may easily observe the large weather-proof banner on the front of our building that reads: "Our Sanctuary Welcomes Refugees and Immigrants – Brooklyn Heights Houses of Worship."

8.    An immigration enforcement action at our synagogue during worship or at any point in the day—especially when young children are present and being educated in their religious tradition—would be shocking and injurious to our community, substantially burdening our religious practice. The guarantee that we, as a minority religious community, can conduct our religious life (including our social justice work) without fear of government intrusion is the backbone of the American compact with religious groups.

9.    DHS's new enforcement policy also threatens my congregation's financial security. We operate based on member pledges and school fees. Anything that makes people feel less likely to attend and participate at the synagogue has negative ramifications for our affiliation rates and therefore our financial resources. Additionally, both worship and school classes require a basic minimum number of attendees to operate (in worship such a minimum quorum of ten Jewish adults is called a *minyan*). Any diminishment in our numbers is sure to impact the viability of the synagogue and its religious programs.

Docusign Envelope ID: 2260AF4A-DA3F-4C95-BE03-B738F8287E53

Case 1:23-cv-00403-DLF    Document 11-9    Filed 02/21/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 65 of 398

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

Serge A. Lippe

C91F0EDF8B2A4D5...

Rabbi Serge A. Lippe

4

# EXHIBIT 7

Docusign Envelope ID: 7B5E8A4B-C502-42BB-9C43-25BEED1F5EA1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## DECLARATION OF REVEREND TERESA HORD OWENS, GENERAL MINISTER AND PRESIDENT OF PLAINTIFF THE CHRISTIAN CHURCH (DISCIPLES OF CHRIST) IN THE UNITED STATES AND CANADA

I, Reverend Teresa Hord Owens, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the General Minister and President of the Christian Church (Disciples of Christ) ("Disciples of Christ") in the United States and Canada. Disciples of Christ is headquartered in Indianapolis, Indiana.

2. I make this statement based upon personal knowledge, files and documents of Disciples of Christ that I have reviewed, as well as information supplied to me by members of our denomination whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting Disciples of Christ business.

3. Disciples of Christ originated in Cane Ridge, Kentucky, in the early 1800s as a movement that rejected any test of fellowship to be welcomed into the Body of Christ. The

current denominational name and structure were adopted in 1969. We now have over 3,000 congregations, all but 20 of which are in the United States.

4. Disciples of Christ understands itself to be one church with many congregations. We are a church with local, regional, and general (church-wide) expressions, but all act in covenant with one another. All congregations, regions and general ministries are connected via the governance of the General Board and the General Assembly, even as each expression operates with its own self-governing authority. While we allow for theological diversity, we affirm a common confession in Jesus Christ as Lord and Savior.

5. Our unified funding system, Disciples Mission Fund, is a mechanism by which congregations give to the church, and resources are allocated across regions and general ministries for the common ministry we all share. Whenever one Disciples congregation is affected, the whole body suffers and will seek to respond through common witness and commonly held church resources. Our affiliation to the General Assembly, and the shared witness among us is important to our identity as one church. The role of the General Minister and President is tasked with leading the whole denomination, caring for and representing the whole denomination and all affiliated congregations.

6. Because the Bible calls Christians to welcome the stranger, Disciples of Christ has long been "immigrant welcoming" and involved in settling refugees and supporting immigrants in local communities. Our congregations welcome and serve immigrants regardless of status, believing that all are created in the image of God and that all persons have a right to respect, dignity, a means to support themselves, and opportunity to determine their own futures.

7. Since 1981, the General Assembly has passed resolutions, making statements in support of the ministry to immigrants. The most recent resolution was passed in 2017: "On Becoming

Docusign Envelope ID: 7B5E8A4B-C502-42BB-9C43-25BEED1F5FA1

Immigrant Welcoming Congregations," https://ga.disciples.org/resolutions/2017/ga-1723/.
Other resolutions were passed in 1981 (Needs of Immigrants, Illegal Aliens, For El Salvadorans),
1983 (First Asylum), 1997 (Support of the Vulnerable), 2003 (Immigration, Ministry and
Hispanic Pastors, Assuring Civil Liberties and Equal Justice to Immigrant Communities in the
United States), 2007 (Welcoming New Neighbors), and 2019 (State of Global Forced
Migration).

8.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive
locations policy as part of its plan to arrest and deport all undocumented people during President
Trump's second term, I have strong reason to believe that our congregations are at imminent risk
of immigration enforcement activity.

9.   Many of our congregations are located in areas with significant Immigration and Customs
Enforcement ("ICE") and Customs and Border Protection ("CBP") enforcement activity,
including along the border in Arizona, Texas, and California.  We also have a number of African
and Haitian immigrant congregations in New York, Florida, Minnesota, and Ohio.  Other
congregants are immigrants from Cuba, Mexico, Guatemala, Colombia, El Salvador, and other
countries in South America.  Our congregations do not inquire whether immigrant members and
visitors have legal status or not, for we believe that all are welcome.  We know, however, of
congregants who have been detained by ICE, and we know that we have both clergy and
congregants who are currently at risk of ICE enforcement action against them.

10. Many of our congregations offer social service ministries in their churches that welcome
all, including immigrants, such as food and clothing pantries, as well as specific services to
immigrants such as English classes or legal services.  These ministries serve both documented
and undocumented people.

Docusign Envelope ID: 7B5E8A4B-C502-42BB-9C43-25BEED1F5AA1

Case 1:25-cv-00403-DLF    Document 11-10    Filed 02/21/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 70 of 398

11. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our religious exercise by interfering with our ability to engage in communal worship and ministry work and by destroying the sanctity of our space. When our congregants do not feel safe to attend worship services or to either partake in or provide various social service ministries, we are no longer free to worship and live our faith as we wish.

12. The rescission of the sensitive locations policy is already burdening our religious exercise. The stress on our clergy and our immigrant congregants is palpable. Our pastors report that some of their congregants are staying home from church for fear of being detained. Our ability to follow the teachings of Jesus is compromised when those we serve are not safe in our church. Some congregations are preparing to provide services for those who are afraid to leave their homes and come to church. Congregations are developing plans of action to be taken in the event of ICE or CBP activity at their churches, which takes time and energy away from their ministry work. They also feel pressured to cut back on their services in order to maintain a safe environment, but that would run counter to our theological commitment to welcome and serve all people, especially immigrants. DHS has left us with no option that permits us to fulfill our religious mandate to serve all humanity, making no distinction on birthplace or immigration status.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

DocuSigned by:

*Teresa Hord Owens*

1A6567A1E81F48A...

Reverend Teresa Hord Owens

4

# EXHIBIT 8

Docusign Envelope ID: 591416F4-7492-4CBB-AD98-8C58849123AE

Case 1:25-cv-00403-DLF    Document 11-11    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 72 of 398

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

     *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

     *Defendants.*

Civil Action No. 1:25-cv-00403

### DECLARATION OF REVEREND MARY ABIGAIL CONLEY
### SUPPORTING PLAINTIFF CHRISTIAN CHURCH (DISCIPLES OF CHRIST)

I, Reverend Mary Abigail Conley, upon my personal knowledge, submit this declaration
pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I am the Senior Pastor of SouthPointe Christian Church (Disciples of Christ)
("SouthPointe").  SouthPointe is a congregation of the Christian Church (Disciples of Christ)
("DOC").  SouthPointe is located on the south side of Lincoln, Nebraska and has about 115
members and about 60 regular participants in the life of the church.

2.  SouthPointe's mission statement is "Welcome All, Feed the Soul, Serve with Joy."  There
are three stories that are central to that mission and identity as a congregation: the parable of the
Good Samaritan (Luke 10:25-37), the miracle of Jesus feeding the 5000 (Matthew 14:13-21;
Mark 6:31-44; Luke 9:12-17; John 6:1-14), and the miracle of Jesus calming the storm (Matthew
8:23-27; Mark 4:35-41; Luke 8:22-25).  Out of these three stories, we draw our commitment to
provide refuge for neighbors and food for neighbors.  It is imperative to our feeding ministry that
people feel safe in our church building and find it a refuge.  As the political climate has shifted,

we have taken steps to make sure immigrants know they are welcome. Materials about rights are available in multiple languages, and we have a zero-tolerance policy for hate speech, including on clothing.

3. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that SouthPointe is at imminent risk of an immigration enforcement action.

4. Lincoln is a targeted refugee resettlement site and the twelfth largest resettlement site per capita in the country. We are home to more than 30,000 immigrants and refugees, representing more than 10 percent of our population. There is a strategic plan in place by the city that focuses on continuing to welcome immigrants, who are necessary for our work force.

5. Every Wednesday, we gather to feed our hungry neighbors. Congregant volunteers pick up leftover food from local grocery stores for distribution from our sanctuary and lobby to anyone who asks. Each week, we serve approximately 45 to 100 households. Some of our regular recipients are immigrants, including people who fled the wars in Ukraine and Afghanistan, as well as people from Iran, Vietnam, and several Spanish speaking countries. We do not differentiate between immigrants who have legal status and those who are undocumented. We know a person's immigration status only if they tell us in conversation. Some participants have told me that they are undocumented. Our food program is widely publicized, making it an easy target for ICE.

6. An immigration enforcement action during our food program will substantially burden our religious exercise by preventing us from carrying out our mission to feed, serve, and protect our vulnerable neighbors regardless of documentation. Our church is supposed to be a place of

Docusign Envelope ID: 591416F4-7492-4CBB-AD88-8C58849123AE

Case 1:25-cv-00403-DLF    Document 11-11    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 74 of 398

refuge where our congregants and visitors find safety and healing from life's storms. An enforcement action will destroy that refuge. I believe that many of our members over the age of 70 will be afraid to participate again; the loss of that demographic will cause our church to close. An enforcement action will force us to stop feeding our hungry neighbors, which would be an abandonment of our religious mission. Without the ability to feed our neighbors in some way, our church will likely close.

7. The rescission of the sensitive locations policy is already substantially burdening our religious exercise. I am SouthPointe's only full-time employee and its greatest expense, and my attention and energy are already diverted by the policy change, as we try to make changes that will keep our visitors safe when they visit our church. In the absence of a court order protecting our church from enforcement action, we will have to change the way we provide services, probably offering to-go boxes for people if needed. Right now, we allow people to come in and "shop" for food, which means they get food they can and will use. It is less helpful to them and much more labor intensive for us to pack boxes; we will need to increase our number of volunteers.

8. We will also need to change our public messaging in worship and on social media to make clear how we will attempt to serve people safely. Feeding our hungry neighbors will become much more difficult. I also do not know how we could communicate with those neighbors; it's much more likely they would just stop showing up. We cannot love our neighbor as commanded in scripture if we don't know where they are, nor can we continue to feed them.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Docusign Envelope ID: 591416F4-7492-4CBB-AD88-8C58849123AE

Case 1:25-cv-00403-DLF    Document 11-11    Filed 02/21/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 75 of 398

Dated:  2/19/2025                          Respectfully submitted,

                                          Signed by:

                                          *Mary Abigail Conley*
                                          51A0599E35EC42A...
                                          Reverend Mary Abigail Conley

4

# EXHIBIT 9

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                                Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF DAVID STEELE, GENERAL SECRETARY OF PLAINTIFF CHURCH OF THE BRETHREN

I, David Steele, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.   I am the General Secretary of the Church of the Brethren, and I have served in that role since 2016.

2.   I make this statement based upon personal knowledge, files, and documents of the Church of the Brethren that I have reviewed, as well as information supplied to me by pastors, district executives, staff, and other members of the Church of the Brethren, whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting the Church of the Brethren's business.

3.   The Church of the Brethren traces its roots back more than 300 years to Germany when, in 1708, a group of individuals influenced by Pietism and Anabaptism broke away from the state churches to form their own religious group seeking to follow a different kind of life based on

Docusign Envelope ID: F3A727A6-8B49-4697-ADC3-54AF8F46G74D

Case 1:25-cv-00403-DLF    Document 11-12    Filed 02/21/25    Page 3 of 10
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 78 of 398

peaceful and compassionate action.  Due to persecution and economic hardship, its members migrated to North America and organized the first congregation in 1723 in Germantown, Pennsylvania.  Currently, the Church of the Brethren has approximately 75,185 members in 782 congregations within 23 districts.  We are headquartered in Elgin, Illinois.

4.    The Church of the Brethren is considered a historic peace church and has continually prioritized loving enemies, welcoming the stranger, and acting in ways that promote the well-being of all and help those in need or who have been marginalized.  Our founders, who began the Brethren movement in central Germany in 1708, faced persecution in Europe and migrated to Pennsylvania, becoming German-speaking immigrants in the English-speaking American colonies.  That foundational history enhances our compassion for and welcome to immigrants who face similar circumstances in the United States today, and who similarly rely on the welcome and aid of others.  The Church of the Brethren welcomes all including undocumented people into our churches for worship services, social service ministries, and other church activities.  Our denominational tagline — "Continuing the work of Jesus: Peacefully. Simply. Together." — expresses the fundamentals of our Christian tradition.

5.    Our faith is founded on and rooted in the community of the church, to which all are welcome in the name of Christ, the Prince of Peace.  Our faith also has a discipleship emphasis on serving others in the name of Jesus Christ.  Our holy scriptures speak of this welcome and service, which God instructs us all to carry out.  As Jesus said in Matthew 10:40, "Whoever welcomes you welcomes me, and whoever welcomes me welcomes the one who sent me."  Similarly, he reminds us Matthew 25:35, "For I was hungry and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me."  The biblical book of James, in the New Testament, has been a touchstone for our faith tradition and has helped the

Church of the Brethren's focus on doing the works of faith, without which our faith is no faith at all: "What good is it, my brothers and sisters, if someone claims to have faith but does not have works? Surely that faith cannot save, can it? If a brother or sister is naked and lacks daily food and one of you says to them, 'Go in peace; keep warm and eat your fill,' and yet you do not supply their bodily needs, what is the good of that? So faith by itself, if it has no works, is dead" (James 2:14-17).

6.    Our faith tradition has a primary focus on the life and teachings of Jesus, but relies on the New Testament as our guide for faith and practice and has turned to the early church as a model. The New Testament letters of the Apostle Paul help us to understand that we in the church of Jesus Christ are intrinsically connected with each other through our faith in Jesus and the bond of the Holy Spirit. What happens to one of us, happens to all of us, and we are called in Christ to share each other's joys and bear each other's burdens. "We, who are many, are one body in Christ, and individually we are members one of another," writes the Apostle Paul in Romans 12:5. "For just as the body is one and has many members, and all the members of the body, though many, are one body, so it is with Christ," he writes in 1 Corinthians 12:12-13, "for in the one Spirit we were all baptized into one body—Jews or Greeks, slaves or free—and we were all made to drink of one Spirit." In this context, any threat or harm to one of our members represents a threat or a harm to all of us in the church.

7.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy and its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of an immigration enforcement action.

8. The Church of the Brethren has congregations across the country, including in regions with significant numbers of Hispanic and/or Haitian migrant congregants, like the Atlantic Northeast, Atlantic Southeast, and Pacific Southwest. These congregations are located in communities where Immigration and Customs Enforcement ("ICE") has conducted raids and enforcement actions over the past few weeks.

9. Our congregations also serve many immigrant members, with a variety of different immigration statuses: some have permanent legal status, some risk deportation because they are undocumented, and some have more temporary status like parole or Temporary Protected Status ("TPS"), which may soon expire. For example, one congregation in our Pacific Southwest District has a membership that is a mix of U.S. citizens, permanent residents, DACA holders, and undocumented individuals. One of our congregations in our Atlantic Southeast District has members who are on parole. A congregation in our Atlantic Northeast District has members whose TPS status is scheduled to expire soon.

10. Many of our congregations across the country also provide social service ministries on their church campuses that serve both documented and undocumented immigrants, such as food distributions, food pantries, soup kitchens, weekly meals, and other ministries that include offering food and educational supplies and other aid to children and families. In just one example, one mostly Hispanic congregation in our Pacific Southwest District runs a food distribution program that serves many immigrant families in the community.

11. An enforcement action during a worship service, religious ceremony, or other church activity will harm Church of the Brethren congregations by interfering with their ability to worship in person together as congregations, with all members of their community, including those who are immigrants and without lawful status. It will substantially disrupt our spiritual

4

Docusign Envelope ID: F3A727A6-BB49-4697-ADC3-54AFBF46G74D

Case 1:25-cv-00403-DLF    Document 11-12    Filed 02/21/25    Page 6 of 10
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 81 of 398

practices and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants and neighbors. Likewise, an enforcement action directed at our congregations' social service ministries will prevent them from carrying out our mission to welcome and serve all immigrants, to whom we feel called to minister to as part of our evangelical faith and who we are called to protect as some of the most vulnerable in our society.

12. DHS's new enforcement policy is already substantially burdening the Church of the Brethren's religious exercise. Since the sensitive locations policy was rescinded, our staff, district executives, and I have talked with pastors at Church of the Brethren congregations who are confused and afraid. They want to know how to protect their churches from intrusion and interruption. Congregations with significant numbers of immigrants have already reported a decrease in worship attendance in the last few weeks, with congregants conveying that they are now afraid of going to church due to the imminent risk of an enforcement action. Some examples of this decline in worship attendance are listed below:

    a. One largely Hispanic congregation in our Pacific Southwest District has reported a decrease in attendance at its weekly worship services from approximately 140 to 90 individuals. The members include a significant number who are undocumented, some of whom have resided in the United States for years.

    b. At a Spanish-speaking congregation also in the Pacific Southwest District, attendance at worship services has dropped by 25 to 40 percent since mid-January because their members are afraid that ICE or Customs and Border Patrol ("CBP") might enter the church or be waiting for people outside.

    c. Another Spanish-speaking congregation in the Pacific Southwest District has seen attendance at its worship services fall by half as word spread that ICE and CBP

Docusign Envelope ID: F3A727A6-BB49-4697-ADC3-54AFBF46G74D

Case 1:25-cv-00403-DLF    Document 11-12    Filed 02/21/25    Page 7 of 10
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 82 of 398

has become active in the area and that churches are no longer considered off limits to immigration authorities. The congregation is a mix of citizens, permanent residents, citizen children, and undocumented people. Even many documented congregants are concerned and deterred from attending services because they all look like they are from Mexico or Central America, and proving status can be difficult.

d.  Another congregation in the Pacific Southwest District with a substantial number of Hispanic congregants reported that its attendance was down by 30 percent as people are fearful of coming to church because they might be detained. The church is a mix of U.S. citizens (both adults and children) and undocumented people, some of whom have been in the U.S. for a very long time. The fear of ICE activity in the area is real because already one member was wrongfully detained.

e.  Another congregation with a large Hispanic immigrant membership, this one in the Atlantic Northeast District, reported a decline in attendance at its worship services from approximately 115 people down to 70.

f.  A congregation in the Atlantic Southeast District with a large Haitian membership reported that attendance at its Sunday worship services has declined from an average of approximately 370 to 270 individuals.

g.  Another congregation in the Atlantic Southeast District with a large Haitian membership reports that attendance is down 50 percent due to the fear of an ICE enforcement action at or near the church.

13. In addition to the decrease in worship attendance, DHS's change in its sensitive locations policy has also impacted the social service ministries of the Church of the Brethren, which are an exercise of our faith and belief that we serve our God by serving our neighbors in need. Congregations providing services such as food distributions, food pantries, soup kitchens, weekly meals, and other ministries to children and families, have reported a decline in attendance and participation. Some examples of this decline in participation in social services are below:

    a.  One urban congregation in the Midwest has faithfully served its neighbors every Saturday evening by providing a hot, nourishing meal at no cost to approximately 65 to 80 guests. Many of the guests are immigrants. Since the change in DHS policy, the meal ministry has experienced a drop in attendance from guests who may be undocumented and fear ICE presence at the program.

    b.  A congregation in the Pacific Southwest District with a large number of Hispanic immigrant members operates a weekly program that provides boxes of food to families in need in the community. Prior to the DHS change in policy, the families came to the church to pick up the boxes. After the change in the policy, families feared they may be targeted in an ICE enforcement action if they came to the church, and attendance declined. As a result, in order to fulfill its service ministry, that church now delivers the boxes to families. This has made the program more difficult to carry out in terms of both time and cost. As a result, the church has been able to serve less families.

    c.  At a Spanish-speaking congregation in the Pacific Southwest District, the church's weekly food distribution for those in need has experienced a reduction in

(Page 83 of Total)    App. 198

Docusign Envelope ID: F3A727A6-BB49-4687-ADC3-54AFBF46G74D

Case 1:25-cv-00403-DLF    Document 11-12    Filed 02/21/25    Page 9 of 10
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 84 of 398

people coming to get boxes of necessities because of fear that the space might be

unsafe.

   d.   A largely Haitian congregation in the Atlantic Southeast operates a food pantry

        that serves its local community that includes both Haitian and Hispanic

        immigrants.  The pantry serves individuals regardless of their immigration status.

        Since the change in DHS's policy, it has experienced a decline in the number of

        individuals coming to receive food because they fear the risk of an enforcement

        action by ICE.

14. Not only has this decline in attendance burdened the religious exercise of those

congregants who are missing worship services due to fear, but it also impacts the religious

exercise of those attending by diminishing the shared community and fellowship experience.

Since its founding, the Church of the Brethren has emphasized the centrality of community to

Christian faith. Our belief is that interpreting scripture and following the teachings of Jesus

cannot be done in isolation or separation, but require the participation of all persons.  In a church

grounded in the centrality of community, the inability of any person to participate within the

community due to fear denies the rich variety of that community to all of its members.

15. Moreover, the imminent threat of a raid or arrest on church property puts congregations

in the impossible position of choosing whether to freely carry out their religious mission (putting

congregants and those they serve at risk of arrest or deportation), telling their immigrant

neighbors to stay home, or changing or cutting back on the way they worship and minister in an

effort to protect those neighbors.  All of these choices violate our church's religious beliefs.

   I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*David A. Steele*

C97CF4E336F8421...

David Steele

9

# EXHIBIT 10

Docusign Envelope ID: C005F55B-29C4-4BDC-8D58-DСB61E4B5A73

Case 1:25-cv-00403-DLF    Document 11-13    Filed 02/21/25    Page 2 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 87 of 398

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

---

<u>**DECLARATION OF PASTOR JOHN DOE # 2 ON BEHALF OF ANONYMOUS
MEMBER CHURCH SUPPORTING PLAINTIFF CHURCH OF THE BRETHREN**</u>

    I, Pastor John Doe # 2, upon my personal knowledge, hereby submit this declaration

pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I am the lead pastor at a Church of the Brethren congregation on the West Coast.

    2.  I wish to submit this declaration anonymously out of fear that my church will be targeted

by Immigration and Customs Enforcement ("ICE") or Customs and Border Patrol ("CBP").

    3.  Our faith teaches us to show our love for God and one another through worship and

community service. We have received God's grace and mercy and that's exactly what we as a

church provide to our immigrant community.

    4.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive

locations policy and its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that our congregation is at imminent risk of

an immigration enforcement action.

5.  Our congregation is located in an urban center with a substantial Hispanic population. The vast majority of our members are Hispanic.  Our membership includes a significant number of members who are undocumented, some of whom have resided in the United States for years. Several members of our congregation have Deferred Action for Childhood Arrivals ("DACA") status, and other have Temporary Protected Status ("TPS").

6.  In addition to worship services, our congregation also operates a robust service ministry that provides food boxes to hungry families within our community every Thursday.  This ministry serves a substantial number of immigrants, both documented and undocumented—we do not discriminate based on legal status.

7.  An immigration enforcement action at our church will substantially burden our religious exercise by preventing us from carrying out our religious mandate to worship together in person as a congregation, with all members of our community, including those who are immigrants and without lawful status.

8.  Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  In the few weeks since the DHS sensitive locations policy's rescission, our church's activities have already been directly impacted.  Attendance at Sunday worship services has declined approximately 33 percent, from an average attendance of approximately 140 to approximately 90 individuals.  My congregants tell me that the reason they are no longer attending services is that they fear ICE or CBP will target our congregation.

9.  Not only has this decline in attendance burdened the religious exercise of those congregants who are missing worship services due to fear, but it also impacts the religious exercise of those attending by diminishing the shared community and fellowship experience.

Children specially are affected because they fear for their parents and choose to stay home. These kids are missing out on the healing power of interacting with other kids from church.

10. DHS's new enforcement policy has also directly impacted our food distribution program, because individuals fear the risk of being arrested by ICE if they come to church to receive the food boxes. Prior to the change in policy, our congregation provided food boxes to 30 to 40 families every Thursday. As a result of the change in enforcement policy, the families we served were too afraid to come to the church to receive a food box because they feared that they could be targeted in an ICE enforcement action. In an attempt to fulfill our service ministry, our congregation has been forced to significantly change the nature of the program. Our members now attempt to deliver the boxes to the families at their homes. This change imposes an increased burden on our members by making it more difficult to coordinate and time consuming. It has also made the program more costly due to the transportation cost for gasoline. In addition, the change has limited our ability to include perishable items in the boxes due to limited storage for items that need refrigeration.

11. Church is considered like a second home to our families, and when some families are missing the whole congregation suffers. The fear of deportation can lead to emotional and developmental challenges and that causes a challenge to pastors and leaders of our church.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

Signed by:

*John Doe #2*

282D9F91063F4C3...

Pastor John Doe # 2

3

# EXHIBIT 11

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF PASTOR JOHN DOE # 3 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF CHURCH OF THE BRETHREN

I, Pastor John Doe # 3, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the lead pastor at a Church of the Brethren congregation in the Atlantic Southeast District.

2. I wish to submit this declaration anonymously out of fear that my church will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Patrol ("CBP").

3. Church of the Brethren's motto – "Continuing the Work of Jesus, Peacefully, Simply, Together" – is our guiding principle, and we strive to live by it by showing our love for God and one another through worship and community service.  Based on these religious values, my congregation welcomes everyone regardless of their immigration status.

4. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy and its plan to arrest and deport all undocumented people during President

Docusign Envelope ID: 0F1B4614-6726-4E54-BA76-9C711149CD2B

Case 1:25-cv-00403-DLF    Document 11-14    Filed 02/21/25    Page 3 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 92 of 398

Trump's second term, I have strong reason to believe that our congregation is at imminent risk of an immigration enforcement action.

5.    Our congregation is located in a city with a substantial and diverse immigrant population. The vast majority of our congregation members are Haitians, and our membership includes a significant number of people who have parole or Temporary Protected Status that is scheduled to expire in the near future.

6.    Our congregation has worship services every Sunday morning and evening.  We also have Sunday School classes on Sunday morning before worship services, a Bible Study on Tuesday evening, and a prayer service on Friday evening.  In addition to worship services, our congregation also operates a food pantry on Wednesday and Thursday that serves our local community, which includes both Hispanic and Haitian immigrants.  Our food pantry serves all in need regardless of their immigration status.

7.    An immigration enforcement action at our church will substantially burden our religious exercise by preventing us from carrying out our religious mandate to worship together in person as a congregation, with all members of our community, including those who are immigrants and without lawful status.

8.    Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  Attendance at Sunday worship services has declined from an average attendance of approximately 370 to 270 individuals.  My congregants tell me that the reason they are no longer coming to church is that they fear ICE will target our congregation.

9.    Not only has this decline in attendance burdened the religious exercise of those congregants who are missing worship services due to fear, but it also impacts the religious exercise of those attending by diminishing the shared community and fellowship experience.

Docusign Envelope ID: 0F1B4614-6726-4F54-BA76-9C711119CD2B

10. DHS's new enforcement policy has also directly impacted our food pantry program because individuals fear the risk of being arrested by ICE if they come to church to receive food from our pantry.

11. DHS's new enforcement policy forces us to choose between freely carrying out our religious mission, which we feel we must do as a church, and violating our commitment to welcome and protect immigrants by putting those we call to worship with us and minister to at risk of ICE action.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

John Doe #3

69CC32530163442...

Pastor John Doe # 3

3

# EXHIBIT 12

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                             Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF JESSE RINCONES, EXECUTIVE DIRECTOR OF PLAINTIFF CONVENCIÓN BAUTISTA HISPANA DE TEXAS

I, Jesus "Jesse" Rincones, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Executive Director of Convención Bautista Hispana de Texas ("CBHT") and have served in that role since 2011.

2. I make this statement based upon personal knowledge, files and documents of CBHT that I have reviewed, as well as information supplied to me by members of CBHT whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CBHT business.

3. CBHT was founded in 1910 (as the Convención Bautista Mexicana de Texas) and incorporated in 2011. We are a nonprofit membership organization with our registered office in San Antonio, Texas.

Docusign Envelope ID: 9CEBED59-358A-43E4-AA53-77D7235C243B

Case 1:25-cv-00403-DLF    Document 11-15    Filed 02/21/25    Page 3 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 96 of 398

4.    Our mission is to help churches and their members fulfill their God-inspired vision.  We currently serve nearly 1,100 Hispanic Baptist churches in Texas.  The basis for our association and our members' work in social service outreach is grounded in Biblical principles that require us to worship, gather, and study the Bible together, and to celebrate the Lord's Supper by taking communion as a body of believers.

5.    Also core to our organization is the biblical mandate to love and care for all individuals, regardless of status, and especially immigrants, whom the Bible commands we welcome and protect.  Most of CBHT's member churches are affiliated at the national level with the Southern Baptist Convention, which has affirmed the responsibility of churches to minister to all individuals, regardless of immigration status, and has declared that any form of nativism, mistreatment, or exploitation is inconsistent with the gospel of Jesus Christ.  Consistent with these religious tenets, CBHT members welcome undocumented people into their churches for worship services, social service ministries, and other church activities.

6.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that CBHT members are at imminent risk of immigration enforcement activity at their churches.

7.    CBHT member churches are located all along the border of Texas, from the Rio Grande Valley to El Paso.  We also have churches located in cities with large immigrant communities, both documented and undocumented, such as Houston, Dallas-Ft. Worth, San Antonio, and Austin.  Immigration and Customs Enforcement ("ICE") has conducted raids in many areas in which our churches are located since the sensitive locations policy was rescinded.

8.   The overwhelming majority of CBHT members have immigrant congregants coming from all over Latin America, some of whom are undocumented.  For example, the congregation at Azle Avenue Baptist Church is 75 percent immigrant.  A member church in El Paso is 40 percent immigrant, most of whom are undocumented.  Another church in Austin is 75 percent immigrant, some of whom are undocumented.  Some of these congregants have received letters to appear or have been arrested by ICE in the past.  Other undocumented congregants have been deported.

9.   CBHT member churches also provide social service ministries to immigrant neighbors, including ESL classes, food pantries, food distribution, back-to-school events, clothes closets, weekly community meals, and immigration ministries.  Azle Avenue Baptist Church has an Immigration Aid Office designed to aid neighbors with navigating the immigration system, including obtaining DACA status and applying for asylum.  These services are provided on church property, and they are part of the church itself—organized, run, and funded by the congregations.  They serve citizens and immigrants, both documented and undocumented.

10. The above-referenced church in El Paso has two social service ministries in its church building that support immigrants: one distributes food to the hungry, and one provides health care services.  Both serve primarily immigrants, and often people who are undocumented.  The above-referenced church in Austin funds, organizes, and runs several social service outreach ministries, including a food pantry and a clothing closet that are located in its church building. Large number of immigrants line up in front of the church to receive food, which could draw ICE's attention to that church.

3

11. Since the policy was rescinded, I have received phone calls, emails, and texts from members that are confused and afraid. They want to know how to protect their churches from intrusion and interruption.

12. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our churches by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. It will substantially disrupt the whole church's spiritual practice and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants. Likewise, an immigration enforcement action directed at their social service ministries will prevent them from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to as part of their evangelical faith and whom they are called to protect as some of the most vulnerable in our society.

13. DHS's new enforcement policy is already substantially burdening the religious exercise of our churches. We already have reports of decreased attendance at certain member churches since the policy rescission, starting the very first Sunday after the rescission. Congregants are telling their pastors that they are now afraid of going to church due to the imminent risk of an ICE raid or enforcement action. The pastor at Azle Avenue Baptist has reported that several of his congregants are no longer leaving their homes out of fear of ICE. Some member churches have stopped publicizing their services on social media and other public communications for fear of prompting enforcement action.

14. DHS's new enforcement policy is presently forcing our member churches to make the impossible choice of refraining from welcoming all congregants to participate in communal

Docusign Envelope ID: 9CEBED59-358A-43E4-AA53-77D7235C243B

Case 1:25-cv-00403-DLF    Document 11-15    Filed 02/21/25    Page 6 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 99 of 398

worship services or putting parishioners at risk of arrest and deportation—either of which violates their sincerely held religious beliefs.

15. Faced with this choice, some CBHT members are already making changes to the way worship is conducted.  At one church, for example, the pastor has removed undocumented people from serving as ushers or greeters during services. Another church is preparing to train its deacons and security team to address what might happen if ICE showed up.  And several member churches have started or are considering locking the doors of their church during services.

16. Many member churches are considering drastic changes to their practices, including reducing services and moving worship online.  One member, Azle Avenue, relies on volunteers to run its programs, and a loss of immigrant congregants would mean a loss of volunteers who would be able to help it care for children, teach, and serve in multiple other ways.

17. If participation in these services decreases, or if CBHT members are forced to change the way they deliver their services, there will also be a devastating impact on the congregants and social recipients the churches serve.  They will be deprived not only of the physical benefits these ministries offer, such as food, clothing, and medical assistance, but also of the spiritual ministry our churches provide as part of their religious mission, such as worship, spiritual counsel, communion, and Bible study.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/19/2025

Respectfully submitted,

Jesse Rincones
49EDDA2B5C10423...

Jesse Rincones

5

# EXHIBIT 13

Docusign Envelope ID: 0FA61114-6D16-4BBB-95D7-319F095CF595

Case 1:25-cv-00403-DLF    Document 11-16    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 101 of 398

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## DECLARATION OF REVEREND FERNANDO ROJAS ON BEHALF OF AZLE AVENUE BAPTIST CHURCH IN SUPPORT OF PLAINTIFF CONVENCIÓN BAUTISTA HISPANA DE TEXAS

I, Fernando Rojas, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the lead pastor of the Azle Avenue Baptist Church in Fort Worth, Texas.

2. I make this statement based upon personal knowledge.

3. Azle Avenue Baptist Church was founded as an Anglo church in 1936 and transitioned to a Hispanic congregation in 2000. We have been a member of the Convención Bautista Hispana de Texas ("CBHT") for over 20 years. The mission of our church is to glorify God through loving Him with all of our being and edify people through the Great Commission (spreading the Gospel) and the Great Commandment (loving our neighbor as ourselves). Integral to our belief that God placed us in our community to love our neighbors is the notion that we do so unconditionally, and without regard to immigration status. Indeed, we believe the Bible commands us to welcome and protect immigrants as some of the most vulnerable members of our community.

4.   In light of the Department of Homeland Security (DHS)'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.   We are located in the Historic Northside of Fort Worth, an area with an over 90 percent Hispanic population.  A large number of that population is comprised of undocumented individuals and families.  I am aware of immigration enforcement raids in Fort Worth and the surrounding areas within the past few weeks.

6.   There are about 100 members of our church, with attendance fluctuating between 75 and 110.  Based on personal relationships, I would estimate that about 75 percent of our congregants are immigrants.  We have people from Cuba, Ecuador, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, and Venezuela.  We do not ask for legal status, but some of them have shared that they are undocumented in personal conversations.  In the past, some of our congregants have been deported.  As a Hispanic church in a largely Hispanic populated neighborhood, we are a likely target for immigration enforcement disruption during our worship services and outreach ministries on church property.

7.   We seek to build up our immigrant neighbors through our Immigration Aid Office, which offers services that help them build lives with less stress, more peace, and more opportunities to find success in this country.  We provide low-cost aid for legal residents to become citizens, and for citizens and legal residents to petition for family members as allowed by law.  In the past we have helped young people obtain their DACA status and currently help those who are eligible to renew it.  As allowed by law, we have also helped people who have come seeking asylum.  Many in our church have experienced the heartbreak of living as undocumented immigrants, and

as a church, we want to provide services that are trustworthy to our community, to help them avoid abuse and fraud. The Office is located within our church facilities and is run by our pastor emeritus as director and our community outreach minister as office manager. The Office is recognized and accredited by the Department of Justice's Executive Office for Immigration Review. *See* https://www.justice.gov/eoir/recognition-accreditation-roster-reports. The Office—which has outdoor signage for the public to see and regularly communicates with immigration authorities on behalf of the people we serve, including congregants—further heightens our risk of being targeted for immigration enforcement action.

8. Whenever we provide other outreach services for our community—whether health and vaccination clinics, community outreach events, or events we have sponsored at our neighborhood elementary school—we have never required legal status nor identification. People know that our doors are always open for them. Being a Hispanic church also helps them feel welcome at our events and services.

9. An enforcement action during a worship service, religious ceremony, or other church activity will substantially burden our church's religious exercise. It will interfere with the whole church's spiritual practices and devastate our congregants regardless of their legal status. Many of our congregants will feel racially profiled, and it will be significantly distressing for any of our congregants to witness the arrest of a family member in a place of sanctuary and a time of worship. Our congregants and visitors will no longer feel safe in our church, undermining our religious mission of making people feel welcome and secure. An enforcement action will also traumatize our children in a place that is supposed to be a peaceful spiritual home.

10. An enforcement action will cause a decrease in attendance among our congregants, thereby hindering our ability to engage in communal worship as a congregation. And because

3

we are largely a volunteer-empowered organization, a loss of congregants will mean a loss of volunteers who would be able to help us care for children, teach, and serve in multiple other ways.  It may also decrease financial support, which would make us cut back on some of our programs.

11. DHS's new enforcement policy is already substantially burdening our religious exercise. We are currently locking our doors in order to control who may enter our facilities, as allowed by law, such that a volunteer can check if any law enforcement officer complies with current requirements to come with warrants signed by a judge.  We have also purchased and installed an electronic lock at our immigration aid office to serve the same purpose.  Multiple clients of our Immigration Aid Office have expressed their fear of an immigration enforcement action at the Office.  As participation in this program decreases, serving our immigrant community through the Office will become impossible, and we will have to stop offering these services and let go of valued personnel.  It will also make it impossible for us to continue sharing the Gospel with those who come and ask about our services.  We are now in a position where we have to choose between making our immigrant congregants and neighbors "easy pickings" when they gather at our church or instead telling them to stay away in violation of our religious mandate to welcome and serve them.  Neither option is conscionable for us.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

Signed by:

_____
31DAC2C707CA45A...

Reverend Fernando Rojas

# EXHIBIT 14

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                                  Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF PASTOR JOHN DOE # 4 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF CONVENCIÓN BAUTISTA HISPANA DE TEXAS

    I, Pastor John Doe # 4, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I serve as lead pastor for a church located in Austin, Texas.  We are a member of the Convención Bautista Hispana de Texas ("CBHT").

    2.  I wish to submit this declaration anonymously out of fear that if my church is identified, it will be targeted for immigration enforcement action.

    3.  Our church looks to worship with and help all those in need in any way we can regardless of their race, ethnicity, country of origin, or immigration status.  We are part of the kingdom of God and ambassadors of the King of Kings.  We follow his mandates and seek his approval above all else (Matthew 5:3-16, Galatians 3:28, 2 Corinthians 5:20).  The Bible calls on us to love our neighbors as ourselves (Mark 12:30-31), knowing that many may also be brothers and sisters in Christ, and to serve and welcome immigrants as some of the most vulnerable in our society.

