[ORAL ARGUMENT NOT YET SCHEDULED]

No. 25-5209

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

MENNONITE CHURCH USA, et al.,

*Plaintiffs-Appellants,*

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

*Defendants-Appellees.*

*On Appeal from the U.S. District Court for the District of Columbia*
*No. 1:25-cv-00403-DLF, Hon. Dabney L. Friedrich*

Brief of Fair and Just Prosecution and the Law Enforcement Action
Partnership as *Amici Curiae* in Support of Appellants

Michael Preston Shipp
Estela Dimas
Lisa Alexandra Hamer
FAIR AND JUST PROSECUTION,
    A PROJECT OF THE TIDES CENTER
1012 Torney Avenue
San Francisco, CA 94129
(415) 561-6400
pshipp@fairandjustprosecution.org

Hyland Hunt
Dana Kaersvang*
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste. 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com
*Licensed in Colorado

*Counsel for* Amici Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.      Parties and Amici**

Appellants' brief lists all parties, intervenors, and amici to date except for the following additional amici for Appellants: Fair and Just Prosecution, a project of the Tides Center, and the Law Enforcement Action Partnership, appearing in this brief.

**B.      Ruling Under Review**

Appellants' brief accurately references the rulings at issue.

**C.      Related Cases**

All related or consolidated cases are identified in Appellants' brief.

    /s/Hyland Hunt
      Hyland Hunt

## RULE 26.1 DISCLOSURE STATEMENT

Fair and Just Prosecution is a project of the Tides Center, which is a 501(c)(3) nonprofit organization. The Tides Center has no parent company and no publicly traded company has a 10% or greater ownership interest in the Tides Center or Fair and Just Prosecution.

The Law Enforcement Action Partnership is a 501(c)(3) nonprofit organization. It has no parent company and no publicly traded company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES................i

RULE 26.1 DISCLOSURE STATEMENT ............................................... ii

TABLE OF AUTHORITIES...................................................................iv

GLOSSARY ..................................................................................... viii

INTEREST OF *AMICI CURIAE* .........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ....................................................................................6

I.    IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP AND OTHER SENSITIVE AREAS ERODES THE TRUST BETWEEN LAW ENFORCEMENT AND THEIR COMMUNITIES THAT IS ESSENTIAL TO PUBLIC SAFETY. ....................................................6

    A. Community Trust Is Essential to Law Enforcement Effectiveness and Legitimacy, and Prosecutors Must Build Trust with Immigrant Communities.....................................................................6

    B. The Pervasive Threat of Deportation Shatters this Fragile Trust and Sends Entire Communities into the Shadows, Thwarting Effective Law Enforcement. ...................................................10

    C. Allowing Immigration Enforcement at or near Houses of Worship and Other Sensitive Areas Is a Unique Threat to Community Trust and Exacerbates the Public Safety Threat Posed by Increased Immigration Enforcement. ......................................................16

        1. DHS's Aggressive Enforcement Actions are Creating an Atmosphere of Fear and Distrust Between Law Enforcement and Immigrant and Latino Communities. ...........................................17

        2. Expanding DHS's Enforcement to Areas at or near Houses of Worship and Other Sensitive Locations is Particularly Harmful.........20

II.   IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP AND OTHER SENSITIVE AREAS THREATENS PUBLIC SAFETY BY WEAKENING CIVIC INSTITUTIONS THAT PROMOTE STABLE AND HEALTHY COMMUNITIES.....................................................23

CONCLUSION ................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018)...................14

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ...............................................25

*Obergefell v. Hodges*, 576 U.S. 644 (2015) .............................................................22

*Perdomo v. Noem*, No. 25-4312, 2025 U.S. App. LEXIS 19503 (9th Cir. Aug. 1, 2025) ................................................................................................................ 17, 19

*United Farm Workers v. Noem*, No. 1:25-cv-00246 (E.D. Ca. Apr. 29, 2025)........18

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018) ......................27

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015)......................................................6

**OTHER AUTHORITIES**

*Acting Brooklyn District Attorney Eric Gonzalez Announces New Policy Regarding Handling of Cases against Non-Citizen Defendants*, Brooklyn Dist. Att'y's Off. (Apr. 24, 2017) .....................................................................................................9

Aleja Hertzler-McCain, *Diocese of San Bernardino Issues Dispensation Saying Catholics Who Fear ICE Don't Have to Attend Mass*, NPR (July 9, 2025) ........22

Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade Their Freedom for Safety*, Los Angeles Times (June 26, 2025)..............................................................................................................26

Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593 (2013) ....................................................................15

Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* (2009) ..............................................................15

Bill Chappell, *Churches Have a Long History of Being Safe Havens—For Immigrants and Others*, NPR (Jan. 26, 2025)......................................................23

Boulder Cnty. Dist. Att'y's Off., *District Attorney Policy Regarding Immigration Collateral Consequences*........................................................................................9

Br. of 17 States and D.C. as Amici Curiae, *Perdomo v. Noem*, No. 2:25-cv-05605 (Doc. 49-1)..............................................................................................................20

iv

Cecilia Menjívar & Cynthia L. Bejarano, *Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area*, 27 Ethnic and Racial Stud. 120 (2004)................................11

Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025)..................64

David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, CATO Institute (Aug. 5, 2025) .....................................18

David S. Kirk et al., *The Paradox of Law Enforcement in Immigrant Communities: Does Tough Immigration Enforcement Undermine Public Safety?*, 641 Annals Am. Acad. Pol. & Soc. Sci. 79 (2012)........................................................ 7, 12, 16

Diana Becton, Off. of the Dist. Att'y Contra Costa Cnty., *Immigration Policy* (2019)........................................................................................................................9

*District Attorney Nathan J. Hochman Statement on Recent Immigrant Enforcement Actions*, Los Angeles Cnty. Dist. Att'y's Off. (June 6, 2025) .............................19

Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593 (2011)......................... 15, 16

