ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5209

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

MENNONITE CHURCH USA, et al.,
*Plaintiffs-Appellants,*
v.
U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,
*Defendants-Appellees.*

On Appeal from the U.S. District Court for the District of Columbia,
No. 25-cv-00403 (Dabney Friedrich, District Judge)

## BRIEF OF *AMICUS CURIAE*
## THE UNITED STATES CONFERENCE OF CATHOLIC BISHOPS
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

Stephen W. Miller
HWG LLP
1919 M. St. NW, 8th Fl.
Washington, DC 20036
(202) 730-1305
smiller@hwglaw.com

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Except for *amicus curiae* United States Conference of Catholic Bishops, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Appellant. References to the ruling at issue, as well as a case of which counsel is aware that raises similar issues and falls within the meaning of D.C. Circuit Rule 28(a)(1)(C), appear in the Brief for Appellant.

*/s/ Stephen W. Miller*
Stephen W. Miller

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29, and D.C. Circuit Rule 26.1, the United States Conference of Catholic Bishops ("USCCB") submits its corporate disclosure statement.

USCCB is a nonpartisan, nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Code. No publicly held corporation has any form of ownership interest in USCCB, which has no parent corporation and does not issue stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

CORPORATE DISCLOSURE STATEMENT ..........................................ii

TABLE OF CONTENTS ......................................................... iii

TABLE OF AUTHORITIES...................................................iv

STATEMENT OF INTEREST .................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT ...................................................................3

   I.  The Plaintiffs Have Suffered Injuries In Fact that are Traceable to Defendants' Rescission of the Sensitive Locations Policy and Redressable by a Return to the Status Quo Ante. ..........................3

   II.  The Plaintiffs Face Imminent Threat of Injury Traceable to Defendants Because the Threat Ties to Their Congregants' Predictable Reaction to Defendants' Rescission of the Sensitive Locations Policy...............................................................6

   III. The Courts Are Ill-Suited to Second-Guess the Concreteness of Plaintiffs' Conscience Injuries. ........................................8

CONCLUSION ...............................................................14

CERTIFICATE OF COMPLIANCE......................................A-1

CERTIFICATE OF SERVICE...........................................A-2

# TABLE OF AUTHORITIES

## Cases

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).....................10

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). ..............................4

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008). ........11

*Dep't of Comm. v. New York*, 588 U.S. 752 (2019). .................................8

*Duberry v. D.C.*, 924 F.3d 570 (D.C. Cir. 2019)......................................7

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). ..................4, 6, 8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012) ..............................................................................11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). ...............................3

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020). 11

*Phila. Yearly Meeting of the Religious Soc'y of Friends v. United States Dep't of Homeland Sec.*, 767 F. Supp. 3d 293 (D. Md. 2025).........4, 7, 9

*Power Co. of Am., L.P. v. FERC*, 245 F.3d 839, 842 (D.C. Cir. 2001) ......7

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989). .....................................................................................................3

*Sprint Communications Co. v. APCC Services, Inc.*, 554 U. S. 269, 288 (2008) .....................................................................................................6

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). ...................8, 9

*Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 393 (1988) .8

## Other Authorities

Alberto Riojas, *Decree Dispensing from the Obligation to Attend Sunday Mass*, Diocese of San Bernardino, Office of the Bishop (2025) ...........................................................................................................12

Bill Chappell, *Churches Have A Long History of Being Safe Havens – For Immigrants and Others*, NPR (Jan. 26, 2025, 6:03 AM). ...............5

iv

Catechism of the Catholic Church § 1560 ............................................... 12

*Religious Liberty, Migration, and the Border*, USCCB Committee for
   Religious Liberty (Feb. 6, 2025) ............................................................ 13

*Statement in Response to Immigration Enforcement Activities in
   Nashville*, Nashville Catholic (May 13, 2025) ...................................... 12

