# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

MENNONITE CHURCH USA, *et al.*,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**BRIEF FOR APPELLEES**

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

AUGUST E. FLENTJE
MICHAEL E. TALENT
  *Attorneys,*
  *Department of Justice*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8976*

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.     Parties And Amici**

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Plaintiffs-Appellants.

1. Scholars of Quaker Practices and Beliefs Isaac Barnes May, Stephen Angell, Jane Calvert, Thomas D. Hamm, Julie Holcomb, Andrew Taylor, and David Watt;

2. Fair and Just Prosecution, a project of the Tides Center;

3. Law Enforcement Action Partnership;

4. United States Conference of Catholic Bishops;

5. Afghans for a Better Tomorrow;

6. Asian American Legal Defense and Education Fund;

7. Bend the Arc: A Jewish Partnership for Justice;

8. Black Alliance for Just Immigration (BAJI);

9. Council on American-Islamic Relations, National (CAIR National);

10.     Council on American-Islamic Relations, New York (CAIR-NY);

11.     Center for Constitutional Rights;

12.     Communities United for Status and Protection (CUSP);

13.     DRUM: Desis Rising Up and Moving;

14.     Global Justice Institute;

15.     Haitian Bridge Alliance (HBA);

16.     Interfaith Center of New York;

17.     Islamic Society of Central New Jersey;

18.     Muslim Advocates;

19.     Muslim Public Affairs Council (MPAC);

20.     National Association of Muslim Lawyers (NAML);

21.     National Immigration Project;

22.     Partnership for the Advancement of New Americans (PANA);

23.     Project ANAR;

24.     Union Theological Seminary.

**B.      Rules Under Review**

References to the ruling at issue appear in the Brief for Plaintiffs-Appellants.

**C.      Related Cases**

Defendants-Appellees are aware of no other related cases besides those referenced in the Brief for Plaintiffs-Appellants.


*s/ Michael E. Talent*
Michael E. Talent

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................1

STATEMENT OF JURISDICTION.......................................................3

STATEMENT OF THE ISSUE...............................................................3

STATEMENT OF THE CASE.................................................................4

    I.    Statutory Background..........................................................4

    II.   Regulatory Background .......................................................4

    III.  Plaintiffs' Suit And Preliminary Injunction Motion ..............9

        A.    Plaintiffs' Complaint.....................................................9

        B.    Plaintiffs' Preliminary Injunction Motion...................12

        C.    The District Court's Denial Of Plaintiffs' Motion.......17

SUMMARY OF ARGUMENT.................................................................22

STANDARD OF REVIEW.....................................................................28

ARGUMENT .......................................................................................28

    I.    Plaintiffs Must Establish That Each Plaintiff Has
        Standing To Seek Preliminary Relief...................................29

    II.   Plaintiffs Cannot Establish An Imminent Threat Of An
        Enforcement Action Attributable To The Current
        Guidance..............................................................................34

        A.    The district court properly concluded that the
            evidence did not show there is an imminent risk
            of an immigration enforcement action in or near
            Plaintiffs' churches or synagogues .............................34

     B.     Because enforcement is not imminent, Plaintiffs cannot establish standing based on alleged conscience and pocketbook harms ............................... 50

III.    Plaintiffs Cannot Establish Standing Based On Declines In Attendance At Events ....................................... 51

     A.     The record does not establish that the decline in attendance is traceable to the challenged guidance or would be redressed by a favorable decision ....................................................................... 52

     B.     Plaintiffs' remaining arguments are meritless ........... 59

CONCLUSION ......................................................................... 68

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Act Now to Stop War & End Racism Coal. v. District of Columbia,*
589 F.3d 433 (D.C. Cir. 2009) .......................................................... 47

*Allen v. Wright,*
468 U.S. 737 (1984) ...............................................................57

*American Library Ass'n v. Barr,*
956 F.2d 1178 (D.C. Cir. 1992) ....................................................... 51

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................... 4

*Arpaio v. Obama,*
797 F.3d 11 (D.C. Cir. 2015) .......................................................... 52

*California v. Texas,*
593 U.S. 659 (2021) .............................................................. 66

*Center for Sustainable Econ. v. Jewell,*
779 F.3d 588 (D.C. Cir. 2015) ....................................................... 49

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ...............................................................48

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................ 29, 30, 37, 46, 48, 49, 50, 51, 55

*Climate United Fund v. Citibank, N.A.,*
154 F.4th 809 (D.C. Cir. 2025) ....................................................... 28

*Diamond Alt. Energy, LLC v. EPA,*
606 U.S. 100 (2025) ......................................................... 29, 31, 59-60

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ............................................. 30, 31, 51, 57, 62-63

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) ................................................. 28-29, 63

*Fulani v. Brady,*
935 F.2d 1324 (D.C. Cir. 1991) ........................................ 55

*Green v. U.S. Dep't of Justice,*
392 F. Supp. 3d 68 (D.D.C. 2019) ................................. 47-48

*Johnson v. Becerra,*
111 F.4th 1237 (D.C. Cir. 2024) ....................................... 31

*Laird v. Tatum,*
408 U.S. 1 (1972) ................................................ 34, 35, 55

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................ 30, 31, 67

*Make the Road N.Y. v. Noem,*
2025 WL 2494908 (D.D.C. Aug. 29, 2025) ......................... 32

*Murthy v. Missouri*
603 U.S. 43 (2024) .............................. 32, 33, 43, 50, 62, 65

*National Council of Agric. Emp'rs v. U.S. Dep't of Labor,*
143 F.4th 395 (D.C. Cir. 2025) ......................................... 64

*National Taxpayers Union, Inc. v. United States,*
68 F.3d 1428 (D.C. Cir. 1995) .........................................63

*Noem v. Vasquez Perdomo,*
2025 WL 2585637 (U.S. Sep. 8, 2025) ............................... 48

*Obama v. Klayman,*
800 F.3d 559 (D.C. Cir. 2015) .........................................29

*Ord v. District of Columbia,*
587 F.3d 1136 (D.C. Cir. 2009) .................................... 41, 48

*O'Shea v. Littleton,*
414 U.S. 488 (1974) ....................................................... 43

*Philadelphia Yearly Meeting of the Religious Soc'y of
Friends v. U.S. Dep't of Homeland Sec.,*
767 F. Supp. 3d 293 (D. Md. 2025) ................................... 57

*Presbyterian Church (U.S.A.) v. United States,*
  870 F.2d 518 (9th Cir. 1989) ................................... 43, 63, 64

*Public Citizen, Inc. v. NHTSA,*
  489 F.3d 1279 (D.C. Cir. 2007) ......................................... 38

*Saline Parents v. Garland,*
  88 F.4th 298 (D.C. Cir. 2023) ........................................... 34

*Sampson v. Murray,*
  415 U.S. 61 (1974) ....................................................... 32

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ...................................................... 62

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ....................................................... 30

*Steffel v. Thompson,*
  415 U.S. 452 (1974) ...................................................... 36

*Suggs v. United States,*
  407 F.2d 1272 (D.C. Cir. 1969) ......................................... 41

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ...................................................... 41

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ................................. 30, 32, 55, 59, 62

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ...................................................... 32

*Trump v. New York,*
  592 U.S. 125 (2020) .................................................. 37, 48

*U.S. Telecom Ass'n v. FCC,*
  825 F.3d 674 (D.C. Cir. 2016) .......................................... 47

*United Presbyterian Church in the U.S.A. v. Reagan,*
  738 F.2d 1375 (D.C. Cir. 1984) ............... 34, 35, 36, 37, 38, 48, 49

*United Transportation Union v. Interstate Commerce Commission,*
  891 F.2d 908 (D.C. Cir. 1989) .......................................... 60

iii

*Warth v. Seldin,*
   422 U.S. 490 (1975) ............................................................... 32

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................... 28, 32

**Statutes:**

5 U.S.C. § 705 ................................................................. 32

8 U.S.C. § 1103(a)(1) ........................................................ 4

8 U.S.C. § 1357 ............................................................... 4

8 U.S.C. § 1357(e) ........................................................... 4

28 U.S.C. § 1292(a)(1) ....................................................... 3

28 U.S.C. § 1331 ............................................................. 3

**Regulatory Materials:**

Exec. Order No. 14,159,
   90 Fed. Reg. 8,443 (Jan. 29, 2025) ..................................... 8

Exec. Order No. 14,165,
   90 Fed. Reg. 8,467 (Jan. 30, 2025) .................................... 8

**Rule:**

Fed. R. App. P. 4(a)(1)(B) .................................................. 3

**Other Authorities:**

Christian Church (Disciples of Christ) in the U.S. & Can.,
   *A Pastoral Letter in Care for Downey Memorial Christian
   Church* (June 12, 2025), https://perma.cc/93VT-LFS4 ....................... 42

Jack Jenkins, *'This Is Domestic Terror': Shaken by ICE Raids, Pastors Rethink Ministries*, Religion News Serv. (Aug. 4, 2025), https://perma.cc/E4D6-2WNW ..............................42-43

Andy Olsen, *When ICE Comes to Church*, Christianity Today (Jan. 31, 2025), https://perma.cc/XCD3-7RXU ........................39

# GLOSSARY

| | |
|---|---|
| DHS | U.S. Department of Homeland Security |
| CBP | U.S. Customs and Border Patrol |
| GED | Certificate of High School Equivalency |
| ICE | U.S. Immigration and Customs Enforcement |

## INTRODUCTION

On January 20, 2025, the Department of Homeland Security (DHS) issued internal guidance (the Huffman Memorandum) advising immigration officers to exercise their "common sense" and "discretion" when conducting enforcement activities near sensitive locations, such as places of worship, and superseding prior guidance on such activities. On January 31, 2025, U.S. Immigration and Customs Enforcement (ICE) issued follow-on guidance charging supervisors with the responsibility of determining whether enforcement actions should occur at sensitive locations (the Vitello Memorandum).