App. 221

Docusign Envelope ID: 39C809FE-EA21-4205-8D38-79B8023CD030

4.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy and its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.    There have been numerous Immigration and Customs Enforcement ("ICE") raids in Austin and several in our immediate neighborhood, which has a large immigrant population. Members of our church have let us know that they have seen various raids in their places of residence or other areas near the church.

6.    At least 75 percent of our congregants are immigrants.  We have congregants from Mexico, Guatemala, El Salvador, Cuba, Honduras, Nicaragua, and a few from South America.  I do not ask whether my congregants are undocumented, but several have shared that they are, or are in the process of trying to get their papers in order.  Some members of our church have already been the subjects of immigrant enforcement action.  Some have received letters to appear in immigration court.  Some have been taken by ICE and later released, while others have left voluntarily after arrest or been deported.  Some have experienced ICE raids at their workplaces.

7.    Moreover, in furtherance of our religious mission of serving the many needs of our underserved immigrant community, regardless of legal status, our church funds, organizes, and runs several social service outreach ministries, including a food pantry and a clothing closet that are located at our church.  We have a large number of immigrants that line up in front of the church to receive food, which could draw ICE's attention to our church.  We also occasionally have community meals, and in the past, we've worked with law enforcement to provide emergency shelter to those in need.

2

Docusign Envelope ID: 39C809FE-EA21-4205-8D38-79B8023CD030

Case 1:25-cv-00403-DLF    Document 11-17    Filed 02/21/25    Page 4 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 108 of 398

8.   Because of our church's ministries serving immigrants, especially our food and clothing pantries, our reputation for welcoming and serving immigrants is well known in our community. We also have a bilingual website and Facebook page where we communicate much of what we do, which helps people feel connected and comfortable in communicating with us.

9.   An enforcement action during a worship service, religious ceremony, or other church activity will substantially burden our church's religious exercise by scaring our congregation and disrupting our ability to worship in a place where we are supposed to feel at peace and free from state surveillance.  Similarly, an enforcement action during one of our social service ministries will make it exceedingly difficult to preserve the trust we have built in our community and provide for the people we serve, who will be less likely to engage with our church for fear for their safety.

10. DHS's new enforcement policy is already substantially burdening our religious exercise. Although cutting back on our worship services or social service ministries would violate our religious beliefs, if we continue to welcome and serve undocumented people at our church, we will be exposing them to arrest and deportation, which is also antithetical to our religious beliefs. There is no conscionable option.  We are also now expending additional resources in an effort to keep our congregants and visitors safe, such as training for our deacons and security team.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025                              Respectfully submitted,

                                             Signed by:

                                             *John Doe #4*
                                             _____
                                             3C23FB3467A24F0...

                                             Pastor John Doe # 4

3

# EXHIBIT 15

Docusign Envelope ID: 0B98B9DB-8932-4BC5-9292-12A2CBD73E39

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

**vs.**

                                      Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF PASTOR JOHN DOE # 5 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF CONVENCIÓN BAUTISTA HISPANA DE TEXAS

I, Pastor John Doe # 5, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I serve as lead pastor for a church located in El Paso, Texas.  We are a member of the Convención Bautista Hispana de Texas ("CBHT").

2.  I wish to submit this declaration anonymously out of fear that my church will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Patrol ("CBP").

3.  Our church is called to glorify God, spread the gospel of Christ, and make disciples, who in turn make disciples, with solid doctrine and faith to the Bible.  We believe we must be Salt and Light, and our mission as a church is thus to support those who are most in need in our community—indeed, God commands us to be Merciful just as he has been Merciful with us.  As part of our religious mission, we strive for the community to view our church as a place of peace, emotional refuge, and support.  It is particularly important to us worship with and serve immigrants, whom the Bible commands we welcome and protect, regardless of status.

App. 225

Docusign Envelope ID: 0B98B9DB-8932-4BC5-9392-12A3CBD73E39

Case 1:25-cv-00403-DLF    Document 11-18    Filed 02/21/25    Page 3 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 111 of 398

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.   It is my understanding that there are over 900,000 immigrants residing in El Paso.  In our church, about 40 percent of members are immigrants.  Most are from Mexico, but we also have some from Honduras and Nicaragua.  Most of our immigrant members are undocumented.  We also have two social service ministries in our church that support immigrants within our community.  One distributes food to the hungry, and one provides health care services.  Both serve primarily immigrants, and often people who are undocumented.  We provide both of these ministries on our church grounds.  As a largely Hispanic church in a largely Hispanic neighborhood, we are a likely target for ICE/CBP disruption during our worship services and outreach ministries on church property.

6.   An enforcement action during a worship service, religious ceremony, or other church activity will substantially burden our church's religious exercise by interfering with our religious mandate to worship together in person as a congregation, with all members of our community, including those who are immigrants and without lawful status.  An enforcement action during our ministry work will prevent us from carrying out the social and evangelical work we feel called to do as Christians.

7.   DHS's new enforcement policy is already substantially burdening our religious exercise. In the month since the policy's rescission, attendance at both our Sunday and Wednesday worship services has declined, and my congregants tell me that the reason is that they fear ICE or

Docusign Envelope ID: 0B98B9DB-8932-4BC5-9292-12A3CBD73E39

CBP will target our church. This decline in attendance not only impedes our religious mission, but it will likely also have a direct impact on our church's finances.

8.  We have also seen participation go down for our outreach ministries as our immigrant neighbors are deterred by DHS's new policy from visiting our church. We are now forced to choose between canceling or limiting our church and ministry activities or instead exposing our congregants and visitors to ICE/CBP action when they visit our church. Neither option is conscionable.

9.  If we are unable to obtain a court order constraining ICE and CBP's authority to conduct immigration enforcement action at our church, we anticipate adopting a closed-door policy where we limit access to services and meetings and possibly hold home services, limiting non-worship activities at the church. That sort of a change would have a devastating impact on our outreach ministry work and our ability to fulfill our religious mandate to welcome and serve our immigrant neighbors. It is at odds with our religious mandate to be an open and welcoming space for all.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

DDD3F494C2AE435...

Pastor John Doe # 5

3

# EXHIBIT 16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                               Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

---

## DECLARATION OF THE MOST REVEREND SEAN W. ROWE FOR PLAINTIFF THE EPISCOPAL CHURCH

    I, the Most Reverend Sean W. Rowe, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I am the Presiding Bishop of The Episcopal Church ("TEC") and have served in this role since November 1, 2024.  As Presiding Bishop, I am duly authorized to speak on behalf of TEC.

    2.  I make this statement based upon personal knowledge, files and documents of TEC that I have reviewed, as well as information supplied to me by TEC members whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting TEC's business.

    3.  TEC was established in 1785 and is a constituent member of the Anglican Communion, a global family of churches that have historic roots in the Church of England.  We are headquartered in New York, NY.  TEC is composed of 106 dioceses, 96 in the United States and its territories, which in turn are composed of more than 6700 congregations with approximately 1.5 million active members.  We are one church with many congregations: every local

Docusign Envelope ID: 59224DFF-6AAF-4781-A1E0-CAB429E97174

Case 1:25-cv-00403-DLF    Document 11-19    Filed 02/21/25    Page 3 of 8
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 115 of 398

expression can exist only within and as part of the unitary church. Because the identity we are given through baptism and faith in Jesus Christ connects us as fellow believers across time and space, an injury to any one baptized believer or congregation is an injury to the whole diocese and the whole denomination.

4.    TEC and its congregations understand our faith to require us to welcome immigrants into our community of worship without distinction based on their legal status. In addition, our faith calls us to serve the vulnerable in a variety of ministries, where we are also required to serve immigrants without distinction based on their legal status. Our faith is shaped by the biblical story of people whom God led into foreign countries to escape oppression. Exodus tells the story of the ancient Israelites escaping slavery in the land of Egypt and wandering in the wilderness without a home. In Leviticus 19:33-34, God commands that this sojourn be remembered: "When an alien resides with you in your land, you shall not oppress the alien. The alien who resides with you shall be to you as the citizen among you; you shall love the alien as yourself, for you were aliens in the land of Egypt." In Ephesians 2:12-19, Christians are told that they are no longer aliens, but through Jesus Christ, citizens of the household of God. In 1 Peter 2:9-12, Christians are told that they have received God's mercy and must demonstrate sacrificial love in their lives and deeds, transcending earthly distinctions and answer Christ's call to welcome the stranger.

5.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement action.

Docusign Envelope ID: 59224DFF-6AAF-4781-A1E0-CA8429E97174

Case 1:25-cv-00403-DLF    Document 11-19    Filed 02/21/25    Page 4 of 8
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 116 of 398

6.    TEC serves Christ by loving our neighbors in many settings, from churches located just miles from the border with Mexico to rural churches serving migrant fieldworker populations to urban churches in major cities with dense immigrant populations.  We have congregations across the country, including in communities that have large undocumented populations, have already experienced Immigration and Customs Enforcement ("ICE") or Customs and Border Patrol ("CBP") actions, or have been specifically named by the Trump Administration as targets for enforcement actions.  During past enforcement efforts, a church in Arizona was targeted by local officials who parked outside and attempted to arrest undocumented congregants leaving church. Since the change in DHS policy, a congregation in the Los Angeles area reports that a detention was made within blocks of their church building.  Another one of our congregations in Southern California reports that ICE agents have been stationed in their neighborhood in the past few weeks, and a congregation in a California agricultural community reports that there have been ICE and CBP personnel stationed on a major street in town since mid-January.  Yet another congregation, in Arizona, had a church member arrested by ICE in her home in early February. And we have also heard that ICE is targeting our congregations' social service programs.  For example, ICE recently showed up at a food pantry hosted by a congregation in California to take photographs of people lined up to receive food.

7.    In God's kingdom, immigrants are not at the edges, fearful and alone—we worship together as one.  Our congregations include immigrants from all over the world, including, but not limited to, Mexico, Guatemala, El Salvador, Venezuela, Honduras, China, Burma, Haiti, Nigeria, Bangladesh, the Philippines, and Ukraine.  Some of our congregations are composed almost entirely of immigrants, both documented and undocumented.  One of our churches in the Los Angeles area has a congregation that is almost 85 percent immigrant, and one of our

3

churches in Long Island estimates that 90 percent of its congregation are immigrants to this country. Our Arizona Diocese has six congregations that are either bilingual or Spanish speaking and one South Sudanese congregation, all of which include immigrants and many people who are undocumented. One Diocese in Central California has undocumented members with final orders of removal against them. That Diocese also has both clergy and lay leaders who are themselves immigrants, several of whom have expressed fear that their status is under threat.

8. In keeping with our faith, TEC also champions and advocates for humane policies towards migrants, and many TEC dioceses and congregations provide resources, support, and care for asylum seekers, undocumented immigrants, refugees, and other migrant communities. Our congregations follow Jesus' command to care for the most vulnerable by providing social services to documented and undocumented immigrants as part of their ministry, including food banks and shared meals, ESL classes, health services, childcare, and more. Many congregations, like St. James Episcopal Cathedral in Fresno, California, host food pantries. One congregation, in the Los Angeles area, distributes five tons of fresh produce each week to needy families in its community by itself. Others, such as congregations in the Diocese of Texas, provide health care services—including pediatric care, family planning and maternal health care, diabetes testing, and HIV/AIDS testing—at little or no cost to those who otherwise would have no reasonable access to such services. In one Diocese in Central California, congregations run food pantries and thrift stores that serve many immigrants, documented and undocumented. Still other congregations make shelter and clothing available for those who lack either. Many, including a congregation in Northern California, provide space for addiction-related support services, while

others, like a congregation in Southern California, lease space to immigrant-focused nonprofits. These services are open to anyone who needs them, regardless of their legal status.

9.   An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status.  Episcopal worship takes an incarnate form: like Christ, congregants must be with one another in a community.  Having the sacred trust of worship and the consecrated space of sanctuary shattered by an immigration enforcement action would be directly opposed to that practice and would harm the Church and its members.  This deliberate breaking up of a unified fellowship would damage the body of the community and harm our practice of faith—not only among those missing, but among those who remain, grieving and incomplete.

10. Likewise, enforcement actions targeted at social service ministries impede the Church's spiritual mission by violating the fundamental principles of mercy and care for the vulnerable. The fear of raids prevents all of us from exercising the ministry that we have been called to by Jesus—to love our neighbor, to care for the vulnerable, to seek justice and peace, and to respect the dignity of every human being.

11. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the new policy was adopted, I have heard from bishops, priests, and laypeople from all over the Church expressing fear and dismay at the impact that the rescission will have, and in many instances has already had, on their ministry.  The effect is already being seen on our worshiping communities, as Church leaders are reporting that immigrants are already staying away from worship services.  Our congregations have already seen evidence of ICE action in

Docusign Envelope ID: 59224DFE-6AAF-4781-A1E0-CAB429E97174

Case 1:25-cv-00403-DLF    Document 11-19    Filed 02/21/25    Page 7 of 8
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 119 of 398

their neighborhoods, including the arrest, detention, and deportation of some of their fellow congregants. In many of our congregations, including St. James, Sunday Spanish-language services are seeing fewer worshippers. Our congregations in Arizona, New York, Texas, and Maryland have also seen a decrease in worshippers coming to worship services and other church activities. Clergy in a Central California Diocese report that people have stopped coming to church for fear of the raids, leading to worship services with very few attendees. Congregants across the Church are reporting that they are afraid to leave their homes to attend worship services or participate in service ministries. Even those with status report they are staying home out of fear that they will be stopped at random because of their appearance or skin color. The loss of some congregants to the fear that ICE could enter during services undermines core Episcopalian beliefs that the Church is one body—when the whole community cannot gather, the communion of the members is impaired, injuring the whole denomination.

12. Our congregations are also reporting that attendance at and participation in social service ministries has also declined since DHS's new policy was announced. Congregation-sponsored food pantries in California are serving fewer people, and one of our Central California Dioceses reports that immigrants have left its social service ministries and not returned. Certain ministries that serve largely undocumented farm worker populations, like St. James's Farm Worker ministry, have had to be ended or restructured in order to keep congregants safe. The Diocese of Arizona reported that at an online event it sponsored featuring a Spanish-speaking immigration attorney, attendance was low because people were afraid to attend—even though attendees could keep their cameras off. Churches are no longer able to serve as full community centers for fear of ICE showing up. As a result of our inability to follow our faith, people will go hungry, will forgo meetings that help them maintain sobriety, will do without free health checks, will miss

Docusign Envelope ID: 59224DFF-6AAF-4781-A1E0-CAB429E97174

Case 1:25-cv-00403-DLF    Document 11-19    Filed 02/21/25    Page 8 of 8
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 120 of 398

ESL or citizenship classes, will not use childcare services that would enable them to work, and will suffer social isolation. And we will lose our ability to love and serve our neighbors in the way they most need it, which fundamentally cuts off our ability to serve as Christ calls us to.

13. In response to the rescission, some of our congregations are already having to alter some of the ways in which they carry out their ministry. At least one congregation has stationed members at the church door to keep an eye out for immigration officials. Others are moving worship and other services online, and one of our Dioceses in Central California has moved worship services to smaller groups that meet in private settings. St. James has ceased advertising its food bank ministry on social media. Still others have moved food distribution efforts to other locations. Each of these adjustments is a burden on the exercise of TEC's ministry, and each diminishes TEC's ability to most effectively live out its faith.

14. DHS's new enforcement policy is also presently forcing our congregations to choose between abandoning their religious obligation to welcome and serve immigrants in their churches without regard to legal status, or continuing to fulfill that obligation while making their congregants and visitors an easy target for ICE action.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Sean W. Rowe*

8F4D34271D4E40C...    _____

Most Reverend Sean W. Rowe

# EXHIBIT 17

Docusign Envelope ID: D0B31135-25A7-4F47-AB04-CDB41BB4E6F1

Case 1:25-cv-00403-DLF    Document 11-20    Filed 02/21/25    Page 2 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 122 of 398

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| MENNONITE CHURCH USA et al., |
| *Plaintiffs,* |
| v. |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., |
| *Defendants.* |

Civil Action No. 1:25-cv-00403

## DECLARATION OF JULIA AYALA HARRIS, PRESIDENT OF THE HOUSE OF DEPUTIES OF THE EPISCOPAL CHURCH SUPPORTING PLAINTIFF THE EPISCOPAL CHURCH

I, Ms. Julia Ayala Harris, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the elected President of the House of Deputies of The Episcopal Church. The House of Deputies, established in 1785, includes over 800 deputies and more than 400 alternates, consisting of clergy and lay representatives from every diocese of The Episcopal Church.  As one of the two Houses that make up the General Convention—the Church's highest policymaking body—it is central to shaping the Church's laws, governance, and witness in the world.

2. I also make this declaration based on my 13 years of leadership in The Episcopal Church and my own lived experience as a first-generation American and the child of an undocumented Mexican immigrant.

3. The Episcopal Church's commitment to welcoming immigrants is deeply rooted in our Christian faith.  Welcoming the stranger is a sacred obligation for Episcopalians.  When

Docusign Envelope ID: D0B31135-25A7-4F47-AB04-CDB41BB4E651

immigrants walk through our church doors, they're not entering as outsiders; they are stepping into the heart of our faith, where their dignity and stories are embraced as reflections of God's love.  This conviction is not abstract theology—it is a lived expression of faith, as taught in Holy Scripture.  Scripture repeatedly commands us to welcome the stranger, reminding us that migration is part of the sacred human story, and that through Jesus Christ we are citizens of the kingdom of God:  Leviticus 19:33-34 ("When an alien resides with you in your land, you shall not oppress the alien.  The alien who resides with you shall be to you as the citizen among you; you shall love the alien as yourself, for you were aliens in the land of Egypt.");  Matthew 25:35 ("I was a stranger and you welcomed me."); Hebrews 13:2 ("Do not neglect to show hospitality to strangers, for by doing that some have entertained angels without knowing it.");  Ephesians 2:19 ("So then, you are no longer strangers and aliens, but you are fellow citizens with the saints and also members of the household of God . . .").

4.    Episcopalians' understanding of their faith and biblical commandments requires us to welcome immigrants without distinction to legal status in worshipping communities and church ministries that serve vulnerable people.  Welcoming the stranger is a sacred obligation for Episcopalians.  Each Episcopalian is a member of one church body within which there are no distinctions between people.  Scripture tells us that harm to one is felt by the rest of the body (1 Corinthians 12:12-13, 26).

5.    These biblical mandates are not abstract principles; they shape the very governance of The Episcopal Church.  Through General Convention, the House of Deputies has passed numerous resolutions affirming our commitment to migrant justice and the dignity of all people, which inform my responsibilities as President in appointing leaders and setting priorities for our governance work.

Docusign Envelope ID: D0B31135-25A7-4F47-AB04-CDB41BB4E651

6.     For centuries, The Episcopal Church has sought to follow Christ's command to love our neighbors as ourselves, particularly the most vulnerable.  Our faith compels us to stand with the sojourner, to offer sanctuary to the persecuted, and to recognize the dignity of every human being—regardless of nationality or legal status.  This belief is enshrined in our Baptismal Covenant and reaffirmed in the work of our congregations and ministries across the country.

7.     I am a first-generation American and the daughter of an undocumented Mexican immigrant.  My family's experiences navigating immigration challenges firsthand have informed my faith and my commitment to The Episcopal Church's mission to uphold the dignity of every human being, regardless of legal status.  The Church's teachings and ministries in support of immigrants are not optional social programs but are integral to its identity and practice.

8.     The Department of Homeland Security ("DHS")'s new enforcement policy has a direct and chilling effect on the governance and mission of The Episcopal Church, including the House of Deputies.  I have heard directly from deputies who fear for their ministries and for the safety of those they serve, particularly in communities where immigration enforcement has targeted churches and faith-based ministries. These fears influence who feels safe standing for election as a deputy, potentially limiting the diversity and full representation of the church in its governance.

9.     As President of the House of Deputies, I am responsible for appointing hundreds of clergy and lay leaders to legislative committees, task forces, and other governing bodies that shape the church's mission, policy, and response to pressing societal issues—including matters of migration and justice.  DHS's new enforcement policy threatens to deter and has deterred participation in these vital roles, as some deputies and potential appointees fear that their public service could expose them, their congregants, or their communities to harm.

3

Docusign Envelope ID: D0B31135-25A7-4F47-AB04-CDB41BB4E651

Case 1:25-cv-00403-DLF    Document 11-20    Filed 02/21/25    Page 5 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 125 of 398

10.    Additionally, when determining locations for governance meetings and churchwide gatherings, I must now consider the risk that some deputies and church leaders—especially those who are immigrants or who minister among immigrant communities—may not be able to travel safely or may feel unsafe attending as a result of DHS's new enforcement policy.  This undermines the ability of The Episcopal Church and the House of Deputies to function as a representative and deliberative body.

11.    Deputies have shared with me their apprehension about whether they can safely continue their ministries in certain communities.  Some are reconsidering their roles in leadership, while others have expressed fear that their work—grounded in The Episcopal Church's longstanding commitment to welcoming the stranger—will put them and their congregants in jeopardy.

12.    The governing bodies of The Episcopal Church, including the House of Deputies must be a place where the full breadth of The Episcopal Church is represented, where all who are called to serve can do so without fear, and where governance decisions can be made with full participation.  The policies in question undermine these fundamental principles and threaten the ability of The Episcopal Church to live out its Gospel mission.

13.    The integrity of our governance is compromised when The Episcopal Church cannot ensure the full and free participation of all deputies, including those from immigrant communities and those ministering to migrants.  A church that cannot assemble without fear cannot fully live into its mission.  The House of Deputies must be a place where the full breadth of The Episcopal Church is represented, where all who are called to serve can do so without intimidation, and where our collective discernment is shaped by the voices of those most

4

impacted by the issues before us.  DHS's new enforcement policy undermines these principles and imperils the Church's ability to live out its Gospel mission.

14.    DHS's new enforcement policy places a substantial burden on The Episcopal Church's religious exercise. By forcing immigrant communities into hiding, it impairs our ability to fulfill our faith-based mission of welcoming the stranger, ministering to the vulnerable, and gathering in sacred worship without fear.  This policy shift interferes directly with our religious freedom and expressive association.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/20/2025

Respectfully submitted,

Signed by:

*Julia Ayala Harris*

E40708C213274D3...    _____

Julia Ayala Harris

5

# EXHIBIT 18

App. 242

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

     *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

     *Defendants.*

Civil Action No. 1:25-cv-00403

### DECLARATION OF THE RIGHT REVEREND JENNIFER REDDALL ON BEHALF OF THE EPISCOPAL DIOCESE OF ARIZONA SUPPORTING PLAINTIFF THE EPISCOPAL CHURCH

I, the Right Reverend Jennifer Reddall, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Bishop of the Episcopal Diocese of Arizona, and I have served in that role since 2019.

2. Welcoming the stranger—including our immigrant neighbors—is central to our faith and practice. We respond to God's call to love, accompany, advocate, and pray for our migrating neighbors. In fulfilling our baptismal promise to "strive for justice and peace among all people, and respect the dignity of every human being," we are committed to the work of welcoming the stranger. We are also required by our faith to provide food and services, including air-conditioned spaces during the summer, to all our neighbors in need, regardless of their documentation status. "And whoever gives even a cup of cold water to one of these little ones in the name of a disciple—truly I tell you, none of these will lose their reward" (Matthew 10:42).

Docusign Envelope ID: BA8E131D-9509-4BB9-B9A9-BB06F67CD552

3.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our Diocese is at imminent risk of an immigration enforcement action.

4.   Our Diocese has many congregations located in areas with large immigrant communities, including some that are near the border.  Border areas are stated targets for Immigration and Customs Enforcement ("ICE") raids and enforcement actions, including in the last few weeks. That targeting has historically extended to our congregations: when SB 1070 was in force in Arizona, Sheriff Joe Arpaio would park outside one of our congregations attempting to arrest undocumented people on their way out of church.  Our priests have reported ICE raids near their churches over the last month, and in early February we had a church member arrested by ICE at her home.  Since then, another person affiliated with a congregation was deported, leaving two of their children behind with extended family. The separation of parents from their children is a grievous injury to our congregations and our understanding of the primacy of family relationships.

5.   Our Diocese is home to many immigrants, both documented and undocumented.  Many of our congregations have families of mixed documentation status.  Six of our congregations are Spanish-speaking or bilingual, and one is South Sudanese.  All of those congregations include immigrants, mostly from Mexico, and people who are undocumented.

6.   Our Diocese has a Border Council that regularly does work in advocacy and helping people find their means of ministry. We also have a longstanding ministry helping asylum seekers cross the border according to the prevailing legal practice at the time.  In addition, many

2

of our congregations offer outreach ministries like food banks and cooling centers, which serve all members of the community, regardless of their immigration status.

7.    An immigration enforcement action at one of our churches will substantially burden our religious exercise by preventing us from carrying out our mission to welcome and serve all immigrants.  A raid will most surely be a direct attack on one of our foundational values— welcoming the stranger and upholding our Baptismal Covenant.  It will also be an infringement on our protected religious freedom and practice.

8.    Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  We have already had a decline in attendance in our immigrant community churches because people are afraid to leave their houses.  We recently held a Zoom meeting with an immigration attorney in Spanish, and many people were too afraid to attend even though they could keep their cameras off.  As a result of the change in policy, we are moving more of our activities online where possible, which has meant a decrease in financial support to our congregations.  It is core to our beliefs that all should be able to worship freely together and that we should be able to help all those in need, and the change in policy has made it impossible for us to live out those beliefs.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/20/2025

Respectfully submitted,

DocuSigned by:

*Jennifer Reddall*

EDFFB9904AC94430...

The Rt. Rev. Jennifer Reddall

# EXHIBIT 19

Docusign Envelope ID: 806607DD-5984-463A-8382-42133A5887CB

Case 1:25-cv-00403-DLF   Document 11-22   Filed 02/21/25   Page 2 of 5
USCA Case #25-5209   Document #2136370   Filed: 09/22/2025   Page 132 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                             Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF THE RIGHT REVEREND DAVID C. RICE
## ON BEHALF OF THE EPISCOPAL DIOCESE OF SAN JOAQUIN AND ST. JAMES
## EPISCOPAL CATHEDRAL SUPPORTING PLAINTIFF THE EPISCOPAL CHURCH

I, the Right Reverend David C. Rice, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Bishop of the Episcopal Diocese of San Joaquin, a role I have held since 2017. As the Bishop I am also the *ex-officio* President of St. James Episcopal Cathedral in Fresno, California ("Cathedral") with general oversight of the Cathedral, and I have served in that role since 2017. The Cathedral has been part of the Episcopal Diocese of San Joaquin (which is part of The Episcopal Church) since its inception.

2. Welcoming the stranger—including our immigrant neighbors—is central to our faith and practice. We believe that we are called to care for immigrants. The first testament (also known as the "Old Testament") repeatedly commands us to "love foreigners because you were foreigners in Egypt (Deuteronomy 10:18-19). Likewise, in Matthew, Jesus, who would have been raised on the aforementioned scriptures, teaches his followers that we should welcome the stranger because "I was a stranger and you welcomed me" (Matthew 25:31-40). Our Holy

App. 247

Scriptures, which comprise both the first and second testaments (Old and New) teach us that hospitality is an important value, that God loves and welcomes the stranger and defends their cause, and that to withhold justice from widows, orphans, and the stranger is against the will of God.  As Episcopalians, our faith is also deeply rooted in the Baptismal Covenant found in the Book of Common Prayer.  This covenant calls us to resist evil, proclaim the Good News of God in Christ, to seek and serve others, as well as to love them, and to strive for justice and peace, and respect the dignity of every human being.  We believe that the Scriptures and the Baptismal Covenant make it clear to us that no human being is "illegal" that everyone is a beloved child of God, and therefore we are called to love our neighbors as ourselves.  That love is manifested in acts of kindness, mercy, justice and peace.

3.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our Cathedral is at imminent risk of an immigration enforcement action.

4.    The Cathedral is located in an area with many immigrants.  This part of California is primarily agriculturally focused, and the nearby farms and ranches employ and house a number of immigrants, documented and undocumented.  There have been recent Immigration and Customs Enforcement ("ICE") raids in Fresno and the surrounding small towns.

5.    We have many immigrant members of the Cathedral, including those who are undocumented.  One of our Sunday services primarily serves a Spanish-speaking group, including immigrants from Mexico, Columbia, El Salvador, Venezuela, and Peru.  Our priests provide ministry to all, regardless of status, and in fact, our Spanish-speaking priest was asked by

a congregation member to attend his deportation hearing in support of his case to remain in the United States.

6.  Our Diocese is a Diocese of Holy Welcome and Advocacy, and we engage in extensive social services as part of that mission.  We have offered Know Your Rights workshops, immigration clinics, and pathway to citizenship programs to immigrants in the community, and these programs have welcomed the documented and undocumented alike.  We also have a monthly food pantry that serves elderly, unemployed/underemployed, unhoused, and immigrant community members.  The food pantry is hosted on the Cathedral campus and run by the clergy and volunteers of the church and community.

7.  An immigration enforcement action at the Cathedral will substantially burden our religious exercise by preventing us from carrying out our mandate to love our neighbor as ourselves, the teachings of Jesus in the Sermon on the Mount (Matthew 25), and our Baptismal Covenant (to strive for justice and peace, and to respect the dignity of every human being).  A raid represents a direct attack on our foundational values and an infringement on our protected religious freedom and practice, and it will essentially shut this congregation down.

8.  Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  Our congregants are afraid of coming to church or our programs because they are afraid of being detained, harmed, separated from their families, and deported by ICE.  We are already seeing fewer people at our Sunday Spanish-language service, and we are considering whether we will need to shut down that service because of lack of attendance.

9.  We have also had to restructure our Farm Worker ministry because the farm workers are too afraid of ICE to come out, and we are considering pausing it entirely.  We have already had to reconfigure our food pantry to help protect those at risk, including ending our social media

advertisements and developing trainings for our volunteers on how to respond should there be a raid.  And we are stopping any immigration clinics, Know Your Rights workshops and pathway to citizenship programs out of fear that ICE could show up.  The fear of ICE enforcement action prevents all of us from exercising the ministry that we have been called to by Jesus—to love our neighbor, to care for the vulnerable, to seek justice and peace, and to respect the dignity of every human being.  Cutting back on worship services and church activities will restrict the development of the spiritual lives of all congregation members, not just immigrant communicants.  In many ways, this bankrupts our mission and mandate as Christians and particularly as Episcopalians, given our Baptismal Covenant to serve others.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

439D3ACDB8DE4D0...

_____

The Right Reverend David C. Rice

# EXHIBIT 20

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

     *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

     *Defendants.*

Civil Action No. 1:25-cv-00403

### DECLARATION OF THE RIGHT REVEREREND LUCINDA ASHBY
### ON BEHALF OF THE EPISCOPAL DIOCESE OF EL CAMINO REAL
### SUPPORTING PLAINTIFF THE EPISCOPAL CHURCH

I, the Right Reverend Lucinda Ashby, upon my personal knowledge, hereby submit this

declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.   I am the Bishop of the Episcopal Diocese of El Camino Real, located in California, and I

have served in that role since 2020.

2.   Our Diocese feels a strong obligation to welcome and care for our immigrant neighbors.

Matthew 25 tells us to "feed the hungry, clothe the naked, visit the sick and imprisoned, and

welcome the stranger." And our Baptismal Covenant says that we are to "seek and serve Christ

in all persons, loving our neighbor as ourselves." Those commands are echoed on our Episcopal

Church signs, which say, "The Episcopal Church Welcomes You." That is both a commitment

and a challenge for all of us. For us, it is not a matter of documentation or legal status, but of

humanity, seeing Christ in the face of all those we serve.

3.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive

locations policy as part of its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that our Diocese is at imminent risk of an immigration enforcement action.

4.   Our Diocese is located in a major agricultural valley that is home to many immigrants, documented and undocumented.  In the past few weeks, ICE has been in the towns and cities where several of our churches are located, conducting raids.  We have seen an ICE presence outside some of our churches, and in early February, ICE agents showed up outside the Food Pantry at one of our congregations and took pictures of people who were in line to receive food. Many people left quickly, without staying to receive their food.

5.   Our Diocese is home to many immigrants, from places as diverse as Mexico, Colombia, the Philippines, China, India, and England.  Some of those members are documented, while others are undocumented—and some of those who are undocumented have a final order of removal against them.  We also have a number of leaders, both clergy and lay, who are themselves immigrants.  Several have told me directly that their own or their spouse's status in this country has been threatened by the new Trump Administration's immigration policies.

6.   Since at least 2018, congregations in our Diocese have engaged with, advocated for, and served immigrants to our country, no matter their legal status.  Many of our congregations host social services like Food Pantries, Thrift Stores, and classes that serve people in the community—including immigrants, regardless of their status.

7.   An immigration enforcement action at one of our churches will substantially burden our religious exercise by preventing us from carrying out our mission to welcome and serve all immigrants.  A raid will most surely be a direct attack on one of our foundational values— welcoming the stranger and upholding our Baptismal Covenant.  It will also be an infringement on our protected religious freedom and practice.

Docusign Envelope ID: 96D39405-7567-4845-B67E-58BE54942D9C

Case 1:25-cv-00403-DLF    Document 11-23    Filed 02/21/25    Page 4 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 139 of 398

8.   Indeed, DHS's new enforcement policy is already substantially burdening our religious

exercise.  In several congregations, our clergy report that people have stopped coming to church

for fear of the raids.  They do not believe the church is a safe place anymore for them, their

families, or their friends.  Some worship services are being held with very few attendees, and

people are not coming for baptisms or quinceañeras.  Some of our leaders, both clergy and lay,

are themselves frightened for their own legal status, even those who are currently documented.

Immigrants are also leaving our social service ministries and not returning out of fear of ICE.

We have already begun to make changes in order to protect some of our people, such as moving

to smaller groups that meet in private settings.  We have also changed the way we handle social

media and other publicity to ensure that people are not being exposed.  What is happening is

cruel, unnecessary, and completely anathema to our calling as followers of Christ.  Because we

cannot worship with all those in our communities or effectively serve the vulnerable and those in

need, we are unable to live our Baptismal Covenant.

   I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/20/2025                                Respectfully submitted,

                                                 DocuSigned by:

                                                 *Lucinda Ashby*
                                                 A19EF66013724A9...    _____
                                                 The Right Reverend Lucinda Ashby

# EXHIBIT 21

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF STEPHEN REEVES, EXECUTIVE DIRECTOR OF PLAINTIFF FELLOWSHIP SOUTHWEST

    I, Stephen Reeves, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I am the Executive Director of Fellowship Southwest ("FSW") and have served in that role since March 2021.

    2.  I make this statement based upon personal knowledge, files and documents of FSW that I have reviewed, and information supplied to me by members of FSW whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting FSW business.

    3.  FSW was founded in 2017 by the Cooperative Baptist Fellowship. In 2021, we became an independent, ecumenical, Christian nonprofit entity with numerous denominations represented on our Board and among our member churches. FSW is headquartered in Dallas, and our member churches are located primarily in Texas, Oklahoma, New Mexico, Arizona, and Southern California.

App. 256

4.    Our basic mission is to help Christians and churches practice compassion, pursue justice, and build new connections across racial and denominational boundaries.  We focus on four areas of compassionate mission work and advocacy: immigration, racial justice, Native American justice, and hunger.  Immigration is our most active area of work, which includes establishing and supporting a network of churches, ministries, and pastors serving migrants on the U.S. southern border.

5.    At FSW, we firmly believe that Christians are called to love their neighbor (Matthew 22:39, Mark 12:31) and welcome the stranger (Matthew 25:35, Exodus 23:9, Deuteronomy 10:19, Leviticus 19:34, Deuteronomy 27:19), regardless of legal status.  We also believe that Christians are called to do justice (Micah 6:8) and relieve suffering. Together, these commands instruct us to serve our immigrant and undocumented neighbors and welcome them to worship with us, and to advocate for changes in systems to promote justice.  Our member churches are committed to this vision and mission, and all of FSW's communications make clear that we hold a faith-based commitment to serving immigrants and migrants.

6.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that FSW members are at imminent risk of immigration enforcement activity at their churches.

7.    FSW has member churches located along the border and near ports of entry, including in El Paso and Brownsville, Texas.  FSW also has member churches located in large cities with significant immigrant populations, such as San Antonio, El Paso, Houston, Dallas, and Fort Worth, Texas.  I have seen media reports that Immigration and Customs Enforcement ("ICE") has conducted raids or enforcement actions in each of these cities in recent weeks.

8.    Some of our member churches have congregations comprised of nearly all immigrants from Latin America.  For example, nearly 100 percent of congregants are immigrants at one of our member churches in Brownsville, Texas.  Another in Fort Worth has an approximately 90 percent immigrant congregation, and that church is also led by a pastor who is an immigrant. The immigrant congregants in our member churches have various immigration statuses—some asylum seekers, some here on visas, and others undocumented.  And I am aware of at least one member church with a congregant who was deported.

9.    In addition to worship services and activities, some of our member churches provide social service ministries that serve both documented and undocumented immigrants, including ESL classes, citizenship classes, low-cost immigration legal services, health fairs, and food and clothes distribution. These ministries are considered part of the churches' mission to love and serve all as Jesus did.

10.   The above-referenced church in Brownsville has social service ministries in its church building that include a soup kitchen and a clothes closet, and it also serves released asylum seekers as well as those recently released from immigrant detention by providing them with water, food, clothing, hygiene kits, and rides to the airport.  These programs serve primarily immigrants, and although the church does not ask about status, it knows that some of the people it serves are undocumented.

11.   The above-referenced church in Fort Worth has provided an array of social services to both documented and undocumented immigrants at different times, such as food, toys, backpacks, coats, accompaniment, water, charging stations, health fairs, ESL classes, and educational and immigration forums.

3

App. 258

Docusign Envelope ID: D3DAC593-5607-44DB-828E-4CDB4E75FEA8

Case 1:25-cv-00403-DLF    Document 11-24    Filed 02/21/25    Page 5 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 144 of 398

12. Another member church in San Antonio participates in social service ministries that serve both documented and undocumented immigrants, including publicly advertised ESL classes. And yet another member church in Waco, Texas, operates a hospitality house for asylum seekers who have recently entered the United States as part of its ministry work.

13. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our churches' religious exercise by preventing them from worshiping together freely and peacefully as a congregation in a place they consider sanctuary, and from welcoming the stranger as they feel so called.  Similarly, any immigration enforcement action taken at or near the churches' outreach ministries will impede their mission of serving their most vulnerable neighbors, including undocumented immigrants, whom they seek to embrace and assist as a demonstration of God's love.

14. DHS's new enforcement policy is already substantially burdening the religious exercise of our member churches.  Several pastors have contacted me to report that their congregants and people they serve are confused and asking if it is safe to attend church; they have also reached out to ask how to protect their churches from intrusion and interruption.  Many of our churches feel a particular calling to minister to and serve their most marginalized neighbors, and they will not be able to do so should undocumented immigrants or asylum seekers not feel safe enough to come to their church.  And at least one of our member churches, the above-mentioned Fort Worth church, has already reported a decline in attendance at worship services.  Likewise, at least one of our member churches, the above-mentioned San Antonio church, has already reported a decline in participation in its social service ministries.