*Ensuring Victims and Witnesses Feel Safe Coming Forward and Cooperating with the Justice System Ultimately Makes Our Communities Safer*, Phila. Dist. Att'y's Off. ......................................................................................................................10

Fair and Just Prosecution, *U-Visa Best Practices for Prosecutors* (2023) ..............10

Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018)............................13

*Hennepin County Attorney Mary Moriarty Statement on Law Enforcement Action in Minneapolis*, Hennepin Cnty. Att'y's Off. (June 4, 2025) ...............................20

Human Rights Watch, *Immigrant Crime Fighters: How the U Visa Program Makes US Communities Safer* (2018) ............................................................................10

Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159 (2010) ............15

Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025)......................................19

Jennifer S. Vey & Hanna Love, *Transformative Placemaking: A Framework To Create Connected, Vibrant, and Inclusive Communities,* Brookings (Nov. 19, 2019)........................................................................................................................24

Jessica M. Doucet & Matthew R. Lee, *Civic Communities and Urban Violence*, 52 Soc. Sci. Rsch. 303 (2015) ...................................................................24

Jesus Jiménez & Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2005)......................17

Jesus Jiménez, et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025) ........................................................19

Jill Blair & Malka Kopell, *21st Century Civil Infrastructure: Under Construction*, Aspen Institute (2015) .....................................................................24

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015)............................................................... 14, 15

Letter from Law Enforcement Immigration Task Force to Hon. Trey Gowdy & Hon. Zoe Lofgren (July 20, 2015).......................................................27

Luis Noe-Bustamante, *Latinos Worry More Than Other U.S. Adults About Deportations*, Pew Rsch. Ctr. (Apr. 30, 2025) ....................................12

Margaret Kadifa, *ICE Arrests All Adults Without Children at S.F. Immigration Court Today*, Mission Local (July 25, 2025).........................................17

Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57 Criminology 237 (2019).......................11, 12, 13

Nat'l Immigrant Women's Advoc. Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* (2018)...................................................................................14

Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 WorkingUSA: J. of Lab. & Soc'y 407 (2006)....................................................................................16

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (2013) .......................................................13

Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just., *Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders* (2010) ...........15

Off. of the Dist. Att'y, 20th Jud. Dist., *Immigrant Rights in the Justice System in Boulder County* (2024) ............................................................9

Phila. Dist. Att'y's Off., *Philadelphia DAO Policy on Avoiding Unjust Immigration Outcomes* (Nov. 27, 2018) ................................................................................8

Philip Jankowski, *Travis DA: Witness' Deportation Fears Stall Domestic Violence Case*, Austin American-Statesman (Mar. 7, 2017) ..............................................13

*Press Briefing by Press Secretary Karoline Leavitt*, White House (Jan. 29, 2025) ..4

Robert C. Davis et al., *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 1 Crim. Just. Pol'y Rev. 183 (2001)....11

S. Poverty L. Ctr., *Under Siege: Life for Low Income Latinos in the South* (2009)................................................................................................................16

Sergio Olmos & Wendy Fry, *Judge Restricts Border Patrol in California: 'You Just Can't Walk Up To People With Brown Skin"*, Cal Matters (Apr. 29, 2025).........18

Sonja Sharp, *Chokeholds, Bikers and 'Roving Patrols': Are Trump's ICE Tactics Legal?*, Los Angeles Times (July 28, 2025) .......................................................17

*Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, Dept. of Homeland Sec. (Jan. 21, 2025) ................................................................................................................4

Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231 (2008)................................................................................................................7

Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation and Engagement*, 20 Psych., Pub. Pol'y & L. 78 (2014) ................................................................................7

Valerie J. Munson, *On Holy Ground: Church Sanctuary In the Trump Era*, 47 Sw. L. Rev. 49 (2017) ..............................................................................................23

*Victims of Criminal Activity: U Nonimmigrant Status*, USCIS (May 16, 2025) .......9

Zak Sos, *Santa Rosa man accused of impersonating officer, threatening to call ICE and sexually assaulting woman*, KTVU Fox 2 (Aug. 2025) .................................13

## GLOSSARY

| DHS | Department of Homeland Security |
|---|---|
| **FJP** | Fair and Just Prosecution, a project of the Tides Center |
| **ICE** | Immigration and Customs Enforcement |
| **LEAP** | Law Enforcement Action Partnership |

## INTEREST OF *AMICI CURIAE*[1]

Fair and Just Prosecution (FJP), a project of the Tides Center, is a national organization that brings together elected prosecutors from around the country as part of a nonpartisan network of leaders committed to a justice system grounded in fairness, equity, compassion, and fiscal responsibility. The leaders that FJP works with hail from over 60 jurisdictions—urban, suburban, and rural alike—and they collectively represent nearly 20% of our nation's population. Among its work, FJP develops and helps to implement policies that serve the two primary interests the prosecutors in our network are obligated to pursue: justice and public safety.

The Law Enforcement Action Partnership (LEAP) is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials advocating for criminal justice and drug policy reforms that will make our communities safer and more just. LEAP's speaker's bureau numbers more than 275 criminal justice professionals advising on police community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support of allied efforts, LEAP calls for more practical and ethical policies from a public safety perspective.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4).

Many of the communities that FJP's network represents and LEAP's speakers hail from have large immigrant populations, with or without legal status. FJP and LEAP work with prosecutors and other law enforcement officials who serve communities in states and jurisdictions that have taken different approaches to immigration enforcement and have themselves implemented varying policies related to immigration, but are united behind the core principle that immigration enforcement must align with community safety and cannot impede it. To this end, FJP and LEAP are committed to ensuring that all members of the community feel protected, while building and maintaining a cooperative relationship between immigrant communities and local law enforcement based on trust and respect.