## STATEMENT OF INTEREST[1]

The United States Conference of Catholic Bishops provides a framework and a forum for the Bishops to teach Catholic doctrine, set pastoral directions, and develop policy positions on contemporary social issues. The USCCB advocates and promotes the pastoral teaching of the U.S. Catholic Bishops in such diverse areas of the Nation's life as the free expression of ideas, fair employment, and equal opportunity for the underprivileged, immigration, protection of the rights of parents and children, the sanctity of life, religious liberty, and the importance of education. When cases before the courts touch upon important tenets of Catholic teaching, the USCCB has filed *amicus curiae* briefs to assert its view. In so doing, the USCCB seeks to further the common good for the benefit of all.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the USCCB affirms that no counsel for a party authored this brief in whole or in part, no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief, and no person other than the USCCB or its counsel contributed money that was intended to fund the preparation or submission of this brief. All appearing parties have consented to the filing of this amicus brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This brief focuses on the conscience injuries Plaintiffs have demonstrated that establish standing sufficient to bring suit. These injuries all arise predictably from the 2025 rescission of the Department of Homeland Security's longstanding policy of generally refraining from immigration enforcement at sensitive locations, such as churches (the "Sensitive Locations Policy"). The rescission of the Sensitive Locations Policy at issue here, which was set forth most recently in a 2021 memorandum but had been in effect for nearly thirty years, has had the predictable, deleterious effect of forcing Plaintiffs into an untenable position: they either increase the risk to their congregants of harmful enforcement action by maintaining the obligation to attend weekly services, or limit the provision of in-person religious services to their congregants in response to the imminent threat of an enforcement action, and their congregants' well-founded fears thereof.

Either scenario represents an abrogation of their religious beliefs and obligations, exactly the kind of conscience injury courts find sufficient for standing. These injuries are severe and concrete, and Plaintiffs do not make their choices lightly or speculatively. Indeed, they

2

have made these weighty decisions in response to Defendants' actions as acts of pastoral care, which the courts are is ill-suited to dismiss as speculative. And these injuries are tied directly to the imminent threat of enforcement at their places of worship, which traces directly to Defendants' rescission of the Sensitive Locations Policy. Plaintiffs have therefore established standing, and this Court should reverse the District Court's contrary ruling.

## ARGUMENT

### I. The Plaintiffs Have Suffered Injuries In Fact that are Traceable to Defendants' Rescission of the Sensitive Locations Policy and Redressable by a Return to the Status Quo Ante.

To establish standing, Plaintiffs must show an injury in fact that is "fairly traceable" to the Defendants' actions, and that can be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Courts have recognized that government conduct that has a chilling effect on congregants' participation in church activities inflicts an injury sufficient to establish standing. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989); *Phila. Yearly Meeting of the Religious Soc'y of Friends v. United States Dep't of Homeland Sec.*, 767 F. Supp. 3d 293 (D. Md. 2025). And where a

defendant's conduct forces a plaintiff to act against their conscience, this "conscience injury" is a "concrete injury . . . for [standing] purposes." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 387 (2024).

To be sure, a plaintiff cannot "manufacture standing" by taking actions "based on hypothetical future harm that is certainly not impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). But the harm here is neither hypothetical nor in the future—it is concrete and present. As the record Plaintiffs assembled and referenced in their brief shows, Plaintiffs have currently incurred injury in decreased worship attendance, conscience injury, and increased-cost injuries as a result of Defendants' policy change. *See, e.g.*, App. 154, 175, 185, 196–99, 203–04, 207–08, 214, 226–27, 233–35, 259–60, 277, 288–89, 307–08, 323–24, 331, 344, 350, 370, 376–77, 381, 385–86, 395, 410, 421, 427, 435–36, 446, 456, 467–68, 472–73, 483, 497. Indeed, the rescission is a but-for cause of these injuries, as the record assembled below shows that Plaintiffs would not have incurred these injuries and costs absent Defendants' stated desire, confirmed by subsequent actions, to conduct immigration enforcement actions at places of worship. *See, e.g.*, App. 164–65, 185, 196–99, 223, 289, 307–08, 370, 509.