Plaintiffs, a coalition of Christian and Jewish religious communities, sued, arguing that the guidance violates the Religious Freedom Restoration Act, the First Amendment, and the Administrative Procedure Act and moved for a preliminary injunction. The district court concluded that Plaintiffs failed to carry their evidentiary burden to show that it was likely they had standing to seek preliminary relief. The district court's careful analysis of the record is correct and should be affirmed.

First, the modest changes in the guidance for determining when immigration officers can take enforcement action in or near places of worship does not mean that an enforcement action is imminent. And indeed, the record shows that it is not. Despite representing tens of thousands of churches and synagogues, Plaintiffs pointed to only three enforcement actions taken in or near a church and four instances of surveillance at a place of worship. The rarity of these enforcement actions undermines any claim that an enforcement action involving any Plaintiff is imminent. Considering the lack of enforcement actions in this record with the Administration's focus on robustly enforcing the immigration laws leads to the compelling inference that places of worship are *not* being targeted. And because enforcement actions at places of worship are not imminent, Plaintiffs' present-day responses to that subjective, hypothetical risk of that future harm—*i.e.*, their conscience and cost harms—are insufficient to establish standing.

Second, Plaintiffs cannot establish that declines in attendance at their worship activities are traceable to the challenged guidance or would be redressed by a favorable decision. As the district court explained, the record discloses that the decline in attendance is due to people's response

to the Administration's broad immigration enforcement crackdown. At best, Plaintiffs have merely alleged that the decline is caused by a subjective fear of enforcement—not by the challenged guidance.

In sum, the district court correctly concluded that Plaintiffs failed to provide sufficient evidence to establish the requisite likelihood they have standing. The Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under the Constitution and 28 U.S.C. § 1331. App. 31. The district court denied Plaintiffs' motion for a preliminary injunction on April 11, 2025. App. 124. Plaintiffs filed a timely notice of appeal on May 30, 2025. App. 125; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The question is whether Plaintiffs have shown a likelihood that they have standing to seek an injunction enjoining the Administration's internal guidance concerning immigration enforcement at places of worship.

## STATEMENT OF THE CASE

## I.    Statutory Background

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).  Congress has directed DHS to enforce the Nation's immigration laws, 8 U.S.C. § 1103(a)(1), and has granted immigration officers broad authority to arrest and detain removable aliens, *id.* § 1357.

Congress has not imposed location restrictions on immigration officers' ability to, *inter alia*, arrest and detain removable aliens present in the United States.  The only statutory, location-based restriction is that, before entering a farm or other outdoor agricultural operation for the purpose of interrogating a person believed to be an alien about his right to be or remain in the United States, an immigration officer must get a warrant.  8 U.S.C. § 1357(e).  Congress has not otherwise limited the ability of immigration officials to arrest and detain removable aliens in or near places of worship.

## II.    Regulatory Background

1.    DHS and its predecessor agency, the Immigration and Naturalization Service, have consistently issued internal guidance to

4

immigration officers governing the factors they should consider, and the approvals they should obtain, before conducting enforcement actions in or near sensitive locations, such as places of worship. That guidance has consistently instructed officers that they may conduct immigration enforcement actions in or near places of worship under exigent circumstances or with prior supervisor approval. *See, e.g.*, App. 146-148 (Puleo Memorandum, issued in 1993); App. 143-144 (Myers Memorandum, issued in 2008); App. 139-141 (Morton Memorandum, issued in 2011); App. 136-137 (Aguilar Memorandum, issued in 2013).

Important to those policies was the exercise of sound judgment and discretion on the part of immigration enforcement officials. As the Morton Memorandum explained, the agency's guidance was "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations" but was "not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action." App. 140 (emphasis omitted).

2. DHS updated its internal guidance regarding sensitive locations in 2021. App. 130-134 (Mayorkas Memorandum). Consistent

with prior memoranda, the Mayorkas Memorandum urged officers and agents to avoid taking enforcement actions in or near sensitive locations, though it recognized that there were circumstances "under which an enforcement action" in or near a sensitive location "needs to be taken." App. 132. The guidance identified several circumstances that would justify action in or near a sensitive location but stressed that the list was "not complete" and "the exercise of judgment is required." App. 133. The guidance also directed officers to "analy[ze] . . . the facts and . . . exercise . . . judgment" in determining what is "near" a sensitive location, as "[t]here is no bright-line definition of what constitutes 'near.'" App. 132.

The Mayorkas Memorandum also instructed immigration officers to, "[a]bsent exigent circumstances[,] . . . seek prior approval from their Agency's headquarters, or as" otherwise delegated before conducting an enforcement action in or near a sensitive location. App. 133. Finally, the guidance expressly stated that it "does not limit an agency's or employee's statutory authority" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party." App. 133-134.

3.    On January 20, 2025, DHS rescinded the Mayorkas Memorandum and issued superseding guidance.  App. 128 (Huffman Memorandum).  The Huffman Memorandum explained that immigration officers routinely use their "enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location."  App. 128.  The Memorandum directs officers to "continue to use that discretion along with a healthy dose of common sense" in determining whether to engage in enforcement activities in or near sensitive locations.  *Id.*  It found it unnecessary, however, "to create bright line rules regarding where our immigration laws are permitted to be enforced."  *Id.*  The guidance does, however, recognize that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion."  *Id.*

On January 31, 2025, the Acting Director of Immigration and Customs Enforcement (ICE) issued follow-on guidance for his agency. App. 512-513 (Vitello Memorandum).[1]  The Vitello Memorandum charged Assistant Field Office Directors and Assistant Special Agents in Charge "with responsibility for making case-by-case determinations regarding

---

[1]    CBP has not issued supplemental guidance.

whether, where, and when to conduct an immigration enforcement action in or near" sensitive areas.  App. 513.

4.     Contemporaneously    with    the    Huffman    and    Vitello Memoranda, the Administration reversed prior policies and emphasized robust enforcement of the Nation's immigration laws.  *See* App. 110-111. The same day DHS issued the Huffman Memorandum, the President signed Executive Order 14,159, establishing that "[i]t is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people."  90 Fed. Reg. 8,443, 8,443 (Jan. 29, 2025).  The order directed DHS "to set priorities" that ensured "the successful enforcement of final orders of removal."  *Id.* at 8,444.  Also on January 20, 2025, the President signed Executive Order 14,165 to secure the Nation's border.  *See* 90 Fed. Reg. 8,467, 8,467-8,469 (Jan. 30, 2025).  As part of that order, the President set a policy of "[r]emoving promptly all aliens who enter or remain in violation of Federal law."  *Id.* at 8,467.

This policy was echoed in public statements reflecting the Administration's "goal of deporting all" immigrants present in the

country illegally, App. 55, and manifested in a public "'immigration enforcement blitz'" "the first week of the Trump Administration" that resulted in numerous arrests, App. 56.

## III.   Plaintiffs' Suit And Preliminary Injunction Motion

### A.   Plaintiffs' Complaint

Roughly three weeks after the Huffman Memorandum was issued, *see* App. 54 (citing a January 21, 2025, news report as first providing them notice of the guidance), Plaintiffs filed this suit.

These 27 Plaintiffs represent "12 national denominational bodies and representatives, 4 regional denominational bodies, and 11 denominational and interdenominational associations." App. 26. Each Plaintiff represents hundreds to thousands of congregations, and thousands to millions of congregants or members. App. 32-44. Plaintiff The African Methodist Episcopal Zion Church, for example, "has 1,600 congregations and approximately 1,500,000 active members," App. 32, and Plaintiff Central Conference of American Rabbis "has 2,300 member rabbis who serve over 2 million Reform Jews," App. 33.

Plaintiffs alleged that they face "an imminent risk of an immigration enforcement action at" a member church, synagogue, or

equivalent entity.  App. 59; *see* App. 60-63, 65-66, 68-70, 72-73, 75-82, 84-89, 91.  They base that risk on having a congregation or congregations located in areas "with large immigrant communities . . . where ICE or [U.S. Customs and Border Protection (CBP)] have conducted enforcement," comprised of foreign-born members that sometimes (but not always) include those present illegally, and providing services to foreign-born individuals.  *See* App. 59-91.

Plaintiffs also alleged that the current guidance is leading to decreases in attendance at some of their places of worship.  *See* App. 59-92.  Plaintiffs alleged that congregants or those who participate in their social services view "going out in the community—even to school or church—[as] unsafe."  *See, e.g.*, App. 61; *see also* App. 70 (alleging "congregants' increased feelings of anxiety, unease, and lack of safety in their community").  However, the complaint is silent about whether any congregants knew about the current guidance.  And these fears are not always driven by immigration status.  Some Plaintiffs claim that there are aliens congregants who are lawfully present but believe "they may be mistakenly arrested." App. 67.

Some Plaintiffs alleged they had taken steps to forestall the enforcement of federal immigration law, such as by locking their doors during worship services, *see, e.g.*, App. 77, or posting lookouts "to keep an eye out for immigration officials," *e.g.*, App. 68. Other Plaintiffs claimed that they now had to choose between "freely carry[ing] out their religious mission" or "chang[ing] or cut[ting] back on the way they worship and minister in an effort to protect" their immigrant congregants. App. 65.

Plaintiffs did not, however, allege that any immigration enforcement occurred at a member church or synagogue as a result of the Huffman or Vitello Memoranda. The one example they provided in the complaint did not allege that the enforcement action involved a member of any Plaintiff organization. *See* App. 28-29.