15. Moreover, the looming threat of an enforcement action on church property puts our member churches in the impossible position of choosing whether to freely carry out their

4

Docusign Envelope ID: D3DAC503-5607-44DB-828F-4CDB4E75FEA8

Case 1:25-cv-00403-DLF    Document 11-24    Filed 02/21/25    Page 6 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 145 of 398

religious mission while placing congregants and those they serve at risk of arrest or deportation, or to change the way they worship and conduct their outreach ministries in an effort to protect their immigrant neighbors in accordance with their faith. Either of these options violates the churches' religious beliefs.

16. Some of our member churches are implementing or considering changes to the way they operate to protect their neighbors, for example, by being less public about the services they provide to the immigrant community and cutting back on outreach efforts, or training and stationing ushers, deacons, or other volunteers at the front door. The above-mentioned church in Fort Worth, for example, is considering many such changes, along with a possible private streaming options or direct visits to those too afraid to come to church, and has already had to cancel mission trips and activities due to fear of immigration enforcement action. And the above-mentioned church in San Antonio, as another example, has begun locking outside doors during outreach ministries.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Stephen K. Reeves*

93B9CF4148C9464... _____

Stephen Reeves

# EXHIBIT 22

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                                  Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## <u>DECLARATION OF REVEREND JOHN DOE # 6 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF FELLOWSHIP SOUTHWEST</u>

I, Reverend John Doe # 6, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as senior pastor for a church located in Brownsville, Texas. My church is a member of Plaintiff Fellowship Southwest ("FSW"), which has supported our direct service ministry work among migrants for the last six or so years.

2. I wish to submit this declaration anonymously out of fear that if my church is identified, it will be targeted by U.S. Immigrations and Customs Enforcement ("ICE") or U.S. Customs and Border Protection ("CBP").

3. As a church, we believe that ministering to and serving immigrants, regardless of their documentation, is a Biblical mandate (Psalm 146:5-9, Deuteronomy 10:17-19, Exodus 22:21, Jeremiah 22:3, Leviticus 19:33-34, Ephesians 2:14-19.)

4. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.   Our church is located mere blocks from the border and less than a mile from a port of entry.  I understand from media reports that there have been immigration raids in recent weeks in Brownsville, which has a substantial undocumented immigrant population.

6.   Nearly 100 percent of our congregants are immigrants, primarily from Nicaragua, El Salvador, Mexico, Guatemala, and Honduras.  Some of them are undocumented, and in the past, several of our congregants have been the subject of immigration enforcement action.  Some members of our church also work for DHS, ICE, and CBP.

7.   Moreover, in furtherance of our mission to welcome and serve immigrants, our church provides a variety of social service outreach ministries that serve immigrants. Although we do not ask those we serve if they are undocumented, we know that some of them are.  These outreach ministries are the backbone of what we do, and they include a soup kitchen and a clothes closet at our church building, along with distribution in a plaza downtown and across the street from the port of entry.  We communicate with CBP/ICE officials to provide services to recently released asylum seekers and those released from detention, whom we offer water, food, clothing, hygiene kits, and rides to the airport.  We also have two buildings on our campus where asylum seekers may stay, from a night to several weeks, before traveling to their final destination, usually a sponsor, in the U.S.

8.   We have assisted over 91,000 migrants in the past six years, and we have seen over 26,000 come to faith in Christ through our ministry of hospitality.

9.   We communicate our church's status as a welcoming place for immigrants, regardless of legal status, on our social media, and our ministry work has been featured by, and I have been

2

interviewed in, numerous TV news stories in both national and local media as well as Spanish media outlets.

10. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our religious exercise by traumatizing our congregation and disrupting our ability to worship freely and peacefully in a place we consider sacrosanct.  Similarly, an enforcement action during one of our social service ministries will destroy the trust we have built in our community and deter those we serve from engaging with our church for fear for their safety, thwarting our religious mission of serving and loving our neighbors.

11. Our members have already expressed fear about coming to church, and I expect attendance will be reduced to almost 25 percent.  If our congregants stop participating in church services and activities, it will hinder our mission of worshiping together and welcoming all to our church, and it will negatively impact our evangelical efforts.  Likewise, the people we serve through our ministries are fearful of enforcement action under DHS's new policy.  A decrease in participation in these ministries will hinder our ability to carry out our religious mission and will also likely cause us to lose financial contributions.

12. DHS's new enforcement policy is already substantially burdening our religious exercise. Although cutting back on our worship services or social service ministries would violate our religious beliefs, if we continue to welcome and serve undocumented people at our church, we will be exposing them to arrest and deportation, which is also antithetical to our religious beliefs.

I hereby declare under penalty of perjury that the foregoing is true and correct.

3

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*John Doe #6*

A88C6C3070AF48F...

Reverend John Doe # 6

4

# EXHIBIT 23

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF REVEREND JOHN DOE # 7 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF FELLOWSHIP SOUTHWEST

    I, Reverend John Doe # 7, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I serve as senior pastor for a church located in Fort Worth, Texas. My church has been a member of Plaintiff Fellowship Southwest ("FSW") for about five years.

    2.  I wish to submit this declaration anonymously out of fear that if my church is identified, it will be targeted by Immigrations and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

    3.  Our mission as a church is to serve our community and to reach lives for Jesus. We believe that all human beings are created in the image and likeness of God. We affirm that God loves every person unconditionally and call upon ourselves to love all people—regardless of their identity, past actions, or whether they are documented or not. As Galatians 3:28 reminds us: "There is neither Jew nor Gentile, neither slave nor free, nor is there male and female, for you

are all one in Christ Jesus." This scripture calls on the Church to embrace everyone without discrimination, rejecting all barriers that may divide us.

4. God has also entrusted us with the ministry of reconciliation—reconciling the world to Him. Nowhere in Scripture are we called to screen or vet others before extending love and care. In Matthew 25, Jesus makes it clear that His followers are called to serve the vulnerable as though serving Him directly. We are called to care for the immigrant, regardless of their status, as if we were serving Christ Himself. This is the mission of our Church: to love, serve, and stand with all people in the name of Christ.

5. Our slogan is "A church for everyone" ("Una Iglesia para todos"). We speak Spanish and, as discussed below, most of our church members are immigrants. When we have forums or anything specifically for the immigrant community, we invite all to come.

6. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

7. Fort Worth has a substantial undocumented immigrant population, and there have been immigration raids here in recent weeks.

8. About 90 percent of our congregants are immigrants from Mexico, Honduras, El Salvador, Nicaragua, Colombia, Venezuela, Argentina, and Paraguay. At one time, most of our members were undocumented, but through the years, some have been able to obtain legal status. We have several DACA recipients; others are a mixture of parolees, asylum seekers, TPS beneficiaries, residents, and people with student or work visas. About 30 percent of our church

2

is still made up of undocumented immigrants, however, and about 90 percent of our congregants have family members that are still undocumented.

9.    Several family members of our church community have been targeted by ICE.  In one heartbreaking case, the sister of one of our members was deported after being a victim of domestic violence.  When she defended herself, she was charged with assault and ultimately deported.  Sadly, this is not an isolated incident.  Other congregants have arrested by ICE, and still others have been deported.

10. Moreover, in furtherance of our religious mission to serve our community without reservation or judgment of the person who seeks help, we provide an array of social services at different times, such as food, toys, backpacks, coats, accompaniment, water, charging stations, health fairs, ESL classes, and educational and immigration forums.  We have had migrants live at our church as they saved up enough to live on their own.  We serve people regardless of documentation: All are humans, and we only desire to meet basic needs.  Among our social service recipients, we know of several who have been arrested by ICE and have received communications or even visits from ICE.  Some have not ended up arrested, but others have and have been deported.

11. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our religious exercise by desecrating our sacred space and severely compromising our sense of safety, sanctuary, and freedom to worship together as a congregation.  Similarly, an enforcement action during one of our outreach ministries will jeopardize our ability to carry the social and evangelical work we feel called to do as Christians by destroying the trust we've built within the community and seeding fear among those we aim to serve.

12. As followers of God, we firmly believe in loving our neighbor.  When our neighbor is in need, unprotected, and when their safety is in danger, we have a duty as the church to act and show our faith to our neighbor and those who are hurting.  Our neighbors are everyone who is created in the image of God, regardless of their background.  Our mission is to spread the Gospel to everyone around us, starting with our community.  Our mission is hurt by the church being a place where ICE agents are now able to enter and target our people.  If the safety of our community is at risk because the government has decided that our neighbors are not welcome, that is going against the mission of the church and goes against everything that we stand for as believers.  For that reason, as a nation that proclaims that we believe in God, we must remember that the Bible teaches us about loving foreigners and not mistreating them (Exodus 22:21). Exodus 23:9 teaches us to have empathy because we are all foreigners. Deuteronomy 10:18-19 talks about our responsibilities towards foreigners; to give them clothing and food and love them because we were all once foreigners.  The Bible also teaches to practice hospitality (Hebrews 13:2).  As a congregation, we cannot carry out our mission if we remain silent and ignore the needs of our most vulnerable neighbors.

13. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the policy was announced, we have seen a decline in attendance at our Sunday services. We have started to get calls and messages from congregants who are afraid that the church will be targeted, and some have indicated that if things remain as they are, they may limit the places they attend, including church services.

14. We are now forced to choose between canceling or limiting our church and ministry activities or instead exposing our immigrant neighbors, whom the Bible calls on us to protect, to

ICE/CBP action when they visit our church.  Neither option is conscionable or in line with our religious beliefs.

15. In order to protect our immigrant neighbors, our church has already had to modify planned activities due to safety concerns, and is considering a variety of changes to the way we conduct our services and activities.  We have begun planning to have an appointed person at the door to stand guard and alert the congregation if ICE shows up.  In addition, we are considering restricting how much information we share publicly about our services and our activities.  At the moment, we have started communicating more through a private, members-only messaging app to keep our congregants informed about church activities and announcements.  This undermines our religious mission because our intention is for more people to know about Jesus, not restrict who can come to a church service.

16. Finally, we will likely need to start planning on conducting more private streaming of our services and finding creative ways to keep our members engaged and receiving the care that they would if they were attending church in person.  But we know from COVID that remote options are not ideal and that there are serious implications for a person's mental and spiritual health if they are not connected to a church community.  Thus, we are also considering sending more people to visit those who do not attend church out of fear of ICE showing up, which will take up more church resources.

17. We have always wanted our church to be a safe space for everyone; that is our motto. We want every person to feel welcome and feel like they have a family they can rely on.  We must protect our congregants and keep providing them a safe space for them to feel supported and welcomed.  We have seen what these types of policies do to our congregation and do not want any more harm to be caused if this continues to stay in place.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Reverend John Doe # 7

# EXHIBIT 24

Docusign Envelope ID: FB242961-D2AE-4D35-B7B0-9053A806474D

Case 1:25-cv-00403-DLF     Document 11-27     Filed 02/21/25     Page 2 of 6
USCA Case #25-5209     Document #2136370     Filed: 09/22/2025     Page 159 of 398

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                                        Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF BARRY CROSSNO, GENERAL SECRETARY OF PLAINTIFF FRIENDS GENERAL CONFERENCE

    I, Barry Crossno, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I am General Secretary of Friends General Conference ("FGC") and I have served in that role since 2011.  I am the chief executive officer of FGC and manage all FGC's affairs.  I am also responsible for articulating FGC's vision and mission.

    2.  I make this statement based upon personal knowledge, files and documents of FGC that I have reviewed, as well as information supplied to me by FGC members whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting FGC's business.

    3.  FGC was founded in 1900 and is a conference of 16 regional Quaker organizations (called yearly meetings) and 12 directly affiliated congregations (called monthly meetings).  We are headquartered in Philadelphia, Pennsylvania, and our yearly and monthly meetings are based primarily in the United States and Canada.  The yearly meetings are composed of hundreds of

App. 274

Docusign Envelope ID: FB242961-D2AE-4D35-B7B0-9953A806474D

Case 1:25-cv-00403-DLF    Document 11-27    Filed 02/21/25    Page 3 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 160 of 398

local Quaker meetings and churches with approximately 30,000 total members and attenders. From the Quaker emphasis on the Divine presence in us all, and on the importance of community as a Quaker testimony, we are intertwined and harm to one of our meetings or congregations injures all the members of our association as a whole.

4.   FGC affirms that "there is that of God in everyone," meaning that everyone is known by God and can know God in a direct relationship.  Many of our spiritual practices and understandings are grounded in Jesus's teachings on compassion, peace, and justice.  As a result, we are very clear that all are welcome at Quaker worship, and that our principles of inclusion and welcoming make no distinction based on legal status.  This commitment arises from biblical teachings to care for strangers and foreigners.  There is widespread unity among FGC members in the belief that, consistent with our religious teachings and convictions, immigrants and migrants deserve care, opportunity, and dignity.  No matter their legal status, immigrants are welcome among Friends.

5.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement action.

6.   FGC has meetings across the country, including several in border-state cities, cities with large immigrant populations, and cities that have seen recent immigration enforcement actions. FGC meetings welcome all comers, including immigrants.  The Atlanta Friends Meeting, for instance, is located in Atlanta, Georgia, which has a large immigrant population and where the Immigration and Customs Enforcement ("ICE") field office has been very active.  A few weeks ago, ICE executed a widely reported enforcement action at a church, during religious services, in

Docusign Envelope ID: FB242961-D2AE-4D35-B7B0-9953A806474D

Case 1:25-cv-00403-DLF    Document 11-27    Filed 02/21/25    Page 4 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 161 of 398

a town less than ten miles away from the meeting house.  In addition, multiple FGC meetings count immigrants among their congregants; one meeting in New York state is composed almost entirely of Congolese immigrants.  Some members of our meetings have spouses without legal status.  In addition, Quakers have, for centuries, chosen to shelter distressed people as a matter of conscience.  In this tradition, many meetings have openly served as sanctuary locations for asylum-seekers and other immigrants.  ICE has previously targeted some of those individuals for deportation.

7.  Many FGC meetings are publicly involved in social justice issues through outreach ministries that are open to and serve immigrants regardless of documentation status.  These services work to provide things like food, clothing, and shelter at a meeting house.  One meeting in Southern California hosts Spanish-language worship groups; another in New Mexico provides on-site services to unhoused people regardless of legal status; and still others publicize their commitment and connection to immigrant relief efforts online or through the media.  The Atlanta Friends Meeting, in particular, hosts a ministry that provides food and legal advice to immigrants who are in removal proceedings.  That ministry is known both to the general public, including through online newsletters and highly visible signage outside the meeting house, and to the local ICE field office.  I have been told that some individual participants in social service ministries have been contacted by ICE about their immigration status.

8.  An immigration enforcement action taken during a meeting activity would harm FGC by interfering with a core Quaker practice of seeking and experiencing communion with the Divine through community and silent worship (called expectant waiting).  An enforcement action in a meeting house would violate the meetings' religious traditions of welcoming the stranger,

recognizing God in everyone, and creating a safe space for worship and Divine community. It would deprive us of the worship that is central to our spiritual practice.

9.  Likewise, an enforcement action directed at our meetings' outreach ministries will prevent them from carrying out our mission to welcome and serve all. Action by ICE or Customs and Border Protection ("CBP") at our meetings will prevent them from engaging in the tangible acts of social service. For the meetings that provide children's programming in their meeting houses, such as the Atlanta Friends Meeting and another New Mexico congregation, enforcement action would present a traumatizing disruption to their important religious education efforts.

10. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the rescission, multiple meetings have been grappling with their congregants' increased feelings of anxiety, unease, and lack of safety in their community. A congregant family at a Texas meeting has not attended services since the sensitive locations policy rescission, expressing their fear of being arrested and deported by ICE or CBP.

11. DHS's new enforcement policy also puts our congregations in the impossible position of choosing whether to freely carry out their religious mission while exposing their communities to the risk of an immigration enforcement action, or to instead change the way they serve and minister in an effort to protect those congregants. Either of these choices is inconsistent with our religious beliefs, and each carries with it practical and intangible spiritual harms to our member meetings.

12. Faced with this choice, some congregations are already making changes to the way worship and other services are conducted. The Atlanta Friends meeting is considering locking its doors during worship, a consideration that, it reports, makes it feel less safe in its community.

Docusign Envelope ID: FB242961-D2AE-4D35-B7B0-99E3A806474D

Case 1:25-cv-00403-DLF    Document 11-27    Filed 02/21/25    Page 6 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 163 of 398

A meeting in New Mexico is similarly considering controlling entrance to its meetinghouses. Both meetings recognize the negative impact on open and welcome community worship, which has long been Quaker tradition, that such decisions would have.  FGC is a community-centric denomination that makes our most important decisions collectively.  We believe that there is God in everyone and that the fullness of God can only be known through our collective experience.  By striking at our ability to minister and worship collectively, including with immigrants regardless of legal status, the policy rescission has had the overall effect of diminishing our opportunity to know God.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/21/2025

Respectfully submitted,

DocuSigned by:

*Barry Crossno*

7610A0040F8F45E...

Barry Crossno

5

# EXHIBIT 25

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MENNONITE CHURCH USA et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY et al., <br><br> *Defendants.* | Civil Action No. 1:25-cv-00403 |

## DECLARATION OF INTERIM CLERK JANE DOE # 8 ON BEHALF OF ANONYMOUS MONTHLY MEETING SUPPORTING PLAINTIFF FRIENDS GENERAL CONFERENCE

I, Interim Clerk Jane Doe # 8, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as Interim Clerk of a Quaker congregation (called a monthly meeting) in the four-state region of Intermountain Yearly Meeting that is part of the Friends General Conference ("FGC"). Our Monthly Meeting is also part of FGC.

2. I wish to submit this declaration anonymously out of fear that our congregation will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

3. It is a fundamental belief of the Society of Friends that there is "that of God" in each person. We are guided by teachings from Scripture, including the traditional Friends' testimonies of equality and community, as well as the many references in the Bible to welcoming the stranger. These beliefs lead us to work with, and for the dignity of, all people, regardless of

legal status.  Quakers have a long tradition of supporting, caring for, and providing sanctuary to immigrants, refugees, and other asylum seekers.  We continue that tradition to this day.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our meeting house is at imminent risk of an immigration enforcement action.

5.   We are located in a border state, and both the state and our city are home to large immigrant populations.  Many of those immigrants are undocumented.  We do not inquire about immigration status because we are welcoming to all, but we know several people in our meeting or associated with families in our meeting have had various histories of immigration, and at least one person associated with our meeting is known to be at risk of deportation.

6.   There is a history of ICE activity in our area; we specifically know of individuals who have been apprehended and deported during their routine ICE appointments.  In the past, we have observed DHS agents conducting surveillance near our location, and local law enforcement—who were known to cooperate with ICE—have used our parking lot as a resting area, purportedly for doing paperwork.

7.    Our meeting has long provided support for immigrants, including undocumented immigrants, as part of our efforts to assist those in need and to treat all, including migrants and refugees, with dignity and humanity.  We have also publicly committed ourselves and our meeting to offering sanctuary after seeking guidance of Spirit and encouraging all members and attenders to share their Light and understanding.  We have provided sanctuary to two members of our community, who were slated by ICE for deportation.  In one of those instances, it was

publicly reported that we provided sanctuary to a person at our meeting house. As a result, we are known to ICE.

8. Consistent with our core guiding testimonies of equality, community, peace, and integrity, we provide on-site services to unhoused individuals in our neighborhood. These services include providing visitors with essentials such as food, clothing, blankets, and tents or sleeping bags. Among those served are many who lack government-issued identification for various reasons, as well as many people of color. Although we do not inquire into immigration or citizenship status, we have been told by at least two individuals that they lack documentation. Indeed, it would be counter to our testimonies to deny service or welcome to anyone based on categories like race, nationality, country of origin, or immigration status. We make no distinction between human beings on those terms and believe that all are created equal, with an equal measure of "that of God within."

9. An immigration enforcement action at our meeting house will substantially burden our religious exercise by thwarting our mission to welcome, serve, and provide sanctuary for all people, including immigrants. Our worship consists of collective contemplation. We also run a concurrent children's program at our meeting house. An enforcement action at any time will be extremely disruptive of both activities and will damage the psychological and physical safety of our members and attenders. Enforcement during worship will destroy the sacred quality of our contemplative practice and spoken ministry that might arise.

10. DHS's new enforcement policy is already substantially burdening our religious exercise. Our meeting is very concerned about an unprovoked enforcement action during our religious services or other activities. Many members of our community are experiencing heightened fear and anxiety as a result of the policy rescission, negatively affecting the quality and freedom of

3

our engagement with each other and our practice of Spirit-led worship. As a result, we are considering reinstating a protocol for responding to enforcement actions during worship. We may also be forced to keep the doors of our meeting house locked and to screen everyone who enters, which diminishes the welcome offered to those who come to worship.

11. Our religious mandate centers on welcoming all with compassion, peace, and dignity. We seek to provide sanctuary for immigrants and refugees in need, regardless of legal status. The imminent threat of enforcement action contravenes these deeply held and longstanding commitments.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025                                   Respectfully submitted,

Signed by:

*Jane Doe #8*

2984E19B541949D...

Jane Doe # 8

4

# EXHIBIT 26

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## DECLARATION OF REVEREND JIHYUN OH ON BEHALF OF PLAINTIFF GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.)

I, Reverend Jihyun Oh, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Stated Clerk of the General Assembly of Presbyterian Church (U.S.A.) ("PCUSA").  I was elected to serve as the Stated Clerk by the General Assembly in July 2024.

2. I make this statement based upon personal knowledge, files and documents of PCUSA that I have reviewed, as well as information supplied to me by PCUSA members whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting PCUSA's business.

3. PCUSA is a national Christian denomination with nearly 1.1 million members in over 8,500 congregations.  Shaped by its Reformed theology, history, and representational form of leadership and governance, PCUSA, through its councils, faithfully works to serve Christ in the world through new and existing communities of faith, hope, love, and witness.  According to the

Foundations of Presbyterian Polity, these communities are to provide for "the shelter, nurture, and spiritual fellowship of the children of God," "the promotion of social righteousness," and "the exhibition of the Kingdom of Heaven to the world" (Great Ends of the Church, F-1.0304). In carrying out its mission, the church offers shelter, nurture, and fellowship for those who are vulnerable, including immigrants and refugees; promotes the health, safety, and well-being of all people; and seeks to exhibit the righteousness, justice, and peace of God's realm. Guided by our shared call to welcome the stranger and belief in the inherent dignity of all people, the General Assembly has directed the PCUSA to actively advocate for and work toward more just immigration laws and processes. The PCUSA Directory for Worship demonstrates that our service of God involves ministries of compassion, justice, and peace. God sends the Church to show compassion in the world: feeding the hungry, caring for the sick, visiting prisoners, freeing captives, sheltering the homeless, welcoming strangers, comforting those who mourn, and being present with all who are in need.

4.    Presbyterians believe that God speaks to us through the Christian Bible. Throughout the Bible, God tells us to extend hospitality to the stranger (or newcomer, or sojourner). In the Old Testament book of Leviticus, God commands us to love the alien as we love ourselves: "When an alien resides with you in your land, you shall not oppress the alien. The aliens who reside with you shall be to you as the native-born among you; you shall love the alien as yourself, for you were aliens in the land of Egypt: I am the Lord your God" (Leviticus 19:33-34). Similar Old Testament verses, in Exodus 22:21 and Deuteronomy 10:19, make it clear that God's people are to show justice, love, and hospitality to immigrants. In the New Testament book of Matthew, Jesus asks us to treat the immigrant the way we would treat Him. He identifies with the immigrant, saying, "I was a stranger and you welcomed me" (Matthew 25:35). As followers of

2

Jesus, we are to treat the newcomer in our midst as we would treat Jesus. The apostles urged the church to remain faithful in this ministry: "Do not neglect to show hospitality to strangers, for by doing that some have entertained angels without knowing it" (Hebrews 13:2; see also Romans 12:13).

5.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of an immigration enforcement action.

6.    Our 8,500 congregations are located across the U.S., including in cities along the U.S. border and locations where there has been a significant increase in Immigration and Customs Enforcement ("ICE") activity in recent weeks. A congregation in Nebraska, for example, has seen reports of ICE activity in both their own city and in neighboring communities, which have included the detention of some community members.

7.    Membership at a Presbyterian Church is open to individuals who join through a public profession of faith, a certificate of transfer, or a reaffirmation of faith. "True faith in Jesus Christ is the only condition for membership in this church" (Confession of Belhar, 10.3). Proof of immigration status has never been a requirement for membership in PCUSA churches. Immigrants with a variety of legal statuses lead PCUSA congregations and are members of numerous PCUSA congregations. Some congregants are undocumented, and some are facing removal orders. At one worshiping community in the Midsouth, almost all of the members are immigrants, and several members have pending immigration cases. Regardless of their immigration status, all of the individuals who join PCUSA are beloved members of the worshiping communities and congregations they attend.

3

8. PCUSA congregations also provide social service ministries on their campuses that are open to and serve immigrants regardless of documentation status. Numerous congregations provide housing and other assistance to immigrant families as they navigate various immigration processes. Those ministries include food and clothing distribution, schools, ESL classes, legal assistance, and job training services. A Presbyterian congregation in North Carolina, for example, offers ESL and GED classes, a Food Pantry, and Clothing ministries on its church campus. And a church in Nebraska hosts Spanish-language health seminars on its property.

9. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our call to gather as a whole people of God, including members of our community who are immigrants and without lawful status. It will prevent members from practicing their communal faith, which involves regular assemblies for the proclamation of the Word and celebration of the Sacraments. It will also interfere with our ability to discern God's will. A core Presbyterian tenet is group discernment. Members discern the will of God together as a body of believers. If they are afraid to gather, they cannot satisfy this tenet. Moreover, an immigration enforcement action at a church building would violate our sacred space, undermining its peace, safety and sanctity.

10. Likewise, enforcement actions targeted at social service ministries impede PCUSA's spiritual mission by violating the fundamental principles of sanctuary, mercy, and care for the vulnerable. Presbyterians, who are called by Christ to clothe the naked, feed the hungry, and welcome the stranger, will not be able to carry out Christ's teachings if people in need of those ministries are too afraid to come.

11. DHS's new enforcement policy is already substantially burdening our religious exercise. Attendance has declined at many of our congregations because of fear of ICE raids. For

example, a worshiping community in the Midsouth reports a decline in attendance of over half its families as a result of the new policy. Other congregations have had to adjust the way they conduct worship services. A congregation in the New England area has decided to end the livestream of their services for fear of drawing unwanted attention from ICE. Now homebound members of that congregation have no means of attending, and the congregation's witness to the larger community is diminished.

12. Other congregations have seen a drop in attendance at their outreach ministries, with some previously vibrant, robust outreach ministries having no participation at all. One of our congregations in Nebraska reports the indefinite end of their ministries of hospitality, as their Spanish-speaking siblings are now afraid to attend gatherings at a church building that may be entered by immigration enforcement. A church in the Mid-United States reports that the students in their education ministry are fearful and unable to concentrate, interfering with their educational mission. And a congregation in North Carolina has seen a roughly 50 percent decrease in attendance at their church food pantry, GED and ESL classes, and clothing ministry.

13. We, as believers, gather to worship, to discern God's will, to support one another, and to be sent in service as Christ's hands and feet in the world. This change in policy has dramatically affected our ability to gather in these ways that are integral to our faith expression.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

EE9F21FBF23F442...

Reverend Jihyun Oh

# EXHIBIT 27

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF PASTOR JOHN DOE # 9 ON BEHALF OF ANONYMOUS MEMBER CONGREGATION SUPPORTING PLAINTIFF GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.)

I, Pastor John Doe # 9, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I serve as pastor for a Presbyterian Church (U.S.A.) congregation in Nebraska.  We are a 500-member church that has an average of 275 people in worship on a Sunday morning.

2.  I wish to submit this declaration anonymously out of fear that our congregation will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

3.  We believe that part of practicing our faith is providing welcome and hospitality to all people and loving our neighbors.  The Bible consistently calls on God's people to extend hospitality to the stranger.  In Leviticus 19:33-34, God commands, "When an alien resides with you in your land, you shall not oppress the alien.  The alien who resides with you shall be to you as the native-born among you; you shall love the alien as yourself, for you were aliens in the land of Egypt: I am the Lord your God."  This passage makes it clear that God's people are to show

Docusign Envelope ID: E8C1792F-2CD1-48CC-88DC-2BEACEE08550

Case 1:25-cv-00403-DLF    Document 11-30    Filed 02/21/25    Page 3 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 177 of 398

justice, love, and hospitality to immigrants.  Jesus reinforces this teaching in Matthew 25:35, saying, "I was a stranger and you welcomed me."  Here, Jesus identifies himself with the stranger, calling his followers to see his presence in those who seek refuge and to welcome them with open arms.

4.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregation is at imminent risk of an immigration enforcement action.

5.  Community members in our city have had recent interactions with ICE, and ICE has detained some individuals.  There have also been increased verified reports of ICE activity in neighboring communities.

6.  We have an average of 100-200 immigrants on our church campus on a weekly basis.  Our congregation has a number of refugee families that are members.  Our ministry in the community also involves many Spanish-speaking immigrants.  Our congregation partners with our local health department to host Spanish language health seminars on our church property.  Our church was selected as the location for these seminars by leaders in the local Spanish-speaking community because they told the health department that they felt safe, comfortable, and welcome on our campus.  Additionally, our church hosts a Mexican folkloric dance troupe on our property twice weekly.  Offering hospitality to our immigrant neighbors and a space people feel safe to gather in to celebrate their culture and receive important health information is a core part of our ministry and how we practice our faith.

7.  An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our congregation by interfering with our religious practice of

Docusign Envelope ID: E8C1792F-2CD1-48CC-88DC-2BEACEE08550

Case 1:25-cv-00403-DLF    Document 11-30    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 178 of 398

worshiping in person together as a congregation, with all members of our community, including those who are refugees. It will also undermine the peace, safety, and sanctity of the space. Our church campus will cease being a safe place, and our siblings in the Spanish-speaking community of our town will no longer gather here. Our member's ability to follow God's repeated command to love the alien as ourselves will be rendered impossible. The government will have blocked our congregation from following God's will.

8. DHS's new enforcement policy is already substantially burdening our religious exercise. Our church hosts a Mexican folkloric dance troupe on our property twice weekly. On Monday, February 3rd, less than half of the dancers and their families attended the practice due to fear of an ICE raid on our church property. Earlier this month, they cancelled their dance practice due to fear of ICE raids on our church property. This limits our ability to offer welcome and hospitality and to share the love of neighbor with those participating in this ministry, impacting our ability to practice our faith.

9. There were also a series of Spanish language health seminars planned for this month at our church. Our mission committee planned to provide hospitality for the seminars as part of the practice of our faith. Based on feedback from the leaders of the Spanish-speaking community, the health seminars were postponed indefinitely due to the new DHS policy. This limits our church's mission and the ability for us to practice our faith through the offering of welcome, hospitality and sharing our love of neighbor in this ministry.

10. We pray that our church campus will once again be considered a safe space in the future. Our ministry to our siblings in the Spanish-speaking community will cease if we are no longer seen as a safe and welcoming space. Community members will lose access to helpful, live-saving health information. They will lose access to the fellowship and friendship enjoyed within

3

Docusign Envelope ID: E8C1792F-2CD1-48CC-88DC-2BEACEE08550

Case 1:25-cv-00403-DLF    Document 11-30    Filed 02/21/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 179 of 398

our campus.  Our members will be blocked from offering Christian hospitality.  They will be

blocked from following God's commands.  They will be blocked from Christian discipleship.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*Pastor John Doe #9*

94781DA570F240E...

Pastor John Doe # 9

4

# EXHIBIT 28

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF JANE DOE # 10 ON BEHALF OF ANONYMOUS CONGREGATION SUPPORTING PLAINTIFF GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.)

I, Jane Doe # 10, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am a member of a Presbyterian congregation in North Carolina. My congregation is a member of the Presbyterian Church (U.S.A.)

2. I wish to submit this declaration anonymously out of fear that my church will be targeted for immigration enforcement action.

3. We are a Matthew 25 church – called to feed the hungry, clothe those in need, care for the sick, and welcome the stranger. Jesus tells us in Matthew 25:35, "I was a stranger and you welcomed me." In the passage, Jesus is identifying himself with the stranger, calling us as his followers to see his presence in those who seek refuge and to welcome them with open arms.

4. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President

App. 296

Trump's second term, I have strong reason to believe that our congregation is at imminent risk of an immigration enforcement action.

5. North Carolina is a state with a large immigrant population and significant Immigration and Customs Enforcement ("ICE") activity, including several raids just this past week.

6. We are a large congregation, and some of our members are naturalized citizens. We welcome church visitors with no regard for their immigration status. Our congregation runs several outreach ministries in the local community. We offer English as a Second Language ("ESL") and Certificate of High School Equivalency ("GED") classes, a Food Pantry, and Clothing ministries on our church campus. The participants in these outreach ministries are majority Spanish-speaking and many are undocumented.

7. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our congregation by interfering with our religious practice of worshiping God through our outreach to our community. It will also undermine the peace, safety, and sanctity of our space. Our church campus will cease being a safe place, and our siblings in the Spanish-speaking community of our town will no longer partake of the food, clothing, and educational services our ministries offer. ICE activity on our church campus will interfere with our members' ability to follow the teachings of Christ and treat the stranger in our community as we would treat Him. The government will have blocked our congregation from following Jesus' teachings in Matthew 25.

8. DHS's new enforcement policy is already substantially burdening our religious exercise. The damage to our ministry is already felt and is ongoing. We have already heard participants in our outreach ministries making decisions about how to shift routines and limit outside activity out of fear of ICE, and we are starting to note a diminishing participation in our programs. Our

Docusign Envelope ID: 611FEEEF-49EC-5296-ABB3-AC7F92CD53A8

Case 1:25-cv-00403-DLF    Document 11-31    Filed 02/21/25    Page 4 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 183 of 398

church food pantry, which serves 280 families, has reported a roughly 50 percent decrease in people showing up to receive food.  People will go hungry as a result.  Attendance at GED and ESL classes was down 50 percent on January 29, 2025.  One GED student specifically mentioned not wanting to leave her house until patrol cars had left the area.  Others have indicated that they are too scared to attend class.  And on February 1, 2025, only 110 of the 250 people expected to receive clothing showed up to that ministry.  Even some of the community partners and volunteers who are not at risk of deportation but are immigrants, are afraid to gather in larger groups, even on our church campus, for fear of unwanted attention from ICE.  We are unable to follow the teachings of Jesus who told us to feed the hungry, clothe the naked, and welcome the stranger when they are too afraid of ICE activity on our church campus to come.

9.   Our ministry to our siblings in the Spanish-speaking community will cease if we are no longer seen as a safe and welcoming space.  Community members will lose access to helpful, life-sustaining food.  They will lose access to clothing.  They will lose access to ESL classes and other educational opportunities.  Our members will be blocked from offering Christian hospitality.  They will be blocked from following Jesus' teachings.  They will be blocked from Christian discipleship.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Jane Doe #10*

8408B717E85F41E...

Jane Doe # 10

3

# EXHIBIT 29

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

---

Civil Action No. 1:25-cv-00403

---

### <u>DECLARATION OF PASTOR JOHN DOE # 11 ON BEHALF OF ANONYMOUS WORSHIPING COMMUNITY SUPPORTING PLAINTIFF GENERAL ASSEMBLY OF THE PRESBYTERIAN CHURCH (U.S.A.)</u>

I, Pastor John Doe # 11, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.   I serve as pastor for a Worshiping Community of the Presbyterian Church (U.S.A.) ("PCUSA") located in the midsouth.  We serve up to 400 members who are connected to the 80 core families who participate in our activities.

2.   I wish to submit this declaration anonymously out of fear that my church will be targeted for immigration enforcement action.

3.   We believe in a God who sent Abraham to a country he did not know so that he could be a blessing there.  We believe in a God who migrated from heaven to live among us in human form as Jesus Christ—a God whose only Son entered life and immediately became a refugee fleeing Herod and seeking safety in Egypt.  God speaks to us through the history of God's people.  God sees us and loves us just as God did all those who sojourned throughout the Bible.

Docusign Envelope ID: AB5A53D6-8BA8-4363-81ED-1D03AD717BED

Case 1:25-cv-00403-DLF    Document 11-32    Filed 02/21/25    Page 3 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 186 of 398

4.  As Presbyterians, we believe that the Holy Spirit has made each member an overseer to care for the church of God.  As such, we gather to discern God's will in our lives and for the church as a body of believers.  Membership in our church body is not predicated on having obtained an immigration status.  "True faith in Jesus Christ is the only condition for membership in this church" (Confession of Belhar, 10.3).

5.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our Worshipping Community is at imminent risk of an immigration enforcement action.

6.  Immigration and Customs Enforcement ("ICE") activity has already increased in our members' neighborhoods, apartment complexes, homes, and at work sites.  Most of the members of our Worshipping Community, nearly 90 percent, identify as an immigrant—most adults being first generation and their children being second generation.  Several members have pending cases with immigration and have been notified to report outside of their regular appointments.  Members have been cooperating, reporting, and following the process asked of them.  Their cooperation has made them known to enforcement and now they are being asked to report outside of their normal appointments.  Members are traumatized and frightened.

7.  An ICE enforcement action conducted at our place of worship will injure our community by interfering with our religious practice of worshiping in person together as a congregation, with all members of our community, including those who are immigrants and without lawful status.  It will also undermine the peace, safety, and sanctity of our worshipping space.  Members will no longer have access to Christian fellowship and worship because their sacred space will have been rendered unsafe.  As a predominantly immigrant worshiping community, many of our

2

Docusign Envelope ID: AB5A53D6-8BA8-4363-81ED-1D03AD717BED

Case 1:25-cv-00403-DLF    Document 11-32    Filed 02/21/25    Page 4 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 187 of 398

members are far from home and have created a second family with those with whom they worship. When we gather, we glorify God, offer the comfort of the Gospel to one another, and become one another's siblings in Christ. When we gather, God works within us to give us what we need to sustain one another.

8. DHS's new enforcement policy is already substantially burdening our religious exercise. We have had a significant drop in our worship activities. Before the rescission of the sensitive locations policy, we regularly had 30 families in attendance. Now, we are only seeing about 8 to 10 families participating on a regular basis. Family attendance at worship has decreased by two-thirds. The members remember the devastation of the first Trump administration when families were separated, and community members were lost. They are re-experiencing that trauma anew. Parents are worried about the change in policy and afraid to participate in normal activities, including church activities—adjusting their schedules and the way they live. Children are showing signs of trauma again with trouble at school and trouble at home. Our members' need for pastoral care has dramatically increased and their ability to look to their fellow believers for comfort has diminished, as so many are now afraid to gather in a space they once thought of as safe.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:
John Doe #11
D6FBF538FCC3442...

Pastor John Doe # 11

# EXHIBIT 30

Docusign Envelope ID: 8096B97A-55EB-4757-AC21-CBDC277BB8B3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## DECLARATION OF GIOVANNI ARROYO ON BEHALF OF PLAINTIFF GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH

I, Giovanni Arroyo, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I currently serve as General Secretary for The General Commission on Religion and Race of The United Methodist Church ("GCORR").  I have served as the elected General Secretary of GCORR since 2021.

2.  I make this statement based upon personal knowledge, files and documents of the GCORR that I have reviewed, as well as information supplied to me by members of GCORR whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting GCORR's business.