FJP and LEAP write to explain the public safety interests at stake here. Beyond the injuries suffered by Appellants and wrongly brushed aside by the district court, the government's elimination of restrictions on civil immigration enforcement in sensitive locations like churches, schools, and hospitals destroys the community trust and civic institutions that are essential for public safety. Under the district court's analysis, however, no harm can be traced to this policy so long as it is accompanied by other actions that also create fear within immigrant communities. This reasoning gives short shrift to the special role played by the civic institutions that are no longer shielded by the sensitive locations policy. And it wrongly creates

a near-insurmountable standing bar for challenges to the most harmful policies—

*i.e.*, the most comprehensively intrusive ones.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over 30 years, the federal government imposed stringent limits on civil immigration enforcement in or near "protected" or "sensitive" locations. These places—including houses of worship, as well as schools, hospitals, and emergency relief providers—provide such essential services that overall community health and safety suffer if they cannot function or if people cannot safely access them. In these spaces, the government authorized enforcement actions only as a last resort, such as when there was "a national security threat" or "an imminent risk of death, violence, or physical harm to a person."[2]

But in an abrupt and dramatic policy change, in January, the government dispensed with those restrictions and granted discretion to individual Immigration and Customs Enforcement (ICE) and Border Patrol agents to seize people and conduct other enforcement actions in what had been protected areas. This was not a quiet policy change, but one that came with overt threats and bellicose rhetoric: "[c]riminals will no longer be able to hide in America's schools and churches to

---

[2] JA133 (Mayorkas Guidelines).

avoid arrest," the Department of Homeland Security (DHS) announced.[3] And according to the White House Press Secretary, in this administration's view anyone who enters the U.S. without authorization is, "by definition, a criminal."[4]

As Appellants explain, they are suffering and will continue to suffer concrete injuries traceable to the dissolution of protections for houses of worship in the absence of a preliminary injunction. FJP and LEAP ask this Court to consider the issue from another perspective: public safety. Law enforcement's main priority is the safety of their local communities. FJP and LEAP are committed to effective law enforcement and public safety strategies that reduce harm and serious crime.

In *amici*'s view, the challenged DHS enforcement policy presents a grave threat to public safety and crime reduction. The district court's reasoning aggravates the harm by shielding the policy from judicial review on the theory that no harm can be traced to the policy simply because it is intertwined with several other policies that also create fear in immigrant communities. The threat to public safety and crime reduction is two-fold. First, allowing immigration enforcement at or near places of worship—which have for centuries been understood as sacred places of sanctuary— is a profound betrayal that will shatter the hard-fought trust between law

---

[3] *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, Dept. of Homeland Sec. (Jan. 21, 2025), https://tinyurl.com/y75jyv8v.

[4] *Press Briefing by Press Secretary Karoline Leavitt*, White House (Jan. 29, 2025), https://tinyurl.com/2t3wd2sm.

enforcement and immigrant communities. This trust is essential for public safety, as without it, law enforcement loses legitimacy and people will fear police and prosecutors rather than work with them to report, investigate, and prosecute crime. As people retreat into the shadows, this breakdown will leave already vulnerable immigrant populations even more susceptible to victimization and reluctant to report crime and participate in the legal system.

Second, in abolishing protected areas, the new DHS enforcement policy will weaken core civic institutions that together promote stable and healthy communities and lower crime rates. The essential services that these once-protected institutions provide—including healthcare, education, spiritual guidance, and other social services—form the foundation of public safety and are all associated with crime reduction. Indeed, churches, synagogues, and other houses of worship often provide social welfare services such as support groups, meals, childcare, classes (e.g., English, drivers' education), and even shelter. When these services are compromised, people suffer, communities fray, and the resulting instability makes crime more likely and law enforcement's job to combat it more difficult.

By discounting the causal link between the challenged policy and Appellants' harm, the district court's decision only heightens the possibility of these negative outcomes. The court rejected standing on the theory that so long as members of immigrant communities are afraid to worship due to several interwoven government

policies, no one policy can be singled out. JA119-20. By doing so, the decision effectively renders the most comprehensive, most trust- and community-destroying government regimes immune from challenge. This deleterious public safety impact is directly relevant to both the standing question and the ultimate legality of DHS's enforcement policy. When considering the issues on appeal, this Court should recognize the extraordinary threat to public safety and effective law enforcement that DHS's policy to abolish protected places represents.

## ARGUMENT

## I.     IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP AND OTHER SENSITIVE AREAS ERODES THE TRUST BETWEEN LAW ENFORCEMENT AND THEIR COMMUNITIES THAT IS ESSENTIAL TO PUBLIC SAFETY.

### A. Community Trust Is Essential to Law Enforcement Effectiveness and Legitimacy, and Prosecutors Must Build Trust with Immigrant Communities.

Our legal system "depends in large measure on the public's willingness to respect and follow its decisions." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445-46 (2015). In particular, prosecutors' and law enforcement's work to solve and prosecute crimes is acutely dependent on community members' confidence in the system. The willingness of victims and witnesses to report crimes to law enforcement, cooperate with prosecutors, show up for court proceedings, and testify truthfully depends on their trust in the system and their belief that it is fair. Indeed, research supports that when people have trust in legal authorities and view the police,

6

the courts, and the law as legitimate, they are more likely to report crimes, cooperate as witnesses, and accept police and judicial system authority.[5] Conversely, when people perceive law enforcement as biased or as a threat to, rather than a protector of, their community, they are more likely to distrust and therefore avoid the legal system (and other government institutions) as a whole—severely undermining the ability of police and prosecutors to work effectively.[6]

This trust is both especially vital and fragile in communities of marginalized people, including immigrant communities. In these communities, as more fully described below, an escalation of immigration enforcement, along with threats to deport as many people as possible, will inevitably reduce immigrants' willingness to report crimes and cooperate with law enforcement investigations, thereby undermining the ability of police and prosecutors to combat crime.[7] As described further below, moving such enforcement into the community's most protected and important public spaces is especially destructive to this trust and supercharges this effect.