In addition to Plaintiffs' record, and as explained below, *amicus* obverses that Plaintiffs are not the only faith organizations confronting these issues. Catholic dioceses that have incurred injuries similar to Plaintiffs have also attributed their responsive actions to Defendants' statements targeting churches, and enforcement actions targeted at churches, rather than a more generalized increase in immigration enforcement. *See infra* p. 12. This is a sensible conclusion. Immigration enforcement priorities and severity have changed over the last thirty years that the Sensitive Locations Policy has been in effect, and yet it is only now, since Defendants have rescinded the Policy, that Plaintiffs and other faith organizations are incurring these injuries as it relates to their ministry to immigrant populations.[2]

Finally, a return to the prior Sensitive Locations Policy would redress the harms wrought by the rescission. "[C]ausation and redressability—are often 'flip sides of the same coin.' If a defendant's action causes an injury, enjoining the action or awarding damages for the

---

[2] *See generally* Bill Chappell, *Churches Have A Long History of Being Safe Havens – For Immigrants and Others*, NPR (Jan. 26, 2025, 6:03 AM) https://www.npr.org/2025/01/26/nx-s1-5273652/church-safe-haven-history-immigrants.

action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 380–381 (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U. S. 269, 288 (2008)). A plaintiff need only show that "the relief sought will constitute a 'necessary first step on a path that could ultimately lead to relief fully redressing the [claimant's] injury.'" *Duberry v. D.C.*, 924 F.3d 570, 583 (D.C. Cir. 2019) (quoting *Power Co. of Am., L.P. v. FERC*, 245 F.3d 839, 842 (D.C. Cir. 2001)). Applied here, "immigration enforcement in or near places of worship was subject to specific restrictions not present in the 2025 Policy." *Phila. Yearly Meeting*, 767 F. Supp. 3d at 318. A return to the status quo ante would thus be a non-speculative first step toward redressing the injuries Plaintiffs have suffered since the rescission.

## II. The Plaintiffs Face Imminent Threat of Injury Traceable to Defendants Because the Threat Ties to Their Congregants' Predictable Reaction to Defendants' Rescission of the Sensitive Locations Policy.

Even if this Court takes the view that Plaintiffs' injuries relate only to potential future enforcement action, properly viewed, such future enforcement action is imminent and traceable to Defendants for standing purposes. Plaintiffs have standing where they can show "an actual and well-founded fear that the law will be enforced" against their

congregants, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014)(quoting *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 393 (1988)), and thus they face an immediate threat of concrete, harmful action, *see All. for Hippocratic Med.*, 602 U.S. at 381. Plaintiffs must also show that they are incurring their harms as a result of the "predictable effect of Government action on the decisions of third parties," *Dep't of Comm. v. New York*, 588 U.S. 752, 768 (2019)—here, their congregants' reactions to Defendants' rescission of the Sensitive Locations Policy. This record evidence shows that Plaintiffs' injuries are sufficient for standing.

As the record establishes, Plaintiffs' places of worship are in communities with large immigrant populations, and they cater to the immigrant community regardless of status. *See, e.g.*, App. 111, 212, 258–59, 358, 380. Defendants have specifically stated that, upon the rescission of the Sensitive Locations Policy, "criminal aliens" would no longer be able to "hide in America's schools and churches to avoid arrest." App. 31. And since rescinding the Sensitive Locations Policy, Defendants have indeed conducted numerous immigration enforcement activities at places of worship. *See* App. 231, 244, 253, 336, 348, 358, 496, 507–08, *see also*

Br. for Apps. at 12, 19–22. Considering the full record, Plaintiffs have shown "an actual and well-founded fear that the law will be enforced" against their congregants. *See Susan B. Anthony List*, 573 U.S. at 160. And it is a predictable result of the rescission and Defendants' subsequent statements and actions conducting immigration enforcement at sensitive locations that Plaintiffs' congregants will decline to attend services. *Cf. Phila. Yearly Meeting*, 767 F. Supp. 3d at 318 (finding traceability on similar facts). The parishioners' fears, and the churches' need to address them, were a foreseeable reaction to rescission of the Sensitive Locations Policy, and a return to the status quo prior to the rescission would redress these injuries. As such, Plaintiffs have again demonstrated standing.