Plaintiffs claim that DHS's revised guidance relating to enforcement activities in or near places of worship—which is embodied in the Huffman and Vitello Memoranda—violates the Religious Freedom Restoration Act, the First Amendment, and is arbitrary and capricious in violation of the Administrative Procedure Act. App. 92-99.

## B. Plaintiffs' Preliminary Injunction Motion

On February 21, 2025, Plaintiffs filed a motion for a preliminary injunction. App. 102-103. They claimed associational and organizational standing to bring suit. Dkt. 11-1, at 12. To support their motion, Plaintiffs filed 66 declarations. In general, they provided one declaration from an officer or leader of each Plaintiff and one to three declarations from a leader or a member of a church or synagogue affiliated with each Plaintiff. The declarations were signed on February 19th, 20th, or 21st.[2]

Each declaration claims that the Plaintiff has "strong reason to believe" that there is an "imminent risk of immigration enforcement" at its churches and synagogues. *See, e.g.*, App. 151-152. And, like the complaint, each links that risk to a mix of the geographic location of congregations, the national origins of the congregants, and the services the churches or synagogues provide. Plaintiff Fellowship Southwest, for example, claims there is an imminent risk of enforcement because it has "member churches located along the border and near ports of entry,"

---

[2] App. 155, 159, 165, 170, 175, 180, 185, 190, 200, 204, 208, 214, 219, 223, 227, 235, 241, 245, 250, 254, 260, 265, 272, 278, 283, 289, 294, 298, 302, 308, 313, 318, 325, 332, 339, 344, 351, 355, 360, 366, 371, 377, 381, 386, 390, 396, 401, 405, 411, 415, 422, 427, 431, 436, 440, 446, 451, 457, 462, 468, 473, 478, 484, 488, 493, 498.

churches with "congregations comprised of nearly all immigrants from Latin America," and churches that "provide social service ministries" to lawfully and unlawfully present aliens. App. 257-258. Other declarations mention that the fact a church or synagogue has illegal alien members, or provides services to illegal aliens, has been "publicly reported." App. 282; *see* App. 328 (referencing a Latino Christian National Network church's "long history of ministering to" illegal aliens on church property). Other declarants mention "past enforcement efforts." App. 231. Plaintiff New York State Council of Churches, for example, references an ICE arrest "shortly after [an alien left] church property" that occurred "while the sensitive locations policy was still in place." App. 375; *see id.* (referencing enforcement in the area of a church in 2017).

Despite claiming a "strong reason" to believe enforcement is imminent, the declarations provide few examples of actual enforcement in or near their places of worship after the Huffman Memorandum was issued. The district court found that only "[o]ne Plaintiff has experienced an ICE enforcement action at [a member] church since the" Huffman Memorandum. App. 500. That enforcement action involved ICE officials

going to a church "daycare office looking for a staff member who they believed to be undocumented." App. 393. Plaintiff also cited one enforcement action at a church unconnected to any Plaintiff (the one in the complaint) and one next door to a Plaintiff church. *See* App. 111 & n.2.[3] Finally, there were four claims of "surveillance at or near" Plaintiffs' places of worship, *see* App. 111 & n.3; *see also* App. 231, 253, 336, though one example is clearly speculative, *see* App. 496 ("We suspect ICE is surveilling us again.").

Despite the absence of endemic enforcement in or near churches and synagogues, Plaintiffs' members claim they have altered some of their practices or incurred costs to forestall immigration enforcement at their locations. Some said they moved "more of [their] activities online" or to private places. App. 245; *see, e.g.*, App. 214, 324-325, 338. Others discussed steps they took to block enforcement, such as "locking the doors of their church during services," App. 395; *see* App. 400, or "training" staff

---

[3] The district court found there were two actions at non-Plaintiff church campuses. App. 111. However, the declaration the court cites for the second enforcement action (that of Bishop Dease) should have referred only to a "raid [that] occurred . . . at a commercial establishment." App. 501. Plaintiffs filed an amended declaration attempting to clarify that fact but appear to have accidently left in a reference to an enforcement action at "a church." App. 508.

"to address what might happen if ICE showed up," App. 509; *see* App. 214.  Lastly, some Plaintiffs claimed they were being forced to choose "between canceling or limiting" religious work or "exposing . . . congregants and visitors to ICE/CBP action when they visit." App. 331; *see, e.g.*, App. 371.

Some Plaintiffs claimed they have experienced declines in attendance at worship services and social service events due to the current guidance.  *See, e.g.*, App. 154; App. 288-289.  This is not uniform, however.  One Plaintiff did not make this claim, *see* App. 164-165, 169-170, and some individual churches and synagogues belonging to other Plaintiffs did not report a decline in attendance, *see* App. 354 (church); App. 426 (synagogue); App. 435 (alleging a drop in attendance at "[s]ome," but not all, churches who are part of the Rhode Island State Council of Churches).

Nor do the declarations uniformly link the declines to the Huffman Memorandum, or the follow-up Vitello Memorandum.  *But see* App. 196-197; App. 461.  Some claim that people "are too scared to leave home to worship" due to the risk of immigration enforcement—but those allegations involve concerns about going out in public areas generally,

regardless of whether the Memoranda apply to those areas. App. 360; *see* App. 298 ("One [Certificate of High School Equivalency (GED)] student specifically mentioned not wanting to leave her house until patrol cars had left the area."); App. 365 ("Reports of ICE enforcement in the area have had a chilling effect on the willingness of many immigrants to go out in public."); *see also* App. 213. Some declarations point to fears over the Administration's "mass arrest and deportation policy." App. 322. Others mention congregants' fear about "going to church due to the imminent risk of an ICE raid or enforcement action," App. 154; *see, e.g.*, App. 175, 185, 213, 234, 350, 421, 456, 483; *see also* App. 446 (noting some people stopped patronizing a food pantry "out of fear of ICE activity"); App. 450 (same), without mentioning the Huffman or Vitello Memoranda. Finally, some claim that "documented congregants are concerned and deterred from attending services." App. 197; *see, e.g.*, App. 154, 158, 483.

Plaintiffs requested that the district court enjoin the government "from carrying out immigration enforcement activities at Plaintiffs' places of worship or during religious ceremonies, absent exigent circumstances or the existence and planned execution of a judicial

warrant," require the government to follow the Mayorkas Memorandum, and stay the effective date of the Huffman Memorandum.  App. 106.

## C.    The District Court's Denial Of Plaintiffs' Motion

The district court denied Plaintiffs' motion for preliminary relief on April 11, 2025, finding that Plaintiffs failed to establish "a substantial likelihood of standing" to challenge DHS's guidance on enforcement at sensitive locations.  App. 122.

First, the district court concluded that Plaintiffs failed to show that the risk of enforcement at their places of worship is "sufficiently imminent."  App. 115 (quotations omitted).  The court observed that the Huffman and Vitello Memoranda do not "direct law enforcement to target churches or synagogues or to treat places of worship as high priority locations for immigration enforcement."  *Id.*  Instead, the Memoranda represent "only 'a modest change in the internal guidance that DHS is providing.'"  App. 116 (quoting Dkt. 34, at 45 (transcript of April 4, 2025, preliminary injunction hearing).

The district court observed that the record does not "show that places of worship are being singled out as special targets."  App. 116.  The

court noted that Plaintiffs pointed "to only three[4] instances since January 20, 2025, where any immigration enforcement action [had] taken place in or near any place of worship anywhere in the country," which "undermines the inference that actions against plaintiffs' congregations are imminent." *Id.* And the surveillance Plaintiffs pointed to, the court observed, was not linked to "an actual or pending immigration raid." *Id.* Thus, the district court found no "evidence of specific directives . . . to target plaintiffs' places of worship, or a pattern of enforcement actions" supporting a finding of a "credible threat of imminent enforcement." App. 117.

Second, the district court concluded that Plaintiffs had not established that declines in attendance are traceable to the Huffman and Vitello Memoranda or that an injunction would redress that harm. *See* App. 117-122. Explaining that the injury turns "upon the decision of an independent third party—the church congregants," the court found no "evidence [from Plaintiffs] showing their injury arises from the predictable effect of Government action." App. 118 (quotations omitted);

_____

[4] As mentioned, two actions occurred at a church and one occurred next door to a church. The court's statement that all three occurred at churches, *see* App. 111, is incorrect, but immaterially so.

*see* App. 119. "The plaintiffs acknowledge that broader immigration enforcement actions, and the extensive media coverage of those actions, have caused many undocumented immigrants to refuse to go out in public in general." App. 119. Thus, the court concluded, "congregants are staying home to avoid encountering ICE in their own neighborhoods, not because churches or synagogues are locations of elevated risk." *Id.*; *see* App. 120 (noting some declarations date the decline to "when the current [A]dministration took office and began implementing broader immigration policy changes").