3.  GCORR is one of 13 general boards and agencies of The United Methodist Church ("UMC"), all of which provide resources and services that equip local congregations and provide a connection for ministry throughout the world.  GCORR is the agency that is mandated to

challenge, lead, and equip the people of The UMC to become inter-culturally competent, ensure institutional equity, and facilitate vital conversations about religion, race, and culture. GCORR also assumes the responsibilities for such matters as, for instance, empowering visible and prophetic leadership at every level of the worldwide church with regards to race, ethnicity, and culture and identifying and responding to global racism, ethnocentrism, and tribalism in order for the denomination to more effectively move its mission forward in a diverse and global society. And GCORR administratively houses and provides oversight for The UMC's Plan for Hispanic/Latino Ministries, which is made up of over 600 Hispanic Latino United Methodist immigrant congregations and ministries.

4.  The UMC currently has about 5 million members in the United States who belong to about 29,000 congregations spread out across all 50 states.

5.  The United Methodist belief and tradition is based on the Judeo-Christian values that mandate care for immigrants by loving them as oneself and providing for their welfare instead of oppressing them (Leviticus 19:30), just as Jesus modeled. Indeed, Jesus identified with the immigrant and calls on Christians to provide hospitality to them (Matthew 25:38-40). The UMC and all its boards and agencies, including GCORR, affirm the worth, dignity, and inherent value and rights of *all* persons, regardless of their nationality or legal status. Church worship and all other services are offered to *all*, irrespective of legal status.

6.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that United Methodist congregations are at imminent risk of immigration enforcement action.

Docusign Envelope ID: 8096B97A-F5EB-4757-AC31-CBDC277BB8B3

Case 1:25-cv-00403-DLF    Document 11-33    Filed 02/21/25    Page 4 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 191 of 398

7.    There are many United Methodist congregations located along the U.S.-Mexico border (in Arizona, California, New Mexico, and Texas), as well as along the U.S.-Canada border.  In the last few weeks, Immigration and Customs Enforcement ("ICE") raids have taken place in many cities where churches are open for worship and provide social services to the community, including Phoenix, Arizona; Los Angeles, California; Atlanta, Georgia; and Tampa, Florida. United Methodist churches are often used every day of the week and therefore have a higher risk of being the subject of an immigration enforcement action.  And some congregations have already been targeted—First United Methodist Church of Germantown, in Philadelphia, Pennsylvania, experienced an ICE raid at the home of a congregant housing a family in sanctuary on behalf of the church.  The family was taken into custody as a result of the raid.  And a church in the Southeastern United States has already had ICE show up at its worship services.

8.    There are over 600 Hispanic United Methodist congregations and over 25 different ethnic United Methodist faith communities in the United States.  These congregations are largely made up of immigrants, most of whom are undocumented.  Many of these congregations worship and offer services in their native languages and are easily identified as "immigrant congregations," making them more visible to immigration enforcement authorities.

9.    Affirming that "the ministry of all Christians consists of service for the mission of God in the world," United Methodist churches serve their members and the community through feeding programs, early childhood education, soup kitchens, ESL classes, tutoring programs, after school programs, and many other forms of service to the community.  For example, First United Methodist Church of Germantown operates a Community Fridge on its property.  Many congregations provide services particularly intended to serve newly arriving immigrants as part of the biblical mandate to care for the stranger and the immigrant.  Direct services such as

3

App. 306

providing showers, food, care packages and backpacks with basic goods, and overnight lodging are commonly provided on church campuses, often by members who are immigrants themselves. For example, a church in the Southeastern United States houses individuals and families on church property.

10. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm United Methodist churches by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. Likewise, enforcement actions targeted at social service ministries impede the denomination's spiritual mission by violating the fundamental principles of sanctuary, mercy, and care for the vulnerable. The fear of ICE activity prevents congregations from carrying out their mission to minister to persons in the community where their church is located and to provide nurture to *all*.

11. DHS's new enforcement policy is already substantially burdening our religious exercise. Some local congregations have reported that attendance at worship services is down since the rescission of the sensitive location policy. Normal church programs such as Sunday School, Women and Men's ministries, committee meetings, and other regular church events are not happening, as people are not attending. A congregation in California has had many members stay home from worship service because they are afraid of ICE, and they are working on developing a strategy to have clergy take communion to those members' homes. First United Methodist Church of Germantown had immigrants stop participating in social services on church property and had to increase their budget to deliver food to immigrant families at their homes. Parents are particularly afraid of bringing their children to church. Many local congregations are reporting a loss of income, as fewer people are attending, leading to less money in the offering

plates.  Some congregations have paid to develop personal safety plans for an ICE raid; other

congregations are investing time to create plans on their own.  A California congregation has had

to spend money on extra staff to help with security.  And local United Methodist congregations

and local annual conferences are re-structuring budgets and looking for funds to provide legal

and social resources to members who are victims of ICE raids or arrests at churches.  Because of

the fear caused by the change in the sensitive locations policy, churches are not able to carry out

their biblically-mandated mission, as they must spread out their very limited resources to provide

needed resources such as trauma counseling for children who witness their parents being arrested

or detained and other emerging needs.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

Giovanni Arroyo

0EB00E6DCDCB4FC...

Giovanni Arroyo

5

App. 308

# EXHIBIT 31

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## <u>DECLARATION OF PASTOR ALISA LASATER WAILOO ON BEHALF OF FIRST UNITED METHODIST CHURCH OF GERMANTOWN SUPPORTING PLAINTIFF GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH</u>

I, Pastor Alisa Lasater Wailoo, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as lead pastor for First United Methodist Church of Germantown ("FUMCOG"), located in the city of Philadelphia. We are a member of The United Methodist Church ("UMC") and in turn, of the General Commission on Religion and Race, an agency of the UMC.

2. Our church is a multiethnic, urban congregation founded in 1796. We have been engaged in ministries of social justice for over 200 years, including housing families in sanctuary since 1985. Our membership is over 300, but we worship about 100 each week.

3. Scripture is unequivocal about God's expectation that we welcome the foreigner. Leviticus 19:34 puts it most succinctly: "The foreigner residing among you must be treated as your native-born. Love them as yourself…." But we could quote from numerous books of the Bible. None of those scriptures delineate between documented and undocumented residents, and

so neither do we.  This religious duty and honor is not only outlined in scripture, but in our denominational documents as well.  That includes the United Methodist Social Principles, which read: "We recognize, embrace, and affirm all persons, regardless of country of origin, as members of the family of God.  We affirm the right of all persons to equal opportunities for employment, access to housing, health care, education, and freedom from social discrimination. We urge the Church and society to recognize the gifts, contributions, and struggles of those who are immigrants and to advocate for justice for all."

4.    In sum, welcoming the non-native-born and supporting those seeking asylum is key to our central faith story.  Jesus, and therefore the salvation that comes through him, could have been stopped by a despot king if local Egyptians had not welcomed in Mary, Joseph, and their baby.  To be faithful, we must do the same.

5.     In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregation is at imminent risk of an immigration enforcement action.

6.    The church is located in a multi-ethnic urban area of a port city where an estimated 47,000 neighbors are at risk of deportation under these new executive orders.  Immigration and Customs Enforcement ("ICE") raids are already taking place around the state, including last week in the nearby neighborhood of Juniata Park.  In the past, our congregant's home and adjacent property, where we were housing a family in sanctuary, was raided, and the family was taken into custody.  ICE agents posed as friends coming to attend the 4-year-old child's birthday party, which is how they gained entrance into the home.

Docusign Envelope ID: B6A4CAD9-9ZD7-4C5A-A2D5-A8CCF3DB877C

Case 1:25-cv-00403-DLF   Document 11-34   Filed 02/21/25   Page 4 of 5
USCA Case #25-5209   Document #2136370   Filed: 09/22/2025   Page 197 of 398

7.  Our doors are open to everyone, and some members of our congregation are immigrants including those we have met through the Sanctuary movement.  Beginning in 1984, we housed, supported, and learned from a family from Guatemala throughout the eighties, until they officially received asylum in 1990.  That family is still an active part of our congregation.  We have hosted additional families over the years.  Each time, we became a hub for other congregations and community members who understand the divine commandment to welcome the stranger and love as we love ourselves.

8.  Our congregation also has numerous outreach ministries that support immigrants within our community.  The Germantown Community Fridge operates on our property, and we partner with them to offer food and prepared meals to local neighbors 24 hours a day, 7 days a week.  In addition, we offer educational opportunities to children and youth throughout the neighborhood and host several non-profits within the buildings on our campus, including those that provide counseling for victims of violence and survivors of breast cancer.  None of these organizations limit their services to documented residents.

9.  As a congregation, we have engaged and participated in visible advocacy work, including grassroots efforts like the Monthly Vigil urging the U.S. to change its policy toward Central America and advocacy efforts in support of the New Sanctuary Movement.  Everything we do— from our weekly worship to our press conferences we have held on the church steps—lets the community know we stand with undocumented individuals and families.

10.  An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our church by interfering with our religious mandate to worship in person together as a congregation, with all members of our community, including those who are immigrants and without lawful status.

Docusign Envelope ID: P6A4CAD9-97D7-4C5A-A2D5-A8CGF3DB877C

11. DHS's new enforcement policy is already substantially burdening our religious exercise. Threats of ICE raids are preventing people from joining our worship and receiving our services. The immigrants we serve as part of our outreach ministries are also being deterred from participating in the ministries. We have already had to increase our budget to cover food purchase and delivery to families who do not feel safe to come to church, but having to deliver to individual houses makes it much harder and more expensive to get food to those in need. We will find a way to serve people, but there will be a cost. This prevents us from fully living out our call to feed the hungry and all the other mandates of caring for those in need highlighted in Matthew 25. It directly hampers our free exercise of religion and undermines our ability to welcome foreigners and offer aid to those seeking asylum, as our faith unequivocally requires.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Alisa Lasater Wailoo*

DE233BEB568746F...

Reverend Alisa Lasater Wailoo

4

# EXHIBIT 32

Docusign Envelope ID: 23E801CE-5070-4D34-95D1-93DCA612555F

Case 1:25-cv-00403-DLF    Document 11-35    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 200 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF PASTOR JOHN DOE # 12 ON BEHALF OF ANONYMOUS CONGREGATION SUPPORTING PLAINTIFF GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH

    I, Pastor John Doe # 12, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I serve as lead pastor for a church in the Southeastern United States. We are a member of The United Methodist Church ("UMC"), and in turn, of the General Commission on Religion and Race, an agency of the UMC.

    2.  I wish to submit this declaration anonymously out of fear that if my church is identified, it will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

    3.  We believe and practice the biblical mandate to welcome the immigrant. Additionally, we oppose all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and families based on their status as migrants, immigrants, or refugees, as stated in the United Methodist Church Social Principles.

App. 315

Docusign Envelope ID: 23E801CE-5070-4D34-95D1-93DCA612555F

Case 1:25-cv-00403-DLF    Document 11-35    Filed 02/21/25    Page 3 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 201 of 398

4.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregation is at imminent risk of an immigration enforcement action.

5.    Our city is home to a number of immigrants, including undocumented immigrants.  Over the last few weeks, we have seen ICE enforcement actions in the city.  We know that ICE has already shown up at our worship services and waited for someone to exit the sanctuary.

6.    Our congregation has several active immigrant members from countries in South and Central America.  We also provide simultaneous English-Spanish interpretation during our worship service.

7.    Currently, we have two specific outreach programs in our church to support immigrants within our community.  One houses individuals and families on church property and welcomes *all* people, without regard to citizenships or immigration status.  The other provides free direct representation to children and their parents to assist with immigration cases, and is also administered on our property, currently serving over 150 children.  In addition to these programs, we have served as a sanctuary ministry that hosted an individual for 10 months and have hosted Know Your Rights workshops in partnership with immigrants' rights organizations.  We serve a large concentration of immigrants.  Hundreds of non-congregant immigrants who participate in in our social service ministries have received communication from ICE/CBP, are in removal proceedings, or have final orders.  Because of the nature of the social services we provide to the immigrant community, we know ICE is aware of our church campus.

8.    An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our church by interfering with our religious

Docusign Envelope ID: 23E801CE-5070-4D34-95D1-925CA612555F

Case 1:25-cv-00403-DLF    Document 11-35    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 202 of 398

mandate to worship together in person as a congregation, with *all* members of our community, including those who are immigrants and without lawful status.

9.   DHS's new enforcement policy is already substantially burdening our religious exercise. People are afraid.  Our phone is ringing with parents who are terrified of being detained and deported and being separated from their children.   We have already had to change our approach to hosting and advertising events.  For example, recently, we co-hosted a workshop that we would normally post publicly and invite all members of the public to, but we kept the event private and limited out of fear that we might put undocumented folks at risk.  As a result, we hosted fewer families than we had the capacity for.  We are already carrying a heavier burden in trying to serve our immigrant community because of the news of ongoing raids that are happening everywhere.

10. DHS's new enforcement policy is already making it harder for our church to live our mission and mandate as freely because we are not able to welcome "all" people.  Whereas we used to be public and vocal about the fact that we welcome all individuals, including the undocumented, we must now keep our services unpublicized even in church for fear of attracting ICE and its immigration enforcement activities.  To help alleviate some of the fear, the church is considering diverting some funds and resources to explore and develop a remote option for legal services.

11. All of the above have a devastating impact on our outreach ministry work and our ability to fulfill our religious mandate to welcome and serve our immigrant neighbors.  It is at odds with our religious mandate to be an open and welcoming space for all.

3

App. 317

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*John Doe #12*

6EA0E1949EC245A...    _____

Pastor John Doe # 12

# EXHIBIT 33

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF REVEREND CARLOS L. MALAVÉ, PRESIDENT OF PLAINTIFF LATINO CHRISTIAN NATIONAL NETWORK

    I, Reverend Carlos L. Malavé, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I am the President of the Latino Christian National Network ("LCNN") and have served in that position for ten years.  I am also an ordained minister with the Presbyterian Church (U.S.A.).

    2.  I make this statement based upon personal knowledge, files and documents of LCNN that I have reviewed, as well as information supplied to me by members of LCNN whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting LCNN business.

    3.  LCNN was founded in 1998 and incorporated as a 501(c)(3) non-profit in August 2001. We are registered in Orlando, Florida, and have members across the country.

4.  LCNN's mission is to work towards unity among Latino Christian leaders for the holistic transformation of our communities.  Our membership is composed of 80 Christian pastors and leaders, many of whom represent Latino denominational offices or national organizations.

5.  Advocacy for comprehensive immigration reform has been at the core of LCNN's work for the last 12 years.  We believe that for God there is no difference between immigrants, refugees, and those born in a particular country.  God is working through the church and other human institutions to remove any humanly constructed barriers that separate people, including physical boundaries.  These beliefs are rooted in biblical passages that instruct the people of God to welcome immigrants and refugees, including Leviticus 19:33-34: "When an alien resides with you in your land, you shall not oppress the alien.  The alien who resides with you shall be to you as the native-born among you; you shall love the alien as yourself, for you were aliens in the land of Egypt."  Our members and their respective churches and organizations agree on these basic principles.

6.  Our members promote these inclusive principles through preaching, teaching, and printed resources.  We also share these principles on our website and the websites of our member churches and organizations.

7.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that LCNN members are at imminent risk of immigration enforcement activity at their churches.

8.  LCNN members are located across the country, including in urban and border areas with high Latino populations.  Several of our members' churches are near the border in states like California and Texas, including in San Diego, Calexico, El Paso, Laredo, McCallen, Nogales,

and Douglas.  Several members are aware of recent ICE enforcement in their community,
including checkpoints near their churches.

9.    The majority of LCNN members lead Latino churches, with congregants from all over
Latin America, including Mexico, Guatemala, El Salvador, Colombia, and Venezuela.  Many of
these congregants are undocumented.  At one member's church in Indiana, at least 80 percent of
the congregants are immigrants, some of whom have requested pastoral support for immigration
legal assistance.  At another member's church in California, the pastor estimates that
approximately 50 percent of the congregants are undocumented.  A member in Florida has a
congregant who was recently informed, after spending 26 years in the United States and
beginning the process of obtaining legal status, that she would be deported within two weeks.

10. Many LCNN members provide social services as part of their church's ministry,
including ESL classes, food and clothing distribution, ministry for special needs individuals, and
classes on healthcare access and financial literacy.  These services target low-income Latino
families, without regard to an individual's nationality, economic, or immigration status.  Many
undocumented people participate in these programs.  LCNN members' churches have also
hosted and supported asylum seekers and unaccompanied minors who have crossed the border.

11. As a result of the mass arrest and deportation policy, the level of fear in the Latino
community is astronomical – including among Latinos who are American citizens by birthright.
Members of the LCNN community have been instructed to carry their birth certificates with
them everywhere to ensure against wrongful arrest, including Puerto Rican American citizens.
Local pastors have reported that their congregations are "scared to death."  One LCNN
member's church in Indiana reported that congregants have expressed concerns about public

3

visibility when attending social service ministries and asked whether it is safe to attend church events.

12. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden LCNN members' religious exercise by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status.  For many members of the network from the Anabaptist tradition, this intrusion echoes a long and horrible history of state persecution.  One LCNN member, a pastor in California, noted that many members of his community came to the United States from countries where government raids on places of worship are common and sought refuge here in order to be able to worship in peace.  Another LCNN member, a pastor in Indiana, similarly explained that given the high percentage of immigrant and mixed-status families in his congregation, an enforcement action will have a devastating emotional, spiritual, and psychological impact on congregants, creating fear, distrust, and lasting trauma.  Such government intrusion, both pastors expect, will deter church attendance and reinforce the belief that immigrants – even legal immigrants – are not safe anywhere, including in houses of worship.

13. Likewise, an immigration enforcement action directed at LCNN members' social service ministries will prevent them and their congregations from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to as part of their evangelical faith. As one LCNN pastor explained, social service outreach is a "direct manifestation of our spiritual calling," allowing us to "actively and tangibly live out our faith, offering hope and sanctuary to those often marginalized and underserved.  Immigration and Customs Enforcement ("ICE") activity targeted at those ministries will cause vulnerable community members to stop

participating, thereby preventing LCNN members from fulfilling their holy responsibility to care for their neighbors.

14. DHS's new enforcement policy is already substantially burdening the religious exercise of LCNN's members, imposing drastic limitations on their ability to carry out their religious obligations. Members' congregants have ceased attending church, opting to attend remotely where it is an option or not to attend at all. Many are abstaining from leaving the house for food, school, medical appointments, or other basic necessities out of fear of risking their freedom. At one member's church in California, attendance at the small business support program, which historically brought in over 100 participants, dwindled to only 25 in reaction to rumors about potential ICE raids.

15. The looming threat of enforcement action is presently forcing our members to make the impossible choice of either excluding undocumented people from church activities and social service ministries, or instead continuing to welcome them, thereby exposing them to arrest and deportation. Both options are unconscionable, as the Holy Scriptures instruct that there will be a final reckoning for those who had the capacity to provide for others but failed to fulfill that sacred commandment.

16. Numerous LCNN members have already begun to restrict worship opportunities to protect congregants. Throughout the country, LCNN members have begun closing worship services and/or moving them online. Regular weekly events at churches have been canceled. The LCNN member in Indiana, noted above, is reducing public advertising of his church's social services, with the consequence of making it more difficult for immigrants to find them, thus reducing the number of people to whom they can minister. Other services are moving to private

homes or offered on an appointment-only basis, therefore preventing some people from receiving timely assistance.

17. Although the primary effects of reducing programming will be on individual congregants, the limitations imposed on religious practice will also have a crippling effect on the financial and communal stability of our members' churches. The LCNN member in Indiana, noted above, reports that his church is now forced to reallocate time, money, and personnel away from worship and community service, towards necessary protective measures to mitigate the harm and fear created by the possibility of ICE enforcement. Other LCNN members have had to let go of their staff and seek new sources of funding to continue to carry out their religious mandate to serve all and do no harm.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

D80D5F264E354DB...

Reverend Carlos L. Malavé

6

# EXHIBIT 34

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

                                   Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

---

### DECLARATION OF PASTOR JOHN DOE # 13 IN SUPPORT OF PLAINTIFF LATINO CHRISTIAN NATIONAL NETWORK

    I, Pastor John Doe # 13, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.   I serve as lead pastor for a church located in southern California.  I am a member of the Latino Christian National Network ("LCNN").

    2.   I wish to submit this declaration anonymously out of fear that my church will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Patrol ("CBP").

    3.   My church is a community of bilingual, intercultural, and intergenerational Christ-followers invited to connect, grow, and serve with Christ in the barrios and cities that its members inhabit.  This leads us to denounce the injustices that impact our zip codes and to announce God's justice in the life, love, and teachings of Jesus of Nazareth.  By fostering holistic relationships with God, family, and neighbors, we seek to integrate Christian faith and social justice initiatives.  We believe that serving and ministering to immigrants, the poor, and all who are oppressed is central to being a follower of Jesus (Matthew 25:31-46).  We are called to

identify with and enter into solidarity with the poor, not simply to offer charity from positions of comfort.  The Christian responsibility to the poor is an essential aspect of the life of every believer who seeks a faith that works through love.  We see any attempt by governments to abridge or curtail these charitable responsibilities as violative of religious freedom.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that my church is at imminent risk of an immigration enforcement action.

5.   My church has approximately 150 current members of 16 different nationalities, coming from Mexico, Guatemala, El Salvador, Honduras, Colombia, Chile, Peru, Brazil, Costa Rica, Nicaragua, Puerto Rico, Taiwan, Hong Kong, China, Singapore, and Hungary.  Our congregation is intergenerational, representing a variety of migration statuses as well as second and third generation Americans.  In our city, there are approximately 11,000 undocumented individuals; one in five Latino households are "mixed status," including at least one undocumented person.  Our congregation includes many mixed status families, where parents are undocumented and children are U.S. citizens or DACA recipients, as well as entire families that are undocumented.

6.   My church has a long history of ministering to the undocumented community through social service ministries offered on our church property.  During the family separation policy under the first Trump administration, we began a day care center for unaccompanied minors along with a partnering organization which provided coordination with Department of Homeland Security and Refugee Resettlement office; several families in our congregation hosted minors separated from their parents in their homes after extensive background checks and efforts to comply with child- and foster-care regulations.  The program was discontinued after children

stopped being released during the COVID-19 pandemic. We currently host a food pantry that serves approximately 400 low and moderate-low income families, documented and undocumented, each week. As part of ministry to our community, we make the gym available to a local youth soccer team composed of Latino families with mixed migratory status. Additionally, we provide a special needs ministry to individuals and families with various disabilities, offering spiritual accompaniment, psycho-social education, and social gatherings. Undocumented members of our community are key recipients of this ministry. Lastly, we have an Alcoholics Anonymous chapter that meets once a week on our campus, which is open to all members of our community regardless of migratory status.

7.  As a church with a large immigrant community and an outspoken stance on immigration policy, we are a likely target for ICE or CBP disruption during our worship services and social service ministries. We are aware of raids within a 20-mile radius of our church, within the communities of many of our commuter congregants. There have also been ICE checkpoints in the vicinity of our church.

8.  An enforcement action during a worship service, religious ceremony such as baptisms, weddings, quinceañeras, and funerals, or other church activity will substantially burden my and my congregation's religious exercise by interfering with our religious mandate to worship and conduct religious ceremonies with all members of our religious community regardless of migratory status. By gathering together as Christians through historic Christian spiritual practices such as prayer, singing, bible study, storytelling, and communal meals, our faith is nurtured, hope is restored, and guidance in decision-making processes is provided (Acts 2:45-47; Hebrews 10:25). Meeting together has a direct correlation to living out our faith; when worship

Docusign Envelope ID: F5737126-F992-4ECA-8BA0-5464ABC42E5E

Case 1:25-cv-00403-DLF    Document 11-37    Filed 02/21/25    Page 5 of 7
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 215 of 398

and religious ceremonies are impacted and no longer able to be conducted with the right to safety

and religious freedom, one of our core tenets of faith is violated.

9.    An enforcement action during worship will also threaten and interrupt our sacrament of

the Lord's Supper, Communion.  This will prevent us from exercising the historical orthodox

Christian practice of sharing in the body and blood of Jesus.  As stated in our sacred text, "For I

received from the Lord what I also handed on to you, that the Lord Jesus on the night when he

was betrayed took a loaf of bread, and when he had given thanks, he broke it and said, 'This is

my body that is for you.  Do this in remembrance of me.'  In the same way he took the cup also,

after supper, saying, 'This cup is the new covenant of my blood. Do this as often as you drink it,

in remembrance of me.'  For as often as you eat this bread and drink the cup, you proclaim the

Lord's death until he comes" (1 Corinthians 11:23-26).  We will not be able to carry out the

Eucharist celebration, which will cause tremendous disorientation for our liturgy as well as for

ourselves as Christians.  The apostle Paul warns about taking communion without discernment

and self-examination: "those who eat and drink without discerning the body of Christ eat and

drink judgment on themselves" (1 Corinthians 11:27-32).  A raid in the middle of worship will

prevent this step in taking Communion and violate our sacred consciousness and moral compass

rooted in hope under the Lordship of Jesus Christ.

10. An enforcement action during our ministry work will prevent us from carrying out the

social and evangelical work we feel called to do as Christians.  If it is not safe for community

members to access our food bank or Alcoholics Anonymous chapter, we will be prevented from

putting our faith into practice by serving our neighbors.  Members of our special needs ministry

are particularly vulnerable to this restriction, as few services exist to replace what our ministry

provides.  These limitations will compound the trauma already present in our southern California

community, which has been affected by raging fires, further limiting the safe spaces that community members can access, such as weekly soccer practices on our campus.

11. DHS's new enforcement policy is already substantially burdening our religious exercise. The policy has already reduced the level of comfort with which congregants travel to and from church, and jeopardized the role of the church as a safe haven from worldly stress and anxiety. We have reduced advertising of events to ensure our congregants' safety and have established protocols to respond to ICE attendance at worship services. Some congregants, expressing profound stress and anxiety, have chosen to begin attending services online rather than risk commuting. This has a direct impact on our congregants' mental health across generations. Losing congregants' attendance does not merely injure them – it erodes our community's intercultural life and prevents us from honoring our core belief in the incarnation of Christ through physical presence.

12. We are now forced to choose between canceling or limiting our church and ministry activities or instead exposing our congregants and visitors to ICE/CBP action when they visit our church. Were we to choose to halt ministry to the immigrant community, we would be choosing to violate God's commands in favor of human ones. As our sacred text in Acts 5:29 states, "But Peter and the apostles answered, 'We must obey God rather than any human authority.'" Neither option is conscionable.

13. If we are unable to obtain a court order constraining ICE and CBP's authority to conduct immigration enforcement action at our church, we will be forced to change our church's practice and meet in a decentralized manner in order to protect our undocumented congregants and ensure their attendance. We will cease publishing our schedule and alter our meeting days. Meeting at multiple locations will increase rental costs; providing for closed Zoom attendance will increase

Docusign Envelope ID: F5737126-F902-4ECA-8BA0-5464ABC42E5E

Case 1:25-cv-00403-DLF    Document 11-37    Filed 02/21/25    Page 7 of 7
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 217 of 398

digital services costs and pull resources away from in-person programming for children.  In some

areas, we expect to cut back worship opportunities, particularly in-person opportunities,

altogether.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/20/2025                                     Respectfully submitted,

Signed by:

8A2462EAFD114D7...  _____

Pastor John Doe # 13

# EXHIBIT 35

Docusign Envelope ID: 88455198-2D47-4EC8-8125-A4B825B7B340

Case 1:25-cv-00403-DLF   Document 11-38   Filed 02/21/25   Page 2 of 7
USCA Case #25-5209   Document #2136370   Filed: 09/22/2025   Page 219 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

     *Plaintiffs,*

v.

                                   Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

     *Defendants.*

## DECLARATION OF REVEREND LAURA EVERETT, EXECUTIVE DIRECTOR OF PLAINTIFF MASSACHUSETTS COUNCIL OF CHURCHES

I, Reverend Laura Everett, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.   I am the Executive Director of the Massachusetts Council of Churches ("MCC") and have served in that role for 14 years.

2.   I make this statement based upon personal knowledge, files, and documents of MCC that I have reviewed, as well as information supplied to me by members of MCC whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting MCC business.

3.   MCC is an association of congregations and 18 denominations convinced that what binds us together in Christ is stronger than what divides us. As the nation's oldest state council of churches, MCC is the embodied expression of Christian unity in faith and witness across the Commonwealth of Massachusetts. MCC is headquartered in Boston, Massachusetts.

4.    Throughout its history, MCC has devoted itself to working for, and bearing witness to, the dignity and support of immigrants.  Indeed, MCC's commitment to serving and ministering to immigrants precedes its founding, through its predecessor bodies that provided direct services of pastoral care, feeding, counseling, literacy education, and housing to immigrant laborers.  To this day, MCC members offer educational opportunities, food and hygiene provision, and refugee resettlement services to the immigrant community.  MCC's core function of a "common Christian witness" has always included our witness of inclusion and care for immigrants.  This support, care, and ministry has never been governed by immigration status.

5.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that MCC members are at imminent risk of immigration enforcement activity at their churches.

6.    Many MCC member churches are based in areas with high concentrations of new immigrants, farm workers, and day laborers, including Lynn, Revere, Chelsea, East Boston, Mattapan, Roxbury, Plymouth, Chinatown (Boston), New Bedford, Fall River, Springfield, and Worcester.  Immigration and Customs Enforcement ("ICE") has conducted several widely reported enforcement actions across the state of Massachusetts where MCC churches are located. One member church in Boston reports that since January 20, 2025, ICE agents have conducted significant enforcement within two miles of their church and regularly stop shoppers outside the only supermarket in their neighborhood to "check their papers."  In Plymouth County, where several MCC member denominations have churches, the Plymouth County Sheriff's department actively contracts to provide detention facilities to ICE, leading churches in that county to feel especially vulnerable, nervous, and scared.

2

Docusign Envelope ID: 88455198-2D17-4EC8-8125-A4B825B7B310

Case 1:25-cv-00403-DLF    Document 11-38    Filed 02/21/25    Page 4 of 7
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 221 of 398

7.    Our member churches have immigrant congregants from all over the world, including Haiti, Armenia, Egypt, Korea, Vietnam, Cambodia, Japan, Lebanon, Syria, Palestine, Israel, Zimbabwe, Kenya, Cameroon, Brazil, Mexico, Dominican Republic, Honduras, Jamaica, the Bahamas, India, Sri Lanka, Cambodia, Cape Verde, and elsewhere in West Africa, Central Africa, and the Caribbean.  Many of our local congregations are made up of these kin in Christ. Among our member denominations are congregations comprised almost entirely of immigrants, both documented and undocumented.  At one member church in Boston, about 50 percent of the congregation are immigrants; at Hadwen Park Congregational Church ("HPCC") in Worcester, about 30 percent are immigrants, documented and undocumented.  Massachusetts hosts the country's third-highest concentration of Haitian immigrants and second-highest concentration of Armenian immigrants.  Many of our Haitian member congregations are reliant on Temporary Protective Status to maintain their presence in the United States.

8.    Congregants have reported contact from or surveillance by ICE agents, including surveillance targeting direct service programs such as legal counsel, education, youth ministry, after school care, and food provision.  Some churches have had congregants placed in removal proceedings and at least one church had a congregant deported.

9.    Many MCC member churches also offer social service ministries—such as food pantries, clothing provision, education, or legal aid programs—that serve both documented and undocumented immigrants.  One member church in Boston feeds 150 families per month, both immigrants and citizens.  These churches often offer food, mental health support, clothing, and direct services as a regular part of their worshipping community.  These resources are provided regardless of documentation status.  Several member denominations conduct outreach targeted at the undocumented community, including visitation programs to Massachusetts ICE detention

3

Docusign Envelope ID: 88455198-2D17-4EC8-8125-A4B825B7B310

centers; one member additionally supports bond and bail payments for detained immigrants. HPCC provides housing for 36 LGBT asylum seekers in church-owned housing.  Our members' social outreach ministries are an expression of our Christian faith and extension of our worship.

10. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our members by interfering with our ability to gather, worship, and serve together.  It will inject fear, intimidation, and trauma into worship spaces crafted to provide safety, sanctuary, and community, doing violence to our sacred mission and unraveling our community.  Such enforcement would traumatize the worshipping community, making them less likely to attend worship in the future.  Immigration enforcement actions during worship would contradict our churches' core belief in welcoming the stranger (including immigrants and foreigners) as one of our own.

11. Likewise, an immigration enforcement action directed at our churches' social service ministries will prevent us from carrying out our mission to welcome and serve all immigrants, whom we feel called to minister to as part of our evangelical faith and to protect as some of the most vulnerable in our society.  In addition, an enforcement action during social service ministries, such as food distribution, will shatter the community safety net that many MCC churches view as a religious expression and extension of worship.  One church in Boston reported that shrinking attendance at social services outreach ministries would cement a sense of the congregation's failure to live out their mission.

12. DHS's new enforcement policy is already substantially burdening the religious exercise of our churches.  Since DHS adopted the new policy, member churches have reported mass anxiety and fear, fueled by rumors of escalating ICE enforcement, that is driving congregants to avoid leaving their homes.  Member churches are reporting decreased attendance, both at church

4

Docusign Envelope ID: 88455198-2D17-4EC8-8125-A4B825B7B310

Case 1:25-cv-00403-DLF    Document 11-38    Filed 02/21/25    Page 6 of 7
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 223 of 398

services and at food pantries, in the wake of the rescission, particularly in cities with significant immigrant populations. At one church in Boston, unhoused congregants are reticent to participate in an upcoming annual event because they fear that it is "the perfect set up for an ICE raid." The fears animating these drops in attendance are also weakening congregations' sense of community. These communities' fracturing harms all congregants, immigrant and nonimmigrant alike – all of whom are people of faith who are instructed to "love thy neighbor as themselves."

13. DHS's new enforcement policy is also presently forcing our member churches to make the impossible choice of either refraining from welcoming all people to participate in communal worship services regardless of immigration status or instead continuing that welcome while making their congregants and visitors easy targets for ICE. Either option is unconscionable.

14. Some MCC members are already making burdensome changes in an effort to keep our places of worship safe. Some churches have removed essential information about religious services from public websites or have canceled events altogether. Scheduled public religious processions are being taken inside and underground, curtailing our public practice of our faith. Other members have expended already-limited resources on additional security measures or to secure more volunteers for church services and social outreach services. As organizations, our member churches fear that the pressure to hide religious practice will lead both to a decrease in giving and financial support and a decrease in faith. We are an embodied people with an embodied ritual practice, particularly in the receiving of the sacraments of Eucharist and Baptism. To "cut back on worship" is to deny us the ability to practice our faith and ultimately to threaten our ability to exist as a religious entity.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Docusign Envelope ID: 88455198-2D17-4EC8-8125-A4B82BB7B310

Case 1:25-cv-00403-DLF    Document 11-38    Filed 02/21/25    Page 7 of 7
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 224 of 398

Dated: 2/21/2025

Respectfully submitted,

Signed by:

2926A60C4C1F478...

Reverend Laura Everett

6

# EXHIBIT 36

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

<u>**DECLARATION OF REVEREND JUDITH K. HANLON ON BEHALF OF HADWEN
PARK CONGREGATIONAL CHURCH SUPPORTING PLAINTIFF
MASSACHUSETTS COUNCIL OF CHURCHES**</u>

    I, Reverend Judith K. Hanlon, upon my personal knowledge, hereby submit this

declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1. I serve as senior pastor for Hadwen Park Congregational Church ("HPCC") in Worcester,

Massachusetts, and have served in that role since 2000. We are a member of the Massachusetts

Council of Churches ("MCC") and of the United Church of Christ ("UCC").

    2. Our church is called to follow the Biblical mandate to welcome the sojourner, the visitor,

the immigrant and give them hospitality as if they were our family. Throughout the history of

our denomination and HPCC in particular, we have sought to minister to the "least of these": the

hungry, thirsty, stranger, naked, sick, and prisoner. It is particularly important for us to welcome

all immigrants and refugees in the name of Jesus Christ, who was himself born in the town of

Bethlehem where his earthly parents were strangers. When people join our church, they

"covenant" (make a promise) with God through Christ and with one another to live as one

App. 341

Docusign Envelope ID: 50EEF45D-7DCF-4C4C-9E7A-1A43D9533A63

Case 1:25-cv-00403-DLF    Document 11-39    Filed 02/21/25    Page 3 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 227 of 398

people, one church, and to work together for the common good of all of creation.    We promise this to ALL WHO ENTER.

3.    Our welcoming statement, which was voted on by our parish council in April 2004, states:  "No matter who you are, or where you are on life's journey, we seek to find a place for you here . . . Welcome to all who have no church home, to all who need strength, to all who want to follow Christ, to those with doubts, or those who do not believe at all.  Welcome to new visitors and old friends.  Welcome to all who have been wounded or unwelcomed at any church, anywhere, anytime.  Welcome to <u>all</u> immigrants and refugees in the name of Jesus Christ who was born in the town of Bethlehem where his earthly parents were strangers.  Welcome to grandparents, mothers, fathers, and single and partnered people.  Welcome to people of all colors, cultures, abilities, sexual orientations and gender identities, to old and young, to believers and questioners – and welcome to questioning believers."

4.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.    It is my understanding that over 20 percent of the Worcester community are immigrants, many of whom are undocumented.  About 30 percent of our congregation at HPCC are immigrants; we have had several undocumented congregants over the years, including from Brazil, El Salvador, and countries within Africa, and continue to have some today.  In following the Biblical mandate to welcome the stranger, we house over 30 LGBT asylum seekers who are fleeing the countries where it is illegal to be gay.  They live in houses owned by the church.  We have been doing this for 17 years.  In support of our immigrant and undocumented congregants,

2

Docusign Envelope ID: 50EEF45D-7DCF-4C4C-9E7A-1A43B9533A63

Case 1:25-cv-00403-DLF    Document 11-39    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 228 of 398

we have advocated in federal courts; provided food, clothing, educational resources, and space for attorney-client meetings; helped retrieve congregants' vehicles when they were impounded; marched for their rights where they are threatened; and advocated with our local government to protect them. One of our main efforts is to make sure that all who come to us seeking asylum do so legally; however, the legal journey towards citizenship is expensive and arduous. Asylum seekers who live with us have been detained after crossing the border. One of our former asylum seekers is currently in detention in Texas. We have been involved in supporting their legal representation with affidavits and testifying at legal proceedings.

6. As outspoken advocates for the rights of immigrants and asylum seekers, particularly those facing discrimination for their gender identity or sexual orientation in their home countries, we are a likely target for Immigration and Customs Enforcement ("ICE") disruption during our worship services and outreach ministries on church property where we have a public food pantry and food, toy, and grocery drives for the underserved population in our city.

7. An enforcement action during a worship service, religious ceremony, or other church activity will substantially burden our church's religious exercise by interfering with our religious mandate to worship together as the body of Christ, including those who are immigrants and without lawful status. An enforcement action during our ministry work will prevent us from carrying out the social and evangelical work that Christ demands of us. We preach that if we have food, we must seek to provide food for every human being. If we are safe, we must seek to provide safety for every human being. If our undocumented congregants and guests in need are unable to engage in our ministry, we will be unable to fulfill this sacred work. We would be hypocrites to our calling in Christ Jesus.

8. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the sensitive locations policy was revoked, many of the asylum seekers living in church housing have stopped coming to church, where their support networks and "new" family are. Recently, individuals who appeared to be immigration enforcement officers came to one of the church-owned houses. They left before I arrived as our documented asylum seekers were terrorized. One was terrified and needed counseling and prayer, unable to eat and emotionally distraught. As a result of their fear, our congregants are isolated from their friends and siblings in the church and are unable to attend the church services in which they find hope and strength in communion with one another and in worshipping the God who has saved them, they believe, from death.