---

[5] *See* Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 263 (2008); Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation and Engagement*, 20 Psych., Pub. Pol'y & L. 78, 78-79 (2014).

[6] *See* Tyler & Fagan, *supra* note 5; Tyler & Jackson, *supra* note 5.

[7] *See* David S. Kirk et al., *The Paradox of Law Enforcement in Immigrant Communities: Does Tough Immigration Enforcement Undermine Public Safety?*, 641 Annals Am. Acad. Pol. & Soc. Sci. 79, 82, 91 (2012).

In recognition of the importance of community trust in law enforcement, prosecutors around the country have attempted to bolster community trust by implementing policies designed specifically to protect immigrant crime victims and provide equal justice to all people involved in the criminal legal system—whether victim, witness, defendant, or a combination thereof—regardless of immigration status. For example, the Philadelphia District Attorney explicitly seeks "immigration neutrality" whenever possible by minimizing collateral immigration consequences (including deportation) that would amount to excessive punishment and create cascading harm to a defendant's family, friends, and community.[8] Accordingly, "[w]here disproportionate immigration consequences may result from a criminal conviction and/or sentence, the case will be reviewed by immigration counsel to see what, if any, changes could be made to neutralize or reduce those consequences," including considering alternative plea offers or sentencing recommendations.[9] The

---

[8] As the Philadelphia District Attorney Office policy on "avoiding unjust immigration outcomes" explains, "[d]eportation following a criminal conviction has significant and often devastating impacts on the emotional and financial well-being of innocent community members, including victims of crimes. Such impacts can include separation of families; significantly increased risks of involvement of children in criminal behavior; victims left without marital or child support; and families facing economic crises (common financial repercussions of deportation include food instability, loss of housing, and greater reliance on government assistance programs)." Phila. Dist. Att'y's Off., *Philadelphia DAO Policy on Avoiding Unjust Immigration Outcomes* 1 (Nov. 27, 2018), https://tinyurl.com/4mz2a6cc.
[9] *Id*. at 1-2.

elected prosecutors in Brooklyn,[10] Boulder,[11] and Contra Costa County in California's Bay Area have similar policies.[12] In Boulder, the District Attorney may also move court dates for those who fear arrest by ICE agents, and created a "Fresh Start" warrant forgiveness program that allows immigrants to clear arrest warrants for low-level offenses without being arrested.[13]

To protect immigrant crime victims and encourage witness cooperation, prosecutors have also regularly utilized and served as the local official empowered to certify U-Visas. Created by Congress in 2000 as part of the Violence Against Women Act, U-Visas grant temporary legal status to qualifying survivors of crime who can be helpful to law enforcement.[14] By helping ensure that undocumented community members feel protected by the law, U-Visas can strengthen fraught relationships between law enforcement and immigrant communities and increase the likelihood that immigrants will report crime. They also work as a deterrent to those who might prey on vulnerable communities, sending a message that victims will

---

[10] *Acting Brooklyn District Attorney Eric Gonzalez Announces New Policy Regarding Handling of Cases against Non-Citizen Defendants*, Brooklyn Dist. Att'y's Off. (Apr. 24, 2017), https://tinyurl.com/mvt35euk.

[11] Boulder Cnty. Dist. Att'y's Off., *District Attorney Policy Regarding Immigration Collateral Consequences*, https://tinyurl.com/4exs4hak.

[12] Diana Becton, Off. of the Dist. Att'y Contra Costa Cnty., *Immigration Policy* (2019), https://tinyurl.com/mvemh6tv.

[13] Off. of the Dist. Att'y, 20th Jud. Dist., *Immigrant Rights in the Justice System in Boulder County* (2024), https://tinyurl.com/5fm939tm.

[14] *See Victims of Criminal Activity: U Nonimmigrant Status*, USCIS (May 16, 2025),  https://tinyurl.com/4m75wsau.

have recourse in a legal system that will protect them.[15] Law enforcement officials report that in addition to the U-Visa program's "immediate practical benefits of ensuring that victims are able to assist with investigations," there are also longer term benefits, like building confidence among immigrant communities that "going to law enforcement will help rather than hurt them."[16]

The overarching goal of these policies "is to create better relationships between law enforcement agencies and immigrant communities by encouraging victims and witnesses of crime to speak out, no matter their legal status."[17] Because when that happens, law enforcement is more effective and communities are safer.

### B. The Pervasive Threat of Deportation Shatters this Fragile Trust and Sends Entire Communities into the Shadows, Thwarting Effective Law Enforcement.

When community members live in constant fear that law enforcement is targeting them wherever they go—including at or near houses of worship—and interactions with law enforcement will result in arrest and deportation, there is a fundamental breakdown in trust that threatens public safety and impedes justice system leaders from doing their jobs. Extensive evidence shows that, in such

---

[15] *See* Fair and Just Prosecution, *U-Visa Best Practices for Prosecutors* 5-6 (2023), https://tinyurl.com/2uaaxmz6.

[16] Human Rights Watch, *Immigrant Crime Fighters: How the U Visa Program Makes US Communities Safer* 14-15 (2018), https://tinyurl.com/yc6t4m8d.

[17] *Ensuring Victims and Witnesses Feel Safe Coming Forward and Cooperating with the Justice System Ultimately Makes Our Communities Safer*, Phila. Dist. Att'y's Off., https://tinyurl.com/3nrkkpjd.

circumstances, undocumented immigrants—and their lawfully present families and neighbors—fear that turning to the police and cooperating with prosecutors could bring adverse immigration consequences. This dynamic poses a major challenge to both the investigation and prosecution of individual crimes as well as the proper allocation of public safety resources.