## III.  The Courts Are Ill-Suited to Second-Guess the Concreteness of Plaintiffs' Conscience Injuries.

The District Court below erred grievously by brushing aside Plaintiffs' present conscience injuries as "driven by a subjective chill" and "too speculative." App. 123 (citations and quotations omitted). In doing so, the District Court had to disregard, or at least dismiss as subjective and speculative, sworn statements in the record documenting Plaintiffs' conscience injuries and related measures they have undertaken in an

8

attempt to respond to their congregants' real, current fear that being on church property will expose them to immigration enforcement. *See* App. 260, 307–08, 331, 381, 427, 446, 456; *see also* App. 214, 323–24.

This Court should be especially wary of countenancing the District Court's approach in a case such as this, where Plaintiffs assert RFRA and First Amendment injuries. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) ("[I]t is not for us to say that their religious beliefs are mistaken or insubstantial."); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1261 (10th Cir. 2008) (noting that courts lack the power to make "intrusive judgments regarding contested questions of religious belief or practice"). Indeed, the implications of the District Court's assessment that Plaintiffs' injuries are too speculative runs up against the Constitution's guarantee of church autonomy, i.e., the "right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (cleaned up), and to be free from "interfer[ence] with the internal governance of the church" (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012)).

9

The conscience and increased-cost injuries Plaintiffs demonstrated before the District Court—heightening security, locking doors, moving services online, and being less public about their immigrant-focused ministries—are changes Plaintiffs have been compelled to make to the manner in which they worship and exercise their charitable ministries. *See* App. 260, 307–08, 381, 427, 446, 456. These are core religious activities, where an otherwise innocuous act like locking a door can carry religious significance. Effectively second-guessing, even dismissing, Plaintiffs' exercise of their pastoral duties and brushing aside their documented conscience injuries, especially in contexts that are at the heart of Plaintiffs' religious purpose, is not a proper role for the courts.

The record Plaintiffs have assembled, as noted above, demonstrates that they incurred these conscience injuries in response to Defendants' actions, and that their own congregants' fears are reasonable under the circumstances Defendants created with the rescission. Given Defendants' stated expansion of enforcement activities to sensitive locations, and with numerous examples of actual enforcement at religious locations, Plaintiffs have been made to confront an imminent threat. Defendants have forced Plaintiffs into choosing between practicing their religion as

10

before while exposing their flock to immigration enforcement, which runs counter to their duty to care for the safety of their congregants, or abrogating or otherwise encumbering their religious practice in an effort to protect their most vulnerable congregants. *See* App. 331; *see also* App. 214, 323–24.

Plaintiffs are not alone in this moment in responding to Defendants' rescission of the Sensitive Locations Policy. Religious organizations throughout the country are wrestling with similar choices, and incurring similar conscience injuries, whether parties in this case or otherwise. For instance, two Catholic dioceses, having assessed the imminent threat posed by the Sensitive Locations Policy rescission to their parishioners, have granted dispensation from the Sunday Mass obligation. Attending Sunday Mass is a grave obligation for the Catholic faithful, and one that Catholic bishops cannot dispense with lightly. The bishops grounded these decisions in their pastoral duties as shepherds to their spiritual flocks, guided by the Catholic Church's mission to care for the spiritual welfare of all the faithful.[3]

---

[3] *See* Catechism of the Catholic Church § 1560 (available at https://www.usccb.org/catechism/pt2sect2chpt3).