The district court acknowledged that Plaintiffs' declarations "summarily attest that congregations 'have already had congregants stop coming to church out of fear of ICE under DHS's new policy.'" App. 120 (alteration omitted) (quoting App. 400). "But such limited and conclusory assertions are not enough," and Plaintiffs provided no other evidence, such as "objective statistical evidence showing that religious attendance declines were a predictable effect of the rescission policy." *Id.* Because they were "conclusory, second-hand, and limited in nature" and there was "evidence of an undisputed alternative cause for the declines in religious attendance," the district court concluded that, "the affidavits do not meet

the high bar that is required to show a causal relationship between the government policy and third-party conduct." *Id.*

"For similar reasons," the district court concluded Plaintiffs failed to show redressability. App. 121. "[T]he evidence," the court explained, did "not establish . . . that religious attendance would rebound under a return to" the Mayorkas Memorandum. *Id.* The court noted that even Plaintiffs agreed that reinstating the Mayorkas Memorandum "without reverting to the 'enforcement priorities of the prior [A]dministration' would not remedy [the] alleged burdens on religious exercise" that formed the gravamen of Plaintiffs' injury. *Id.* Plaintiffs' congregants would still potentially encounter immigration enforcement whenever they left "their homes" or in "traveling to or from religious services." *Id.*

Bolstering its analysis was the "minimal[]" difference between the Mayorkas Memorandum's allowance for immigration enforcement activities in or near places of worship "'with prior approval from'" DHS headquarters and the Vitello Memorandum's allowance for such enforcement with "prior verbal or written approval from [ICE] Assistant Field Office Directors and Assistant Special Agents in Charge." App. 121-122. The district court found it was at best "questionable" whether "any

substantive distinctions between the memoranda deter the kinds of immigration enforcement actions that the plaintiffs seek to prevent." App. 122.

The district court then concluded that Plaintiffs did not have standing based on alleged conscience injuries. App. 122-123. The court held that their conscience injuries—choosing between "withdrawing welcome to all immigrants or else making those immigrants an easy target for enforcement action," App. 122 (quotations omitted)—was "driven by subjective chill and fear of enforcement" as opposed to "likely or imminent" enforcement actions, relying on its finding that "enforcement actions are [not] sufficiently likely or imminent." App. 123 (quotations omitted). The absence of "a credible threat of enforcement" at Plaintiffs' places of worship, the court explained, meant that "the causal link between religious welcome and an immigration raid . . . is simply too speculative or too attenuated to support Article III standing." *Id.* (quotations omitted).

Finally, the district court held that because Plaintiffs failed to show "that enforcement actions are imminent at their places of worship," they

could not establish standing based on the costs they incurred "to secure their premises" from federal officials.  App. 123-124.

On May 30, 2025, Plaintiffs filed their notice of appeal.  App. 125.

## SUMMARY OF ARGUMENT

I.     To receive a preliminary injunction, each Plaintiff must establish that it is likely it has standing to seek prospective relief.  That means that each Plaintiff must provide evidence showing an injury to it caused by the challenged government action that would be redressed by a favorable decision.  This requirement is especially important in a case like this one, where there are a number of Plaintiffs representing tens of thousands of churches and synagogues and millions of congregants.

II.    The district court did not clearly err in finding, based on the record before it, that an enforcement action in or near Plaintiffs' places of worship is not imminent.

A.     It is well-established that knowledge the government is engaged in some activity, and a fear that the activity could harm a plaintiff, is insufficient to establish standing.  Rather, a plaintiff must show an imminent, non-speculative risk that the challenged government action will harm it.  Thus, Plaintiffs must show that an immigration

enforcement action done pursuant to the challenged guidance, and targeting at least some of their churches or synagogues, is imminent.

The record does not show that an enforcement action in or near Plaintiffs' churches or synagogues is imminent—much more an action that is due to the current guidance. It is undisputed that the Huffman and Vitello Memoranda do not direct law enforcement to target places of worship or label those places as high priority targets for enforcement actions. Instead, the Memoranda authorize immigration officials to use their law enforcement discretion to determine when to engage in enforcement actions in sensitive locations, and the Vitello Memorandum requires ICE agents to receive prior authorization from a superior before doing so. That alone establishes that Plaintiffs' fears of enforcement are speculative.

The evidence of past enforcement action supports that conclusion. Plaintiffs provided only three examples of enforcement actions in or near worship places post-Huffman Memorandum and only four alleged examples of surveillance by immigration officers—one of which is speculative. The paucity of examples of immigration enforcement is made all the more stark by the fact that Plaintiffs represent tens of

thousands of places of worship, have millions of members, and have at least some churches and synagogues that have admitted to providing services and shelter to illegal aliens. Given the number of opportunities for there to be enforcement actions in or near Plaintiffs' places of worship—and the fact the Administration has a general policy (not challenged here) of robustly enforcing the immigration laws—the trifling number of actual enforcement actions in or near places of worship leads to only one conclusion: that such enforcement actions are not imminent. So while the Administration revised prior guidance as to enforcement at worship places, it is entirely speculative that enforcement actions taken pursuant to that guidance will occur in or near one of Plaintiffs' churches or synagogues—especially since the current guidance represents only a modest change from the Mayorkas Memorandum.

**B.** Plaintiffs' conscience and pocketbook harms establish standing only if immigration enforcement actions are imminent. Because that is not the case, these claims of standing fail.

**III.** Plaintiffs cannot establish standing based on declines in attendance at worship services and ministry events.

**A.** The district court's conclusion that traceability and redressability are absent is well-grounded in the record.

As the district court found, the record shows that congregants and participants in social service events are staying home and avoiding places of worship because of the Trump Administration's broad policy of immigration enforcement—not because DHS, through the Huffman Memorandum and the Vitello Memorandum, revised its internal guidance for conducting enforcement actions at sensitive locations. Indeed, Plaintiffs fail to provide evidence that every Plaintiffs' absent congregants or participants were aware of the Huffman and Vitello Memoranda or of the recission of the Mayorkas Memorandum when they decided not to attend services.

Relatedly, because there is no evidence of imminent immigration enforcement actions in or near Plaintiffs' places of worship, individuals are staying home based on a fear of hypothetical future harm. As a result, the declines in attendance are not the product of the challenged guidance but of congregants' and participants' subjective fears.

The district court also correctly concluded, for similar reasons, that redressability was lacking. Because the cause of the attendance declines

was a subjective fear of hypothetical harm and the Administration's immigration enforcement policies, enjoining the implementation of the Huffman and Vitello Memoranda, and reinstating the Mayorkas Memorandum, would not provide redress. The Administration's immigration enforcement would remain ongoing—a point Plaintiffs acknowledged when they asked the district court for injunctive relief that limited enforcement actions more than the Mayorkas Memorandum did.

**B.** Plaintiffs' remaining arguments are meritless and are generally attempts to circumvent the clear-error standard of review that applies to the district court's factual findings.

Plaintiffs argue that the district court failed to give proper credence to a claimed commonsense inference that rescinding internal DHS guidance offering certain protections for places of worship will lead to a decrease in attendance, and that reinstating the Mayorkas Memorandum would alleviate some of that fear and prompt some to return. That ignores two significant facts. First, the Mayorkas Memorandum did not prohibit immigration enforcement actions in sensitive locations—it merely included an additional layer of approval for such actions. Second, it ignores the broader immigration policy changes this Administration

has implemented and their effect on illegal aliens generally, including those attending Plaintiffs' worship and social events.

In all events, it is not "commonsense" that a person who is refusing to go out in public entirely is doing so because of a change in internal agency guidance about the conduct of enforcement actions that can occur at certain places. Rather, the commonsense inference is that some other, more broadly applicable policy is affecting his decision.

Plaintiffs argue that the district court improperly required them to prove the Huffman and Vitello Memoranda were the sole cause of the cited attendance declines. Not so. The district court's decision is grounded in the record, which reflects Plaintiffs' failure to show that the current sensitive-locations guidance caused the complained-of attendance declines.

Thus, Plaintiffs shift their argument to claim that they need only show that one of each Plaintiffs' congregants or social service participants stopped attending events because of the Huffman and Vitello Memoranda. It is dubious that a single absence is a cognizable injury. But in any event, Plaintiffs failed to make even that minimal showing. Their arguments as to redressability fail for the same reasons.

Finally, Plaintiffs' claim that the district court demanded certain types of evidence misstates the district court's analysis. As is clear from the court's decision, it mentioned various types of evidence to illustrate the lack of evidence Plaintiffs provided to show standing.

## STANDARD OF REVIEW

This Court reviews "the district court's preliminary injunction [decision] for abuse of discretion, its underlying legal conclusions de novo, and its findings of fact for clear error." *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 819 (D.C. Cir. 2025).

## ARGUMENT

To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 22 (2008). "[T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction," including Article III standing. *Food &*

*Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting

*Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015)).

On appeal, Plaintiffs argue they have standing because the

Huffman and Vitello Memoranda impose, or will imminently impose, four

harms: (1) "attendance declines at their worship activities and social

service ministries"; (2) "the imminent risk of immigration enforcement

action in or near their places of worship"; (3) "conscience injuries"; and

(4) self-imposed costs to forestall federal immigration enforcement.

Appellants' Br. 24. Those arguments failed in the district court, and they

fail here.

## I.   Plaintiffs Must Establish That Each Plaintiff Has Standing To Seek Preliminary Relief

"Article III of the Constitution confines the jurisdiction of federal

courts to 'Cases' and 'Controversies.'" *Diamond Alt. Energy, LLC v. EPA*,

606 U.S. 100, 110 (2025). That limit is "fundamental to the judiciary's

proper role in our system of government" and embodies "separation-of-

powers principles." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408

(2013) (quotations omitted). "Federal courts do not possess a roving

commission to publicly opine on every legal question," and they "do not

exercise general legal oversight of the Legislative and Executive

Branches, or of private entities" or state governments.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-424 (2021).  Instead, they are confined to adjudicating disputes between parties "of the sort traditionally amenable to, and resolved by, the judicial process."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).

An "essential" aspect of Article III's case-or-controversy requirement "is the doctrine of standing."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

The injury element is satisfied by "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent."  *Lujan*, 504 U.S. at 560 (citations, footnote, and quotations omitted).  The causation element is satisfied when the injury is "fairly traceable" to the challenged action.  *Clapper*, 568 U.S. at 409 (quotations omitted).  Redressability is usually the "flip side[] of the same coin" as

causation, because "[i]f a defendant's action causes an injury, enjoining the action . . . will typically redress that injury." *Alliance for Hippocratic Med.*, 602 U.S. at 380-381 (quotations omitted).