9. If we are unable to obtain a court order constraining ICE's authority to conduct immigration enforcement action at our church, we anticipate that the drop in attendance could end our congregation. We are known as the church of justice and joy; we do not believe that there is joy without justice for all. Without the ability to welcome our immigrant, asylum seeker, and undocumented congregants, we will not be able to pursue joy nor realize justice. If our immigrant population no longer attends, sings, prays, reads, and speaks at church, our church population will dwindle and may ultimately die.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

Signed by:

A8C8E048E68A4FB...

Reverend Judy Hanlon

4

# EXHIBIT 37

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## DECLARATION OF JONATHAN CARLSON, MODERATOR OF PLAINTIFF MENNONITE CHURCH USA

I, Jonathan Carlson, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am Moderator of Mennonite Church USA ("MC USA") and I have served in that role since 2023. I preside at all sessions of the denomination's Delegate Assembly, serve as its official representative, and chair MC USA's Executive Board. I previously served as the Moderator-Elect, from 2021 to 2023.

2. I make this statement based upon personal knowledge, files and documents of MC USA that I have reviewed, as well as information supplied to me by MC USA members whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting MC USA's business.

3. MC USA was founded in 2001 upon the merger of two national Mennonite bodies, and it is headquartered in Elkhart, Indiana, with additional offices in Newton, Kansas, and

congregations throughout the country.  MC USA has approximately 50,000 members across 477 congregations within 15 area conferences.  Our identity as Mennonites is communal, such that harm to any of our members affects every member and the strength of our denomination as a whole.  As Paul writes in 1 Corinthians 12:26, "if one part of the body suffers, all the parts suffer with it."

4.  MC USA is considered a historic peace church.  We practice in the Anabaptist tradition that prioritizes loving enemies and doing good to all.  Faithfully putting Jesus' teachings—which include lessons to welcome and show hospitality to strangers and foreigners—into tangible practice is central to Mennonites' religious calling and mission.  MC USA commits itself to joining God's reconciling mission and to living and acting as sisters and brothers in Christ regardless of legal status.  Because we abide the biblical understanding that every person is created in the image of the Holy One, we renounce any indifference to or mistreatment of immigrants, whether documented or not.  MC USA's dedication to ministering to immigrants derives from the Mennonites' long—and often painful—history of migration and forced displacement.  Mennonites have historically considered ourselves to be "strangers" even if we have legal status where we reside; in turn, we remain faithful to the teachings of Jesus by helping the strangers among us.

5.  Consistent with these beliefs, MC USA maintains an online list of resources to help churches and individuals respond to challenges posed by the immigration system; we have also hosted churchwide learning, prayer, and Bible study initiatives focused on immigration.  MC USA advocates for just and humane immigration policies, and it empowers its congregations, area conferences, and denominational staff to serve as advocates for immigrants and refugees.

2

6.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy and its plan to arrest as part of its plan to deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of an immigration enforcement action.

7.   MC USA has congregations across the country, including in border states and in cities with large immigrant populations—such as Chicago, Philadelphia, and San Antonio—that have seen recent immigration enforcement actions.  Nearly every MC USA congregation is located in areas shaped by migration.  For instance, the Hyattsville Mennonite Church in Maryland is located both in and near neighborhoods with many immigrants who, upon arrival, often settle in one of several apartment complexes near the church.  The church pastor has accompanied individuals to Immigration and Customs Enforcement ("ICE") check-ins, and other congregants have engaged in immigration advocacy.  A church in Pennsylvania previously experienced ICE activity in its neighborhood, including a raid that targeted five of its congregants.  Another church in Texas experienced an ICE raid down the street from its building just a few weeks ago.

8.   Immigrants comprise a significant portion of numerous MC USA congregations, including some in which all or nearly all of the congregants and faith leaders are immigrants. Many of those immigrant congregants are undocumented; some are facing removal orders. At one church in Kansas, for instance, all congregants except one are immigrants, predominantly from Mexico.  Most of the congregant families have one or more members who are undocumented.  Numerous other congregations are providing sanctuary and other assistance to immigrant families as they navigate the asylum process.  The Kansas church has set up an immigration fund that, with the assistance of a local lawyer, helps people work toward legal

Docusign Envelope ID: 9D80DB14-231A-4710-9B89-FB57C2BA84BC

status.  Another church in Colorado has helped an immigrant family navigate life in the United States by assisting with things like legal paperwork and school enrollment.

9.    Many of our congregations have social service outreach programs on their campuses that are open to and serve immigrants regardless of documentation status.  Those ministries include food and clothing distribution, relief kit production, English language classes, legal assistance, and job training services.  A church in Pennsylvania regularly serves more than 100 immigrants—congregants and non-congregants alike—through its social service ministries.  The Assembly Mennonite Church in Indiana operates an outreach ministry that provides off-campus assistance with transportation, child care, education, finances, and housing to documented and undocumented immigrants.  As opportunities for direct acts of service, these outreach ministries are incredibly important to the Mennonite sense of faith and identity, drawing from the early Anabaptist leader Menno Simons, who directed that true evangelical faith manifests in works of love and service to those in need.

10. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status.  It will prevent congregations from expressing and practicing communal faith, which prioritizes in-person worship with singing, prayer, and small-group support.  Our faith and belief in walking in the way of Jesus requires us to protect the vulnerable and to offer welcome and safety to all.  An enforcement action will violate the religious sanctuary, peace, and security we strive to provide to all congregants.  It will turn our places of worship into sites of anxiety and terror.

11. Likewise, an enforcement action directed at our congregations' social service ministries will prevent them from carrying out our mission to welcome and serve all, including immigrants. Action by U.S. Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP") at our churches will deter our congregations from gathering for fellowship and worship, and it will prevent them from engaging in the tangible acts of social service that are so central to our faith and religious practice. Mennonites have an intensely communal faith: we believe that, together, we are the Body of Christ. An ICE or CBP disruption to our religious practices will fracture the sense of unity and togetherness fostered through our worship services. Moreover, and particularly in light of the history of faith-based persecution that is prominent within the Mennonite identity, an ICE or CBP raid or other action will be incredibly traumatic to our congregations.

12. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the rescission, at least one congregation has witnessed a significant decrease in church attendance. Congregants at a Texas church, for instance, have stated that they can no longer come to church for fear of an ICE or CBP enforcement action, and even congregants who still attend services in person do so with increased fear. As a result, the congregation has already experienced a significant drop in attendance at church activities since the policy change. This development is not only affecting religious services; it means that some who might rely on the congregation's essential outreach ministries (such as clothing and food distribution) are not receiving those services. Other congregations worry that congregants will be reluctant to worship together in person.

13. DHS's new enforcement policy also puts our congregations in the impossible position of choosing whether to freely carry out their religious mission while exposing their communities to

the risk of an immigration action, or to instead change the way they serve and minister in an effort to protect those congregants. Either of these choices is inconsistent with our religious beliefs, and each carries with it practical and intangible spiritual harms to our congregations.

14. Faced with this choice, some congregations are already changing the way worship and other services are conducted. The Hyattsville Mennonite Church has altered the announcements it puts in its bulletins, website, and church newsletter. It has shifted toward more in-person, rather than electronic, communication. It is considering locking and monitoring the church doors—a move in direct tension with its mandate to show the hospitality of Christ to all who enter the church. Another congregation, in Pennsylvania, has begun to limit public-facing messages about the church and its community. A congregation in Texas has begun to close its doors at all times and has felt forced to move religious services online, even though it recognizes that many of its congregants may not have the access or skills necessary to participate online. Altogether, DHS's new enforcement policy is impairing our congregations' ability to build safe and welcoming worshiping communities and to follow our essential mission to provide fellowship, spiritual growth, and community support to their congregants.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Jonathan Carlson*

9FAA810C2D964B7...

Jonathan Carlson

6

# EXHIBIT 38

Docusign Envelope ID: A002F21B-97FD-4CE2-98AE-E4B05A3682B6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

      *Plaintiffs,*

v.

                                  Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

      *Defendants.*

## DECLARATION OF PASTOR JOHN DOE # 14 ON BEHALF OF ANONYMOUS CONGREGATION SUPPORTING PLAINTIFF MENNONITE CHURCH USA

    I, Pastor John Doe # 14, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I serve as lead pastor of a Mennonite Church USA congregation located in Pennsylvania. Approximately 400 people attend our church services on a weekly basis, including many families and children.

    2.  I wish to submit this declaration anonymously out of fear that my congregation will be targeted by U.S. Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

    3.  Our congregation believes that peace and justice are central to being followers of Jesus, and those tenets guide our congregation's mission and work.  The teachings of Leviticus 19:33-34, about "treat[ing] the stranger as you would a native-born citizen," and Matthew 25:35, about welcoming the stranger, are foundational to our congregation's religious beliefs in ministering to immigrants no matter their legal status.

4.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.    Our city is home to a large immigrant population, and many of those immigrants are undocumented.  The neighborhood in which our church is located is made up almost exclusively of immigrants.  Both our city and our neighborhood have thus been regular targets for ICE activity.  For instance, in 2007-2009, ICE was in the neighborhood around our church nearly every week, making traffic stops and entering residences.  About five of our congregants were targeted in an ICE raid during that period.  In the last few weeks, ICE has conducted several raids in our city.

6.    Our congregation itself is comprised mostly (90 percent) of immigrants, including myself.  About half of our immigrant congregants do not have legal status.

7.    We operate multiple social service ministries in our church, all of which primarily serve our immigrant congregants and neighbors.  These outreach ministries include a weekly food distribution, a preschool, and trainings on immigration and legal rights.  We have also previously served as a sanctuary for a family in need of safety.  Our congregants are currently sponsoring three immigrant families, all of whom have received communication from ICE.

8.    An immigration enforcement action at our church will substantially burden our religious exercise by preventing us from fulfilling our obligation to welcome and serve all immigrants. We are extremely concerned about the possibility of an enforcement action in our church.  Based on past experience, I expect that even one enforcement action in our neighborhood or at our church will decrease attendance at and participation in church services and ministries.

2

9.   Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  The policy rescission has made our people very afraid.  We are limiting public information about our church community, and providing specific information about services only in small groups, because we know we are a target.  We are also considering moving more services online, even though I anticipate that will limit participation and community connection.

10.  Reduced attendance at or participation in our church services and outreach ministries will impact our entire religious exercise.  It is central to our church's faith expression, and vital to our identity as a congregation, that we worship God in community, with singing, prayer, and small group support.  In addition, our religious mandate is to be instruments of God's healing and hope and to be living examples of Christ's love to the whole world.  The imminent threat of enforcement action undermines our ability, as Mennonites and followers of Jesus, to bring Christ's love for all of humanity through our religious services and outreach ministries.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

1F7F8BB3D3444AA...

Pastor John Doe # 14

3

# EXHIBIT 39

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF PASTOR JANE DOE # 15 ON BEHALF OF ANONYMOUS CONGREGATION SUPPORTING PLAINTIFF MENNONITE CHURCH USA

I, Pastor Jane Doe # 15, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I serve as pastor of a Mennonite Church USA congregation in Texas that was founded by four immigrant women and myself, a citizen and second-generation immigrant.

2.  I wish to submit this declaration anonymously out of fear that my congregation will be targeted by U.S. Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

3.  Our church is not just a place of worship; it a sanctuary for immigrants led by immigrants. Serving and ministering to all people, regardless of immigration status, is central to our mission and is guided by the Bible, which teaches love, compassion, and hospitality toward all. We believe we are co-creating the body of Christ with each new family that we welcome into our community.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.   Our city is close to the Mexico border and has a large undocumented immigrant population.  ICE has been very active in our city, both in the past and now.  A few weeks ago, there was an ICE raid down the street from our church.

6.   The regular attendees of our church are all immigrants.  About ten percent of them are undocumented or have a current deportation order.  Many of our congregants are contacted by ICE, the Executive Office for Immigration Review ("EOIR"), or U.S. Citizenship and Immigration Services ("USCIS") with requests to present themselves at the local ICE office or court, or with updates on the status of their applications and court cases.  Those with active asylum cases frequently need to fill in applications, submit change-of-address forms, and renewal forms.  They know they need to update any changes in their status and are constantly monitored.  Several members of our congregation have ankle monitors.  We also have several in our community who have Temporary Protected Status ("TPS").  Those who will lose their TPS status in April, pursuant to the Trump administration's recent decision to revoke protection for a segment of Venezuelans, are extremely fearful that they will become undocumented.

7.   From the day we planted the church and founded our ministry, and consistent with our faith mission, we have been serving immigrants by providing a place of belonging in the family of God.  We work to help immigrants continue on their path of discipleship.  Through our ministry work, we also provide a community of support and basic necessities such as housing and transportation assistance.  We run a shelter network that often shelters families with small

Docusign Envelope ID: 0480E8C5-55A5-45C4-97B5-71DC80B5ABCD

Case 1:25-cv-00403-DLF    Document 11-42    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 244 of 398

children.  We also provide English classes in our church to help people improve their language skills; weekly food distributions; a clothing pantry that includes diapers and toys; and, in collaboration with legal aid organizations, legal assistance services to help with access to translation, and filing of legal paperwork.  All of these outreach ministries serve both documented and undocumented immigrants.

8.    An immigration enforcement action at our church will substantially burden our religious exercise by thwarting our mission to welcome, serve, and be a safe haven for all people, including immigrants.  It will create terror and anxiety among those we support, hinder their access to our essential social service ministries, and disrupt the sanctuary and community we strive to provide.  It will force us to cut back on worship services and other church activities, which will reduce congregants' spiritual growth, fellowship, and community support—all of which are essential to our mission.  That will be a critical blow: our immigrant congregants and participants have shared that the church is one body that gives them courage to keep going and never lose hope.

9.    DHS's new enforcement policy is already substantially burdening our religious exercise. The policy change undermines the safety and security of our congregation and the immigrant families we serve.  We have experienced a significant decrease in church attendance.  Most congregants have said they are afraid to come to worship services or to connect with their community ever since the policy was rescinded.  Even those who still attend services and ministries do so in fear.  I have heard from many congregants that every knock on the door makes them panic and now church is not a place of respite from that fear.  We have changed our policies to make sure all doors stay closed at all times.  We have also started online services for

those who are too scared to leave home to worship, though it is an inadequate alternative to worshipping in community.

10. Our religious mandate is centered on supporting and ministering to immigrants.  We do so through in-person communal worship and social services that are a core part of our faith mission to serve all individuals.  The imminent threat of enforcement action contravenes our commitment, as a Mennonite church, to teach peace, provide hospitality, welcome the stranger, support spiritual growth, and be a place of refuge in God's love.  Furthermore, it hinders our ability to provide for our community through our ministry work.  Our ability to make sure that families and children are warm, safe, fed, and have the medical care they need is hindered by the threat of ICE raids at our church.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Jane Doe #15*

01345A9AA3124E6...

Pastor Jane Doe # 15

4

# EXHIBIT 40

Docusign Envelope ID: 51750D63-3F27-449D-A4B8-C96FDB044756

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MENNONITE CHURCH USA et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY et al., <br><br> *Defendants.* | Civil Action No. 1:25-cv-00403 |

## DECLARATION OF BISHOP THOMAS J. BICKERTON
## ON BEHALF OF PLAINTIFF NEW YORK ANNUAL CONFERENCE OF THE UNITED
## METHODIST CHURCH

I, Bishop Thomas J. Bickerton, hereby submit this declaration pursuant to 28 U.S.C.

§ 1746 and declare as follows:

1. I am the Resident Bishop of The New York Annual Conference of The United Methodist

Church ("NY Conference") and have served in that role since 2016.

2. I make this statement based upon personal knowledge, files and documents of The NY

Conference that I have reviewed, as well as information supplied to me by members of The NY

Conference whom I believe to be reliable. These files, documents, and information are of a type

that is generated in the ordinary course of our business and that I would customarily rely upon in

conducting The NY Conference's business.

3. The New York Annual Conference is a subdivision of The United Methodist Church

("UMC") as provided for in its Book of Discipline. The NY Conference covers the geographic

area of New York City, Long Island, parts of upstate New York, and parts of Connecticut. The

NY Conference has been part of The UMC since it was formed and incorporated in the State of

New York in 1968. We are a nonprofit membership organization headquartered in White Plains, New York.

4. The UMC is a worldwide Christian denomination whose primary mission is to "make disciples of Jesus Christ for the transformation of the world." Core to our organization is the Biblical mandate to love and care for all individuals, regardless of status—and especially immigrants, whom the Bible commands we welcome and protect. In line with these religious tenets, The NY Conference members welcome undocumented people into their churches for worship services, social service ministries, and other church activities.

5. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that The NY Conference's congregations are at imminent risk of an immigration enforcement action.

6. The NY Conference's congregations are located in regions with large immigrant communities, both documented and undocumented, such as New York City and Long Island. Immigration and Customs Enforcement ("ICE") has conducted raids in many areas in which our churches are located since the sensitive locations policy was rescinded. I also understand there is currently an increased presence of ICE officers in New York City and Connecticut communities.

7. I understand ICE has engaged in recent enforcement actions in New York City, including against at least one NY Conference church member. Specifically, we understand that a member of Christ Church-Washington Heights (one of our local UMC churches in New York City) was detained in one of those enforcement actions. We at The NY Conference are aware that ICE enforcement actions have also taken place in the past in the Fair Haven neighborhood of New

2

Haven, CT where there are three UMC congregations, and there have been other reports of enforcement actions that have recently taken place elsewhere in Connecticut.

8.   Local churches in The NY Conference host a variety of outreach ministries specifically intended to serve immigrant populations, such as English-As-Second-Language ("ESL") classes, soup kitchens, food pantries, clothing pantries, and tutoring programs.  For example, St. Paul & St. Andrew United Methodist Church hosts Miracle Mondays, helping hundreds of immigrants with their basic needs, like food and clothing.  Brooks Memorial Methodist Church hosts a food ministry that serves undocumented individuals, and the First United Methodist Church of Jamaica also hosts a food ministry.  St. Paul's United Methodist Church of Vanderveer Park hosted a vacation bible school for 90+ children from a nearby migrant shelter this past summer and also has a feeding ministry and an ESL class on site.  Newman Memorial United Methodist Church, located in Brooklyn, is currently working to upgrade their space to become a shelter to serve the undocumented/migrant community.  Bay Ridge United Methodist Church works in cooperation with another Lutheran church to provide church space throughout the week to serve immigrants, both documented and undocumented, including hosting a food pantry.  And the pastor of Newburgh United Methodist Church has been leading the congregation in partnering with interfaith allies to support migrant ministry.  There are also a number of UMC congregations that host Immigration Law & Justice New York (ILJNY) pop-up legal clinics, including Hicksville United Methodist Church, John Wesley United Methodist Church, Chinese United Methodist Church in Manhattan, and First United Methodist Church in Flushing.  All of these ministries are run by the pastor and members of the local church, in accordance with their mission and ministry, serving those in their communities. The majority of these ministries are operated by local churches on local church property.

3

Docusign Envelope ID: 51750D63-3E27-449D-A4B8-C96FDB044756

Case 1:25-cv-00403-DLF    Document 11-43    Filed 02/21/25    Page 5 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 250 of 398

9.   An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our churches by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status.  It will substantially disrupt the whole church's spiritual practice and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants.  Likewise, an immigration enforcement action directed at their social service ministries will prevent member churches from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to and protect as part of our evangelical faith.

10. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the sensitive locations policy was rescinded, I have received phone calls, emails, and texts from pastors at member churches who are confused and afraid.  They want to know how to protect their churches from intrusion and interruption.  Reports of ICE enforcement in the area have had a chilling effect on the willingness of many immigrants to go out in public, including our congregants and those we serve through our social services.  Dissuading attendance will also have a financial impact on our local churches, since local church ministry depends on financial giving from membership.

11. DHS's new enforcement policy is already forcing our congregations to undertake costly changes to their ministry work: for example, Bay Ridge United Methodist Church has had to deliver food to numerous families who are now too afraid of immigration action to come to their food pantry.  If participation in our social services continues to decrease despite these changes, there will be a devastating impact on the congregants and social recipients the churches serve. They will be deprived not only of the physical benefits these ministries offer, such as food,

Docusign Envelope ID: 51750D63-3527-449D-A4B8-C96FDB044766

clothing, medical assistance, etc., but also of the spiritual ministry our churches provide as part of their religious mission, such as worship, spiritual counsel, communion, and Bible study.

12. The imminent risk of immigration enforcement action is also forcing our member churches to make the impossible choice of refraining from welcoming all congregants to participate in communal worship services or putting parishioners at risk of arrest and deportation—either of which violates their sincerely held religious beliefs.

13. In summary, ICE intrusion into the sanctuary spaces of NY Conference congregations fundamentally harms the UMC as a whole, The NY Conference, its local churches, their members and all persons who seek refuge through the Gospel of Jesus Christ as expressed in and through our churches.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

DocuSigned by:

*Bishop Thomas J. Bickerton*

166361A5945E429...

Bishop Thomas J. Bickerton

# EXHIBIT 41

Docusign Envelope ID: 7132EE49-1F82-4E37-BA35-5D9378ACA28B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## <u>DECLARATION OF REVEREND DR. JAMES F. KARPEN ON BEHALF OF ST. PAUL & ST. ANDREW UNITED METHODIST CHURCH FOR PLAINTIFF NEW YORK ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH</u>

I, Reverend Dr. James F. Karpen, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as Senior Pastor for St. Paul & St. Andrew United Methodist Church ("St. Paul & St. Andrew") located in Manhattan, New York.

2. St. Paul & St. Andrew is a local church of Plaintiff The New York Annual Conference of The United Methodist Church ("UMC").

3. Our mission as a local United Methodist Church, in brief, is to fulfill the UMC mandate to "make disciples of Jesus Christ for the transformation of the world" and to be a community of welcome and to increase the amount of love and justice in the world by putting "our love into action."

4. Part of our mission is to work with and on the behalf of asylum-seekers and other immigrants as stated in our recent Statement on Migrant Justice, which reads, in part:

We are called and committed to living out the radical welcome of our God. As part of living out this call, St. Paul & St. Andrew has a long history of being a "Sanctuary Church," advocating and educating for the justice, equity, and inclusion of refugees and asylum-seekers. Recent executive orders have targeted our immigrant siblings, making their journeys and lives even more difficult. We mourn this added burden and recommit to following Jesus, who was a refugee himself, dependent on the welcome and love of others to provide refuge…

5. We at St. Paul & St. Andrew stand unwaveringly in love and solidarity with our newest neighbors. We will continue to put our love and faith into action, responding to the needs of our neighbors, welcoming the stranger, and advocating for the equity and inclusion of our immigrant siblings. Together, with our interfaith, legal, non-profit, and mutual aid partners, we will continue to work to lift up the dignity and sacred worth of all people, oriented to the most vulnerable among us.

6. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of an immigration enforcement action.

7. We have a membership of over 500, which includes both documented and undocumented persons. We do not ask for any form of documentation when a person wishes to join our church.

8. As part of our mission, in 2018 we declared ourselves to be a Sanctuary Church, offering a place of safety to all. This declaration, of course, is backed by centuries of religious tradition. In that role, we have provided physical sanctuary to a family whose mother was facing deportation. We also provided sanctuary (including housing) for a number of new arrivals from the southern border during 2022-2023.

9. Since 2022, we have offered a weekly resource fair for new arrivals to our city and have served thousands of our newest neighbors, providing spiritual support, legal advice, essential

2

goods, access to benefits, food, and clothing to the families who have come to us, including those who are undocumented.

10. Given its location and the demographics of our area and congregation, I am very concerned about the increased risk of immigration enforcement action in and around our church following the rescission of the sensitive locations policy. Such enforcement activity will interfere with our religious mandate to worship together in person as a congregation, with *all* members of our community, including those who are immigrants, some of whom may be undocumented.

11. In the few weeks since the DHS sensitive locations policy's rescission, our church's activities have already been impacted. Attendance at services has declined, and my congregants tell me that the reason is that they fear that Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP") will target our church.

12. Because attendance has already declined among our congregation due to fear of ICE and CBP action, I believe our church will have difficulty with membership growth and recruiting more immigrant families to come to our services and seek sanctuary both physical and that provided by the Gospel of Jesus Christ. That will not only impede our religious mission, but it will likely also have a direct impact on our church's finances as fewer persons will feel comfortable attending service and sharing in the ministry and mission at St. Paul & St. Andrews.

13. The immigrants we serve as part of our outreach ministries are also being deterred from participating in the ministries, which prevents us from carrying out the social and evangelical work we are called to do as Christians. Several of our guests and friends have indicated a new reluctance to even leave their places of residence to receive needed support services, take part in our classes, or come to attend worship under DHS's new enforcement policy.

3

14.    DHS's new enforcement policy is forcing St. Paul & St. Andrew to choose between freely carrying out our religious mission, which we feel we must do as a church, and violating our commitment to welcome and protect immigrants by putting those we call to worship with us and minister to at risk of ICE/CBP action.  We are contemplating whether we need to adopt a closed-door policy limiting access to worship and social services and meetings.  We are also considering holding home services and limiting non-worship activities at the church.  This type of forced change is at odds with our religious mandate to be an open and welcoming space for all.

15. DHS's new enforcement policy has had a devastating impact on our mission and ministry, including our outreach ministry work, and has impaired our ability to fulfill our religious mandate to welcome and serve all, including our immigrant neighbors.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/21/2025

Respectfully submitted,

Signed by:

*Rev. Dr. James F. Karpen*

3903257B5D1C45A...

Reverend Dr. James F. Karpen

4

# EXHIBIT 42

Docusign Envelope ID: CC78E91E-A545-5649-81B7-3874A2978155

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

  *Plaintiffs,*

v.

             Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

  *Defendants.*

## DECLARATION OF PETER COOK, EXECUTIVE DIRECTOR OF PLAINTIFF NEW YORK STATE COUNCIL OF CHURCHES

  I, Peter Cook, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

  1. I am the Executive Director of the New York State Council of Churches ("NYSCOC") and have served in that role since 2016.

  2. I make this statement based upon personal knowledge, files and documents of NYSCOC that I have reviewed, as well as information supplied to me by members of NYSCOC whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting NYSCOC business.

  3. NYSCOC is a statewide organization through which Christians accomplish mission goals that can be achieved more effectively by working together. Founded in 1893, NYSCOC consists of nine denominational members representing 29 distinct judicatories in New York and 7,500 churches. NYSCOC's members covenant to care for one another, safeguard the presence of vital

Christian communities, provide hospitality to all, proclaim the Gospel boldly in each place, and declare God's just will among the powers and principalities.  NYSCOC is headquartered in Albany, New York.

4.  NYSCOC works for a world in which all people can be treated equally as children of God.  At the heart of our mission is to challenge our churches, society, and government to strengthen the social safety net and extend the boldest form of hospitality possible to others, especially immigrants, without regard to legal status.  NYSCOC's members believe that congregations should be a place of peace and safety for the oppressed in our midst, and they seek to change laws, directives, and structures that compromise that welcome.  NYSCOC has worked with non-profit partners to advocate for transparency in immigrant family separation policies, equitable payment of farmworkers, and access to basic services—including Medicaid, affordable housing, and driver's licenses—for our undocumented neighbors.

5.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that NYSCOC members are at imminent risk of immigration enforcement activity at their churches.

6.  NYSCOC's member churches are located throughout New York State, including in areas with large immigrant populations that have been targeted for Immigration and Customs Enforcement ("ICE") raids in recent weeks.  Many of our churches are in counties that employ immigrant farm and dairy workers, as well as in large cities that have thriving immigrant populations of varied legal statuses.  Although a majority of these immigrants come from Latin America, member congregations include immigrants from all over the world, documented and undocumented.

7.    Many NYSCOC churches have immigrant congregants, both documented and undocumented.  One member church in Saratoga Springs witnessed a spree of ICE enforcement near their church in 2017, as well as a series of smaller enforcement actions at nearby businesses. Another member church in New York City has been subjected to ICE surveillance and unauthorized entry by ICE agents and has had congregants detained and deported while off of church grounds.

8.    NYSCOC member churches also provide social service ministries to immigrant neighbors, including legal services, English classes, health clinics, clothing closets, and food pantries, that serve undocumented people.  One member congregation in Saratoga Springs houses up to 30 immigrants on church property.  Numerous NYSCOC members have declared themselves to be sanctuary churches.  In one instance while the sensitive locations policy was still in place, a sanctuary guest was arrested by ICE shortly after leaving church property.

9.    As a result of the rescission of the sensitive locations policy, our congregations are deeply anxious and feel inadequately prepared for escalating enforcement.  At one member church in New York City, a parishioner rose in the middle of a recent Sunday sermon to ask how they could respond to enforcement actions during worship services.

10. An immigration enforcement action taken during a worship service, religious ceremony, or other congregational activity will harm our member churches by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status.  "Disruption" doesn't begin to describe the violation that this would impose on those worshipping, studying, or praying together.  Two churches in the Capital Region noted that enforcement during worship services would do great damage with one pastor stating such enforcement will directly violate the spirit of

Docusign Envelope ID: 0C78E91E-A545-5649-81B7-3874A2978155

Case 1:25-cv-00403-DLF    Document 11-45    Filed 02/21/25    Page 5 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 261 of 398

peace in which they seek to conduct church activities, eroding the church's culture of shared security. Another member church in Rochester reported that such an incident will make their immigrant congregants unlikely to return to church.

11. Likewise, an immigration enforcement action directed at our churches' social service ministries will prevent them from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to as part of their evangelical faith and to protect as some of the most vulnerable in our society. A member church in Saratoga Springs reports that after a series of ICE enforcement actions near the church in 2017, there was a noticeable decline in immigrant attendance at the soup kitchen on church property. ICE enforcement actions *at* the church, particularly targeting the social service ministries, will be devastating to the congregation's ability to serve their immigrant neighbors. Such enforcement actions could also create a fear of entrapment, inhibiting the willingness of those who engage with outreach ministries to seek services that sustain or add value to their lives.

12. DHS's new enforcement policy is already substantially burdening the religious practice of our churches. Since the new policy was adopted, member churches across the state have reported mass anxiety and fear. According to one member congregation in Rochester, both staff and recipients at their social service ministry have begun expressing fear of enforcement actions. Several churches in New York City have already reported a decline in attendance for worship and at social service ministries, directly connected to fear of ICE enforcement under the new policy. In response, those churches have been forced to increase security measures, increasing the cost of each additional event and reducing the church's ability to offer meaningful programming. For one such church, the spiritual energy they must invest in managing the

Docusign Envelope ID: CC78E91E-A545-5649-81B7-3874A2978155

congregation's anxiety has detracted from other life-giving ministries and eroded the sense of safety for other marginalized groups within the Church.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

*Peter Cook*

E6FBE092D3B04A4...

Peter Cook

5

# EXHIBIT 43

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA et al.,

     *Plaintiffs,*

v.

                             Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

     *Defendants.*

---

## DECLARATION OF REVEREND JOHN DOE # 16 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF NEW YORK STATE COUNCIL OF CHURCHES

I, Reverend John Doe # 16, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I serve as lead pastor for a church located in New York, New York. We are a member of the New York State Council of Churches ("NYSCOC").

2.  I wish to submit this declaration anonymously out of fear that my church will be targeted for immigration enforcement activity.

3.  My church is Gospel-centered, taking seriously the prophet Micah's call to act justly, to love mercy, and to walk humbly with God, which we pursue most vibrantly through our spiritually-grounded social justice programming and creative community worship. We take seriously our commitment to helping the stranger, and view our engagement with civic, political, and social movements as an intrinsic part of our practice. We hold immigrant justice as one of the most important embodiments of living out the Gospel.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that my church is at imminent risk of an immigration enforcement action.

5.   Immigrants make up nearly 40 percent of New York City's population.  The city is home to over 400,000 undocumented immigrants, many of whom have lived here for years or even decades.  Although the demographics in the area around our church have changed rapidly, we have a substantial number of immigrant congregants, some of whom are undocumented.  We have had congregants detained (elsewhere, not at our church) and ultimately deported.

6.   Our church has a long history of providing sanctuary and is an original member of the New Sanctuary Coalition.  We host a weekly mutual aid gathering, which provides connections to legal services, work permitting, health insurance, childcare, clothing, food, community, and housing options; most of the people who come to avail themselves of these services are undocumented.  In response to our advocacy, we have previously been surveilled, and we have strong reasons to believe that Immigration and Customs Enforcement ("ICE") has entered our building without permission.  As an outspoken voice for the undocumented community and a longtime sanctuary provider, we are a likely target for ICE disruption during our worship services and social service ministries.

7.   An enforcement action during a worship service, religious ceremony, or other church activity will substantially burden our church's religious exercise by desecrating our worship space, thwarting our calling to worship and serve together, and endangering the people we are spiritually obliged to love and protect.  An enforcement action during our ministry work will

2

prevent us from carrying out the social and evangelical work we feel called to do as Christians, likely causing our social service recipients to stop participating in our programs.

8.   DHS's new enforcement policy is already substantially burdening our religious exercise. Since the new policy was adopted, we have already seen a decline in attendance at our social services programming, and fear has accompanied every worship service and spiritual community event we hold as a direct result of our congregants' increased fear of immigration enforcement. In response, we have increased our security measures, therefore increasing the cost of worship to the church.  These impacts are both financial and psychological, taking up psychic space that could be better put towards our gospel-centered work.  The time and energy needed to ease the panic is exhausting and directly impairs our ability to care for our community.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

BCA4F92392AC4FA...

Reverend John Doe # 16

3

# EXHIBIT 44

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA, et al.,

    *Plaintiffs,*

vs.

                                     Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

    *Defendants.*

## DECLARATION OF REVEREND JENNIFER COPELAND, EXECUTIVE DIRECTOR OF PLAINTIFF NORTH CAROLINA COUNCIL OF CHURCHES

    I, Reverend Jennifer Copeland, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.   I am the Executive Director of the North Carolina Council of Churches ("NCCC"), a role I have held since 2015.

    2.   I make this statement based upon personal knowledge, files and documents of NCCC whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting the NCCC's business.

    3.   NCCC is a non-profit, ecumenical membership organization promoting Christian unity and working towards a more just society in the State of North Carolina.  NCCC's members include 27 judicatories of 19 denominations and seven individual congregations.  Across the state, our members have over 6,200 congregations.  Founded in 1935 to address racial inequality, NCCC enables denominations, congregations, and people of faith to impact the State on issues

such as economic justice and development, human well-being, equality, and compassion and peace, following the example and mission of Jesus Christ. Ensuring labor and housing protection for migrant farmworkers is one of NCCC's top priority areas, and its work includes mobilizing people of faith to participate in grassroots movements and legislative efforts to empower immigrants in North Carolina.

4.  Our immigrant advocacy work is driven by scripture. Immigrant populations — also called sojourners, refugees, and foreigners — are mentioned repeatedly in Old Testament scripture as a group whom God directs the people to protect because they were some of the most socially and economically vulnerable groups in that day. Care for the most vulnerable among us carries over into the New Testament when God's people are reminded of this imperative through the teaches of Jesus and the letters of Paul. And just as scripture makes no distinction between our families and the "sojourner who is among you" and directs us to rejoice in God's generosity equally with both (Deuteronomy 26:11), neither does the Council distinguish between those with U.S. citizenship and those without. I have every reason to believe that each of our member bodies are in accord with our interpretation of the biblical imperative to care for and protect our immigrant neighbors.

5.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that NCCC members are at imminent risk of immigration enforcement activity.

6.  NCCC has members across North Carolina, a state with a large immigrant population and significant Immigration and Customs Enforcement ("ICE") activity, including several raids just this past week. Most of NCCC's denominational members have congregations with immigrant

members and immigrant congregations, and some of those congregants are undocumented.  One congregation, for example is approximately two-thirds immigrant, and another is 96 percent immigrant, primarily from Spanish speaking countries.

7.  In addition, many of NCCC members' congregations provide social service ministries at their churches, such as English as a Second Language ("ESL") classes, soup kitchens, and food pantries that serve both documented and undocumented people.  One church, for example, runs a "Circle of Welcome" ministry that specifically targets refugees, providing them with wraparound services, and partners with another local outreach ministry to serve the Spanish-speaking community, such as by offering space for ESL classes.

8.  An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our members' religious exercise by interfering with their congregations' ability to worship in person together, with all members of their community, including those who are immigrants and without lawful status.  Likewise, an enforcement action directed at our members' social service ministries will prevent them from fulfilling their mission to welcome and serve all immigrants, whom scripture directs us to protect regardless of status.

9.  The rescission of the sensitive locations policy is already substantially burdening our members' religious exercise.  Since the recission, multiple congregations have reported a decrease in worship attendance, with congregants conveying that they are afraid of going to church due to the threat of ICE activity.  Our members are also now in the impossible position of choosing whether to continue to minister to undocumented immigrants at their churches, thereby making them a potential target for arrest, or to instead cut back on their social service ministries in an effort to protect them.  Either option violates the churches' religious beliefs.  At least one of

our members' congregations is considering worshipping in secret, in private homes, or virtually as a precaution, which undermines their spirit of welcome and hospitality.  That congregation is also preparing to deliver communion to individual homes, a labor-intensive practice that is a poor replacement for taking communion together as a congregation in person.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/20/2025                                    Respectfully submitted,

DocuSigned by:

*Jennifer Copeland*

687F1F9921F945D...

Reverend Jennifer Copeland

4

# EXHIBIT 45

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA, et al.,

*Plaintiffs,*

vs.

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF REVEREND JOHN DOE # 17 SUPPORTING PLAINTIFF NORTH CAROLINA COUNCIL OF CHURCHES

I, Reverend John Doe # 17, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as senior pastor for a church located in North Carolina. We are a member of the North Carolina Council of Churches ("NCCC").

2. I wish to submit this declaration anonymously out of fear that my church will be targeted for immigration enforcement action.

3. Our church's mission and ministry is to emphasize and proclaim the love of God revealed in His son Jesus Christ to all people of every nationality, every culture, and every language. We do this by obeying His Word and putting it into practice with love by serving all our neighbors, regardless of immigration status. Our mission is exemplified by scripture, "When a foreigner resides among you in your land, do not mistreat them. The foreigner residing among you must be treated as your native-born. Love them as yourself, for you were foreigners in Egypt." (Leviticus 19:33-34).

App. 388

4.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.  Immigration and Customs Enforcement ("ICE") is active in our state, conducting numerous raids in just the past week. Over 16,000 immigrants reside in our city. In our church, about 96 percent of congregants are immigrants. Most of them come from Spanish-speaking countries such as Mexico, Guatemala, Nicaragua, Peru, Honduras, and Puerto Rico. We do not ask about immigration status, but we know some are undocumented.

6.  We also provide a food pantry service ministry on the property that supports immigrant families, both documented and undocumented.

7.  An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially our church's religious exercise by interfering with our religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. It will destroy the sense of safety and community we have worked so hard to cultivate. It will scare our congregants away, causing them to become isolated and afraid. Such a threatening situation will create shock, panic, and chaos in our congregation, inflicting psychological and spiritual trauma on all of our congregants regardless of immigration status. It will also deter people from our social service ministries, thwarting our ability to serve our immigrant neighbors as Jesus calls us to do.