Given that many immigrants had hostile experiences with the legal system in their home countries, they are already prone to distrust authorities in the U.S.[18] This can be exacerbated by other hurdles such as language barriers and unfamiliarity with the American legal system.[19] In addition, they often face heightened police scrutiny, whether because of racial profiling or because of increasingly aggressive federal immigration enforcement that can sometimes include local authorities. Research and experience show that "the development of trusting relationships between citizens and the police is often challenged by the presence and application of local and federal immigration enforcement programs."[20]

---

[18] Cecilia Menjívar & Cynthia L. Bejarano, *Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area*, 27 Ethnic and Racial Stud. 120, 129-30, 140-42 (2004); Robert C. Davis et al., *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 1 Crim. Just. Pol'y Rev. 183, 185, 189-91 (2001).

[19] Menjívar & Bejarano, *supra* note 18, at 126.

[20] Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57 Criminology 237, 254 (2019).

The fear of arrest and deportation that immigrant and Hispanic communities live under predictably hinders cooperation and communication with police and prosecutors. According to a recent Pew survey, 51% of Latino immigrants and 42% of all Latino adults in the U.S. worry about forced removal of themselves, family members, or close friends.[21] Immigrants often assume that interaction with law enforcement officials could have adverse consequences for themselves or a loved one.[22] As a consequence, people in communities of recent immigrants are less likely to report violent crime: in neighborhoods where 65% of residents are immigrants, there is only a 5% chance that a victim will report a violent crime, compared with a 48% chance in a neighborhood where only 10% of residents are born outside the U.S., according to one study.[23] Another survey of Latinos in four major cities found that 70% of undocumented immigrants and 44% of all Latinos would be less likely to contact law enforcement authorities if they were victims of a crime for fear that the police would ask about their immigration status or the immigration status of people they know, and 67% of undocumented immigrants and 45% of all Latinos would be less likely to voluntarily offer information about, or report, crimes because

---

[21] Luis Noe-Bustamante, *Latinos Worry More Than Other U.S. Adults About Deportations*, Pew Rsch. Ctr. (Apr. 30, 2025), https://tinyurl.com/ynevhsyc.
[22] Kirk et al., *supra* note 7, at 79-80.
[23] Xie & Baumer, *supra* note 20, at 249.

of the same fear.[24] These fears are illustrated in tragic statistics showing a significant drop in sexual assault reporting at times of increased immigration enforcement, and confirmed by prosecutors' testimony.[25] In one recent incident, a victim delayed reporting a sexual assault out of fear of being deported; the man who assaulted her had impersonated a police officer and threatened to turn her over to immigration enforcement.[26] Thus, as researchers conclude, "the presence and application of local and federal immigration enforcement programs" can impede or demolish trust of law enforcement, and thus "may dissuade residents from calling on the police to help address crime problems."[27]

Law enforcement is keenly aware of this. In a national survey, one-fifth of police officers reported that increased immigration enforcement made immigrants less willing to make police reports, less likely to help police when they arrived at the scene of the crime, less likely to assist with subsequent investigations, and less

---

[24] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (2013), https://tinyurl.com/vudutpr9.

[25] Philip Jankowski, *Travis DA: Witness' Deportation Fears Stall Domestic Violence Case*, Austin American-Statesman (Mar. 7, 2017), https://tinyurl.com/ym9hjzrk; Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018), https://tinyurl.com/9n5b7s3v.

[26] Zak Sos, *Santa Rosa man accused of impersonating officer, threatening to call ICE and sexually assaulting woman*, KTVU Fox 2 (Aug. 2025), https://tinyurl.com/35m62a3e.

[27] Xie & Baumer, *supra* note 20, at 254.

willing to work with prosecutors.[28]  In another survey of law enforcement agencies, 71% of respondents believed that when immigrant victims do not cooperate with law enforcement, it adversely affects the ability to hold violent perpetrators accountable; 64% of respondents found that it affects officer safety; and 69% reported that it affects community safety.[29]

The fear of immigration enforcement and the resulting damage to cooperation with law enforcement affect not just undocumented community members but also individuals with citizenship or lawful status, particularly in "mixed-status" households.[30] People would simply not want law enforcement lurking near their family, close to a mother or a father or a grandparent who could be at risk of deportation, and potentially questioning their status.

The public safety implications of this breakdown are dire. Undocumented people are already susceptible to victimization, and since people who prey on the

---

[28] Nat'l Immigrant Women's Advoc. Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* 100-01 (2018), https://perma.cc/52MV-X8TG; *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 341 (E.D. Pa. 2018) (noting police commissioner's "testimony that the City's ability to fight crime is impaired when victims and witnesses are afraid to report crimes for fear of immigration consequences").

[29] Nat'l Immigrant Women's Advoc. Project, *supra* note 28, at 54, 103.

[30] *See*, *e.g.*, Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) (study indicating "that for each 1-point increase in fear of deportation, Latina participants were 15% less willing to report being victim of a violent crime to police").

most vulnerable know that immigrant communities are reluctant to report crimes, these communities face a range of criminal conduct.[31] For example, in one study, nearly two-thirds of undocumented migrant workers reported being the victim of at least one crime, with the most common being theft and robbery.[32] Undocumented immigrants are especially vulnerable to robbery and theft because they typically lack a bank account and carry cash.[33] Similarly, undocumented immigrants are also vulnerable to domestic violence, with abusive partners exploiting the threat of removal and financial dependence to maintain power and control.[34] In the workplace, between 40-80% of mostly undocumented immigrants reported being

---

[31] *See*, *e.g.*, Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just., *Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders* 16 (2010), https://tinyurl.com/dfcnrtxe.

[32] Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 tbl. 2 (2010).

[33] *See* Elizabeth Fussell, *The Deportation Threat Dynamic and Victimization of Latino Migrants: Wage Theft and Robbery*, 52 Soc. Q. 593, 604-05 (2011); Anita Khashu, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 25 (2009), https://perma.cc/KL5A-EQWR.

[34] *See*, *e.g.*, Messing et al., *supra* note 30, at 330 (citing several studies); Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013).

victims of wage theft,[35] and other immigrants report facing violence at work.[36] Thus, paradoxically, "harsh legal sanctions against immigrants … framed as a means to keep communities 'safe' … in fact have the opposite effect," pushing people outside the law's protection and cultivating crime.[37] Expanding that aggressive enforcement into areas at or near houses of worship magnifies this negative effect by disconnecting immigrants from their faith communities, which are often their most important social support networks.