In San Bernardino, Bishop Rojas, observing in July the "pastoral needs of [the] diocese and the concerns expressed by many of our brothers and sisters regarding fears of attending Mass due to potential immigration enforcement," granted dispensation from the Sunday Mass obligation due to the grave impediment that the fear of immigration enforcement at Sunday Mass poses.[4] And in Nashville, Bishop Spalding announced in May that "many of those in our diocese are concerned about possibly being confronted or detained *while attending Mass or other parish events*. Our churches remain open to welcome and serve our parish communities, but no Catholic is obligated to attend Mass on Sunday if doing so puts their safety at risk."[5]

*Amicus* knows the bishops in San Bernardino and Nashville made their decisions described above acts of pastoral care in response to the

---

[4] Alberto Riojas, *Decree Dispensing from the Obligation to Attend Sunday Mass*, Diocese of San Bernardino, Office of the Bishop (2025) https://www.sbdiocese.org/newsmedia/statements/2025/Diocesan%20Decree%20Dispensing%20from%20the%20Obligation%20to%20Attend%20Sunday%20Mass.pdf.

[5] *Statement in Response to Immigration Enforcement Activities in Nashville*, Nashville Catholic (May 13, 2025) https://www.nashvillecatholic.org/news/posts/statement-in-response-to-immigration-enforcement-activities-in-nashville (emphasis added).

threat of imminent and terrible harm to their parishioners.[6] Certainly, these bishops did not incur these conscience injuries to "manufacture standing" in a case they did not bring—these are weighty actions taken, and injuries sustained, as a direct result of Defendants' decision to rescind the Sensitive Locations Policy. While *amicus* is not privy to Plaintiffs' internal deliberations in responding to this grave time, *amicus* is deeply familiar with their conscience injuries in making grave decisions as an act of pastoral care for their congregants. To wave away these decisions as essentially capricious suggests an insensitivity to the constitutional issues at stake. The District Court should not have

---

[6] *See Religious Liberty, Migration, and the Border*, USCCB Committee for Religious Liberty (Feb. 6, 2025) https://www.usccb.org/resources/Religious_Liberty_Migration_Border.pdf ("[I]t is especially important that [governments] respect the basic rights of Christian ministries to serve the vulnerable as Christ has taught us. When a person in need comes before us, we don't ask for documentation before providing food, clothing, and shelter. Rather, we recognize their inherent God-given dignity and the reality that '[e]very migrant is a human person who, as such, possesses fundamental, inalienable rights that must be respected by everyone and in every circumstance' (*Caritas in veritate*, 62). Ministry to migrants is not peripheral to the work of the Church. It is central. It institutionalizes those corporal works of mercy which are an expression of the love of Christ.").

disregarded these exercises of pastoral care, and erred in dismissing these injuries as speculative and driven by subjective chill.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's decision and remand for further consideration of Plaintiffs' request for preliminary injunctive relief.

Dated: September 29, 2025          Respectfully submitted,


*/s/ Stephen W. Miller*
Stephen W. Miller
HWG LLP
1919 M St. NW, 8th Fl.
Washington, DC 20036
(202) 730-1305
smiller@hwglaw.com

*Counsel for Amicus Curiae*

14

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the requirements of Federal Rules of Appellate Procedure 29(a)(5) and 32(a) because, according to the Microsoft Word word-processing program on which it was created, it is proportionately spaced, has a Century typeface of 14 points, and contains 2872 words, excluding those parts of the brief exempted under Federal Rule of Appellate Procedure 32(f).

/s/ *Stephen W. Miller*
Stephen W. Miller

## CERTIFICATE OF SERVICE

I hereby certify that, on September 29, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system, which served a copy of the document on all counsel of record in the case.

September 29, 2025             Respectfully submitted,

                              /s/ *Stephen W. Miller*
                              Stephen W. Miller
                              HWG LLP
                              1919 M St. NW, 8th Fl.
                              Washington, DC 20036
                              (202) 730-1305
                              smiller@hwglaw.com

A-2