"It is," however, "'substantially more difficult' for plaintiffs to establish standing" to challenge government action where the injury turns on the actions of third parties. *Johnson v. Becerra*, 111 F.4th 1237, 1244 (D.C. Cir. 2024) (quoting *Lujan*, 504 U.S. at 562). In that case, standing "depend[s] on how . . . third parties not before the court will act in response" to the challenged government action. *Diamond Alt. Energy*, 606 U.S. at 112. That requires distinguishing "predictable" effects of the challenged action from "speculative" ones. *Id.* (quotations omitted). The challenged governmental action must be "at least a substantial factor motivating the third parties' actions[] . . . [a]nd there must be little doubt as to the likelihood of redress." *Johnson*, 111 F.4th at 1244 (alterations, citations, and quotations omitted). "This is a significant barrier—courts have routinely rejected suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties." *Id.*

"At the preliminary injunction stage," Plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). Moreover, "standing is not dispensed in gross." *TransUnion LLC*, 594 U.S. at 431. Because Plaintiffs seek injunctive relief,[5] *see* Appellants' Br. 4, any remedial order they receive can extend no farther than what is "necessary to provide complete relief to each plaintiff with standing to sue," *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Thus, for *every* Plaintiff to receive a preliminary injunction, *each* Plaintiff must have established standing to receive a preliminary injunction. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 502 (1975) ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered

---

[5] In the district court, Plaintiffs also moved to stay the effective dates of the Huffman and Vitello Memoranda under 5 U.S.C. § 705. *See* Dkt. 11-1, at 34. Plaintiffs do not argue they have standing to seek that relief or suggest that the standing analysis differs between the two remedies—and it does not. Section 705 was designed "to reflect existing law[,] . . . not to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Thus, "[t]he factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction." *Make the Road N.Y. v. Noem*, 2025 WL 2494908, at *8 (D.D.C. Aug. 29, 2025). Plaintiffs must therefore still make a clear showing that they have standing to seek prospective relief.

by other, unidentified members of the class to which they belong and which they purport to represent.").

"Heeding these conditions is critically important in a sprawling suit like this one." *Murthy*, 603 U.S. at 61. Plaintiffs are geographically dispersed associations with demographically heterogenous bodies; they represent tens of thousands of congregations and millions of congregants of different backgrounds and views. Similarly, federal law enforcement actions take place at different times, in different contexts, and with varying degrees of visibility and connection to a place of worship. As a result, it is inappropriate to treat "the defendants, plaintiffs, and [the congregants] each as a unified whole." *Id.* Rather, each Plaintiff must establish it has suffered a cognizable injury, traceable to the challenged guidance set out in the Huffman and Vitello Memoranda, and redressable by the requested relief. As the district court correctly concluded, Plaintiffs cannot meet this standard.

## II. Plaintiffs Cannot Establish An Imminent Threat Of An Enforcement Action Attributable To The Current Guidance

### A. The district court properly concluded that the evidence did not show there is an imminent risk of an immigration enforcement action in or near Plaintiffs' churches or synagogues

1. It is well-settled that a cognizable injury cannot arise merely from the knowledge that the government is engaging, or may engage, in certain activities. *See Saline Parents v. Garland*, 88 F.4th 298, 304 (D.C. Cir. 2023) (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). There must be "some concrete harm (past or immediately threatened) apart from the 'chill' itself" that arises from an "'exercise of governmental power'" that is "regulatory, proscriptive, or compulsory in nature[.]" *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (quoting *Laird*, 408 U.S. at 11). And the plaintiff must be either "presently or prospectively subject to the regulations, proscriptions, or compulsions" at issue. *Laird*, 408 U.S. at 11. The issue is one of imminence versus speculation; the absence of an "immediate threat of concrete, harmful action," and the assertion of "mere speculative harm," does not give rise to standing. *United Presbyterian Church*, 738 F.2d at 1380 (quotations omitted).

In *Laird*, for example, the issue was whether a plaintiff had standing to challenge a government surveillance program based on the claim "his First Amendment rights [were] being chilled by the mere existence" of the program. 408 U.S. at 10. He did not; standing required that the plaintiff be "presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging," *id.* at 11, or "a claim of specific present objective harm or a threat of specific future harm," *id.* at 14. Both were lacking. *See id.* at 13.

In *United Presbyterian Church*, this Court held that *Laird* foreclosed standing based on a claim that an Executive Order establishing "procedures and limitations applicable to" intelligence activities caused the plaintiffs to "fear . . . being subjected to illegal surveillance[,] . . . which deters them from conducting constitutionally protected activities." 738 F.2d at 1377-1378. The Court explained that *Laird* "is clear and categorical: 'allegations of a subjective "chill" are not adequate.'" *Id.* at 1379 (alterations omitted) (quoting *Laird*, 408 U.S. at 13-14). It would be different, the Court indicated, if there was some "threatened or [at least] contemplated" action directed at the plaintiffs.

*Id.* at 1380 (contrasting the case with *Steffel v. Thompson*, 415 U.S. 452 (1974)).

Plaintiffs here, therefore, must do *more* than claim an injury based on "the 'chilling effect'" of speculative immigration enforcement actions. *United Presbyterian Church*, 738 F.2d at 1378. The "more" Plaintiffs point to is "the imminent risk of an enforcement action" in or near a church or synagogue. Appellants' Br. 31 (quotations omitted); *see, e.g.*, Appellants' Br. 46.

2. There is, however, no such imminent risk. It is undisputed that neither the Huffman nor the Vitello Memorandum "direct law enforcement to target churches or synagogues or to treat places of worship as high priority locations for immigration enforcement." App. 115. Rather, all the Memoranda do is modify the internal guidelines for immigration officials to engage in enforcement action at sensitive locations if doing so is consistent with "discretion" and "common sense," App. 128, and, for ICE officers, where an Assistant Field Office Director or an Assistant Special Agent in Charge approves the action, *see* App. 513. These are ultimately limited changes from the prior guidance, where such enforcement actions were permitted upon an individual

assessment of the circumstances of the contemplated action and with approval by a different supervisor, *see* App. 132-133—and no one has claimed that enforcement actions were imminent under that guidance. Because the new Memoranda, like the old guidance, "at most authorize[]" immigration enforcement in or near Plaintiffs' churches and synagogues, fears of enforcement at those locations "are necessarily conjectural." *Clapper*, 568 U.S. at 412 (emphasis omitted) (citing *United Presbyterian Church*, 738 F.2d at 1380); *see, e.g.*, *Trump v. New York*, 592 U.S. 125, 133 (2020) (per curiam) (finding a risk of future harm speculative where it turns on action the government "*might* take in the future").

Plaintiffs' evidence does not suggest otherwise. Their declarations do not show they are "threatened" with immigration enforcement actions or that such actions are "even contemplated." *United Presbyterian Church*, 738 F.2d at 1380. Indeed, Plaintiffs do not even attempt to make that showing for each Plaintiff. They simply claim standing for all by pointing generally to the location of churches and synagogues "in communities with large immigrant populations"; the decision of Plaintiffs' churches and synagogues to "host" and "cater" to "immigrants of varying legal statuses"; public knowledge that their congregations

include or may include illegal aliens; and the fact their churches and synagogues openly advocate and affirm a "religious mandate to welcome immigrants into their sanctuaries." Appellants' Br. 50-51.

That is little more than a claim Plaintiffs face an imminent threat of enforcement because their "activities are such that they are especially likely to be targets of" immigration enforcement. *United Presbyterian Church*, 738 F.2d at 1380. Yet "[e]ven if it were conceded that these factors place the [P]laintiffs at greater risk than the public at large, that would still fall far short of the 'genuine threat' required to support this theory of standing." *Id.*; *see, e.g.*, *Public Citizen v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007) (allowing standing based on an increased risk of harm "would drain the 'actual or imminent' requirement of meaning").

Drilling into the evidence confirms there is no imminent threat of immigration enforcement actions in or near Plaintiffs' places of worship. Plaintiffs provided three examples of enforcement actions in or near their places of worship post-Huffman Memorandum: one occurred at another church, *see* App. 28, one occurred on the property of a Plaintiff church, *see* App. 393-394, and one occurred next door to a Plaintiff's church, App.

507.  *See also* App. 116.  There is little detail beyond that.  The latter two are simply assertions of prior enforcement actions.  As for the first, the news article Plaintiffs cite indicate that immigration officials—though they arrived at the church during a service—did not enter or attempt to enter the church; they waited "in the parking lot" and asked for the alien they came to detain.  Andy Olsen, *When ICE Comes to Church*, Christianity Today (Jan. 31, 2025), https://perma.cc/XCD3-7RXU, *cited at* App. 28 n.11.

As the district court found, the paucity of examples of actual enforcement actions in or near Plaintiffs' places of worship "undermines the inference that actions against plaintiffs' congregations are imminent."  App. 116.  That logic also applies to Plaintiffs' claim "that ICE has conducted surveillance at or near their members' premises."  App. 111.  Of those examples, *see* App. 111 n.3, one involves speculation that ICE was engaging in surveillance, *see* App. 496, and none, as the district court found as a matter of fact, were linked to "an actual or pending immigration raid," App. 116.  That does not provide a reason to conclude that Plaintiffs face an imminent risk of immigration enforcement actions in or near their churches or synagogues.