8.  The rescission of the sensitive locations policy is already substantially burdening our church's religious exercise. We have experienced a decrease in attendance at our worship

Docusign Envelope ID: 67EABD5E-5155-47A2-A075-35546B61C3AD

Case 1:25-cv-00403-DLF    Document 11-48    Filed 02/21/25    Page 4 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 275 of 398

services since the rescission, and some members have indicated that they may stop attending

soon because of the looming threat of ICE activity.  We are considering holding our worship

services in secret, similar to the practices of the early church who hid from the Roman

authorities, or at private homes or virtually.  We are preparing to deliver communion to

individual homes, which is a labor-intensive and time-consuming practice that is a poor

replacement for receiving communion together as a congregation in person.  All of these

precautions are inconsistent with our call to be open and welcoming, yet if we do not take them,

we expose our vulnerable congregants to ICE action.  Neither option is conscionable.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:
John Doe #17
5C60D2638795465...

_____

Reverend John Doe # 17

3

# EXHIBIT 46

Docusign Envelope ID: 4EA87203-7989-4D96-A540-62FA1CB8B4A8

Case 1:25-cv-00403-DLF    Document 11-49    Filed 02/21/25    Page 2 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 277 of 398

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

THE TRUSTEES OF THE NORTH
GEORGIA CONFERENCE OF THE
UNITED METHODIST CHURCH et al.,

     *Plaintiffs,*

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

     *Defendants.*

Civil Action No. 1:25-cv-00403

---

## DECLARATION OF BISHOP ROBIN DEASE ON BEHALF OF PLAINTIFF THE NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH

I, Bishop Robin Dease, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Resident Bishop of The North Georgia Conference of The United Methodist Church, and have served in that role since January 2023.

2. I make this statement based upon personal knowledge, files and documents of the North Georgia Conference that I have reviewed, as well as information supplied to me by members of the North Georgia Conference whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting the North Georgia Conference's business.

3. The North Georgia Conference was founded in 1830 and incorporated in 1988. Our mission is to help churches and their congregants fulfill their God-inspired vision. We currently serve over 200,000 congregants in 411 local churches.

4.    Core to the North Georgia Conference's belief system is the Biblical mandate to love and care for all individuals, regardless of status—and especially immigrants, whom the Bible commands we welcome and protect.  Our churches are affiliated at the national level with the United Methodist Church, which has affirmed the responsibility of churches to minister to all individuals, regardless of immigration status, and has declared that any form of nativism, mistreatment, or exploitation is inconsistent with the gospel of Jesus Christ.  In line with these religious tenets, our congregations welcome undocumented people into their churches for worship services, social service ministries, and other church activities.

5.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement action.

6.    Our churches are located across the State of Georgia, in every area north of (and inclusive of) Harris, Meriwether, Upson, Monroe, Jasper, Putnam, Baldwin, Hancock, Warren, McDuffie, and Richmond counties, with the exception of Dade County, which is not part of our annual conference.  We have churches located in cities and counties with large immigrant communities, both documented and undocumented, such as Athens-Clarke County, Atlanta, Columbia County, Dekalb County, and Douglas County.

7.    Immigration and Customs Enforcement ("ICE") has conducted raids in many areas in which our churches are located since the sensitive locations policy was rescinded, and it raided one of our churches and conducted another raid at a church next door to another of our churches. In the local church that was raided, which is located in Atlanta, ICE agents came into the daycare office looking for a staff member who they believed to be undocumented.  That staff member no

Docusign Envelope ID: 4EA87203-7989-4D96-A540-62FA1CB8B4A8

longer worked at that church so ICE ended its enforcement action with no further incident. The
other local church has a campus in Gwinnett County immediately next door to a church that ICE
raided, which heightened anxieties within its congregation, staff, and clergy because
approximately half of the congregation is comprised of immigrants.

8.    The North Georgia Conference has approximately sixteen predominately immigrant local
congregations. For example, the congregation at the Gwinnett County church that is right next
door to a church that ICE raided is composed of 50 percent immigrant members hailing from
Mexico, El Salvador, Venezuela, Sierra Leon, Nigeria, Liberia, England, Korea, Haiti, Honduras,
Guatemala, Ecuador, Kenya, and Jamaica. Another local church in Barrow County has a
congregation that is approximately 73 percent Hispanic, with many congregants hailing from
Mexico, Guatemala, Honduras, Columbia, Ecuador, Peru, and Argentina. Our local churches do
not make inquiries regarding immigration status, but we know that we have congregants who are
undocumented and some have been deported.

9.    Many of our churches also provide social service ministries, including ESL classes, food
pantries, food distribution, back-to-school events, clothes closets, weekly community meals, and
immigration ministries. One of our local churches, which wishes to remain anonymous, offers a
food pantry and a free lunch summer program, with approximately 50 percent of those served
being Hispanic. These services are provided on church property, and they are part of the church
itself—organized, run, and funded by the congregations. They serve citizens and immigrants,
both documented and undocumented.

10. Immigration enforcement actions have already taken place in at least two of our churches.
Additional immigration enforcement action, particularly any taken during a worship service,
religious ceremony, or other church activity, will harm our churches even further by continuing

3

Docusign Envelope ID: 4EA87203-7989-4D96-A549-62FA1CB8B4A8

Case 1:25-cv-00403-DLF   Document 11-49   Filed 02/21/25   Page 5 of 6
USCA Case #25-5209   Document #2136370   Filed: 09/22/2025   Page 280 of 398

to interfere with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. It will substantially disrupt the whole church's spiritual practice and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants, as we have already seen from those churches where enforcement actions have taken place.

11. Likewise, an immigration enforcement action directed at their social service ministries will prevent our churches from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to and protect as part of our evangelical faith.

12. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the sensitive locations policy was rescinded, I have received reports of phone calls, emails, and texts to the North Georgia Conference from pastors who are confused and afraid. They want to know how to protect their churches from intrusion and interruption. We already have reports of decreased attendance since the sensitive locations policy rescission, starting the very first Sunday after the recession. Congregants are telling their pastors that they are now afraid of going to church due to the imminent risk of an ICE raid or enforcement action, especially given that nearby churches have already experienced enforcement actions.

13. Some of our churches are already making changes to the way worship is conducted. One church, for example, is making arrangements to move some of its ministry activities to a virtual format for fear of ICE intrusion on church property. Another is preparing to offer online options for its ESOL program. Others are training their boards of trustees and security teams to address what might happen if ICE showed up. And several have started to or are considering locking the doors of their church during services.

Docusign Envelope ID: 4EA87203-7989-4D9C-A549-62FA1CB8B4A8

14. DHS's new enforcement policy forces our churches to make the impossible choice of refraining from welcoming all congregants to participate in communal worship services or putting parishioners at risk of arrest and deportation—either of which violates their sincerely held religious beliefs.  This problem is compounded by congregational concerns that immigration enforcement action during church activities could escalate to a point where bystanding congregants and guests suffer physical harm.

15. If participation in these services decreases, or if our churches are forced to change the way they deliver their services, there will also be a devastating impact on the congregants and social recipients the churches serve.  They will be deprived not only of the physical benefits these ministries offer, such as food, clothing, medical assistance, etc., but also of the spiritual ministry our churches provide as part of their religious mission, such as worship, spiritual counsel, communion, and Bible study.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*Robin Dease*

B716AEA073B8492...

Bishop Robin Dease

# EXHIBIT 47

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

  *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

  *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF ANGELA GILREATH-RIVERS ON BEHALF OF ANONYMOUS MEMBER CHURCH FOR PLAINTIFF THE NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH

I, Angela Gilreath-Rivers, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am a retired elder in full connection who previously served as the pastor in charge of several United Methodist Churches. I currently serve as retired supply (a clergy member who has retired but is still appointed to serve) at a United Methodist Church that is part of the North Georgia Conference of The United Methodist Church.

2. The United Methodist Church ("UMC") is a worldwide Christian denomination whose main mission is to spread the Christian faith and preach the word of Jesus Christ as set out in the biblical gospels. The Annual Conference is the most basic administrative body of The UMC. Each UMC local church is chartered by (meaning created and organized by) and belongs to an Annual Conference as part of the larger United Methodist "connection" of local churches and members.

3. Jesus was an immigrant in Egypt. In many places in the Bible, we are told to welcome the stranger. Matthew 25:40 applies to all people. We are called to serve all of our neighbors,

especially those in need.  Our church has interrupted services to track the progress of a member returning with a coyote (an individual helping them cross the border).  We have prayed for children crossing the northern Mexican desert with a coyote.  Legal status is irrelevant in our congregation, except when it affects our community.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy and its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement action.

5.   Almost three-fourths of our congregants are Hispanic, with many hailing from Mexico, Guatemala, Honduras, Colombia, Ecuador, Peru, Argentina, and Puerto Rico.  We also have members from Italy and the Ivory Coast.  These church statistics are not estimations, as they come from our church's most recent end-of-year report.  We know that the majority of our congregants are immigrants, and many are undocumented.  That is a core part of our church: we do not minister *to* immigrants, we are in ministry *with* immigrants, since the majority of our congregants are immigrants.  Therefore, immigrants can be in positions of ministering to others in our church, so they are not always on the receiving end of the benefits of our ministries.  We all cooperatively work together.

6.   There have already been several Immigration and Customs Enforcement ("ICE") raids in our community, including raids at businesses and factories.  And the stark differences between our county's relatively low immigrant demographics and our church's very high immigrant demographics make our church a very easy and attractive target for immigrant enforcement actions.  We have already had congregants targeted during law enforcement roadblocks, and one congregant was arrested in an ICE raid at their workplace.

7.  Our church also has social service ministries that serve immigrants, including numerous workshops with immigration lawyers and the Georgia Latino Alliance of Human Rights.

8.  An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our church by interfering with our religious mandate to worship in person together as a congregation, with all members of our community, including those who are immigrants and without lawful status.

9.  DHS's new enforcement policy is already substantially burdening our religious exercise. We have had congregants arrested and deported, and one family chose to return to Mexico.   We have started locking our doors during church services to protect against an ICE raid and making sure our parking lot is secure before they exit worship services.  We are also unable to use our outdoor park area with picnic tables due to security concerns for our immigrant congregants and guests.   All of these precautions have unavoidably become physical manifestations of our congregation's fear of an imminent ICE action, and they undermine our church's religious commitment to be an open and welcoming place for all people to gather.

10. These fears have put a significant chill on church participation.  Our church has already had congregants stop coming to church out of fear of ICE under DHS's new policy.  We livestream our services, but many of the previously in-person congregants say the online experience is not the same—they are deprived of a vital part of our spiritual ministry when they cannot be here in person to worship with us.  And because there is a strong correlation to in-person worship participation and congregant giving, the decline in attendance is an existential financial threat to our church because we are a low-income congregation with few financial resources under the best of circumstances.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

Angela Gilreath-Rivers

42708FD0BBB0414...

Angela Gilreath-Rivers

4

# EXHIBIT 48

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF PASTOR JANE DOE # 18 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF THE NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH

I, Pastor Jane Doe # 18, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I serve as a pastor at a church in Georgia, and I have served in that capacity for several years. My church is part of The North Georgia Conference of the United Methodist Church.

2. The United Methodist Church ("UMC") is a worldwide Christian denomination whose main mission is to spread the Christian faith and preach the word of Jesus Christ as set out in the biblical gospels. Each local UMC church is chartered by (meaning created and organized by) and belongs to an Annual Conference as part of the larger United Methodist "connection" of local churches and members.

3. As the UMC Council of Bishops declared in a January 2025 letter, "As United Methodist[s], we have firmly declared through our Social Principles that we are called to actively welcome the migrant, immigrant, and refugee among us." We do not inquire about anyone's

Docusign Envelope ID: 6DE4349D-34A6-43C5-B2BB-3A76B6AB1490

Case 1:25-cv-00403-DLF    Document 11-51    Filed 02/21/25    Page 3 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 289 of 398

legal status, as we have instructions from Scripture (such as Matthew 25:31- 46) that require us to care for all people.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that my church is at imminent risk of an immigration enforcement action.

5.   My church is located close to the border between DeKalb and Gwinnett counties, both of which have substantial immigrant populations.  We are also located at the end of both the MARTA heavy rail transit system and Gwinnett County's public bus lines, which are both heavily used by immigrant populations.  We have heard that there have been Immigration and Customs Enforcement ("ICE") raids nearby, including the arrest of an immigrant at another church in our area while he attended church services.

6.   My church has a significant number of members from other countries.  We also run several social service ministries that serve immigrants, including an English for Speakers of Other Languages ("ESOL") program.  We have a preschool that serves several children whose parents are immigrants to the United States.  We have a weekly shower ministry that provides showers, laundry services, and a hot meal to our unhoused neighbors.  We offer a cold-weather shelter that offers overnight accommodations in our Activities Center to our unhoused neighbors and offers short hotel stays for families and sick individuals.  All these services are provided on campus, and with the hotel stays, they are initiated on our campus.  They are run by church members and organized by church members.  All these ministries are part of our church and are intended to provide services to those in need while giving us a chance to show the love of Christ.

2

7.  An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm my church by interfering with our religious mandate to worship in person together as a congregation, with all members of our community, including those who are immigrants and without lawful status.  Witnessing people being violently detained and arrested and removed from a church is extremely distressing.  Furthermore, an ICE enforcement action during a worship service will be very disrespectful to God and to all those who wish to worship.  Our church leadership is very concerned about what will happen during ICE action from a safety perspective.

8.  DHS's new enforcement policy is already substantially burdening our religious exercise. Teachers who work at a school in our church have already reported that parents of some of their students are concerned about continuing to come to the church due to the risk of ICE activity. Furthermore, due to concerns about the increased risk of an ICE raid on our church, we have already taken the ESOL program information off of our lighted sign and restricted all communications regarding that ministry strictly to word of mouth only.  We are also seriously considering offering online options for the ESOL program.  We have explored similar options for our preschool and ministries to the unhoused community, but there is no way to provide those services virtually.  Finally, our church leadership is training our ushers and greeters on how to respond to an ICE enforcement action.  All of this significantly burdens our ability to welcome strangers in the manner prescribed by our faith and biblical teachings.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*Jane Doe*

9EADCD842F82483...

Pastor Jane Doe # 18

3

# EXHIBIT 49

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF RABBI JACOB BLUMENTHAL,
## CHIEF EXECUTIVE OFFICER OF PLAINTIFFS THE RABBINICAL ASSEMBLY
## AND THE UNITED SYNAOGUE OF CONSERVATIVE JUDAISM

I, Rabbi Jacob Blumenthal, hereby submit this declaration pursuant to 28 U.S.C. § 1746

and declare as follows:

1. I am the Chief Executive Officer of both The Rabbinical Assembly ("the RA") and The

United Synagogue of Conservative Judaism ("USCJ"). I have been the CEO of the RA since

2019, and the CEO of USCJ since 2020.

2. I make this statement based upon personal knowledge, files and documents of the RA

and USCJ that I have reviewed, as well as information supplied to me by members and staff of

the RA and USCJ whom I believe to be reliable. These files, documents, and information are of

a type that is generated in the ordinary course of our business and that I would customarily rely

upon in conducting the business of the RA and USCJ.

3. The RA is the international association of Conservative Jewish rabbis founded in 1901,

and is a nonprofit membership organization headquartered in New York, NY. The RA currently

has 1,640 member rabbis worldwide, of whom over 1,300 are located within the United States.

4.    The USCJ was founded as an unincorporated federation of Conservative Jewish synagogue congregations in 1913 and incorporated as the United Synagogue of America by special act of the New York Legislature in 1916.  Its name was changed to The United Synagogue of Conservative Judaism by act of the New York Legislature in 1992.  USCJ currently has 560 member congregations located in seven Districts throughout North America, including over 500 located within the United States.  Our member congregations have over 1,000,000 individual members and participants.

5.    Core to our organizations is the mandate to love and care for all individuals, regardless of status—and especially immigrants, whom the Torah commands we welcome and protect. Specifically, the Torah lays out this tenet 36 times, more than any other teaching: "The stranger who resides with you shall be to you as one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt" (Leviticus 19:34).  In line with these religious tenets, Conservative congregations and rabbis welcome undocumented people into their synagogues for worship services, social service ministries, and other synagogue activities.

6.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy and its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that USCJ congregations, the vast majority of which are led by RA member rabbis, are at imminent risk of immigration enforcement action.

7.    Our congregations and their rabbis are located all along the borders and in population centers with large immigrant communities, both documented and undocumented.  Immigration and Customs Enforcement ("ICE") has already conducted raids in many areas in which our synagogues are located since the sensitive locations policy was rescinded.  For example, we have congregations in both New York City and Chicago, both of which have been targeted for raids in

2

Docusign Envelope ID: EE23AE1F-4EF9-476D-81A2-37741EC3B3A8

Case 1:25-cv-00403-DLF    Document 11-52    Filed 02/21/25    Page 4 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 294 of 398

recent weeks.  There have also been raids near congregations in Denver, Los Angeles, Philadelphia, and South Florida since the administration began.

8.  Many of USCJ's member congregations have immigrant congregants from all over the world, and the RA's rabbis are frequently called upon to counsel immigrant congregants.  For example, our congregations in New York and California have large numbers of Persian immigrant members.  Our congregation in Winter Springs, Florida, also has a significant immigrant population, as does one of our Chicago congregations.  Our immigrant congregants include those who are undocumented—at one Conservative congregation in El Paso, TX, where the rabbi is an RA member, a congregant is currently fighting deportation.  Many of our congregations and rabbis, like Congregation Beth Shalom in Seattle, WA, also employ immigrants as staff.

9.  Some of our rabbis and their congregations also provide social service ministries, including ESL classes, food pantries, food distribution, back-to-school events, clothes closets, weekly community meals, and immigration ministries.  These are open to everyone, regardless of whether they are documented.  One synagogue in the Northeast hosts an on-site shelter providing emergency housing, while another in New Jersey is in the process of formulating plans for housing asylum seekers on the synagogue premises.  A synagogue in Seattle has created sanctuary space for immigrants.  One Chicago congregation has been supporting refugee families, including homeless Venezuelan refugees living on the street in front of the synagogue building, and a congregation in Orlando runs an on-site food pantry that serves immigrants and other needy individuals.  These services are provided on synagogue property, and they are part of the religious congregation itself—organized, run, and funded by the congregations and its individual members.  They serve citizens and immigrants, both documented and undocumented.

10. An immigration enforcement action taken during a worship service, religious ceremony, or other activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status. It will substantially disrupt the whole synagogue's spiritual practice and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants and strangers to the community alike. Congregants have told their rabbis that an immigration raid will make them afraid of going to services and other synagogue programs. Likewise, an enforcement action directed at our congregations' social service ministries will prevent them from carrying out our mission to welcome and serve all, including immigrants, to whom we are called to minister to and protect as a fundamental belief of our faith.

11. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the new policy was implemented, I and other leaders of both the RA and USCJ have received countless phone calls, emails, and texts from rabbis and other representatives of member congregations who are confused and afraid. They want to know how to protect their congregations from intrusion and interruption. We already have reports of decreased attendance since the policy rescission. For example, Congregation Beth Shalom has already seen a decrease in attendance due to fear of an enforcement action and has had to cancel some of their social service programming. One of our Chicago congregations reports that congregants have said that they will stop attending services if the policy remains in place. And several congregations are revising their policies to help make themselves less of a target and minimize the risk of an ICE raid, including congregations in Seattle and New Jersey.

12. The imminent risk of immigration enforcement action is also presently forcing our members to make the impossible choice between refraining from welcoming all congregants to

participate in communal worship services or putting congregants at risk of arrest and deportation—either of which violates the laws of the Torah.

13. If participation in religious services decreases, or if members are forced to change the way they deliver their services, there will also be a devastating impact on the congregants and service recipients. They will be deprived not only of the physical benefits these ministries offer, such as food, clothing, medical assistance, and more, but also of the spiritual ministry our rabbis and congregations provide as part of their religious mission, such as worship, rabbinic counsel, and Bible study.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

DocuSigned by:

*Jacob Blumenthal*

0F130B9C5B714CF...

Rabbi Jacob Blumenthal

# EXHIBIT 50

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

## DECLARATION OF RABBI JILL BORODIN ON BEHALF OF HERSELF AND CONGREGATION BETH SHALOM SUPPORTING PLAINTIFFS THE RABBINICAL ASSEMBLY AND THE UNITED SYNAOGUE OF CONSERVATIVE JUDAISM

I, Rabbi Jill Borodin, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I was ordained as a Rabbi by the Jewish Theological Seminary in 2001 and have served as the Rabbi of Congregation Beth Shalom since August 2005.  I am a member of the Rabbinical Assembly and our congregation is a member of The United Synagogue of Conservative Judaism.

2.  Our synagogue feels a strong obligation to welcome the stranger, and especially immigrants.

3.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our synagogue is at imminent risk of an immigration enforcement action.

4.  Our congregation is located in Seattle, Washington, a city with a significant immigrant population that has been the target of recent immigration enforcement actions.  Our congregation

Docusign Envelope ID: 997DAE79-A31B-5EEE-B87G-B1897C4AF26B

Case 1:25-cv-00403-DLF    Document 11-53    Filed 02/21/25    Page 3 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 299 of 398

includes many Jewish and non-Jewish immigrants to the United States, some documented, some not, and some whose status is unknown to me.  We also employ staff who are immigrants.

5.  Since 2016, we have had an Immigration and Sanctuary committee that works to effectuate our sanctuary statement, supporting immigrants and refugees in need.  The committee accompanies immigrant community members to immigration appointments and hearings, provides basic necessities like hygiene supplies, homewares, and clothing, and staffs and supports asylum and TPS clinics.

6.  An immigration enforcement action at our synagogue will substantially burden our religious exercise by preventing us from carrying out our mission to welcome and serve all immigrants.  A raid would most surely be a direct attack on one of our foundational values— welcoming the stranger, as we are commanded to do.  It would also be an infringement on our protected religious freedom and practice.

7.  Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  We are seeing already the imminent risk of an enforcement action inhibit the free exercise of our religious freedom to pray together as a community.  Immigrants have reported that they are afraid of coming to synagogue, so they are staying away and not attending our services and other programs.  Members are afraid that uninvited security personnel will intrude on our worship and life cycle celebrations, which are very intimate and private affairs.  This fear is interfering with our ability to pray freely.  Members and staff are concerned that they will be targeted even though they are legal residents, and some have asked us to keep copies of their immigration documents for them at the synagogue in case of a raid.  And our social action committee has had to abandon some of the projects they have been working on for months as it is not possible under the new executive actions.  Our professional and lay leadership have spent

Docusign Envelope ID: 997DAE70-A31B-5EEF-B67G-B1897C4AF26B

Case 1:25-cv-00403-DLF    Document 11-53    Filed 02/21/25    Page 4 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 300 of 398

many hours, and our synagogue has incurred significant expenses, seeking counsel on this new

policy, and it has interrupted our ability to do our regular work. Our community takes very

seriously the biblical commandments regarding the treatment and protections of strangers and

immigrants, and it is core to who we are. These changes are adversely impacting our ability to

practice this part of our religion.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/19/2025

Respectfully submitted,

Signed by:

*Jill Borodin*

D362CDB4C38E48B...

Rabbi Jill Borodin

3

# EXHIBIT 51

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF RABBI DEBORAH WAXMAN, PRESIDENT AND CEO OF PLAINTIFF RECONSTRUCTING JUDAISM

I, Rabbi Deborah Waxman, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the president and CEO of Reconstructing Judaism, and I have served in this role since 2014.

2. I make this statement based upon personal knowledge, files and documents of Reconstructing Judaism that I have reviewed, as well as information supplied to me by Reconstructing Judaism members whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting Reconstructing Judaism's business.

3. Reconstructing Judaism has been the central denominational agency and central organization of the Reconstructionist movement since 2012. We currently have 94 congregations, mostly in the United States, and are headquartered in Wyncote, Pennsylvania. We also have a couple dozen congregations that fall within our movement because their rabbis

App. 417

are graduates of the Reconstructionist Rabbinical College and/or members of the Reconstructionist Rabbinical Association. Denominational training and affiliation are some of the ways we bring the Talmud's command that "every Jew is responsible for each other" to life, and an injury to one of our affiliated congregations is felt across the denomination.

4.   Reconstructing Judaism's vision is a diverse, connected and engaged Judaism that meaningfully contributes to a just and compassionate world. Inspired by the Torah's repeated teaching that Jews have a special obligation to welcome and care for "strangers," the Reconstructionist movement holds an overarching ideological commitment to supporting and sheltering immigrants, regardless of whether they are Jews and regardless of their legal status. This religious mandate is bolstered by centuries of Jewish lived experience, including the Holocaust, when Jews were immigrants and refugees seeking shelter in the face of danger and discrimination.

5.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our member congregations are at imminent risk of immigration enforcement actions.

6.   We have congregations located across the United States, including in areas that have been targeted for immigration enforcement because they have large immigrant populations. Our congregation in Montclair, New Jersey, is very near multiple neighborhoods densely populated by immigrants, as is our congregation in New York City. And we have several congregations in agricultural communities that have substantial immigrant populations, including in Sonoma, California. We also have congregations in or in close proximity to cities that have experienced immigration raids in just the last few weeks, including Chicago, Philadelphia, New York City,

and the Bay Area.  In the last two weeks of January, there were raids, arrests, and immigration enforcement actions less than a mile away from one of our congregations located outside Chicago.  That congregation has experienced documented Immigration and Customs Enforcement ("ICE") presence at surrounding stores and neighborhoods over the last several weeks.

7.    Many Reconstructionist congregations serve immigrants or those with immigrant family members as part of their congregations.  Since Jews are a worldwide people, there are frequently immigrants in our congregations from all over the world, including Russia, Mexico, Central and South American countries, and African countries.  For example, one congregation located outside of Chicago has congregants who hail from 25 different countries, from Argentina to Mexico to Ukraine.  Another congregation, in Northern New Jersey, has members who are both immigrants themselves and who have immigrant members of their families.  Although we do not ask about legal status as it is irrelevant to inclusion in our community, we are fairly certain that some of our congregants are undocumented.

8.    Our congregations also offer social services to immigrants regardless of their immigration status.  Many of our congregations have social service outreach programs on their campuses, such as soup kitchens or food pantries, legal assistance, and temporary housing. Many of our members have also taken actions specifically to welcome immigrants, including offering sanctuary to immigrant families.  For example, one congregation outside Chicago has been a Welcoming Congregation since 2017 and is actively involved in supporting refugees when they come to this country, including through an Immigrant Justice Task Force made up of member volunteers.  Another congregation, in Northern New Jersey, has an apartment on their property to house immigrants and asylum seekers in their community.  And Kehilla has been a

sanctuary congregation for almost 40 years and more recently has begun hosting immigrant guests on their property. They also have an accompaniment program where they provide help with housing, legal representation, basic needs like food and clothing, and assistance with the immigration process and removal proceedings. Some of our congregations also rent space to other nonprofits, including those that provide direct services to immigrants.

9. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status. It is a spiritual obligation and an abiding commitment among Reconstructionist Jews to provide support and shelter to immigrants, regardless of whether they are Jews and regardless of their legal status. The knowledge of suffering and fear by immigrants, particularly fear that affects their participation in worship and activities, is considered a loss and a wound in our denomination. Moreover, the holiness of Jewish worship sites, extending to the breadth of synagogue property, is sacrosanct. The history of attacks on and expulsions of Jews has contributed to a powerful sense of protectiveness and concern by Jews for our holy places. ICE activity at one of our synagogues—during services or at any point, and whether Jews or our guests are the targets—will be profoundly invasive and traumatizing, and it will violate the safety and sanctity of that space.

10. Likewise, an enforcement action directed at our congregations' social service ministries will prevent our congregations from carrying out our mission to welcome and serve all, including immigrants. As Jews and as Reconstructionists, we are commanded to care for those who are vulnerable, hungry, poor, unhoused, and at risk. Enforcement action at our synagogues will undermine our religious obligation to make sure that we care for refugees and immigrants.

Docusign Envelope ID: 47B40A80-EE7A-4A3F-B421-915A6486BE87

Case 1:25-cv-00403-DLF    Document 11-54    Filed 02/21/25    Page 6 of 7
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 306 of 398

11. DHS's new enforcement policy is already substantially burdening our religious exercise. Our immigrant congregants and social service recipients are fearful of participating in synagogue activities and ministries, and we know that many immigrants are no longer participating in our services. Congregants at our synagogue in Northern New Jersey have said that they are afraid that they may be swept up in raids regardless of their immigration status simply because they are Latino or speak Spanish. That congregation is experiencing decreased participation in its social service activities and difficulty in attracting new members because of the rescission of the policy. The same is true elsewhere. For example, the local immigrant community has communicated to leadership at our congregation outside of Chicago that they are fearful of leaving their homes and coming to public services, community and social outreach programs, and supportive services because of the imminent risk of ICE raids. Our congregants and social service recipients are suffering and staying home because of DHS's new enforcement policy.

12. Because a key commitment of Reconstructionism is thinking, dreaming, and making decisions in conversation with community, the loss of that community undermines our ability to engage in our religious practice. And we cannot achieve our religious mandate to welcome and support "the stranger" when immigrants do not feel safe coming to our synagogues. Already, in response to DHS's new enforcement policy, many congregations have invested time and resources in training staff and congregants about how to respond to the possibility of a raid and how to keep each other safe. Our congregation in Northern New Jersey, for example, has made significant efforts training staff, outside organizations, and congregants themselves about the risk of a raid. Kehilla is similarly developing extra security precautions, including keeping doors locked, putting up signage, and training staff and the congregation.

13. DHS's new enforcement policy is also presently forcing our congregations to choose between abandoning their religious obligation to welcome and serve immigrants in their synagogues without regard to legal status, or continuing to fulfill that obligation while making their congregants and visitors an easy target for ICE action. Both choices are unconscionable. For Reconstructionists, helping the undocumented is a spiritual obligation. We experience the knowledge of suffering and fear by the undocumented affecting their participation in worship and other activities as a loss and as a wound to our collective communities. Cutting back on either worship or social service work will also cause our congregations to lose members, undermining our mission to create a community of belonging and harming congregations' financial capacity to keep their doors open.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

DocuSigned by:

*Deborah Waxman*

4C2F1CF1EEC6405...

Rabbi Deborah Waxman

6

# EXHIBIT 52

App. 423

Docusign Envelope ID: F897653D-6940-4BF4-8417-99C09CA1008D

Case 1:25-cv-00403-DLF    Document 11-55    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 309 of 398

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF RABBI DEV NOILY ON BEHALF OF KEHILLA COMMUNITY SYNAGOGUE SUPPORTING PLAINTIFF RECONSTRUCTING JUDAISM

I, Rabbi Dev Noily, upon my personal knowledge, hereby submit this declaration

pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I am the Senior Rabbi of Kehilla Community Synagogue.  The Kehilla Community

Synagogue was started in 1984 and is based in Piedmont, CA.  I am a graduate of the

Reconstructionist Rabbinical College and a current member of the Reconstructionist Rabbinical

Association, bringing our synagogue within the Reconstructing Judaism movement.

2.  Kehilla's religious mandate includes our obligation to heal and repair the world, a central

theme in Judaism, by showing compassion to all, and by actively working towards social justice,

peace, and environmental sustainability.  We call ourselves a "community synagogue" because

in Kehilla, you don't need to experience life's inevitable *simchas* and *tsuris* – joys and

heartaches – in isolation.  Being in community sweetens our joyous times and holy days, and

softens the times of distress as we support and console each other.  Justice for immigrants is one

of our central values.  Our religious services and programs are open to all.  We not inquire as to

citizenship or immigration status. Kehilla has many congregants who themselves, or whose family members, were impacted by the Holocaust. Many of us would not be here today if someone had not taken a risk to shelter our parents or grandparents or take other steps to help get them out of danger. We feel compelled to do the same, if necessary, for others who are fleeing danger or unjust persecution by their home countries or by the United States government.

3.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our synagogue is at imminent risk of an immigration enforcement action.

4.  Kehilla is located just outside Oakland, California, one of the most diverse cities in the country and a place where Immigration and Customs Enforcement ("ICE") regularly conducts enforcement actions. Approximately 26 percent of Oakland residents are foreign born, and some sources estimate that one in ten Oakland residents are undocumented. We ourselves have a number of congregants who are immigrants. We are also located approximately 10 miles from ICE's San Francisco Field Office and less than 20 miles from a maritime border, within Customs and Border Protection ("CBP")'s zone of operations. While CBP has in the past more typically operated closer to the southern border, it recently began making mass immigration arrests in central California and has stated its intent to launch mass arrest operations in Northern California.

5.  Several years ago, Kehilla constructed a guest space inside our synagogue in which we provide short-term, temporary shelter and other services to newly arrived immigrants and immigrants released from detention or those who have lost their housing. As of today, we have had 30 different individuals stay at Kehilla for a total of nearly 600 nights. While these guests

Docusign Envelope ID: F897653D-6910-4BF4-8417-99C09CA1008D

Case 1:25-cv-00403-DLF    Document 11-55    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 311 of 398

are with us, volunteers from our congregation provide meals, rides, visits, and many other types

of support.  Guests who stay with us are also invited to participate in broader congregational

activities, including adult classes, Kehilla School activities, services, holiday celebrations, and

other activities.  Some have spoken at services or educational events.  Those who stay with us

stay in a private room but also use common areas, such as the social hall, courtyard, and kitchen.

6.   In 2015, Kehilla initiated an accompaniment program promoting opportunities for our

members to show up for and journey alongside immigrants in their struggle for freedom and

safety.  Our accompaniment program involves coordinating teams of Kehilla volunteers to work

with newly arrived families and individuals to assist with practical needs such as finding

housing, jobs, and legal representation, applying for MediCal, and school enrollment, and to

connect people with resources in the community and much more.  To date, teams from Kehilla's

Immigration Committee have accompanied 110 individuals from all over the world.  Sometimes

these social services and supports are offered to people on synagogue grounds; other times they

are offered off-site.

7.   Any immigration enforcement action at our synagogue will substantially burden our

religious exercise by preventing us from carrying out our mission to welcome and serve all

immigrants.  ICE or CBP intrusion on our synagogue will desecrate our sacred space and

interfere with our religious obligation to make sure that we care for refugees and immigrants, as

we are commanded to do.  Enforcement action at Kehilla will cause congregants to feel unsafe

and to withdraw from in-person activities, or to refrain from sending their children to the on-site

religious-educational programming Kehilla offers, undermining our ability to fulfill our religious

mission of being in community together.  It will also discourage immigrants from seeking social

services and support or shelter at Kehilla, threatening our ability to perform this foundational

3

expression of our religious mission.  It thus will prevent congregation members from having the transformational spiritual experience, growth, and community building that occurs for so many congregants through participation in Kehilla's work.

8.  DHS's new enforcement policy is already substantially burdening our religious exercise. We are already reconsidering how we engage in our work so that we do not put our members or congregation at risk, but we are trying hard to avoid anything that would compromise our religious purpose.  We are developing extra security precautions, such as always having someone staff the door when it is unlocked, ensuring that volunteers or paid staff are always present in the building, putting up signage, and training our staff and congregation in know-your-rights information.  The heightened vigilance we now must project undermines the welcoming and safe environment that is foundational to our religious mandate.  The changes also constitute a significant diversion of attention and resources that would otherwise be applied to advancing other aspects of Kehilla's religious purpose.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*Dev Noily*

EB2972FAD9164B1...

Rabbi Dev Noily

# EXHIBIT 53

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MENNONITE CHURCH USA et al., | |
| *Plaintiffs,* | |
| v. | Civil Action No. 1:25-cv-00403 |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

### DECLARATION OF RABBI JOHN DOE # 19 ON BEHALF OF AN ANONYMOUS SYNAGOGUE SUPPORTING PLAINTIFF RECONSTRUCTING JUDAISM

I, Rabbi John Doe # 19, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Senior Rabbi at a synagogue in the Mid-Atlantic. Our congregation has been part of Reconstructing Judaism for nearly 50 years.

2. I wish to submit this declaration anonymously out of fear that my synagogue will be targeted for immigration enforcement action.

3. Our synagogue has always been and will continue to be a place welcoming and serving immigrants. We are committed to social action—Tikkun Olam—to help repair the world in which we live. One of our most important commandments is to love the stranger; we are all created in G-d's image. While we celebrate the time we escaped bondage in Egypt and became strangers in the strange land, our more immediate and collective memory is that of fleeing genocide and hardship—so the idea of providing refuge and safe harbor is personal to us. We feel a strong obligation to welcome the stranger and especially any immigrant.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our synagogue is at imminent risk of an immigration enforcement action.

5.   Our synagogue is located in an area with a number of immigrants, and it is surrounded by other towns and cities with many immigrants.  There have been immigration raids in many of these cities.  Our congregation also has a sizable immigrant population, including individuals from Israel, the Former Soviet Union, Columbia, Germany, Cuba, Canada, South Africa, England, Argentina, and Spain, among other places.

6.   Our synagogue provides individual and family sanctuary to immigrants in various stages of asylum processing.  One of the buildings on our campus has a top floor that is a fully operational suite apartment that has housed immigrants in need of temporary shelter since 2017, and we are currently housing a family as our guests.  We began our mission of housing immigrants no matter their status because it's deeply imbedded in our mission of welcoming all. We consider it a vital part of our work, who we are, and our religious teachings to welcome the stranger.  We also have a Tikkun Olam group that participates in numerous activities that provide services to the less fortunate.  We have hosted activities like soup kitchens and addiction groups that serve primarily immigrants, both documented and undocumented.  And we also host interfaith gatherings at our synagogue that include congregations with significant immigrant populations.

7.   An immigration enforcement action at our synagogue will substantially burden our religious exercise by desecrating our sacred space and preventing us from carrying out our mission to welcome and serve all immigrants.  It will be a direct attack on one of our

2

App. 430

foundational values—welcoming the stranger, as we are commanded to do. It would also be an infringement on our protected religious freedom and practice.

8. Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise. Our Hispanic congregants are scared that they will be targeted, decreasing participation in the many activities that make our synagogue a valued community for all. We are also finding that this risk is a deterrent for new members, potentially reducing dues and putting a strain on our finances. DHS's new enforcement policy is curtailing our mission and, just as importantly, infringing on our Jewish values and faith.

9. DHS's new enforcement policy has already caused us to spend time and resources to train staff, outside organizations, and congregants about the risk of an enforcement action. Even congregants who are "greeters" during our events now need to know how to act in case of Immigration and Customs Enforcement ("ICE") presence and must carry the burden of the extra thought and stress that that now imparts on them. One of our core missions is to be welcoming to all. To communicate differently to our immigrant members and neighbors as a result of the increased risk of an enforcement action and act in accordance with those changes is fundamentally at odds with our beliefs.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*John Doe #19*

FE3A292A14D34C1...

Rabbi John Doe # 19

3

# EXHIBIT 54

Docusign Envelope ID: 9E247E14-42A1-43C2-ADA4-EC48E9C3D92A

Case 1:25-cv-00403-DLF    Document 11-57    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 318 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF JEREMY LANGILL FOR
## PLAINTIFF RHODE ISLAND STATE COUNCIL OF CHURCHES

I, Jeremy Langill, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and

declare as follows:

1.  I am the Executive Minister of the Rhode Island State Council of Churches ("RISCC")

and have served in that role since 2023.

2.  I make this statement based upon personal knowledge, files and documents of RISCC

that I have reviewed, as well as information supplied to me by members of RISCC whom I

believe to be reliable.  These files, documents, and information are of a type that is generated in

the ordinary course of our business and that I would customarily rely upon in conducting

RISCC's business.