> **C. Allowing Immigration Enforcement at or near Houses of Worship and Other Sensitive Areas Is a Unique Threat to Community Trust and Exacerbates the Public Safety Threat Posed by Increased Immigration Enforcement.**

DHS's new policy to allow immigration enforcement at or near houses of worship and other sensitive areas threatens community trust in law enforcement, and therefore public safety, in two ways: First, it magnifies the overall atmosphere of fear and distrust that has been exacerbated by excessive and sometimes unlawful enforcement tactics. Second, inviting ICE and Border Patrol agents to transgress once-protected places—places that form the backbone of a strong and stable civil

---

[35] *See* S. Poverty L. Ctr., *Under Siege: Life for Low Income Latinos in the South* 6 (2009), https://tinyurl.com/c9esjftn; *see also* Fussell, *supra* note 33; Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 Working USA: J. of Lab. & Soc'y 407, 417 tbl. 8 (2006) (finding a wage theft rate of approximately 50% in New York).

[36] S. Poverty Law Ctr., *supra* note 35, at 7.

[37] Kirk et al., *supra* note 7, at 82-83.

society, and that provide services both spiritually sacred and essential to survival—permits uniquely destructive actions that will deeply wound community trust in, and the legitimacy of, all of law enforcement.

### 1. DHS's Aggressive Enforcement Actions are Creating an Atmosphere of Fear and Distrust Between Law Enforcement and Immigrant and Latino Communities.

Since January, DHS has dramatically scaled up immigration enforcement using tactics that have sowed fear and distrust in law enforcement, including but not limited to conducting enforcement actions in sensitive spaces. ICE agents have waited outside courthouses, ultimately arresting people who appear for their court dates while seeking asylum;[38] they have conducted  massive workplace raids and "roving patrols" admittedly based on racial profiling;[39] they have stepped outside their civil enforcement role to arrest and detain U.S. citizen protestors; and agents have consistently concealed their faces (including during an arrest in a church parking lot) and even failed to identify as law enforcement at all, leading some people to believe they are heavily armed and masked kidnappers.[40]

---

[38] *See, e.g.,* Margaret Kadifa, *ICE Arrests All Adults Without Children at S.F. Immigration Court Today*, Mission Local (July 25, 2025), https://tinyurl.com/4566wusk.

[39] Sonja Sharp, *Chokeholds, Bikers and 'Roving Patrols': Are Trump's ICE Tactics Legal?*, Los Angeles Times (July 28, 2025), https://tinyurl.com/7adz6eun.

[40] *See Perdomo v. Noem*, No. 25-4312, 2025 U.S. App. LEXIS 19503, at 16-19 (9th Cir. Aug. 1, 2025), stayed pending disposition of appeal, *Noem v. Perdomo*, No. 25A169 (U.S. Sep. 8, 2025); Jesus Jiménez & Emily Baumgaertner Nunn, *Church*

DHS's apparent reliance on and expansion of racial profiling—an unconstitutional and ultimately unhelpful tactic—will prove a major setback for law enforcement and public safety, alarming and alienating people particularly in Latino communities that have borne the brunt of this enforcement. After reviewing ICE arrest records, the CATO Institute found that "[i]llegal profiling accounts for a substantial portion of [ICE] arrests in 2025," with one in five arrests being Latinos with no criminal record or removal order.[41] "ICE is arresting thousands of people in random locations … who had no prior contact with law enforcement," CATO reported, "the telltale sign of illegal profiling."[42]

Court decisions bear this out. For example, in April, the U.S. District Court for the Eastern District of California issued a preliminary injunction barring Border Patrol from conducting warrantless immigration stops throughout the Eastern District of California.[43] At the hearing, the judge explained, "You just can't walk up to people with brown skin and say, 'give me your papers.'"[44]

---

*Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (June 11, 2005), https://tinyurl.com/mp522mjt.

[41] David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, CATO Institute (Aug. 5, 2025), https://tinyurl.com/mujfbamh.

[42] *Id.*

[43] *United Farm Workers v. Noem*, No. 1:25-cv-00246 (Doc. 47) (E.D. Ca. Apr. 29, 2025),  https://bit.ly/3Jxjtru.

[44] Sergio Olmos & Wendy Fry, *Judge Restricts Border Patrol in California:  'You Just Can't Walk Up To People With Brown Skin"*, Cal Matters (Apr. 29, 2025), https://tinyurl.com/47dt9wu2.

The possibility that through these sweeping raids DHS will violently harass and detain U.S. citizens is not theoretical. Chilling accounts of citizens being arrested and detained at work [45] or local community businesses[46] have been reported. As a result, some people now always carry passports or other identification with them. One citizen told the New York Times: "I'm a boring senior that lives in [Los Angeles] that likes to go for walks, and for the first time in history, I don't feel safe."[47]

Both state and local prosecutors have publicly condemned these tactics while explaining how they threaten community trust and public safety. In Los Angeles, District Attorney Nathan Hochman said even though "immigration enforcement is under federal jurisdiction and not within the authority of our office, we recognize the real and profound impact these operations have on the trust between immigrant communities and local law enforcement."[48] In Hennepin County, Minnesota, home to Minneapolis and Saint Paul, County Attorney Mary Moriarty emphasized her

---

[45] *Perdomo*, 2025 U.S. App. LEXIS 19503, at 17-18.

[46] Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025), https://tinyurl.com/bdz9d3by.

[47] Jesus Jiménez, et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025), https://tinyurl.com/yeyssm3f; *see also* JA57 (Compl. ¶ 76) (noting ICE arrest of "a grandmother, mother, and toddler," all U.S. citizens, "after the family was overheard speaking Spanish").