Indeed, it suggests the contrary. Plaintiffs are 27 organizations representing tens of thousands of churches and synagogues across the nation. Three proximate enforcement actions and at most four instances of surveillance are comparatively trifling numbers that do not plausibly suggest imminent future immigration enforcement at any church or synagogue—much more at any churches or synagogues affiliated with Plaintiffs. The small number of enforcement actions targeting Plaintiffs is especially stark since several Plaintiffs admit that it is public knowledge they provide services to illegal aliens, *see, e.g.*, App. 328, or have publicly sheltered illegal aliens, *see, e.g.*, App. 281-282. *See also* Appellants' Br. 51.

Those facts should also be considered in light of the Administration's decision to enforce more aggressively the immigration laws, *see* App. 110; *see also* Appellants' Br. 51-52 (gathering sources), and the fact the relevant timeframe includes an "immigration enforcement blitz," App. 28. Both facts would tend to significantly *increase* the number of enforcement actions in or near places like Plaintiffs' churches or synagogues. That Plaintiffs cannot point to a plethora of such enforcement actions means the record does not establish that Plaintiffs

specifically, and places of worship more generally, are being "singled out or uniquely targeted by the government." App. 115 (alteration omitted) (quoting *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009)).

In sum, the fact that Plaintiffs' churches and synagogues are, by their own accounts, target-rich environments for immigration enforcement for an Administration committed to enforcing the law, but that there are negligible examples of actual enforcement, leads to only one conclusion: that, as the district court found, "threatened enforcement [at Plaintiffs' places of worship] is [not] 'sufficiently imminent.'" App. 115 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-159 (2014)).

Perhaps recognizing that fact, Plaintiffs attempt to bolster their arguments with extra-record evidence to which the government could not respond. Appellants' Br. 19-21, 53. But because "[t]his is not evidence drawn from the record[,] it is not proper argument in this court." *Suggs v. United States*, 407 F.2d 1272, 1276 n.5 (D.C. Cir. 1969) (per curiam). That is especially so here. One of the incidents occurred on May 20, 2025, Appellants' Br. 19—well before Appellants filed their notice of appeal on

May 30, 2025, App. 125.  Plaintiffs do not explain why they failed to bring this issue before the district court.

And while the Court should disregard these extra-record facts, they are not helpful to Plaintiffs in any event.  The enforcement action on June 11, 2025, for example, occurred "in the parking lot of a Plaintiff church," Appellants' Br. 20, and involved "a community member that was simply walking through [the] parking lot and had no connections to the church," Christian Church (Disciples of Christ) in the U.S. & Can., *A Pastoral Letter in Care for Downey Memorial Christian Church* (June 12, 2025), https://perma.cc/93VT-LFS4.  That suggests enforcement occurred incidentally at a place of worship—not that the place of worship was targeted for enforcement.  Other incidents were not enforcement actions at all but involved federal agents using church property for staging operations.  *See* Appellants' Br. 19-20.

Indeed, one of the articles Plaintiffs cite—published in August—underscores the rarity of enforcement actions at places of worship.  The article "identified . . . 10 instances of apparent immigration enforcement activity . . . since Trump's inauguration" in five states and Puerto Rico. Jack Jenkins, *'This Is Domestic Terror': Shaken by ICE Raids, Pastors*

*Rethink Ministries*, Religion News Serv. (Aug. 4, 2025), https://perma.cc/E4D6-2WNW. Ten enforcement actions in five states and Puerto Rico over roughly a six-month period is vanishingly small—and belies any claim that enforcement at any particular church or synagogue is imminent. And of course, this extra-record citation of news articles cannot form the basis for assessing the district court's ruling or findings.

Furthermore, past enforcement actions "are relevant only for their predictive value." *Murthy*, 603 U.S. at 59; *see, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974). Thus, for example, in *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 528-529 (9th Cir. 1989), past "surveillance" of churches did not, by itself, establish "standing to pursue prospective relief." In this case, the lack of actual enforcement in the weeks after the Huffman Memorandum was issued makes this a "weak record [that] gives [Plaintiffs] little momentum going forward." *Murthy*, 603 U.S. at 69. And Plaintiffs provide essentially nothing else on this front. They rely on the Administration's general policy of aggressive immigration enforcement. *See* Appellants' Br. 51-52. But that same policy failed to produce a slew of immigration enforcement activities in

or near churches or synagogues in the past. The "predictive value" of past enforcement here is that enforcement actions in or near places of worship is not imminent.

Bolstering that conclusion is the district court's finding that the Huffman and Vitello Memoranda represent "only a modest change" from the Mayorkas Memorandum. App. 116 (quotations omitted). "Just like the Mayorkas [Memorandum], the [Huffman Memorandum] does not direct immigration officers to conduct immigration enforcement activity at . . . sensitive location[s], . . . [i]t simply authorizes them to do so." Dkt. 34, at 44 (transcript of April 4, 2025, preliminary injunction hearing). That authorization is limited by the officer's "discretion" and "common sense," App. 128, and, for ICE, that the officer receive approval from an Assistant Field Office Director or an Assistant Special Agent in Charge, App. 513; *see* App. 122. Thus, the new guidance, like the old guidance, allows enforcement in sensitive locations and, for ICE activities, requires supervisor approval. There is nothing about either Memorandum that requires, or even indicates, that enforcement actions at places of worship are imminent.

Plaintiffs disagree, arguing that the Mayorkas Memorandum more clearly set an "exceptionally high bar" for enforcement at places of worship and required a higher level of approval. *See* Appellants' Br. 42-43. But given the heavy emphasis on enforcing the immigration laws by this Administration, *see, e.g.*, App. 55-56, that Plaintiffs could only muster a couple of examples of enforcement actions at places of worship shows the current guidance imposes real limits on immigration officers' exercise of discretion—that is, as the district court found, the Memoranda represent only a "modest change" from prior guidance, App. 116.

Underscoring the point is that immigration enforcement actions and surveillance occurred at Plaintiffs' churches and synagogues even under the prior guidance. *See, e.g.*, App. 281, 380 (surveillance). Plaintiff New York State Council of Churches, for example, said enforcement actions occurred "near [a] church in 2017," and that ICE arrested a person "shortly [after he left] church property" when "the sensitive locations policy was still in place." App. 375; *see* App. 169 ("[W]e have had numerous confrontations with ICE at our church over the years."). That is, the tempo of enforcement in or near worship places has, at most, barely increased, and any increase is explainable less by a sudden shift

in how immigration officials exercise their discretion in engaging in enforcement activity at places of worship and more by a policy change to focus on enforcing the Nation's immigration laws more robustly.

This case therefore has the essential features that made the threat of injury in *Clapper* speculative—a government action that does not target Plaintiffs but instead authorizes, though does not require, officials to engage in action that *may* cause an injury and, for ICE enforcement actions, requires supervisor approval. *See* 568 U.S. at 411-413. The minimal examples of immigration enforcement actions at Plaintiffs' churches and synagogues (three enforcement actions; at most four instances of surveillance), or elsewhere, and the modest discretion the Huffman and Vitello Memoranda provide federal officials, means the only logical inference on this record is the one the district court came to: there is "no credible threat of imminent enforcement." App. 117. Plaintiffs simply fail to show the district court erred—much more that it clearly erred—in reaching that conclusion.

3.    To avoid the high bar of clear error review, Plaintiffs claim the district court analyzed imminence by "incorrectly appl[ying] a stricter test largely borrowed from the context of preenforcement challenges to

firearms statutes." Appellants' Br. 47. Plaintiffs argue the court needed to look to whether they intended "to engage in the violative conduct at issue, against the conventional background expectation that the government will enforce the law." Appellants' Br. 49 (quotations omitted),

By its terms, that test is an ill fit here. The challenged guidance simply vests federal officials with discretion about whether to engage in enforcement actions at sensitive locations, including places of worship. *See* App. 128, 512-513. It does not impose proscriptions or duties on Plaintiffs, and so Plaintiffs cannot intend "to commit . . . acts" that violate proscriptions or shirk duties imposed by it. *Act Now to Stop War & End Racism Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) (quotations omitted). And indeed, the cases on which Plaintiffs rely in arguing for their test involve statutes and regulations proscribing or mandating certain action by the challengers. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739-740 (D.C. Cir. 2016) (standing to challenge a regulation eliminating a plaintiff's discretion to manage internet traffic on its network); *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 79

(D.D.C. 2019) (standing because the plaintiffs wished to engage in "prohibited" conduct).

Because the Huffman and Vitello Memoranda vest enforcement discretion in federal officials, the question for standing purposes is whether Plaintiffs are speculating "as to how" federal officials "will exercise their discretion," *Clapper*, 568 U.S. at 412, or whether Plaintiffs can point to "any specific action [that] is threatened or even contemplated against them," *United Presbyterian Church*, 738 F.2d at 1380. *See Trump*, 592 U.S. at 133 (finding a claimed injury too speculative because how federal actors would exercise their discretion created "fundamental uncertainty"); *see also Noem v. Vasquez Perdomo*, 2025 WL 2585637, at *2 (U.S. Sep. 8, 2025) (Kavanaugh, J., concurring in the grant of the application for stay) ("What matters is the '*reality* of the threat of repeated injury,' not 'subjective apprehensions.'") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983)). Considering whether there is "a special law enforcement priority" or whether Plaintiffs have "been 'singled out or uniquely targeted'" is consistent with that analysis and thus wholly appropriate. App. 115 (quoting *Ord*, 587 F.3d at 1140).

**\*\*\***

"In sum, [Plaintiffs] . . . do[] not establish that injury based on potential future [immigration enforcement] is certainly impending." *Clapper*, 568 U.S. at 414. "To give these plaintiffs standing on the basis of threatened injury would be to acknowledge, for example, that all churches would have standing to challenge a statute which provides that search warrants may be sought for church property if there is reason to believe that felons have taken refuge there. That is not the law." *United Presbyterian Church*, 738 F.2d at 1380.