3.  RISCC was founded in 1937 by a Christian minister, a Unitarian minister, and a Rabbi.

Our mission is built around the principle that God loves everyone, that God includes everyone,

and that because of this, we are to be a voice of love and inclusion in all the places that decisions

App. 433

are made.  We are a nonprofit membership organization headquartered in Providence, Rhode Island.

4.   RISCC maintains relationships with eight judicatory bodies of eight denominations.  Our membership consists of 20 individual congregations across Rhode Island.  Our belief in welcoming strangers and serving immigrants is rooted in scripture: Leviticus 19: 33-34 instructs that, "The alien who resides with you shall be to you as the citizen among you; you shall love the alien as yourself, for you were aliens in the land of Egypt: I am the Lord your God."  It is our firmly rooted theological commitment that all are welcome at the table, that all are included in God's embrace.  God does not turn anyone away from God's family, so we do not either.

5.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy and its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement action.

6.   Rhode Island has a relatively large community of immigrants—one in eight Rhode Islanders was born in another country.  Moreover, the entire state is within 100 miles of the border and therefore within Customs and Border Protection ("CBP")'s jurisdiction.  We have already seen immigration enforcement actions in Rhode Island since the new administration was sworn in.  For example, there was an Immigration and Customs Enforcement ("ICE") arrest in Newport the last week in January, and one of our members in Providence, Church Beyond the Walls, reports that they have seen enforcement actions in town.

7.   Many of our congregations have immigrant members, including some who are undocumented.  A Baptist member congregation has immigrant members from Africa, Asia, the Virgin Islands, and Germany.  A Methodist member church has had immigrant members from

nations in every continent except Antarctica. A Unitarian member church has long welcomed immigrants in their membership and currently has a family of asylum seekers as members of the congregation.

8. We have numerous congregations that provide assistance to those in need, including handing out food and clothing on their premises. For example, the Baptist church referenced above has addiction counseling meetings in their building that are open to all. The Methodist church provides food, clothing, and counseling services on church property. And the Unitarian church has a Food Share Pantry and serves lunches to residents and neighbors. These ministries serve a diverse range of people, including people who are immigrants and undocumented. Some member churches, such as the Unitarian church, have also provided sanctuary shelter for immigrant families on church premises and have helped provide support to asylum seekers and other immigrant families.

9. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status. An enforcement action would be an unprecedented and untenable incursion into a sacred space in which congregants are invited to be co-creators with the divine and freely participate in the life of the church. Likewise, enforcement actions targeted at our members' social service ministries impede their spiritual mission by violating the fundamental principles of sanctuary, mercy, and care for the vulnerable.

10. DHS's new enforcement policy is already substantially burdening our members' religious exercise. Some of our churches are already reporting a decrease in attendance since the policy rescission. For example, the Methodist church has seen a drop in attendance at its worship

Docusign Envelope ID: 9E247E14-42A1-43C2-ADA4-FC48F9C3D92A

Case 1:25-cv-00403-DLF    Document 11-57    Filed 02/21/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 321 of 398

services and has diverted leaders' time and resources in order to provide security to their congregants, potentially putting the long-term future of their institution at risk. The Baptist church is actively working on a safety plan for their congregation, including educating members about their legal rights in the event of an immigration raid. That church has also changed the way it uses social media, YouTube, and other online spaces to communicate, and leadership worries about the impact this will have on their relationship with their community and housebound members. For RISCC, DHS's new enforcement policy has changed the way we communicate about our association and its activities to the public. We are more diligent and cautious about what we communicate and have removed our membership from our website. This is affecting the very heart of Christian living—the gathering of the community.

11. Our churches are also reporting that attendance at and participation in social service ministries has also declined since DHS's new policy was announced. If we have to cut back on services, our congregations would be greatly impacted as people would lose access to the community and faith formation we provide.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Jeremy Langill*
4AB1C955111945F...

Jeremy Langill

4

# EXHIBIT 55

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

    Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

## DECLARATION OF REVEREND JOHN DOE # 20 ON BEHALF OF ANONYMOUS CONGREGATION SUPPORTING PLAINTIFF RHODE ISLAND STATE COUNCIL OF CHURCHES

I, Reverend John Doe # 20, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.   I serve as Pastor for a church in Rhode Island.  We are a member of the Rhode Island State Council of Churches ("RISCC").

2.   Our church founded on the recognition that we are all broken in this world, redeemed only by God's grace.  We understand that we are called to accept people wherever they are on their journeys, who are drawn to this Way of healing, community, and liberation in the Spirit of Jesus.  We serve hundreds of multicultural, multiracial, and multigenerational congregants regardless of race, immigration status, sexual orientation, economic or social standing, abilities, or past.

3.   Our church's founding documents recognize the need to serve all who come to a common table of God's love, acceptance, and power for change regardless of background or immigration status.  We have been a church inclusive of immigrants and have served immigrants since the

Docusign Envelope ID: D707A47A-9D5F-4D97-886B-115FE4E1965C

beginning.  We were literally founded to implement this way of radical Love in the Methodist tradition.

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5.   There are many immigrants in Providence, and there have been immigration raids in the city and nearby neighborhoods.  Many of our own members are immigrants, and over the years we have welcomed immigrants from nations in every continent except Antarctica.  Some of our members are undocumented and some have been targeted by Immigration and Customs Enforcement ("ICE").

6.   Providing social services to the community is a vital part of our mission.  Currently, we provide food, clothing, and counseling services on church property.  These services are offered to both congregants and non-congregants, and to all immigrants regardless of their legal status.  Some of our social service recipients are undocumented.  There is no citizenship test with God and there is none with us.

7.   An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our church by interfering with our religious mandate to worship in person together as a congregation, with all members of our community, including those who are immigrants and without lawful status.  It will undermine the core mission of our church of being seen as a place of refuge for those in need, and it could well affect the future financial viability of our congregation.

8.    Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  We have already seen a negative impact on attendance at our worship services and ministries because of the fear and anxiety around being targeted by ICE—even among those with legal status.  This reality has forced us to devote both time and some of our limited financial resources in order to secure the safety of our people from government risk, potentially jeopardizing our institutional life.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/21/2025

Respectfully submitted,

Signed by:

*John Doe #20*

89519723AE9743B...

Reverend John Doe # 20

3

# EXHIBIT 56

App. 441

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF MELISSA S. JOHNSON, GENERAL COUNSEL AND VICE PRESIDENT, PEOPLE & CULTURE FOR PLAINTIFF UNION FOR REFORM JUDAISM

I, Melissa S. Johnson, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the General Counsel and Vice President, People & Culture for Union for Reform Judaism ("URJ"), roles I have held since 2020.

2. I make this statement based upon personal knowledge, files and documents of URJ that I have reviewed, as well as information supplied to me by members of URJ whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting URJ's business.

3. URJ was founded in 1873 by Rabbi Isaac Mayer Wise as the Union of American Hebrew Congregations. We are a nonprofit membership organization headquartered in New York that serves as the umbrella organization for the congregations of North American Reform Judaism. URJ currently has 815 congregations across North America encompassing 1.5 million Reform

Jews. An injury to one Reform congregation is felt deeply as an injury to all and to the denomination overall.

4. URJ envisions a world in which Judaism enables all people to experience peace and wholeness (*shalom*), justice and equity (*tzedek*), and belonging and joy (*shayachut* and *simcha*). URJ has long supported a fair and generous immigration policy, informed by the history of the Jewish people as a group forced time and again to flee the lands in which it resided. URJ affirms its commitment to create the same opportunities for today's immigrants that America offered the Jewish community not so many years ago.

5. The history of the Jewish people from Egypt through the Holocaust and continuing today is the story of a group forced time and again to flee the lands in which it resided. Repelled often in times of greatest need, Jews recognize the necessity for havens for the persecuted. Our people were and continue to be immigrants to this nation. We have benefited from its open doors, and we suffered when they were closed. We struggled to adjust to a society that did not always welcome our arrival. We understand the problems faced by today's immigrants, as well as the difficulties attributable to the problem of illegal immigration.

6. Welcoming the stranger, or immigrant, is a core part of Jewish tradition, mentioned 36 times in the Torah (the first five books of the Hebrew scriptures). Leviticus commands, "The stranger who resides with you shall be to you as one of your citizens; you shall love them as yourself, for you were strangers in the land of Egypt" (19:33-34). One key rule of the Hebrew Bible and later Jewish law was that those who were the "*ger*," the non-citizen resident, were granted the same social benefits and access to charity and communal support (including food assistance to the hungry and shelter to the homeless) to which Jewish citizens were entitled. Our own people's long history as "strangers" reminds us of the difference between societies where

2

Docusign Envelope ID: A9EEF154-C6C4-4C29-8862-3099E2037325

Case 1:25-cv-00403-DLF    Document 11-59    Filed 02/21/25    Page 4 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 329 of 398

immigrants were "othered," despised, and oppressed, and those societies which welcomed and supported immigrants.

7. I have good reason to believe that the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people in the country puts URJ congregations at imminent risk of immigration enforcement activity.

8. URJ member congregations are located in cities like Chicago, Newark, Miami, and Atlanta where high-profile immigration raids have been conducted in recent weeks; others are located in border communities with large undocumented populations, such as the Rio Grande Valley. Many of our congregants are immigrants and while we do not possess records or direct knowledge, we have reason to believe that some are undocumented.

9. Rooted in our religious text and history, URJ has adopted resolutions since the 1980s on immigration, including encouraging Reform congregations to declare themselves places of sanctuary for those at risk of deportation, and many have heeded that call, making them likely targets for immigration enforcement action. For example, one URJ congregation works with connections in the local sheriff department to provide quick, temporary refuge for individuals under threat of deportation. Some URJ congregations have had previous interactions with Immigrations and Customs Enforcement ("ICE"). For example, ICE agents once confronted a rabbi at a URJ synagogue about the immigrant-justice work that his congregation was undertaking.

10. Many URJ congregations also host on-site foodbanks, meal programs, homeless shelters, clothing donation, English classes, and other support services that serve undocumented immigrants among others. Reform Jewish synagogues are widely known for their social justice

3

Docusign Envelope ID: A9EEF154-C6C4-4C20-8862-3099E2037385

Case 1:25-cv-00403-DLF    Document 11-59    Filed 02/21/25    Page 5 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 330 of 398

endeavors, including their immigrant justice work.  This makes their social service ministries an easy target for immigration enforcement now that the sensitive locations policy has been rescinded.

11. An immigration enforcement action at a URJ synagogue will have a profoundly disruptive effect on our ability to fulfill our religious and prophetic mandate.  It will fray the social bonds within the congregation and inhibit the core value of creating experiences that strengthen a vibrant Jewish life.  It also will catalyze a decline in worship attendance, which could impact a synagogue's ability to hold prayer services with the common quorum of ten Jewish adults.  Many congregants at URJ synagogues are the descendants of Holocaust survivors whose families had to flee for safety, and many already are on high alert due to recurring, violent and high-profile antisemitic events.  The infiltration into a sacred space of armed law enforcement will cause profound emotional and spiritual distress, which is antithetical to our religious mission.  An enforcement action during worship services or a religious ceremony will thwart URJ synagogues' mission to serve as "a house of prayer for all peoples" (Isaiah 56:7), without regard to demographics or status.

12. Likewise, an immigration enforcement action directed at a URJ congregation's social services will cut at the very core of our Reform Jewish identity, values, and mission.  As former URJ President Eric Yoffie said, "Reform Jews are committed to social justice.  Even as Reform Jews embrace ritual, prayer, and ceremony more than ever, we continue to see social justice as the jewel in the Reform Jewish crown."  ICE interference with our people's ability to fulfill the Jewish prophetic mandate to welcome the stranger will undermine a core tenet of Jewish faith, and those who are served by, with, and through our congregations will be denied vital supports that allow them to sustain themselves in a moment of challenge.

Docusign Envelope ID: A9EEF154-C6C4-4C20-8862-3099E2037325

Case 1:25-cv-00403-DLF    Document 11-59    Filed 02/21/25    Page 6 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 331 of 398

13. DHS's new enforcement policy is already substantially burdening our congregations' religious exercise.  For example, an on-site food bank at one URJ congregation has changed its policies in response to patrons' concerns about ICE raids.  Whereas patrons previously waited in the synagogue's parking lot while volunteers finished setting up the pantry, the synagogue now allows everyone to wait inside.  Some of the food pantry's patrons have stopped coming altogether out of fear of ICE activity.  If participation in such social service ministries continues to decrease, or our congregations are forced to change the way they deliver their services, there will also be a devastating impact on both the recipients of those services and our ability to fulfill our religious mandate of service.  Some synagogues are preparing to increase their security measures and provide more online programing, both of which will require diverting financial resources from other congregational priorities.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Melissa S. Johnson*

233159A1079D4EF...

Melissa S. Johnson

5

# EXHIBIT 57

Docusign Envelope ID: 19636D55-8387-4598-8187-3F714E2452CB

Case 1:25-cv-00403-DLF    Document 11-60    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 333 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF RABBI JOHN DOE # 21 ON BEHALF OF ANONYMOUS CONGREGATION IN SUPPORT OF PLAINTIFF UNION FOR REFORM JUDAISM

I, Rabbi John Doe # 21, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Senior Rabbi at a synagogue in the New York City metropolitan area. Our congregation is a member of the Union for Reform Judaism.

2. I wish to submit this declaration anonymously out of fear that my congregation will be targeted for immigration enforcement action.

3. Rooted in our sacred texts and the lived experiences of our families, our congregation holds deep beliefs and commitments to serving immigrants. Jewish tradition is insistent on caring for the stranger in our midst. Thirty-six times in the Torah, our most core, sacred text, we are enjoined to welcome the stranger. Out of the experience of Egyptian slavery and the exodus, we are told that because we know the feelings of the stranger, we are obligated to welcome and care for those deemed as outsiders in and around our community. One compelling example comes in the book of Leviticus, in the midst of the "Holiness Code," the central text of Torah

that teaches how to live a life of commitment to God and to humanity. There, we are commanded to treat citizen and stranger alike and to graciously provide the same care and dignity: "The strangers who reside with you shall be to you as your citizens; you shall love each one as yourself, for you were strangers in the land of Egypt: I the Eternal am your God" (Leviticus 19:34).

4. This commitment is not just rooted in biblical stories. Many in our community descend from survivors of the Holocaust and refugees from Europe and the Middle East during times of persecution and expulsion. Many in our community were resettled in the United States by the Hebrew Immigrant Aid Society as immigrants and refugees. Both in gratitude and in empathy and shared commitment, our history compels us to be engaged in work that serves immigrant and vulnerable populations.

5. In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our synagogue is at imminent risk of an immigration enforcement action.

6. Our congregation is located in a New York City suburb with a significant Hispanic population. More than 30 percent of people in our city are foreign born. We have heard reports of Immigration and Customs Enforcement ("ICE") raids in our county, including at a school a few towns over.

7. Our synagogue's risk of enforcement action is particularly heightened because we operate an on-site food pantry that welcomes 60-80 patrons each week and provides hundreds of bags of food to local churches, schools, community centers, and homebound patrons. When our patrons enter, we make clear that we do not ask about immigration status, but most are native

Spanish speakers and many have told us that they are concerned for themselves or their families because they are undocumented. We share that we are a safe place, and we provide resources in English and Spanish to explain their rights. We explain that we will do whatever we can to provide necessary service, resources, and information to them. Our hope is that our undocumented neighbors will share with friends, family, and community that our synagogue is a place they can go where they will be safe and treated with dignity and respect. We also work to resettle refugee families who often visit our synagogue.

8.    DHS's recission of its sensitive locations policy is already substantially burdening our religious exercise, in particular with operation of our food ministry. In the past, patrons waited outside while volunteers finished setting up the pantry for walk-in hours. Now, under the looming threat of ICE action, our immigrant patrons feel too vulnerable to stand outside together. In response, we changed policies to allow everyone to wait inside, but some patrons have stopped coming to the pantry altogether. This negatively impacts our ability to fulfill our religious mission of welcome and service, as the people we are called to care for are unable to get the food that they and their families desperately need.

9.    An immigration enforcement action at our synagogue will damage our food pantry's reputation and negatively impact our ability to serve our community and fulfill our religious mission. The pantry was founded by, and is run by, congregants, and it is a foundational part of the synagogue's social service outreach ministry work and a keystone of our congregational identity. We are committed to finding other ways to serve our patrons who cannot risk coming to our synagogue in person, but this will require additional time and effort from staff and volunteers to hand-deliver food. We also recognize that these patrons will be hesitant to give us their addresses, and our staff and volunteers may be afraid to have those addresses in their

3

possession, both for their own safety and for that of our patrons.  If it becomes no longer feasible or safe to house the pantry on our campus, we will incur significant extra costs to find a safer alternative location, which may not even exist.

10. An enforcement action will also have a devastating and chilling effect on the entire synagogue community.  Many of us have family histories of immigrating to the United States to flee persecution.  Many are the descendants of Holocaust survivors whose families arrived as refugees, some originally of questionable status.  The threat of ICE raids is a traumatizing prospect that is all too reminiscent of the homes our families fled or were forced to leave from decades ago.  An enforcement action will cause some congregants, believing that I as our spiritual leader cannot ensure that our synagogue is a safe place, to cease or decrease their participation in religious services.  It could also cause parents to disenroll their children from our early childhood program, which would diminish our community and have a significant negative impact on our budget and our ability to provide a range of services to our congregation.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*John Doe #21*

165E8B82776A4FE...

Rabbi John Doe # 21

# EXHIBIT 58

Docusign Envelope ID: C039E0C4-DE55-482D-A07A-0A34E24A7FA0

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF CAREY MCDONALD, EXECUTIVE VICE PRESIDENT OF PLAINTIFF UNITARIAN UNIVERSALIST ASSOCIATION

I, Carey McDonald, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I am Executive Vice President of the Unitarian Universalist Association ("UUA") and I have served in that role since 2018.  I am an officer of the UUA, appointed by our Board of Trustees.  I also serve as the UUA's clerk under Massachusetts law.

2.  I make this statement based upon personal knowledge, files and documents of the UUA that I have reviewed, as well as information supplied to me by UUA staff members whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting the UUA's business.

3.  The UUA was founded in 1961 as a merger of the American Unitarian Association (founded in 1825) and the Universalist Church of America (founded in 1793).  We are headquartered in Boston, Massachusetts.  We have over 1000 member congregations and related

App. 453

faith communities, located across all 50 states and the District of Columbia.  Our adult

membership numbers over 130,000 people.  UUA member congregations covenant

congregation-to-congregation and through our Association to support and assist one another in

our ministries.

4.   We believe Love is the power that holds us together and is at the center of our shared

values, which also include Justice, Equity, Transformation, Pluralism, Interdependence,

Generosity, and Hope.  Our religious beliefs and structure are grounded in the mutual

commitment (covenant) we make on behalf of our shared values and, in turn, on the practice of

living out those commitments in religious community.  Because we are united in a shared

covenant, and because we believe that our destinies are fundamentally intertwined, harm to one

of our congregations or members impacts our denomination as a whole.

5.   These principles have guided our longstanding, robust commitment to immigration

justice.  They compel us to affirm that all immigrants, regardless of legal status, should be

treated humanely.  We explicitly and publicly support humane treatment of immigrants without

regard to whether they are documented or undocumented, and we have issued statements

condemning immigration raids and the inhumane treatment of immigrants.  In putting these

principles into practice, we have dedicated ourselves to caring for those at risk.  Our members

have consistently affirmed Unitarian Universalism's commitment to immigration justice as a

core aspect of how our values call us to practice our faith.

6.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive

locations policy and as part of its plan to deport all undocumented people during President

Trump's second term, I have strong reason to believe that our congregations are at imminent risk

of an immigration enforcement action.

7.    Many UUA congregations are located near the U.S.-Mexico and U.S.-Canada borders, or in cities where immigration-enforcement actions have recently occurred.  For example, one congregation in Indiana is located in an area where local industry has created a significant migrant community; the members of that church include immigrants and a Deferred Action for Childhood Arrivals ("DACA") recipient.  Many other of our congregations include immigrants, both documented and undocumented.  In addition, several UUA congregations have declared themselves sanctuary congregations and have housed immigrants on short- and long-term bases. Our members are often well-known, locally or nationwide, for providing sanctuary and resources to immigrants.  Stemming from a religious value to care for the strangers and immigrants among us, for instance, a congregation in Colorado has dedicated itself to serving and ministering to immigrants, regardless of legal status, and opted to become a sanctuary congregation.  Another congregation in Massachusetts is a sanctuary church that became certified as a temporary overnight shelter to provide short-term housing to migrants.

8.    UUA congregations are actively and publicly involved in social service ministries that provide assistance for immigrants regardless of documentation status.  For example, the same Colorado congregation provides monthly English as a Second Language ("ESL") classes in conjunction with an immigration justice group.  This congregation also hosts a bi-weekly food pantry with a large number of immigrant participants and provides church space to community partners who serve immigrants.  Together, those ministries regularly bring immigrants into the church building, and the congregation welcomes immigrants without inquiry of their legal status. Another congregation in California actively works for immigration justice within its community, including for undocumented immigrants.  This congregation operates a large food and diaper charitable distribution for which the vast majority of its clients are immigrants.  Yet another

3

congregation, in the Midwest, rents church space to a Head Start program that serves the local migrant community.

9.   An immigration enforcement action during religious services or ministries would interfere enormously with UUA congregations' abilities to act consistent with their foundational principles: to welcome and care for the stranger; or to provide a space for sanctuary, safety, and trust to congregants, including immigrants and other vulnerable people.  UUA congregations would be left unable to fulfill their spiritual mission through congregants' participation in worship, prayer, or other services.  An action by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP") at congregations' outreach ministries will likewise prevent them from putting our religious values into practice and caring for those at risk.  Overall, an enforcement action at a UUA congregation would harm our ability to communicate the core messaging of our faith tradition, particularly the traditions of justice and equality.  It would weaken the fabric of our community as a whole.

10. DHS's new enforcement policy is already substantially burdening UUA congregations' religious exercise.  Since the policy rescission, it is my understanding that members of some congregations have stopped attending services.  Congregation leaders have expressed concerns over publicly sharing information about worship services (including how to join the church or the timing of services) even though that information is essential to full participation in congregational life.  One congregation in Massachusetts has stopped publicizing its various immigrant support efforts out of concern that such publicity may draw attention to its immigrant congregants and they would no longer feel safe at worship.  The UUA has already diverted many resources to responding to congregant and participant concerns, and to providing guidance, in the wake of the sensitive locations policy rescission.

11. DHS's new enforcement policy also puts our congregations in the impossible position of choosing whether to freely carry out their religious mission while exposing their communities to the risk of an immigration action, or to instead change the way they serve and minister in an effort to protect those congregants. Either of these choices is inconsistent with our religious beliefs, and each carries with it practical and intangible harms to our member congregations.

12. Faced with this choice, some congregations are already making changes to the way worship and other services are conducted. Many are considering changes to enhance their congregants' physical safety. A congregation in Colorado feels forced to consider increasing its security and moving some religious gatherings to private homes, though the financial burden of such measures might require them to limit their social service ministries. A church in San Diego is also evaluating additional security plans and procedures; another church in Southern California has already begun putting additional protection systems in place. In addition to imposing a heavy resource burden, measures such as these prevent our congregations from providing the open and welcoming worship spaces that are so central to our faith.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Signed by:

*Carey McDonald*

B63D2602B3C7497...

Carey McDonald

5

# EXHIBIT 59

Docusign Envelope ID: AFDEB059-1754-40C7-BBAB-3CA0DC19E365

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF JANE DOE # 22 ON BEHALF OF ANONYMOUS CONGREGATION SUPPORTING PLAINTIFF UNITARIAN UNIVERSALIST ASSOCIATION

I, Jane Doe # 22, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.   I serve as Board of Trustees President of a Unitarian Universalist congregation that is part of the Unitarian Universalist Association.

2.   I wish to submit this declaration anonymously out of fear that my congregation will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

3.   Fundamental to our covenant as a congregation are our belief in the inherent worth and dignity of every person; our regard for justice, equity, and compassion in human relations; and our respect for interdependence of human existence. We support every person's right to flourish with dignity, love, and compassion and, as a congregation, we strive to foster diverse, multicultural communities where all can thrive. These beliefs are central to our religious

Docusign Envelope ID: AFDEB059-1754-40C7-BBAB-3CA0DC19E365

Case 1:25-cv-00403-DLF    Document 11-62    Filed 02/21/25    Page 3 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 345 of 398

mandate and mission; accordingly, they undergird our decades-long commitment to serve and minister to every person regardless of legal status.

4.    In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregation is at imminent risk of an immigration enforcement action.

5.    We are located in a border state.  Our city is home to a large and diverse immigrant population.  Our neighborhood has many immigrant residents, particularly from Central America, and a high percentage of them are without legal status.  During the previous Trump Administration, large ICE raids were conducted in our city.    At that time, children in our church tutoring program frequently expressed their fears that they and their families were being targeted by ICE.  In recent weeks, immigration enforcement operations in our city have led to multiple arrests.  Our church membership is diverse.  We have congregants who are immigrants, including several who are undocumented immigrants.  We have a history of being a sanctuary church.

6.    Consistent with our commitment to celebrating human dignity, community, and interdependence, our congregation has long provided support for immigrants, including undocumented immigrants.  We serve many of our neighbors in our diverse community, and our services are live interpreted into Spanish.

7.    We provide social service ministries that cater to all, including immigrants without legal status.  Many of the congregants and volunteers who participate in these ministries are themselves immigrants of varying documentation status.  For example, we sponsor a nonprofit organization that operates out of our church space and is run by our church members.  The

2

Docusign Envelope ID: AFDEB059-1754-40C7-BBAB-3CA0DC19E365

Case 1:25-cv-00403-DLF    Document 11-62    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 346 of 398

organization hosts a food distribution program, a diaper distribution program, and a tutoring

program for our neighbors, many of whom are undocumented immigrants.

8. An immigration enforcement action at our church will substantially burden our religious

exercise by preventing us from openly welcoming and ministering to our communities—both our

own congregants as well as our non-congregant neighbors. An enforcement action will interfere

with our ability to gather to practice the rituals and ceremonies of our faith. It will violate the

sanctity of our church, leading our congregants to become only more fearful of what might

happen during worship or other religious activities.

9. DHS's new enforcement policy is already substantially burdening our religious exercise.

At least one member of our congregation has already stopped attending services because of the

sensitive locations policy rescission. We have already diverted considerable time toward

evaluating how to fulfill our religious mandate under DHS's new policy. For example, we are in

the process of enacting changes to our security protocols, such as closing our front gate during

all programming, including Sunday services. We are also seriously considering only allowing

congregants to enter our church one by one, with a volunteer greeter screening every single

person who enters. Furthermore, we are evaluating our options to move services online, though

there are several in our congregation who would be unable to attend due to technological

barriers. And because participants in our social service ministries must often stand in line on the

sidewalk outside our church, we are grappling with the possibility that we may not be able to

provide certain services at all. The people we typically serve with these ministries may then face

lack of food or basic materials such as diapers.

10. We are a congregation dedicated to empowering and enhancing dignity and community

participation, especially among marginalized groups. These ideas are central to our religious

Docusign Envelope ID: AFDEB059-1754-40C7-BBAB-3CA0DC19E365

beliefs.  The imminent threat of enforcement action directly interferes with our ability to freely

practice our faith.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/21/2025                                         Respectfully submitted,

_Signed by:_

_Jane Doe #22_

6579DD5566134DC...                              _____

Jane Doe # 22

4

# EXHIBIT 60

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF BISHOP KENNETH H. CARTER, JR.
## ON BEHALF OF PLAINTIFF THE WESTERN NORTH CAROLINA CONFERENCE
## OF THE UNITED METHODIST CHURCH

I, Bishop Kenneth H. Carter, Jr., hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I currently serve as the presiding bishop for The Western North Carolina Conference ("WNCC") of The United Methodist Church ("UMC"). I have served in this position since 2021.

2. I make this statement based upon personal knowledge, files and documents of the WNCC that I have reviewed, as well as information supplied to me by my staff and the clergy of local churches within our annual conference, all of whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and ministry and that I would customarily rely upon in conducting the business and ministry of the Conference.

3. The WNCC is an Annual Conference in the UMC as defined in the United Methodist Discipline. The Annual Conference is the most basic body of the UMC. Each local

App. 464

Docusign Envelope ID: 001B3BB0-8524-4CD9-A217-EF6B04CA959A

Case 1:25-cv-00403-DLF    Document 11-63    Filed 02/21/25    Page 3 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 350 of 398

church in the UMC is chartered by and belongs to an Annual Conference. The Western NC Conference was formed on June 5, 1968. Currently, the Western NC Conference covers 44 counties in western North Carolina and consists of 628 local churches with 164,924 members with a total of 1,463 clergy (active and retired).

4.      Our primary mission statement adopted in 2024 states: "Our mission is to make disciples of Jesus Christ for the transformation of the world. We accomplish that through creating vital and sustainable local congregations, embracing racial justice and inclusion as discipleship and sanctification, centering the well-being and health of leadership, both clergy and laity, and re-claiming our United Methodist identity."

5.      Our worship services are open to all people, as are sacraments such as holy communion. This concept is enshrined in the UMC Constitution and is a core tenet of our faith. The Bible repeatedly calls us to welcome the stranger and provide hospitality without distinction (Leviticus 19:33-34, Matthew 25:35). Jesus himself was a refugee, fleeing persecution as a child (Matthew 2:13-15). These Biblical precepts form the basis for the UMC theology and doctrine surrounding worship, ministry, and immigration.

6.      In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement action.

7.      Our Conference includes several major metropolitan areas, including the cities of Charlotte, Greensboro, Winston-Salem, and Asheville. There are a number of immigrants who live in these areas, as well as elsewhere across the state. There is currently an increased presence of Immigration and Customs Enforcement ("ICE") vehicles on roads in many larger cities like

2

Docusign Envelope ID: 001B3BB0-8524-4CD9-A217-EF6B04CA959A

Case 1:25-cv-00403-DLF    Document 11-63    Filed 02/21/25    Page 4 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 351 of 398

Charlotte, and there have been rumors of ICE raids in the Greensboro area. ICE has also

recently conducted a series of large-scale detentions in Raleigh and Durham. One of our local

churches is located in a community that has been the subject of large-scale raids and detentions

by ICE. Another local church is located near an ICE office and in an area which has been the

focus of immigration enforcement in the past. That congregation has itself been targeted, as ICE

officers have been known to drive through the parking lots at the church to visually scan the

people on church property and have approached the pastors to try to informally gain information

on congregants.

      8.     The WNCC has five predominately immigrant local churches and over ten

predominantly immigrant worshiping communities in other local churches. Many of our

congregations have worship services dedicated solely to the Hispanic community. Our

congregants come from countries like Mexico, Brazil, Costa Rica, El Salvador, Ghana, Liberia,

Vietnam, South Korea, Ukraine, and Nepal. They are not asked about their immigration status,

and immigration status is irrelevant for membership in a local church, attendance of worship

services, or receipt of outreach ministry services. However, there are undocumented people in

our churches as well as persons who have temporary protected status or refugee status which

DHS already has or may revoke.

      9.     Working with immigrant populations is a ministry area of all Annual Conferences,

including the WNCC and its local churches. There are a variety of outreach ministries operated

on church property and specifically designed to serve immigrant populations. These include

English as a Second Language ("ESL") classes, soup kitchens, food pantries, clothing pantries,

mobile showers, and tutoring programs. One local church, for example, sponsors ESL classes

for immigrants; it also provides free community meals and hosts Alcoholics Anonymous ("AA").

These programs predominately serve their immigrant community.  We also have local churches that help immigrants obtain housing and some that provide housing as well as furnishings, household supplies, and home goods.  Some churches assist immigrants with employment placement.  Some of our churches provide transportation assistance to immigrants for medical appointments, court dates, and other purposes.

10.    An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status.  It will also desecrate local church buildings, which are sacred Christian spaces dedicated to God and are consecrated as such through a service of holy consecration when completed.  An armed raid would be a particular violation—the UMC prohibits firearms on its properties based upon Jesus' call to his followers to be peacemakers (Matthew 5:9), and it echoes God's dreams for peace for all of creation as expressed in Micah 4:1-4 where the call was for man to "beat their swords into plowshares" and as a call against the general plague of violence.  If agents armed with guns enter a church property, particularly the sanctuary space, it will violate the sanctity of the property and worship spaces which have been dedicated to God as places of peace and holiness.  This will be devastating to our religious practices as Christians.  Likewise, enforcement actions targeted at social service ministries impede the Conference's spiritual mission by violating the fundamental principles of sanctuary, mercy, and care for the vulnerable.

11.    DHS's new enforcement policy is already substantially burdening our religious exercise.  The effect of the sensitive locations policy rescission is already being felt by our congregations, with attendance at worship services and programming declining.  One of our

4

Docusign Envelope ID: 001B3BB0-8524-4CD0-A217-EF6B04CA959A

Case 1:25-cv-00403-DLF    Document 11-63    Filed 02/21/25    Page 6 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 353 of 398

churches reports that it has seen a marked and sudden decline in church attendance and ministry

participation among its immigrant membership, along with a marked decrease in financial giving

by those members.  Since DHS adopted the new enforcement policy, worship attendance has

decreased by more than sixty percent.  Another church reports that it has suffered a drop in

worship attendance and ministry participation, and financial giving by membership has also

decreased.  They have canceled Bible study classes and other group Chrisitan study meetings

because members are afraid to leave their homes to attend.  Participation in the ESL classes and

AA has decreased, and they will likely have to close a clothing pantry they run for their

community due to the lack of volunteers to work at it.  To lower their public profile, the church

took their website offline, took their social media pages down, and quit live-streaming worship

services.  They also began locking their doors during worship services and have paid for and

installed wireless security cameras to monitor the property.

    12.    Our Conference itself has been forced to shift its ministry focus to educate its

clergy, local churches, agencies, and committees on the change in the administration's

immigration policies.  This has taken time and money from other ministry areas, and it has been

a significant burden on our ability to focus on fulfilling our religious calling and living out our

faith.

    I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

                                        Respectfully submitted,

                                        *Signed by:*
                                        *kenneth H. Carter, Jr.*
                                        2C62086A1EF7447...
                                        Bishop Kenneth H. Carter, Jr.

# EXHIBIT 61

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MENNONITE CHURCH USA et al., *Plaintiffs,* v. U.S. DEPARTMENT OF HOMELAND SECURITY et al., *Defendants.* | Civil Action No. 1:25-cv-00403 |

**DECLARATION OF REVEREND JOHN DOE # 23 ON BEHALF**
**OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF THE WESTERN**
**NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH**

I, Reverend John Doe # 23, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746, and declare as follows:

1.    I currently serve as the senior pastor for a local church in the Western North Carolina Conference ("WNCC") of The United Methodist Church ("UMC"), an annual conference within the UMC.  The church I serve is located in Mecklenburg County, the largest metropolitan area in the state.

2.    I wish to submit this declaration anonymously out of fear that my church will be targeted by Immigration and Customs Enforcement ("ICE").

3.    The UMC is a worldwide Christian denomination whose main mission is to spread the Christian faith and preach the word of Jesus Christ as set out in the biblical gospels.  Our church looks to holy scripture as the call to its immigrant ministry and membership.  For example, Exodus 22:21 directs us, "Do not mistreat an alien or oppress him, for you were aliens in Egypt."  Similarly, Zechariah 7:10 commands, "Do not oppress the widow or the fatherless,

App. 470

Docusign Envelope ID: CF3147A1-D27C-47E7-A284-62A548B394B5

the foreigner or the poor." And as Matthew 22:37-39 says, the "greatest and first commandment" is "'You shall love the Lord your God with all your heart and with all your soul and with all your mind' . . . And a second is like it: 'You shall love your neighbor as yourself.'"

4.      As a local UMC church, we abide by the UMC's Discipline and Constitution, which requires us to "welcome migrants, refugees, and immigrants into [our] congregations and to commit [ourselves] to providing concrete support, including help with navigating restrictive and often lengthy immigration policies, and assistance with securing food, housing, education, employment, and other kinds of support" (Discipline, ¶ 163.g).

5.      In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

6.      Our church is located in a city that has a high population of immigrants. Our area has been the focus of recent and past large-scale enforcement raids and arrests by ICE, and ICE has visibly increased its presence in our city since January 21, 2025.

7.      Our church has a large percentage of members and attendees that are foreign-born, with approximately 25 percent of our congregation made up of immigrants. That percentage is mostly Asian and Hispanic. They are not asked about their immigration status, and immigration status is irrelevant for membership at our church, attendance of worship services, or receipt of outreach ministry services. My assumption is that there are undocumented people in the congregation. One member who had expired documentation left the country on their own accord after the rescission of the sensitive locations policy. There are people in our

congregation that have temporary protected status or CHNV status in programs that are under review by the administration.

8.     An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregation by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status.  It will also harm the safety and sacred nature of our church.  In the UMC, all local church buildings are sacred Christian spaces dedicated to God and are consecrated as such through a service of consecration when completed. Having immigration enforcement enter the premises would desecrate this space of divine worship.  That is especially true if armed officers were to enter the premises—being a holy space dedicated to Christ, the UMC has prohibited firearms from local church properties based upon Jesus' call to his followers to be peacemakers (Matthew 5:9) and God's dreams for peace for all of creation as expressed in Micah 4:1-4, where the call was for man to "beat their swords into plowshares."

9.     DHS's new enforcement policy is already substantially burdening our religious exercise.  Our church has seen a marked and sudden decline in church worship attendance.  On Sunday, February 16, 2025, no immigrant members or congregants attended worship services, meaning a 100 percent decrease in immigrant attendance.  Participation in immigrant group Bible Studies has also declined because participants do not want to leave their homes out of fear of ICE arrest.  We now screen visitors entering worship services and ministry activities to make sure they are not ICE agents, which is contrary to the doctrine and theology of the UMC, to be open to all who want to worship and participate in ministry.  Losing attendees and having to limit access to services and meetings has a devastating impact on our religious mandate to welcome

3

and serve our immigrant members and ministry recipients, as well as our non-immigrant

members.  It is at odds with our religious mandate to be an open and welcoming space for all.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*John Doe #23* _____

6DF8357511454C3...

Reverend John Doe # 23

4

# EXHIBIT 62

Docusign Envelope ID: 52E329FA-CAEE-4BD5-9A03-97E593E264140

Case 1:25-cv-00403-DLF    Document 11-65    Filed 02/21/25    Page 2 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 360 of 398

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

Civil Action No. 1:25-cv-00403

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

## DECLARATION OF REVEREND JOHN DOE # 24 ON BEHALF OF ANONYMOUS MEMBER CHURCH SUPPORTING PLAINTIFF THE WESTERN NORTH CAROLINA CONFERENCE OF THE UNITED METHODIST CHURCH

I, Reverend John Doe # 24, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746, and declare as follows:

1.    I currently serve as the senior pastor for a local church in the Western North Carolina Conference ("WNCC") of The United Methodist Church ("UMC"), an annual conference within the UMC.  The church I serve is in the "Triad" area of North Carolina, meaning near the cities Winston-Salem, Greensboro, and High Point.

2.    I wish to submit this declaration anonymously out of fear that my church will be targeted by Immigration and Customs Enforcement ("ICE").

3.    The UMC is a worldwide Christian denomination whose main mission is to spread the Christian faith and preach the word of Jesus Christ as set out in the biblical gospels.