[48] *District Attorney Nathan J. Hochman Statement on Recent Immigrant Enforcement Actions*, Los Angeles Cnty. Dist. Att'y's Off. (June 6, 2025), https://tinyurl.com/5cu6mpa5.

"singular focus … on the safety of the people who live here," and said that "ICE showing up in the heart of one of our vibrant immigrant communities alongside local law enforcement causes grievous and irreparable harm. … ICE's presence will keep people from reporting crimes, from testifying as witnesses, and from seeking help."[49] And 18 state attorneys general, in a brief challenging the administration's suspicionless stop and racial profiling in Los Angeles, argued that such tactics have "undermined the trust, built over years, between local law enforcement and the immigrant community," thus "creat[ing] a culture of fear that has disrupted community life" and "impeded the daily operations of local law enforcement."[50]

### 2. Expanding DHS's Enforcement to Areas at or near Houses of Worship and Other Sensitive Locations is Particularly Harmful.

DHS's new policy that allows enforcement at or near houses of worship and other sensitive locations exacerbates this very serious public safety problem, and uniquely so. The rescission memo, and the threats that accompanied it, strike at the core of human existence and send a clear message that nowhere is safe—that law enforcement and the legal system will punish you, your family, and your friends merely for exercising core constitutional rights and seeking essential services,

---

[49] *Hennepin County Attorney Mary Moriarty Statement on Law Enforcement Action in Minneapolis*, Hennepin Cnty. Att'y's Off. (June 4, 2025), https://tinyurl.com/y5fsvbyp .
[50] Br. of 17 States and D.C. as *Amici Curiae*, *Perdomo v. Noem*, No. 2:25-cv-05605 (Doc. 49-1) at 1, 13, https://tinyurl.com/4d7et57e.

including spiritual well-being. Facing this threat, people will view law enforcement not as a trusted protector of public safety, but as an institution to be feared and avoided.

First, this policy marks a dramatic departure from the decades-long tradition of authorizing immigration enforcement in "protected areas" only as last resort, such as when there is "a national security threat" or " an imminent risk of death, violence, or physical harm to a person."[51] Now individual agents retain "discretion," based on their own "common sense," to arrest and search people in these spaces.[52] Codifying the "common sense" of agents is, we submit, a near-limitless standard, and a marked shift from requiring agents to "seek prior approval from their Agency's headquarters[] before taking an enforcement action in or near a protected area."[53] Agents themselves have understood the rescission as "free[ing] them up" to undertake such enforcement. JA110-11 (quoting DHS press release).

Second, houses of worship have long been protected precisely because the activities held there are so important "to the well-being of people and the communities of which they are a part."[54] For many community members, the practice of religion is a deeply personal exercise in understanding their lives and

---

[51] JA132-33 (Mayorkas Guidelines).
[52] JA128 (Rescission Memo).
[53] JA133 (Mayorkas Guidelines).
[54] JA131 (Mayorkas Guidelines).

place in the world, and many congregants view in-person worship as a religious mandate that they cannot abandon without spiritual consequences.[55] As a matter of constitutional law, the "First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015). Beyond providing for religious activities, houses of worship are often the only locations available where members of community groups can meet and support one another: from public service organizations like Kiwanis and Rotary clubs, to support groups for those wrestling with addiction, cancer, and grief.

While the specific prohibition on immigration enforcement endured for 30 years, the legal and cultural norms recognizing houses of worship as protected spaces of sanctuary and refuge date back centuries. In the 1800s U.S. churches gave safe harbor to enslaved people, and later to people resisting military conscription during the Vietnam war. These practices followed centuries-old traditions—dating back to the earliest years of Christianity—holding that churches were sacred and

---

[55] Aleja Hertzler-McCain, *Diocese of San Bernardino Issues Dispensation Saying Catholics Who Fear ICE Don't Have to Attend Mass*, NPR (July 9, 2025), https://tinyurl.com/3v9bzc32 (diocese issuing dispensations for members who cannot attend services due to fear of immigration enforcement at or near churches).

protected spaces. [56] Eliminating the protections against state interference by immigration enforcement in and around these sensitive spaces is thus uniquely destructive to the community's trust and faith in law enforcement.

To dispense with these longstanding, cross-cultural norms not for the sake of public safety, but to find and deport immigrant members of the community, shatters law enforcement legitimacy and tells people to avoid the legal system rather than work within it. There are unique harms resulting from law enforcement not respecting these sacred spaces. Contrary to the District Court's reasoning, it can't be the case that the government's actions become immune from challenge the more unlawful enforcement tactics they pile on top of one another. That reasoning only generates incentives to take ever more actions that destroy community trust in law enforcement, which harms us all.

## II.  IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP AND OTHER SENSITIVE AREAS THREATENS PUBLIC SAFETY BY WEAKENING CIVIC INSTITUTIONS THAT PROMOTE STABLE AND HEALTHY COMMUNITIES.

It bears repeating that the longstanding policy to shield sensitive locations from immigration enforcement not only protected immigrant access to these spaces, it also promoted public safety and the overall "well-being of … the communities of

---

[56] Bill Chappell, *Churches Have a Long History of Being Safe Havens—For Immigrants and Others*, NPR (Jan. 26, 2025),  https://tinyurl.com/ffab3bsj; *see also* Valerie J. Munson, *On Holy Ground: Church Sanctuary In the Trump Era*, 47 Sw. L. Rev. 49 (2017).

which they are a part."[57] Ensuring community-wide access to schools, hospitals, houses of worship, and emergency and social services promotes a stable, healthy, and well-connected civil society with lower crime rates. That is especially true as these institutions increasingly house public safety initiatives designed to address the root causes of—and thereby reduce—community violence. The new DHS policy abolishing protected areas will have the opposite effect; it weakens these core civic institutions by effectively excluding people from them, diminishing their public-safety benefit and thus burdening the limited resources of local law enforcement.