As a result, Plaintiffs lack associational standing. The churches and synagogues they represent do not "have standing to sue in their own right" and, in all events, "the participation of individual members in the lawsuit" would be necessary to determine whether a threat of enforcement as to them is imminent. *Center for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015) (quotations omitted); *see id.* at 597 ("Member participation is not required where a suit raises a pure question of law and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any

aggrieved member of the organization." (quotations omitted)). The district court properly rejected this theory of standing.

## B. Because enforcement is not imminent, Plaintiffs cannot establish standing based on alleged conscience and pocketbook harms

Because Plaintiffs cannot show standing based on an imminent threat of an immigration enforcement action, they attempt to "manufacture standing . . . by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Murthy*, 603 U.S. at 46 (quoting *Clapper*, 568 U.S. at 416). Specifically, Plaintiffs argue that the current guidance forces them to choose between welcoming "immigrants" and making them "an easy target for enforcement action," or "withdraw[ing] that welcome by cutting back on their . . . religious services and ministries." Appellants' Br. 57-58. In either case, they argue, they have suffered a conscience injury. Appellants' Br. 58. Plaintiffs also argue that as a result of the current guidance, they have incurred costs "to protect their congregants and visitors." *Id*.

The district court held that because there was no imminent threat of enforcement, those injuries were the product of a "'subjective chill' and

'fear' of enforcement." App. 123 (quoting *American Library Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C. Cir. 1992)); *see* App. 124. As a result, "the causal link between [the injuries] and an immigration raid at a place of worship is 'simply too speculative or too attenuated to support Article III standing.'" App. 123 (quoting *Alliance for Hippocratic Med.*, 602 U.S. at 393); *see* App. 124. That is correct. *See, e.g., Clapper*, 568 U.S. at 416 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending."). And Plaintiffs do not dispute that this theory of standing fails if, as is the case, enforcement is not imminent; they simply argue (incorrectly) that the risk of immigration enforcement is imminent. *See* Appellants' Br. 59; Appellants' Br. 60 ("Such measures are driven by a fear of enforcement operations that is far from speculative or subjective."). Because it isn't, Plaintiffs do not have standing based on these purported harms.

## III. Plaintiffs Cannot Establish Standing Based On Declines In Attendance At Events

Plaintiffs claim standing based on the present harm of a decline in attendance at worship services and social service events. *See* Appellants' Br. 25-45. Plaintiffs concede that this "injury arises from third-party

conduct," Appellants' Br. 30—namely, others' decision to attend or not attend worship services or community service events. To establish traceability and redressability, Plaintiffs must therefore provide "substantial evidence of a causal relationship between the" Huffman and Vitello Memoranda and people's decision not to attend worship services or social service events, and that evidence must leave "little doubt as to causation and the likelihood of redress." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (quotations omitted).

## A. The record does not establish that the decline in attendance is traceable to the challenged guidance or would be redressed by a favorable decision

1.    As the district court explained, "multiple affiants . . . attested[] [that] congregants are afraid to leave their homes as a result of increased ICE activity" in the broader community. App. 119 (quotations omitted) (gathering record cites); *see, e.g.*, App. 298 ("One GED student specifically mentioned not wanting to leave her house until patrol cars had left the area."); App. 360 (mentioning congregants "too scared to leave home to worship"); App. 365 ("Reports of ICE enforcement in the area have had a chilling effect on the willingness of many immigrants to go out in public."). That "evidence suggests that

congregants are staying home to avoid encountering ICE in their own neighborhoods, not because churches or synagogues are locations of elevated risk." App. 119; *see, e.g.*, App. 322 (linking the "astronomical" "level of fear in the Latino community" to the Administration's "mass arrest and deportation policy"). Plaintiffs' failure to provide evidence differentiating "between the effects of broader immigration enforcement priorities" and the current guidance defeats their claims of traceability. App. 119.

The district court's analysis—which is firmly grounded in the record—is correct. Plaintiffs, to be sure, claim that at least "[s]ome declarants spoke specifically to the risk of enforcement action *at* their places of worship due to the rescission." Appellants' Br. 31. But the parts of the record Plaintiffs cite do not establish that the fear of enforcement stems from the Huffman or the Vitello Memorandum. For example, Plaintiffs note that one "declarant testified that '[a]ttendance at services has declined, and my congregants tell me that the reason is that they fear that [ICE] or [CBP] will target our church.'" Appellants' Br. 31 (alterations in original) (quoting App. 370). But a fear that ICE or CBP will target a church could just as plausibly arise from the

Administration's decision to engage in "enforcement actions across the country" and to launch "the largest mass deportation operation in American history." App. 55-56 (quotations omitted). That is, that fear could, as the district court found, just as plausibly—if not more plausibly—stem from "the [A]dministration's broader immigration crackdown" rather than the relatively minor changes in internal agency guidance about enforcement at sensitive locations at issue here. App. 119. Of a similar ilk are statements that congregants do not "feel safe in their house of prayer," that "[t]hey do not believe the church is a safe place anymore," that they "fear of ICE raids," or "that they are afraid of coming to synagogue." Appellants' Br. 32 (first quoting App. 487; then quoting App. 254; then quoting App. 288; and then quoting App. 414).

Ultimately, those statements are "limited in nature," App. 120, because they do not expressly link the claimed fear to DHS's internal guidance about enforcement in sensitive places and are too cursory and conclusory to rule out that the decline in attendance is due to the Administration's "broader immigration enforcement priorities." App. 119; *see* App. 120. Indeed, Plaintiffs suffer from an even more fundamental evidentiary defect—they provided no evidence that

congregants at *every* Plaintiff organization "even *knew*" about the new guidance. *TransUnion LLC*, 594 U.S. at 438. The upshot: Plaintiffs' failure to rule out that the Administration's broader, more well-publicized enforcement actions are the cause of the declines in attendance means there exists an "independent intervening or additional causal factor[]," and thus the drop in attendance is not "fairly traceable to the" challenged guidance. *Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991) (quotations omitted).

Nor is that the only intervening or additional causal factor. Plaintiffs link the decline in attendance to an alleged "imminent risk of an enforcement action." Appellants' Br. 31 (quoting App. 196). But as discussed, *see supra* Part II.A, immigration enforcement at their places of worship is not imminent; there is only a "fear[] of hypothetical future harm that is not certainly impending," *Clapper*, 568 U.S. at 416. As a result, attendance declines are also attributable to congregants' "subjective" "perception of" the risk of immigration enforcement at a place of worship, *Laird*, 408 U.S. at 13, and not the Huffman and Vitello Memoranda.

To be sure, there are at least two statements that suggest some congregants were aware of the Huffman and Vitello Memoranda, and that the former rescinded the Mayorkas Memorandum. One is a statement from the General Secretary of the Church of the Brethren that a decline in attendance at one congregation is due to "word spread[ing] that ICE and CBP has become active in the area and that churches are no longer considered off limits." App. 196-197. Another declarant claims that a congregant "stopped attending services because of the sensitive locations policy rescission." App. 461. But those conclusory statements do not undermine the district court's holding. The first statement references general enforcement activity, fails to rule it out as the cause, and fails to connect DHS's current guidance to the decline in attendance. Those statements could also be the product of a subjective chill brought about by the risk of immigration enforcement. The second statement, for example, in addition to lacking any details or specificity, is wholly consistent with a general concern about increased enforcement.

In sum, the district court did not clearly err in concluding Plaintiffs failed to show traceability.  It was, in fact, correct.[6]

2.     "For similar reasons, the plaintiffs have not shown that a preliminary injunction would redress their alleged attendance injury."  App. 121; *see Alliance for Hippocratic Med.*, 602 U.S. at 380 ("[C]ausation and redressability[] are often flip sides of the same coin." (quotations omitted)).  As the district court explained, an injunction barring DHS's use of the Huffman Memorandum, and thus "a return to the Mayorkas Memorandum[,] without reverting to the 'enforcement priorities of the prior [A]dministration' would not remedy" Plaintiffs' attendance declines because it "would not mitigate the risks cited by congregants of leaving their homes generally, or of traveling to or from religious services."  App.

_____

[6]     A district court reached a different conclusion in a separate challenge to the internal guidance.  *See Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 315-318 (D. Md. 2025).  That decision is not binding, is incorrect, and is currently being appealed.  *See Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. 25-1512 (4th Cir. filed May 6, 2025).  Moreover, it is based on an entirely different record.  Courts have generally eschewed categorical rules or shortcuts in the standing context, focusing instead on whether the facts of the case meet the requirements of Article III.  *See, e.g., Alliance for Hippocratic Med.*, 602 U.S. at 384 (explaining causation is "not a 'mechanical exercise'" but one that requires a "heavily fact-dependent" analysis (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984))).

121. It is also speculative that it would lead to less enforcement at sensitive locations, as the Mayorkas Memorandum conferred "only limited protections against immigration officers' exercise of discretion." App. 121. Nor would it necessarily ease the subjective fear congregants have of the risk of immigration enforcement.

Plaintiffs essentially admitted that fact when they requested relief broader than merely enjoining the Huffman and Vitello Memoranda and reinstating the Mayorkas Memorandum. Plaintiffs requested an injunction against *all* enforcement activities "absent exigent circumstances or" the "execution of a judicial warrant." App. 106. That is more restrictive than the Mayorkas Memorandum, which created a non-exclusive list of instances where "enforcement action needs to be taken in or near a protected area." *See* App. 132-133. Plaintiffs argued the broader relief was necessary to account for the fact "the entire enforcement policy scheme"—not just the current guidance for enforcement actions in sensitive areas—changed with the new Administration. Dkt. 34, at 11. Only that additional relief, they claimed, would restore "the status quo of the chances that there would be a[n] immigration raid in the plaintiffs' places of worship." *Id*. at 12. For that

to be true, the attendance declines must be the result of something besides the rescission of the Mayorkas Memorandum by the Huffman Memorandum—and that "something" is, as Plaintiffs admitted, "the entire enforcement policy scheme"—*i.e.*, the government's robust enforcement of immigration law overall.