4.    Our church looks to holy scripture as the call to its immigrant ministry and membership.  For example, Deuteronomy 10:18-19 directs us, "You shall also love the stranger, for you were strangers in the land of Egypt."  Similarly, Zechariah 7:10 commands, "Do not

oppress the widow or the fatherless, the foreigner or the poor." And as Matthew 22:37-39 says, the "greatest and first commandment" is "'You shall love the Lord your God with all your heart and with all your soul and with all your mind' . . . And a second is like it: 'You shall love your neighbor as yourself.'"

5.      As a local church within the UMC, we abide by the UMC's Discipline and Constitution, which requires us to "welcome migrants, refugees, and immigrants into [our] congregations and to commit [ourselves] to providing concrete support, including help with navigating restrictive and often lengthy immigration policies, and assistance with securing food, housing, education, employment, and other kinds of support" (Discipline, ¶ 163.g).

6.      In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

7.      Our church is located in an area that has been the focus of large-scale enforcement raids and arrests by ICE at homes and businesses. Our church also has a large percentage (approximately 90 percent) of members, attendees, and service recipients that are foreign-born, most of whom are Hispanic. They are not asked about their immigration status, and immigration status is irrelevant for membership at our church, attendance of worship services, or receipt of outreach ministry services. We do have undocumented persons in our congregation, and our ministries do serve undocumented persons.

8.      Aside from worship services and Bible studies, there are a variety of outreach ministries specifically for immigrant populations at our church and within the wider community

2

Docusign Envelope ID: 52E329FA-C4EE-4BD5-9A03-97E93E2641A0

Case 1:25-cv-00403-DLF    Document 11-65    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 362 of 398

offered on our church grounds, such as English as Second Language ("ESL") classes, free community meals, clothing pantries, and Alcoholics Anonymous ("AA").

9.      An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will substantially burden our congregations by interfering with our religious mandate to worship in person together with all members of our community, including those who are immigrants and without lawful status.  It will also harm the safety and sacred nature of our church.  In the UMC, all local church buildings are sacred Christian spaces dedicated to God and are consecrated as such through a service of consecration when completed. Having immigration enforcement enter the premises would desecrate this space of divine worship.  That is especially true if armed officers were to enter the premises—being a holy space dedicated to Christ, the UMC has prohibited firearms from local church properties based upon Jesus' call to his followers to be peacemakers (Matthew 5:9) and God's dreams for peace for all of creation as expressed in Micah 4:1-4, where the call was for man to "beat their swords into plowshares."

10.      DHS's new enforcement policy is already substantially burdening our religious exercise.  Our church has seen a marked and sudden decline in church attendance and ministry participation among its immigrant membership and a decrease in financial giving from our foreign-born congregants (down approximately 10 percent).  We have had to cancel Bible studies as members do not want to leave their homes out of fear of ICE arrest, and attendance at ESL classes has markedly decreased.  We may have to shut our clothing pantry because the majority of our volunteers were immigrants and they are no longer coming to participate. Our church financially depends on giving from members.  Our church also depends on volunteer service to our outreach ministries.  Extended decreases in both will strain finances and ministry operations.

Docusign Envelope ID: 52E329FA-C4EE-4BD5-9AA3-97F593E2641A0

Case 1:25-cv-00403-DLF    Document 11-65    Filed 02/21/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 363 of 398

11.    We are already making changes to our church operations in response to the rescission of the sensitive locations policy.  We now lock our doors during worship services and screen those entering.  We used to advertise our worship services and ministries through signage, social media, local social services providers, and personal invitations, but now we have taken down our website, stopped live-streaming worship services, and cancelled small group meetings, like prayer meetings and studies.   We no longer market or publicize our services or ministries. All of this is contrary to the doctrine and theology of the UMC, to be open to all who want to worship and participate in ministry.

12.    Losing attendees and having to limit access to services and meetings has a devastating impact on our religious mandate to welcome and serve our immigrant members and ministry recipients, as well as our non-immigrant members.  It is at odds with our religious mandate to be an open and welcoming space for all.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/21/2025

Respectfully submitted,

Signed by:

*John Doe #24*

F775F506F9C84F6...

Reverend John Doe # 24

# EXHIBIT 63

Docusign Envelope ID: 92D292A8-F0A9-446B-8978-9E20AA7B2DF6

Case 1:25-cv-00403-DLF   Document 11-66   Filed 02/21/25   Page 2 of 6
USCA Case #25-5209   Document #2136370   Filed: 09/22/2025   Page 365 of 398

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

   *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

   *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF REVEREND KERRI PARKER, EXECUTIVE DIRECTOR OF PLAINTIFF WISCONSIN COUNCIL OF CHURCHES

 I, Reverend Kerri Parker, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

 1. I am the Executive Director of Wisconsin Council of Churches ("WCC") and have served in that role since 2017.  I am also an ordained minister in the United Church of Christ.

 2. I make this statement based upon personal knowledge, files and documents of WCC that I have reviewed, as well as information supplied to me by members of WCC whom I believe to be reliable.  These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting WCC's business.

 3. WCC was incorporated in 1947 following twelve years of cooperation by Protestant Churches to address human needs in the state that were too great for any one church to address alone.  As of December 2024, our members are 32 judicatory bodies (representing 23 Christian traditions), 3 observer bodies, and 13 ecumenical partners (faith-based organizations in

App. 480

Docusign Envelope ID: 92D292A8-F0A9-4468-8978-9F20AA7B2DF6

alignment with our mission).  Our membership spans approximately 2000 congregations and represents approximately 1 million Christians, including those from denominations as diverse as mainline Protestants, historic Peace churches, Orthodox, Historically Black traditions, Evangelical/Charismatic/ Pentecostal traditions, and Roman Catholics.  We are a membership organization headquartered in Madison, Wisconsin.

4.   WCC has a long history of accompanying immigrants, immigrant-serving organizations, and churches that seek to be welcoming of immigrants and refugees.  This work is founded in scripture and Christian traditions of hospitality.  The New Testament calls us to look beyond differences in background to see our connections and oneness in Christ.  We are told, "There is no longer Jew or Greek, there is no longer slave or free, there is no longer male and female; for all of you are one in Christ Jesus" (Galatians 3:28).

5.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our members are at imminent risk of an immigration enforcement action.

6.   Wisconsin has a sizable immigrant community, especially in rural, farming areas where immigrants are known to be part of the seasonal and/or year-round workforce—and where many of our member churches are located.  There have also been targeted Immigration and Customs Enforcement ("ICE") actions in Wisconsin in the last few weeks.  Much of the state is also within the 100-mile border enforcement zone, putting many of our members within Customs and Border Protection ("CBP")'s jurisdiction.

7.   Our member churches are composed of immigrants from around the world, representing countries from Mexico to Haiti to Laos to Kenya.  One member church in Southern Wisconsin

2

Docusign Envelope ID: 92D292A8-F0A9-446B-8978-9F20AA7B2DF6

Case 1:25-cv-00403-DLF    Document 11-66    Filed 02/21/25    Page 4 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 367 of 398

has a congregation made up almost entirely of immigrants from Mexico. WCC members have congregants with all types of status: those who are documented, those with no documentation, those who are Deferred Action for Childhood Arrivals ("DACA") recipients, and those who are in mixed-status families. Some of our members also have immigrant pastors, and one, Emaus Lutheran Church in Milwaukee, lost their pastor to deportation. Two of our member traditions (American Baptist Churches of Wisconsin and Wisconsin United Methodist Conference) have particularly large numbers of immigrant congregants, with immigrant pastors and/or many immigrant members of the congregation, including undocumented members who are at risk under the new policy. Other member congregations also have many immigrant members; one congregation worships in seven languages on Sundays.

8. In keeping with our faith, many of our member churches have social service ministries, some of which are focused on serving immigrants and others which incidentally do. These include food pantries, community meals and gardens, homeless shelters, clothing closets, and medical clinics. St. Luke's Episcopal Church, for example, offers career counseling, a meal program, and a clothing closet, among other services. Those programs serve numerous immigrants, and St. Luke's has two bilingual staff members at all times specifically to help Spanish-speaking clients. Several of our members have also offered immigrant-specific services, such as immigration/paperwork clinics or mobile consulate visits. Some congregations, including a member church in Western Wisconsin, have also served as sanctuary churches.

9. An immigration enforcement action taken during a worship service, religious ceremony, or other church activity will harm our churches by interfering with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. Such an action will be physically,

Docusign Envelope ID: 92D292A8-F0A9-4468-8978-9F20AA7B2DF6

Case 1:25-cv-00403-DLF    Document 11-66    Filed 02/21/25    Page 5 of 6
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 368 of 398

emotionally, and spiritually disruptive.  It will violate a space that has been dedicated to the holy work of attention to God and neighbor, associating it with harms and violent memories.  Such events would make it difficult to resume the mission of our faith.  Likewise, enforcement actions targeted at social service ministries impede the Church's spiritual mission by violating the fundamental principles of sanctuary, mercy, and care for the vulnerable.  Our sacred texts offer spiritual context for such occasions.  Scripture narratives dedicated to occasions when God's people failed to protect their guests from harm by those who demanded they turn them over (Judges 19:16-24) are illustrations of inhospitality and distance from the ways of God.

10. Indeed, DHS's new enforcement policy is already substantially burdening our religious exercise.  Congregants are already reporting their fear of coming to church due to ICE/CBP raids, and attendance declines have begun.  One member church, St. Luke's, has already been told by one member family that they do not feel safe coming to church services under DHS's new policy.  Another member church in Southern Wisconsin has reported decreases in attendance because families no longer feel safe from ICE/CBP inside the church.  The families who do attend that church's services have requested that they keep their outside doors locked during the worship service due to fear of an ICE/CBP raid at any moment, and the church has both secured the doors and stationed members to keep an eye on the street.  It is not only undocumented congregants who express these fears.  Congregants who are visa and green card holders, DACA recipients, refugees here under previously authorized resettlement processes, naturalized citizens, and citizens by birth who have darker skin are similarly worried about the prospect of ICE raids at church.

11. Decreased participation in congregational life compromises our member churches' ability to practice being "one body," according to the teaching of scripture.  Whether it is a rite or

4

App. 483

sacrament where meals are shared, a sign of peace, common prayer, or the lifting of voices together in song, community is a key element of our religious practice. Decreased participation also results in a loss of income for our members that could affect their ability to keep up the building and/or pay church staff.

12. In response to the rescission, our congregations are already having to alter some of the ways in which they carry out their ministry. Some are moving immigrants out of leadership positions and placing less at-risk members at the forefront so as to minimize the exposure of those who could be targeted by ICE. Other congregations are looking into shifting to virtual worship services and Bible studies for at-risk populations. One member church in Western Wisconsin has been considering changes to their public communications, adopting new safety protocols, and even possibly going "underground" to meet in secret. And many member churches are discussing holding smaller outreach ministry events and making revisions to their video/streaming policy so as not to show congregants on video.

13. DHS's new enforcement policy is also presently forcing our member churches to choose between abandoning their religious obligation to welcome and serve immigrants in their churches without regard to legal status, or continuing to fulfill that obligation while making their congregants and visitors an easy target for ICE action. Either option is unconscionable.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/20/2025

Respectfully submitted,

Kerri Parker

3077406D3B2B490...

Reverend Kerri Parker

# EXHIBIT 64

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403

## <u>DECLARATION OF JANE DOE # 25 ON BEHALF OF ANONYMOUS MEMBER</u>
## <u>CHURCH SUPPORTING PLAINTIFF WISCONSIN COUNCIL OF CHURCHES</u>

I, Jane Doe # 25, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I serve in a leadership position with the South-Central Synod of Wisconsin of the Evangelical Lutheran Church in America, and I work with a member congregation that is focused on welcoming the Latinx immigrant community. Our Synod, including this congregation, is a member of the Wisconsin Council of Churches ("WCC").

2.  I wish to submit this declaration anonymously out of fear that our congregation will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

3.  Our congregation endeavors to provide a welcoming space where the Latinx immigrant community can worship in their own language, bring their culture and traditions, receive the gift of the Eucharist, and be part of the Body of Christ in the new land. We believe we are called to "welcome the stranger" through protection and hospitality, and to honor the stranger or those of

other faiths with respect and equality.  This is deeply rooted in our faith tradition.  In Mathew's

Gospel (25:35), we hear the call: "I was hungry and you gave me food, I was thirsty and you

gave me something to drink, I was a stranger and you welcomed me . . . ." And in the Letter to

the Hebrews (13:1-2), we read, "Let mutual love continue. Do not neglect to show hospitality to

strangers, for by doing that some have entertained angels without knowing it."

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive

locations policy as part of its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that our congregation is at imminent risk of

an immigration enforcement action.

5.   Immigrants from Mexico, some of whom are undocumented, make up 90 percent of our

congregation.  Our church prominently displays signs in Spanish, and we have been publicly

involved in immigrant rights work both at the state and federal level.

6.   An immigration enforcement action taken during a worship service, religious ceremony,

or other church activity will harm our congregation by interfering with our religious mandate to

worship in person together, with all members of our community, including those who are

immigrants and without lawful status.  An immigration enforcement action will be devastating

and traumatizing.  A great number of families will stop coming to attend our church's activities.

It could even force us to close our doors.

7.   DHS's new enforcement policy is already substantially burdening our religious exercise.

Attendance at our worship services and other congregation activities has decreased because

families no longer feel safe in their house of prayer.  The families that do attend are feeling

anxious and afraid.  During our last worship service, they asked me to keep the outside doors

locked out of fear that there could be an ICE/CBP raid at any moment.  For the time being, we

are locking the doors and stationing one or two members to keep an eye on the street, even though this undermines our call to be welcoming and open to all.  We are considering moving some activities online, but eventually, if this policy remains in place, we will have to close.  Our congregants' fear and loss of participation prevents us from sharing God's good news of love and salvation and from following Jesus's mandate to the church: "All authority in heaven and on earth has been given to me.  Therefore, go and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, and teaching them to obey everything I have commanded you." (Matthew 28:18-20).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*Jane Doe # 25*

8C027EF580D147B...

Jane Doe # 25

3

App. 488

# EXHIBIT 65

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## <u>DECLARATION OF DAVID LINERS, EXECUTIVE DIRECTOR OF</u>
## <u>PLAINTIFF WISDOM</u>

    I, David Liners, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Executive Director of WISDOM, a role I have held since 2002.

2. I make this statement based upon personal knowledge, files and documents of WISDOM that I have reviewed, as well as information supplied to me by members of WISDOM whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting WISDOM's business.

3. WISDOM is a network of interfaith organizations who work for racial and economic justice throughout Wisconsin. WISDOM began with Milwaukee Inner-City Congregations Allied for Hope's founding in 1988 and then became its own membership organization in 2000. WISDOM's members include 180 congregations from 19 different faith traditions across

Wisconsin. For over 25 years, WISDOM has consistently advocated for fair and safe immigration processes for all families. WISDOM is headquartered in Milwaukee, Wisconsin.

4. All of our faith communities believe that showing compassion to the immigrant (or "the stranger" or "the foreigner") is something we have been very specifically charged to do by God. Not only is this made explicit in the Hebrew Bible, but it ties with a core belief that every human being is created in the image and likeness of God. And, we believe that every human being means every human being. This compels our member congregations to reach out to welcome all people, including immigrants, and it compels us to offer service especially to "the least of these"—the poor, the marginalized, and the fearful. Our service is not contingent on someone's legal status; it is contingent on their status as a beloved child of God.

5. This belief that we are compelled to show compassion toward the immigrant among us is central to WISDOM and its mission. It has been a common theme throughout our entire history. Every congregation that has joined WISDOM in the past 25 years has known it is joining an organization that works for just and compassionate treatment of all immigrants, regardless of legal status.

6. I have good reason to believe that the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people in the country puts WISDOM member congregations at imminent risk of immigration enforcement activity.

7. Undocumented immigrants are spread rather evenly throughout Wisconsin. In Milwaukee and Racine (where WISDOM has a strong presence), there are many undocumented immigrants. WISDOM has congregations in Appleton, Waukesha, Eau Claire, Wausau, Green Bay, Watertown, and Oshkosh, all of which have significant numbers of undocumented people.

Docusign Envelope ID: DBF3E3DC-BE42-3564-BDA7-F5E120D6D33D

Case 1:25-cv-00403-DLF    Document 11-68    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 377 of 398

There has been Immigration and Customs Enforcement ("ICE") activity across Wisconsin in recent weeks.

8.   Many of our member churches have substantial numbers of congregants who are immigrants, some of whom are undocumented.  A member church in southeastern Wisconsin, for example, is roughly 50 percent Mexican, and many of its congregants are undocumented. Several of that church's congregants have received communications from ICE, including a recent demand to self-deport, and the church previously experienced the detention and deportation of one of its ministry students and her family.  Other member churches have social service ministries that serve both documented and undocumented community members.

9.   An enforcement action during worship services or other religious activities would harm WISDOM members by destroying their feelings of safety and sanctuary in their place of worship and spurring reluctance to come together and worship as a community.  One member church reports that an enforcement action at its location will likely lead to the church's closure, due to the high numbers of immigrants among its members.  Enforcement action targeted at WISDOM members will also pressure them to cut off social service support systems that they currently offer as part of their religious mission, out of fear of making undocumented visitors an easy target for ICE.

10. WISDOM member's religious practices are already substantially burdened by DHS's new enforcement policy.  One member church reports incredible anxiety among its members because it is well-known locally as a community that welcomes and ministers to large numbers of immigrants, including those without documentation.  Congregations already report locking their doors 24/7—including during Sunday worship—and making changes to procedures for drop-off and pick-up for children's activities, changes to worship offerings, and the

3

discontinuation of social media outreach in their communities, which burdens their ability to reach current and prospective members and practice their faith.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  2/20/2025

Respectfully submitted,

Signed by:

*David Liners*

4F48785D0890478...

David Liners

# EXHIBIT 66

Docusign Envelope ID: 149ACCAA-326B-48C9-9D9B-630A2DC2AAF0

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

## DECLARATION OF JOHN DOE # 26 IN SUPPORT OF PLAINTIFF WISDOM

    I, John Doe # 26, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

    1.  I am a member of the church council at a Lutheran church in southeastern Wisconsin. Our church has been a member of WISDOM for more than 15 years.

    2.  I wish to submit this declaration anonymously out of fear that my congregation will be targeted for immigration enforcement action.

    3.  Our values are grounded in faith, in our biblical and Lutheran confessional sources, and our love of God and neighbor. We believe that each person is created in God's image. We respect this God-given right to dignity and, inspired by the life of Jesus, show love and compassion for all people. Through proclamation of the gospel, through worship, and as servants of God working for healing and justice in the world, we uphold and seek to protect the dignity and human rights of all people, including immigrants regardless of legal status.

    4.  In light of the Department of Homeland Security ("DHS")'s recission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that our church is at imminent risk of an immigration enforcement action.

5. Roughly 50 percent of our congregants are Mexican. We conduct worship services and programming in several languages. We intentionally do not track whether immigrant congregants have legal status, but we know that some are undocumented.

6. Our church also has a very long history of serving our urban neighbors, including immigrants. We have marched for immigrant rights, appeared in court with members and non-members, hosted and attended prayer vigils, assisted with various immigrant paperwork, provided financial assistance for DACA participants, and offered educational workshops aimed at helping people become self-sustainable. This congregation is well-known for its ministry to immigrants, both documented and undocumented. We receive hate mail regarding our involvement with "those people."

7. Because of our demographics and our commitment to immigrant justice, we already have had encounters with Immigration and Customs Enforcement ("ICE"). Several congregants have received communication from ICE, including one who received a very recent letter telling her that she has to leave the country by October 2025. Another congregational member was detained and deported along with her family. We believe that ICE has conducted surveillance outside of our church in the past, and we have recently noticed an unknown vehicle repeatedly idling on the edges of our property for 15 to 30 minutes at a time over the course of several days. We suspect ICE is surveilling us again.

8. An enforcement action at our church will substantially burden our religious exercise by desecrating our sacred space, thwarting our efforts to worship and serve God together, and

Docusign Envelope ID: 149ACCAA-326B-48C9-9D9B-630A2DC2AAF0

Case 1:25-cv-00403-DLF    Document 11-69    Filed 02/21/25    Page 4 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 382 of 398

inflicting trauma on our congregants and visitors in a place that is supposed to be a safe spiritual refuge.

9.   DHS's new enforcement policy is already substantially burdening our religious exercise. We are looking over our shoulders outside on church property and glancing out windows to monitor the neighborhood.  Every unknown vehicle on the property incites anxiety among all in the building.  Even visitors to worship services are "watched."  We feel we have lost our sense of peace and security and we are extending less hospitality, which is antithetical to our religious mission.

10.  We have also had to put into practice protocols meant to increase the safety of those within our congregation, members and non-members alike.  We have begun locking doors 24/7 (even on Sunday mornings) and have made changes to drop-off and pick-up of children in our afterschool program.  We are no longer using social media, which had previously been very important to our communication strategy.  We are also considering moving our Spanish service online, which would deny a core part of our congregation the opportunity to worship together in person.  These changes have come at significant cost to the church.  We need more manpower to monitor doors and "admit" people.  We are also considering hiring extra staff in the afterschool program, which we cannot afford.

11.  We are already experiencing a decrease in participation in worship services and other church activities due to fear of enforcement action under DHS's new policy.  If these trends continue—especially in light of our church's large immigrant population—we could be forced to close.  Lower attendance across the board will lead to less offerings, which could deal a fatal blow to our ministry and mission.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/21/2025

Respectfully submitted,

Signed by:

*John Doe #26*

ECDE5A8951CF451...    _____

John Doe # 26

4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MENNONITE CHURCH USA et al.,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

*Defendants.*

Civil Action No. 1:25-cv-00403-DLF

## PLAINTIFFS' NOTICE OF FILING CORRECTED DECLARATIONS

Plaintiffs filed the Complaint in this case on February 11, 2025.  ECF No. 1.  Ten days later, on February 21, Plaintiffs moved this Court for a preliminary injunction.  ECF No. 11.  That motion was accompanied by a memorandum in support, ECF No. 11-1, and by 66 declarations from Plaintiffs and their members, *see* ECF Nos. 11-4–11-69.  With the government's opposition, ECF No. 16, and the Plaintiffs' reply, ECF No. 20, the motion is fully briefed, and the Court has set a preliminary injunction hearing in this case for April 4, 2025.

In preparing for the April 4 hearing, counsel for Plaintiffs learned that two of the declarations filed in support of the preliminary injunction motion—ECF No. 11-35 (Ex. 32, Doe # 12 declaration) and ECF No. 11-49 (Ex. 36, Dease declaration)—each contain an inaccurate piece of information.  Both the declarants and counsel for Plaintiffs were unaware of this error until March 31, 2025, and immediately conducted due diligence to ascertain the accurate information.  To correct this error, counsel provide amended declarations, attached hereto, and seeks to strike the assertions in Plaintiffs' preliminary injunction memorandum and reply brief that were based on incorrect information.  Counsel are also prepared to file an amended preliminary injunction memorandum and reply brief, should that further assist the Court.  The inaccurate information did

1

not inform any of the allegations in Plaintiffs' Complaint; nor does it affect Plaintiffs' standing to bring this challenge or the merits their claims.

The two corrections are as follows:

*First*, Exhibit 32 to Plaintiffs' preliminary injunction motion contains the declaration of Pastor John Doe # 12. ECF No. 11-35. In relevant part, the declaration recounts recent ICE enforcement actions in the area of a Plaintiff's member church and states, "We know ICE has already shown up at our worship services and waited for someone to exit the sanctuary." *Id.* at ¶ 5. Very recently, on the afternoon of March 31, 2025, the declarant learned that this information is incorrect. Although there has been ICE activity near the church in the past, there had not been an enforcement action during worship services in the weeks since the policy rescission. The attached amended declaration removes that inaccurate sentence.

The incorrect information is referenced on pages one and 13 of Plaintiffs' preliminary injunction memorandum. *See* Pls.' Mem. 1 (noting that "immigration agents have already begun exercising this newfound authority to snare worshippers and other visitors at Plaintiffs' places of worship"); *id.* at 13 (describing ICE enforcement action at Plaintiffs' churches and citing Doe #12 Decl. ¶ 5). It is also cited on page three of Plaintiffs' reply brief. *See* Pls.' Reply Br. 3 (describing Plaintiffs as the "direct subjects of ICE enforcement actions" and citing Ex. 32). Counsel seek to strike this information from the memorandum and reply brief, as Plaintiffs no longer rely on it in support of their preliminary injunction motion. With this information removed, the assertion that remains is accurate: One Plaintiff has experienced an ICE enforcement action at its church since the policy rescission, as described in Exhibit 46 to the preliminary injunction motion.

*Second,* Exhibit 46 to the motion contains a declaration on behalf of The North Georgia Conference of the United Methodist Church. ECF No. 11-49. That declaration describes that, in the time since the sensitive locations policy rescission, ICE has raided one of the Plaintiff's churches. The declaration adds that ICE "conducted another raid at a church next door to another of our churches." *Id.* at ¶ 7. The declarant has affirmed that an immigration action took place at one of Plaintiff's places of worship, and that a raid occurred next door to another of Plaintiff's

2

places of worship.  However, the declarant recently identified a transcription error that incorrectly suggested the raid occurred at a church; it took place instead at a commercial establishment.

The attached amended declaration removes the inaccurate phrase, correctly asserting instead that ICE has "conducted another raid next door to another of our churches."  The incorrect information did not serve as the basis for any allegations in the Complaint or any arguments in support of the preliminary injunction motion.  *See* Pls.' Mem. 13 (citing Ex. 46, Dease Decl. ¶ 7, as simply "describing separate enforcement action next door to a church").

April 2, 2025

Respectfully submitted,

/s/ *Kelsi Corkran*
Kelsi Brown Corkran (Bar No. 501157)
Shelby B. Calambokidis (Bar No. 1684804)
/s/ *Julia Gegenheimer*
Julia Gegenheimer* (NY Bar No. 4949475)
Alexandra Lichtenstein (Bar No. 1724947)
Kate Talmor* (Maryland Bar)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
    AND PROTECTION
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 661-6728
kbc74@georgetown.edu

*Attorneys for Plaintiffs*

*Admitted pro hac vice. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*

Docusign Envelope ID: 0900B9EB-57E7-4BDF-8880-B5F7C272DE23

Case 1:25-cv-00403-DLF    Document 24-1    Filed 04/02/25    Page 1 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 387 of 398

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

MENNONITE CHURCH USA et al.,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY et al.,

    *Defendants.*

Civil Action No. 1:25-cv-00403

---

### AMENDED DECLARATION OF PASTOR JOHN DOE # 12 ON BEHALF OF ANONYMOUS CONGREGATION SUPPORTING PLAINTIFF GENERAL COMMISSION ON RELIGION AND RACE OF THE UNITED METHODIST CHURCH

I, Pastor John Doe # 12, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1.  I serve as lead pastor for a church in the Southeastern United States. We are a member of The United Methodist Church ("UMC"), and in turn, of the General Commission on Religion and Race, an agency of the UMC.

2.  I wish to submit this declaration anonymously out of fear that if my church is identified, it will be targeted by Immigration and Customs Enforcement ("ICE") or Customs and Border Protection ("CBP").

3.  We believe and practice the biblical mandate to welcome the immigrant. Additionally, we oppose all laws and policies that attempt to criminalize, dehumanize, or punish displaced individuals and families based on their status as migrants, immigrants, or refugees, as stated in the United Methodist Church Social Principles.

Docusign Envelope ID: 0900B9EB-57E7-4BDF-8880-B5F7C272DE23

4.   In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive

locations policy as part of its plan to arrest and deport all undocumented people during President

Trump's second term, I have strong reason to believe that our congregation is at imminent risk of

an immigration enforcement action.

5.   Our city is home to a number of immigrants, including undocumented immigrants.  Over

the last few weeks, we have seen ICE enforcement actions in the city.

6.   Our congregation has several active immigrant members from countries in South and

Central America.  We also provide simultaneous English-Spanish interpretation during our

worship service.

7.   Currently, we have two specific outreach programs in our church to support immigrants

within our community.  One houses individuals and families on church property and welcomes

*all* people, without regard to citizenships or immigration status.  The other provides free direct

representation to children and their parents to assist with immigration cases, and is also

administered on our property, currently serving over 150 children.  In addition to these programs,

we have served as a sanctuary ministry that hosted an individual for 10 months and have hosted

Know Your Rights workshops in partnership with immigrants' rights organizations.  We serve a

large concentration of immigrants.  Hundreds of non-congregant immigrants who participate in

our social service ministries have received communication from ICE/CBP, are in removal

proceedings, or have final orders.  Because of the nature of the social services we provide to the

immigrant community, we know ICE is aware of our church campus.

8.   An immigration enforcement action taken during a worship service, religious ceremony, or

other church activity will substantially burden our church by interfering with our religious

2

Docusign Envelope ID: 0900B9EB-57E7-4BDF-8880-B5F7C272DE23

Case 1:25-cv-00403-DLF    Document 24-1    Filed 04/02/25    Page 3 of 4
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 389 of 398

mandate to worship together in person as a congregation, with *all* members of our community, including those who are immigrants and without lawful status.

9.   DHS's new enforcement policy is already substantially burdening our religious exercise. People are afraid.  Our phone is ringing with parents who are terrified of being detained and deported and being separated from their children.   We have already had to change our approach to hosting and advertising events.  For example, recently, we co-hosted a workshop that we would normally post publicly and invite all members of the public to, but we kept the event private and limited out of fear that we might put undocumented folks at risk.  As a result, we hosted fewer families than we had the capacity for.  We are already carrying a heavier burden in trying to serve our immigrant community because of the news of ongoing raids that are happening everywhere.

10. DHS's new enforcement policy is already making it harder for our church to live our mission and mandate as freely because we are not able to welcome "all" people.  Whereas we used to be public and vocal about the fact that we welcome all individuals, including the undocumented, we must now keep our services unpublicized even in church for fear of attracting ICE and its immigration enforcement activities.  To help alleviate some of the fear, the church is considering diverting some funds and resources to explore and develop a remote option for legal services.

11. All of the above have a devastating impact on our outreach ministry work and our ability to fulfill our religious mandate to welcome and serve our immigrant neighbors.  It is at odds with our religious mandate to be an open and welcoming space for all.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/2/2025

Respectfully submitted,

Signed by:

John Doe #12

6EA0E1949EC245A...

_____

Pastor John Doe # 12

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE TRUSTEES OF THE NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY et al., <br><br> *Defendants.* | Civil Action No. 1:25-cv-00403 |

### AMENDED DECLARATION OF BISHOP ROBIN DEASE ON BEHALF OF PLAINTIFF THE NORTH GEORGIA CONFERENCE OF THE UNITED METHODIST CHURCH

I, Bishop Robin Dease, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Resident Bishop of The North Georgia Conference of The United Methodist Church, and have served in that role since January 2023.

2. I make this statement based upon personal knowledge, files and documents of the North Georgia Conference that I have reviewed, as well as information supplied to me by members of the North Georgia Conference whom I believe to be reliable. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting the North Georgia Conference's business.

3. The North Georgia Conference was founded in 1830 and incorporated in 1988. Our mission is to help churches and their congregants fulfill their God-inspired vision. We currently serve over 200,000 congregants in 411 local churches.

4.  Core to the North Georgia Conference's belief system is the Biblical mandate to love and care for all individuals, regardless of status—and especially immigrants, whom the Bible commands we welcome and protect.  Our churches are affiliated at the national level with the United Methodist Church, which has affirmed the responsibility of churches to minister to all individuals, regardless of immigration status, and has declared that any form of nativism, mistreatment, or exploitation is inconsistent with the gospel of Jesus Christ.  In line with these religious tenets, our congregations welcome undocumented people into their churches for worship services, social service ministries, and other church activities.

5.  In light of the Department of Homeland Security ("DHS")'s rescission of the sensitive locations policy as part of its plan to arrest and deport all undocumented people during President Trump's second term, I have strong reason to believe that our congregations are at imminent risk of immigration enforcement action.

6.  Our churches are located across the State of Georgia, in every area north of (and inclusive of) Harris, Meriwether, Upson, Monroe, Jasper, Putnam, Baldwin, Hancock, Warren, McDuffie, and Richmond counties, with the exception of Dade County, which is not part of our annual conference.  We have churches located in cities and counties with large immigrant communities, both documented and undocumented, such as Athens-Clarke County, Atlanta, Columbia County, Dekalb County, and Douglas County.

7.  Immigration and Customs Enforcement ("ICE") has conducted raids in many areas in which our churches are located since the sensitive locations policy was rescinded, and it raided one of our churches and conducted another raid next door to another of our churches.  In the local church that was raided, which is located in Atlanta, ICE agents came into the daycare office looking for a staff member who they believed to be undocumented.  That staff member no

2

longer worked at that church so ICE ended its enforcement action with no further incident.  The other local church has a campus in Gwinnett County immediately next door to a church that ICE raided, which heightened anxieties within its congregation, staff, and clergy because approximately half of the congregation is comprised of immigrants.

8.  The North Georgia Conference has approximately sixteen predominately immigrant local congregations.  For example, the congregation at the Gwinnett County church that is right next door to a church that ICE raided is composed of 50 percent immigrant members hailing from Mexico, El Salvador, Venezuela, Sierra Leon, Nigeria, Liberia, England, Korea, Haiti, Honduras, Guatemala, Ecuador, Kenya, and Jamaica.  Another local church in Barrow County has a congregation that is approximately 73 percent Hispanic, with many congregants hailing from Mexico, Guatemala, Honduras, Columbia, Ecuador, Peru, and Argentina.  Our local churches do not make inquiries regarding immigration status, but we know that we have congregants who are undocumented and some have been deported.

9.  Many of our churches also provide social service ministries, including ESL classes, food pantries, food distribution, back-to-school events, clothes closets, weekly community meals, and immigration ministries.  One of our local churches, which wishes to remain anonymous, offers a food pantry and a free lunch summer program, with approximately 50 percent of those served being Hispanic.  These services are provided on church property, and they are part of the church itself—organized, run, and funded by the congregations.  They serve citizens and immigrants, both documented and undocumented.

10. Immigration enforcement actions have already taken place in at least two of our churches. Additional immigration enforcement action, particularly any taken during a worship service, religious ceremony, or other church activity, will harm our churches even further by continuing

Docusign Envelope ID: 32F84752-DA69-5193-83F5-951ACB87A374

to interfere with their religious mandate to worship in person together as a congregation, with all members of their community, including those who are immigrants and without lawful status. It will substantially disrupt the whole church's spiritual practice and destroy all sense of peace and safety in what is supposed to be a place of sanctuary for congregants, as we have already seen from those churches where enforcement actions have taken place.

11. Likewise, an immigration enforcement action directed at their social service ministries will prevent our churches from carrying out their mission to welcome and serve all immigrants, whom they feel called to minister to and protect as part of our evangelical faith.

12. DHS's new enforcement policy is already substantially burdening our religious exercise. Since the sensitive locations policy was rescinded, I have received reports of phone calls, emails, and texts to the North Georgia Conference from pastors who are confused and afraid. They want to know how to protect their churches from intrusion and interruption. We already have reports of decreased attendance since the sensitive locations policy rescission, starting the very first Sunday after the recession. Congregants are telling their pastors that they are now afraid of going to church due to the imminent risk of an ICE raid or enforcement action, especially given that nearby churches have already experienced enforcement actions.

13. Some of our churches are already making changes to the way worship is conducted. One church, for example, is making arrangements to move some of its ministry activities to a virtual format for fear of ICE intrusion on church property. Another is preparing to offer online options for its ESOL program. Others are training their boards of trustees and security teams to address what might happen if ICE showed up. And several have started to or are considering locking the doors of their church during services.

Docusign Envelope ID: 32F84752-DA69-5193-83F5-9514CB87A374

Case 1:25-cv-00403-DLF    Document 24-2    Filed 04/02/25    Page 5 of 5
USCA Case #25-5209    Document #2136370    Filed: 09/22/2025    Page 395 of 398

14. DHS's new enforcement policy forces our churches to make the impossible choice of refraining from welcoming all congregants to participate in communal worship services or putting parishioners at risk of arrest and deportation—either of which violates their sincerely held religious beliefs. This problem is compounded by congregational concerns that immigration enforcement action during church activities could escalate to a point where bystanding congregants and guests suffer physical harm.

15. If participation in these services decreases, or if our churches are forced to change the way they deliver their services, there will also be a devastating impact on the congregants and social recipients the churches serve. They will be deprived not only of the physical benefits these ministries offer, such as food, clothing, medical assistance, etc., but also of the spiritual ministry our churches provide as part of their religious mission, such as worship, spiritual counsel, communion, and Bible study.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/2/2025

Respectfully submitted,

Signed by:

*Bishop Robin Dease*

B716AEA073B8492...

Bishop Robin Dease

5

App. 510

# EXHIBIT A

FOR OFFICIAL USE ONLY

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC  20536



U.S. Immigration
and Customs
Enforcement

January 31, 2025

MEMORANDUM FOR:    Russell Hott
                   Acting Executive Associate Director
                   Enforcement and Removal Operations

                   Robert Hammer
                   Acting Executive Associate Director
                   Homeland Security Investigations

FROM:              Caleb Vitello
                   Acting Director

SUBJECT:           Common Sense Enforcement Actions in or Near Protected Areas

---

On January 20, 2025, Acting Secretary Benjamine C. Huffman issued a memorandum titled, *Enforcement Actions in or Near Protected Areas*, superseding and rescinding effective immediately the October 27, 2021, *Guidelines for Enforcement Actions in or Near Protected Areas* memorandum from former Secretary Alejandro N. Mayorkas. The Acting Secretary's memorandum acknowledges the ability of the Department's law enforcement personnel to apply enforcement discretion to balance a variety of interests, including the degree to which law enforcement actions occur in protected areas.[1]

For this reason, the Department will not be issuing bright line rules regarding where immigration laws are permitted to be exercised. Instead, the Acting Secretary authorized the Director of U.S. Immigration and Customs Enforcement (ICE) and the Commissioner of U.S. Customs and Border Protection to issue further guidance to assist law enforcement personnel in exercising appropriate enforcement discretion.

---

[1] For purposes of ICE immigration enforcement action, protected areas include schools (pre-schools through post-secondary, including colleges, universities, and vocational and trade schools); hospitals; churches, synagogues, mosques, or other institutions of worship; and a site during the occurrence of a public demonstration, such as a march, rally, or parade.

FOR OFFICIAL USE ONLY
App. 512

Common Sense Enforcement Actions in or Near Protected Areas
Page 2 of 2

I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway, AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.

Any further guidance your Directorates develop should be coordinated together and developed in consultation with the ICE Office of Regulatory Affairs and Policy and OPLA to ensure consistency and legal sufficiency.

<u>Disclaimer</u>

This guidance does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person.

Distribution:

Deputy Director
Executive Associate Director, Enforcement and Removal Operations
Executive Associate Director, Management and Administration
Associate Director, Office of Professional Responsibility
Principal Legal Advisor
Assistant Director, Office of Civil Rights Compliance
Assistant Director, Office of External Affairs
Assistant Director, Office of Firearms and Tactical Programs
Assistant Director, Office of Regulatory Affairs and Policy
Chief of Staff, Office of the Director
Deputy Chief of Staff, Office of the Director

FOR OFFICIAL USE ONLY