"Civic infrastructure—or the organizations and institutions that help people connect with one another, address shared concerns, and solve public problems—forms the backbone of a healthy community."[58] Ample research shows that "more civically robust communities will be better off and have lower crime rates than civically weak communities," in particular those with "a strong matrix of religious and secular institutions to facilitate civic engagement and a locally invested and stable population."[59] Each of these "component[s] theoretically contributes to the

---

[57] JA131 (Mayorkas Guidelines).

[58] Jennifer S. Vey & Hanna Love, *Transformative Placemaking: A Framework To Create Connected, Vibrant, and Inclusive Communities,* Brookings (Nov. 19, 2019), https://tinyurl.com/2e8stsuv; *see also* Jill Blair & Malka Kopell, *21st Century Civil Infrastructure: Under Construction*, Aspen Institute (2015), https://tinyurl.com/yck5jdhk.

[59] Jessica M. Doucet & Matthew R. Lee, *Civic Communities and Urban Violence*, 52 Soc. Sci. Rsch. 303 (2015), https://tinyurl.com/4tyab7n6.

ability of communities to foster cohesion and efficacy, secure and manage local municipal resources, and prevent a host of crime and public health related problems."[60]

As another component of this civic infrastructure, places of worship provide multiple public safety benefits. They not only foster opportunities to build community and seek spiritual guidance, they often provide critical social services, from meals to shelter to childcare, that are essential to community well-being. For example, rabbis within the Central Conference of American Rabbis (CCAR), a plaintiff in this case, serve synagogues that "provide social services to immigrants," including one that "runs an on-site preschool," and another that "runs a longstanding, on-site homeless shelter in a major city."[61] *See also Fulton v. City of Philadelphia*, 593 U.S. 522, 547-48 (2021) (Alito, J., concurring) (recounting history and unique role of religious charities caring for children via orphanages and foster care placement). Such services are central not just to religious practice, implicating constitutional and statutory free exercise rights when threatened, but to social stability and public safety.

DHS's enforcement policy has already impeded these functions. In East Los Angeles, Pastor Carlos Rincon said that the threat of immigration enforcement has

---

[60] *Id.*

[61] JA40-41 (Compl. ¶ 88).

cut attendance at his Pentecostal church by half.[62] Five miles away, at Our Lady of Lourdes Church, Father Ricardo Gonzalez reports that attendance is down at least 30%.[63] Elsewhere, the Diocese of San Bernardino took the extraordinary step of absolving parishioners of their obligation to attend mass, citing fear of immigration raids.[64] These are only a few examples of how DHS's enforcement policy has undermined houses of worship.[65] The district court's discounting of these real and substantial injuries to communities of worship fails to grapple with the special role that these institutions play in the community and how targeting these community spaces, in particular, magnifies the fear—and the complete breakdown of trust—generated by aggressive immigration tactics more generally.

It will ultimately be local prosecutors and law enforcement in high-immigrant jurisdictions and the communities they serve—not federal officials—who will bear the brunt of this breakdown in civil society. As this enforcement policy further erodes core civic institutions, it will demand greater amounts of already scarce and carefully

---

[62] Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade Their Freedom for Safety*, Los Angeles Times (June 26, 2025), https://tinyurl.com/5ezrufr6.

[63] *Id.*

[64] Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025), https://tinyurl.com/44tf9te3.

[65] *See* JA29-30, JA38-71 (Compl. ¶¶ 8, 82-160); Opening Br. 19-21.

allocated local law enforcement resources to protect public safety.[66] Thus, in addition to delegitimizing law enforcement—itself a grave public safety threat—DHS's enforcement policy will weaken local enforcement and other civic institutions that form the foundation of effective public safety policy.

\* \* \* \* \*

In addition to burdening religious exercise, the DHS policy to abolish protected areas and permit immigration enforcement at or near places of worship and other sensitive locations will severely undermine effective law enforcement and public safety. Rescinding the sensitive locations policy in the context of other aggressive and discriminatory enforcement tactics makes the harm from the rescission worse, not better—and it should not make the rescission immune from review, contrary to the district court's reasoning. The pending threat to arrest people for attending their church or synagogue or mosque will shatter any remaining trust between immigrant communities and law enforcement. In addition, it will keep people from seeking essential services that, along with law enforcement, promote

---

[66] *See* Letter from Law Enforcement Immigration Task Force to Hon. Trey Gowdy & Hon. Zoe Lofgren (July 20, 2015), https://perma.cc/V7MX-VCAF; *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018), *aff'd in part*, 921 F.3d 865 (9th Cir. 2019) (explaining that it is "entirely reasonable for the State to determine that assisting immigration enforcement in any way . . . is a detrimental use of state law enforcement resources").

public health and safety. In short, the DHS policy is not a public safety measure. It is a public safety threat.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

/s/Hyland Hunt

| | |
|---|---|
| Michael Preston Shipp | Hyland Hunt |
| Estela Dimas | Dana Kaersvang* |
| Lisa Alexandra Hamer | DEUTSCH HUNT PLLC |
| FAIR AND JUST PROSECUTION, | 300 New Jersey Ave. NW, Ste. 300 |
| A PROJECT OF THE TIDES CENTER | Washington, DC 20001 |
| 1012 Torney Avenue | (202) 868-6915 |
| San Francisco, CA 94129 | hhunt@deutschhunt.com |
| (415) 561-6400 | *Licensed in Colorado |
| pshipp@fairandjustprosecution.org | |

*Counsel for* Amici Curiae

September 29, 2025

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief is in 14-point Times New Roman proportional font and contains 6,483 words as counted by Microsoft Word, excluding the items that may be excluded. The brief thus complies with the type-face, style, and volume limitations set forth in Rule 29(a)(5) and 32(a)(5)–(7)(B) of the Federal Rules of Appellate Procedure.



/s/Hyland Hunt

Hyland Hunt

September 29, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on September 29, 2025, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

/s/Hyland Hunt
Hyland Hunt