## B.   Plaintiffs' remaining arguments are meritless

1.    Plaintiffs claim that the district court applied the wrong standard for evaluating traceability and redressability.  *See* Appellants' Br. 34-36.   A significant—and telling—feature of this argument is Plaintiffs' heavy reliance on so-called "commonsense inferences."  *See* Appellants' Br. 30; *see also* Appellants' Br. at 33, 35, 40-42.   But "plaintiffs had the burden to prove" standing, and their reliance on inferences to fill evidentiary gaps in a record they compiled is "insufficient to support standing." *TransUnion LLC*, 594 U.S. at 439.  All this argument does is underscore that the record does not support Plaintiffs' position.

That, of course, is not to gainsay the relevance of commonsense inferences.  For example, the "analysis of causation and redressability . . . recognize[s] commonsense economic realities," *Diamond Alternative*

*Energy*, 606 U.S. at 116, and thus courts can apply "basic economic logic" in evaluating standing, *United Transportation Union v. Interstate Commerce Commission*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989). Plaintiffs, however, do not show that there is a similar basic logic to apply here. They claim it is "wholly predictable" that rescinding a "policy offering certain protections for places of worship" will lead to a decrease of attendance and "that reinstating the prior policy would likely alleviate some of that fear and prompt some . . . to return." Appellants' Br. 35. But to make that claim, Plaintiffs must disregard the "broader immigration enforcement actions" this Administration has taken and the fact the changes in the sensitive location guidance are modest. App. 119. Rescission of the Mayorkas Memorandum was not the only change relating to immigration enforcement this Administration has made—but the inference Plaintiffs request the Court to draw assumes just that. Moreover, and as previously discussed, the Huffman and Vitello Memoranda are not a drastic departure from the Mayorkas Memorandum but instead a "modest change in the internal guidance that DHS is providing." App. 116 (quotations omitted). As a result, the

inference that congregants will respond diametrically differently based on which memorandum applies is incorrect.

Furthermore, it fails as a matter of logic. It is not a commonsense inference to conclude that a person who is refusing to go out in public is doing so because of a change in internal agency guidance for when immigration enforcement may occur at certain locations. Rather, the commonsense inference is that more robust immigration enforcement writ large is causing the refusal. *See* App. 119.

At core, Plaintiffs' argument about commonsense inferences is an attempt to recast as a legal error their dispute with the district court's factual conclusions that they failed to tie "the rescission to the alleged declines in religious attendance" and failed to show that "a preliminary injunction would redress their alleged attendance injury." App. 121. The Court should reject this attempted end-run of the standard of review.

2. The record belies Plaintiffs' claim that the district court improperly required them to prove that the Huffman and Vitello Memoranda were the sole cause of attendance declines even though "Article III does not require the challenged action to be the only cause of a plaintiff's injury." Appellants' Br. 36. The district court concluded that

Plaintiffs failed, as an evidentiary matter, to carry their burden of showing that the Huffman and Vitello Memoranda caused declines in attendance. Rather, a change in broader enforcement priorities by this Administration, as well as subjective fears of immigration enforcement, provided congregants and participants "independent incentives to" stay home. *Murthy*, 603 U.S. at 60.

Plaintiffs thus shift to trying to lighten their evidentiary burden, arguing that "traceability is satisfied so long as even one of each Plaintiffs' congregants or social service participants stopped attending because of the policy rescission specifically." Appellants' Br. 37. To start, Plaintiffs' claim rests on their view that "[t]he loss of any congregant or social service participant injures a religious body." Appellants' Br. 28. But Plaintiffs fail to show that claimed injury (the loss of one congregant) "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC*, 594 U.S. at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). To the contrary, it would be "unprecedented and limitless" to find that churches could sue over any internal government agency guidance "affecting" their attendance by just one person. *Alliance for Hippocratic Med.*, 602 U.S.

at 391-392. Plaintiffs' claim that the loss of a single congregant or participant is inconsistent with their "religious traditions," Appellants' Br. 28, at best shows nothing "more than a frustration of [their organizational] purpose"—which "'is the type of abstract concern that does not impart standing.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).

That is consistent with *Presbyterian Church (U.S.A.)*, which Plaintiffs cite to support their position. *See* Appellants' Br. 27-28. There, standing to seek damages existed because multiple "members" of the plaintiff churches withdrew "from active participation in the churches," leading to the cancellation of "a bible study group," diversion of "clergy time . . . from regular pastoral duties," a loss of support for the churches, and "congregants [who became] reluctant to seek pastoral counseling and . . . less open in prayers and confessions." *Presbyterian Church (U.S.A.)*, 870 F.2d at 521-522. The withdrawal was the product of a long period of intrusive surveillance—"[f]rom approximately March 1984 to January 1985," federal agencies "infiltrated" the churches and "recorded several services" and church activities. *Id.* at 520. It was the impairment of the

churches' "ministries," based on intrusive, extensive government action that gave rise to an organizational injury. *See id.* at 522.

Here, however, Plaintiffs do not point to intrusive, extensive government action at their church; nor do they point to ministries that have been canceled because of such action. As they argue here, the organizational injury they claim to have suffered is simply a decline in attendance. *See, e.g.*, Appellants' Br. 28 ("The loss of any congregant or social service participant injures a religious body."). Plaintiffs have therefore not shown a cognizable, organizational injury. The district court, to be sure, assumed without deciding that they had. *See* App. 117-118. But this Court is fully empowered to reach this issue, hold otherwise, and affirm the district court on that basis. *See, e.g.*, *National Council of Agric. Emp'rs v. U.S. Dep't of Labor*, 143 F.4th 395, 404 (D.C. Cir. 2025) (The Court has "an independent duty . . . to assure [itself] that this case satisfies the requirements of Article III.").

In all events, Plaintiffs' argument is question-begging for they have *not* shown where in the record "one of each Plaintiffs' congregants or social service participants stopped attending" in response to the current internal guidance. Appellants' Br. 37. Indeed, Plaintiff Central Atlantic

Conference United Church of Christ does not mention a decline in church attendance when discussing alleged present burdens. *See* App. 164-165, 169-170.[7]  Plaintiffs' treatment of themselves "as a unified whole" is simply an attempt to "gloss[] over complexities in the evidence" that undermine their case. *Murthy*, 603 U.S. at 60.

Plaintiffs push the related claim that "[t]he district court made a . . . legal error when it required that Plaintiffs demonstrate that 'religious attendance would *rebound*'" to show redressability.  Appellants' Br. 37 (quoting App. 121).  All they had to do, they argue, is show that "it is likely that at least one of each Plaintiff's congregants or social service participants will return if a preliminary injunction issues."  Appellants' Br. 38.  This variation on Plaintiffs' traceability argument fails for essentially the same reasons—not the least of which is, to reiterate, Plaintiffs' failure to provide evidence for each Plaintiff that there was a decline in attendance traceable to the Huffman and Vitello Memoranda.

Finally, requiring Plaintiffs to show that their injuries are traceable to the current guidance will not allow the government to "shield

---

[7]    Thus barring relief for this Plaintiff regardless of the outcome for the others.

itself from" legal challenges "by targeting Plaintiffs' immigrant congregants in so many different ways that no single action is the predominant cause of Plaintiffs' injury." *Contra* Appellants' Br. 38. The district court did not hold that Plaintiffs lacked standing because their harms were predominantly caused by some other government action. The district court held that Plaintiffs lacked standing because they failed to show that the Huffman and Vitello Memoranda caused the complained-of attendance declines. Even treating the Memoranda as part of "the [A]dministration's broader" immigration enforcement policies, as Plaintiffs do, *see* Appellants' Br. 41 (quotations omitted) (citing App. 110-111), does not mean that responses to that overall policy are traceable to this single part. *See California v. Texas*, 593 U.S. 659, 678-680 (2021) (finding traceability lacking where harms arose from other statutes than the one challenged).

3.   Plaintiffs' claim that the district court demanded "'objective statistical evidence'" or "evidence from the third parties themselves," Appellants' Br. 39 (quoting App. 120); *see* Appellants' Br. 39-40, misstates the court's analysis. As is clear from the court's decision, it was noting

the lack of evidence Plaintiffs provided to connect the claimed declines to the challenged guidance. *See* App. 120.

Plaintiffs' argument underscores the breadth of their position. Instead of providing specific, detailed evidence connecting their alleged declines in attendance with the Huffman Memorandum or the Vitello Memorandum, they argue for standing based on general assertions that the challenged guidance is causing harm to all of them. This would reduce the standing analysis to "mere pleading requirements" as opposed to treating it as "an indispensable part of the plaintiff[s'] case." *Lujan*, 504 U.S. at 561. The district court properly held Plaintiffs to their task of supporting their standing "with the manner and degree of evidence required" for a preliminary injunction, *id.*, and properly found they had not discharged it.

# CONCLUSION

For the foregoing reasons, the district court's denial of Plaintiffs' preliminary injunction should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

AUGUST E. FLENTJE
MICHAEL E. TALENT

*s/ Michael E. Talent*
*Attorneys*
*Department of Justice*
*Civil Division, Room 7533*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8976*
*Michael.Talent@usdoj.gov*

December 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a) because it contains 12,872 words, excluding exempted parts. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Michael E. Talent*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Michael E. Talent*